UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JAN MARTÍNEK, | ) | |
| | ) | |
| Plaintiff | ) | **CLASS ACTION COMPLAINT** |
| | ) | |
| v. | ) | |
| AMTRUST FINANCIAL SERVICES, INC., | ) | |
| BARRY D. ZYSKIND, GEORGE | ) | |
| KARFUNKEL, AND LEAH KARFUNKEL, | ) | |
| | ) | |
| Defendants | ) | |

1.     Plaintiff, Jan Martínek ("Plaintiff"), alleges the following upon information and belief, except for those allegations as to his own acts, which are based upon Plaintiff's personal knowledge, against AmTrust Financial Services, Inc. ("AmTrust" or "the Company"), its chief executive officer ("CEO"), and certain of its directors.  Plaintiff's information and belief is based on, among other things, the independent investigation of his counsel.  This investigation included, but was not limited to, a review and analysis of: (a) AmTrust's public filings with the Securities and Exchange Commission ("SEC"); (b) research reports by securities and financial analysts; (c) transcripts of AmTrust's conferences; (d) other publicly available presentations by AmTrust; (e) AmTrust's press releases; (f) news and media reports concerning AmTrust and other facts related to this action; (g) data reflecting the pricing and trading volume of AmTrust preferred shares; and (h) other publicly available material and data, including as identified herein.

## NATURE OF THE ACTION

2.     Plaintiff, by his attorneys, brings this class action on behalf of a Class consisting of himself and all other persons who purchased any of AmTrust's six series of preferred stock (some represented by depositary shares) on the open market on a U.S. stock exchange during the period January 22, 2018, through January 18, 2019 ("Class Period").

3.     AmTrust is essentially a family-run business.  Before taking the Company private in November 2018, Defendants Barry D. Zyskind ("Zyskind"), George Karfunkel, Leah Karfunkel, and their family members and affiliates (collectively, the Karfunkel-Zyskind Family) owned approximately 55% of AmTrust.  Pursuant to an Agreement and Plan of Merger, dated as of March 1, 2018, as amended by an amendment dated June 6, 2018 (the "Amended Merger Agreement," collectively, the "Merger Agreement"), between AmTrust, Evergreen Parent, L.P. ("Parent"), and Evergreen Merger Sub., Inc. ("Merger Sub"), the Karfunkel-Zyskind Family and

private equity firm Stone Point Capital LLC ("Stone Point") acquired the 45% of AmTrust's minority common shares that the Family did not own, for $14.75 per share (the "Merger" or the "Buyout").

4.     Only the common stock was acquired in the Merger. However, AmTrust also had approximately a billion dollars' worth of issued preferred stock outstanding, which had only been issued a few years before (from 2013 to 2016). The cost to acquire the recently issued preferred stock, had the merger been so designed, would have materially increased the cost of the Merger to the Karfunkel-Zyskind Family and Stone Point ("Acquirers"). Upon the announcement of a potential Merger, stockholders and stock market professionals repeatedly expressed concern over the future of the preferred stock. Further, many holders of preferred stock also owned common stock that was being solicited by AmTrust and the Karfunkel-Zyskind Family to vote in favor of the Merger. Accordingly, in order to allay concerns of those common stock investors who also owned preferred stock and the market about the future of the preferred stock, and to encourage preferred stockholders who also held common stock to vote in favor of the Merger, Defendants publicly and repeatedly reassured investors about the future for AmTrust's preferred stocks. Specifically, Defendants informed the investing market that, unlike the common shares, which were being acquired in the Buyout, the six series of publicly traded AmTrust preferred stock— which had been sold to public retail investors with the explicit commitment in the underwriting documents that they would be listed on the New York Stock Exchange ("NYSE")—were not being purchased in the Merger, but, as represented in the Buyout proxy, would continue to be listed on the NYSE and would remain listed and outstanding following the Merger. *See, e.g.,* ¶¶ 48, 56-58, 64-68, *infra*. Contrary to these numerous and oft-issued public representations, less than two months following the close of the Merger, on January 18, 2019, AmTrust announced it would

delist all six series of AmTrust preferred stock from the NYSE, attempting to legitimize the delisting based on the contrived excuse "that the administrative costs and burdens associated with maintaining the listings on the NYSE and the registration exceed the benefits" and that there was a new "ownership structure" due to the Merger.  Since these costs and burdens and new ownership structure were known or had to have been known during the entire time Defendants were publicly proclaiming that the preferred stock would remain listed, the only logical conclusion is that Defendants never intended or were deliberately reckless when making their public statements that the preferred stock would remain listed on the NYSE.

5.      Immediately upon the announcement of the delisting, the prices of the preferred stocks dropped by almost 40% the very next trading day, with the preferred stocks losing hundreds of millions of dollars in value.

6.      AmTrust had been under intense investigation and scrutiny for several years with respect to its accounting methods and business practices by several governmental and regulatory agencies, including the Federal Bureau of Investigations ("FBI") and the SEC.  The delisting coming on the heels of the Buyout means that AmTrust would no longer be subject to regulatory public disclosure requirements under the Securities Exchange Act of 1934 and is thus able to impede or thwart investigations into its alleged misconduct.

**JURISDICTION AND VENUE**

7.      This action arises under Sections 10(b) (15 U.S.C. § 78j(b)) and 20(a) (15 U.S.C. § 78t(a)) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder by the SEC, and is brought on behalf of investors who purchased AmTrust preferred shares on the open market during the Class Period.

8.     In connection with the acts alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including the United States mail and facilities of a national exchange.

9.     Jurisdiction is conferred upon this Court by Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.  This action arises out of the laws of the United States.  The Courts of the United States have exclusive jurisdiction of claims brought under the Exchange Act under 15 U.S.C. § 78aa.

10.     This Court has personal jurisdiction over Defendants pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) because Defendants have sufficient contacts with the United States through their regular and substantial transaction of business therein and exercising jurisdiction over those Defendants is reasonable.

11.     Venue is proper in this District because AmTrust maintained offices in this District during the Class Period and many of the acts and transactions constituting the violations of law herein complained of occurred within this District, including the preparation and dissemination of materially false and misleading statements and corporate documents.

## PARTIES

12.     Plaintiff is a resident of the Czech Republic.   As set forth in the attached certification, Plaintiff purchased shares or depositary shares of all six series of preferred stock of AmTrust on the NYSE during the Class Period.  Plaintiff made the purchases in reliance on Defendants' material false and misleading statements and omissions of material facts and on the integrity of the market for AmTrust's preferred stock at artificially inflated prices, and was damaged upon the disclosure of Defendants' intent to delist all the series of preferred stock.

Plaintiff suffered losses of approximately $177,800 as a result of Defendants' federal securities law violations and the material false and misleading statements and omissions alleged herein.

13.    Defendant AmTrust is an insurance holding company headquartered in New York, New York and incorporated in Delaware.  Through its subsidiaries, AmTrust provides specialty property and casualty insurance products.  AmTrust provides insurance services in all fifty states, the District of Columbia, and Puerto Rico.

14.    Defendant Zyskind is the son-in-law of the late Michael Karfunkel, one of the co-founders of AmTrust, and Leah Karfunkel.  Zyskind served as a director on AmTrust's Board of Directors since 1998 and as the Chairman of the Board since May 2016.  He has also served as CEO and President of AmTrust since 2000.  Zyskind also serves as an officer and director of many of AmTrust's wholly owned subsidiaries, as well as on the boards of various other entities owned or controlled by the Karfunkel Family.  Zyskind is also the non-executive chairman of Maiden Holdings Ltd. ("Maiden Holdings"), a publicly held Bermuda insurance holding company formed by Michael Karfunkel, George Karfunkel, and Zyskind in 2007, which has several reinsurance and service agreements with AmTrust.

15.    Defendant George Karfunkel has served as a director of AmTrust since 1998. George Karfunkel is also, with his brother Michael Karfunkel, a co-founder of AmTrust.  George Karfunkel is the chairman of Sabr Group, a purported consulting company that has served as the subscription agent for certain of AmTrust's stock offerings. According to the Company's public filings, George Karfunkel owns various real estate holdings, including "major office buildings in New York, Chicago and several other cities," through entities he controls with Leah Karfunkel. Through these entities, George Karfunkel and Leah Karfunkel lease various properties to AmTrust, including its corporate headquarters.

16.     Defendant Leah Karfunkel, the widow of Michael Karfunkel, has served as a director of AmTrust since May 2016.

17.     Defendants Zyskind, George Karfunkel, and Leah Karfunkel are collectively referred to herein as the "Individual Defendants."

