UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| JAN MARTÍNEK, | ) | |
| | ) | No. 19-cv-8030-KPF |
| Plaintiff, | ) | (Failla, J.) |
| | ) | |
| v. | ) | |
| AMTRUST FINANCIAL SERVICES, INC., | ) | |
| BARRY D. ZYSKIND, GEORGE | ) | |
| KARFUNKEL, AND LEAH KARFUNKEL, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**WOLF POPPER LLP**
Carl L. Stine
Patricia I. Avery
Adam J. Blander
845 Third Avenue, 12th Floor
New York, New York 10022
(212) 759-4600
cstine@wolfpopper.com

*Attorneys for Lead Plaintiff Jan Martínek and Lead Counsel for the Putative Class*

TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND .................................................................................................................... 2

    A. AmTrust and Its Preferred Stock ............................................................................... 2

    B. AmTrust Experiences Controversy............................................................................ 2

    C. Defendants Announce Their Buyout Plans and Repeatedly Assure Investors of Their Intention to Continue Listing the Preferred Stock, Post-Buyout ........................................ 3

    D. Contrary to Their Prior Assurances, Defendants Announce the Delisting of the Preferred Stock, and the Stock's Trading Price Immediately Sinks .................................... 8

ARGUMENT ........................................................................................................................ 9

    I. LEGAL STANDARDS ON A MOTION TO DISMISS ...................................... 9

    II. PLAINTIFF HAS ADEQUATELY ALLEGED SECURITIES VIOLATIONS ............. 10

    A. Plaintiff Has Adequately Alleged That Defendants' Statements Were Misleading ......... 11

    1. Representations that the Preferred Stock Would Remain Listed on the NYSE ............... 12

       a. "Expectations" and "Intentions" of Continued Listing ................................................ 12

       b. Representations that the Stock "Will" Continue to be Listed ....................................... 14

    2. Defendants' Representations to Insurance Regulators .................................................... 16

    3. Statements That the Preferred Shares Would Remain "Outstanding in Accordance With Their Terms".......................................................................................................... 17

    4. Deutsche Bank's Presentation........................................................................................ 19

    B. Plaintiff Has Adequately Alleged Defendants' Scienter ................................................. 20

    1. Defendants Personally and Concretely Benefitted From the Fraud .............................. 20

    2. There Exists Strong Circumstantial Evidence of Conscious Misbehavior .................... 23

    III. IN THE ALTERNATIVE, PLAINTIFF SHOULD BE GRANTED LEAVE TO REPLEAD.......................................................................................................... 25

CONCLUSION.................................................................................................................... 25

TABLE OF AUTHORITIES

**Cases**

*In re Am. Int'l Grp. Inc.,*
  741 F. Supp. 2d 511 (S.D.N.Y. 2010) ................................................................................ 11

*In re AmTrust Fin. Services, Inc. S'holder Litig.,*
  No. 2018-0396-AGB, 2020 WL 914563 (Del. Ch. Feb. 26, 2020) .................................... *passim*

*Basic v. Levinson,*
  485 U.S. 224 (1988) .......................................................................................................... 15

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.,*
  957 F. Supp. 2d 277 (S.D.N.Y. 2013) ................................................................................ 11

*City of Pontiac Gen. Emples. Ret. Sys. v. Lockheed Martin Corp.,*
  875 F. Supp. 2d 359 (S.D.N.Y. 2012) ................................................................................. 9

*Cruz v. TD Bank, N.A.,*
  742 F.3d 520 (2d Cir. 2013) .............................................................................................. 25

*Elliott Associates, L.P. v. Hayes,*
  141 F. Supp. 2d 344 (S.D.N.Y. 2000) ................................................................................ 22

*In re Gen. Elec. Co. Sec. Litig.,*
   857 F. Supp. 2d 367 (S.D.N.Y. 2012) ............................................................................... 14

*Jones v. Perez,*
  550 F. App'x 24 (2d. Cir. 2013) ......................................................................................... 13

*Kalnit v. Eichler,*
  99 F. Supp. 2d 327 (S.D.N.Y. 2000), *aff'd* 264 F.3d 131 (2d Cir. 2001) ..................... 21, 22

*Keefe, Bruyette & Woods, Inc. v. AmTrust Financial Services, Inc.,*
  No. 650695/2019, 2019 WL 3526283 (Sup. Ct. N.Y. County July 29, 2019) ................... 18

*Loreley Financing No. 3 v. Wells Fargo Securities,*
  797 F.3d 160 (2d Cir. 2015) .............................................................................................. 24

*Matana v. Merkin,*
  957 F. Supp. 2d 473, 495 (S.D.N.Y. 2013) ....................................................................... 17

*Matrixx Initiatives, Inc. v. Siracusano,*
  563 U.S. 27 (2011) ............................................................................................................ 10

*Miss. Pub. Emples. Ret. Sys. v. Boston Sci. Corp.,*
  523 F.3d 75 (1st Cir. 2008) ............................................................................................... 24

*Moon Joo Yu v. Premiere Power LLC,*
  No. 14 Civ. 7588(KPF), 2015 WL 4629495 (S.D.N.Y. Aug. 4, 2015) ........................... 9, 20

*Northstar Fin. Advisors, Inc. v. Schwab Invs.*,
  779 F.3d 1036 (9th Cir. 2015).................................................................................. 17

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)...................................................................................... 22

*Pearlstein v. BlackBerry Ltd.*,
  93 F. Supp. 3d 233 (S.D.N.Y. 2015)......................................................................... 23

*Plotkin v. IP Axess Inc., Etc.*,
  407 F.3d 690 (5th Cir. 2005)..................................................................................... 23

*In re Quintel Entm't Inc. Sec. Litig.*,
   72 F. Supp. 2d 283 (S.D.N.Y. 1999) ........................................................................ 11

*Rubinstein v. Gonzalez,*
  241 F. Supp. 3d 841 (N.D. Ill. 2017) ....................................................................... 20

*In re Sadia,*
  269 F.R.D. 298 (S.D.N.Y. 2010)............................................................................... 15

*Slayton v. Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010)...................................................................................... 14

*Sonesta International Hotels Corp. v. Wellington Associates*,
  483 F.2d 247 (2d Cir. 1973)...................................................................................... 10

*In re Stillwater Capital Partners Inc. Litig.*,
  858 F. Supp. 2d 277 (S.D.N.Y. 2012) ........................................................................ 9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ................................................................................................ 9, 19

*In re Vivendi, S.A., Sec. Litig.,*
   838 F.3d 223 (2d Cir. 2016)...................................................................................... 11

*Wilson v. Merrill Lynch & Co.*,
  671 F.3d 120 (2d Cir. 2011)...................................................................................... 15

## Statutes

15 U.S.C. § 78u-4(b)(1) ................................................................................................... 9
15 U.S.C. § 78u-4(b)(2)(A)............................................................................................... 9
15 U.S.C. § 78u-5(b)(1)(E) ........................................................................................ 11, 14
15 U.S.C. § 78u-5(b)(2)(F) ........................................................................................ 11, 15
15 U.S.C. § 78u-5(c)(1)(A)(i) .................................................................................... 11, 15

**Rules**

Fed. R. Civ. P. 15(a) ........................................................................................................... 25

Fed. R. Civ. P. 9(b) ............................................................................................................. 9

**PRELIMINARY STATEMENT**

This putative class action for securities fraud is on behalf of open market purchasers of the six series of AmTrust[1] preferred shares (collectively, the "Preferred Stock"), from January 22, 2018, through January 18, 2019.  During this Class Period, Defendants falsely assured investors that they "will" maintain the listing of the Preferred Stock on the New York Stock Exchange ("NYSE"), notwithstanding the plans of AmTrust's controlling stockholder group to acquire AmTrust's common stock in a private Buyout.  These assurances were material as the listing provided ready liquidity to investors, a dynamic Defendants do not dispute in their brief supporting their Motion to Dismiss ("OB"). On January 18, 2019, less than two months after the Buyout closed, Defendants announced they were delisting the Preferred Stock, which, unsurprisingly, caused the stock's price to plummet by nearly 40% by the next trading day.

