UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JAN MARTINEK,

                            Plaintiff,

                -v.-

AMTRUST FINANCIAL SERVICES, INC.,
BARRY D. ZYSKIND, GEORGE KARFUNKEL,
and LEAH KARFUNKEL,

                            Defendants.

---

19 Civ. 8030 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiff Jan Martinek brings this putative securities class action against

AmTrust Financial Services, Inc. ("AmTrust" or the "Company"), and AmTrust

executives Barry D. Zyskind, George Karfunkel, and Leah Karfunkel (together,

the "Individual Defendants," and with AmTrust, "Defendants").  Plaintiff alleges

that he and other putative class members suffered losses when Defendants

made false and misleading statements regarding the Company's preferred stock

trading on the New York Stock Exchange ("NYSE") following the Individual

Defendants' buyout of the Company's common stock.  Plaintiff has brought

securities fraud claims under Sections 10(b) and 20(a) of the Securities

Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5

promulgated thereunder, 17 C.F.R. § 240.10b-5.  Defendants have moved to

dismiss the Complaint pursuant to Federal Rules of Civil Procedure 9(b) and

12(b)(6) for failure to state a claim.  As set forth in the remainder of this

Opinion, while the Court does not believe that each of Plaintiff's proffered

misstatements and omissions suffices to state a claim for securities fraud, several do.  Defendants' motion to dismiss is accordingly denied.

### BACKGROUND[1]

#### A.    Factual Background

##### 1.    AmTrust's Issuance of Preferred Stock

AmTrust is an insurance company founded and controlled by the Karfunkel-Zyskind Family.  (Compl. ¶¶ 14-18).  As relevant here, the Family consists of Barry Zyskind, AmTrust's CEO and Chairman of the Board, and AmTrust directors George Karfunkel and Leah Karfunkel.  (*Id.* at ¶ 14).

Between 2013 and 2016, AmTrust issued six different series of preferred stock and depositary shares, raising almost $1 billion from the public.  (Compl. ¶ 26).  The preferred stock was issued pursuant to a prospectus, registration statement, and prospectus supplements, all filed by AmTrust with the SEC. (*Id.*).  AmTrust also filed a Certificate of Designation with the SEC for each series of preferred stock.  (*Id.*).

---

[1]    The facts in this Opinion are drawn primarily from Plaintiff's Complaint ("Complaint" or "Compl." (Dkt. #5)), which is the operative pleading in this case, and the Declaration of Kevin S. Reed ("Reed Decl." (Dkt. #29)) and attached exhibits.  The documents attached to the Reed Declaration are documents that have been publicly filed with the United States Securities and Exchange Commission (the "SEC").  *See Tongue* v. *Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016) ("The Court may [] consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff upon which it relied in bringing the suit." (internal quotation marks omitted)).

For ease of reference, the Court refers to Defendants' opening brief as "Def. Br." (Dkt. #29); Plaintiff's opposition brief as "Pl. Opp." (Dkt. #30); and Defendants' reply brief as "Def. Reply" (Dkt. #31).

As part of each of the preferred stock offerings, AmTrust entered into underwriting agreements in which it covenanted, with respect to each series of preferred stock, "[t]o use its commercially reasonable efforts to list the Securities on the NYSE within 30 days of the Closing Date and to maintain the listing of the Securities on the NYSE." (Compl. ¶ 27; *see id.* at ¶¶ 28, 31). These underwriting agreements were attached as exhibits to the prospectus supplements (and other documents) filed with the SEC and were available to the investing public. (*Id.*). The first page of each prospectus supplement for each series of preferred stock stated that AmTrust "intend[s] to apply to list the depositary shares representing the Series Preferred Stock on the New York Stock Exchange[.]" (*Id.* at ¶ 29).

Following the issuance of the preferred stock, AmTrust applied to list its stock on the NYSE. (*See* Compl. ¶ 32). The NYSE timely approved the listing of each of the AmTrust series of preferred stock, and all six series of preferred stock were listed and publicly traded on the NYSE. (*Id.*). Plaintiff purchased shares of all six series of preferred stock of AmTrust on the NYSE. (*Id.* at ¶ 12). According to NYSE rules, a listing on the NYSE is continuous once it is approved, as long as fees are paid by the listing company. (*Id.*).

The shares of preferred stock were redeemable or callable at various times in the future, but none of the series was redeemable or callable prior to August 2019. (Compl. ¶ 33). Specifically, the preferred stock was subject to optional redemption (each series subject to a redemption date, but none prior to August 2019) at a redemption price equal to $1,000 per share. (*Id.*).

3

Moreover, upon any liquidation, dissolution, or winding up of AmTrust, holders of preferred stock would be entitled to the liquidation preference (after payment of liabilities) of $1,000 per share.  (*Id.*).

### 2. The SEC Investigation and the Genesis of the Going-Private Transaction

For years prior to the Individual Defendants' buyout proposal, AmTrust engaged in accounting practices that, when finally investigated by the SEC, the New York Department of Financial Services ("DFS"), and the Federal Bureau of Investigation (the "FBI"), resulted in AmTrust having to restate approximately three years of financial statements from 2013 to 2017.  (Compl. ¶ 35).  As a result of adverse publicity resulting from the restatement of several years of AmTrust's financial statements, increases in loss reserves, and the disclosure of the SEC investigation, AmTrust's stock price dropped by half — from $27 to approximately $13.46 — over the first three quarters of 2017.  (*Id.*).  Despite the disappointing performance of AmTrust common stock, AmTrust's Form 10-Q for the third quarter of 2017 (filed on November 9, 2017) stated:

> Based on the consideration of all available evidence, including analysis of quantitative and qualitative factors, we believe the share price decline in the nine months of 2017 is relatively short-term in nature and is primarily related to the restatement of prior period results and associated material weaknesses disclosed in our Annual Report on Form 10-K for the year ended December 31, 2016, and is not indicative of an actual decline in our fair value or our reporting units' fair value.

(*Id.*).

At the same time AmTrust management represented to the investing public that the poor performance of AmTrust stock was to be short-lived, the Karfunkel-Zyskind Family and Stone Point Capital LLC ("Stone Point"), a private equity firm specializing in management buyouts, approached the AmTrust Board, disclosing their intention to take the Company private. (Compl. ¶ 37; *see also id.* at ¶ 19).  The Individual Defendants began preparing for a take-private acquisition on May 25, 2017, when AmTrust issued 24,096,384 shares of common stock in a private placement, solely to the Karfunkel-Zyskind Family, at $12.45 per share.  (*Id.* at ¶ 38).  This transaction increased the Karfunkel-Zyskind Family's control over AmTrust by about 10%, bringing them to a position of over 50% ownership of AmTrust.  (*Id.*).

A few months later, in September 2017, Zyskind and Stone Point engaged in further discussions about the possibility of taking AmTrust private. (Compl. ¶ 39).  However, the Company's financial performance in the third quarter of 2017 was disappointing and caused a further decline in the price of the stock.  (*Id.*).  The parties halted discussions about taking AmTrust private as the Karfunkel-Zyskind Family saw an opportunity to achieve the same goal at a lower price.  (*Id.*).  On November 8, 2017, only a day before he would sign the 10-Q stating that AmTrust's stock performance "was not indicative of an actual decline in [AmTrust's] fair value or our reporting units' fair value," Zyskind approached the Board, suggesting a potential going-private transaction.  (*Id.* at ¶ 39).

