UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAN MARTÍNEK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| AMTRUST FINANCIAL SERVICES, INC., | ) |
| BARRY D. ZYSKIND, GEORGE | ) |
| KARFUNKEL, AND LEAH KARFUNKEL, | ) |
| | ) |
| Defendants. | ) |
| | ) |

No. 19-cv-8030-KPF
(Failla, J.)

**MEMORANDUM OF LAW IN SUPPORT OF
LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

**WOLF POPPER LLP**
Carl L. Stine
Patricia I. Avery
Adam J. Blander
845 Third Avenue, 12th Floor
New York, New York 10022
(212) 759-4600
cstine@wolfpopper.com

*Attorneys for Lead Plaintiff Jan Martínek and Lead Counsel for the Putative Class*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................................... ii

I.    PRELIMINARY STATEMENT ..................................................................................................... 1

II.   RELEVANT FACTS ....................................................................................................................... 2

III.  ARGUMENT................................................................................................................................... 4

A.    Standards for Class Certification Motions............................................................................... 4

B.    Plaintiff Has Satisfied Rule 23(a) ............................................................................................ 5

    1.  The Class is Numerous .......................................................................................................... 5

    2.  There are Questions of Law Common to All Class Members ............................................... 6

    3.  Plaintiff's Claims are Typical of the Class Claims................................................................ 7

    4.  Plaintiff and Class Counsel Are Adequate Representatives .................................................. 7

A.    The Proposed Class Satisfies Rule 23(b)(3) ............................................................................10

    1.  Predominance is Satisfied ................................................................................................... 10

        a.  Plaintiff Is Entitled to the Fraud-on-the-Market Presumption................................. 11

            i.  The Market for Preferred Stock Was Efficient.................................... 13

            ii. The *Cammer* Factors Support Market Efficiency............................... 13

            iii. Additional Factors Support Market Efficiency .................................. 20

        b.  Common Issues Concerning Damages Predominate ................................................ 22

    2.  Rule 23(b)(3)'s Superiority Requirement is Satisfied .................................................... 23

IV.   CONCLUSION.............................................................................................................................. 25

## TABLE OF AUTHORITIES

**Cases**

*In re 2TheMart.com, Inc. Sec. Litig.*,
    114 F. Supp. 2d 955 (C.D. Cal. 2000) ................................................................. 14

*In re Alstom SA Sec. Litig.*,
    253 F.R.D. 266 (S.D.N.Y. 2008) ......................................................................... 22

*In re Am. Realty Capital Props., Inc. Litig.*,
    Case No. 15-mc-40 (AKH), 2017 U.S. Dist. LEXIS 142416 (S.D.N.Y. Aug. 31, 2017) ........ 12

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ....................................................................................... 8, 10

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013) ..................................................................................... 5, 7, 11

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
    222 F.3d 52 (2d Cir. 2000) ...................................................................................... 8

*In re Barrick Gold Sec. Litig.*,
    314 F.R.D. 91 (S.D.N.Y. 2016) .............................................................................. 23

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ............................................................................................... 11

*Billhofer v. Flame Technologies, S.A.*,
    281 F.R.D. 150 (S.D.N.Y. 2012) ............................................................................ 21

*In re Blech Sec. Litig.*,
    187 F.R.D. 97 (S.D.N.Y. 1999) ................................................................................. 1

*Cammer v. Bloom*,
    711 F. Supp. 1264 (D.N.J. 1989) .......................................................... 13, 14, 16, 17

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
    12 Civ. 0256 (LAK) (AJP), 2017 U.S. Dist. LEXIS 134645 (S.D.N.Y. Aug. 22, 2017) ..... 8, 23

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
    17 Civ. 1580 (LGS), 2020 U.S. Dist. LEXIS 49786 (S.D.N.Y. Mar. 23, 2020) ........................ 6

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ................................................................................................. 22

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011) ("*Halliburton I*") ............................................................... 10, 11

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014) ("*Halliburton II*") .............................................................. 10, 18

*Krogman v. Sterritt,*
  202 F.R.D. 467 (N.D. Tex. 2001) ................................................................................... 20

*Lapin v. Goldman Sachs & Co.,*
  254 F.R.D. 168 (S.D.N.Y. 2008) .............................................................................. 16, 24

*In re MF Global Holdings Ltd. Inc. Litig.,*
  310 F.R.D. 230 (S.D.N.Y. 2015) ................................................................................... 24

*Monroe Cty. Employees' Ret. Sys. v. S. Co.,*
  332 F.R.D. 370 (N.D. Ga. 2019) ................................................................................... 12

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC,*
  No. 08-cv-5310, 2016 U.S. Dist. LEXIS 153804 (S.D.N.Y. Nov. 4, 2016) ............................... 7

*In re Novo Nordisk Sec. Litig.,*
  No. 3:17-cv-00209-BRM-LHG, 2020 U.S. Dist. LEXIS 16240 (D.N.J. Jan. 31, 2020) ......... 12

*Parsons v. Ryan,*
  754 F.3d 657 (9th Cir. 2014) .......................................................................................... 6

*Pearlstein v. Blackberry Ltd.,*
  No. 13 Civ. 7060 (CM), 2021 U.S. Dist. LEXIS 14888 (S.D.N.Y. Jan. 26, 2021) ........... *passim*

*Petrie v. Elec. Game Card, Inc.,*
  308 F.R.D. 336 (C.D. Cal. 2015) ................................................................................... 21

*In re Petrobras Sec. Litig.,*
  312 F.R.D. 354 (S.D.N.Y. 2016) ................................................................................... 12

*In re Petrobras Sec. Litig.,*
  862 F.3d 250 (2d Cir. 2017) ............................................................................... 10, 13, 25

*Pub. Emples. Ret. Sys. of Miss. v. TreeHouse Foods, Inc.,*
  No. 16-cv-10632, 2020 U.S. Dist. LEXIS 32586 (N.D. Ill. Feb. 26, 2020) .............................. 9

*Roach v. T.L. Cannon Corp.,*
  778 F.3d 401 (2d Cir. 2015) .......................................................................................... 22

*Robidoux v. Celani,*
  987 F.2d 931 (2d Cir. 1993) ............................................................................................ 7

*In re SCOR Holding (Switz.) AG Litig.,*
  537 F. Supp. 2d 556 (S.D.N.Y. 2008) ........................................................................... 25

*SEC v. AmTrust Fin. Servs.,*
  20 Civ. 4652 (LLS), 2020 U.S. Dist. LEXIS 136485 (S.D.N.Y. July 31, 2020) ...................... 24

*In re Signet Jewelers Ltd. Sec. Litig.,*
  No. 16 Civ. 6728 (CM) (RWL), 2019 U.S. Dist. LEXIS 114695
  (S.D.N.Y July 10, 2019) ....................................................................................... 7, 11, 12

*Strougo v. Barclays PLC*,
312 F.R.D. 307 (S.D.N.Y. 2016)............................................................................ 12, 13, 15, 16

*Sykes v. Mel S. Harris and Assocs. LLC*, *et al.*,
780 F.3d 70 (2d Cir. 2015) ..................................................................................... 22

