UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JAN MARTÍNEK,

                Plaintiff,

v.

AMTRUST FINANCIAL SERVICES, INC.,
BARRY D. ZYSKIND, GEORGE KARFUNKEL,
and LEAH KARFUNKEL,

                Defendants.

No. 19-cv-8030
(Failla, J.)

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' OPPOSITION TO LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

QUINN EMANUEL URQUHART &
  SULLIVAN, LLP

Michael B. Carlinsky
Kevin S. Reed
51 Madison Ave., 22nd Fl.
New York, NY 10010
(212) 849-7000

*Attorneys for Defendants*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...........................................................................................1

BACKGROUND ..............................................................................................................2

    A.    Plaintiff's Claims ................................................................................2

    B.    Plaintiff's Motion For Class Certification And The Feinstein Report....................3

LEGAL STANDARD........................................................................................................5

ARGUMENT ..................................................................................................................6

I.    INDIVIDUAL RELIANCE INQUIRIES PREDOMINATE AS PLAINTIFF HAS FAILED TO PROVE THE APPLICABILITY OF THE FRAUD-ON-THE-MARKET THEORY ...........................................................................................6

    A.    The "Critical" Direct Indicator Of Market Efficiency—The Cause-And-Effect Relationship Between Unexpected News And Share Price—Demonstrates The Market For The Preferred Securities Was Not Efficient ..........8

        **1.**    **Dr. Feinstein's Event Study Does Not Show An Efficient Market Existed During The Putative Class Period** ................................8

        **2.**    **Dr. Khare's Complete Event Study Shows The Market Was Not Efficient**..................................................................................12

        **3.**    **Dr. Feinstein's Alternative Market Interest Rate Analysis Is Flawed And, In Any Event, Has No Bearing On Market Efficiency** ...............................................................................13

    B.    The Indirect Indicia Do Not Support A Finding Of Market Efficiency ...............15

        **1.**    **Proper Analysis Of The Weekly Trading Volume Shows A Large Proportion Of The Class Period Did Not Satisfy The Cammer Threshold**................................................................15

        **2.**    **The Absence Of Securities Analysts Following And Reporting On The Stock Indicates The Market Was Not Efficient** ......................16

        **3.**    **The Extent To Which Market Makers Trade In The Stock** ...............18

        **4.**    **AmTrust's Eligibility To File SEC Form S-3 Has No Bearing On Market Efficiency For The Preferred Shares** .................................19

        **5.**    **The Market Capitalization Of Each Series Indicates Market Inefficiency**..................................................................................19

        **6.**    **The Bid-Ask Spread For Each Series Indicates An Inefficient Market**..................................................................................20

II.    PLAINTIFF HAS FAILED TO ESTABLISH DAMAGES CAN BE MEASURED ON A CLASS-WIDE BASIS CONSISTENT WITH HIS THEORIES OF LIABILITY ...........................................................................21

III.    PLAINTIFF IS NOT TYPICAL OF THE CLASS........................................................23

IV.    IN THE ALTERNATIVE, PLAINTIFF'S CLASS SHOULD BE LIMITED...................25

CONCLUSION....................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

*Abu Dhabi Com. Bank v. Morgan Stanley & Co. Inc.*,
269 F.R.D. 252 (S.D.N.Y. 2010) ..................................................................................... 24

*In re Alstom SA Sec. Litig.*,
253 F.R.D. 266 (S.D.N.Y. 2008) ..................................................................................... 19

*In re Am. Int'l Group Inc. Secs. Litig.*,
265 F.R.D. 157 (S.D.N.Y. 2010), *vacated and remanded on other grounds*, 689 F.3d
229 (2d Cir. 2012) ........................................................................................................... 17

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ........................................................................................................... 6

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) .................................................................................................... *passim*

*Bell v. Ascendant Sols., Inc.*,
422 F.3d 307 (5th Cir. 2005) ............................................................................... 10, 12, 18

*BlackRock Balanced Cap. Portfolio v. Deutsche Bank Nat'l Tr. Co.*,
2018 WL 5619957 (S.D.N.Y. Aug. 7, 2018) .................................................................. 24

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) ............................................................................... *passim*

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ..................................................................................... 6, 21, 22, 23

*In re Conagra Foods, Inc.*,
302 F.R.D. 537 (C.D. Cal. 2014) .................................................................................... 23

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ........................................................................................................... 6

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011) ........................................................................................................... 6

*In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*,
281 F.R.D. 174 (S.D.N.Y. 2012) ............................................................................... *passim*

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009) .............................................................................................. 25

*Fogarazzo v. Lehman Bros.*,
232 F.R.D. 176 (S.D.N.Y. 2005) ..................................................................................... 23

iii

*Ft. Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*,
    301 F.R.D. 116 (S.D.N.Y. 2014) ............................................................................ 22

*George v. China Auto. Sys., Inc.*,
    2013 WL 3357170 (S.D.N.Y. July 3, 2013) ....................................................... 9, 11

*IBEW Loc. 90 Pension Fund v. Deutsche Bank AG*,
    2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013) .......................................................... 7

*In re IMAX Sec. Litig.*,
    272 F.R.D. 138 (S.D.N.Y. 2010) ............................................................................ 25

*In re Initial Pub. Offering Secs. Litig.*,
    471 F.3d 24 (2d Cir. 2006) .................................................................................. 5, 6

*Kottaras v. Whole Foods Market, Inc.*,
    281 F.R.D. 16 (D.D.C. 2012)................................................................................. 23

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) .................................................................. *passim*

*McGuinness v. Parnes*,
    1988 WL 66214 (D.D.C. Jun. 17, 1988).......................................................... 24, 25

*O'Neil v. Appel*,
    165 F.R.D. 479 (W.D. Mich. 1996)......................................................................... 18

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
    2018 WL 3861840 (N.D. Ohio Aug. 14, 2018)..................................... 9, 10, 12, 22

*Pearlstein v. BlackBerry Ltd.*,
    2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) ........................................................... 21

*In re PolyMedica Corp. Sec. Litig.*,
    453 F. Supp. 2d 260 (D. Mass. 2006)....................................................................... 9

*In re Signet Jewelers Ltd. Sec. Litig.*,
    2019 WL 3001084 (S.D.N.Y. July 10, 2019)......................................................... 21

*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*,
    546 F.3d 196 (2d Cir. 2008) ..........................................................................*passim*

*Unger v. Amedisys, Inc.*,
    401 F.3d 316 (5th Cir. 2005) ................................................................................... 7

*Waggoner v. Barclays PLC*,
    875 F.3d 79, 94 (2d Cir. 2017) ................................................................................ 7

iv

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)...................................................................................... 5, 6, 25

*Zemel Family Trust v. Philips Int'l Realty Corp.*,
   205 F.R.D. 434 (S.D.N.Y. 2002) ................................................................. 6

## Rules and Regulations

Fed. R. Civ. P. 23(a) ...................................................................................... 6, 23

Fed. R. Civ. P. 23(b) ...................................................................................... 6, 21

Fed. R. Evid. 702 ............................................................................................ 14, 15

## Other Authroities

Paul A. Ferrillo et. al., "The 'Less Than' Efficient Capital Markets Hypothesis:
   Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases," 78 St. John's L.
   Rev. 81 (2004).

