# EXHIBIT 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------x

JAN MARTINEK,

                    Plaintiff,

                         Case No.  1:19-CV-08030-KPF

               v.

AMTRUST FINANCIAL SERVICES, INC.,

BARRY D. ZYSKIND, GEORGE

KARFUNKEL AND LEAH KARFUNKEL,

                    Defendants.

------------------------------------------x

                    7:22 a.m.

                    April 15, 2021



          VIRTUAL VIDEOTAPED DEPOSITION of JAN

MARTINEK, the Plaintiff in the above entitled

matter, pursuant to Notice, before Stephen J.

Moore, a Registered Professional Reporter,

Certified Realtime Reporter and Notary Public of

the State of New York.

JAN MARTINEK

A P P E A R A N C E S:

        WOLF POPPER LLC

                Attorneys for Plaintiff

                845 3rd Avenue - 12th Floor

                New York, New York   10022

        BY:    CARL L. STINE, ESQ.

                - and -

                PATRICIA AVERY, ESQ.

        QUINN EMANUEL URQUHART & SULLIVAN LLP

                Attorneys for Defendants

                51 Madison Avenue - 22nd Floor

                New York, New York 10010

        BY:     KEVIN S. REED, ESQ.

                - and -

                MICHAEL RUBIN, ESQ.

JAN MARTINEK

Q       Well, if your first investment in AmTrust was in December of 2018, do you recall approximately how far before then you heard of AmTrust, was it weeks, months, years?

A       It would be weeks or months, I don't know, I don't remember.

Q       How did you first hear about AmTrust?

A       I heard about it from my friend, Pavel Oliva.

Q       I didn't hear the last part of it.

A       I'm sorry?

Q       Okay, I see now, you heard about it from your friend Oliva?

A       Pavel Oliva.

Q       And who is Pavel Oliva?

A       Pavel Oliva is a friend of mine who lives in the states and used to be a fund manager, hedge fund, focus on financial institutions.

MR. STINE:  Jan, can you move so that the camera puts you more in the middle?

Page 92

JAN MARTINEK

Thank you.

Q    How long have you known Mr. Oliva?

A    I met him when I was a Fulbright Scholar in the United States.

Q    So quite a while ago?

A    So it would be probably 1992.

Q    You said he used to be a fund manager.  Does he currently have a job?

A    He has his own family office.

Q    And it was he who suggested to you that you consider an investment in AmTrust preferred securities?

A    Yes, he brought the idea.

Q    And can you recall that conversation?  What did he tell you about it?

A    I don't remember the conversation, it's two and a half years ago, and I have many conversations on investments every day.  I don't remember.

Q    Okay, well, accepting that you can't remember any of the complete conversation, do you remember any details about the conversation?

JAN MARTINEK

A       I don't -- I'm sorry, I don't remember.

I speak to Pavel very often, and I don't remember -- I don't remember when it was exactly, I don't remember what he said.

It's two and a half years ago, and as I said, I have daily several similar conversations with Pavel, and with many -- not Pavel, not with Pavel daily, but I have daily many conversations like that.

Q       So you remember Mr. Oliva suggested to you an investment in AmTrust, but you don't remember anything he told you about the securities; is that a fair summary?

A       I believe that he -- his investment thing was that the security is undervalued and that he didn't believe that the security would be delisted.

And that was the investment theme that we invested, or I invested and I think -- and he invested as well.

And we believed that if the securities would not be delisted, it would be a very good investment.

Page 94

JAN MARTINEK

That's the reason we bought.

Q     So now you are remembering a bit more about your conversation with him, is that right?

In other words, what you're testifying to is what you recall the two of you speaking about when he suggested this investment to you?

A     I'm sorry, that's not what I said.

I said that I have very -- I had several conversations, I speak to Mr. Oliva often, and our investment theme was, and I tried to summarize the investment theme.

I'm not saying that -- you asked me what was the first contents of, what was the contents of our first conversation, and I don't recall that.

I'm just saying that the overall investment theme which we have discussed repeatedly on several calls was this.

And I'm not assigning that conversation to any particular call, I am just saying that was why we invested, and that is

JAN MARTINEK

what we have discussed several times.

Q    Do you have any recollection of how many times you spoke with Mr. Oliva about this potential investment in AmTrust before you made the investment?

A    I don't have any -- I don't know.  It would be several times, but I don't -- I don't know.

Q    And you don't recall any of those conversations individually, is that right?

A    That is correct, yes.

Q    And your testimony is that you have a recollection of the overall investment theme you discussed during these conversations; is that a fair summary?

A    I am saying that the reason why we have -- why he invested and why I invested and what we have discussed several times was that we believed that AmTrust would not get delisted, and if it would be, it would -- and I still believed that it wouldn't be delisted, then we would have made money on this.