18.     Defendants Zyskind, George Karfunkel, and Leah Karfunkel and their affiliates ("Karfunkel-Zyskind Family") are and were a controlling group of AmTrust at the time of the statements complained of herein, directly or indirectly owning a majority of the common stock of AmTrust.   As such, they jointly filed a Schedule 13D and amendments thereto with the SEC indicating that each is a member of a "group" for purposes of reporting beneficial ownership under Section 13 of the Exchange Act, including Schedule 13D/As filed  on January 10, 2018 (Amendment No. 13), January 22, 2018 (Amendment No. 14), March 2, 2018 (Amendment No. 15), April 30, 2018 (Amendment No. 16), July 25, 2018 (Amendment No. 17), and November 30, 2018 (Amendment No. 18).

**Non-Defendant Relevant Parties**

19.     The following entities are participants in one or more of the actions described in this Complaint, but are not named as defendants herein.  For convenience sake they are identified below:

> (a)     Stone Point Capital LLC ("Stone Point"), a Delaware limited liability company headquartered in Connecticut, is a private equity firm specializing in management buyouts.  Stone Point was a participant in the Buyout of the common stock of AmTrust with the Karfunkel-Zyskind Family.

(b)     Evergreen Parent L.P. ("Parent") is a Delaware limited partnership. Its limited partners are Trident Pine Acquisition LP ("Trident Pine"), a Delaware limited partnership, which, in turn, has limited partners, to wit, Trident VII Professionals Fund, L.P., Trident VII, L.P., Trident VII DE Parallel Fund, L.P. and Trident VII Parallel Fund, L.P. Collectively, these are referred to as the "Trident Funds." Each of them is managed by Stone Point and K-Z Evergreen, LLC, a Delaware limited liability company owned by the Karfunkel-Zyskind Family. Parent was formed solely for the purpose of effectuating the Merger and other related transactions. The Trident Funds were established in 2016 to make private equity investments. Parent was a party to the Merger Agreement with AmTrust, and remains following consummation of the Merger.

## CLASS ACTION ALLEGATIONS

20.     Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of himself and persons who purchased any series of AmTrust preferred stock on the open market on a U.S. stock exchange during the Class Period (January 22, 2018, to January 18, 2019, inclusive) and were damaged as a result of Defendants' announcement of the delisting of the preferred stock. Excluded from the Class are Defendants, present and former executive officers of AmTrust and any parent, subsidiary, or affiliate of AmTrust, and the Individual Defendants' immediate family members (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)), and the legal representatives, heirs, successors, or assigns of any such excluded person.

21.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes there are thousands of members of the Class.  There are many millions of shares of each series of preferred stock issued and outstanding, and purchased during the Class Period.  Each series of AmTrust preferred stock was actively traded on the New York Stock Exchange throughout the Class Period, and each series traded on every day of the Class Period.  During the Class Period, over 3.3 million shares of Preferred Series A, over 3.9 million of Preferred Series B, over 3.5 million of Preferred Series C, almost 6 million of Preferred Series D, almost 5 million of Preferred Series E, and over 9 million of Preferred Series F, traded.  Members of the Class may be identified from records maintained by AmTrust or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

22.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

23.     Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection; he is a member of the Class; his claims are typical of the claims of all Class members; and he does not have interests antagonistic to, or in conflict with, those of the Class.

24.     There are numerous questions of law and fact that are common to the Class and predominate over any questions affecting individual members of the Class, including:

a.  Whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.  Whether Defendants misrepresented or omitted material facts concerning their plans regarding the continued listing of AmTrust preferred stock;

c.  Whether Defendants' statements omitted material facts necessary to make the statements made not misleading in light of the circumstances under which they were made;

d.  Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

e.  Whether the prices of AmTrust's preferred shares were artificially inflated during the Class Period; and

f.  Whether members of the Class were damaged by virtue of their investments in AmTrust's preferred shares during the Class Period, and if so, the appropriate measure of damages.

25.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since a multiplicity of actions could result in an unwarranted burden on the Court system and could create the possibility of inconsistent judgments. Moreover, a class action will allow redress for many persons whose claims would otherwise be too small to litigate individually. There will be no difficulty in the management of this action as a class action.

## GENERAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS

### The Preferred Stock

26.    Between 2013 and 2016, AmTrust issued six different series of preferred stock and depositary shares, which represented a $1/40^{th}$ interest in one share of the preferred stock, raising almost a billion dollars from the public. The preferred stock was issued pursuant to a prospectus and registration statement and prospectus supplements, all filed by AmTrust with the SEC. AmTrust also filed a Certificate of Designation with the SEC for each of the series of preferred stock. The six series of preferred stock that AmTrust offered for sale to the public consisted of:

(a)     6.75% Non‑Cumulative Preferred Stock, Series A, consisting of 4,600,000 (plus a potential over-allotment option of 690,000) shares, at an offering price of $25 per share, for aggregate gross proceeds of $132,250,000, which were listed and traded on the NYSE beginning in June 2013;

(b)     7.25% Non-Cumulative Preferred Stock, Series B, consisting of 115,000 shares, represented by 4,000,000 (plus a potential over-allotment option of 600,000) depositary shares, each representing a $1/40^{th}$ interest in a share of the Series B Preferred Stock, at an offering price of $25 per depositary share, for aggregate gross proceeds of $115,000,000, which were listed and traded on the NYSE beginning in June 2014;

(c)     7.625% Non-Cumulative Preferred Stock, Series C, consisting of 92,000 shares, represented by 3,200,000 (plus a potential over-allotment option of 480,000) depositary shares, each representing a $1/40^{th}$ interest in a share of the Series C Preferred Stock, at an offering price of $25 per depositary share, for aggregate gross proceeds of $92,000,000, which were listed and traded on the NYSE beginning in September 2014;

(d)     7.50% Non-Cumulative Preferred Stock, Series D, consisting of 189,750 shares, represented by 6,600,000 (plus a potential over-allotment option of 990,000) depositary shares, each representing a $1/40^{th}$ interest in a share of the Series D Preferred Stock, at an offering price of $25 per depositary share, for aggregate gross proceeds of

$189,750,000, which were listed and traded on the NYSE beginning in March 2015;

(e)    7.75% Non-Cumulative Preferred Stock, Series E, consisting of 143,750 shares, represented by 5,000,000 (plus an over-allotment of 750,000) depositary shares, each representing a 1/40th interest in a share of the Series E Preferred Stock, at an offering price of $25 per depositary share, for aggregate gross proceeds of $143,750,000, which were listed and traded on the NYSE beginning in March 2016; and

(f)    6.95% Non-Cumulative Preferred Stock, Series F, consisting of 287,500 shares, represented by 10,000,000 (plus an over-allotment of 1,500,000) depositary shares, each representing a 1/40th interest in a share of the Series F Preferred Stock, at an offering price of $25 per depositary share, for aggregate gross proceeds of $287,500,000, which were listed and traded on the NYSE beginning in September 2016.

27.    As part of each of the preferred stock offerings, AmTrust entered into Underwriting Agreements with the underwriters of the offerings in which AmTrust covenanted with respect to each series of preferred stock, in order to induce investors to purchase the preferred stock, in words or substance, *"[t]o use its commercially reasonable efforts to list the Securities on the NYSE within 30 days of the Closing Date and to maintain the listing of the Securities on the NYSE."* *E.g.,* Underwriting Agreements ¶ 6(j).  Emphasis added.  These Underwriting Agreements were attached as exhibits to the prospectus supplements (and other documents) filed with the SEC and available to the investing public.

28.    The listing and the continuation of that listing of the series of preferred stock on the NYSE was such a critical component of the preferred stock that the underwriters who sold the preferred stock for AmTrust included in the Underwriting Agreements provisions stating that their obligations were subject to there being no suspension or material limitation in the trading of the preferred stock, and the underwriters maintained the right to terminate the agreement, if prior to the closing date on the underwritings, there was a suspension or trading limitation on the NYSE with respect to the preferred stocks.  *E.g.,* Underwriting Agreements ¶¶ 5(iii) and 9.

29.    The first page of each prospectus supplement for each of the series of preferred stock stated that AmTrust "***intend[s] to apply to list the depositary shares representing the Series Preferred Stock on the New York Stock Exchange….***"  Emphasis added.