As alleged by Plaintiff, the justification for the delisting—namely, the cost of filing public financial statements with the SEC—was known during the Class Period.  Moreover, Defendants were motivated to mislead investors given that the Buyout proposal faced intense stockholder opposition.  For example, during the Class Period, activist investor Carl Icahn commenced a proxy battle, urging minority stockholders to reject it (which initially succeeded).  Defendants needed the support of voting common stockholders who also owned preferred shares, as well as the approval of government regulators, who required assurances that the Preferred Stock would remain listed.   Defendants' willful indifference to the interests of Preferred Stockholders is further buttressed by their history of trammeling on public investors' rights, as recently recognized by the Delaware Court of Chancery.  Defendants' Motion must be denied.

---

[1] Terms not defined herein have the same meaning as defined in Plaintiff's Complaint.  References to paragraphs of the Complaint are in the form "¶__."

## BACKGROUND

### A.    AmTrust and Its Preferred Stock

Defendant AmTrust is an insurance company founded and controlled by the Karfunkel-Zyskind Family (the "Family").   As relevant here, the Family consisted of Barry Zyskind, AmTrust's CEO and Chairman of the Board, and AmTrust directors George Karfunkel and Leah Karfunkel (collectively, the "Individual Defendants").  ¶ 14.  AmTrust was required by law to maintain sufficient capital reserves to pay anticipated claims.  Rather than dilute their ownership of the Company by issuing shares of common stock to the public, the Individual Defendants, between 2013 and 2016, raised approximately $1 billion of cash through the issuance of six series of preferred stock, reflecting approximately 25% of AmTrust's equity capitalization.  ¶ 26. Preferred shares are commonly listed on the NYSE, which provides liquidity for preferred stock holdings.  Many of the popular indices that track performance of preferred shares consist only of listed shares, and many institutions are restricted from owning unlisted preferred shares.[2] Accordingly, the offering materials for the Preferred Stock obligated AmTrust to apply the stock for listing on the NYSE, and use its "commercially reasonable efforts…to maintain the listing." ¶¶ 27-29; *infra* at p.18.  AmTrust's listing, without interruption, of the preferred shares on the NYSE made each successive issuance of preferred shares more saleable.

### B.    AmTrust Experiences Controversy

As a public company, AmTrust was beset by controversy.  Since 2015, the Individual Defendants were defending against a stockholder derivative action in the Delaware Court of

---

[2]    *See,    e.g.,    iShares    Preferred    and    Income    Securities    ETF*, www.ishares.com/us/products/239826/ishares-us-preferred-stock-etf (tracking the performance of "exchange-listed" preferred securities); *see also* ¶¶ 64-65.

2

Chancery arising from their usurpation of a valuable insurance business from AmTrust.[3]

Moreover, on February 27, 2017 AmTrust announced that it had identified "material weaknesses"

in its financial reporting internal controls; on March 16, 2017, AmTrust announced it would be

increasing its loss reserves, and that its financial statements for 2014, 2015, and 2016 were

unreliable, and would be required to be restated; and on April 11, 2017, *The Wall Street Journal*

reported that the SEC, the FBI, and the New York Department of Financial Services were, with

the help of a former AmTrust auditor, investigating AmTrust's finances.  ¶¶ 35, 41.[4]   These

disclosures caused the price of AmTrust common shares to fall from $27.66 on February 24, 2017,

to $15.30 by the close of markets on April 11, 2017, as well as a number of lawsuits, including a

consolidated securities fraud action and a second derivative action.[5]   A private buyout, if AmTrust

were able to delist the Preferred Shares, would obviate the need for AmTrust to comply with the

periodic public financial reporting required of public companies under the Securities Exchange

Act.  ¶ 43.  A buyout would also extinguish any derivative liability.

> **C.**      **Defendants Announce Their Buyout Plans and Repeatedly Assure Investors of Their Intention to Continue Listing the Preferred Stock, Post-Buyout**

The Individual Defendants began preparing for a Buyout on May 25, 2017, when they

caused AmTrust to issue over 24 million common shares solely to members of the Family, at

$12.45 per share, the closing price for AmTrust that day. ¶ 38.  This $300 million private placement

gave the Individual Defendants majority control of the Company. *Id.*  By September 2017, Zyskind

---

[3] *See In re AmTrust Fin. Services, Inc. S'holder Litig.*, No. 2018-0396-AGB, 2020 WL 914563, at *3 (Del. Ch. Feb. 26, 2020) (hereinafter, "Del. Decision") (summarizing the derivative claims asserted against Defendants).

[4] Despite the report, Defendants did not acknowledge the existence of the SEC's five-year-long investigation until May 2018, when they were soliciting approval of the Buyout.  *Id. see also* ¶ 42 (identifying additional disclosures in October 2018 regarding the SEC's findings against AmTrust's accountants).

[5] *See In re AmTrust Fin. Services, Inc. Sec. Litig.*, 1:17-cv-01545-LAK (S.D.N.Y.) and *In re AmTrust Financial Services, Inc. Deriv. Litig.*, 1:17-CV-00553-MN, (D. Del.); Del. Decision at *3 (summarizing these derivative claims).

was discussing a potential Buyout with private equity firm Stone Point Capital LLC, and by November 6, 2017, Zyskind disclosed his intentions to the Board.  ¶¶ 39-40; Ex. 12 (Proxy) at 22.

On January 9, 2018, the Individual Defendants and Stone Point, their financial partner (collectively, the "Acquisition Group"), delivered to the Board a letter proposing the acquisition of all unaffiliated common shares (the "Proposal" or "Proposal Letter").  ¶¶ 44-45.  The Proposal offered $12.25 per share and "contemplate[d]" that the Preferred Stock "will remain outstanding in accordance with their terms." ¶¶ 45-46.  The Proposal was publicized by the filing of a Schedule 13D and a press release on January 10, 2018, before the market's open.   ¶ 46; ¶ 66(a).

The Proposal to maintain the Preferred Stock "in accordance with their terms" raised questions among investors.  The listing of stock would require AmTrust to continue complying with regulations governing public companies, such as the periodic public filing of financial statements and would defeat a central justification for any going-private acquisition, but particularly so for AmTrust, which was facing accounting problems, multiple investigations into its finances, stockholder lawsuits, and the corresponding negative publicity.  ¶ 46.  On the other hand, it was likely impractical for the Individual Defendants to purchase, in addition to the common stock, nearly $1 billion of Preferred Stock. ¶ 4. The publication *Barron's* made inquiries with AmTrust regarding the future of the Preferred Stock. ¶ 66(b); ¶ 101(c).