During this time and for several years prior (beginning in at least June 2013, the month when AmTrust started issuing its preferred stock), AmTrust responded, on an ongoing basis, to an investigation by the SEC into the Company's accounting practices. (Compl. ¶ 41). The practices under scrutiny included accounting for loss and loss adjustment expense reserve estimates for AmTrust's major business lines and segments, internal controls, investment in life settlement contracts, and certain acquisitions. (*Id.*). Although the *Wall Street Journal* reported in April 2017 that AmTrust's accounting had been investigated by the SEC and some accounting matters had been disclosed, the SEC's five-year-long investigation into AmTrust was not disclosed until AmTrust filed its 2018 proxy statement on May 4, 2018, soliciting approval of the buyout proposal set out below. (*Id.*).

Further disclosures from the SEC's investigation into AmTrust's accounting practices came to light throughout 2018. (Compl. ¶ 42). In mid-October 2018, the SEC announced that it had barred three former accountants at BDO USA LLP ("BDO") from auditing publicly traded companies because they had released an audit report for AmTrust before the underlying auditing work had been performed. (*Id.*). In brief, BDO had been hired by AmTrust in 2013 to perform a consolidated audit of its financial statements and internal controls. (*Id.*). The audit report was issued and publicly disclosed in early 2014, but the work papers were backdated and the underlying work supporting the audit report was not performed until months *after* AmTrust's annual report had been publicly issued. (*Id.*).

6

### 3.    The Individual Defendants' Buyout Proposal

On January 9, 2018, Trident Pine Acquisition LP, an affiliate of Stone Point, together with the Individual Defendants and certain entities controlled by them (collectively, the "Acquisition Group"), sent a letter (the "Proposal Letter") to the Board of Directors of AmTrust proposing the potential acquisition of all of AmTrust's outstanding shares of common stock not already owned or controlled by the Karfunkel-Zyskind Family (the "Proposal").  (Compl. ¶ 44).  In the Proposal Letter, the Acquisition Group offered a purchase price of $12.25 per share in cash — the lowest price for AmTrust common stock in the preceding five years.  (*Id.*).  The Proposal Letter was signed by David Wermuth (Vice President and Secretary of the general partner of Trident), Zyskind, George Karfunkel, and Leah Karfunkel.  (*Id.*).

Importantly, the Proposal contemplated only the acquisition of the Company's common stock, and not any of AmTrust's preferred stock.  (Compl. ¶ 45).  To that end, the Proposal Letter stated: "Finally, this proposal also contemplates that the outstanding series of AmTrust preferred stock will remain outstanding in accordance with their terms."  (*Id.*).

On January 10, 2018, Defendants Zyskind, George Karfunkel, and Leah Karfunkel filed a Schedule 13D (Amendment No. 13) in which they disclosed the Proposal, attaching copies of the Proposal Letter and a January 9, 2018 press release announcing the Proposal.  (Compl. ¶ 46).  The press release made no mention of the preferred stock.  (*Id.*).  The Schedule 13D further announced that, as indicated in the Proposal, the Karfunkel-Zyskind Family expected that

a special committee of the Board of Directors of AmTrust would consider the
Proposal and make a recommendation to the Board.  (*Id.*).  On January 10,
2018, AmTrust issued a press release announcing the formation of a special
committee of AmTrust directors (the "Special Committee") to review the
Proposal.  (*Id.* at ¶ 47).

Shortly after the announcement of the Proposal, the financial press and
investors queried Defendants as to the future of the preferred stock in light of
the contemplated buyout.  (Compl. ¶ 48; *id.* at ¶ 66(b)).  Indeed, observers were
puzzled as to why the Karfunkel-Zyskind Family intended to keep the preferred
stock listed, given that it would defeat a central justification for going private —
to avoid the regulatory and public scrutiny and associated expense inherent in
any publicly traded company.  (*Id.* at ¶ 48; *see id.* at ¶ 41).

To clarify the position, on January 22, 2018, the Individual Defendants
filed a Schedule 13D (Amendment No. 14), to address the preferred stock and
confirm that the intent of the Proposal was that all the series of the preferred
stock would remain outstanding and continue to be listed on the NYSE.
(Compl. ¶ 48; *see also id.* at ¶ 66(c)).  On January 22, 2018, following this
announcement, the prices of each series of preferred stock rose to close
between 4.2% and 6.4% higher than the preceding trading day (January 19,
2018); by the end of that trading week, each series of preferred stock closed
between 6% and 9.8% higher than the closing price on January 19, 2018.  (*Id.*
at ¶ 48).

Following several weeks of negotiations between and among the Board, the Special Committee, and others, AmTrust announced on March 1, 2018 (the "March 1, 2018 Press Release"), that it had entered into a definitive merger agreement with Evergreen Parent, L.P., an entity formed by the Acquisition Group whereby the Karfunkel-Zyskind Family, the Company's majority controlling stockholder, and Stone Point would acquire the Company's minority common shares for $13.50 per share (the "Merger").  (Compl. ¶ 49).  The March 1, 2018 Press Release stated with respect to the preferred stock:

> Each share of the Company's currently outstanding preferred stock will remain outstanding and it is expected that they will continue to be listed on the New York Stock Exchange following the consummation of the transaction.

(*Id.*).  Stone Point and the Karfunkel-Zyskind Family also announced in the March 1, 2018 Press Release that the Merger would allow AmTrust "to be able to focus on long term decisions, without the emphasis on short-term results." (*Id.* at ¶ 51).  As of March 1, 2018, the Stone Point website contained the following representation concerning the Merger: "Each share of the Company's currently outstanding preferred stock will remain outstanding and it is expected that they will continue to be listed on the New York Stock Exchange following the consummation of the transaction."  (*Id.* at ¶ 52).

### 4.    The Merger's Reception

The Merger was heavily criticized following its announcement.  (Compl. ¶ 54).  For example, one large AmTrust stockholder launched a public relations campaign in which it urged activist investor Carl Icahn to invest in AmTrust

9

and wage a proxy battle opposing the Merger.  (*Id.*).  On May 17, 2018, Icahn
publicly disclosed that he had acquired approximately 9.4% of AmTrust's
common stock and sent a letter to the AmTrust Board of Directors informing it
that (i) other stockholders had requested his assistance in "oppos[ing] your
opportunistic going private transaction," and (ii) Icahn had determined that the
Merger was "blatantly taking advantage of AmTrust's minority shareholders."
(*Id.* at ¶ 55).  Icahn not only publicly implored stockholders to vote against the
Merger, but also filed a lawsuit against the Karfunkel-Zyskind Family for
breaches of fiduciary duty.  (*Id.*).  However, despite owning 9.4% of AmTrust
common stock (the equivalent of nearly one-fifth of all unaffiliated stock), Icahn
was unable to vote his stock against the Merger, as he had purchased the stock
following the Merger vote record date set by the AmTrust Board.  (*Id.*).