*In re Teva Sec. Litig.*, No. 3:17-cv-558 (SRU),
No. 3:17-cv-558 (SRU), 2021 U.S. Dist. LEXIS 43316 (D. Conn. Mar. 9, 2021) ................... 21

*In re Twitter, Inc. Sec. Litig.*,
No. 16-cv-05314-JST, 2020 U.S. Dist. LEXIS 86978 (N.D. Cal. Apr. 17, 2020).................... 12

*In re U.S. Foodservice Inc. Pricing Litig.*,
729 F.3d 108 (2d Cir. 2013) .................................................................................... 24

*In re Veeco Instruments, Inc., Sec. Litig.*,
235 F.R.D. 220 (S.D.N.Y. 2006)............................................................................... 5

*Waggoner v. Barclays PLC*,
875 F.3d 79 (2017) .............................................................................................. 10, 18, 20

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ............................................................................................. 6

*Wilson v. LSB Indus.*,
No. 15-cv-7614, 2018 U.S. Dist. LEXIS 138832 (S.D.N.Y. Aug. 13, 2018) ........................ 15

*In re Winstar Commc'ns Sec. Litig.*,
290 F.R.D. 437 (S.D.N.Y. 2013)............................................................................... 15

**Rules**

17 C.F.R. § 239.13 ............................................................................................... 16

Fed. R. Civ. P. 23 .................................................................................................. *passim*

## I.    PRELIMINARY STATEMENT

Lead Plaintiff Jan Martínek ("Plaintiff") hereby moves under Rule 23 of the Federal Rules of Civil Procedure to certify a class of:

> All persons who purchased Series A preferred stock of AmTrust Financial Services, Inc. ("AmTrust"), or AmTrust's Depositary Shares representing 1/40th of a share of either AmTrust's Series B, C, D, E or F preferred stock (hereinafter, the "Preferred Stock") on the open market on a U.S. stock exchange from January 22, 2018, to January 18, 2019, inclusive (the "Class Period"), excluding present and former executive officers of AmTrust and any parent, subsidiary, or affiliate of AmTrust, Barry D. Zyskind, George Karfunkel, and Leah Karfunkel and their immediate family members (collectively, the "Excluded Persons"), and the legal representatives, heirs, successors, or assigns of any such Excluded Person (hereinafter, the "Class").

Plaintiff also moves the Court to appoint him the Class Representative for the Class, and his counsel, Wolf Popper LLP ("Wolf Popper") as Class Counsel (hereinafter, the "Motion").

"Class action treatment of related claims is particularly appropriate when plaintiffs seek redress for violations of the securities laws." *In re Blech Sec. Litig.,* 187 F.R.D. 97, 102 (S.D.N.Y. 1999).  That principle certainly applies here.  Plaintiff alleges that AmTrust, along with AmTrust's controlling stockholders, Barry Zyskind, George Karfunkel, and Leah Karfunkel (the "Individual Defendants," and collectively with AmTrust, "Defendants") violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j, 78t) ("Exchange Act") and Securities & Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder (17 CFR § 240.10b-5).  The alleged misconduct—fraud—was perpetrated upon all Class members during the Class Period, and all Class members were similarly injured following its revelation.  Questions of law or fact relevant to Plaintiff's claims are common to all Class members, such as whether Defendants misled investors, whether they did so with scienter, and the extent of Class members' damages due to Defendants' wrongdoing.  Moreover, there can be no dispute that Plaintiff—who, among other things, (i) initiated this lawsuit, (ii) is a "sophisticated investor who performed a diligent pre-suit

investigation," as admitted by Defendants in their unsuccessful motion to dismiss (*see* Dkt. #28 at 2), and (iii) seeks to recover his considerable losses exceeding $170,000—is more than adequate to protect interests of the Class in this Action. Nor can there be any doubt as to his attorneys' adequacy, who have decades of experience litigating securities fraud and stockholder actions, and who have prosecuted this Action with zeal and professionalism. Also beyond serious dispute is that common issues predominate over individual ones, given that the market for Preferred Stock during the Class Period was efficient, as shown in the expert report of Professor Steven P. Feinstein, Ph.D., CFA ("Feinstein Report"). Finally, a class action is clearly superior to individual actions across the country seeking the same exact relief.

As each of the elements of Rules 23(a) and 23(b)(3) are met, Plaintiff respectfully requests that the Court certify this Action as a class action, appoint him as Class Representative for the Class, and appoint his counsel Wolf Popper as Class Counsel. Defendants must be held to account for their misconduct. Allowing this litigation to proceed as a class action will ensure that result.

## II.   RELEVANT FACTS

AmTrust is an insurance company controlled by the Karfunkel-Zyskind Family. As pertinent here, the Family consists of Barry Zyskind, AmTrust's CEO and Chairman of the Board, and AmTrust directors George Karfunkel, and Leah Karfunkel (i.e., the Individual Defendants). *See* Defendants' Answer and Affirmative Defenses to Plaintiff's Class Action Complaint (Dkt. #35, "Ans.") ¶¶14-18. In 2018, AmTrust was taken private by the Individual Defendants (the "Buyout"). Ans. ¶ 3. Only AmTrust's common stock was acquired and extinguished in the Buyout. However, there existed approximately a billion dollars in AmTrust Preferred Stock outstanding, issued only a few years earlier. Acquiring the Preferred Stock, had the Buyout been so designed, would have materially increased the cost of the Buyout to the Individual Defendants. Upon the announcement of the Individual Defendants' Buyout offer, stockholders and stock

2

market professionals expressed concern over the future of the Preferred Stock of a private company.  Throughout the Class Period, to allay concerns of the market, including those common stock investors who also owned Preferred Stock (who would be voting on the Buyout), Defendants publicly represented that, unlike the common shares, which they were acquiring, the Preferred Stock would continue to be listed on the New York Stock Exchange ("NYSE") and would remain listed following the Buyout. Compl. ¶ 4.

For example, on January 22, 2018, the Individual Defendants filed a Schedule 13D with the SEC clarifying that their merger proposal (made weeks earlier) did not anticipate the delisting of the Preferred Stock. As pertinent here, the Schedule 13D stated as follows:

> [I]t is the Group's current intention that, following completion of the proposed transaction, each series of the Issuer's preferred stock will continue to be listed on the New York Stock Exchange, the Issuer will continue to file reports with the SEC and the Issuer will continue to pay dividends on each series of preferred stock on a current basis. In the future, the Issuer may take any action that is permitted by the terms of each series of preferred stock. Ans. ¶¶ 48, 66(c).

Moreover, both the preliminary and definitive proxies filed in connection with the Buyout (respectively, on April 9, 2018 and May 4, 2018) stated as follows:

> each outstanding share of preferred stock of the Company will remain outstanding and will continue to be listed on the New York Stock Exchange following the Merger and the reporting obligations with respect to such shares under the Exchange Act will therefore continue. Ans. ¶¶ 57-58.