Donald C. Langevoort, "Theories, Assumptions, and Securities Regulation: Market
   Efficiency Revisited," 140 U. Pa. L. Rev. 851 (1992) ............................................... 19

v

**PRELIMINARY STATEMENT**

Plaintiff's claims cannot proceed on a class basis for several independent reasons.

*First*, individual issues predominate because Plaintiff does not carry his burden to establish that the market for the preferred securities at issue operated efficiently during the alleged class period, and, therefore, he may not rely on the fraud-on-the-market presumption to prove reliance. The three-date event study proffered by his expert is woefully insufficient to provide empirical evidence of market efficiency throughout a 362-day class period, and the indirect indicia of efficiency courts often examine do not point to a finding of efficiency in this case. Moreover, even if Plaintiff had proven efficiency for some part of the class period (he has not), Plaintiff manifestly fails to prove market efficiency during the portion of the class period that follows the cessation of trading in AmTrust's common securities, which means the alleged class period cannot extend beyond that date. This necessitates excluding Plaintiff from any class that could even arguably be certified, as all of his purchases occurred during that period.

*Second*, Plaintiff has failed to offer a viable class-wide damages model. Plaintiff's expert acknowledges that any model must address issues like quantifying the impact of confounding information and the alleged misrepresentations, but Plaintiff's expert offers only vague promises that he will address these issues without explaining how, which is insufficient.

*Third,* Plaintiff is not typical. He has given sworn testimony that he purchased his shares because they were undervalued due to the market's fear they would be delisted. This admission is diametrically opposed to the central thesis of his claim on behalf of the purported class that the shares were overvalued because the market believed they would not be delisted. Plaintiff is thus vulnerable to unique defenses that make him an unsuitable class representative. Plaintiff's motion for class certification should, therefore, be denied.

## BACKGROUND

### A.     Plaintiff's Claims

AmTrust is an insurance holding company that provides specialty property and casualty insurance products. (Compl. ¶ 13.) The Individual Defendants are directors of AmTrust, and Defendant Zyskind has served as AmTrust's CEO and President since 2000. (*Id.* ¶¶ 14-16.) Between 2013 and 2016, AmTrust issued six series of Preferred Securities known as the Series A, B, C, D, E, and F shares (the "Preferred Securities"). (*Id.* ¶ 26.)

In 2017, Defendant Zyskind and Stone Point Capital began discussions about taking AmTrust private. (*Id.* ¶¶ 19(a), 35, 39.) These discussions culminated with a January 9, 2018 letter from Stone Point and the Individual Defendants to the AmTrust board of directors, offering to buy the outstanding shares of AmTrust's common stock for $12.25 per share. (*Id.* ¶ 44.) After a campaign by activist investor Carl Icahn, this offer was raised to $14.75 per share. (*Id.* ¶¶ 54-55, 61-62.) On June 21, 2018, a clear majority of the unaffiliated stockholders voted to approve the go-private transaction, which closed on November 29, 2018. (*Id.* ¶¶ 69-70.)

On January 18, 2019, AmTrust's Board of Directors announced that it had elected to voluntarily delist the Preferred Securities. (*Id.* ¶ 73.) Though Plaintiff filed an objection with the SEC (*id.* ¶ 86), the SEC took no action, and the delisting became effective February 7, 2019 (*id.* ¶ 92). The Preferred Securities remain outstanding according and continue to trade in the over-the-counter market. (*Id.* ¶ 76.) All dividends have been paid as scheduled.

Plaintiff's claims are premised on purported misrepresentations—occurring between January 2018 (when the AmTrust Board received the offer to purchase the company's outstanding common shares) and January 18, 2019 (when the Board announced the Preferred Securities would be delisted)—variously stating that the Preferred Securities were expected to or would continue to be publicly listed after the go-private transaction. (*Id.* ¶¶ 66-68.) Specifically,

2

these supposed misrepresentations occurred on (1) January 22, 2018; (2) March 1, 2018; (3) March 16, 2018; (4) April 9, 2018; and (5) May 4, 2018. (*Id.*; Dkt. 34 at 34-37 (determining certain proffered misstatements are not actionable).)

According to Plaintiff, these alleged misrepresentations artificially inflated the price of the Preferred Securities until AmTrust disclosed on January 18, 2019 that the Preferred Securities would be delisted. (Compl. ¶¶ 97-98.)    Based on this claim, Plaintiff seeks to represent a class consisting of all persons who purchased the Preferred Securities during the approximately one-year period from January 22, 2018 to January 18, 2019. (Mot. at 1).

**B.     Plaintiff's Motion For Class Certification And The Feinstein Report**

Plaintiff moves to certify this class based on a "fraud-on-the-market" theory and contends "reliance," a required element of his claim for violation of section 10(b) of the Securities Exchange Act of 1934,[1] can thereby be proven uniformly across the class. (Mot. at 11-22.) According to Plaintiff, the fraud-on-the-market theory applies because the Preferred Securities traded in an efficient market, and the price thus reflected all publicly-available information. (*Id.*) Plaintiff relies on the opinion of his proffered expert, Dr. Steven P. Feinstein. (*Id.*)

Plaintiff concedes, as he must, that the "most significant factor" to assess market efficiency is the extent to which there exists a "cause-and-effect relationship" between unexpected news about the company and the reaction of the stock price. (*Id.* at 17.) *See also In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 182 (S.D.N.Y. 2012) (the "cause-and-effect relationship between unexpected news and market price . . . is the critical factor—the *sine qua non* of efficiency."); *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.* ("*Bombardier*"), 546 F.3d 196, 207 (2d Cir. 2008) ("Without the

---

[1]  Plaintiff's Section 20(a) claim depends "on the validity of an underlying securities violation," and is thus also dependent on Plaintiff's ability to prove class-wide reliance. (*See* Dkt. 34 at 21.)

demonstration of such a causal relationship, it is difficult to presume that the market will integrate the release of material information about a security into its price."). Plaintiff's expert, Dr. Feinstein, agrees. *See* Declaration of Kevin Reed ("Reed Decl.") ¶ 4, Ex. 2 at ¶ 110 ("The event study is the paramount tool for testing market efficiency.")

Here, Dr. Feinstein attempts to demonstrate this "cause-and-effect relationship" through an event study. (Dkt. 45-1 at 51-62.) When properly conducted, an event study isolates and quantifies the price impact of company-specific information from the impact of other market and sector factors. Reed Decl. ¶ 7, Ex. 5, Rebuttal Expert Report of Alok Khare, Ph.D ("Khare Rpt.") ¶ 25. It starts with the identification of the event, followed by a regression analysis to filter out price impacts unrelated to the event. A test of statistical significance is then performed to examine whether the event had a price impact reliably different from the impact expected due to day-to-day random changes. For his event study, Dr. Feinstein analyzed only three "news events" during the one-year class period: the January 22, 2018 disclosure that began the class period, a May 18, 2018 open letter from Carl Icahn challenging the pricing of the go-private transaction, and the January 22, 2019 allegedly corrective disclosure that ended the class period. (Dkt. 45-1 ¶¶ 178, 180.) Dr. Feinstein concludes the stock price reactions on those three days prove "a cause-and-effect relationship between the release of Company information and changes in the AmTrust Preferred Shares market prices" for the entirety of the one year class period. (*Id.* ¶ 203; Mot. at 18.)