Q    You said a few minutes ago that

JAN MARTINEK

part of the investment theme was that the stock was undervalued.

Why did you believe it was undervalued?

A    I believe that there was a concern that the security could be delisted by part of the market, or there was a risk.

Q    When you spoke with Mr. Oliva about this potential investment, were you discussing any particular series of AmTrust preferred stock, or were you discussing all of them as one, or something else?

A    As I said, I don't -- I don't remember any particular conversation.

I think Mr. Oliva invested in all six preferred securities, and so did I, so I think it was about -- more about the general concept than one individual security.

We might have liked one more than others, but I don't recall that.

Q    When you made your investment in the AmTrust preferred securities, did you have a targeted return in mind?

A    No; no.

JAN MARTINEK

Q    Was your intent to hold them for a period of time?

A    Yes.

Q    In other words, it wasn't meant to be a short in and out investment?

A    No, it was -- I wouldn't call it short.  We just wanted to hold it until the situation clarifies and the share price rerates.  I didn't have a price target.

I don't recall that -- sorry, I don't recall having a price target.

I might have, I don't remember.

Q    Okay.

And so you didn't have any particular threshold at which you intended to sell them at the time you made the investment?

A    It is two and a half years ago, I don't remember.

Q    Okay.

Other than speaking to Mr. Oliva, what if any research did you do prior to making your investment in the AmTrust preferred securities?

A    As I said, I do many investments

Page 98

JAN MARTINEK

and I spend my time reading and analyzing investments.

I do not recall what I have done in this particular case, because at the time it was investment like any other, so I assume that I have done what I have described in the past half an hour to you when you asked me what you do generally.

But I do not recall exactly have I done at the time.

Q    Okay.

You said you had a belief at the time you invested that AmTrust would not delist the securities, is that right?

A    Yes.

Q    And what was your basis for that belief at the time you made your investment?

A    I, again, this is two and a half years ago, and it's very difficult for me to -- to recall exactly what I knew at the time, because again, at that time it was -- it was the investment like any other.

I believed that -- I did knew, I was aware of some of AmTrust's statements that

Page 103

JAN MARTINEK

Q     When you say you are long in, it means you own them, right?

A     Yes, long means that I own, I have an exposure into those securities.

Q     And so in the paragraph that begins, "Prefy AmTrust Financial," you are explaining to Mr. Trojan your investment thesis, right?

A     Yes.  No, it is just two -- three sentences about the -- the opportunity. I would not call it full thesis, some buy interest.  It's three sentences.

Q     The first says that the company was taken private, right?

A     Yes.

Q     And the second sentence, can you translate that for us?

A     "There was a panic in the market that -- how the owners will treat with the press," owners meaning the AmTrust, "which remains traded."

Q     Is that a reference to what you said earlier about you thought the stock was undervalued because there was a fear about

JAN MARTINEK

this -- in the market about the stocks being delisted?

A       Yes.  That's --

Q       And then the next sentence, if you could translate for us?

A       "If they would do something wild, the capital markets would close to them, which is, for private insurance company, not a good strategy."

Q       So what you are saying there is you think it's unlikely that AmTrust would delist the securities, because that would result in the capital markets being closed to them, which would be bad for a private insurance company?

A       That's what it says.

Q       Okay.

MR. REED:  We can put that away. We have been going for another hour. Should we take another five minutes or so?

MR. STINE:  Sure.  Jan and Pat, there is a breakout room set up for the three of us, so do you see how to do

JAN MARTINEK

that at the bottom of your screen?

Breakout room.

THE VIDEOGRAPHER:  We are going off the record at 10:27.  This marks the end of media unit number 2.  Thank you.

(At this point in the proceedings there was a recess, after which the deposition continued as follows:)

THE VIDEOGRAPHER:  We are back on the record at 10:37.  This marks the beginning of media unit number 3.

MR. REED:  Give me just one second here.

Q      So let's go back to Exhibit 1, which was the chart of your securities transactions relating to this case.

A      Okay.

MR. STINE:  It was the Plaintiff's certification, but --

MR. REED:  Correct.

MR. RUBIN:  Sorry, which one?  I apologize.

MR. REED:  Exhibit 1, please.

MR. RUBIN:  When you say Exhibit

Page 106

JAN MARTINEK

1 -- Exhibit 1 back up, I understand.
Sorry about that.

Can we see it?

MR. REED:  Yes, rotate the view
and scroll down to the chart that's
attached to the certification.

MR. RUBIN:  Sure.

Q        Normally, Mr. Martinek, I would
ask you to just flip these pages as you need
them, but in this virtual environment you will
have to let us know if you want me to scroll.