30.    Further, the terms of each of the series of preferred stock included in the respective prospectus supplements (on several pages in each supplement, including the cover pages) and on their term sheets as filed with the SEC the representation that AmTrust intended to list the respective series of preferred stock on the NYSE.  Moreover, each of the prospectus supplements repeatedly told investors that they should rely on the statements in the prospectus supplements.

31.    Additionally, the underwriting agreements pursuant to which the six series of preferred stock were publicly sold contained the agreement by AmTrust "to maintain the listing[s] of the [preferred stock] on the NYSE."

32.    The NYSE timely approved the listing of each of the AmTrust series of preferred stock, and all of AmTrust's six series of preferred stock were listed and publicly traded on the NYSE.  According to the NYSE rules, a listing on the NYSE is continuous once it is approved, as long as fees are paid by the listing company.

33.     The shares of preferred stock were redeemable or callable at various times in the future, but none of the Series were redeemable or callable prior to August 2019.  Specifically, the preferred stock was subject to optional redemption (each series subject to a redemption date, but none prior to August 2019) at a redemption price equal to $1,000 per share.  (The $1,000 was equivalent to $25 per depositary share.)  Moreover, upon any liquidation, dissolution or winding-up of AmTrust, holders of preferred stock would be entitled to the liquidation preference (after payment of liabilities) of $1,000 per share.

**Defendants Time the Buyout to Take Advantage of a Depressed Stock Price to Benefit Themselves**

34.     As noted earlier, AmTrust was founded and controlled by members of the Karfunkel-Zyskind Family.

35.     For years prior to the Buyout Proposal, AmTrust engaged in accounting practices that, when finally called into question and investigated by the SEC, as well as the New York Department of Financial Services, and the FBI, resulted in AmTrust having to restate approximately three years of financial statements from 2013 to 2017.  As a result of adverse disclosures resulting from the restatement of several years of AmTrust's financial statements, increases in loss reserves, and the disclosure of an investigation by the SEC, AmTrust's stock price dropped in half in 2017, from $27 to approximately $13.46 by the end of the third quarter of 2017, roughly equivalent to the Initial Buyout Proposal of $13.50.  Despite the disappointing performance of AmTrust common stock, AmTrust's Form 10-Q for the third quarter of 2017 (filed on November 9, 2017) stated:

> Based on the consideration of all available evidence, including analysis of quantitative and qualitative factors, ***we believe the share price decline in the nine months of 2017 is relatively short-term in nature*** and is primarily related to the restatement of prior period results and associated material weaknesses disclosed in our Annual Report on Form 10-K for the year ended December 31, 2016, ***and is***

***not indicative of an actual decline in our fair value or our reporting units' fair value.***

(Emphasis added).

36.    The Form 10-Q was signed by Defendant Zyskind.

37.    At the same time AmTrust management was representing to the investing public that the poor performance of AmTrust stock was to be short-lived, the Karfunkel-Zyskind Family and Stone Point were approaching the AmTrust Board, disclosing their intention to take the Company private.

38.    In fact, the Karfunkel-Zyskind Family had been gearing up for a take-private acquisition for months.  For example, by late May 2017, AmTrust's common stock had experienced a significant drop to $12.45 per share.  As a result, on May 25, 2017, AmTrust issued 24,096,384 shares of AmTrust common stock in a private placement, solely to the Karfunkel-Zyskind Family, at $12.45 per share.  This private placement occurred only days after a significant drop in the market price of the stock, thus clearly benefitting the Karfunkel-Zyskind Family by millions of dollars.  It increased the Karfunkel-Zyskind Family's control over AmTrust by about 10% of the Company, bringing them over 50% ownership of AmTrust, and did so at a price less than the Merger price, all a mere matter of months before the Family fully disclosed its intent to the Board to acquire AmTrust and take it private.  There was no effort by the Karfunkel-Zyskind Family to make this a public offering and allow anyone other than the Family to benefit from the depressed stock price.

39.    A few months later, in September 2017, Zyskind and Stone Point engaged in discussions about the possibility of taking AmTrust private.  However, the Company's third quarter 2017 disappointing financial results caused a decline in the price of the stock and the

discussions were halted as the Family saw the opportunity to take the Company private at a lower price.

40.    The Karfunkel-Zyskind Family and Stone Point resumed discussions and, on November 8, 2017, only a day before he would sign the 10-Q stating that AmTrust's stock performance "was not indicative of an actual decline in [AmTrust's] fair value or our reporting units' fair value," Zyskind approached the Board, suggesting a potential going-private transaction.

41.    During this time and for several years beginning in, at least, June 2013 (the month when AmTrust started issuing its preferred stock with the Series A), AmTrust had been responding to an investigation by the SEC into the Company's accounting practices, including accounting for loss and loss adjustment expense reserve estimates for AmTrust's major business lines and segments, internal controls, investment in life settlement contracts, and certain acquisitions. Although the *Wall Street Journal* had reported in April 2017 that AmTrust's accounting had been investigated by the SEC and some accounting matters had been disclosed, the SEC's five-year long investigation into AmTrust was not disclosed until AmTrust filed its 2018 proxy statement on May 4, 2018 soliciting approval of its Buyout Proposal set out below.  The SEC investigation had not been concluded and was ongoing.  The preferred stocks were not being bought out in the Proposal and their NYSE listing mandated continued public SEC filings and, thus, continued SEC scrutiny into AmTrust's accounting misconduct.

42.    Further disclosures from the SEC's investigation into AmTrust's accounting practices continued to come to light.  In mid-October 2018, the SEC announced that it had barred three former accountants at BDO USA LLP from auditing publicly traded companies because they had released an audit report for AmTrust before the underlying auditing work had been performed. BDO had been hired by AmTrust in 2013 to perform a consolidated audit of its financial statements

and internal controls.  The audit report was issued and publicly disclosed in early 2014, but the work papers were backdated and the underlying work supporting the audit report was not performed until months after AmTrust's annual report had been publicly issued.

43.    There had been no public disclosure of any final conclusions of the continuing investigations.  However, the delisting of the preferred stocks would render AmTrust no longer subject to mandatory SEC filings under the Securities Exchange Act of 1934 that would ordinarily be issued for the benefit of these stockholders.

**The Buyout Proposal**

44.    On January 9, 2018, Trident Pine Acquisition LP, an affiliate of Stone Point (by Stone Point GP Ltd, its general partner), together with Defendants Zyskind, George Karfunkel, and Leah Karfunkel and certain entities controlled by them (the "Acquisition Group"), sent a letter ("Proposal Letter") to the Board of Directors of AmTrust proposing the potential acquisition of all of the outstanding shares of common stock of AmTrust not already owned or controlled by the Karfunkel-Zyskind Family at a purchase price of $12.25 per share in cash (the "Proposal") – the lowest price for AmTrust common stock in the preceding five years.  This initial proposal was signed by David Wermuth (Vice President and Secretary of the general partner of Trident), Zyskind, George Karfunkel, and Leah Karfunkel.

45.    The Proposal contemplated only the acquisition of the Company's common stock and not any of AmTrust's preferred stock.  The Proposal Letter stated, at pg. 1:   "Finally, this proposal also contemplates that the outstanding series of AmTrust preferred stock will remain outstanding in accordance with their terms."

46.    On January 10, 2018, Defendants Zyskind, George Karfunkel, and Leah Karfunkel filed a Schedule 13D (Amendment No. 13) in which they disclosed the Proposal, attaching copies

of the Proposal Letter and a January 9, 2018 press release announcing the Proposal. The press release made no mention of the preferred stock. The Schedule 13D further announced that, as indicated in the Proposal, the Karfunkel-Zyskind Family expected that a special committee of the Board of Directors of AmTrust would consider the Proposal and make a recommendation to the Board of Directors of AmTrust.

47.     On January 10, 2018, AmTrust issued a press release announcing the formation of a special committee of AmTrust directors to review the Proposal, appointing AmTrust directors Donald T. DeCarlo, Susan C. Fisch, Abraham Gulkowitz, and Raul Rivera to serve as the committee.

48.     Shortly after the announcement of the Proposal, *Barron's* and investors queried Defendants as to the future of the preferred stock in light of the Buyout. Indeed, observers were puzzled regarding why the Karfunkel-Zyskind Family intended to keep the preferred stock listed, given that it would defeat a central justification for going private – to avoid the regulatory and public scrutiny and associated expense inherent in any publicly traded company.  To clarify the position, Defendants Zyskind, George Karfunkel, and Leah Karfunkel filed a Schedule 13D, Amendment No. 14, with the SEC on January 22, 2018, to address the preferred stock and confirm that the intent of the proposal was that all the series of the preferred stock would remain outstanding and continue to be listed on the NYSE. On January 22, 2018, the prices of each series of Preferred Stock rose following this announcement, to close between 4.2% and 6.4% higher than the preceding trading day (January 19, 2018), and by the end of that trading week had closed between 6% and 9.8% higher than the closing price on January 19, 2018.