In response, on January 22, 2018 (the beginning of the Class Period), before the market opened, the Individual Defendants filed an Amended Schedule 13D, addressing investor concerns:

> The proposal contemplates that each series of the Issuer's preferred stock will remain outstanding following completion of the proposed transaction in accordance with its terms. *In addition, it is the Group's current intention that, following completion of the proposed transaction, each series of the Issuer's preferred stock will continue to be listed on the New York Stock Exchange, the Issuer will continue to file reports with the SEC* and the Issuer will continue to pay dividends on each series of preferred stock on a current basis. In the future, the Issuer may take any action that is permitted by the terms of each series of preferred stock.

4

¶ 66(c) (emphasis added). On this news, over a five-day period ending Friday, January 26, 2018, the prices of each series of Preferred Stock rose by a range of 6% to 9.8%.  ¶ 48.

On March 1, 2018, before the market's open, AmTrust announced on a Form 8-K that it had entered into a definitive Merger Agreement whereby the Acquisition Group would acquire unaffiliated common stock for $13.50 per share.   The Merger Agreement, filed as an exhibit to the Form 8-K, provided that the Buyout would not close unless a majority of unaffiliated common stockholders affirmatively voted for it.  ¶ 53.  Defendants included this provision as it is necessary to invoking Delaware's deferential "business judgment" review, a powerful defense in M&A litigation.[6] The inclusion of this provision created significant deal risk because minority stockholders had many reasons to be deeply skeptical of the Buyout.   For example, the $13.50 per-share Merger Consideration, did not appropriately value AmTrust.  The Individual Defendants had recently assured investors in AmTrust's November 9, 2017 Form 10-Q that nearly the same stock price ($13.46) was "not indicative…of fair value" and that AmTrust's recent trading price decline (as discussed above) was "short term in nature." ¶¶ 35, 40.  Thus, the Buyout was an opportunistic gambit by the Acquisition Group to take AmTrust private at the moment its common stock was trading at historic, uncharacteristic lows. ¶ 53.  Stockholders were also aware of the history of the Individual Defendants' self-dealing and inadequate accounting practices (*supra* at Sec. B; *see also infra* at pp.21, 23) and were reasonably concerned that the Buyout was just the latest example of misconduct from the Individual Defendants.  Defendants understood that the Buyout would face intense stockholder opposition.  ¶ 53.

---

[6] Del. Decision, at *1.  Indeed, on February 6, 2020, the Delaware Court of Chancery, in denying the Individual Defendants' motions to dismiss litigation attacking the Buyout as unfair to minority common stockholders, recognized this incentive, but found that, notwithstanding the existence of the provision, the Individual Defendants could still be found liable for breaching their fiduciary duties. *Id.*

5

Significantly, for the success of the Buyout proposal, certain public common stockholders also owned shares of the Preferred Stock and were only likely to support it if AmTrust were to maintain the listing for the preferred shares. ¶¶ 4, 93(b). Crucially for those voting common stockholders, AmTrust stated in a March 1, 2018 press release that, notwithstanding the just-announced Buyout, the Preferred Stock "will remain outstanding and it is expected that they will continue to be listed on the [NYSE] following the consummation of the transaction." ¶¶ 50, 66(f). AmTrust's Form 10-K, filed on March 16, 2018, made an identical representation. ¶ 66(h). That AmTrust "expected" to continue listing the Stock, assuaged voting stockholders who also owned Preferred Stock that their investments would remain liquid. *See, e.g.,* ¶¶ 41, 93(b). These assurances were made to tip the scales to favor the Buyout. *Id.*

On April 9, 2018, before the market opened, Defendants issued a Preliminary Proxy urging stockholders to vote in favor of the Buyout. Dispensing with the earlier representations that this was merely Defendants' "expect[ation]," the Proxy now contained a firm, unqualified commitment to continue listing the Preferred Stock, post-Buyout. Specifically, in response to the question "What effects will the merger have on AmTrust Financial?" the Proxy answered that, unlike the common stock, the Preferred Stock unqualifiedly "*will* remain outstanding and *will* continue to be listed on the [NYSE] following the merger and the reporting obligations with respect to such shares under the Exchange Act *will* therefore continue." ¶ 56 (emphasis added); Ex. 9 at 18. On May 4, 2018, before the market opened, Defendants filed a Definitive Proxy, which repeated, verbatim, the same unqualified representation that the Preferred Stock "will continue to be listed on the [NYSE] following the merger." ¶¶ 57-58; Ex. 12 at 18. Defendants' earlier qualification on January 22, 2018, that "[i]n the future, the Issuer may take any action that is permitted by the terms of each series of preferred stock" did not appear in either the Preliminary or Final Proxy.

6

As expected, the Buyout was heavily criticized, including from several large stockholders. *See, e.g.,* ¶ 54. On May 17, 2018, Carl Icahn disclosed that he had acquired approximately 9.4% of AmTrust's common stock, and that he would be waging a proxy battle and commencing litigation challenging the Buyout, which he assailed as "blatantly taking advantage of AmTrust's minority shareholders." ¶ 55. On May 25, 2018, Institutional Shareholder Services ("ISS") issued its greatly anticipated report on the Buyout, criticizing Defendants' "less-than-robust sales process," and valuing AmTrust's common stock to be between $14.35 and $20.82 (well above the $13.50). ISS recommended that stockholders vote against the Buyout. ¶ 59.

On the morning of June 4, 2018—the date of the scheduled stockholder vote—Defendants issued a press release acknowledging that the Buyout lacked support from a majority of the minority stockholders, and that they would adjourn the vote. ¶ 60. Immediately thereafter, Icahn and Zyskind engaged in negotiations, and, within a day, the Acquisition Group agreed to increase its offer by $1.25, to $14.75 per share of common stock. Icahn agreed to support the Proposal, terminate his proxy battle, and dismiss his litigation. ¶¶ 61-62. ISS issued a new report reiterating its misgivings, but modified its recommendation in favor of the Buyout. ¶ 63. Despite this Amendment to the Merger Agreement, Defendants' representations that AmTrust "will" retain the Preferred Stock listing remained unchanged, and a majority of minority stockholders approved the Buyout on June 21, 2018. ¶ 69. AmTrust's Form 10-Q filings issued thereafter, on August 9, 2018 and November 9, 2018, did not walk back the Proxies' unambiguous statements. ¶ 66 (l)&(m). Following the requisite regulatory approval,[7] the Buyout closed on November 29, 2018. ¶ 70.

---

[7] As discussed herein, Defendants' applications to state insurance commissions also represented that AmTrust would continue listing the Preferred Stock on the NYSE. ¶ 66(b)&(n).