AmTrust publicly filed a preliminary proxy statement to encourage
stockholders to vote in favor of the Merger.  (Compl. ¶ 56).  The preliminary
proxy statement represented that the preferred shares would continue to be
listed on the NYSE following the Merger and, thus, the Company's reporting
obligations under the Securities Exchange Act of 1934 would continue.  (*Id.*).
Specifically, the preliminary proxy filed with the SEC in a Schedule 14A on
April 9, 2018, stated, at page 17:

> Q: What effects will the merger have on AmTrust
> Financial?
>
> A: The shares of common stock of the Company are
> currently registered under the Exchange Act, and such
> shares are quoted on the NASDAQ Stock Market under
> the symbol "AFSI."  As a result of the merger, all of the
> shares of common stock of the Company will cease to

be publicly traded and will be owned by Parent. Following the consummation of the merger, the registration of the shares of common stock of the Company and our reporting obligations with respect to such shares under the Exchange Act will be terminated upon application to the SEC. In addition, upon the consummation of the merger, such shares will no longer be listed on any stock exchange or quotation system, including on the NASDAQ Stock Market. *However, each outstanding share of preferred stock of the Company will remain outstanding and will continue to be listed on the New York Stock Exchange following the merger and the reporting obligations with respect to such shares under the Exchange Act will therefore continue.*

(*Id.* (emphasis added)). Defendants repeated this statement in a definitive proxy, issued by Defendants and filed with the SEC in a Schedule 14A on May 4, 2018. (*Id.* at ¶ 57). The definitive proxy also reprinted the entirety of the original Proposal Letter, in which the Individual Defendants had stated: "Finally, this proposal also contemplates that the outstanding series of AmTrust preferred stock will remain outstanding in accordance with their terms." (*Id.* at ¶ 58).

On May 25, 2018, Institutional Shareholder Services ("ISS") issued its report on the Merger, which criticized the Special Committee's "less-than-robust sale process," and which concluded that "a standalone scenario seems to be a preferable alternative to the currently proposed transaction"; accordingly, ISS concluded that "a vote AGAINST the merger is warranted." (Compl. ¶ 59). ISS suggested a valuation range between $14.35 and $20.82 per share. (*Id.*). Among other things, ISS questioned the independence of the Special Committee's chairperson, and criticized certain missteps by the Committee during negotiations. (*Id.*). ISS also disputed AmTrust's suggestion

11

that the Company's growth was slowing down, noting that "the publicly available information paints a less dire picture of the company's prospects." (*Id.*).  ISS noted that Zyskind "would appear to know the company as well as anyone," and that his willingness to buy the Company at $13.50 per share implied that "the company's challenges are not so severe."  (*Id.*).

The Merger was so heavily criticized that it became clear to Defendants that the vote on the Proposal would likely not satisfy the majority-of-the-minority condition to which Defendants had agreed in order to comply with Delaware corporate law.  (Compl. ¶ 60).  Accordingly, the vote on the Merger was adjourned.  (*Id.*).  Following adjournment, Icahn and Zyskind engaged in negotiations, and within a day, the Acquisition Group agreed to increase its offer by $1.25 per share, to $14.75 per share.  (*Id.* at ¶ 61).  In less than a month, Icahn's investment in 18.4 million AmTrust common shares had netted him approximately $23 million; he agreed to support the Merger at the revised price, terminate his proxy battle, and dismiss his lawsuit.  (*Id.*).

In light of this nominal increase the Merger consideration now fell (albeit barely) within ISS's fairness range as identified above.  (Compl. ¶ 63).  Consequently, ISS modified its determination, recommending the Merger.  (*Id.*).  On June 21, 2018, a majority of unaffiliated stockholders (67.4%) voted to approve the Merger.  (*Id.* at ¶ 69).

### 5. The Merger's Closing and Defendants' Delisting of the Preferred Stock

The Merger closed on November 29, 2018, and the Acquisition Group acquired the remaining unaffiliated shares of AmTrust's common stock.

(Compl. ¶ 70).  Less than two months later, on January 18, 2019, AmTrust issued a press release announcing the delisting of all six series of preferred stock (as well as two series of subordinated notes), the last remaining publicly traded AmTrust equity securities.  (*Id.* at ¶ 71).

AmTrust began the delisting process by filing a Form 8-K with the SEC announcing its intent to delist the preferred stock from the NYSE and issuing a press release to the same effect.  (Compl. ¶ 72).  The press release, issued on January 18, 2019, announced that AmTrust's Board had approved the voluntary delisting and deregistration of all six series of its publicly traded preferred stock.  (*Id.*).  The press release stated, *inter alia*,

> AmTrust Financial Services, Inc. ("AmTrust" or the "Company") today announced that its Board of Directors has approved the voluntary delisting of all six series of preferred stock and two series of subordinated notes from the New York Stock Exchange.
>
> ***
>
> The Company expects the delisting of the Listed Securities to become effective on or about February 7, 2019 at which time AmTrust's SEC reporting obligations with respect to the Listed Securities will be suspended.
>
> AmTrust's decision to delist and deregister the Listed Securities was based on its determination that the administrative costs and burdens associated with maintaining the listings on the NYSE and the registration exceed the benefits given the small number of record holders and low daily trading volume.  In addition, this decision was made in light of the Company's new ownership structure and the resulting changes to its longterm strategy, following the completion of AmTrust's go-private transaction on November 29, 2018 and the delisting of its common stock.

(*Id.*).[2]

According to Plaintiff, the impact of the announcement was devastating to the approximately $1 billion worth of preferred stock then outstanding. (Compl. ¶ 81).  Specifically, on the next trading day following the announcement of the delisting, the prices of all series of preferred stock dropped, as *Barron's* reported, by almost 40%, losing over $300 million in value in one day.  (*Id.* at ¶ 82; *see also id.* at ¶ 81).  *Barron's* also noted that the delisting was a "seeming reversal of promises that AmTrust managers made to the [SEC] and state insurance regulators."  (*Id.* at ¶ 81 (quoting Bill Alpert, "Troubled Insurer AmTrust to Delist Preferred Stock," *Barron's*, Jan. 28, 2019)).[3]

### 6.    The Response to the Delisting Decision

Investors were shocked and angry.  (Compl. ¶ 86).  Plaintiff issued an open letter to Stone Point, challenging the delisting decision and stating that Stone Point was compromising its reputation by agreeing to delist, which enriched it and the Karfunkel-Zyskind Family at the expense of retail investors. (*Id.*).  Plaintiff also submitted a letter to the SEC objecting to the delisting and noting that he had purchased preferred equity specifically in reliance on

---

[2]    Following the delisting, AmTrust's preferred stocks became traded on "pink sheets," without the protections afforded to the shareholders by being listed on the NYSE or another national exchange.  (Compl. ¶ 76).

[3]    Specifically, *Barron's* reported that the Acquisition Group's application to state insurance commissions stated that "AmTrust will continue to remain subject to certain SEC reporting requirements and requirements governing the independence of its audit committee given that its preferred stock will remain outstanding and listed on the New York Stock Exchange post-merger."  (Compl. ¶ 66(b)).

AmTrust's assurances that the shares would remain listed and urging the SEC to commence an investigation.  (*Id.*).  Other investors, including those who have commenced litigation, expressed similar sentiments, and contacted AmTrust directly to note their disapproval.  (*Id.*).

Further, Keefe, Bruyette & Woods, Inc. ("KBW"), an underwriter for AmTrust's preferred securities and debt notes, sued AmTrust in New York State Supreme Court, asserting claims for breach of contract and alleging reputational harm in connection with AmTrust's delisting announcement.  *See Keefe, Bruyette & Woods, Inc.* v. *AmTrust Fin. Serv., Inc.*, Index No. 650695/2019 (N.Y. Sup. Ct. 2019).  (Compl. ¶ 88).  KBW moved to preliminarily enjoin AmTrust from proceeding with the delisting, urging it to postpone the effectiveness of the delisting.  (*Id.*).  It also contacted the SEC. (*Id.*).  As alleged in its complaint:

> 4. One of the selling features for the Depositary Shares was the fact that they were to be listed on the NYSE.  A listing on a national securities exchange, such as the NYSE, triggers a company's reporting requirements under the Securities Exchange Act of 1934.  The reporting requirements provide securities holders with continuous information material to their investment in the company including quarterly reports, annual reports, proxy solicitations and notice of unscheduled material events or corporate changes.  Listing on the NYSE also provides securities holders with a liquid trading market.
>
> 5. In the Underwriting Agreement for the Series F Depositary Shares dated September 20, 2016 (the "Underwriting Agreement"), AmTrust explicitly covenanted that it would keep the Depositary Shares listed on the NYSE.  AmTrust gave the exact same covenant in the Underwriting Agreements for all of the

Preferred Shares (series A-F) and the two issues of
Subordinated Debt Notes.