Contrary to Defendants' representations, less than two months following the close of the Buyout, on January 18, 2019, AmTrust announced it would delist the Preferred Stock from the NYSE, claiming that "the administrative costs and burdens associated with maintaining the listings on the NYSE and the registration exceed the benefits" and that there was a new "ownership structure" due to the Buyout. Compl. ¶ 4. Since these factors were known or had to have been known during the Class Period, the inference is that Defendants never intended to maintain the

3

listing, or were deliberately reckless when stating so. Indeed, *Barron's* reported on January 23, 2019, that the announcement appeared to be a "reversal of promises that AmTrust managers made." Compl. ¶ 81.

On January 19, 2019, the trading day following the announcement of the delisting, the trading prices of each of the six series of Preferred Stock outstanding dropped by almost 40%, with the shares losing over $300 million dollars in market value. Compl. ¶ 82.

In the wake of these events, Plaintiff commenced this Action, and this Court thereafter appointed him as Lead Plaintiff and his counsel as Lead Counsel under the PSLRA. Dkt. #23. In an Opinion and Order dated August 14, 2020 (Dkt. #34, the "August 14, 2020 Order"), this Court denied in substantial part Defendants' motion to dismiss, finding, among other things, that Plaintiff had pleaded sufficient facts demonstrating that Defendants' statements regarding the continued listing of the Preferred Stock were false or misleading; that Defendants failed to issue any meaningful cautionary statements so as to invoke the safe harbor provision of the PSLRA; and that Defendants acted with scienter. The Court concluded that "[t]he fact of the matter is that, prior to the Merger, Defendants repeatedly assured investors that the preferred stock would remain listed, and then, less than two months after the transaction closed, decided to delist the preferred stock," and that the "professed reasons for delisting the stock…were known to the Individual Defendants before the Merger," a fact "only strengthen[ing] Plaintiff's argument [that] this was a classic bait and switch." August 14, 2020 Order at 41.

## III. ARGUMENT

### A. Standards for Class Certification Motions

A class must be certified upon a showing of numerosity, commonality, typicality, and adequacy under Rule 23(a), and predominance and superiority under Rule 23(b)(3). While this

analysis sometimes "entail[s] some overlap with the merits of the plaintiff's underlying claim… merits questions may be considered to the extent--but only to the extent--that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds,* 568 U.S. 455, 465-66 (2013) (citations omitted). "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Id.*

### B.    Plaintiff Has Satisfied Rule 23(a)

#### 1.    The Class is Numerous

To satisfy numerosity under Fed. R. Civ. P. 23(a)(1), the plaintiff must show that "the class is so numerous that joinder of all members is impracticable." "While no minimum number of plaintiffs is required for a suit to be maintained as a class action, generally, courts will find a class sufficiently numerous when it comprises 40 or more members.'" *In re Veeco Instruments, Inc., Sec. Litig.*, 235 F.R.D. 220, 237 (S.D.N.Y. 2006) (citation omitted). "Precise quantification of the class members is not necessary because a court may make common sense assumptions regarding numerosity." *Id.* at 238.  Accordingly, in suits "relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *Pearlstein v. Blackberry Ltd.,* No. 13 Civ. 7060 (CM), 2021 U.S. Dist. LEXIS 14888, at *19 (S.D.N.Y. Jan. 26, 2021) (citation omitted).

During the Class Period, there were over 36 million shares of Preferred Stock outstanding. *See* Feinstein Report (Exhibit A to the Declaration of Carl L Stine, Esq. ("Stine Decl.")) ¶¶ 47-58 (identifying shares outstanding for each series of Preferred Stock).[1]  The average daily trading volume for the Preferred Stock, which reflects how often stock changed hands, ranged (among

---

[1] Unless otherwise noted, references to "¶" are to the Feinstein Report.

each series) from 12,681 to 34,975 shares. ¶ 111.  Moreover, the average weekly turnover rate for the stock reflected a range of 1.38% to 2.09%.  ¶ 112 (citing the pertinent data).  These facts establish a sufficiently numerous class.

### 2.      There are Questions of Law and Fact Common to All Class Members

A plaintiff must also demonstrate that there exist "questions of law or fact common to the class."   Fed. R. Civ. P.  23(a)(2).   Commonality is considered a "low hurdle" and "easily surmounted," *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 206 n.8 (S.D.N.Y. 1995).  "Even a single [common] question will do," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011).  Thus, "[w]here the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class, commonality exists." *Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014).

Here, there are multiple questions in dispute common to the Class, including: (i) whether Defendants' statements were materially misleading in violation of the securities law; (ii) whether Defendants made such statements with scienter; (iii) whether the Individual Defendants exercised sufficient power over any other Defendant so as to be adjudged a control person under Section 20(a) of the Exchange Act; and (iv) whether Defendants' misrepresentations caused damage to the Class, and if so, the extent of such damages.  Courts invariably find commonality to be demonstrated based on the questions identified above.  *See, e.g., In re Chi. Bridge & Iron Co. N.V. Sec. Litig.,* 17 Civ. 1580 (LGS), 2020 U.S. Dist. LEXIS 49786, at *30 (S.D.N.Y. Mar. 23, 2020) ("[C]ommonality is satisfied because Plaintiffs allege the same injury and claims resulting [from] common misrepresentations and omissions concerning Defendants' business. All plaintiffs were impacted by disclosures affecting equally all market participants who transacted [in] CBI stock.") (citation omitted); *In re Signet Jewelers Ltd. Sec. Litig*., No. 16 Civ. 6728 (CM) (RWL), 2019 U.S.

Dist. LEXIS 114695, at *23 (S.D.N.Y July 10, 2019) (numerous common questions existed "as is typical of most securities fraud putative class actions") (citing *Amgen,* 568 U.S. at 474-75)). Commonality has been established here.

### 3. Plaintiff's Claims are Typical of the Class Claims

The claims of the plaintiff must also be "typical" of those of the class.  Fed. R. Civ. P. 23(a)(3).  In federal securities actions, the typicality standard is "not demanding" and is satisfied by a showing that "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, No. 08-cv-5310, 2016 U.S. Dist. LEXIS 153804, at *13 (S.D.N.Y. Nov. 4, 2016) (citation omitted). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Id*. (quoting *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993)).

Like all other Class members, Plaintiff bought Preferred Stock during the Class Period— in fact, all six series of the stock—when it was trading at artificially high prices due to Defendants' fraudulent statements.  *See* Dkt. #21-4 (Plaintiff's PSLRA Certification).  And, like all other Class members, he suffered economic loss when the truth was revealed and the trading price for Preferred Stock plummeted. *See* Dkt. #21-5 (chart of Plaintiff's $176,366 estimated loss).   It is clear that the claims of Plaintiff and Class members "arise from the same course of events and will be resolved based on similar legal arguments."  *Signet*, 2019 U.S. Dist. LEXIS 114695, at *22 (finding typicality based on same facts recounted above).  Typicality is satisfied.