As an alternative to his event study, Dr. Feinstein also purports to have examined the movement of AmTrust's Preferred Securities price in response to changes in market interest rates. (Dkt. 45-1 ¶¶ 204-205.) For this exercise, Dr. Feinstein used the S&P Preferred Shares Index as a proxy for interest rates. (*Id.* ¶ 205.) He does not explain why that is appropriate, nor is

it, as the interest rate changes are not the sole driver of changes to the Preferred Shares Index. (*Infra* at 13-15.) Nonetheless, Dr. Feinstein concludes that the price of AmTrust Preferred Securities "responded in statistically significant fashion to changes in market interest rates on a day-to-day basis," which, according to Dr. Feinstein, further "proves that the AmTrust Preferred Shares demonstrated market efficiency throughout the Class Period." (Dkt. 45-1 ¶ 205.)

Finally, Dr. Feinstein opines that an "out-of-pocket damage methodology . . . can be applied commonly for all Class members." (*Id.* ¶ 218.) Dr. Feinstein acknowledges "there may be specific issues complicating the quantification" in this case, but asserts "standard tools of valuation analysis can be applied" to address those issues. (*Id.* ¶ 220.) Dr. Feinstein then provides a laundry list of "commonly used valuation tools." (*Id.* ¶ 222.) Without identifying which of these vaguely-described "tools" would be used to address the "specific issues" complicating the analysis in this case, Dr. Feinstein asserts "each Class member's damages under Section 10(b) can be computed in the same way." (*Id.* ¶¶ 223-25.)

## LEGAL STANDARD

Plaintiff bears the burden of demonstrating that class certification is appropriate. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "Rule 23 does not set forth a mere pleading standard." *Id.* Rather, "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.*

For its part, the Court must make "findings," after a "rigorous analysis," about whether the plaintiff has satisfied each requirement of Rule 23, even if that analysis overlaps with the merits. *See id.* at 350-352 & n. 6; *Bombardier*, 546 F.3d at 201-203; *In re Initial Pub. Offering Secs. Litig.*, 471 F.3d 24, 32-42 (2d Cir. 2006) ("*IPO*"). In resolving whether the plaintiff has carried that burden, the Court may weigh conflicting evidence "just as the judge would resolve a

dispute about any other threshold prerequisite for continuing a lawsuit." *IPO*, 471 F.3d at 42.

Indeed, the Court may and should assess the credibility of witnesses (*see Zemel Family Trust v. Philips Int'l Realty Corp.*, 205 F.R.D. 434, 437 (S.D.N.Y. 2002)), and carefully analyze and weigh the persuasiveness of expert testimony.  *See Wal-Mart*, 564 U.S. at 353-355; *Bombardier*, 546 F.3d at 208 n. 15 & 210-11; *IPO*, 471 F.3d at 42.  At the class certification stage, the Court also may exclude expert testimony that fails to meet the reliability standard of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), or at any rate disregard expert opinions that are unreliable or unpersuasive, or do not prove what they claim to prove.

Here, Plaintiff seeks to certify a class under Rule 23(b)(3).  "To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites: Common questions must 'predominate over any questions affecting only individual members'; and class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy.'"  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997).  Rule 23(b)(3) imposes a "demanding" standard that requires courts "to take a 'close look' at whether common questions predominate over individual ones" before certifying a class.  *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013) (internal quotation omitted).

## ARGUMENT

**I.     INDIVIDUAL RELIANCE INQUIRIES PREDOMINATE AS PLAINTIFF HAS FAILED TO PROVE THE APPLICABILITY OF THE FRAUD-ON-THE-MARKET THEORY**

Class certification is available in Section 10(b) cases only when plaintiffs establish a class-wide presumption of reliance. Absent that, individual questions about reliance predominate and the class action fails to be a superior mechanism. *See Wal-Mart*, 564 U.S. at 351 n. 6; *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809-11 (2011); *Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988).  In *Basic*, the Supreme Court adopted the fraud-on-the-market theory as a

6

rebuttable evidentiary presumption of class-wide reliance, based on the "premise that the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." 485 U.S. at 246-47 & n. 24 (quotations omitted).

A demonstration of market efficiency – *i.e.*, an ability of the market to absorb all publicly available information and incorporate it into the price of the security at issue – is required to invoke *Basic*'s fraud-on-the-market presumption. "Plaintiffs bear the burden of proving market efficiency—defendants do not." *IBEW Loc. 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 5815472, at *21 (S.D.N.Y. Oct. 29, 2013). Beginning with *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), courts have developed eight factors (the "*Cammer/Krogman* Factors") to aid in assessing whether the market for a particular stock is efficient:

> (1) the average weekly trading volume expressed as a percentage of total outstanding shares; (2) the number of securities analysts following and reporting on the stock; (3) the extent to which market makers and arbitrageurs trade in the stock; (4) the company's eligibility to file SEC registration Form S-3 (as opposed to Form S-1 or S-2); (5) the existence of empirical facts "showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price;" (6) the company's market capitalization; (7) the bid-ask spread for stock sales; and (8) float, the stock's trading volume without counting insider-owned stock.

*Unger v. Amedisys, Inc.*, 401 F.3d 316, 323 (5th Cir. 2005) (collecting cases).

These factors are not of equal importance in demonstrating market efficiency. With the exception of the fifth factor—facts showing a cause and effect relationship between unexpected news and stock price—the remaining factors are only "indirect indicia of market efficiency[.]" *Waggoner v. Barclays PLC*, 875 F.3d 79, 94 (2d Cir. 2017). Thus, as Plaintiff recognizes, direct evidence of market efficiency through demonstration of the cause-and-effect relationship is "critical," especially where the "indirect" factors are "less compelling," (Mot. at 18 (quoting *Barclays*, 875 F.3d at 97-98).) *See also Cammer,* 711 F. Supp. at 1287 ("a cause and effect

relationship . . . is the essence of an efficient market and the foundation for the fraud on the market theory."); *Freddie Mac*, 281 F.R.D. at 182 (this relationship is "the *sine qua non* of efficiency."). Dr. Feinstein manifestly fails to show such a relationship. Plaintiff, therefore does not establish an entitlement to the *Basic* presumption, and his class claims must fail.

###### A.     The "Critical" Direct Indicator Of Market Efficiency—The Cause-And-Effect Relationship Between Unexpected News And Share Price—Demonstrates The Market For The Preferred Securities Was Not Efficient

####### 1.     *Dr. Feinstein's Event Study Does Not Show An Efficient Market Existed During The Putative Class Period*

Dr. Feinstein purports to have conducted an event study to examine whether the requisite cause-and-effect relationship between news concerning AmTrust and the prices of the Preferred Securities existed throughout the alleged one-year class period from January 22, 2018 through January 19, 2019. (Dkt. 45-1 at 51-62.) In conducting this event study, however, Dr. Feinstein analyzed only three events – the disclosures at the very beginning and end of the alleged class period, and one occurring in May 2018. For reasons detailed in Dr. Khare's report, Dr. Feinstein's study was manifestly insufficient to support his conclusion of market efficiency. (Khare Rpt. ¶¶ 61-97.)