It appears from this chart that
you acquired your position in the AmTrust
preferred between December 12 and December 27th
of 2018.

Is that consistent with your
recollection, or do you want to look at the
chart?

A        I do not remember, so if the
information is there, I believe it should be
correct, but I don't recall.

Q        All right.  Well, is there a
reason why you spread your purchases of the
securities out over a two week period as

JAN MARTINEK

opposed to buying them all at once or in tranches?

A    I very often do that, that you just buy in gradually and then you sell gradually.  That's a very common practice which I do; not always, but often.

Q    Okay.  Now the delisting of the securities was announced on January 18th of 2019.

It appears that you waited until the 29th, 11 days later, to start selling.

Do you know why you waited that long before beginning to sell your securities?

A    I as you can see from my Seeking Alpha articles, to me it was such an incredible bad faith action that I somehow believed that the regulators would stop that.

I don't remember -- I think I start selling when I understood that the regulators, the politicians will not get involved.

Why exactly that date, I don't recall.

Q    Why did you sell your

Page 108

JAN MARTINEK

securities?

A    I sold it because I believe that -- I'm sorry, it's -- I'll give you -- one of my favorite investors is John Hampton, and John Hampton is Australian short seller.

And he has a strategy that he looks for bad guys and he says once scumbag, always scumbag. Once people misbehave they tend to misbehave again.

So, so I believed that they will just continue.

I also read article on Seeking Alpha by somebody else, which found that the Stone Point guys have done that before, they bought, while Friedman was a Goldman Sachs Chairman or was in Goldman Sachs, they bought another insurer.

They delisted the equities, then they delisted the prefs, then they kept paying for one, two, three-quarters, I don't recall, then they delisted -- then they stopped paying the prefs and they bought -- bought the -- bought the prefs back from desperate investors for pennies.

JAN MARTINEK

So it just looked like they are going to do it again, and I still believe that they are going to do it again.

Q        Okay.

So, I think I heard maybe two reasons that motivated you to sell, and I want to summarize them and have you tell me if I understood it correctly.

The first is you believed that the delisting was an act of misconduct that made management untrustworthy.

Is that a fair summary of your first reason?

A        Yes, they stole the -- they said repeatedly that they would not delist and then they went and delisted.

And as a reason, they gave an information that it would be just too costly and bothersome to report quarterly results.

But that's something they knew all along.

So when they make these statements, they must have known it.

In my experience, as for

Page 228

JAN MARTINEK

Q    Again, at the top of the e-mail, he suggests to you that you should ask if you can get a piece of the 30 percent settlement that your lawyer gets, or he can pay you as a consultant of not less than $100,000.

Do you see that?

A    Yes.

Q    Did you ever make requests like that?

A    I did as we went through the conversation below, I asked Mr. Stine before, and I was told we went through this.

So I didn't ask, based on this e-mail from Mr. Oliva, I didn't make any action, because I know the answer.

The answer is that I will get pro rata, and that the court may award some special award between $10,000 to 50,000 at their discretion, and that I am not entitled to anything else.

And so it was a nice suggestion from Mr. Oliva, based on not knowing the situation, and probably not even bothering to read the full e-mail string.

Page 229

JAN MARTINEK

Q      Okay, I just have a couple of more questions.

MR. REED:  Let's go back to the certification with the chart attached, Mike.

MR. STINE:  You are sharing your screen, if you care.

MR. RUBIN:  Yes, I will share until I get there.

MR. STINE:  I think you had e-mails on the side.  You don't want to waive any privileged information there.

MR. RUBIN:  I definitely don't.  The certification, Kevin?

MR. REED:  Yes, please.

I was going to, so given what you hear people share on Zoom, that's a relatively minor one.

MR. STINE:  Yes, or accidentally sharing e-mails; right?

MR. RUBIN:  The certification is Exhibit 1, so I will pull that up.

MR. REED:  Let's scroll down to the chart and then rotate the view.

Page 230

JAN MARTINEK

Q    If you look through this chart, Mr. Martinek, it looks like on February 6th you did a series of buys and sells within that same day.

Can you explain those transactions to me?

A    I don't remember, I don't know, probably it was just maybe -- I noticed that there is some pattern that you could do intraday trade, and I did that, but I don't know, I don't know.  I don't know.

There could be some reason what happened, I don't know.

I bought something, I coincidence could have bought more and decided to sell it again.  I don't know, I don't remember; I don't know.

Q    It looks on the 6th you bought some of every series of the preferreds, and then sold later that day.

You have no recollection of why you did that?

A    I don't, no, absolutely not.

I do a lot of trading, so I do,

JAN MARTINEK

as I said, I could do thousands of transactions per year, and I don't recall why it had that.