49.     Following several weeks of negotiations with the Board, a special committee thereof, and others, on March 1, 2018, AmTrust announced ("March 1, 2018 Press Release") that

it had entered into a definitive merger agreement with Evergreen Parent, L.P., an entity formed by the Acquisition Group ("Merger Agreement") whereby the Karfunkel-Zyskind Family, the Company's majority controlling stockholder, and private equity firm Stone Point would acquire the Company's minority common shares for $13.50 per share (the "Proposed Merger") (the "Merger Price").

50.    The March 1, 2018 Press Release stated with respect to the preferred stock:

Each share of the Company's currently outstanding preferred stock will remain outstanding and it is expected that they will continue to be listed on the New York Stock Exchange following the consummation of the transaction.

51.    Stone Point and the Karfunkel-Zyskind Family also announced in the March 1, 2018 press release that their going private Proposal would allow AmTrust "to be able to focus on long term decisions, without the emphasis on short-term results."

52.    As of March 1, 2018, the Stone Point Capital website contained the following representation concerning the AmTrust Merger: "Each share of the Company's currently outstanding preferred stock will remain outstanding and it is expected that they will continue to be listed on the New York Stock Exchange following the consummation of the transaction."

53.    Given (i) the exceedingly low per-share merger price reflected in the Merger, (ii) the unmistakable (and undeniable) fact that the Karfunkel-Zyskind Family and Stone Point were opportunistically trying to take AmTrust private at the moment AmTrust's stock was trading at historic and uncharacteristic lows, and (iii) the fact that the Karfunkel-Zyskind Family already had a history of being accused of self-dealing in connection with AmTrust, Defendants realized that the Merger would face intense opposition, and that stockholder approval of the Merger by a majority of unaffiliated stockholders (a condition of the Merger closing) would be no *fait accompli*. AmTrust understood that in order to secure approval of the Merger, it would need to assuage the

concerns of many large AmTrust common stockholders who also happened to own considerable stakes of AmTrust preferred stock. These large stockholders would be voting not only as common stockholders, but also with the interest of their preferred stock holdings in mind.[1]

54. As expected, the Buyout Proposal was heavily criticized following its announcement. For example, one large AmTrust stockholder launched a public relations campaign in which it urged activist investor Carl Icahn to invest in AmTrust and wage a proxy battle opposing the Buyout.

55. On May 17, 2018, Icahn publicly disclosed that he had acquired approximately 9.4% of AmTrust's common stock and sent a letter to the AmTrust board of directors informing it that other stockholders had requested his assistance in "oppos[ing] your opportunistic going-private transaction" and that Icahn determined that the Buyout was "blatantly taking advantage of AmTrust's minority shareholders." Icahn not only publicly implored stockholders to vote against the Buyout, but also filed a lawsuit against the Karfunkel-Zyskind Family for breaches of fiduciary duty. Ironically, despite owning 9.4% of AmTrust common stock (the equivalent of nearly one-fifth of all unaffiliated stock), Icahn was unable to vote his stock against the Merger, as he bought the stock following the merger vote record date set by the AmTrust Board. As described below, AmTrust did not disclose the record date in its initial proxy (leaving instead blank placeholder text), even though the date had already been set at the time of that proxy.

56. AmTrust publicly filed a preliminary proxy to encourage stockholders to vote in favor of the Merger. In seeking to convince stockholders to vote "FOR" the Merger, the preliminary proxy represented that the preferred shares would continue to be listed on the NYSE

---

[1] Indeed, publicly available information available from Bloomberg demonstrates that several large holders of AmTrust common stock also have significant holdings of preferred stock.

following the Merger and, thus, the Company's reporting obligations under the Securities Exchange Act of 1934 would continue.  This statement was a firm, unqualified commitment that the preferred stock "will continue to be listed."  This Preliminary Proxy, filed with the SEC in a Schedule 14A on April 9, 2018, stated, at page 17:

**Q: What effects will the merger have on AmTrust Financial?**

A: The shares of common stock of the Company are currently registered under the Exchange Act, and such shares are quoted on the NASDAQ Stock Market under the symbol "AFSI." As a result of the merger, all of the shares of common stock of the Company will cease to be publicly traded and will be owned by Parent. Following the consummation of the merger, the registration of the shares of common stock of the Company and our reporting obligations with respect to such shares under the Exchange Act will be terminated upon application to the SEC. In addition, upon the consummation of the merger, such shares will no longer be listed on any stock exchange or quotation system, including on the NASDAQ Stock Market. ***However, each outstanding share of preferred stock of the Company will remain outstanding and will continue to be listed on the New York Stock Exchange following the merger and the reporting obligations with respect to such shares under the Exchange Act will therefore continue.***  (Emphasis added.)

57.    Defendants repeated this exact same unqualified false and misleading statement in a definitive proxy statement, issued by Defendants and filed with the SEC in a Schedule 14A on May 4, 2018, on pages 17-18.

**Q: What effects will the merger have on AmTrust Financial?**

A: The shares of common stock of the Company are currently registered under the Exchange Act, and such shares are quoted on the NASDAQ Stock Market under the symbol "AFSI." As a result of the merger, all of the shares of common stock of the Company will cease to be publicly traded and will be owned by Parent. Following the consummation of the merger, the registration of the shares of common stock of the Company and our reporting obligations with respect to such shares under the Exchange Act will be terminated upon application to the SEC. In addition, upon the consummation of the merger, such shares will no longer be listed on any stock exchange or quotation system, including on the NASDAQ Stock Market. ***However, each outstanding share of preferred stock of the Company will remain outstanding and will continue to be listed on the New York Stock Exchange following the merger and the reporting obligations with respect to such shares under the Exchange Act will therefore continue.***  (Emphasis added.)

58.     The definitive proxy also reprinted, at page 26, as part of the Background of the Merger section, the entirety of the original January 9, 2018 initial proposal letter in which the Individual Defendants had stated: "***Finally, this proposal also contemplates that the outstanding series of AmTrust preferred stock will remain outstanding in accordance with their terms.***"

59.     On May 25, 2018, Institutional Shareholder Services ("ISS") issued its greatly anticipated report on the Merger, which criticized the Special Committee's "less-than-robust sale process," and which concluded that "a standalone scenario seems to be a preferable alternative to the currently proposed transaction" and, accordingly, found that "a vote AGAINST the merger is warranted." ISS suggested a valuation range between $14.35 and $20.82 per share.   Among other things, ISS questioned the independence of the Special Committee's chairperson, Donald DeCarlo, and criticized certain missteps by the Committee during negotiations.  ISS also disputed AmTrust's suggestion that the Company's growth was slowing down, noting that "the publicly available information paints a less dire picture of the company's prospects."  ISS noted that Zyskind "would appear to know the company as well as anyone," and that his willingness to buy the Company at $13.50 per share implied that "the company's challenges are not so severe."

60.     The Proposal was so heavily criticized that it became clear to Defendants that it was likely that the vote on the Proposal would not satisfy the majority-of-the-minority condition that the Defendants had agreed to in order to comply with Delaware law.  Accordingly, the vote on the Merger was adjourned.

61.     Following adjournment of the Merger, Icahn and Zyskind engaged in negotiations, and within a day, the Acquisition Group agreed to increase its offer by $1.25 per share, to $14.75 per share.

- 21 -

62.    Specifically, the Merger Agreement was amended by an amendment dated June 6, 2018 (collectively, the "Amended Merger Agreement"), pursuant to which the Acquisition Group would acquire AmTrust's minority shares for $14.75 per share (the "Amended Merger") (the "Amended Merger Price").   In less than a month, Icahn's investment in 18.4 million AmTrust common shares netted him approximately $23 million.  This quick profit was sufficient to satisfy Icahn, and he agreed to support the Proposal, terminate his proxy battle, and dismiss his lawsuit.

63.    Thus, for a nominal increase in the offering price, the Karfunkel-Zyskind Family was able to cement its control over the common stock of AmTrust.  In light of this nominal increase the Amended Merger consideration now barely fell within ISS's fairness range as identified above. Consequently, and despite its considerable misgivings regarding the Merger, ISS modified its determination, recommending the Merger.