**D.      Contrary to Their Prior Assurances, Defendants Announce the Delisting of the Preferred Stock, and the Stock's Trading Price Immediately Sinks**

Contrary to Defendants' representations, on January 18, 2019, after the market's close, and *less than two months* following the close of the Buyout, AmTrust announced it would delist all Preferred Stock from the NYSE, claiming that "the administrative costs and burdens associated with maintaining the listings on the NYSE and the registration exceed the benefits" and also citing AmTrust's new "ownership structure" due to the Buyout. ¶¶ 71-74. *Barron's* reported that the announcement was a "seeming reversal of promises that AmTrust managers made…." ¶ 81.  As discussed herein, the factors stated as reasons for the delisting were known or had to have been known during the Class Period when Defendants made the unqualified, affirmative representation that the preferred shares "will" remain listed and Defendants' brief does not attempt to suggest otherwise. *See, e.g.,* OB at 21-22.  The strong inference is that Defendants had actual knowledge of these factors during the Class Period and never intended to maintain the listing, or were deliberately reckless when stating, unambiguously, that they "will" retain the listing. ¶¶ 76-80 (explaining how the purported bases for this change of heart were clearly known).  On the trading day following the announcement of the delisting, the Preferred Stock's trading prices dropped by almost 40%, losing over $300 million dollars in market value.  ¶ 82 (identifying price decline for each series).[8]  The delisting took effect on February 7, 2019, providing significant cost-savings to the Individual Defendants, at preferred stockholders' great expense.  ¶¶ 85-92.

Plaintiff, as Defendants acknowledge, is a "sophisticated investor" who purchased shares

---

[8] In the wake of the announcement, AmTrust's underwriter, KBW, filed suit in New York State Supreme Court, claiming that AmTrust's delisting decision damaged KBW's reputation with investors. ¶ 87-90; *infra* n.19.  Another action (*Matlick*) has been filed on behalf of AmTrust's preferred stockholders and noteholders in the same court, which asserts (i) contract and third-party beneficiary claims arising from the preferred securities' offering documents issued between 2013 and 2016, and, more recently, (ii) Securities Act claims arising from alleged false statements in the 2016 Series E and Series F Preferred Stock offering materials (the earlier offerings, which had similar statements, are beyond the statute of repose). ¶ 91.  AmTrust has moved to dismiss the *Matlick*

in each series of Preferred Stock, who protested the delisting when announced, and who alleges losses of $177,800 arising from Defendants' fraud.  OB at 2, 7; ¶ 86.

## ARGUMENT

## I.    LEGAL STANDARDS ON A MOTION TO DISMISS

A plaintiff need only allege facts sufficient to state a claim that is "facially plausible," thereby "allow[ing] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *In re Stillwater Capital Partners Inc. Litig*., 858 F. Supp. 2d 277, 284 (S.D.N.Y. 2012) (citations omitted).  On a motion to dismiss, "all factual allegations" are accepted as "as true," and construed in the light most favorable to the plaintiff.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

When alleging securities fraud, a plaintiff must also comply with Fed. R. Civ. P. 9(b), which requires pleading "with particularity the circumstances constituting fraud," and the Private Securities Litigation Reform Act ("PSLRA"), which requires her to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  *Moon Joo Yu v. Premiere Power LLC,* No. 14 Civ. 7588(KPF), 2015 WL 4629495, at *7 (S.D.N.Y. Aug. 4, 2015) (J. Failla) (citing 15 U.S.C. § 78u-4(b)(1)).  The PSLRA also requires pleading a "strong inference" of scienter.  § 78u-4(b)(2)(A).  While this inference must be cogent, it "need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences."  *Tellabs,* 551 U.S. at 324.  On a motion to dismiss, "a tie on scienter goes to the plaintiff."  *City of Pontiac Gen. Emples. Ret. Sys. v. Lockheed Martin Corp*., 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012).  To

---

amended complaint based on a variety of statutory, timeliness, and contractual defenses (which are not applicable here) and the motion is *sub judice* as of today.

demonstrate scienter, "Plaintiffs can show either [i] that defendants had the motive and opportunity to commit fraud, or [ii] strong circumstantial evidence of conscious misbehavior or recklessness." *Moon Joo Yu,* 2015 WL 4629495, at \*9 (citations omitted). "Motive and opportunity" is demonstrated through showing that defendant "benefitted in some concrete and personal way from the purported fraud." *Id.*

## II.    PLAINTIFF HAS ADEQUATELY ALLEGED SECURITIES VIOLATIONS

The elements of a Section 10(b) claim are (i) falsity (i.e., a material misrepresentation or omission), (ii) scienter, (iii) a connection between the falsity and the purchase or sale of the security, (iv) reliance, (v) economic loss, and (vi) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). Defendants contend that Plaintiff has not adequately alleged two elements: falsity and scienter. They are wrong on both counts.

Defendants do not deny the materiality of their representations regarding the Preferred Stock's continued listing. Indeed, the price of the Preferred Stock immediately plummeted upon announcement of the delisting, ¶¶ 81-83, demonstrating that the value of the Stock was tied to its continued listing; *see also* ¶¶ 64, 88 (explaining why national securities exchange listing is important to investors).[9] Accordingly, the relevant inquiry is whether the Complaint sufficiently alleges facts supporting 1) a reasonable inference that at least one of Defendants' challenged statements was misleading; and 2) a strong inference that such a statement was made with a culpable state of mind. If so, then the Motion must be denied.

---

[9] *See also Van Gemert v. Boeing Co.,* 520 F.2d 1373, 1381 (2d Cir. 1975), (listing on the NYSE "carries implicit guarantees of trustworthiness" and assures that investors that they "will be dealt with fairly"); *Sonesta International Hotels Corp. v. Wellington Associates*, 483 F.2d 247, 254 (2d Cir. 1973) (delisting would "deprive…shareholders of a ready market..and of the protection of certain Exchange requirements, including its disclosure rules" and accordingly "[t]he possibility of losing these advantages" was material).

### A.     Plaintiff Has Adequately Alleged That Defendants' Statements Were Misleading

Defendants claim that their statements that AmTrust "will" maintain the listing are "forward-looking" and protected by the PSLRA's "safe harbor."  However, this affirmative defense does not protect a defendant from statements "made in connection with a going private transaction," 15 U.S.C. § 78u-5(b)(1)(E), an exception applicable to all statements challenged here, which Defendants made in connection with the Buyout process.[10]  Nor is there safe harbor from statements "made in a disclosure of beneficial ownership in a report required to be filed…pursuant to section 13(d)," § 78u-5(b)(2)(F),  such as the Amended Schedule 13D filed on January 22, 2018, the beginning of the Class Period.  ¶ 18.  *Defendants' brief ignores these statutory exceptions.*

At any rate, the safe harbor only applies if the challenged statement is forward-looking and even then only if the statement is "identified as . . . forward-looking" and "accompanied by *meaningful* cautionary statements identifying *important factors* that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i) (emphases added).  Because "statements of existing facts" can never be forward-looking statements, *see, e.g., In re Quintel Entm't Inc. Sec. Litig.,* 72 F. Supp. 2d 283, 292 (S.D.N.Y. 1999), it is "well-settled that cautionary language cannot protect against the omission of present fact." *City of Austin Police Ret. Sys. v. Kinross Gold Corp.,* 957 F. Supp. 2d 277, 313 (S.D.N.Y. 2013) (citation omitted); *In re Am. Int'l Grp. Inc.,* 741 F. Supp. 2d 511, 532 (S.D.N.Y. 2010) ("someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away" is not protected).  Similarly,

---

[10] *See also* Ex. 12 (Proxy) at Ex. 12 at 1 (AmTrust acknowledging Buyout "may be deemed a 'going private transaction' under the rules of the U.S. Securities and Exchange Commission…")

11

statements containing both forward-looking and non-forward-looking elements must be severed, the latter receiving no protection. *In re Vivendi, S.A., Sec. Litig.,* 838 F.3d 223, 246 (2d Cir. 2016).