(*Id.* at ¶ 88).  KBW alleged that the delisting deprived the holders of the

preferred securities of "material company information," and "remove[d] a liquid

trading market for these securities."  (*Id.* at ¶ 89).  As a result, KBW alleged

that "the delisting will significantly damage KBW's and its affiliate's customer

relationships," "damage KBW's reputation as an underwriter," "significantly

impair KBW's and its affiliate's reputation and goodwill," and that "it is obvious

that tens of thousands of retail investors have already been negatively impacted

by AmTrust's public announcement of its intent to delist its Preferred Shares."

(*Id.*).

On February 7, 2019, a judge of the New York County Supreme Court

denied KBW's request for a temporary restraining order to enjoin the delisting,

stating that "[w]ith respect to the decrease in [preferred] share price, this is a

harm to the investor," not an underwriter like KBW.  (Compl. ¶ 90).  On

July 29, 2018, the court dismissed KBW's complaint without prejudice,

reiterating the points raised in its February 7, 2019 ruling, and stating that

KBW had failed to allege that it, as AmTrust's underwriter, had suffered a

direct injury as a result of the delisting.  (*Id.*).[4]

---

[4]    Several preferred stockholders also filed an action against AmTrust in New York State
        Supreme Court, alleging, among other things, breach of contract and other common law
        claims.  (Compl. ¶ 91 (citing *Matlick* v. *AmTrust Financial Services, Inc.*, Index
        No. 651349/2019 (N.Y. Sup. Ct. 2019))).  AmTrust also moved to dismiss the complaint
        in that action, and on March 16, 2020, the court granted its motion.  *See Matlick*, Index
        No. 651349/2019, Dkt. #187 (Sup. Ct. N.Y. Cty. Mar. 16, 2019).  The claims in that
        case — brought under Sections 11 and 12 of the Securities Exchange Act of 1934 and
        New York State law, *see id.* — are different from the claims at issue here and, for the
        most part, do not bear on the Court's analysis.

On February 7, 2019, AmTrust filed a Form 15 advising that it had terminated listing of all series of preferred stock.  (Compl. ¶ 92).  The Form 15, signed by Stephen Ungar, Senior Vice President, General Counsel and Secretary of AmTrust, was entitled "Certification and Notice of Termination of Registration Under Section 12(g) of the Securities Exchange Act of 1934 or Suspension of Duty to File Reports Under Sections 13 and 15(d) of the Securities Exchange Act of 1934."  (*Id.*).

## B.    Procedural History

Plaintiff filed the Complaint, styled as a putative class action, on August 28, 2019.  (Dkt. #1; *see also* Dkt. #5).  On September 6, 2019, Plaintiff reported that the notice required to be published by the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(a)(3)(A), had been published on August 30, 2019, in *PR Newswire*.  (Dkt. #10).  On September 9, 2019, the Court issued a motion schedule for any party wishing to be appointed as lead plaintiff.  (Dkt. #11).  The Court received a motion only from Plaintiff Jan Martinek.  (*See* Dkt. #18-21).  Accordingly, on November 18, 2019, the Court issued an order appointing Martinek as lead plaintiff, to represent purchasers of AmTrust preferred stock from January 22, 2018, to January 18, 2019, inclusive (the "Class Period"), and approving his selection of Wolf Popper LLP as lead counsel.  (Dkt. #23).

On January 27, 2020, Defendants filed their motion to dismiss the Complaint.  (Dkt. #27-29).  Plaintiff filed his opposition brief on March 13, 2020.  (Dkt. #30).  Defendants filed their reply brief on April 3, 2020.  (Dkt.

#31).  On April 6, 2020, Defendants submitted a request for oral argument on their motion.  (Dkt. #32).  The Court endorsed Defendants' letter explaining that the Court would order oral argument if and when it decided that oral argument would aid the Court in resolving the motion.  (Dkt. #33).  The Court has now reviewed the motion papers and has determined that oral argument is unnecessary.

### DISCUSSION

**A.    Applicable Law**

**1.    Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)**

When considering a motion to dismiss under Rule 12(b)(6), a court should "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief."  *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)).  Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).

"While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [a plaintiff's] claims across the line from conceivable to plausible.'"  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (per curiam) (quoting *Twombly*, 550 U.S. at 570).  "Where a

complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

### 2.    Securities Fraud Under Section 10(b), Rule 10b-5, and Section 20(a)

Under Section 10(b) of the Exchange Act, it is

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  Rule 10b-5, promulgated by the SEC under Section 10(b), further provides that a person may not

> employ any device, scheme, or artifice to defraud[;] ... make any untrue statement of a material fact or ... omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[;] or ... engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person[;] in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  "Although Section 10(b) does not expressly provide for a private right of action, courts have long recognized an implied private right of action under Section 10(b) and Rule 10b-5."  *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 939 F. Supp. 2d 360, 376 (S.D.N.Y. 2013) (citing *Superintendent of Ins.* v. *Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n.9 (1971) ("It is now established that a private right of action is implied under [Section] 10(b).")).

To prevail on a Section 10(b) or a Rule 10b-5 claim, a plaintiff must prove "[i] a material misrepresentation or omission by the defendant; [ii] scienter; [iii] a connection between the misrepresentation or omission and the purchase or sale of a security; [iv] reliance upon the misrepresentation or omission; [v] economic loss; and [vi] loss causation.'"  *GAMCO Inv'rs, Inc.* v. *Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016) (quoting *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)).  Such claims are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u-4(b).  *See, e.g.*, *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (affirming that securities fraud claims must satisfy the heightened pleading standards of both Rule 9(b) and the PSLRA); *Arco Capital Corp.* v. *Deutsche Bank AG*, 949 F. Supp. 2d 532, 539 (S.D.N.Y. 2013) (same).

Under Rule 9(b), a plaintiff must "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  This requires that a plaintiff's complaint: "[i] specify the statements that the plaintiff contends were fraudulent, [ii] identify the speaker, [iii] state where and when the statements

were made, and [iv] explain why the statements were fraudulent." *Rombach* v. *Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Mills* v. *Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).  In contrast, "intent, knowledge, and other conditions of mind may be averred generally." *Kalnit* v. *Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quoting Fed. R. Civ. P. 9(b)).

Section 20(a) of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable under [the Exchange Act and its implementing regulations] shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable."  15 U.S.C. § 78t(a).  A claim under Section 20(a) is thus dependent on the validity of an underlying securities violation.  Indeed, to establish control-person liability, a plaintiff must show [i] "a primary violation by the controlled person"; [ii] "control of the primary violator by the defendant"; and [iii] that the controlling person "was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc.*, 493 F.3d at 108.

### 3.    The Challenged Elements of Plaintiff's Securities Fraud Claim

Defendants' motion attacks two elements of Plaintiff's claims, arguing that Plaintiff failed to allege adequately: (i) a material misrepresentation or omission and (ii) scienter.  The Court addresses each in turn.