### 4. Plaintiff and Class Counsel Are Adequate Representatives

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the

interests of the class." Adequacy analyzes "whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class; and [whether] 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation," *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000) (citation omitted), and "serves to uncover conflicts of interest between named parties and the class they seek to represent," *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 625 (1997) (citation omitted). As only a "fundamental" conflict will affect adequacy, "speculative" conflicts are disregarded. *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.,* 12 Civ. 0256 (LAK) (AJP), 2017 U.S. Dist. LEXIS 134645, at *23-24 (S.D.N.Y. Aug. 22, 2017).

Plaintiff's interests are not antagonistic, but rather, are fully aligned, with the Class's interests. Plaintiff has certified that he is willing to provide testimony at a deposition and trial, if necessary, and that he will not accept any payment for serving as a class representative, other than that awarded by the Court. *See* Dkt. #21-4 (PSLRA Certification). Moreover, Plaintiff's sizable loss due to Defendants' fraud incentivizes him to obtain the best possible recovery for the Class. Dkt. #21-5 (loss summary reflecting loss to Plaintiff of $176,366). Plaintiff also responded to Defendants' interrogatories and requests for the production of documents, and searched for and collected documents in connection with responding to these requests. Stine Decl. ¶ 5. He has also continually conferred with his counsel to discuss case matters and strategy. Aside from zealously prosecuting this action for damages, Plaintiff has also demonstrated his commitment to holding Defendants' feet to the fire, aside from litigation. Among other things, he issued an open letter to Stone Point Capital LLC, the Individual Defendants' private equity partner, stating that the firm was compromising its reputation in agreeing to delist the Preferred Stock, and also submitted a letter to the SEC articulating his objections to the decision. Compl. ¶ 86. As Defendants conceded in their motion to dismiss, Plaintiff, a former investment banker who now operates a family-run

8

business, "is a sophisticated investor who performed a diligent pre-suit investigation." Dkt. #28. Plaintiff is an adequate—if not ideal—class representative, and it is assured that he will continue to devote the time and effort needed to ensure that the Class succeeds in this lawsuit.

Moreover, Plaintiff has retained qualified and experienced counsel who will continue to vigorously prosecute this Action on behalf of the Class. Wolf Popper possesses extensive experience successfully litigating complex securities class actions, both in federal and state court, including through trial, and has a track record of obtaining substantial recoveries for the classes it has represented. *See* Dkt. #21-6 (Wolf Popper firm resume).  In this Action, Wolf Popper has, at all relevant times, prosecuted the Class's claims with the attention and resources such an important case deserves by, among other things, (i) investigating potential claims against Defendants, an investigation culminating in the filing of a comprehensive complaint; (ii) opposing and ultimately prevailing against Defendants' motion to dismiss; (iii) serving discovery on Defendants, including serving document requests and requests for admission, and repeatedly meeting and conferring with Defendants on the scope of production; (iv) responding to discovery requests from Defendants and collecting and reviewing Plaintiff's documents for responsiveness and privilege; (v) drafting and serving several subpoenas on non-parties (v) retaining an expert to opine on market efficiency issues; and (v) filing this Motion.  *See* Stine Decl. ¶ 4.  Wolf Popper has repeatedly been appointed as Class Counsel in federal securities cases, given its expertise in prosecuting these matters.  *See, e.g., Pub. Emples. Ret. Sys. of Miss. v. TreeHouse Foods, Inc.,* No. 16-cv-10632, 2020 U.S. Dist. LEXIS 32586, at *22 (N.D. Ill. Feb. 26, 2020) ("After considering [Wolf Popper's] work on the case to date and its record in securities litigation,…the Court concludes that counsel is experienced and competent")  (citation omitted).  As Wolf Popper meets the requirements of Rule 23(a)(4) and

9

Rule 23(g),[2] the Court should appoint it as Class Counsel for the Class under Rule 23(g).

## A. The Proposed Class Satisfies Rule 23(b)(3)

### 1.    Predominance is Satisfied

Rule 23(b)(3) requires common questions of law or fact to predominate over individual issues.  This requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623.  Predominance is satisfied if: "(1) resolution of any [common] material legal or factual questions…can be achieved through generalized proof, and (2) these [common] issues are more substantial than the issues subject only to individualized proof."  *In re Petrobras Sec. Litig.*, 862 F.3d 250, 270 (2d Cir. 2017); *accord Waggoner v. Barclays PLC,* 875 F.3d 79, 93 (2017).  "Predominance is a test readily met in certain cases alleging … securities fraud…." *Amchem,* 521 U.S. at 625.  "That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate." *Halliburton Co. v. Erica P. John Fund, Inc.,* 573 U.S. 258, 276 (2014) ("*Halliburton II*").

Whether common questions predominate over individual questions "begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co*. ("*Halliburton I*"), 563 U.S. 804, 809 (2011).  To prove a violation of Section 10(b), class members must demonstrate "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Id.* at

---

[2] "[I]n appointing class counsel, the court must consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). "Class counsel must fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4).

809-10 (citations omitted)*; see also* August 14, 2020 Order at 20 (same). Clearly, most of these elements constitute common, classwide issues. *See Amgen,* 568 U.S. at 475 (recognizing that the "essential elements" of a 10(b) claim are subject to common proof). Thus, whether common questions of law or fact predominate in a securities fraud lawsuit often turns on the element of reliance. *Halliburton I*, 563 U.S. at 810.[3]

Here, the issue of reliance predominates because Plaintiff is entitled to the fraud-on-the-market presumption of reliance established in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), later re-affirmed in *Halliburton II.*

### a.      Plaintiff Is Entitled to the Fraud-on-the-Market Presumption

The fraud-on-the-market presumption is based on the "premise [] that the price of a security traded in an efficient market will reflect all publicly available information about a company; accordingly, a buyer of the security may be presumed to have relied on that information in purchasing the security." *Amgen*, 568 U.S. at 458; *see also Basic*, 485 U.S. at 246 ("the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations"); *id.* at 246-47 ("[I]t is hard to imagine that there ever is a buyer or seller who does not rely on market integrity. Who would knowingly roll the dice in a crooked crap game?").

To demonstrate that the fraud-on-the-market presumption of reliance applies, a plaintiff must show that "(*i*) the alleged misrepresentations were publicly known ('publicity'), (*ii*) the stock traded in an efficient market ('market efficiency'), and (*iii*) the plaintiff traded the stock between

---

[3] Plaintiff has also brought a "control person" claim under Section 20(a) of the Exchange Act against the Individual Defendants.    Whether these Defendants exercised control over AmTrust is clearly a predominating common question. *Signet,* 2019 U.S. Dist. LEXIS 114695, at *27, n.2 ("the method for demonstrating whether Defendants exerted control over Signet varies only based on Defendants' identities, not the Plaintiff's.").

when the misrepresentations were made and when the truth was revealed ('market timing')." *Signet*, 2019 U.S. Dist. LEXIS 114695, at *28-29 (citing *Basic*, 485 U.S. at 248 n.27). "[P]laintiffs are not required to prove price impact directly to invoke the *Basic* presumption. Rather, market efficiency, publicity, and materiality serve as a proxy for price impact." *Strougo v. Barclays PLC*, 312 F.R.D. 307, 314 (S.D.N.Y. 2016) (citation omitted). Moreover, while materiality forms a basis for the fraud-on-the-market theory, "proof of materiality is not required prior to class certification because such proof is not necessary to ensure satisfaction of Rule 23(b)(3)'s predominance requirement." *Amgen*, 568 U.S. at 467 n.4.