*First*, it is impossible to draw reliable conclusions about whether the requisite cause-and-effect relationship between AmTrust-related news and the prices of the Preferred Securities existed over the one-year alleged period by examining a mere *three days* within that period. (*Id.* ¶¶ 61-83.) This is so even assuming Dr. Feinstein's conclusions about the three days he examined were correct. As one academic paper cited by Dr. Khare put it, "Merely demonstrating a single or small number of cases where there is an apparent cause-and-effect relationship is not enough, since this measures only one point in time during the class period, and only the stock's response to one or a handful of disclosures." Paul A. Ferrillo et. al., "The 'Less Than' Efficient

8

Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases," 78 St. John's L. Rev. 81, 128 (2004).  Stated more plainly, the mere fact a person ate a ham sandwich for lunch on three sunny days in 2018 cannot justify a conclusion that the person ate ham every time the sun appeared at lunchtime in 2018.

Courts, like academics, have rejected this "proof by example" approach.  *See, e.g., George v. China Auto. Sys., Inc.*, 2013 WL 3357170, at *12 (S.D.N.Y. July 3, 2013) (price reaction on seven out of sixteen days "is an insufficient foundation upon which to pronounce market efficiency"); *Freddie Mac*, 281 F.R.D. at 182 (16 of 57 news days insufficient to establish market efficiency because "Plaintiff must show that the market price responds to most new, material news"); *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp. ("OPERS")*, 2018 WL 3861840, at *4 (N.D. Ohio Aug. 14, 2018) ("an event study with too few 'events' is incapable of distinguishing whether stock price movements are the probable result of news events or simply random variation."*)*; *In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 270 (D. Mass. 2006) ("It is not sufficient simply to report movement on significant news days. To approach usefulness, an analysis should statistically compare all news days with all non-news days.").  Dr. Feinstein himself has acknowledged that "[f]or a market to be efficient, it needs to be incorporating available information ***all the time***."  *OPERS*, 2018 WL 3861840 at *2 (quoting the deposition testimony of Dr. Feinstein) (emphasis added).  Proof of market behavior on three days, whatever it shows, cannot establish constant market efficiency over a 362-day class period.

Dr. Feinstein sought to justify using only three dates in his event study by asserting that preferred shares like those at issue in this case are less reactive than common shares to most company news, such as earnings announcements, because the common shares provide an "equity buffer" that insulates the preferred shares from the impact of all but the most severe negative

9

developments. (Dkt. 45-1 ¶¶ 175-76.) Dr. Feinstein's reason for examining only three days is ultimately irrelevant, as the fact remains that three days simply are not enough to draw conclusions about whether market efficiency existed throughout a year. It bears noting, however, Dr. Feinstein's "equity buffer" rationale is pure *ipse dixit* on Dr. Feinstein's part, unsupported by any scholarship or authority. Moreover, at least in relation to the Preferred Securities at issue here, Dr. Feinstein's assumption that those securities were not reactive to earnings announcements and other company news is incorrect. First, the Preferred Securities were high-yield debt, rated below investment grade, and research has shown that, in an efficient market, high yield debt like the AmTrust Preferred Shares *is* likely to respond to corporate announcements. (Khare Rpt. ¶¶ 76-80).) Additionally, any effect Dr. Feinstein's supposed "equity buffer" may have had was eliminated in June 2018 when AmTrust stopped paying dividends on the common stock in June 2018, and two of the three earnings announcements Dr. Feinstein failed to consider occurred *after* June 2018. (*Id.* ¶ 81.)

**Second**, as insufficient as a three-date event study is, Dr. Feinstein's study is actually worse than that because he chose as one of his three events AmTrust's alleged corrective disclosure. As Dr. Khare details, the use of a corrective disclosure in event studies is frowned upon due to a propensity to bias the results. (*Id.* ¶¶ 68-70.) "Economists . . . agree that using the last day of a class period is not a scientifically valid way to test for market efficiency because, among other reasons, securities Plaintiffs intentionally select such dates for purposes of increasing potential damages." *OPERS*, 2018 WL 3861840, at *2. *See also Bell v. Ascendant Sols., Inc.*, 422 F.3d 307, 316 (5th Cir. 2005) ("single-day price decline on the last day of the class period in response to . . . a corrective disclosure . . . is plainly insufficient by itself to show

10

market efficiency throughout the class period").[2]   Further, a large decline in response to the corrective disclosure could be due to investor over-reaction to bad news, which suggests an *inefficient* market.  (Khare Rpt. ¶ 70.)  That risk is undoubtedly present in this case, as market commentary suggests that investors may have been laboring under the incorrect impression that AmTrust intended to eliminate its Preferred Securities, and their dividends, after the go-private transaction closed.   *See* Seeking Alpha, *AmTrust Preferreds To Pop*, available at https://seekingalpha.com/article/4283143-amtrust-preferreds-to-pop  ("At the time of the privatization, the consensus opinion regarding the preferred dividends was that they would be eliminated immediately after the transaction closed.").  Prof Feinstein's three-date event study is, thus, in truth, only a two-date event study, which renders it even more insufficient.

*Third*, the necessity for a broad event study was, if anything, more pronounced in this case than normal due to the nature of the alleged class period.  The cessation of trading in AmTrust's common stock upon the closing of the company's go-private transaction on November 29, 2018 resulted in a reduction in publicly available news about the company and, for that reason, warrants separate examinations of market efficiency for the Preferred Securities for the periods before and after that date.  (Khare Rpt. ¶ 72 n. 53.)  Dr. Feinstein himself recognized as much, and conducted separate efficiency analyses for the periods before and after AmTrust's common stock stopped trading  *See* Dkt. 45-1 ¶ 1 n. 1 ("I also conducted market efficiency analyses for two subintervals within the Class Period: 22 January 2018 through 28 November 2018 ('Interval-1'), and 29 November 2018 through 18 January 2019 ('Interval-2').)

---

[2]   Indeed, Dr. Feinstein all but admits all of his dates were cherry picked, to the exclusion of others that (as shown below) do not support his conclusion.  (Dkt. 45-1 ¶ 179 ("the three events identified would reasonably warrant a large security price reaction in an efficient market").  *See George,* 2013 WL 3357170 at *11 (event study unreliable where expert "predefined events . . . that were expected to impact the stock price").

11

For reasons unexplained, however, he examined Interval-1 and Interval-2 separately only with respect to the application of the *Cammer/Krogman* Factors other than a cause-and-effect relationship between company news and stock price, and he did not use his event study to draw separate market efficiency conclusions about Interval-1 and Interval-2.  In all likelihood this was because he studied only two events occurring in the eight-months of Interval-1 and just one event occurring in the two-month Interval-2.  The event in Interval-2, moreover, was the alleged corrective disclosure, which, as noted above, is disfavored for use in event studies.