It's probably trading, if it was trading within one day and with several hours between, then it could be intraday trading, just taking short term gains.

I don't know whether there were gains, I don't know.  I don't know.

Q    Do you have any notes or records or anything else in your office that you could consult that would refresh your recollection as to the purpose for these trade?

A    I don't make any notes, no.

Q    So we have got all we are going to get on why that happened, there is nothing that you can refer to?

A    No.

MR. STINE:  Objection, asked and answered.

MR. REED:  Let's have tab 9, please, Michael.

MR. STINE:  Are we up to Exhibit 9, or did I miss one?

MR. REED:  I am going to rely on

Page 232

JAN MARTINEK

Michael.  I am referring to the tab number in our own internal number.

MR. RUBIN:  This will be Exhibit 9.

(The above described document was marked Exhibit 9 for identification as of this date.)

MR. RUBIN:  So, Kevin, this is a couple of different documents.  Do you want sort of the cover one first?

MR. REED:  I apologize, I am calling out the wrong thing.  I want Martinek 9, the Bates number 9.

MR. RUBIN:  Got you.

MR. REED:  My mistake.

Q      Are you able to see this, Mr. Martinek?

A      Yes.

MR. REED:  We are going to mark as Exhibit 9 a document that bears the Bates number Martinek 9.

A      Yes.

Q      This is an e-mail that you sent on the 23rd of January, 2019 to Eduard Onderka.

Page 233

JAN MARTINEK

Is that one of your partners in the family office?

A    That's correct, yes.

Q    Is this is January 23, 2019, so it several days after the delisting has been announced?

A    Yes.

Q    Can you just give me a general subject matter for this e-mail, what you're writing about here?

A    I think this is my -- it's a summary of my conversation with investment relation team member from my Maiden Holdings.

Q    Okay.

And why are you reporting on that to Mr. Onderka?

A    As I mentioned, we discussed -- we discuss investments, and I don't recall this letter, this e-mail.

So we have discussed with Edward probably Maiden, and that's -- I probably agreed that I would call them or I said I would call them, so I was just writing to him what they said.

**Page 234**

JAN MARTINEK

But I don't recall this conversation, I don't recall this e-mail.

Q    Okay.

A    I don't recall the context.

Q    Okay, if I am understanding you right, from Google Translate, the bulk of the e-mail is you talking about Maiden and what its plans are forthcoming period?

A    I think it's almost -- it is all about Maiden, except the last sentence.

Q    The last sentence is where I am most interested where you say, "If I were them I would buy AmTrust preferreds for Maiden.  I don't know if that will be positive.  I'll call Olive."

Is that a fair translation, or can you tell us what it says?

A    Yes, it says that if I would be in their shoes I would buy AmTrust prefs into Maiden.

Q    And when you say if I were in their shoes, who is "their"?

A    I would say probably the AmTrust Maiden Group.

Page 235

JAN MARTINEK

Q    So you are saying if you were with the AmTrust Maiden Group, you would buy up the preferreds?

A    Or I am saying that I was speculating, that's what they could be doing.

Q    Okay.

MR. REED:  All right, I think I am probably done.  Let me just have two minutes to look over my outline and see if there is any cleanup I need to do.

MR. STINE:  Good.

MR. REED:  Let's take a couple of minutes.

THE VIDEOGRAPHER:  Going off the record at 1:40 p.m.

(At this point in the proceedings there was a recess, after which the deposition continued as follows:)

THE VIDEOGRAPHER:  We are back on the record at 1:45.

MR. REED:  We have no further questions for the witness at this time, so we will conclude the deposition, unless Mr. Stine has any questions.

Page 236

JAN MARTINEK

And thank you for your time, Mr. Martinek.

MR. STINE:  No, we have no questions at this time.

MR. REED:  So we can go off the record.  Thanks everybody.

THE VIDEOGRAPHER:  We are off the record at 1:45, and this concludes today's testimony given by Jan Martinek.

The total number of media units used was 5, and will be retained by Veritext Legal Solutions.

Thank you.

Page 237

JAN MARTINEK

I, the undersigned, a Certified Shorthand Reporter of the State of New York, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction;

That the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case before completion of the proceedings, review of the transcript [ ] was [x ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated:  4/22/2021

Stephen J. Moore
   RPR, CRR

**Page 238**

**JAN MARTINEK**

**DECLARATION UNDER PENALTY OF PERJURY**

Case Name: MARTINEK v. AMTRUST

Date of Deposition: April 15,

2021


I, JAN MARTINEK, hereby certify

Under penalty of perjury under the

laws of the State of New York that the

foregoing is true and correct.

Executed this _____ day of

_____, 2021, at

_____.


_____

JAN MARTINEK