**Defendants' Additional Representations Concerning the Post-Buyout Continued Listing of the Preferred Stocks on the NYSE**

64.    Listing of a stock on a national securities exchange is an important feature to investors, the absence of which adversely affects the market and trading price of the stock.  Listing on a national securities exchange triggers a company's reporting requirements under the Securities Exchange Act of 1934.   Such reporting requirements provide stockholders with material information about their stocks.  NYSE listing also provides stockholders with a liquid trading market.  Notably, most institutional investors cannot invest in unlisted securities. Most brokerage houses cannot trade unlisted securities for their clients.  (Often, brokers would send a letter to clients advising that they need to sell the delisted instruments within very short period after the delisting.)   Investing in delisted securities is thus possible for only a very small universe of investors through a very limited number of financial intermediaries.  Delisting of a security has very negative consequences with respect to its liquidity, transferability, and price.

65.     The investing public places great reliance on the protections afforded by being listed.  Listing on the NYSE helps protect the liquidity of shares and reassures stockholders and potential purchasers that the NYSE requirements are being met.  Listing and trading on a national exchange carries implicit guarantees of trustworthiness, financial stability, and fair disclosure, as well as assurance that investors will be dealt with fairly and pursuant to law.  Among other things, the NYSE requires a majority of directors on a company board to be independent.

66.     Against the background of the initial representations that the preferred stock when offered would be listed on the NYSE and that listing would be maintained on the NYSE, any uncertainty about the future of the preferred stock arising from the initial announcement of the proposed Buyout was put firmly to rest by Defendants.  Beginning with the initial proposal to buy out the common stockholders and continuing on through the negotiations of the proposed transaction, the announcements of the entry into the definitive merger agreement, an adjournment of the special meeting to vote on the proposal, the announcement of the entry into the Amended Merger Agreement, and filings of quarterly financial results made until almost the time the Merger closed in November 2018, Defendants repeatedly represented in filings with the SEC, press releases, and in responses to questions from investors, as well as reporting in filings with state insurance commissions, that AmTrust would continue to maintain the listings on the NYSE of AmTrust's six series of preferred stock following the Merger.   Defendants consistently stated that AmTrust's preferred stock would continue to be outstanding and listed on the NYSE following the Merger, and that AmTrust would continue to pay dividends and would continue to file reports with the SEC:

(a)     The initial January 9, 2018 proposal letter, attached as Exhibit 99.3 to the Schedule 13 D, Amendment No. 13 signed by Defendants Zyskind,

George Karfunkel, and Leah Karfunkel, and filed with the SEC on January 10, 2018, stated, "Finally, this proposal also contemplates that the outstanding series of AmTrust preferred stock will remain outstanding in accordance with their terms." The January 9, 2018 press release announcing the proposal made no mention of the preferred stock. (Exhibit 99.4 to the Schedule 13D, Amendment No. 13.)

(b)     According to an article in *Barron's* written by Bill Alpert, dated January 28, 2019, when the Buyout of the common stock was first proposed in January 2018, "*Barron's* asked the insurer about the status of holders of the more than $1 billion in preferred shares and baby-bond notes. . . . [and as a consequence the] buyout group later updated its SEC filings to say they intended to pay the [preferred] dividends and maintain the preferred listings on the NYSE." *Barron's* further reported that "[b]efore the June 2018 shareholder approval of the buyout, the Zyskind group proxy said that AmTrust preferred shares would remain listed. So did the group's application to state insurance commissions, saying: '***AmTrust will continue to remain subject to certain SEC reporting requirements and requirements governing the independence of its audit committee given that its preferred stock will remain outstanding and listed on the New York Stock Exchange postmerger.***'" (Emphasis added).

(c)     On January 22, 2018, Defendants Zyskind, George Karfunkel, and Leah Karfunkel filed a Schedule 13D, Amendment No. 14, to address the

preferred stock and confirm that the intent of the proposal was that the preferred stock would remain outstanding and continue to be listed on the NYSE, amending the "Purpose of Transaction" section of the prior Schedule 13D, stating:

> Item 4 of Schedule 13D is amended by inserting the following at the end of the fourth paragraph of Item 4 in Amendment No. 13:
>
> "The proposal contemplates that each series of the Issuer's preferred stock will remain outstanding following completion of the proposed transaction in accordance with its terms. In addition, it is the Group's current intention that, following completion of the proposed transaction, ***each series of the Issuer's preferred stock will continue to be listed on the New York Stock Exchange, the Issuer will continue to file reports with the SEC and the Issuer will continue to pay dividends on each series of preferred stock on a current basis. In the future, the Issuer may take any action that is permitted by the terms of each series of preferred stock.*** " (Emphasis added.)

(d)     The Agreement and Plan of Merger dated March 1, 2018, stated, at pg. 15 (under the Section, pg. 14, titled "Effect of Merger on Capital Stock"), that "(c) each share of Preferred Stock shall remain outstanding in accordance with its terms."

(e)     On March 1, 2018, AmTrust filed a Form 8-K with the SEC and attached a copy of the Merger Agreement reflecting that the listing of the preferred stock would not be affected.

(f)     On March 1, 2018, AmTrust issued a press release announcing that the Individual Defendants and Stone Point Capital had entered into a definitive agreement to acquire the approximately 45% of AmTrust that the Individual Defendants and their affiliates did not already own or

control.  The release further stated that "[e]ach share of the Company's currently outstanding preferred stock will remain outstanding and it is expected that they will continue to be listed on the New York Stock Exchange following the consummation of the transaction."  The press release was also filed with the SEC with the Company's Form 8-K filed on March 1, 2018.

(g)     On March 2, 2018, Defendants Zyskind, George Karfunkel, and Leah Karfunkel filed a Schedule 13D, Amendment No. 15, dated March 1, 2018, in which they certified as true, complete and correct that "each share of preferred stock of the Issuer shall remain outstanding in accordance with its terms."

(h)     On March 16, 2018, AmTrust filed its annual report on Form 10-K for 2017, in which it stated (at page 1) that "[e]ach share of our currently outstanding preferred stock will remain outstanding and it is expected that the preferred stock will continue to be listed on the New York Stock Exchange following the consummation of the transaction."

(i)     On April 9, 2018, AmTrust filed a Schedule 13E-3, signed by, among others, AmTrust, the Individual Defendants, Evergreen Merger Sub, Inc. (by Defendant Zyskind, Co-President), Evergreen Parent, L.P. (by Defendant Zyskind, Manager of its General Partner, Evergreen Parent, GP, LLC), K-Z Evergreen, LLC (by Zyskind, its Manager), which stated (at pg. 2 of the January 16, 2018 presentation slides to the Organizational Meeting of the Special Committee), "… this proposal

also contemplates that the outstanding series of AmTrust preferred stock will remain outstanding in accordance with their terms," and explicitly recognized that this would require "[o]ngoing disclosure and other obligations of the preferred securities."

(j) On April 23, 2018, Henry Reinhold, Manager of the GKarfunkel Family LLC, a holding company for certain irrevocable trusts established by Defendant George Karfunkel, filed a Schedule 13D with respect to their AmTrust stockholdings, which stated, "each share of preferred stock of the Issuer shall remain outstanding in accordance with its terms."

(k) On May 4, 2018, Defendants (together with Evergreen Merger Sub, Inc., Evergreen Parent, L.P., Evergreen Parent GP, LLC, K-Z Evergreen, LLC, Rollover Stockholders, Trident Pine Acquisition LP, Trident Pine GP, LLC, Trident VII Professionals Fund, L.P., Trident VII, L.P., Trident VII DE Parallel Fund, L.P., and Trident VII Parallel Fund, L.P.) jointly filed a Schedule 13E-3 (Amendment No. 1) with the SEC and attached a copy of AmTrust's 2017 Form 10-K, which stated (at pg. 1): "[e]ach share of our currently outstanding preferred stock will remain outstanding and it is expected that the preferred stock will continue to be listed on the New York Stock Exchange following the consummation of the transaction."   This 13E-3 Amendment also attached a copy of the January 16, 2018 presentation slides to the Organizational Meeting of the Special Committee, discussed above, which stated (at pg. 2): "… this proposal also contemplates that the

outstanding series of AmTrust preferred stock will remain outstanding in accordance with their terms," and explicitly recognized that this would require **"*[o]ngoing disclosure and other obligations of the preferred securities.*"** (Emphasis added).