Notwithstanding the defects in Defendants' statutory arguments, Plaintiff will analyze the challenged misstatements using the same groupings as in their Brief[11]:

### 1. Representations that the Preferred Stock Would Remain Listed on the NYSE

#### a. "Expectations" and "Intentions" of Continued Listing

During the Class Period, Defendants initially stated that they "expected" or "inten[ded]" to continue listing the Preferred Stock on the NYSE. ¶¶ 50; 66(b)-(c); 66(f); *supra* at pp. 4-6  Whether Defendants actually "expected" to continue the listing at the time of their assurances must be evaluated against the backdrop of what Defendants said when the delisting was announced months later. Specifically, Defendants claimed that, post-Buyout, "the administrative costs and burdens associated with maintaining the listings on the NYSE and the registration exceed the benefits" and that AmTrust had a new "ownership structure."  ¶ 73.  As explained in the Complaint, the Individual Defendants were the founders, longtime controlling stockholders, and directors and officers of AmTrust who, in September 2017 (four months *before* the Class Period) began planning with Stone Point, a sophisticated private equity firm with an insurance focus, to take the Company private.  ¶¶ 37-40.  And, Defendants' Acquisition Group conducted extensive due diligence as early as November 17, 2017, in advance of its January 9, 2018 Proposal.  *See* Ex. 12 (Proxy) at 22-33. Thus, the "costs and burdens" of continuing the listing and the Company's "new ownership structure" (i.e., AmTrust was now entirely owned by the Karfunkel-Zyskind Family and its affiliates, rather than just majority owned) were clearly known when Defendants were publicly

---

[11] One exception is that Defendants appear to distinguish between false statements made before the Buyout and those made thereafter (*Compare* OB Sec. I.A.3 *with* I.A.4).  Defendants do not explain how this distinction is relevant to Plaintiff's Section 10(b) claims on behalf of stock purchasers during the Class Period.

stating that they "expected" the Preferred Stock would remain listed.  Moreover, the Complaint goes through each of Defendants' purported bases for delisting and explains how they were all known months earlier, also noting that none of these purported bases were even identified as "risks" during the Class Period.  ¶¶ 76-80.

Defendants, in their brief, do not seriously attempt to offer an explanation as to why their "expect[ation]" (*e.g.*, ¶¶ 50, 52) to maintain the listing changed after only a few months, or what new information came to light causing them to reconsider.  Indeed, Defendants now acknowledge that the costs associated with the continued listing, post-Buyout, were not a "surprise."  OB at 21-22.  Instead, they repeat their public statement that those costs, at the time of the announced delisting, "exceeded the benefits given the small number of record holders and low daily trading volume." *Id.* (citing ¶ 73).  However, the trading volume for Preferred Stock was not materially different, if not lower, *during the Class Period*.[12]  Moreover, Defendants' reference to "the small number of record holders" (¶ 73) is an obfuscation as the vast majority of investors are not (and will never be) the record holders of the stock they beneficially own. ¶ 78.[13]  Thus, because the circumstances of the listing did not change from before the Buyout to after the Buyout, the only logical conclusion is that Defendants never expected to maintain the listing, or were deliberately reckless, when publicly stating that they "expected" the Preferred Stock will remain listed.  This inquiry is also relevant to the strong inference of Defendants' scienter, as discussed in Section B.[14]

---

[12] For example, during the Class Period, the Series A Preferred Stock had an average trading volume of 12,681 shares per day, *considerably lower* than the corresponding figure for the time between the November 29, 2018 Buyout closing and the January 18, 2019 announcement of the delisting, which is 22,813 shares per day.

[13] Similarly, Defendants' brief opts not to explain or even identify the "change[d] longterm strategy following the completion of [the Buyout]") supposedly justifying their delisting decision (OB at 22 (citing ¶¶ 73,76), essentially conceding that those justifications were pretextual.

[14] Defendants' reliance on *Jones v. Perez*, 550 F. App'x 24 (2d. Cir. 2013), is completely misplaced. *Jones* held that, under the circumstances alleged, no reasonable investor would have understood the defendant-company's representation of "no present intention" of filing for bankruptcy to be an assurance of "no possibility" of future bankruptcy.  *Id.* at 27.  Obviously, financial issues facing a distressed company's debt are constantly in flux, and intentions with respect to bankruptcy can change very quickly.  Certainly, even healthy companies

###### b.    Representations that the Stock "Will" Continue to be Listed

Even if the Court finds Defendants' stated "expectations" too equivocal to sustain a Section 10(b) claim (it should not), any ambiguity was snuffed out by April 9, 2018, when the Preliminary Proxy stated that the Preferred Stock "*will* continue to be listed on the [NYSE] following the merger and the reporting obligations with respect to such shares under the Exchange Act *will* therefore continue." (emphasis added).    Defendants repeated these unambiguous statements thereafter, including in the Proxies and in subsequent Form 10-Qs.    Defendants claim they "expressly identified statements in the 'Questions and Answers' section of these proxy statements as protected forward-looking statements."    OB at 6.    Putting aside the fact that these statements were made "in connection with a going private transaction" and not protected, § 78u-5(b)(1)(E), no investor would have reasonably understood assurances that Defendants unequivocally "will" take certain action within their control to be forward-looking, when the only caution was that certain unidentified statements within a dense five-page Q&A section may be forward looking. *See* Ex. 12 at 82; *Slayton v. Am. Express Co.*, 604 F.3d 758, 770-71 (2d Cir. 2010) (rejecting boilerplate and generalized warnings as insufficient to invoke safe harbor).    Moreover, unlike their earlier statements, Defendants' unqualified assurance that they "will" maintain the listing was a representation to investors that they had evaluated the competing factors and had made a definitive determination.    Barely two months after the closing of the Buyout did they acknowledge the falsity of their representation and that, in fact, at the time of the Proxy, they had made, at most, a tentative determination to maintain the listing. *See In re Gen. Elec. Co. Sec. Litig.,* 857 F. Supp. 2d 367, 380, 388, 397 (S.D.N.Y. 2012) (CEO's statement that investors could "count on a great dividend"

---

cannot completely rule out the "possibility" of future bankruptcy.  The same dynamics, however, are not present here, where the purported events occasioning AmTrust's reversal with respect to the listing *were plainly present during the Class Period.*

14

was actionable and not protected by safe harbor for forward-looking statements, when the dividend was cut over ten weeks later; CEO's scienter was also demonstrated).