### a.    Material Misrepresentations or Omissions

Rule 10b-5 prohibits "mak[ing] any untrue statement of a material fact" or "omit[ting] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).  "A statement is misleading if a reasonable investor would have received a false impression from the statement."  *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 609 (S.D.N.Y. 2017) (quoting *Freudenberg* v. *E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010)).  "The 'veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers.'"  *In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 472 (S.D.N.Y. 2017) (quoting *Kleinman* v. *Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013)).

"Section 10 'do[es] not create an affirmative duty to disclose any and all material information.'"  *In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d at 472 (quoting *Matrixx Initiatives, Inc.* v. *Siracusano*, 563 U.S. 27, 44 (2011)).  "Thus, generally, 'an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts.'"  *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d at 609 (quoting *Stratte-McClure* v. *Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015)).  "A duty to disclose under Rule 10b-5 may arise 'when there is a corporate insider trad[ing] on confidential information, a statute or regulation requiring disclosure, or a corporate statement that would otherwise be inaccurate, incomplete, or

misleading.'" *Id.* (alteration in original) (quoting *Stratte-McClure*, 776 F.3d at 101).

Even where a company is not under a duty to disclose, however, once it "chooses to speak, it has a 'duty to be both accurate and complete.'" *Sharette* v. *Credit Suisse Int'l*, 127 F. Supp. 3d 60, 78-79 (S.D.N.Y. 2015) (quoting *Plumbers' Union Local No. 12 Pension Fund* v. *Swiss Reinsurance Co.*, 753 F. Supp. 2d 166, 180 (S.D.N.Y. 2010)).  This obligation only extends, however, to facts necessary to render "what was revealed [to] not be so incomplete as to mislead."  *Richman* v. *Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 273 (S.D.N.Y. 2012) (quoting *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008)).  Indeed, a company need not "accuse itself of wrongdoing," nor disclose an ongoing investigation, where the failure to do so would not make the company's statements misleading.  *Id.* (quoting *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004)); *see also* *Menaldi* v. *Och-Ziff Capital Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 511 (S.D.N.Y. 2017) ("For such a duty [to disclose uncharged wrongdoing] to arise, … there must be a connection between the illegal conduct and the misleading statements beyond the simple fact that a criminal conviction would have an adverse impact upon the corporation's operations in general or the bottom line." (quoting *Menaldi* v. *Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 581 (S.D.N.Y. 2016))).

To be actionable, a misstatement or omission must also be material, meaning that "a reasonable investor would have considered [it] significant in

making investment decisions." *Heller* v. *Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 614 (S.D.N.Y. 2008) (quoting *Ganino* v. *Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000)).  This is so where "there [is] a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 646 (S.D.N.Y. 2017) (quoting *ECA, Local 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009)).  "[W]hether an alleged misrepresentation is material necessarily depends on all relevant circumstances," and "[b]ecause materiality is a mixed question of law and fact, in the context of a Fed. R. Civ. P. 12(b)(6) motion, a complaint may not properly be dismissed … on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017) (last alteration in original) (quoting *ECA*, 553 F.3d at 197)).

> ### b.    Scienter

As mentioned above, pursuant to the PSLRA, "no defendant may be held liable for any … false or misleading statements unless [a] [p]laintiff has stated 'with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind.'" *In re Banco Bradesco*, 277 F. Supp. 3d at 664 (quoting 15 U.S.C. § 78u-4(b)(2)) (emphasis added).  Scienter includes "a mental state embracing intent to deceive, manipulate, or defraud," or

"recklessness."  *Id.* at 664 (quoting *Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185, 193 n.12 (1976); *ECA*, 553 F.3d at 198).  A "strong inference" that a defendant acted with scienter need not be an irrefutable inference, though it "must be more than merely plausible or reasonable[.]"  *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  It cannot be identified "in a vacuum," as "[t]he inquiry is inherently comparative[.]"  *Id.* at 323.  A "strong inference" is an inference that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* at 324.

To evaluate whether the PSLRA's standard has been met, courts consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs, Inc.*, 551 U.S. at 323 (emphasis in original); *see also id.* at 326 ("[The court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically. ... [A] court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?").  And "[w]hen the defendant is a corporate entity, ... the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."  *Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).  "Ascribing a state of mind to a corporate entity is a difficult and sometimes confusing task ... because the hierarchical and differentiated corporate structure often muddies the distinction between

25

deliberate fraud and an unfortunate (yet unintentional) error caused by mere mismanagement." *Jackson* v. *Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020).

Ultimately, the facts pleaded must: (i) show "that the defendants had the motive and opportunity to commit fraud," or (ii) constitute "strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198. "In order to raise a strong inference of scienter through 'motive and opportunity' to defraud, [a plaintiff] must allege that [defendants] 'benefitted in some *concrete and personal way* from the purported fraud.'" *Id.* (emphasis added) (quoting *Novak* v. *Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000)). It is not enough for a plaintiff to show "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation[.]" *Id.*; *accord, e.g.*, *Chill* v. *Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996) ("[A] generalized motive ... which could be imputed to any publicly owned, for-profit endeavor, is not sufficiently concrete for purposes of inferring scienter.").

In the absence of a showing of motive, a plaintiff must plead conscious misbehavior or recklessness. Conscious recklessness is a "state of mind approximating actual intent, and not merely a heightened form of negligence." *S. Cherry St., LLC* v. *Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (quotation mark and emphasis omitted) (quoting *Novak*, 216 F.3d at 312). To plead conscious recklessness adequately, a plaintiff must allege facts showing "conduct which is highly unreasonable and which represents an extreme

departure from the standards of ordinary care to the extent that the danger was either known to the defendants or so obvious that the defendant must have been aware of it." *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000); *accord Rothman* v. *Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) (quoting *Rolf* v. *Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)). A plaintiff may allege that a defendant "engaged in deliberately illegal behavior, knew facts or had access to information suggesting his public statements were not accurate, or failed to check information that he had a duty to monitor." *Nathel* v. *Siegal*, 592 F. Supp. 2d 452, 464 (S.D.N.Y. 2008) (citing *Novak*, 216 F.3d at 311). Opinions or predictions can be the basis for scienter "if they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them." *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) (citation omitted).

## B. Analysis

### 1. Plaintiff Has Adequately Pleaded an Actionable Misstatement

Plaintiff argues that each of Defendants' representations about AmTrust's preferred stock remaining listed on the NYSE following the Merger was a material misstatement. In response, Defendants argue that Plaintiff has not shown that these statements were false when made, and in any event, such statements are protected forward-looking statements that cannot give rise to a Section 10(b) claim. (Def. Br. 14). Both sides group such alleged misstatements into five groups (*see* Def. Br. 9-15; Pl. Opp. 12), which groupings the Court adopts for purposes of this Opinion.

### a.    Defendants' Representations That the Preferred Stock "Will" Continue to Be Listed Are Actionable

While Plaintiff proffers several types of alleged misstatements, the representations that are most clearly actionable are Defendants' statements that the preferred stock "will" continue to be listed post-Merger.  In their April 9, 2018 preliminary proxy, Defendants stated that the preferred stock "*will* continue to be listed on the [NYSE] following the merger and the reporting obligations with respect to such shares under the Exchange Act *will* therefore continue." (Compl. ¶ 67 (emphases added)).  This statement was then repeated in AmTrust's final proxy and in subsequent Form 10-Qs.  (*See id.* at ¶ 68).  These statements laid to rest any investor doubt regarding the certainty of Defendants' "expectations" regarding the preferred stock.

Defendants posit two arguments with respect to these alleged misstatements.  *First*, Defendants argue that "Plaintiff does not allege any facts suggesting that this statement was false when made, particularly as the go-private transaction by its own terms had no effect on the Preferred Stock, which remained listed for a time after the transaction closed."  (Def. Br. 14).  But the very fact that Defendants decided to delist the preferred shares barely two months after the Merger closed — on bases that were known to Defendants at the time they represented that they "will" maintain the listings — strongly suggests that Defendants knew this statement to be false when made.