Here, the prerequisites for invoking the fraud-on-the-market presumption are readily met. First, each statement upon which Plaintiff seeks relief was made publicly by the Defendants in SEC Filings during the Class Period. Second, Plaintiff and Class members purchased Preferred Stock after Defendants' misrepresentations and before disclosure of the relevant truth, which Defendants concealed up to January 18, 2019. *See* Dkt. #21-4 (Plaintiff PSLRA certification). Finally, for the reasons set forth below, and as explained in the accompanying Feinstein Report, the market for Preferred Stock was efficient throughout the Class Period.[4]

---

[4] Dr. Feinstein is a well-recognized expert in economics and capital markets. His reports opining on market efficiency (including the market efficiency of preferred securities), loss causation, and other matters pertinent to securities litigation have been credited in courts throughout the country. *See, e.g., In re Petrobras Sec. Litig.,* 312 F.R.D. 354, 371 (S.D.N.Y. 2016), *aff'd in part and vacated in part on other grounds*, 862 F.3d 250 (2d Cir. 2017) (certifying class of purchasers of various Petrobras securities, including preferred stock: "The Court sides with Feinstein"); *see also Blackberry,* 2021 U.S. Dist. LEXIS 14888 (relying on Dr. Feinstein's market efficiency opinion in granting class certification); *In re Twitter, Inc. Sec. Litig.,* Case No. 16-cv-05314-JST, 2020 U.S. Dist. LEXIS 86978 (N.D. Cal. Apr. 17, 2020) (denying defendants' motion for summary judgment based on opinion and testimony of Dr. Feinstein regarding loss causation); *In re Novo Nordisk Sec. Litig.,* Case No. 3:17-cv-00209-BRM-LHG, 2020 U.S. Dist. LEXIS 16240, at *9, 25 (D.N.J. Jan. 31, 2020) (noting that "Dr. Feinstein establishes each of the *Cammer* and *Krogman* factors weigh in favor of market efficiency" and observing that "this Court has previously found Dr. Feinstein to be credible to offer expert opinions on market efficiency, loss causation, and damages in securities-fraud cases"); *Monroe Cty. Employees' Ret. Sys. v. S. Co.,* 332 F.R.D. 370 (N.D. Ga. 2019) (crediting Dr. Feinstein's opinion following two days of competing expert testimony on a motion for class certification); *In re Am. Realty Capital Props., Inc. Litig.,* Case No. 15-mc-40 (AKH), 2017 U.S. Dist. LEXIS 142416 (S.D.N.Y. Aug. 31, 2017) (granting plaintiffs' class certification motion, which was

### i.       The Market for Preferred Stock Was Efficient

The burden in demonstrating market efficiency at the class certification stage "is not an onerous one." *Petrobras*, 862 F.3d at 278; *see also id.* at 278 n.29 (noting that a plaintiff's burden in showing entitlement to the *Basic* presumption at the class certification stage cannot be stricter than the burden expected at trial before the "ultimate finder of fact"). Nor is this burden an overly mechanistic one, whereby market efficiency is established only upon the plaintiff's demonstration that every factor correlating with market efficiency is present. *Barclays*, 875 F.3d at 94 (noting that the Second Circuit has "repeatedly—and recently—declined to adopt a particular test for market efficiency") (citation omitted). Accordingly, there are no "distinct requirements" in proving market efficiency; rather the Second Circuit has endorsed "opting instead for a holistic analysis based on the totality of the evidence presented." *Id.* at 97.

### ii.       The *Cammer* Factors Support Market Efficiency

Courts in the Second Circuit look to the non-exhaustive list of factors set forth in *Cammer v. Bloom*, 711 F. Supp. 1264, 1285-87 (D.N.J. 1989) when analyzing market efficiency. *Barclays*, 875 F.3d at 94. Those factors are:

> (1) the average weekly trading volume of the stock, (2) the number of securities analysts following and reporting on it, (3) the extent to which market makers traded in the stock, (4) the issuer's eligibility to file an SEC registration Form S-3, and (5) the demonstration of a cause and effect relationship between unexpected, material disclosures and changes in the stock's price.

*Id.* The first four factors "examine *indirect* indicia of market efficiency," while the fifth factor, by contrast, "permits plaintiffs to submit *direct* evidence…of…a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock

---

supported by Dr. Feinstein's market efficiency analysis; court found that the defendant-company's common stock traded in an efficient market, and then stated that its holding "also extends to ARCP's preferred stock and debt securities, which also satisfy many of the aforementioned [*Cammer/Krogman*] factors").

13

price," and is generally accomplished through an event study. *Id.* (emphasis added). In the Second Circuit, as well as the "majority of courts," the five *Cammer* factors are to be used as "an analytical tool rather than as a checklist." *Barclays*, 312 F.R.D. at 321 (citations omitted).

As confirmed in the Feinstein Report and discussed below, an analysis of the *Cammer* factors establishes that the Preferred Stock traded on an efficient market during the Class Period. *See* ¶¶ 206-215 (market efficiency summary).

**High Weekly Trading Volume:** "Average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption." *Cammer,* 711 F. Supp. at 1293 (citation omitted). As noted earlier, the average weekly trading volume for the Preferred Stock as a percentage of shares outstanding ranged from 1.38% to 2.09%, depending on the series. ¶ 112. The average weekly turnover range for Interval-1 and Interval-2 were 1.21%-1.94% and 2.36%-3.11%, respectively. *Id.*[5] Utilizing the standard set forth in *Cammer*, Dr. Feinstein observes that the trading volume for Preferred Stock "during the Class Period and in Interval-1 exceeded the threshold for a substantial presumption of market efficiency" and that the trading volume "during Interval-2 exceeded the threshold for a strong presumption of market efficiency." ¶ 113. Dr. Feinstein concludes that "the active trading volume of the AmTrust Preferred Shares is compelling evidence of the efficiency of their market." ¶ 114; *see also In re 2TheMart.com, Inc. Sec. Litig.*, 114 F. Supp. 2d 955, 965 n.6 (C.D. Cal. 2000) (1% weekly volume supports market efficiency, and would satisfy first *Cammer* factor).

---

[5] In addition to analyzing the *Cammer/Krogman* factors during the Class Period, Dr. Feinstein also analyzed data from subinterval periods, segregated by the date the common stock was extinguished and delisted as part of the Buyout: January 22, 2018-November 28, 2018 ("Interval-1") and November 29, 2018-January 18, 2019 ("Interval-2").