Dr. Feinstein's two-day, or at-best three-day, event study is thus woefully insufficient to demonstrate an efficient market for the Preferred Securities during Interval-1, Interval-2, or the alleged class period as a whole.  "An event study may be rejected . . . if it is methodologically unsound or unreliable." *Bombardier*, 546 F.3d at 208 n. 15 (citing *Bell*, 422 F.3d at 316).  In fact, the court in *OPERS* rejected as unreliable Dr. Feinstein's opinion on market efficiency due to this same flawed analysis.  *OPERS*, 2018 WL 3861840 at *4 ("Dr. Feinstein all but admitted that no literature, academic or otherwise, supports using an event study focused on a single date to try to establish that the market for a particular security was efficient for the entirety of a 330-day Class Period.").  The same result should obtain here.

### 2.    *Dr. Khare's Complete Event Study Shows The Market Was Not Efficient*

The flaws in Dr. Feinstein's limited event study are further illustrated by Dr. Khare's[3] more robust event study that properly examines 12 relevant news days during the putative class period.  As detailed in his report (Khare Rpt. ¶¶ 75-97), using Dr. Feinstein's market model, Dr. Khare analyzed the three events analyzed by Dr. Feinstein, plus the three earnings

---

[3]  Dr. Khare is Senior Managing Director of FTI Consulting and holds a PhD in Economics from U.C. Santa Barbara.  His qualifications are set forth more fully in his contemporaneously-filed report.  (Khare Rpt. ¶¶ 5-19.)

announcements during the purported class period, plus six additional announcements relating to the go-private transaction, which Dr. Feinstein erroneously failed to consider, despite having described "announcements and developments informing investors about the future treatment and status of the Preferred Shares in the planned Go-Private Transaction [as] available and appropriate event candidates." (Dkt. 45-1 ¶ 177)[4]

When Dr. Feinstein's own methods are applied to all of the relevant events during the class period, it shows the market was *not* efficient: five of the series of Preferred Securities had statistically significant reactions to only 18.2% of the events, and the sixth series had statistically significant reactions to only 27.3% of the events. (Khare Rpt. ¶ 94.)[5] These reactivity percentages were lower than those shown by 90 percent of the stocks in the S&P 500. (*Id.* ¶ 94.); *see also Freddie Mac*, 281 F.R.D. at 182 (response "to material news 28% of the time is insufficient to satisfy Plaintiff's burden of proving *Cammer*'s cause-and-effect factor.").

### 3.    *Dr. Feinstein's Alternative Market Interest Rate Analysis Is Flawed And, In Any Event, Has No Bearing On Market Efficiency*

In addition to his flawed event study, Dr. Feinstein also purported to demonstrate the requisite cause-and-effect relationship for market efficiency by examining the price movement of the Preferred Securities in relation to fluctuations in market interest rates. (Dkt. 45-1 ¶¶ 204-205.) Dr. Khare labels this Dr. Feinstein's "Significant Explanatory Variable Test." (Khare Rpt. ¶ 58.) It, too, is deeply flawed for myriad reasons.

---

[4]    Like the May 18, 2018 event that Dr. Feinstein did analyze, all six additional events gave the market information about the probability of the transaction being completed, which was value-relevant to the AmTrust Preferred Shares because, as stated by Dr. Feinstein, these events "affected the likelihood that the Preferred Shares would or might be delisted, which outcome would reduce or impede their future marketability." (Khare Rpt. ¶ 87.)

[5]    Though, as shown above, the "corrective disclosure" date should not be included, even if it is, the outcome does not change: five series reacted to only 25% of the events, and the sixth reacted to only 33% of the events. (*Id.* ¶ 94 n. 81.)

***First,*** Dr. Feinstein provides no support in the academic literature for application of Significant Explanatory Variable Test and fails to explain why this would be a reliable method for testing market efficiency. *See* Fed. R. Evid. 702 (expert opinion must be "the product of reliable principles and methods"). As described above, both courts and academic literature repeatedly cite to an event study analysis as the proper method for demonstrating a cause-and-effect relationship indicative of market efficiency. The Significant Explanatory Variable Test is not an event study and merely examines the correlation between prices of a series of preferred stock and the S&P Preferred Shares Index. (Khare Rpt. ¶ 100.)

***Second***, Dr. Feinstein's opinions in other cases demonstrates why this is not a reliable method. Though Dr. Feinstein now suggests the cause-and-effect relationship he purports to observe between interest rate movements and the prices of the Preferred Securities should *always* hold true in an efficient market, he has opined that other preferred securities traded in an efficient market even where they did not have a statistically significant relationship with the interest rates. (Khare Rpt. ¶¶ 98-102.) In other words, by Dr. Feinstein's own account, the existence of this relationship is simply not relevant to whether the securities traded in an efficient market.

***Third,*** one of the key premises of Dr. Feinstein's Significant Explanatory Variable Test – that the S&P Preferred Shares Index is a fair proxy for interest rates (*see* Dkt. 45-1 ¶¶ 204-205) – is untrue. The S&P Preferred Shares Index is not a proxy for "market interest rates" because its price is impacted by a multitude of other factors. (Khare Rpt. ¶¶ 107-12.) Dr. Feinstein does not claim otherwise. (Dkt. 45-1 ¶ 205 (claiming only that the Preferred Shares Index "reflects changes in market interest rates," not that interest rates are the *sole* cause of changes).)[6] Thus,

---

[6]    In fact, as shown by Dr. Khare, the Preferred Shares Index moved in the *opposite* direction than it should have in response to interest rate changes 53% of the time, demonstrating it is *not* an appropriate proxy for market interest rates. (Khare Rpt. ¶ 111.)

even assuming this relationship with market interest rates *could* provide an indication whether a market is efficient (it cannot), Dr. Feinstein's analysis fails to demonstrate such a relationship existed . *See* Fed. R. Evid. 702(d) (expert's methods must be "reliably applied").

**Fourth,** even setting aside the flaws noted above, Dr. Feinstein's analysis is also flawed because it fails to show any cause-and-effect relationship between the Preferred Shares Index and the price of the Preferred Securities.  (Khare Rpt. ¶ 100.)  The test neither identifies any specific events when interest rates increased or decreased, nor does it estimate any price impact solely attributable to an identified interest rate change.  (*Id.*)  Thus, even if properly conducted, the test could at most show a *correlation* between interest rate changes and Preferred Securities prices, not that interest rate fluctuations *caused* the Preferred Securities' price changes.  (*Id.*.)

B.    **The Indirect Indicia Do Not Support A Finding Of Market Efficiency**

Plaintiff also relies on Dr. Feinstein's report to contend the seven "indirect" *Cammer/Krogman* factors support a finding of market efficiency.  (Mot. at 13-22.)  Here, too, Dr. Feinstein's analysis comes up wanting.  The majority of these factors weigh against a finding of market efficiency or are irrelevant for the particular securities at issue here

As detailed in Dr. Khare's report, an overarching flaw in Dr. Feinstein's analysis of the indirect factors (also referenced as "structural factors") is that he fails to apply them using appropriate benchmarks for significance.  Dr. Feinstein ignores benchmarks he and other researchers have previously found to be appropriate in favor of lower benchmarks that allow him to reach his desired result in this matter.  (Khare Rpt. ¶¶ 126-31.)  This defect pervades his analysis of the structural factors, but there are other issues as well.