(l)     On August 9, 2018, AmTrust filed its quarterly report on Form 10-Q for the quarter ended June 30, 2018, signed by Defendant Zyskind and Adam Karkowsky, AmTrust's Chief Financial Officer.  The 10-Q stated that "[e]ach share of the Company's preferred stock will remain outstanding in accordance with its terms through consummation of the proposed merger transaction [pg. 28]" and "[e]ach share of our preferred stock will remain outstanding in accordance with its terms through consummation of the Merger [pg. 57]."  Zyskind certified that the 10-Q did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

(m)     On November 9, 2018, AmTrust filed its quarterly report on Form 10-Q for the quarter ended September 30, 2018, signed by Defendant Zyskind and Adam Karkowsky.  This 10-Q similarly reported that "[e]ach share of the Company's preferred stock will remain outstanding in accordance with its terms through consummation of the proposed merger transaction [pg. 30]" and "[e]ach share of our preferred stock will remain outstanding in accordance with its terms through

consummation of the Merger [pg. 60]." AmTrust further stated in this 10-Q (at pg. 58) that "[m]anagement believes we will have sufficient liquidity to satisfy our needs over the next twelve months, including the ability to pay interest on our debt and dividends on our preferred shares." Zyskind certified that the 10-Q did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

(n)    It has also been publicly reported by *Barron's* and in the complaint filed in the *Keefe, Bruyette & Woods, Inc. v. AmTrust Financial Services, Inc.* action discussed herein, that AmTrust made a similar representation "to state insurance commissions in connection with seeking approval of the 2018 Merger stating: "AmTrust will continue to remain subject to certain SEC reporting requirements and requirements governing the independence of its audit committee given that its preferred stock will remain outstanding and listed on the New York Stock Exchange postmerger."

67.    Moreover, in the preliminary and final Merger proxies, Defendants represented to the investment community that the preferred stock would continue to be listed on the NYSE following the Merger. The Preliminary Proxy, filed with the SEC in a Schedule 14A on April 9, 2018, before the market opened, stated, at page 18:

**Q: What effects will the merger have on AmTrust Financial?**

A: The shares of common stock of the Company are currently registered under the Exchange Act, and such shares are quoted on the NASDAQ Stock Market under the symbol "AFSI." As a result of the merger, all of the shares of common stock of the Company will cease to be publicly traded and will be owned by Parent. Following the consummation of the merger, the registration of the shares of common stock of the Company and our reporting obligations with respect to such shares under the Exchange Act will be terminated upon application to the SEC. In addition, upon the consummation of the merger, such shares will no longer be listed on any stock exchange or quotation system, including on the NASDAQ Stock Market. ***However, each outstanding share of preferred stock of the Company will remain outstanding and will continue to be listed on the New York Stock Exchange following the merger and the reporting obligations with respect to such shares under the Exchange Act will therefore continue.*** (Emphasis added.)

68.     Defendants repeated this false and misleading statement in a definitive proxy statement, issued by Defendants and filed with the SEC in a Schedule 14A on May 4, 2018, before the market opened, on pages 17-18:

**Q: What effects will the merger have on AmTrust Financial?**

A: The shares of common stock of the Company are currently registered under the Exchange Act, and such shares are quoted on the NASDAQ Stock Market under the symbol "AFSI." As a result of the merger, all of the shares of common stock of the Company will cease to be publicly traded and will be owned by Parent. Following the consummation of the merger, the registration of the shares of common stock of the Company and our reporting obligations with respect to such shares under the Exchange Act will be terminated upon application to the SEC. In addition, upon the consummation of the merger, such shares will no longer be listed on any stock exchange or quotation system, including on the NASDAQ Stock Market. ***However, each outstanding share of preferred stock of the Company will remain outstanding and will continue to be listed on the New York Stock Exchange following the merger and the reporting obligations with respect to such shares under the Exchange Act will therefore continue.*** (Emphasis added.)

69.     On June 21, 2018, a majority of unaffiliated stockholders (67.4%) voted to approve the Amended Merger Agreement.

**The Merger Closing and Almost Immediate Delisting of All the Preferred Stocks**

70.     The Buyout closed on November 29, 2018, and the Acquisition Group acquired the remaining unaffiliated shares of common stock of AmTrust.

71.    Less than two months later, after the close of business on Friday, January 18, 2019, just before the three-day Martin Luther King holiday weekend, and contrary to Defendants' representations throughout 2018 in the Merger Agreement, the Proxies, other SEC filings and public statements, AmTrust issued a press release announcing the delisting of all six series of the preferred stock (as well as two series of subordinated notes), the last remaining publicly traded AmTrust equity securities.

72.    Following the procedure under Exchange Act Section 12(d) and Rule 12d2-2(c) (17 CFR 240.12d2-(c)) and NYSE Rules 806.02 and 808.00, AmTrust began the delisting process by filing a Form 8-K with the SEC announcing its intent to delist the Preferred Securities from the NYSE and issuing a press release to the same effect.

73.    The January 18, 2019 press release announced that AmTrust's board of directors had approved the voluntary delisting and deregistration of all six series of its publicly traded preferred stock, Series A, B, C, D, E, and F.  The press release stated, *inter alia*,

> AmTrust Financial Services, Inc. ("AmTrust" or the "Company") today announced that its Board of Directors has approved the voluntary delisting of all six series of preferred stock and two series of subordinated notes from the New York Stock Exchange.
>
> The Company intends to voluntarily delist the Series A Preferred Stock (NYSE: AFSI-PA) (the "Listed Preferred Stock"), the Company's Depositary Shares representing 1/40th of a share of its Series B, C, D, E and F Preferred Stock, respectively (NYSE: AFSI-PB, AFSI-PC, AFSI-PD, AFSI-PE, AFSI-PF) (collectively, the "Listed Depositary Shares"), the Company's 7.25% Subordinated Notes due 2055 (NYSE: AFSS) and the Company's 7.50% Subordinated Notes due 2055 (NYSE: AFST) (collectively, the "Listed Subordinated Notes", and with the Listed Preferred Stock and the Listed Depositary Shares, the "Listed Securities").
>
> The Company intends to file with the Securities and Exchange Commission ("SEC") a notification on Form 25 on or about January 28, 2019 to delist and deregister the Listed Securities under Section 12(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). The Company expects the delisting of the Listed Securities to become effective on or about

February 7, 2019 at which time AmTrust's SEC reporting obligations with respect to the Listed Securities will be suspended.

***AmTrust's decision to delist and deregister the Listed Securities was based on its determination that the administrative costs and burdens associated with maintaining the listings on the NYSE and the registration exceed the benefits given the small number of record holders and low daily trading volume. In addition, this decision was made in light of the Company's new ownership structure and the resulting changes to its longterm strategy, following the completion of AmTrust's go-private transaction on November 29, 2018 and the delisting of its common stock.*** (Emphasis added.)

74.    Thus, despite all the representations about the listing of the preferred stock, barely seven weeks after the Merger closed, and less than three years since the last preferred instruments were issued (with the condition that the preferred stock be listed on the NYSE), AmTrust announced that its Board—which contained the same members pre-Merger, in addition to certain additional board members from Stone Point who joined the Board following the closing of the Merger Agreement—had approved the delisting.

75.    The delisting was to become effective on or about February 7, 2019, "at which time AmTrust's SEC reporting obligations with respect to the [preferred stock] will be suspended."

76.    The publicly professed rationalization for why AmTrust's Board made this decision to delist was based on its "determination that the administrative costs and burdens associated with maintaining the listings on the NYSE and the registration exceed the benefits given the small number of record holders and low daily trading volume." The press release also identified "the Company's new ownership structure" since the Merger, and made a vague reference to the "resulting changes to its long-term strategy" as reasons for the delisting.  The "administrative costs and burdens associated with maintaining the listings on the NYSE and the registration" were certainly facts that were knowable and known or ignored with deliberate recklessness at the time when Defendants were publicly stating throughout 2018 that the preferred stock would remain

listed.  Moreover, if such "costs" were an actual issue, the listing could have been moved to another exchange, such as NASDAQ.  Instead, the preferred stocks are now traded on the "pink sheets," with none of the protections afforded by being listed on the NYSE or another national exchange. Defendants' prior statement that the preferred stock "will remain" listed was an implicit acknowledgment that they had conducted an adequate investigation of the costs of retaining that listing and would not delist the preferred stock based on known or knowable facts at the time of their false statements.