Defendants also note that the Preferred Stock was listed for "a time" following the Buyout, and thus their statements are technically true. OB at 1, 12, 14. However, no reasonable investor would understand Defendants' representation of "continuing" to maintain the listing post-Buyout to leave open the possibility of delisting for only a brief seven-week moment after the Buyout closed, which is, theoretically, "a time."[15] Defendants are essentially asking this Court to close its mind to overall context when construing their statements. *See Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011) ("so-called 'half-truths' – literally true statements that create a materially misleading impression – will support claims for securities fraud."); *In re Sadia,* 269 F.R.D. 298, 302 (S.D.N.Y. 2010) (in the materiality context, noting the need to analyze "how information would be viewed by a reasonable investor, which is "influenced by considerations of fairness, probability, and common sense") (citing *Basic v. Levinson*, 485 U.S. 224, 231-32 (1988)). Waiting merely seven weeks following the Buyout to announce the delisting cannot immunize Defendants.

Defendants also point to the Individual Defendants' January 22, 2018 Amended Schedule 13D Amendment (also not protected by the safe harbor, *see* § 78u-5(b)(2)(F)), which stated that "[i]n the future, the Issuer may take any action that is permitted by the terms of each series of preferred stock." However, this caveat did not appear in the later-filed Proxies, which indicated that Defendants had abandoned any conceivable delisting intentions. At any rate, even if one looks

---

[15] Merriam-Webster includes these definitions and synonyms for the transitive verb "continue": "keep up, maintain"; "to keep going or add to"; prolong; "to allow to remain in a place or condition;" and "retain." Defendants' position must have a logical endpoint: surely they must acknowledge that a delisting announcement, say, one trading day after the Buyout's close (technically: "a time"), would render their statements false and misleading.

15

at the January 22, 2018 Amended Schedule 13D in isolation, the sentence immediately preceding the caveat quoted above still stated that it was the Individual Defendants' "current intention" that the Preferred Stock "will continue to be listed." In light of this assurance, Defendants' vague reference in the next sentence to unidentified future actions they "may" take does not protect them. § 78u-5(c)(1)(A)(i) (cautionary statement must be "meaningful" and clearly identify the future event). Moreover, as explained in Section II.3, the delisting was, in fact, not permitted by the stock offering terms.

### 2. Defendants' Representations to Insurance Regulators

The Complaint identifies a January 28, 2019 *Barron's* article quoting the Acquisition Group's applications to state insurance commissions who needed to sign off on the Buyout, which assured these regulators that "AmTrust will continue to remain subject to certain SEC reporting requirements and requirements governing the independence of its audit committee given that its preferred stock will remain outstanding and listed on the [NYSE] postmerger." ¶ 66(b). Defendants do not deny that *Barron's* has quoted them faithfully. Instead, they observe that the article was published after announcement of the delisting, and thus Plaintiff could not have relied on it. However, the fact that Defendants' representations to state regulators mimic those made to the investing public strengthens Plaintiff's allegation that Defendants understood that the reader would reasonably understand that Defendants were committing to keeping the stock listed "postmerger." That is because state regulators would obviously discount, if not entirely reject, Defendants' assurances that AmTrust would "continue to remain subject to certain SEC reporting requirements and requirements governing the independence of its audit committee" if Defendants also disclosed that such obligations would terminate, at Defendants' unilateral discretion, once the Buyout was approved (which is what occurred). The consistency of Defendants' statements—

regardless of whether the audience was AmTrust investors or insurance commissions—demonstrates that the statements to investors was misleading, and, moreover, constitutes circumstantial evidence of Defendants' knowledge of their statements' falsity, or at the very least, misleading potential.[16]   Accordingly, the inference of scienter, discussed in the next section, is strongly inferable.

### 3.    Statements That the Preferred Shares Would Remain "Outstanding in Accordance With Their Terms"

Plaintiff also alleges that Defendants' representations that the Preferred Stock would "remain outstanding in accordance with their terms" was false, or at least materially misleading. Defendants claim these statements were true because the Preferred Stock remains outstanding, and that the terms of the governing stock instruments entitle AmTrust to delist at any time.  OB at 9-10.  The latter point is not accurate.  The Prospectus Supplements, which describe the terms of the governing certificate of designation and deposit agreements for the Preferred Stock (OB at 4, n.5) stated that AmTrust "intends to apply to list" the stock's depository shares on the NYSE.[17] Defendants claim that this assurance must be discounted because AmTrust included cautionary language in the original Registration Statements noting the risk that the Preferred Stock may not be approved for listing, and "[e]ven if they are,…there may be little or no secondary market."  OB at 10 (citing Ex. 1 at 20).  But the Preferred Stock *was* approved for listing, neutralizing that risk entirely.  Had Defendants wished to alert investors to the risk that AmTrust would decide to delist

---

[16] To state the obvious: had Defendants made representations to insurance commissions that were inconsistent with their public representations to investors, the commissions would have noticed.  The uniformity of Defendants' representations (however insincere) was thus crucial in obtaining approval of the Buyout.

[17] ¶ 29. Defendants' commitment to abide by the "terms" of the Preferred Stock included those found in the depository agreements *and* those found in the document actually selling the stock: the Prospectus.  *See Northstar Fin. Advisors, Inc. v. Schwab Invs.*, 779 F.3d 1036 (9th Cir. 2015) (plaintiff stated contract claim arising from deviation from objectives stated in registration statement and prospectus); *Matana v. Merkin*, 957 F. Supp. 2d 473, 495, n.10 (S.D.N.Y. 2013) (undisputed that subscription applications "incorporate by reference the 1996 Prospectus").

*following* approval, they should have so articulated.[18]  Similarly, the risk of "little or no secondary market" is far too generic to have put investors on notice of the risk that AmTrust would unilaterally decide to delist. *See Slayon, supra*.  In fact, there existed prior to the delisting an active, efficient market for AmTrust preferred shares.  Moreover, any purported risks were mitigated by Defendants' unequivocal statements during the Class Period that AmTrust "will" maintain the listing, post-Buyout.

Similarly, the Underwriting Agreements, incorporated by the prospectus supplements, required AmTrust to use its "commercially reasonable efforts…to maintain the listing," entitling the underwriter to terminate if trading was limited on the NYSE.  Referencing without describing AmTrust's brief seeking dismissal of the KBW action, Defendants claim that the underwriting agreements did not contain a promise to list the Preferred Stock "in perpetuity." OB at 10-11.[19] However, as KBW explained in its own brief, no one is suggesting an obligation "in perpetuity;" even the most recently issued Series F Preferred Stock was redeemable by AmTrust as early as September 2021.  2019 WL 3754697, n.4; *see generally id.* at Sec.II.A.B. (refuting AmTrust's contractual defenses).  Defendants also assert, conclusorily, that Plaintiff is not a third-party beneficiary to the underwriting agreements.  OB at 10.  However, whether or not Plaintiff has standing to enforce the terms therein, the underwriting agreements—attached as exhibits to the prospectus supplements and filed with the SEC—are certainly relevant in evaluating the falsity of the representation during the Class Period that preferred shares would continue to be outstanding

---

[18] Obviously, Defendants' reference to the generic disclaimer that "there can be no assurance that actual developments will be those anticipated by us" (OB at 10, citing to Ex. 1 at 4,48) is inapposite here, given that the decision to delist was made unilaterally by Defendants, and did not involve assumptions "beyond [their] control." *Id.*

[19] Notably, the court declined to adopt these contractual defenses, dismissing KBW's action (without prejudice) solely on the ground that the Preferred Stock's loss in value was to investors, like Plaintiff, not KBW. *See Keefe, Bruyette & Woods, Inc. v. AmTrust Financial Services, Inc.*, No. 650695/2019, 2019 WL 3526283 (Sup. Ct. N.Y. County July 29, 2019).