Further, Defendants' interpretation of this statement is strained and inconsistent with how an investor would reasonably interpret this statement.  Defendants' statement that they "will" maintain the preferred stock's listing

28

indicated to investors that Defendants had evaluated the pros and cons of continuing to list the preferred stock on the NYSE and had made a reasoned determination to continue.  *See In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d at 472 ("The 'veracity of a statement … is measured … by its ability to accurately inform rather than mislead prospective buyers.'" (quoting *Kleinman*, 706 F.3d at 153)).  No investor would reasonably understand Defendants' representation of "continuing" to maintain the listing post-buyout as leaving open the possibility of delisting a mere seven weeks after the Merger closed — even though such a period is, as Defendants strain to argue, "a time."  *See Omnicare, Inc.* v. *Laborers Dist. Council Const. Industry Pension Fund*, 575 U.S. 175, 186-87 (2015) ("[W]hether a statement is 'misleading' depends on the perspective of a reasonable investor:  The inquiry … is objective.").  Defendants' representations were, at best, misleading.  *See Wilson* v. *Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011) ("[S]o-called 'half-truths' —  literally true statements that create a materially misleading impression — will support claims for securities fraud."); *In re Sadia,* 269 F.R.D. 298, 302 (S.D.N.Y. 2010) (noting, in the materiality context, the need to analyze "how information would be viewed by a reasonable investor," which is "influenced by considerations of fairness, probability, and common sense" (citing *Basic* v. *Levinson*, 485 U.S. 224, 231-32 (1988))).

*Second*, Defendants claim that they expressly identified statements in the "Questions and Answers" section of these proxy statements as forward-looking

statements protected by the PSLRA.  (Def. Br. 14).[5]  But the only cautionary language in the proxies was that certain unidentified statements within a dense five-page Q&A section may be forward-looking.  (*See* Reed Decl., Ex. 12 at 82).  As an initial matter, it is questionable that a reasonable investor would have understood assurances that Defendants "will" take certain action within their control to be forward-looking.  *See, e.g.*, *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 380, 388, 397 (S.D.N.Y. 2012) (finding that CEO's statement that investors could "count on a great dividend" was actionable and not protected by safe harbor for forward-looking statements, when the dividend was cut some ten weeks later).

---

[5]     Plaintiff contends that the safe harbor provision of the PSLRA would not apply to Defendants' statements because such an affirmative defense does not protect statements "made in connection with a going private transaction."  (Pl. Opp. 11 (quoting 15 U.S.C. § 78u-5(b)(1)(E))).  Plaintiff also points to another statutory exemption to the safe harbor rule for statements "made in disclosure of beneficial ownership in a report required to be filed … pursuant to section 13(d)."  (*Id.* (quoting 15 U.S.C. § 78u-5(b)(2)(F)).  Plaintiff purports that this exemption applies to the Schedule 13D that Defendants filed on January 22, 2018, at the beginning of the Class Period.  (*See id.*).

Defendants respond that Plaintiff's claims are not based on the "going private" part of the transaction, but are based solely about shares that remained public.  (Def. Reply 2). Defendants are correct that "Plaintiff offers no authority suggesting that the PSLRA safe harbor exception was intended to apply to representations about shares that were publicly traded before and after the transaction, nor any reason that an investor should be able to consider forward-looking statements about publicly traded shares that are accompanied by cautionary language to be material in one context but not the other." (*Id.*).  Defendants also argue that even if Plaintiff were correct that the PSLRA's safe harbor provision did not apply, it is of no moment because the same result obtains under the judicially created "counterpart" to the PSLRA's safe harbor, the "bespeaks caution" doctrine, which covers forward-looking statements regarding intention and expectation.  (*See id.* at 3 (citing *Rombach* v. *Chang*, 355 F.3d 164, 173 (2d Cir. 2004) and *Johnson* v. *Sequans Commc'ns S.A.*, No. 11 Civ. 6341 (PAC), 2013 WL 214297, at *15 (S.D.N.Y. Jan. 17, 2013)).

The Court need not decide which of the safe harbor provision or the bespeaks caution doctrine applies because, as explained in this Opinion, Defendants' statements were either: (i) not adequately cautionary or (ii) knowingly false.

In any event, this generalized warning is insufficient to invoke the safe harbor provision of the PSLRA. *See* 15 U.S.C. § 78u-5(c)(1)(A)(ii) (stating that forward-looking statement must be "accompanied by *meaningful* cautionary statements *identifying important* factors that could cause actual results to differ materially from those in the forward-looking statement" (emphases added)); *see also Slayton* v. *Am. Express Co.*, 604 F.3d 758, 770-71 (2d Cir. 2010) (rejecting boilerplate and generalized warnings as insufficient to invoke safe harbor); *In re Skechers USA, Inc. Sec. Litig.*, No. 18 Civ. 8039 (NRB), 2020 WL 1233759, at *7-8 (S.D.N.Y. Mar. 12, 2020) (explaining that to trigger PSLRA safe harbor, warnings must contain sufficiently meaningful information about specific risks addressed by alleged misstatements).

> **b.    Defendants' Statements of Expectation or Current Intention That the Preferred Stock Would Continue to Be Listed Are Actionable**

Plaintiff's next category of misstatements involves Defendants' "expectation" that the preferred stock would continue to be listed on the NYSE. Specifically, Plaintiff alleges that on three occasions between March 1 and May 4, 2018, AmTrust stated that "[e]ach share of the Company's currently outstanding preferred stock will remain outstanding and it is *expected* that they will continue to be listed on the New York Stock Exchange following the consummation of the transaction."  (Compl. ¶¶ 50, 52, 66(f), (h), (k)).

Defendants contend that Plaintiff has failed to plead any facts suggesting that this statement of expectation was false when made, particularly as the preferred stock *did* remain outstanding for a time after the go-private

transaction closed.  (Def. Br. 12).  Further, Defendants argue that each time
AmTrust made this statement, it simultaneously cautioned investors that
"[w]hen we use words such as … 'expect' … we do so to identify forward-looking
statements … [and] [a]ctual results may differ materially from those expressed
or implied in these statements."  (Reed Decl., Ex. 7 at 1; *id.* at Ex. 8 at 5; *id.* at
Ex. 14 at 5).  According to Defendants, "[t]his cautionary language means that
AmTrust's statements of its expectations are protected by the PSLRA's safe
harbor, which protects forward looking statements that are either 'identified
and accompanied by meaningful cautionary language *or* [are] immaterial *or* the
plaintiff fails to prove that [they were] made with actual knowledge that it was
false or misleading.'"  (Def. Br. 12-13 (quoting *Ong* v. *Chipotle Mexican Grill,
Inc.*, 294 F. Supp. 3d 199, 237 (S.D.N.Y. 2018)).

While there are, of course, circumstances where "expectations" are
forward-looking and protected by the PSLRA's safe harbor provision, *see, e.g.*,
*Ong*, 294 F. Supp. 3d at 237, this case presents a much closer question.  At
the outset of its analysis, the Court finds it worth noting that while the
"cautionary" language here refers to the word "expect," it does not meaningfully
address the specific risk that AmTrust would decide to delist the preferred
stock.  *See In re Skechers USA, Inc. Sec. Litig.*, 2020 WL 1233759, at *8.  But
even if the Court were to accept Defendants' contention that these statements
fall within the PSLRA's safe harbor provision, the Court would still find the
statements actionable.  As explained herein, Plaintiff has pleaded that the
Defendants' proffered reasons for delisting the stock that were known or

32

knowable to Defendants at the time they held their "expectations" and that, therefore, these statements were made with actual knowledge that they were false or misleading.