**Significant Analyst Coverage:** "[A] stock covered by a 'significant number of analysts is more likely to be efficient because such coverage implies that investment professionals are following the company and taking buy/sell recommendations to investors." *Barclays*, 312 F.R.D. at 316 (citing *Cammer*, 711 F. Supp. at 1286). In his report, Dr. Feinstein notes that "Thomson Eikon, an information provider that makes available some analyst reports on certain companies, listed analyst reports covering AmTrust published by five different analyst companies during the Class Period." ¶ 117. In addition to the reports listed by Thomson Eikon, Dr. Feinstein also observed two online reports by Panther Investments, with one of the reports specifically analyzing the Preferred Stock. ¶ 118.[6] While analyst coverage generally dropped contemporaneously with the closing of the Buyout, Dr. Feinstein does observe that at least one analyst continued to cover and follow the Company. ¶ 118-119. Citing, among other things, academic literature demonstrating that "coverage by one or two analysts strengthened the presumption of efficiency for a publicly traded stock," Dr. Feinstein concludes that "coverage during Interval-1 satisfies the analyst coverage *Cammer* factor" and that the evidence for Interval-2 does not support such a finding, "but neither does it necessarily indicate inefficiency." ¶ 120 (citations omitted); *cf. In re Winstar Commc'ns Sec. Litig.,* 290 F.R.D. 437, 446 (S.D.N.Y. 2013) (*Cammer* factor met where three analysts followed company); *Wilson v. LSB Indus.,* No. 15-cv-7614, 2018 U.S. Dist. LEXIS 138832, at *30 (S.D.N.Y. Aug. 13, 2018) ("that one large brokerage firm published reports strongly supports the notion of a functioning market").

**Market Makers:** Market makers are intermediaries who trade in a security, standing ready

---

[6] AmTrust was also covered by other professional industry observers, such as A.M. Best, which provides credit ratings for insurance companies. Compl. ¶ 101(d); Ans. ¶ 101(d). Aside from analyst coverage, there was also significant press coverage about AmTrust during the Class Period. ¶ 122 (463 published articles about AmTrust during Class Period reflected in Factiva database).

15

to buy and sell with other market participants. ¶ 106. As Dr. Feinstein notes, *Cammer* "determined that the market making infrastructure for a security was an important determinant in establishing whether or not the market for the security was an efficient market," and specifically inquired whether the security traded on a large exchange, like the NYSE. ¶ 103.[7] The NYSE "is one of the most renowned, most liquid, and most efficient forums in the world" and, as a NYSE-traded security, the Preferred Stock "traded under the supervision of a lead market maker called the 'Designated Market Maker.'" ¶ 104.[8] Beyond the NYSE, the Preferred Stock "also benefited from the participation of numerous Nasdaq market makers," as well as the prominent investment banks underwriting each series of stock. ¶¶ 106-108.[9] Dr. Feinstein concludes that the above facts, including that "trading was facilitated by numerous market makers," constitute "compelling evidence" of market efficiency. ¶ 110. This *Cammer* factor is satisfied.

**SEC Form S-3 Eligibly:** A company is eligible to file a Form S-3 registration statement if it possesses a market capitalization of at least $75 million and has filed SEC reports for twelve consecutive months. *See* 17 C.F.R. § 239.13. The Form is "predicated on the [SEC's] belief that the market operates efficiently for these companies [eligible for Form S–3s], i.e., that the disclosure in Exchange Act reports and other communications by the registrant, such as press

---

[7] *See Cammer,* 711 F. Supp. at 1292 (citing academic literature and noting that "at a minimum, there should be a presumption" that the markets for "virtually all the securities traded" on the NYSE are efficient). As Dr. Feinstein notes, "[i]n fact, the allegations of the case focus on the Company's assurances that the securities would continue to enjoy the benefits of a NYSE listing." ¶ 105.

[8] Courts invariably recognize that stocks trading on the NYSE, the stock exchange with the largest market capitalization in the world, correlates with market efficiency. *See, e.g., Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 183 (S.D.N.Y. 2008) ("[N]o argument could be made that the New York Stock Exchange is not an efficient market."); *Barclays*, 312 F.R.D. at 318 (NYSE listing is a "good indicator of efficiency"). To state the obvious: the Preferred Stock traded on the NYSE during the entirety of the Class Period, until their delisting in February 2019.

[9] Indeed, one of these underwriters sued AmTrust, alleging damage to its reputation in light of the delisting. Aug. 14, 2020 Order at 15-16.

releases, has already been disseminated and accounted for by the marketplace." *Cammer*, 711 F. Supp. at 1284 (citations omitted).   As set forth in the Feinstein Report, "[d]uring the Class Period, when the common shares were listed, the average float of the AmTrust common shares was $1.52 billion, far exceeding the level required for S-3 registration," ¶ 136.  Indeed, the S-3 requirement is met, even if one only considers the "size of the AmTrust Preferred Share issues," which reflected an aggregate liquidation preference of $913.75 million.  ¶ 139. Regarding the reporting aspect of the S-3 requirement, for more than half the Class Period, AmTrust was eligible for S-3 registration, while AmTrust's ineligibility during the other portion of the Class Period was due to AmTrust's utilization in March 2017 (prior to the Class Period) of Rule 12b-25(b) of the Exchange Act, whereby it requested two extensions to file consolidated financial statements. (AmTrust thereafter filed its Form 10-K on April 4, 2017).  ¶ 141.[10]   Importantly, however, AmTrust timely filed required financial statements throughout the Class Period.  ¶¶ 140-141.  Based on the above facts, Dr. Feinstein concludes that this *Cammer* factor was met for the entire Class Period.  ¶ 143; *see also Blackberry,* 2021 U.S. Dist. LEXIS 14888, *41-42 (factor met as float "far exceeds both the original and amended S-3 float requirements of $150 million and $75 million, respectively").

**Cause and Effect Relationship:** As noted earlier, the final, and likely most significant *Cammer* factor is demonstrated when there are facts supporting a cause-and-effect relationship between unexpected corporate or financial news and an immediate stock price reaction.  Such a relationship is "the essence of an efficient market and the foundation for the fraud on the market theory," *Cammer*, 711 F. Supp. at 1287, and constitutes "direct evidence" of market efficiency,

---

[10] *Cammer* itself clarifies that ineligibility due to the "timing" of filings should not affect whether this market efficiency factor is met. 711 F. Supp. at 1287 ("[I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.").

17

*Barclays*, 875 F.3d at 94.  In the Second Circuit, "where the remaining four *Cammer* factors and the three *Krogman* factors all point toward market efficiency, a court can dispense with [this] factor completely."  *Blackberry,* 2021 U.S. Dist. LEXIS 14888, *43-44 (citation omitted).  Alternatively, "[d]irect evidence of an efficient market [i.e., this final *Cammer* factor] may be more critical, for example, in a situation in which the other four *Cammer* factors (and/or the *Krogman* factors) are less compelling in showing an efficient market."  *Barclays*, 875 F.3d at 97-98.