1.    *Proper Analysis Of The Weekly Trading Volume Shows A Large Proportion Of The Class Period Did Not Satisfy The* **Cammer** *Threshold*

A large average weekly trading volume, expressed as a percentage of outstanding shares,

15

"implies significant investor interest in the company," which in turn is an indirect indicator of market efficiency. *Cammer*, 711 F. Supp. at 1286. Dr. Feinstein opines the trading volume of the Preferred Securities "is compelling evidence of the efficiency of their market," but his analysis does not support that conclusion. (*See* Dkt. 45-1 ¶ 114.)

To begin with, in a 2020 article, Dr. Feinstein presents a median weekly turnover of 3.3% as the benchmark for this factor, such that weekly trading volume above that percentage indicates market efficiency (Khare Rpt. ¶ 147.). With respect to the Preferred Securities, Dr. Feinstein's analysis showed that none of them had a weekly trading volume of 3.3% (Dkt. 45-1 ¶ 114), so he abandoned that benchmark in favor of the 17-year old 1% benchmark used in the *Cammer* decision. (*Id*. ¶ 113.) That aside, Dr. Feinstein's analysis fails to look at each week individually, and is instead based on an average for the proposed class period. (*See id.* ¶ 112.) This approach leads to incorrect conclusions because the average rate can be biased by high turnover during a few weeks, while the majority of the period had far lower volume. (Khare Rpt. ¶ 151). In fact, this is exactly what occurred here: during many weeks, the trading volume fell below the 1% threshold identified in *Cammer* as an indicator of market efficiency. (*Id.*, Ex. 11 (Series F, for example, fell below this threshold 23 out of 52 weeks).)[7] Accordingly, when properly analyzed, the weekly trading volume is not indicative of an efficient market. (*Id.*)

> **2.      *The Absence Of Securities Analysts Following And Reporting On The Stock Indicates The Market Was Not Efficient***

The fraud-on-the-market theory rests on the premise that "the price of a company's stock is determined by the available material information regarding the company and its business."

---

[7]    Dr. Feinstein also presents evidence of the average *daily* trading volume of the Preferred Securities, but this metric is of little use without a benchmark with which to compare, and Dr. Feinstein fails to provide one. (Dkt. 45-1 ¶ 111.) When an appropriate benchmark is used (the trading volume of all other U.S. companies), it reveals the trading volume was lower than at least 65% of those companies for each series of the Preferred Securities. (Khare Rpt. ¶¶ 143-145.)

16

*Basic*, 485 U.S. at 241.   Thus, it is important to examine whether "a significant number of securities analysts followed and reported on a company's stock," because those analysts digest the available information for purposes of making buy/sell recommendations which, in turn, influence the price of the stock.  *See Cammer*, 711 F. Supp. at 1286.

With respect to Interval-2 (after the common stock had been taken private), Dr. Feinstein concedes "the evidence does not support a finding of market efficiency[.]"  (Dkt. 45-1 ¶ 120.) Indeed, Dr. Feinstein cannot identify a single published analyst report for that period.  (*Id.*)  For Interval-1, Dr. Feinstein asserts the analyst coverage during that period supports a finding of market efficiency.  (*Id.*)  This assertion, however, is unsupported.  Dr. Feinstein claims to have identified "analyst reports covering AmTrust" during the putative class period (*id.* ¶¶ 116-118), but fails to note those analyst reports covered the common stock or AmTrust generally, not its preferred shares.  (*See id.* ¶ 120; *see also* Khare Rpt. ¶ 154.)  As courts have recognized, an analyst report that does not address the specific security "provides little support to the claimed efficiency of the market[.]"  *In re Am. Int'l Group Inc. Secs. Litig.*, 265 F.R.D. 157, 177 (S.D.N.Y. 2010), *vacated and remanded on other grounds* 689 F.3d 229 (2d Cir. 2012).  *See also Bombardier*, 546 F.3d at 205-06 (no error in determination "that a lack of analyst coverage indicated that the market was inefficient" where "there were no analysts who specifically followed the Certificates," as opposed to the company generally).[8]

---

[8]   While Dr. Feinstein does note "one of the reports specifically analyzed the AmTrust Preferred Shares," the cited article was not written by a professional analyst trained to analyze Preferred Securities and, in fact, the author disclaims as much.  *See* Panther Investments, "AmTrust Financial Preferred Securities–Avoid or Consider Shorting," *available at* https://seekingalpha.com/article/4180858-amtrust-financial-preferred-stock-avoid-consider-shorting (describing itself as an "Investment Professional Focused on Event-Driven / Special Situations Investments as well as some Growth at a Reasonable Price").  In any event, a single "analyst report" is insufficient to satisfy this factor, which instead depends on "a ***large number*** of financial analysts report[ing] on the stock[.]" *Bombardier*, 2006 WL 2161887 at *6 (S.D.N.Y.

Tacitly recognizing the dearth of analyst coverage during the relevant period, Dr. Feinstein attempts to bolster his conclusion through reference to "463 articles" in various "news media, including news reports on the internet[.]" (Dkt. 45-1 ¶¶ 121-122.)  Again, however, Dr. Feinstein does not claim any of those articles discussed the Preferred Securities, and he instead searched generally for articles about "AmTrust Financial Services, Inc."  (*Id.* ¶ 122 n. 99.)  Moreover, "random commentary by news reporters cannot substitute for serious attention to stock by professional securities analysts . . . Such haphazard media attention is hardly indicative of an efficient market."  *O'Neil v. Appel*, 165 F.R.D. 479, 501 (W.D. Mich. 1996).

### 3.    *The Extent To Which Market Makers Trade In The Stock*

Dr. Feinstein notes the Preferred Securities traded on the NYSE and NASDAQ, two public trading forums.  (Dkt. 45-1 ¶¶ 103-110.)[9]  While Dr. Feinstein contends this serves as "compelling evidence" of efficiency (*id.* ¶ 110), "the mere fact that a stock trades on a national exchange does not necessarily indicate that the market for that particular security is efficient." *Bell v. Ascendant Sols., Inc.*, 422 F.3d 307, 313 (5th Cir. 2005).  *See also Freddie Mac*, 281 F.R.D. at 178 ("a stock's listing on a national exchange . . . is not dispositive when efficiency is disputed").  As *Cammer* explained, "[i]t would be illogical to apply a presumption of reliance merely because a security is traded within a certain 'whole market', without considering the trading characteristics of the individual stock itself."  711 F. Supp. at 1281.

Dr. Feinstein also observes that some institutional investors owned shares of the Preferred Securities.  (Dkt. 45-1 ¶¶ 124-29.)  Courts have considered this to be an indicator of

---

Aug. 1, 2006), *aff'd*, 546 F.3d 196 (2d Cir. 2008) (emphasis added).  *See also Krogman v. Sterritt*, 202 F.R.D. 467, 475 (N.D. Tex. 2001) (existence of one analyst and coverage by Moody's and similar publications insufficient to cause this factor to favor market efficiency).