77.    Similarly, it was absolutely known during 2018 what AmTrust's "new ownership structure" would be post-Merger.  No indication or explanation was given by any Defendant as to how these facts only arose after the Merger was approved, and suddenly became known by them less than two months after the closing of the Merger, and only became a consideration shortly before they would have had to publicly disclose their financial results and file their annual and quarterly reports with the SEC.

78.    The vague, passing reference to the "small number of record holders" is deceptive since Defendants know that the majority of purchasers own the stock in street name through, for example, Cede & Co. and that there are undoubtedly thousands of persons who purchased the billion dollars of preferred stock.

79.    Further, none of these "explanations" for the delisting were included as "risks" related to the preferred stock in AmTrust's 2017 Form 10-K or any other submission made to the SEC by any Defendant that was filed during the Class Period.

80.    In truth, no explanation was or has been given as to why these justifications and rationalizations for the delisting were only anticipated *after* approval for the Merger was already secured and *after* the Merger had closed.

81.     The effect of the announcement of the delisting on the trading prices of the preferred stock was quick and devastating.  There was approximately $1 billion worth of preferred stock outstanding.  As *Barron's* reported, "The announcement of the delisting resulted in a 40% decrease in the trading price of the preferred stock and some of AmTrust's notes." *Barron's* also noted that the delisting was a **"seeming reversal of promises that AmTrust managers made to the [SEC] and state insurance regulators."** Bill Alpert, "Troubled Insurer AmTrust to Delist Preferred Stock," *Barron's*, Jan. 28, 2019. (Emphasis added).

82.     Specifically, the very next trading day following the announcement of the delisting, the prices of all the series of the preferred stock dropped, as Barron's reported, by almost 40%, losing over $300 million in value in one day as a result of the announcement of the delisting.  The following table illustrates the closing price and the extent of the immediate and devastating decline for each preferred stock series:

| Series | January 18, 2019 closing price | January 22, 2019 closing price | % Decline |
|---|---|---|---|
| A | $14.13 | $8.88 | 37% |
| B | $14.71 | $9.30 | 38% |
| C | $15.96 | $9.50 | 37% |
| D | $14.97 | $9.62 | 36% |
| E | $16.02 | $9.85 | 39% |
| F | $14.18 | $8.94 | 37% |

83.     This market reaction clearly demonstrates the materiality of the Defendants' false and misleading statements and the damage to Plaintiff and the other purchasers of the preferred stocks, once the truth was revealed.

84.    Not only was the price decline sharp and immediate, the fact of delisting eliminated financial reporting protections under the Securities Exchange Act of 1934 afforded by the listing. Thus, the preferred stockholders would no longer receive material information about AmTrust and its financial condition, which would continue to undermine any trading market for the preferred stock, and the Karfunkel-Zyskind Family would no longer be subject to the regulatory scrutiny that had plagued them in the past.

85.    The "cost savings" obtained by the delisting was, in actuality, a transfer of wealth from the holders of the preferred shares to the Acquisition Group, the new 100% equity holders. These savings presumably went straight to the new AmTrust's bottom line, potentially increasing profits that benefitted the post-closing equity holders, while the almost 40% drop in the value of the preferred that was caused by the delisting damaged the public holders of those preferred shares.

86.    Unsurprisingly, preferred stockholders were shocked and angry. For example, Plaintiff, a principal of Central European Capital Partners, (and purchaser of all six series of AmTrust preferred stock during the Class Period) issued an open letter to Stone Point, challenging the delisting decision and stating that Stone Point was compromising its reputation by agreeing to the delisting decision, which enriched it and the Karfunkel-Zyskind Family at the expense of "retail" investors.  Plaintiff also submitted a letter to the SEC objecting to the delisting, and noting that he purchased preferred equity specifically in reliance on AmTrust's assurances that the shares would remain listed, and urging the SEC to commence an investigation.

87.    Other investors have expressed similar sentiments, and have contacted AmTrust directly to note their disapproval, including others who have commenced litigation.

88.    Further, Keefe, Bruyette & Woods, Inc. ("KBW"), an underwriter for AmTrust preferred securities and debt notes, sued AmTrust in New York State Supreme Court, Index No.,

650695/2019, asserting claims for breach of contract (among other things) and alleging reputational harm in connection with AmTrust's delisting announcement. KBW moved to preliminarily enjoin AmTrust from proceeding with the delisting, urging it to postpone the effectiveness of the delisting.  It also contacted the SEC.  As alleged in its complaint:

> 4. One of the selling features for the Depositary Shares was the fact that they were to be listed on the NYSE. A listing on a national securities exchange, such as the NYSE, triggers a company's reporting requirements under the Securities Exchange Act of 1934. The reporting requirements provide securities holders with continuous information material to their investment in the company including quarterly reports, annual reports, proxy solicitations and notice of unscheduled material events or corporate changes. Listing on the NYSE also provides securities holders with a liquid trading market.

> 5. In the Underwriting Agreement for the Series F Depositary Shares dated September 20, 2016 (the "Underwriting Agreement"), AmTrust explicitly covenanted that it would keep the Depositary Shares listed on the NYSE. AmTrust gave the exact same covenant in the Underwriting Agreements for all of the Preferred Shares (series A-F) and the two issues of Subordinated Debt Notes.

89.    KBW alleged that the delisting deprived the holders of the preferred securities of "material company information," and "remove[d] a liquid trading market for these securities." As a result, KBW alleged that "the delisting will significantly damage KBW's and its affiliate's customer relationships," "damage KBW's reputation as an underwriter," "significantly impair KBW's and its affiliate's reputation and goodwill," and that "it is obvious that tens of thousands of retail investors have already been negatively impacted by AmTrust's public announcement of its intent to delist its Preferred Shares."

90.    On February 7, 2019, a justice in New York State Supreme Court, New York County, denied KBW's request for a temporary restraining order to enjoin the delisting, stating that "[w]ith respect to the decrease in [preferred] share price, ***this is a harm to the investor***" (such as Plaintiff), not an underwriter like KBW.  (Emphasis added.).  On July 29, 2018, the New York

Supreme Court Justice dismissed KBW's complaint without prejudice, reiterating the points raised in its February 7, 2019 ruling, and stating that KBW failed to properly allege that it, as AmTrust's underwriter, suffered direct injury as a result of the delisting.

91.    Several preferred stockholders also filed an action against AmTrust in New York State Supreme Court, alleging, among other things, breach of contract and other common law claims.  *See Matlick v. AmTrust Financial Services, Inc.*, Index No. 651349/2019.  AmTrust has moved to dismiss the complaint.

92.    On February 7, 2019, AmTrust filed a Form 15 advising that it had terminated listing of all the series of preferred stock.  The Form 15, signed by Stephen Ungar, Senior Vice President, General Counsel and Secretary of AmTrust, was entitled "Certification And Notice Of Termination Of Registration Under Section 12(g) Of The Securities Exchange Act of 1934 or Suspension of Duty [*sic*] to File Reports Under Sections 13 And 15(d) of the Securities Exchange Act of 1934."

**Scienter**

93.    In addition to the foregoing facts, Defendants' scienter is further illustrated by the following:

(a)    Defendants manipulated the record date for the vote on the Merger. AmTrust filed the preliminary proxy to solicit votes in favor of the Merger on April 9, 2018.  When AmTrust filed the preliminary proxy, the record date for the stockholder vote was left blank, as is typically done in preliminary proxies.  The blank date gave the clear impression that a record date had not then yet been determined.  On May 4, 2018, AmTrust filed a definitive proxy, which indicated that the record date

for being entitled to vote on the Merger was April 5, 2018, a date several days prior to the filing of the preliminary proxy on April 9th.  Under applicable Delaware law, a record date cannot be set prior to the board adopting a resolution setting the date.  Thus, when the preliminary proxy was issued there had already been a resolution setting the date and Defendants knew, and failed to disclose, what the record date was.  Thus, Defendants prevented stockholders from buying shares in order to vote against the Buyout and ensured that potentially tens of millions of shares purchased in April 2018 were unable to vote on the Merger.  For example, Icahn, the chief agitator against the Merger and holder of approximately 9.4% of AmTrust stock (and nearly double that percentage when considering only unaffiliated shares entitled to vote on the Merger) could not vote his shares at the stockholder meeting.  By setting the record date and not disclosing it until a month later, Defendants were successfully able to reduce the number of shares that might have voted against the Merger.  ISS called this tactic into question, and, upon an investigation comparing it with other precedent transactions, found it to be "out of the ordinary" and "anomalous."