18

"in accordance with their terms."

### 4.    Deutsche Bank's Presentation

During the Class Period, Defendants also filed a presentation from the Special Committee's financial advisor, Deutsche Bank ("Deutsche"), confirming their intent to maintain the Preferred Stock listing.  Specifically, the presentation identified as a "key term" Defendants' proposal that the preferred shares "remain outstanding in accordance with their terms," and under the "comments/areas for clarification" column for this statement, Deutsche recognized this meant the "[o]ngoing disclosure and other obligations of the preferred securities." ¶ 66(i), (k). This is important because it shows that Deutsche understood Defendants' representation that the stock will "remain outstanding in accordance with its terms" to include the commitment to maintain the listing on the NYSE, as it was the *listing*, rather than the continued outstanding nature of the stock, that would require "ongoing disclosure…obligations" from the SEC. *Id*.  Defendants' Brief mischaracterizes the presentation, claiming that "ongoing disclosure" was an "area [identified by Deutsche] to be clarified in the future."  OB at 11 (including slide).  But there are other statements in the slide pointing out areas to be clarified, such as "silent on converts / debt," "discuss financing condition (not in press release)" and "Understand potential appraisal rights condition."  *Id.*  This shows that when Deutsche identified areas in need of clarification, it clearly stated so.  That sort of identified uncertainty is absent from the challenged Deutsche statement Defendants disseminated, which is plainly a "comment," not an "area for clarification."  At the very least, in the event of any perceived ambiguity (OB at 6 (acknowledging Deutsche "did not specify" whether this was an "an area for clarification")), Plaintiff is entitled to every favorable inference.

19

### B.     Plaintiff Has Adequately Alleged Defendants' Scienter

#### 1.     Defendants Personally and Concretely Benefitted From the Fraud

"The court's job is not to scrutinize each allegation [of scienter] in isolation but to assess all the allegations holistically." *Tellabs*, 551 US at 326.  Here, the Individual Defendants, AmTrust's controlling stockholder family, understood that acquisition of the Preferred Stock would materially increase the cost of a Buyout.  ¶ 4.  This posed a problem for the Individual Defendants, who wished to take AmTrust private and evade the financial reporting obligations that had plagued them and the Company in recent years.  ¶¶ 6, 41, 48, 84.  The Individual Defendants sought to assuage the market, state insurance commissions, and stockholders voting on the Buyout by representing that the Preferred Stock would remain listed and that AmTrust would continue to be subject to reporting requirements.  Based on these representations, the Buyout was approved by stockholders and government regulators. Then, two months after the Buyout closed, the Individual Defendants pulled the rug from underneath everyone, obtaining private status and going "dark," without going through the trouble of acquiring the approximately $1 billion of Preferred Stock. And, as described earlier in Section II.A.1, Defendants' purported reasons for the delisting were obviously known during the Class Period.  This is a classic bait and switch and Defendants' fraudulent intent is strongly inferable from the facts alleged.  *See Rubinstein v. Gonzalez,* 241 F. Supp. 3d 841, 856 (N.D. Ill. 2017) (scienter established when CEO appeased worried workers that company was "more energized" about pursuing acquisition, even though company "was in the process of analyzing whether to walk away from the deal in light of the tax rule changes"); *see generally Moon Joo Yu*, 2015 WL 4629495, at *9 (scienter established against chairman of company, who "directly benefitted from the misstatements made…, as Plaintiffs relied on the representations set forth therein in making their decision to invest" and chairman's "need to

generate money" demonstrated a motive to commit fraud).

Here, the Individual Defendants had a particular, unique motive to take the company private, which led them to misrepresent the status of the listing. Defendants were motivated to squeeze out minority stockholders to acquire a highly profitable business, at a time when AmTrust common stock was trading at historic lows. But there existed another, more sinister motivation to close on the Buyout: As noted earlier, AmTrust's accounting misconduct had precipitated government investigations, a securities action, and a stockholder derivative action. In addition, the Individual Defendants were defending, since 2015, another derivative action alleging self-dealing and the usurpation of a corporate opportunity. Accordingly, the Individual Defendants were highly motivated to effectuate the Buyout, which would extinguish the common stock and thereby extinguish the derivative plaintiffs' standing to continue prosecuting the actions. Indeed, all derivative actions were voluntarily dismissed once the Buyout closed. Just recently, on February 26, 2020, the Delaware Court of Chancery, in denying the defendants' motions to dismiss, found that AmTrust's directors, including the Individual Defendants, "had a material self-interest in the [Buyout], which was expected to extinguish viable derivative claims exposing each of them to significant personal liability," and that the facts of the underlying derivative claims were "very troubling and very unusual." Del. Decision, at *1, *3, *11.[20]

Defendants also claim that motives "common to most corporate officers" such as the "desire to complete a merger" are too general to allege scienter. OB at 17-18. The cases cited in

---

[20] With respect to the SEC investigation into AmTrust's accounting practices, Defendants deny a motive to evade the SEC's scrutiny, as the investigation was already a matter of public knowledge during the Class Period, and the Buyout would not have stopped the investigation or "prevent the SEC from publishing…any findings of wrongdoing." OB at 18. However, negative findings, if AmTrust remained public, would have likely caused another significant decrease in the trading price of its stock, additional stockholder claims, and disciplinary action from regulators. As a private company, AmTrust would be facing exponentially less severe consequences from any adjudication, and would be off the investing public's radar.

21

support of this proposition, however, do not address the situation here, where AmTrust's controlling stockholders were not effectuating a typical transaction with a third-party for the benefit of the Company and its stockholders, but were seeking a transaction for *themselves*, to squeeze out minority stockholders, which would also extinguish their derivative liability. For example, *Kalnit v. Eichler*, cited repeatedly by Defendants (OB at 17-18), acknowledged that allegations that directors "hoped to receive increased compensation, lucrative executive positions and other corporate perquisites" were reasonable, but insufficient to demonstrate scienter, as such a rule would expose independent directors to liability for virtually any merger. 99 F. Supp. 2d 327, 337-39 (S.D.N.Y. 2000), *aff'd* 264 F.3d 131 (2d Cir. 2001). Here, Plaintiff acknowledges that improved D&O "compensation" was not the driving motive behind the push for the Buyout and false statements made during the process. Rather, the driving force was much more significant: the Individual Defendants' acquisition of a multi-billion dollar insurance company at a bargain price, in spite of minority stockholder opposition. *Compare with Kalnit,* 264 F.3d at 140 (rejecting scienter inference because "the shareholders themselves would benefit from [the] superior transaction" defendant was pushing for).