Defendants claimed that AmTrust's decision to delist was based on its "determination that the administrative costs and burdens associated with maintaining the listings on the NYSE and the registration exceed the benefits given the small number of record holders and low daily trading volume." (Compl. ¶ 76). The press release announcing the delisting also identified "the Company's new ownership structure" since the Merger and made a vague reference to the "resulting changes to its long-term strategy" as reasons for the delisting. (*Id.*). The Individual Defendants were the founders, long-time controlling stockholders, and directors and officers of AmTrust, who spent months planning to take the Company private. (*See* Compl. ¶¶ 37-40). The Acquisition Group conducted extensive due diligence as early as November 17, 2017, in advance of its January 9, 2018 Proposal, for the Merger that closed on November 29, 2018. Thus, both the "administrative costs and burdens associated with maintaining the listings on the NYSE" and the Company's "new ownership structure" were certainly facts known to Defendants throughout 2018, when they publicly stated that the preferred stock would remain listed. Moreover, as Plaintiff argues, to the extent "costs" were the actual issue, the listing could have been moved to another exchange such as NASDAQ. Instead, the preferred stocks were left to be traded on pink sheets with none of the protections afforded by being listed on the NYSE or another national

exchange.[6]  Notably, none of these "explanations" for the delisting was included as a "risk" related to the preferred stock in AmTrust's 2017 Form 10-K or any other SEC filing by any Defendant during the Class Period.  (*Id.* at ¶ 79).

Defendants respond that "even if the facts supporting the delisting were knowable when Defendants made these statements, that would not create a strong inference that Defendants (i) had those facts in mind in 2018, (ii) concluded they justified delisting the preferred stock, (iii) decided to delist, and (iv) falsely stated that they did not expect to delist."  (Def. Reply 5-6).  But Defendants' had an obligation to avoid half-truths, *see Wilson*, 671 F.3d at 130, and by perpetuating the "expectation" that the preferred stock would continue to be listed, Defendants fostered the misimpression that they had contemplated what would happen with the preferred stock following the Merger and had made a conscious decision that the preferred stock would remain listed.  Accordingly, the Court finds Defendants' statements regarding their "expectations" that the preferred stock will continue to remain listed to be actionable.

### c. Plaintiff's Remaining Proffered Misstatements Are Not Actionable

The remainder of Plaintiff's alleged misstatements are non-actionable. *First*, Plaintiff points to nine statements made by AmTrust between January and November 2018, that the Merger "contemplates that the outstanding series

---

[6]     Further, the vague gesture to the "small number of record holders" was deceptive, per Plaintiff, because, as Defendants know, the majority of investors are not the actual record holders of the stock they beneficially own — most investors own the stock in street name through financial institutions.  (*See* Compl. ¶ 78).

of AmTrust preferred stock will remain outstanding in accordance with their terms." (Compl. ¶¶ 45, 58, 66(a), (d), (g), (i)-(m)). Plaintiff claims that this statement is untrue because the prospectus supplements, which describe the terms of the governing certificates of designation and deposit agreements for the preferred stock, stated that AmTrust "intends to apply to list" the stock's depository shares on the NYSE, and because AmTrust made statements in the underwriting agreements that it would use commercially reasonable efforts to list the stock. (Pl. Opp. 17-18).

Defendants rejoin that, as an initial matter, the prospectus supplements and underwriting agreement that contain the representation that Defendants intend to apply to list the preferred stock, are not terms of the preferred stock, which are contained solely in the certificates of designation and depositary agreements. (*See* Def. Br. 10). Defendants also contend that regardless of whether these terms are technically part of the preferred stocks, the prospectus supplements contain no promise that the preferred stock would remain listed, much less remain listed in perpetuity. The Court agrees with the latter argument, and the reasoning of *Matlick* v. *AmTrust Fin. Servs., Inc.*, 67 Misc. 3d 1202(A), 2020 WL 1294669 (Sup. Ct. N.Y. Cty. Mar. 16, 2020), in which the court explained that at the time of issuing the preferred shares, "AmTrust had no duty to inform investors of the fact that it could one day voluntarily delist its Securities, a fact which federal law has always made clear[.]" *Id.* at *8.

*Second*, Plaintiff points to a presentation prepared by the Special Committee's financial advisor, Deutsche Bank. The presentation contained a

slide identifying, as a "key term" of the Proposal, that the preferred shares would "remain outstanding in accordance with their terms," and indicating under the heading "comments/areas for clarification" this meant the "[o]ngoing disclosure and other obligations of the preferred securities."  (Compl. ¶ 66(i), (k)).  As noted above, the Court has found statements indicating that the preferred stock would remain outstanding in accordance with its terms not to be actionable.  Further, the fact that Deutsche Bank raised AmTrust's disclosure and other obligations of the preferred stock as a "comment" or "area for clarification" is not an affirmative statement by Defendants that the preferred stock would continue to be listed on the NYSE and is far too vague to induce reasonable reliance by an investor.  *See, e.g., Abuhamdan* v. *Blyth, Inc.*, 9 F. Supp. 3d 175, 192 (D. Conn. 2014) (finding reference to "growth at ViSalus" too vague to induce reasonable reliance by an investor).

Plaintiff's final category of misstatements are those that were published in a *Barron's* article regarding representations that AmTrust made to insurance regulators, which article became public *after* AmTrust announced the delisting. (*See* Compl. ¶¶ 66(b), (n), 81, 88-91).  Plaintiff does not allege that he was aware of these statements until they were published, and a "plaintiff cannot rely on acts of which [he] was unaware."  *Arco Capital Corp. Ltd.* v. *Deutsche Bank AG*, 986 F. Supp. 2d 296, 306-07 (S.D.N.Y. 2013) (citing *Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta Inc.*, 552 U.S. 148, 161, 171 (2008)).  As Plaintiff could not have relied on these statements until after AmTrust announced its decision to delist the Preferred Stock, these alleged statements

36

cannot give rise to a Section 10(b) claim.  However, as explained below, such statements may be relevant when considering Defendants' scienter.

### 2.    Plaintiff Has Adequately Pleaded Scienter

As explained above, a strong inference of scienter can be pleaded in two ways: "[i] showing that the defendants had both motive and opportunity to commit the fraud or [ii] [facts] constituting strong circumstantial evidence of conscious misbehavior or recklessness."  *ATSI Commc'ns, Inc.*, 493 F.3d at 99 (citations omitted).  A complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs, Inc.*, 551 U.S. at 324.  In determining whether Plaintiff has adequately pleaded scienter, "[t]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."  *Id.* at 326.