Dr. Feinstein's event study provides direct evidence that the price of Preferred Stock quickly responded to the release of new Company-specific information during the Class Period. An event study is a well-established and universally-accepted methodology to determine whether a stock price rapidly incorporates new information. ¶¶ 165-168; *Halliburton II*, 573 U.S at 280-81 (endorsing event study).  Here, Dr. Feinstein identified three news events during the Class Period whereby investors were given unexpected information "that was economically material to the valuation of the Preferred Shares." ¶ 178.[11]  They were: i) the January 22, 2018 Schedule 13D, at the beginning of the Class Period, where the Individual Defendants stated that it was their current intention to continue listing the Preferred Stock on the NYSE, continue filing reports with the SEC, and continue paying dividends on the Preferred Stock; ii) the May 17, 2018 disclosure (after the close of trading) that activist investor Carl Icahn would be waging a proxy battle against the Individual Defendants against the Buyout; and (iii) the January 18, 2019 announcement that the Preferred Stock would be delisted (i.e., the close of the Class Period).  ¶ 180.  For each of the three events, Dr. Feinstein analyzed the data from the trading occurring immediately following the event's revelation, ¶¶ 196-202. For the January 22, 2018 event, he concluded that the residual

---

[11] Dr. Feinstein explains why periodic earnings announcements would be inappropriate event dates for preferred securities, like the Preferred Stock, as part of an event study. ¶¶ 175-177.

returns were unusually large one-day movements for the Preferred Stock and that "[t]he likelihood of obtaining a residual return of this magnitude and associated *t*-statistic if only random volatility (rather than information) was impacting the stock price ranged between 0.000071% (Series F) and 0.045% (Series C)." ¶ 197. For the May 18, 2018 event, he concluded that the residual returns were unusually large one-day movements for the Preferred Stock and that "[t]he likelihood of obtaining a residual return of this magnitude and associated *t*-statistic if only random volatility (rather than information) was impacting the stock price ranged between 0.0023% (Series F) and 4.31% (Series E)." ¶ 199. For the January 22, 2019 event, he concluded that the residual returns were unusually large one-day movements for the Preferred Stock and that "[t]he likelihood of obtaining a residual return of this magnitude and associated *t*-statistic due to random chance alone is virtually nil." ¶ 201. Based on this empirical data, Dr. Feinstein concludes the existence "of a cause-and-effect relationship between the release of Company information and changes in the AmTrust Preferred Stocks' market price," ¶ 203, thereby proving the final *Cammer* factor.

But there is more. Aside from performing an event study, Dr. Feinstein also performed regression analyses with respect to daily market interest rates. As explained by Dr. Feinstein:

> The fundamental value of preferred stock changes with Company information, but also on a day-to-day basis as market interest rates change. A higher market interest rate would make the fixed preferred dividend rate less attractive to investors, and should therefore depress the preferred share price. Alternatively, a lower market interest rate should boost the preferred share price. In an efficient market, investors would take note of market interest rate changes and such changes would be continuously incorporated into preferred share trading prices.

¶ 204. Here, Dr. Feinstein demonstrates that that Preferred Stock "responded in statistically significant fashion to changes in market interest rates on a day-to-day basis," and, importantly, that the stock "moved significantly with the S&P Preferred Shares Index," which reflects changes in interest rates. ¶ 205. Dr. Feinstein explains:

19

> As shown in Table-9, the S&P Preferred Shares Index is a significant explanatory variable of the AmTrust Preferred Shares stock returns at an extremely high level of statistical significance. Evidently, on a continuous basis throughout the Class Period, investors monitored market interest rates and incorporated their valuation impact on the AmTrust Preferred Shares into the securities' trading prices.

*Id.* Like the event study, this "day-to-day" empirical data, according to Dr. Feinstein, "proves that the AmTrust Preferred Shares demonstrated market efficiency throughout the Class Period." *Id.*

Accordingly, Plaintiff has provided ample direct, empirical evidence of the Preferred Stock's market efficiency, thereby establishing *Cammer*'s fifth factor.

### iii.    Additional Factors Support Market Efficiency

In addition to the *Cammer* factors, other factors may support market efficiency. For example, the *Krogman* factors inquire into "(1) the capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders ('the float')." *Barclays*, 875 F.3d at 95 (2d Cir. 2017) (quoting *Krogman v. Sterritt,* 202 F.R.D. 467, 474 (N.D. Tex. 2001)).[12] Those factors are also present here:

**Market Capitalization:** As noted earlier, AmTrust was a large company with also a large float. "Market capitalization is the sum total value of a company's outstanding common equity." ¶ 146. During Interval-1, when AmTrust common stock was outstanding, AmTrust's market capitalization "ranged between $2.35 billion and $2.92 billion and averaged $2.71 billion," which "placed AmTrust in the 2nd decile of all U.S. companies by size." *Id.* "Of course, the common stock market capitalization fell to zero when the common stock was retired on 29 November 2018, the start of Interval-2." ¶ 147. However, even during this period, the total outstanding value of the Preferred Stock was $494.4 million (compared to $692.2 million during Interval-1), which was

---

[12] Discussion of AmTrust is discussed above, in connection with AmTrust's S-3 eligibility.

20

alone, larger than the common stock market capitalization of 60% of all publicly traded companies. ¶ 149. Dr. Feinstein concludes that the above data also supports a finding of market efficiency. ¶¶ 149-150; *see Billhofer v. Flame Technologies, S.A.*, 281 F.R.D. 150, 160 (S.D.N.Y. 2012) ($288-$717 million market capitalization range constituted "substantial market capitalization").

**Bid-Ask Spread:** During the Class Period, the average bid-ask spreads for the Preferred Stock for Series A, B, C, D, E, and F were 1.36%, 1.03%, 1.22%, 0.79%, 1.04%, and 0.67%, respectively. ¶ 156. A narrow bid-ask spread may constitute evidence of market efficiency. To be sure, the average month-end bid-ask spread over the course of the Class Period for all stocks in the Center for Research in Security Prices, LLC ("CRSP") US Stock database, which tracks stocks traded on U.S. exchanges, was 0.61%, which is lower. *Id.* However, this fact comes with some important caveats: First, the CRSP database tracks only common stock, not preferred securities. *Id.* Second, "[i]n 2001, the year of the *Krogman* opinion, the average month-end bid-ask spread for all stocks in the CRSP database was 3.70%." ¶ 158. Dr. Feinstein also notes that a very recent case within the Second Circuit found that the average daily bid-ask spread of 2.66% for a company's preferred securities (more than twice the bid-ask spread for the AmTrust Preferred Stock), "weighs moderately in favor of market efficiency." ¶ 159 (citing *In re Teva Sec. Litig.*, No. 3:17-cv-558 (SRU), 2021 U.S. Dist. LEXIS 43316, at *53 (D. Conn. Mar. 9, 2021)). Dr. Feinstein also noted that "[o]ther courts have stated that average daily bid-ask spreads of 2.44% and 2.91%, both of which are wider than that of the AmTrust Preferred Shares, were narrow enough to indicate market efficiency." *Id.* (citations omitted). Based on these additional considerations, Dr. Feinstein concludes that "the size of the bid-ask spreads on the AmTrust Preferred Shares supports the conclusion that their market was efficient during the Class Period." *Id; cf. Petrie v. Elec. Game Card, Inc.,* 308 F.R.D. 336, 356 (C.D. Cal. 2015) (finding that an average spread of 2.91%

21

marginally helped plaintiffs more than it helped defendants).

**Institutional Ownership:** Based on a review from a database that is compiled of Form 13-F filings, Dr. Feinstein identified 20 holdings from major institutions among the various series of Preferred Stock during the Class Period. ¶ 128 (including table of institutions). Dr. Feinstein notes however, that the database "is not necessarily comprehensive" as institutions are not required to report holdings of preferred stock, which are not classified as "Section 13(f) securities." ¶ 126. Accordingly, the major institutions identified in the database only reflect those that voluntarily reported their preferred stock holdings. ¶¶ 126-127. In Dr. Feinstein's opinion, "[t]hat the AmTrust Preferred Shares were held and traded by sophisticated institutional investors favors a conclusion of market efficiency. ¶ 129; *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008) (institutional ownership "facilitate[s] the efficiency of the market.").

In light of the above, as the market for Preferred Stock was efficient during the Class Period, the fraud on the market presumption is invoked.

**b.    Common Issues Concerning Damages Predominate**

Under *Comcast Corp. v. Behrend*, a plaintiff's proposed method for calculating damages must be consistent with her theory of liability—that is, it must "measure only those damages attributable to that theory." 569 U.S. 27, 35 (2013). "*Comcast* did not rewrite the standards governing individualized damage considerations." *Sykes v. Mel S. Harris and Assocs. LLC*, *et al.*, 780 F.3d 70, 88 (2d Cir. 2015). Rather, "[a]ll that is required at class certification is that the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability'." *Id.* (citations omitted). Accordingly, the potential for individualized damage inquiries for class members cannot rebut predominance. *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 402, 405 (2d Cir. 2015).

22

Courts recognize that out-of-pocket damages under Section 10(b) of the Exchange Act are "measurable on a class-wide basis" and do not raise "individualized damages issues that defeat predominance." *See, e.g.*, *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 106 (S.D.N.Y. 2016). Here, Plaintiff's class-wide damages methodology more than satisfies *Comcast*. As Dr. Feinstein explains, damages are subject to the standard out-of-pocket methodology. ¶ 218. Utilizing this methodology, Dr. Feinstein opines, will quantify the amount of artificial inflation caused or maintained by Defendants' misconduct that existed in Preferred Stock on each day of the Class Period. ¶¶ 219-222. This methodology is consistent with Plaintiff's theory of liability, namely that the price of Preferred Stock was artificially inflated during the Class Period due to Defendants' misstatements. *See, e.g., Blackberry,* 2021 U.S. Dist. LEXIS 14888, *63-65 (rejecting defendants' numerous *Comcast*-related arguments with respect to Dr. Feinstein's damages opinions, and concluding that "Plaintiffs have provided a class-wide model for calculating damages arising from [their] theory of liability" and thus "have met their burden under *Comcast*.").

As noted above, the existence of differences in damages calculations is not sufficient to defeat class certification. Here, the evidence and methodology for calculating daily artificial inflation, and thus damages, are both common to the Class and applicable on a Class-wide basis. ¶¶ 223-225. Common issues clearly predominate over damages.

**2.      Rule 23(b)(3)'s Superiority Requirement is Satisfied**

Rule 23(b)(3) also requires a finding that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." "The superiority requirement asks courts to balance, in terms of fairness and efficiency, the advantages of a class action against those of alternative available methods of adjudication." *MetLife*, 2017 U.S. Dist. LEXIS 134645, at *35 (citations omitted). "Because the alternatives are either no recourse for thousands of

stockholders or a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake," securities fraud suits "easily satisfy" the superiority requirement. *In re MF Global Holdings Ltd. Inc. Litig.,* 310 F.R.D. 230, 239 (S.D.N.Y. 2015).

In evaluating superiority under Rule 23(b)(3), courts consider: (i) the interests of class members in "individually controlling the prosecution or defense of separate actions"; (ii) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (iii) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (iv) the manageability of a class action. Each factor supports superiority.

*First*, Plaintiff seeks to represent a Class that includes a large number of geographically-dispersed investors and "the amount of potential recovery per plaintiff is not so high as to ensure that each plaintiff could or would bring an action individually," *Lapin*, 254 F.R.D. at 187, and thus individual litigation would be prohibitively expensive, *see generally In re U.S. Foodservice Inc. Pricing Litig.,* 729 F.3d 108, 130 (2d Cir. 2013) ("class actions can be superior precisely because they facilitate the redress of claims where the costs of bringing individual actions outweigh the expected recovery"). *Second*, concentrating this litigation in a single forum has numerous benefits, including eliminating the risk of inconsistent adjudication and promoting the fair and efficient use of the judicial system. *Lapin,* 254 F.R.D. at 187. *Third*, Plaintiff is unaware of any other action asserting claims like those asserted here.[13] *Finally*, there are no management difficulties that would preclude this Action from being maintained as a class action. To the

---

[13] To be sure, and as this Court observed, Defendants have been sued for their misconduct in several different fora. *See* Aug. 14, 2020 Order at 15-16, 38; *see also SEC v. AmTrust Fin. Servs.,* 20 Civ. 4652 (LLS), 2020 U.S. Dist. LEXIS 136485, at *3-4 (S.D.N.Y. July 31, 2020) (enforcement action alleging AmTrust's failure to properly disclose loss reserve information, and resulting in consent judgment requiring AmTrust to pay $10,300,000 civil penalty and enjoining it from violating various provisions of the federal securities law). However, Plaintiff's action is the only one asserting claims under §§ 10(b) and/or 20(a) of the Exchange Act on behalf of purchasers of Preferred Stock.

contrary: "litigating each case separately would be wasteful, and result in delay and an inefficient expenditure of judicial resources." *In re SCOR Holding (Switz.) AG Litig.,* 537 F. Supp. 2d 556, 579 (S.D.N.Y. 2008). A class action is clearly superior.[14]

## IV.    CONCLUSION

For the reasons stated above, Plaintiff's Motion should be granted in its entirety.


DATED: March 15, 2021                                         Respectfully submitted,

                                                             **WOLF POPPER LLP**


                                         By:_____
                                                             Carl L. Stine
                                                             Patricia I. Avery
                                                             Adam J. Blander
                                                             845 Third Avenue, 12th Floor
                                                             New York, New York 10022
                                                             (212) 759-4600

                                                             *Counsel for Lead Plaintiff*
                                                             *And the Putative Class*

---

[14] While such an inquiry is not explicitly mandated under Rule 23, the Class also clearly meets any "ascertainability" standard as it is "defined using objective criteria that establish a membership with definite boundaries." *Petrobras,* 862 F.3d at 264. Specifically, the Class "include[s] persons who acquired specific securities during a specific time period" and accordingly, relies on criteria—namely, "securities purchases identified by subject matter [and] timing" —that "are clearly objective." *Id.* at 269*; Blackberry,* 2021 U.S. Dist. LEXIS 14888, at *36 ("Ascertaining the members of the class will be easily administrable by references to investor records.").