[9]    Dr. Feinstein also notes that underwriters of a security sometimes serve as market makers—who trade in the security—but does not claim any of the underwriters of the Preferred Securities performed this function. (Dkt. 45-1 ¶ 108.)  This general observation is meaningless here.

efficiency only where the institutional investors have "held a substantial percentage" of the securities, and thus were likely to act "as arbitrageurs [to] facilitate[] the efficiency of the market." *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008). Dr. Feinstein fails to note the Preferred Securities owned by "some institutions" (Dkt. 45-1 ¶ 127) made up only a small fraction of the Preferred Securities, not a "substantial percentage" that could give rise to an inference that institutional trading facilitated market efficiency. (Khare Rpt. ¶¶ 174-77.)

### 4. *AmTrust's Eligibility To File SEC Form S-3 Has No Bearing On Market Efficiency For The Preferred Shares*

In certain cases, the issuer's ability to file SEC Form S-3 is used as a simplified way of examining the trading volume of a stock—"it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency." *Cammer*, 711 F. Supp. at 1287. *See also Freddie Mac*, 281 F.R.D. at 181 ("I find the SEC Form S–3 factor redundant in light of the market capitalization factor."). In turn, the high trading volume serves as "a rough proxy" for whether the company is widely followed by analysts. Donald C. Langevoort, "Theories, Assumptions, and Securities Regulation: Market Efficiency Revisited," 140 U. Pa. L. Rev. 851, 876 & n. 81 (1992) ("Whether it is a good proxy is another question, for many people have noted that the number of companies extensively followed by analysts is less than that covered by the form."). However, as shown in above, *supra* at 16-19, the trading volume and attendant news coverage of the common stock (or the company generally) do not indicate efficiency of the market for the specific securities at issue here (the Preferred Securities).

### 5. *The Market Capitalization Of Each Series Indicates Market Inefficiency*

In *Krogman v. Sterritt*, the court examined market capitalization as an indirect indicator of market efficiency because "there is a greater incentive for stock purchasers to invest in more

highly capitalized corporations." 202 F.R.D. at 478.[10]  Dr. Feinstein first analyzed the market value of the common stock during "Interval 1." (Dkt. 45-1 ¶ 146.)  But the value of the common stock provides no indication of investors' incentives to invest in the Preferred Securities, the value of which was dependent on other factors.  (Khare Rpt. ¶ 134.)  Apparently recognizing this, Dr. Feinstein also examined the "aggregate" market capitalization for all six series of the Preferred Securities to conclude they were valued greater than 64% of all publicly-traded companies in the United States.  (Dkt. 45-1 ¶ 148.)  However, this aggregate approach is misleading due to the distinct trading characteristics of each series.  (Khare Rpt. ¶ 135.)  In other matters, Dr. Feinstein has properly analyzed the market capitalization of each security separately, rather than the improper aggregate method used here.[11]  When market capitalization is examined for each series of Preferred Securities, it reveals the market capitalization was in the *bottom* quartile when compared to other publicly-traded companies.  (Khare Rpt. ¶¶ 137-42 (the percentiles ranged from 21.7% for Series C to 38.3% for Series F, with most falling around the bottom 25th percentile).)  *Cf. Krogman*, 202 F.R.D. at 478 (market capitalization in "top sixty percent" weighed only "slightly" in favor of market efficiency).

###### 6.      The Bid-Ask Spread For Each Series Indicates An Inefficient Market

"A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade." *Krogman*, 202 F.R.D. at 478.  Dr. Feinstein concedes the bid-ask spread for the Preferred Securities was "wider than the average bid-ask spread among common stocks"—indeed, in some cases, multiples wider.  (Dkt. 45-1 ¶ 156.)  Dr. Feinstein

---

[10]    As Dr. Feinstein has recognized, "market capitalization [is] a single encompassing 'size' factor standing in for the *Cammer/ Krogman* factors of S-3 eligibility, market capitalization, and float." (Reed Decl. ¶ 6, Ex. 4 at 4).)  Thus, while Dr. Feinstein separately examines the "float," the relevance of that factor is largely encompassed within the "market capitalization" factor. (*See also* Khare Rpt. ¶ 132.)

[11]    *See, e.g.*, Khare Rpt. ¶ 135 n.124.

attempts to salvage this result by comparing to the average bid-ask spread of stocks twenty years ago, at the time of *Krogman*. (*Id.* ¶ 158.) But this is meaningless—investors comparing the expense of stocks have only *current* stocks as alternatives, not those from two decades ago. (Khare Rpt. ¶¶ 161-70.) *See also Pearlstein v. BlackBerry Ltd.,* 2021 WL 253453, at *16 (S.D.N.Y. Jan. 26, 2021) (Dr. Feinstein compared bid-ask spread to all stocks in CRSP, not historical bid-ask spreads); *Krogman*, 202 F.R.D. at 478 (comparing bid-ask spread to sample used in study, not historic spreads); *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *12 (S.D.N.Y. July 10, 2019) (comparing to "all stocks trading on the NYSE and NASDAQ").

***

In sum, Dr. Feinstein's three-date event study is woefully deficient and provides no direct evidence that the market for these Preferred Securities was efficient during the alleged class period. His alternative empirical analysis – the Significant Explanatory Variable Test – is unrecognized and was flawed in execution. And his analysis of the other *Cammer/Krogman* factors, which are in any event intended to buttress direct evidence of efficiency, not substitute for it, suffers from myriad flaws and is unpersuasive. Plaintiff, therefore, has failed to carry his burden to establish an entitlement to rely on the fraud on the market theory of reliance, and certification must be denied.

## II. PLAINTIFF HAS FAILED TO ESTABLISH DAMAGES CAN BE MEASURED ON A CLASS-WIDE BASIS CONSISTENT WITH HIS THEORIES OF LIABILITY

A class can be certified under Rule 23(b)(3) only if the plaintiff provides a class-wide method of determining monetary relief for their liability theory. *Comcast*, 569 U.S. at 34-38. Although the plaintiff need not provide an "actual calculation . . . at this stage," she must offer more than an expert's "say-so" that a viable model of class-wide damages exists. *Ft. Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 142 (S.D.N.Y. 2014).

21

Here, Dr. Feinstein recognizes certain case-specific issues could complicate the damages analysis in this case and provides a laundry list of vaguely described "tools" that could hypothetically be used to address them, but fails to provide any discussion that would allow the Court to examine the validity of his approach. (*See* Dkt. 45-1 ¶¶ 220-25.) Indeed, there are a number of issues that could prevent Plaintiff from quantifying class-wide damages in this case.

First, Dr. Feinstein's proposed damage analysis makes no effort to address the potential economic impact associated with a change in trading venue (from a public exchange to over-the-counter). (Khare Rpt. ¶¶ 184-86.) Plaintiff alleges damages resulted from the announcement of the delisting (Compl. ¶ 97), but there are a number of factors that could have contributed to the price change associated with that event that have *nothing* to do with the alleged misrepresentations about where the Preferred Securities would trade (*i.e.*, Plaintiff's theory of liability)—for example, investor expectations concerning the payment of dividends or market interest rates, which are unrelated Plaintiff's theory of liability, but would be expected to have an impact on price. (Khare Rpt. ¶¶ 184-91.) Dr. Feinstein has not identified the methodology he would use to estimate and exclude the price impact of such confounding information. Second, Dr. Feinstein proposes to calculate per-share damages to investors by solely using alleged corrective disclosures, but fails to provide any specific methodology for determining the price impact, if any, of the purported misrepresentations. (*Id.* ¶¶ 192-94.) Instead, he offers only a generic laundry list of *potential* analyses that *might* be used for that determination.

These vague descriptions fall far below the standard established in *Comcast* to allow the Court to conduct a "rigorous analysis" of the validity of Plaintiff's proposal—Dr. Feinstein's proposed damages methodology is only a promise that he *could* design a model, but this is insufficient to support a finding of predominance. *See, e.g., OPERS*, 2018 WL 3861840, at \*19

(rejecting plaintiff's model of class-wide damages in 10(b) suit as "general and vague" where Dr. Feinstein "describe[d] in his report various techniques he believes he could use to calculate out-of-pocket damages based on inflation," but had not decided "the specifics of exactly which model [he] would use to calculate damages"); *Kottaras v. Whole Foods Market, Inc.*, 281 F.R.D. 16, 26 (D.D.C. 2012) (expert's proposed methodology for calculating class-wide damages was too vague because it failed to account for "[confounding] factors that may have affected price"); *In re Conagra Foods, Inc.*, 302 F.R.D. 537, 577–78 (C.D. Cal. 2014) (expert report "describ[ing] the methods [the expert] would use to make the [damages] calculation," but failing to "report that [the expert] has actually employed them" did not satisfy *Comcast*).

## III.   PLAINTIFF IS NOT TYPICAL OF THE CLASS

Rule 23(a) only permits certification of a proposed class if the party seeking certification proves, *inter alia*, that its claims or defenses are "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). A putative class representative's claims are not typical where, as here, the proposed representative would be subject to unique defenses. *Fogarazzo v. Lehman Bros.*, 232 F.R.D. 176, 180 (S.D.N.Y. 2005).  Plaintiff in this case fails that test.

Plaintiff purchased all of his Preferred Securities during the alleged class period between December 12-26, 2018, near the end of the alleged class period. (Reed Decl. ¶ 3, Ex. 1 at Tr. 106:9-107:7; 230:12.)  In deposition, Plaintiff testified that (i) he purchased the Preferred Securities based on his belief that they were undervalued due to a misplaced fear among investors that AmTrust was likely to delist them from the NYSE, and (ii) he believed this fear was misplaced because delisting the securities would close AmTrust off from the capital markets and AmTrust would be unwilling to bear that consequence.  (*Id.* ¶ 3, Ex. 1 at Tr. 93:12-94:1; 95:25-96:8; 104:5-17.)  A contemporaneous email Plaintiff sent to a friend confirms that this was the reasoning behind Plaintiff's investment. (*Id.* ¶ 5, Ex. 3.)

23

These admissions by Plaintiff place him in direct conflict with the rest of the purported class.  Plaintiff's sworn testimony that the Preferred Securities were undervalued due to the market's misplaced fear they would be delisted is squarely at odds with his allegation on behalf of the putative class that the Preferred Securities were fraudulently <u>overvalued</u> because Defendants' alleged misstatements misled the market into believing the Preferred Securities would <u>not</u> be delisted.  Plaintiff is thus opposed to the purported class on the issue of reliance, because while he argues in his Complaint for the fraud-on-the-market-theory on the basis that the market believed Defendants' statements that the securities would remain listed and priced them accordingly, his sworn testimony, as an experienced and sophisticated investor, is that the market disbelieved Defendants' statements and priced the Preferred Securities on the basis that they would be delisted.   Additionally, Plaintiff's admission that he believes the shares were undervalued during the class period places him in opposition to the damage theory he has alleged for the class, which rests on the premise the price of the Preferred Securities was inflated by the purported misrepresentations and the putative class members suffered losses upon announcement of the delisting.  (Compl. ¶ 97.)  In these circumstance, Plaintiff is subject to unique defenses and fails to satisfy Rule 23's typicality requirement..  *See BlackRock Balanced Cap. Portfolio v. Deutsche Bank Nat'l Tr. Co.*, 2018 WL 5619957, at *9 (S.D.N.Y. Aug. 7, 2018) (plaintiff's "atypical damages model . . . could give rise to unique defenses that would not only be inapplicable to other members of the class, but could actually prejudice them."); *Abu Dhabi Com. Bank v. Morgan Stanley & Co. Inc.*, 269 F.R.D. 252, 262 (S.D.N.Y. 2010) ("although some investors may have relied substantially or exclusively on the ratings they received, others may have placed comparatively more weight on their own independent credit assessments."); *McGuinness v. Parnes*, 1988 WL 66214, at *3 (D.D.C. Jun. 17, 1988) (named plaintiff atypical

24

because he did not believe that the market price reflected the market value of the stock).

## IV.    IN THE ALTERNATIVE, PLAINTIFF'S CLASS SHOULD BE LIMITED

For all the reasons set forth above, no class should be certified.  But if any class is certified, the Court should exclude (1) those who purchased Preferred Securities during Interval 2 (after the AmTrust common stock was delisted); and (2) any purchasers of the Preferred Securities who sold all their shares before the alleged corrective disclosure on January 18, 2019.

*First,* while Plaintiff has failed to demonstrate market efficiency throughout the class period, this failure of proof is particularly acute for Interval 2: Dr. Feinstein concedes certain indirect indicia do not support a finding of market efficiency, and his limited event study for this period examined only the "corrective disclosure" date, an approach that has been rejected by courts and economists alike.  *See supra* at 10-11.  Thus, Plaintiff cannot invoke *Basic*'s presumption, and class certification is not proper for those who purchased during that period. Further, because Plaintiff's only purchases of the Preferred Securities occurred during Interval 2, should the Court agree, Plaintiff must be excluded from the class.  *Wal-Mart*, 564 U.S. at 348 ("a class representative must be part of the class") (quotation, citation omitted); (Khare Rpt. ¶ 97.)

*Second,* the Second Circuit has approved exclusion of prospective class members who sold before disclosure of the truth entered the market, on the grounds they will not be able to demonstrate harm on a common basis with class members who have some plausible loss causation theory. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40-41 (2d Cir. 2009).  *See also In re IMAX Sec. Litig.,* 272 F.R.D. 138, 153 (S.D.N.Y. 2010) (in *Flag Telecom Holdings* "the Second Circuit ultimately excluded all in and out traders from the definition of the class.").  Thus, those who sold their shares before January 18, 2019 must be excluded.

## CONCLUSION

Defendants respectfully request the Court deny Plaintiff's motion for class certification.

Dated: April 30, 2021
New York, New York

/s/ Kevin S. Reed

Michael B. Carlinsky
Kevin S. Reed
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
51 Madison Ave., 22nd Fl.
New York, NY 10010
Tel.: (212) 849-7000
Fax: (212) 849-7100
michaelcarlinsky@quinnemanuel.com
kevinreed@quinnemanuel.com

*Attorneys for Defendants*

26