(b)     Preferred stockholders holding millions of shares of preferred stock also owned common stock that was being solicited by the Karfunkel-Zyskind Family to vote in favor of the Merger.  In order to allay concerns of investors and the market about the future of the preferred stock, as well as to encourage preferred stockholders who also held

common stock to vote their common shares in favor of the Merger,
Defendants publicly represented that the six series of publicly traded
AmTrust preferred stock that were not being purchased in the Merger
would continue to be listed on the NYSE.

**Loss Causation**

94.     As alleged herein, Defendants engaged in a scheme to deceive investors in preferred
shares during the Class Period by misrepresenting and omitting material facts concerning the future
of the preferred shares, including their continued listing on the NYSE.

95.     Relying upon the integrity of the market price of AmTrust's preferred shares and
public information relating to AmTrust and the continuation of the listing of the preferred shares
on the NYSE, Plaintiff and the other Class Members purchased or otherwise acquired AmTrust's
Series A, B, C, D, E, and/or F preferred shares at prices that incorporated and reflected Defendants'
misrepresentations and omissions of material fact, as alleged herein.

96.     Plaintiff and the Class suffered actual economic loss and were damaged when the
foreseeable risks of Defendants' fraudulent scheme and concealment by the Defendants'
misstatements and omissions were disclosed upon the disclosure of the planned delisting of all the
series of preferred stock.

97.     As a direct and proximate result of the announcement of the delisting, the price of
every series of AmTrust preferred stock dropped almost 40% in a single day, a market loss of over
$300 million.

98.     As set forth herein, Defendants' wrongful conduct directly and proximately caused
the damages suffered by Plaintiff and the Class.  Throughout the Class Period, the prices at which
Plaintiff and the Class purchased AmTrust preferred stock were artificially inflated as a result of

Defendants' materially false and misleading statements and omissions of material fact concerning the future viability and market for AmTrust's preferred shares. Had Defendants disclosed complete, accurate, and truthful information during the Class Period concerning their intent and future plans to delist the preferred shares, Plaintiff and the Class would not have purchased or otherwise acquired AmTrust's preferred shares either at all or at the artificially inflated prices that they paid. It was entirely foreseeable to Defendants that engaging in the fraud designed to tout the continued listing on the NYSE of the preferred shares likely enabled the successful affirmative vote approving of the Merger, and the concealment of their intent from the public would cause the prices of AmTrust's preferred shares to be artificially inflated, or would maintain existing artificial inflation. It was also foreseeable that the ultimate disclosure of this information, and/or the materialization of the risks concealed by Defendants' material misstatements and omission, would cause the price of AmTrust's preferred shares to decline.

99.    Thus, Defendants' conduct, as alleged herein, proximately caused foreseeable losses to Plaintiff and the Class who purchased or otherwise acquired AmTrust's preferred shares during the Class Period.

100.    The economic losses, i.e., damages, suffered by Plaintiff and the Class are direct and foreseeable results of: (i) Defendants' materially false or misleading statements and omissions of material fact; (ii) the perpetuation of the fraudulent scheme; and (iii) the subsequent declines in the prices of AmTrust's preferred shares when the truth was revealed upon the announcement of the delisting.

**Presumption of Reliance**

101.    At all relevant times, the market for AmTrust's preferred shares was efficient for the following reasons:

(a)     The preferred shares met the requirements for listing, and were listed and traded daily on the NYSE, a highly efficient and automated market.

(b)     As a regulated issuer, AmTrust filed periodic reports with the SEC and the NYSE.

(c)     AmTrust regularly communicated with public investors via established market communication mechanisms, including the regular issuance of press releases on major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services, as further evidenced by AmTrust's communications with *Barron's* and subsequent filing with the SEC in response to inquiries from *Barron's* concerning AmTrust's plans with respect to the continued listing of AmTrust's preferred shares on the NYSE.

(d)     AmTrust was followed by market professionals, rating agencies, and securities analysts including *Barron's*, A.M. Best, JMP Securities LLC, SunTrust Humphries Robinson, and Compass Point Research & Trading LLC, which wrote reports that were distributed to the market, brokerage firms' sales force, and various customers.  Each of these reports was publicly available and entered the public market place.

102.   As a result of the foregoing, the market for AmTrust's preferred shares promptly digested current information from all publicly available sources and reflected such information in the prices of AmTrust's preferred shares.  Under these circumstances, purchasers of AmTrust's

preferred shares who purchased during the Class Period suffered similar injury through their purchase of preferred shares at artificially inflated prices, and a presumption of reliance applies.

103.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their statements in violation of a duty to disclose such information.

## COUNT I

### Against Defendants for Violation of Sections 10(b) of The Exchange Act and Rule 10b-5 Thereunder

104.    Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

105.    Defendants participated in a course of conduct involving misrepresentation and concealment of adverse material information about the continued listing of the preferred shares of AmTrust as specified herein.

106.    Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of fraudulent conduct as alleged herein in an effort to assure investors of the continued listing of AmTrust's preferred securities, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statement made about listing of the shares, in light of the circumstances under which they were made, not misleading.  This conduct operated as a fraud and deceit upon the purchasers of AmTrust's preferred shares during the Class Period.

107.    Defendants are liable as direct participants in the wrongs complained of herein.

108.    Had Plaintiff and the other members of the Class known of the material adverse information not disclosed by Defendants, or had they been aware of Defendants' material

misstatements, they would not have purchased AmTrust's preferred shares at artificially inflated prices.

109.    Plaintiff and the Class were injured because the risks that materialized were risks of which they were unaware as a result of Defendants' misrepresentations, omissions, and other fraudulent conduct alleged herein.  The material decline in the price of AmTrust's preferred shares was caused by the public dissemination of the true facts, which were previously concealed or hidden.  Absent Defendants' wrongful conduct, Plaintiff and the Class would not have been injured.

110.    The price of AmTrust's preferred shares declined materially upon public disclosure of the true facts, which had been misrepresented or concealed, as alleged in this complaint. Plaintiff and other members of the Class have suffered substantial damages as a result of the wrongs alleged herein.

111.    By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Against the Individual Defendants
### Pursuant to Section 20(a) of the Exchange Act

112.    Plaintiff incorporates by reference and realleges each of the foregoing allegations.

113.    The Individual Defendants had direct involvement in the day-to-day operations of the Company and had the power to control or influence the particular statements giving rise to the securities violations as alleged herein, and exercised the same.

114.    As set forth above in Count I, AmTrust violated Section 10(b) and Rule 10b-5 promulgated thereunder by its acts and omissions as alleged in this Complaint.

115.    By virtue of his positions as Chairman, President and CEO of AmTrust, and a member of the group that controlled AmTrust, Defendant Zyskind is liable for the Company's violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as alleged in Count I, pursuant to Section 20(a) of the Exchange Act.

116.    By virtue of their positions as directors and controlling stockholders of AmTrust, Defendants George Karfunkel and Leah Karfunkel are liable for the Company's violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as alleged in Count I, pursuant to Section 20(a) of the Exchange Act.

117.    As a result of the deceptive practices and false and misleading statements and omissions, the market price of AmTrust's preferred shares was artificially inflated during the Class Period.  In ignorance of the materially false and misleading nature of the representations described above and the deceptive and manipulative devices employed by Defendants, Plaintiff and the other members of the Class, in reliance on either the integrity of the market and/or directly on the statements and reports of Defendants, purchased AmTrust's preferred shares at artificially inflated prices.

118.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

119.    By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the Exchange Act.

120.    Plaintiff and the other members of the Class have been damaged by the violations as described in this Count and seek recovery for the damages caused thereby.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of itself and the other members of the Class, prays for judgment as follows:

1.     Declaring this action to be a proper class action maintainable pursuant to Fed. R. Civ. P. 23(b)(3) and declaring Plaintiff to be a proper Class representative;

2.     Awarding Plaintiff and the other members of the Class damages suffered as a result of the wrongs complained of herein, together with appropriate interest;

3.     Awarding Plaintiff and the other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

4.     Awarding Plaintiff and the other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury for all claims so triable.

DATED: August 28, 2019

WOLF POPPER LLP


By: _____*Carl L. Stine*_____
         Carl L. Stine
Patricia I. Avery
Adam J. Blander
845 3rd Avenue, 12th Floor
New York, New York 10022
(212) 759-4600

*Counsel for Plaintiff*