This is also not a situation of controlling stockholders simply "maximiz[ing] their equity control over a company" while raising "much needed capital," as was alleged in *Elliott Associates, L.P. v. Hayes*, 141 F. Supp. 2d 344, 359 (S.D.N.Y. 2000) (OB at 18). Here, the Individual Defendants were attempting to take AmTrust private at a beneficial price (for them), and were concerned that revealing the truth regarding the Preferred Stock would invite further scrutiny from voting stockholders and insurance regulators, frustrating their plans. As described earlier, Plaintiff specifically alleges that, given the existence of a majority-of-the-minority provision, and because the Buyout was targeted for heavy criticism, Defendants were motivated to ensure that common

22

stockholders who also owned Preferred Stock voted in favor of the Buyout, and as a result told these stockholders what they needed to hear – that Defendants would maintain the listing. *See, e.g.,* ¶ 93(b). Defendants' contention that these allegations are "conclusory" is unfounded and in fact contradicted by the fact that, due to public outcry, minority stockholders initially voted *down* the Buyout (an exceedingly rare occurrence in public M&As). ¶ 60. Defendants understood that every bit of stockholder support mattered.

### 2. There Exists Strong Circumstantial Evidence of Conscious Misbehavior

The Complaint also alleges facts "that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000). As noted earlier, the Individual Defendants had a long history of self-dealing at AmTrust, the Buyout being just one example, but also "troubling" was the usurpation of a corporate opportunity giving rise to derivative claims. Del. Decision at *11. Also troubling was the May 2017 $300 million private placement of AmTrust stock solely to members of the Karfunkel-Zyskind Family described earlier, which, like the Buyout, was also effectuated at a bargain price.[21]

Moreover, it cannot be ignored that less than *two months* after the Buyout closed, Defendants announced the delisting, and no circumstances had materially changed in the interim. As discussed earlier, it is strongly inferable that Defendants knew that they would soon delist the Preferred Stock, or, at the very least, were aware of the circumstances that would ultimately cause them to decide to delist. It is well settled that "allegations of later-emerging facts" may raise inferences regarding facts then in existence and known by a defendant during the time of the challenged statements. *See Plotkin v. IP Axess Inc., Etc.*, 407 F.3d 690, 698 (5th Cir. 2005). Thus,

---

[21] Defendants claim the placement was done to "stabilize" AmTrust's stock price (OB at 4), which essentially concedes that it was timed immediately after a significant drop in stock price.

"the fact that a business files for bankruptcy on 'Day Two,' may, under the right surrounding circumstances, provide grounds for inferring that the business was performing poorly on 'Day One.'" *Id.* (citing *Novak*, 216 F.3d at 313); *id.* at 700 (scienter established, as it was "reasonable to assume, given the importance of these deals to the company, that [defendant] would have familiarized itself with the financial condition of [its contracting partners] and would have discovered details about their poor financial condition.").

Defendants contend that "temporal proximity alone does not raise a circumstantial inference of fraud." OB at 19 (citation omitted). That may be so when there are material changes in economic conditions between the alleged misstatement and the revelation of the truth.[22] Here, however, all justifications regarding the Preferred Stock, such as the liquidity of the stock, the costs associated with maintaining the listing, and "the small number of record holders," as well as AmTrust's "new ownership structure" were *known* to Defendants—indeed many of these facts were known to the public—during the Class Period. *See Miss. Pub. Emples. Ret. Sys. v. Boston Sci. Corp.*, 523 F.3d 75, 91 (1st Cir. 2008) (while temporal proximity alone is insufficient, "this court has insisted on a 'fact-specific inquiry' regarding scienter and "the extremely short time period here is strong evidence").

There is other circumstantial evidence of Defendants' misbehavior during the merger process. For example, Defendants manipulated the record date for the stockholder vote, leaving the record date blank in the preliminary proxy, which gave the false impression that a date had not yet been determined, and which prevented stockholders who purchased common stock in order to agitate against the Buyout (like Icahn, who owned nearly one-fifth of all minority stock) from

---

[22] *See, e.g., Pearlstein v. BlackBerry Ltd.,* 93 F. Supp. 3d 233, 247 (S.D.N.Y. 2015) (cited by Defendants) (scienter not inferable when a sizable charge against inventory was recorded after defendants' positive statements, thus, this drastic change in circumstances rebutted the inference that defendants were aware of the alleged omitted facts).

24

voting, ensuring the Buyout. ¶¶ 55, 93(a). Indeed, an ISS investigation deemed this tactic to be "anomalous." *Id.* Defendants claim their setting of the record date was within the time provided by Delaware statute (OB at 20), which sidesteps the scienter inquiry of whether their actions were misleading or otherwise indicative of conscious misbehavior.[23]

## III.   IN THE ALTERNATIVE, PLAINTIFF SHOULD BE GRANTED LEAVE TO REPLEAD

Should the Court find his allegations wanting (it should not), Plaintiff respectfully requests any dismissal be without prejudice, and for leave to replead. *See Loreley Financing No. 3 v. Wells Fargo Securities*, 797 F.3d 160, 190 (2d Cir. 2015) ("[w]ithout the benefit of a ruling," a party may be unable "to weigh the practicality and possible means of curing specific deficiencies."). As this would be Plaintiff's first amendment, it cannot be said his request is too bold.[24]

## CONCLUSION

In light of the foregoing, Defendants' Motion should be denied in its entirety.

---

[23] Defendants also seek dismissal of Plaintiff's "control person" Section 20(a) claims, asserting (solely) that he has not pleaded 1) a predicate Section 10(b) claim, or 2) the Individual Defendants' "conscious misbehavior or recklessness" (i.e., scienter). OB at 23. As explained, Plaintiff has adequately these elements.

[24] To the extent necessary, the amendment would include, among other things, additional facts (some of which have come to light only recently) concerning i) the falsity of Defendants' statements concerning the delisting; ii) Defendants' motive to mislead investors; and iii) Defendants' knowledge of facts during the Class Period relevant to their state of mind.

Defendants do not claim that amendment would be futile or prejudicial. Instead, they claim Plaintiff already "declined" an opportunity to amend. OB at 23 (citing to Dkt. 13, a so-ordered stipulation regarding PSLRA lead plaintiff deadlines). In fact, the opportunity "declined" is available to every litigant, given the general rule entitling a party to "amend its pleading once as a matter of course" before a motion to dismiss. Fed. R. Civ. P. 15(a)(1). Obviously, a party's declination to amend at the early stages of litigation does not extinguish the presumption in favor of "freely" granting leave to amend at a later date "whenever justice so requires." Fed. R. Civ. P. 15(a)(2); *Cruz v. TD Bank, N.A.*, 742 F.3d 520, 523 (2d Cir. 2013) (the "the usual practice" is to allow leave to replead when granting a motion to dismiss). Defendants are cynically attempting to punish Plaintiff for putting his best foot forward in his initial pleading before he was appointed lead plaintiff, and seek to prevent him from curing any alleged defects identified, for the first time, in their Motion. Plaintiff should be afforded the same opportunities as any other litigant.

DATED: March 13, 2020                    Respectfully submitted,

                                         **WOLF POPPER LLP**


                                         By:      *Carl L. Stine*
                                                  Carl L. Stine
                                         Patricia I. Avery
                                         Adam J. Blander
                                         845 3rd Avenue, 12th Floor
                                         New York, New York 10022
                                         (212) 759-4600

                                         *Counsel for Lead Plaintiff*
                                         *And the Putative Class*

26