Plaintiff provides the following narrative explaining Defendants' motive and opportunity to commit fraud:  AmTrust was plagued by accounting scandals during its time as a public company.  (*See* Compl. ¶ 35).  On February 27, 2017, AmTrust announced that it had identified "material weaknesses" in its financial reporting internal controls.  *Id.*  Then, on March 6, 2017, AmTrust announced that it would be increasing its loss reserves, and that its financial statements for 2014, 2015, and 2016 were unreliable and would need to be restated.  (*See id.*).  On April 11, 2017, the *Wall Street Journal* reported that the SEC, the FBI, and DFS were, with the help of a former

37

AmTrust auditor, investigating AmTrust's finances.  (*Id.*; *id.* at ¶ 41).[7]  These disclosures caused the price of AmTrust common shares to plummet from $27.66 on February 24, 2017, to $15.30 by market close on April 11, 2017, and caused the filing of several lawsuits, including a consolidated securities fraud action and a derivative action.  *See In re AmTrust Fin. Servs., Inc. Sec. Litig.*, No. 17 Civ. 1545 (LAK) (S.D.N.Y.); *In re AmTrust Fin. Servs., Inc. Deriv. Litig.*, No. 17 Civ. 553 (MN) (D. Del.).[8]

According to Plaintiff, the Individual Defendants seized on the opportunity to take AmTrust private at the moment its common stock was trading at an uncharacteristic low.  (Compl. ¶ 53).  A private buyout would obviate the need for AmTrust to comply with the periodic public financial reporting that is required of public companies under the Securities Exchange Act.  (*Id.* at ¶ 43).  Furthermore, a buyout would extinguish any derivative liability arising out of the accounting scandal that could expose the Individual Defendants to significant personal liability.  (*Id.*).  Thus, the only thing exposing Defendants to SEC reporting and derivative liability was the listing of the preferred shares on the NYSE.  However, acquiring the preferred stock in the buyout, in addition to the common stock, would materially increase the cost of

---

[7]     Despite the report, Defendants did not acknowledge the existence of the SEC's five-year-long investigation until May 2018, when they were soliciting approval of the Merger.  (*See* Compl. ¶¶ 41-42 (identifying additional disclosures in October 2018 regarding the SEC's findings against AmTrust's accountants)).

[8]     Further, the Individual Defendants had been defending against a stockholder derivative action in the Delaware Court of Chancery since 2015, arising from their alleged usurpation of a valuable insurance business from AmTrust.  *See In re AmTrust Fin. Servs., Inc. S'holder Litig.*, No. 2018-0396 (AGB), 2020 WL 914563, at *3 (Del. Ch. Feb. 26, 2020).

such a buyout.  As told by Plaintiff, the listing of the preferred stock posed a problem for the Individual Defendants, who wished to take AmTrust private and evade the financial reporting obligations that had plagued them and the Company in recent years.  (*Id.* at ¶¶ 6, 41, 48, 84).

Precisely for this reason, when the Individual Defendants proposed the Merger, investors and the public questioned their motives: maintaining the preferred stocks on the NYSE would require AmTrust to continue complying with regulations governing public companies and would defeat a seemingly central justification for any going-private acquisition.  In order to ensure that the Merger was approved, Defendants had to assuage the market, state insurance commissions, and stockholders voting on the Merger by representing that the preferred stock would remain listed and that AmTrust would continue to be subject to reporting requirements.  Notably, many of the investors in preferred stock were also shareholders of AmTrust's common stock: in assessing whether to vote for the Merger, those investors needed to be reassured that their preferred stock would remain listed and, therefore, liquid. In order to ensure that the Merger was approved, Defendants maintained that they "expected" the preferred stock to remain listed and later stated that it "will" remain listed.

Defendants respond to Plaintiff's allegations of motive by citing cases in which courts have held that motives common to corporate officers are insufficient to show scienter.  (*See* Def. Br. 17-18).  It is true that motives such as the desire for a corporation to appear profitable, the desire to complete a

merger, and the desire to keep stock prices high to increase officer

compensation do not suffice to constitute "motive."  *See ECA,* 553 F.3d at 198.

At the same time, motive can be proven through a showing that the defendant

"benefitted in some concrete and personal way from the purported fraud."  *Id.*

The motive Plaintiff ascribes to the Individual Defendants here — to

squeeze out minority stockholders to acquire a highly profitable business, at a

time when AmTrust common stock was trading at historic lows, and in the

process to extinguish existing derivative securities fraud claims exposing each

of the Individual Defendants to personal liability — is particular, unique, and

indicative of Defendants benefiting in a concrete and personal way from the

purported fraud.  *See id.* ("'[M]otive' showing is generally met when corporate

insiders allegedly make a misrepresentation in order to sell their own shares at

a profit."); *Moon Joon Yu* v. *Premiere Power LLC*, No. 14 Civ. 7588 (KPF), 2015

WL 4629495, at *9 (S.D.N.Y. Aug. 4, 2015) (concluding that defendant's need to

generate money to pay off a $2.4 million settlement obtained against him

constituted a personal and concrete motive).  As Plaintiff explains, the cases

cited by Defendants are inapposite, as they do not address the situation here,

where AmTrust's controlling stockholders were not effecting a typical

transaction with a third party for the benefit of the Company and its

stockholders, but rather were seeking a transaction to benefit *themselves*, to

squeeze out minority stockholders, which would also extinguish their derivative

liability.  *Cf. Kalnit* v. *Eichner*, 99 F. Supp. 2d 327, 337-39 (S.D.N.Y. 2000)

(acknowledging that allegations that directors "hoped to receive increased

compensation, lucrative executive positions and other corporate perquisites" were reasonable, but insufficient to demonstrate scienter, as such a rule would expose independent directors to liability for virtually any merger), *aff'd*, 264 F.3d 131 (2d Cir. 2001); *Elliott Assocs., L.P.* v. *Hayes*, 141 F. Supp. 2d 344, 359 (S.D.N.Y. 2000) (rejecting inference of scienter where controlling stockholders were attempting to "maximize their equity control over a company" while raising "much needed capital").

The fact of the matter is that, prior to the Merger, Defendants repeatedly assured investors that the preferred stock would remain listed, and then, less than two months after the transaction closed, decided to delist the preferred stock.  Defendants' professed reasons for delisting the stock — which, as explained above, were known to the Individual Defendants before the Merger — only strengthen Plaintiff's argument this was a classic bait and switch. Accordingly, the Court finds that Plaintiff's narrative of scienter is "cogent and at least as compelling as any opposing inference one could draw from the facts as alleged."  *See In re Adv. Battery Techs., Inc.*, 781 F.3d 638, 644 (2d Cir. 2015) (quoting *Tellabs*, 551 U.S. at 324).

### 3.    Plaintiff Has Adequately Stated a Claim for Control Person Liability Under Section 20(a)

The Complaint also alleges that the Individual Defendants violated Section 20(a).  A *prima facie* case of control person liability under Section 20(a) of the Exchange Act requires "[i] a primary violation by the controlled person; [ii] control of the primary violator by the defendant; and [iii] that the defendant

was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc.*, 493 F.3d at 108.

In moving to dismiss, Defendants argue that the Section 20(a) claim must fail because Plaintiff has: (i) failed to plead a Section 10(b) or Rule 10b-5 claim against AmTrust; and (ii) not adequately pleaded that any Individual Defendant culpably participated in securities fraud.  (Def. Br. 23).  However, as explained above, the Court has already found that Plaintiff has stated a primary violation of Section 10(b) and adequately pleaded scienter.  Plaintiff has certainly alleged facts showing that the Individual Defendants "knew or should have known that [AmTrust], over whom [the Individual Defendants] had control, was engaging in fraudulent conduct."  *Special Situations Fund III QP, L.P.* v. *Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 439 (S.D.N.Y. 2014).  Accordingly, Plaintiff has adequately pleaded his Section 20(b) claim.

## CONCLUSION

For the reasons explained above, Defendants' motion to dismiss is DENIED.

Defendants are hereby ORDERED to file a responsive pleading on or before **September 4, 2020**.  Further, the parties are hereby ORDERED to submit a proposed case management plan to the Court on or before **September 11, 2020**.

SO ORDERED.

Dated:     August 14, 2020
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge