# EXHIBIT 5

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **JAN MARTÍNEK,** | Case No. 1:19-cv-08030-KPF |
| **Plaintiff** | |
| **v.** | |
| **AMTRUST FINANCIAL SERVICES, INC.,** **BARRY D. ZYSKIND, GEORGE** **KARFUNKEL, AND LEAH KARFUNKEL,** | |
| **Defendants** | |

## <u>REBUTTAL EXPERT REPORT OF ALOK KHARE, PH.D.</u>

_____

Alok Khare, Ph.D., CFA, CAIA

April 30, 2021

## TABLE OF CONTENTS

**Page**

I.    **INTRODUCTION**.................................................................................................1

    A.    ASSIGNMENT AND SCOPE...........................................................................1

    B.    QUALIFICATIONS ......................................................................................2

    C.    INFORMATION RELIED UPON .....................................................................4

II.    **SUMMARY OF OPINIONS**.............................................................................5

III.    **BACKGROUND** ...............................................................................................7

    A.    AMTRUST AND THE PREFERRED SECURITIES AT ISSUE................................7

    B.    VALUATION OF AMTRUST PREFERRED SECURITIES ....................................9

IV.    **MARKET EFFICIENCY IS MOST PERSUASIVELY DEMONSTRATED THROUGH EMPIRICAL PROOF IN THE FORM OF AN EVENT STUDY**.........10

    A.    A CAUSE-AND-EFFECT RELATIONSHIP BETWEEN A COMPANY'S ANNOUNCEMENTS AND ITS SECURITY PRICES IS THE "SINE QUA NON" OF MARKET EFFICIENCY ......................................10

    B.    AN EVENT STUDY IS WIDELY RECOGNIZED AS THE BEST METHOD TO TEST FOR A CAUSE-AND-EFFECT RELATIONSHIP BETWEEN A COMPANY'S ANNOUNCEMENTS AND ITS SECURITY PRICES ....................................................................................12

        *1.    Academic Literature Supports the Use of Event Studies to Directly Examine Market Efficiency*................................................................12

        *2.    Court Decisions Support the Use of Event Studies to Directly Examine Market Efficiency* ......................................................................13

        *3.    Prof. Feinstein Supports the Use of Event Studies to Directly Examine Market Efficiency* ......................................................................14

V.    **PROF. FEINSTEIN'S EMPIRICAL EVIDENCE OF MARKET EFFICIENCY OF THE AMTRUST PREFERRED SECURITIES IS INSUFFICIENT AND FUNDAMENTALLY FLAWED**............................................15

    A.    OVERVIEW OF PROF. FEINSTEIN'S EMPIRICAL EVIDENCE .................................15

    B.    PROF. FEINSTEIN'S THREE-DATE EVENT STUDY IS INSUFFICIENT TO ESTABLISH THAT THE SIX SERIES OF AMTRUST PREFERRED SECURITIES TRADED IN AN EFFICIENT MARKET THROUGHOUT THE CLASS PERIOD ......................................................16

        *1.    An event study of three dates cannot prove a cause-and-effect relationship* ....................16

        *2.    Prof. Feinstein's justification for using only three-dates in his event study is baseless*................................................................21

        *3.    Correcting Prof. Feinstein's event study to include 9 additional dates that he failed to analyze confirms that Prof. Feinstein has failed to demonstrate the cause-and-effect relationship for the AmTrust Preferred Securities*................................24

    C.    PROF. FEINSTEIN'S SIGNIFICANT EXPLANATORY VARIABLE TEST IS INSUFFICIENT TO ESTABLISH THAT THE SIX SERIES OF AMTRUST PREFERRED SECURITIES TRADED IN AN EFFICIENT MARKET THROUGHOUT THE PROPOSED CLASS PERIOD .................................31

        *1.    Prof. Feinstein's Significant Explanatory Variable Test is not a generally accepted test of examining a cause-and-effect relationship*............................................32

2.    *The Significant Explanatory Variable Test cannot demonstrate a cause-and-effect relationship between interest rates and the prices of AmTrust Preferred Securities as the Preferred Shares Index is not a suitable proxy for interest rates* .......... 34

3.    *The Significant Explanatory Variable Test also fails to demonstrate the market efficiency of the six series of AmTrust Preferred Securities because, in an efficient market, prices should reflect all available information* ..................................... 36

VI.    **PROF. FEINSTEIN'S EXAMINATION OF THE STRUCTURAL INDICATORS OF EFFICIENCY DOES NOT SUPPORT HIS CONCLUSION THAT THE SIX SERIES OF AMTRUST PREFERRED SECURITIES TRADED IN AN EFFICIENT MARKET** ..........................................**39**

A.    OVERVIEW OF PROF. FEINSTEIN'S ANALYSIS OF STRUCTURAL FACTORS ....................................... 39

B.    PROF. FEINSTEIN INCORRECTLY ASSERTS THAT THE STRUCTURAL *CAMMER / KROGMAN* FACTORS AND "PUBLISHED PEER-REVIEWED EMPIRICAL RESEARCH, INDICATE MARKET EFFICIENCY" FOR THE PREFERRED SECURITIES .................................................................. 40

1.    *Benchmarks from three sources (Villanueva and Feinstein (2020), Tabak (2019), and the Feinstein Benchmark dataset), whenever available, confirm that Prof. Feinstein has failed to demonstrate that structural Cammer/ Krogman factors "indicate market efficiency" for the six series of the Preferred Securities* ........... 42

(a)    Market Capitalization, S-3 Registration, and Float............................................. 42

(b)    Trading Volume and Weekly Turnover ...................................................... 46

(c)    Analyst Coverage ......................................................................... 49

(d)    Bid-Ask Spread .......................................................................... 52

(e)    Market Makers............................................................................ 55

2.    *Prof. Feinstein incorrectly asserts that Feinstein Factors "indicate market efficiency" for the Preferred Securities* ................................................................. 57

(a)    Institutional Ownership ................................................................... 57

(b)    NYSE Listing ............................................................................ 60

(c)    News Coverage........................................................................... 60

VII.    **PROF. FEINSTEIN'S  SECTION 10(B) DAMAGE METHODOLOGY IS FLAWED AND INCOMPLETE** ............................................................................**61**

A.    OVERVIEW OF PROF. FEINSTEIN'S DAMAGE METHODOLOGY ........................................... 61

B.    FLAWS IN PROF. FEINSTEIN'S DAMAGE METHODOLOGY ................................................. 62

## LIST OF EXHIBITS IN THIS REPORT

| Exhibit Number | Title |
| --- | --- |
| 1 | CV of Alok Khare, Ph.D., CFA, CAIA |
| 2 | Documents Considered |
| 3 | Key Characteristics of the AmTrust Preferred Securities |
| 4 | Event Study Regression Results |
| 5 | The Alleged Misrepresentation Dates that Prof. Feinstein Failed to Analyze did Not Have a Statistically Significant Price Impact on All of the Six Series of AmTrust Preferred Securities |
| 6 | *t*-statistics on the Preferred Shares Index found by Prof. Feinstein in the Petrobras and Electrobras Matters were Generally Not Statistically Significant |
| 7 | On 54%-58% of Days in the Proposed Class Period, the AmTrust Preferred Securities and Long-Term Interest Rates Did Not Co-Move in Expected Directions |
| 8 | None of the *t*-statistics on Prof. Feinstein's Market and Sector Indices are Statistically Significant |
| 9 | *Cammer*, *Krogman*, and Feinstein Factors |
| 10 | All Series of AmTrust Preferred Securities Are Distinct, and Prof. Feinstein Incorrectly Combines Them To Examine Market Capitalization |
| 11 | The AmTrust Preferred Securities Weekly Turnover was Below 1% for 17% - 44% of the Weeks in the Proposed Class Period |
| 12 | The Feinstein Benchmark Dataset Shows that the AmTrust Preferred Securities Average Dollar Bid-Ask Spreads are at the 84th – 96th Percentiles of U.S. Companies |

## I.    INTRODUCTION

### A.    Assignment and Scope

1.    I have been retained by the counsel for AmTrust Financial Services, Inc. ("AmTrust" or the "Company") and the individual defendants in this putative class action brought by plaintiff Jan Martinek ("Plaintiff") to analyze and evaluate the analyses and opinions contained in the Expert Report of Professor Steven P. Feinstein dated March 15, 2021 ("Feinstein Report").

2.    Mr. Martinek asserts claims under Section 10(b) of the Securities Exchange Act of 1934 and U.S. Securities and Exchange Commission Rule 10b-5 adopted thereunder (collectively, "Section 10(b)") on behalf of a proposed class defined as "himself and all other persons who purchased any of AmTrust's six series of preferred stock (some represented by depositary shares) on the open market on a U.S. stock exchange during the period January 22, 2018, through January 18, 2019 ('Class Period')."[1]  I refer to the six series collectively as the "AmTrust Preferred Securities" or the "Preferred Securities").[2]

3.    Defendants' counsel has asked me to determine whether:

- Prof. Feinstein has reliably demonstrated "that the AmTrust Preferred Shares traded in an efficient market over the course of the Class Period;"[3]
- Prof. Feinstein has provided a common damages methodology that can reliably estimate damages attributable to Plaintiff's theory of liability.[4]

---

[1] Jan Martinek *v.* AmTrust Financial Services, Inc., et al. Class Action Complaint ("Complaint"), ¶2. I refer to January 22, 2018 through January 18, 2019 as the "Proposed Class Period."

[2] The six series are AmTrust Series A, B, C, D, E, and F preferred stock.  On NYSE, for series A, AmTrust listed the shares of the preferred stock, whereas for Series B through F, AmTrust listed depositary shares, each representing 1/40th of a share of the relevant series. See AmTrust's 10-Q filed November 9, 2018, p. 60.

[3] Report on Market Efficiency of Professor Steven P. Feinstein, Ph.D., CFA dated March 15, 2021 in Jan Martinek *v.* AmTrust Financial Services, Inc., et al., Case No. 1:19-cv-08030-KPF (henceforth "Feinstein Report"), ¶27.

[4] Feinstein Report, ¶28

4.     This report sets forth my opinions in this action based on the information available and the analyses I have performed through the date of this report regarding the opinions and claims put forth in the Feinstein Report.  This report, and my opinions contained herein, are subject to change or modification should additional relevant information become available.

**B.     Qualifications**

5.     I am a Senior Managing Director in the Forensic and Litigation Services Practice at FTI Consulting, Inc. ("FTI"), and co-leader of the Securities, Accounting, and Regulatory Enforcement Practice in FTI's Forensic & Litigation Consulting segment.  FTI is a multi-disciplined consulting firm that provides various advisory services to corporate clients in the U.S. and abroad.  The Forensic and Litigation Services Practice specializes in providing financial, accounting, economic, and investigative consulting services to clients.

6.     One of my responsibilities at FTI is to provide economic, financial, and damage quantification consulting services to clients.  I have provided dispute advisory consulting services in securities, antitrust, and other matters.

7.     I have performed economic analyses that evaluate class certification, loss causation, negative causation, and damage claims in numerous securities matters asserting violations of Rule 10b-5 of the Securities and Exchange Act of 1934 or section 11 of the Securities Act of 1933.  I have evaluated event studies and market efficiency analyses supporting class certification claims. I have analyzed performance and transaction costs of trading strategies and valued equities and other securities (e.g., bonds, options, futures, warrants, restricted stock units).

8.     I have also performed economic analyses to evaluate loss causation, event studies, and damage claims in security matters filed in Australia and Canada.

9.    In total, I have performed economic analyses to evaluate class certification/ loss causation/ damage claims in more than 20 matters alleging violations of security laws in the U.S., Australia, and Canada.

10.    The industries that I have experience with include Auto Parts, Auto Manufacturing, Biotech, Banking, Brokerage and Mutual Funds, Credit Card Payment Processing, Computer Software, Consumer Goods, Computer Manufacturing, Electronic Parts, Food & Beverage, Health, Insurance, Mortgages, Mining, and Telecommunications.

11.    I obtained a B. Tech. in Electrical Engineering from the Indian Institute of Technology, Kanpur, India, and my Ph.D. from UC Santa Barbara.  My dissertation committee included Prof. Rajnish Mehra (chair), known for his research on the equity premium puzzle, and Nobel Laureate Prof. Finn Kydland.  During the Ph.D., I served as a Graduate Student Instructor and taught Corporate Finance, Ph.D. level econometrics sequence, intermediate microeconomics, and macroeconomics classes as a teaching assistant. I worked as a research assistant at the UC Santa Barbara Economic Forecast Project and developed real estate and macroeconomic forecast models.

12.    During the Ph.D., I also worked at Partnervest Advisory Services, an SEC Registered Investment Advisor based in Santa Barbara. While working at Partnervest, among other things, I performed analysis of equity & fixed-income securities, as well as mutual funds. I also did statistical analyses to analyze performance of their proprietary asset allocation models.

13.    After completing the Ph.D. in 2007, I worked as a postdoctoral fellow and a lecturer in the statistics department at UC Santa Barbara.  After that, I started working in economic consulting and worked at LECG, LLC, AFE Consulting, and Navigant Consulting before joining FTI in 2015.

14. I am also a CFA Charterholder and a CAIA Charter holder. I obtained these credentials after completing my Ph.D.

15. The CFA designation is a well-respected and globally recognized credential in the investment management profession. To receive this credential, applicants must pass a series of three exams covering such topics as economics, equity analysis, financial valuation, business analysis, quantitative methods, investment analysis, portfolio management, risk management, financial accounting, and ethical and professional standards.

16. The CAIA designation is "the globally recognized credential for professionals managing, analyzing, distributing, or regulating alternative investments." [5] To receive this credential, applicants must pass a series of two exams that test knowledge of various alternative assets and relative analytics, portfolio management, and ethical and professional standards.

17. I am a member of the American Finance Association, the American Economic Association, the CFA Institute, the CFA Society San Francisco, and the CAIA Association.

18. Attached as **Exhibit 1** is a copy of my current resume, including a listing of publications I have authored.

19. My business address is FTI Consulting, Inc., 50 California St, Suite 1900, San Francisco, CA, 9411. FTI is being compensated for my services in this action at an hourly rate of $711. Neither I nor FTI has any financial interest in the outcome of this litigation. Besides me, under my direction, FTI staff also performed research and other support work for me on this action.

### C.    Information Relied Upon

20. I have relied upon data and information from various sources, which are reasonably relied upon by experts in my field. Besides the report filed by Prof. Feinstein in this matter, I also

---

[5] https://caia.org/programs/the-caia-charter

reviewed analyses that Prof. Feinstein performed to examine the market efficiency of preferred securities in other securities class action matters. In addition, I reviewed the Plaintiff's Complaint in this matter, and the Court's Opinion and Order in this matter dated August 14, 2020 ("MTD Order").

21. **Exhibit 2** lists the documents I have considered in preparing this report, and includes documents cited in this report and its exhibits and Prof. Feinstein's other reports that I reviewed. Although I may cite to a particular page or pages of documents in this report, such pinpoint cites are provided for clarification purposes only, and other portions of the documents and depositions cited may be relevant for my analyses in this matter. Citations to a document or documents are intended to be illustrative and are not exhaustive.

22. I have also relied upon my professional experience, my general knowledge of academic and professional literature, and my expertise obtained over many years as a professional economist. I am prepared to amend my analyses and to perform additional calculations should I consider it necessary after receiving further information regarding this matter.

## II.    SUMMARY OF OPINIONS

23. Below I summarize the findings in this report.

24. Prof. Feinstein has failed to demonstrate that the six series of the AmTrust Preferred Securities traded in an efficient market throughout the Proposed Class Period, or during any subset of the Proposed Class Period.

25. Prof. Feinstein's event study is insufficient to prove that the AmTrust Preferred Securities traded in an efficient market during the Proposed Class Period. An event study analysis of the cause-and-effect between company news and price movements of its securities is, by far, the most important test to demonstrate market efficiency. Prof. Feinstein's event study analysis in this case is incomplete, at best. It includes only three events, one of which is the alleged corrective

disclosure, which is inappropriate for an event study analysis used to evaluate market efficiency. Prof. Feinstein's justification for using just three events – a claim that the AmTrust Preferred Securities would not be expected to react to company earnings announcements in an efficient market – is fundamentally flawed given, among other things, the below investment grade ratings of the Preferred Securities.  Regardless of the justification, an analysis of just three events, whatever the results, cannot prove market efficiency throughout a one-year period.

26.    My extension of Prof. Feinstein's event study analysis to include nine events (three earnings announcements, and six disclosures concerning AmTrust's go-private transaction) that Prof. Feinstein should have analyzed shows that the six series of AmTrust Preferred Securities more likely than not did **not** demonstrate the cause-and-effect relationship between news and price movements that is the hallmark of market efficiency.

27.    Prof. Feinstein's alternative empirical analysis of market efficiency for the AmTrust Preferred Securities – through which he purports to find evidence of market efficiency in the correlation between changes in the S&P Preferred Shares Index (as a proxy for market interest rates) and the prices of the AmTrust Preferred Securities – is not a reliable or generally-accepted test for market efficiency.  Additionally, this purported test was not reliably applied by Prof. Feinstein, as, even if a correlation between interest rates and preferred stock price was probative of efficiency (it is not), the Preferred Shares Index is not a suitable proxy for interest rates. Additionally, the results of this test are simultaneously indicative of market inefficiency, as they do not show statistically significant relationships between the market or sector indices and AmTrust preferred stock price movements.

28.    Prof. Feinstein's examination of the structural factors based on the *Cammer*[6] and *Krogman*[7] decisions, plus certain additional factors not cited in those cases, suffers from a number of problems, chiefly Prof. Feinstein's failure to present them in the context of the benchmarks that he himself has determined to be meaningful in his published research, and Prof. Feinstein's failure to examine all of the factors for the individual series of the AmTrust Preferred Securities.  Once the factors are applied properly and viewed relative to the appropriate benchmarks, they do not provide evidence supporting market efficiency for the six series of AmTrust Preferred Securities.

29.    Prof. Feinstein has proposed a common damage methodology that is flawed and incomplete. He has not proposed a method that could be used to isolate the stock price reactions for each series of the AmTrust Preferred Securities attributable only to the delisting from the NYSE.  Furthermore, the methodology proposed by Prof. Feinstein ignores that the allegations in this matter primarily relate to alleged affirmative misrepresentations about continued listing, and his analysis does not consider the price impact, if any, of the alleged misrepresentations. Prof. Feinstein's methodology does not specify what potential valuation methodology, if any, is capable of addressing the impact of any potentially confounding information released with the alleged corrective disclosure.

## III.    BACKGROUND

### A.    AmTrust And The Preferred Securities At Issue

30.    AmTrust is a holding company whose subsidiaries provide property and casualty insurance to customers in the U.S. and internationally.[8]  The subsidiaries "underwrite and provide property

---

[6]  *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) ("*Cammer*").
[7]  *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) ("*Krogman*").
[8] AmTrust Prospectus Supplement dated June 3, 2013 ("Series A Prospectus"), p. S-16 noting "Our operations are substantially conducted through direct and indirect subsidiaries. As a holding company, we do not own any significant assets other than equity in our subsidiaries."

and casualty insurance in the United States and internationally to niche customer groups that we believe are generally underserved within the broader insurance market."[9]

31.    **Table 1** below provides AmTrust's net income for 2016, 2017, and the nine months ending September 30, 2018.  As the table shows, AmTrust incurred a loss in 2017 and then made a profit during the first nine months of 2018. In other words, going into the Class Period, AmTrust had a history of risky financial performance.

**Table 1: AmTrust Financial Net Income (millions)[10]**

| 2016 | 2017 | 9 Months Ended 9/30/2018 |
|---|---|---|
| $430.4 | -$334.9 | $508.3 |

32.     AmTrust had common stock outstanding and trading on the New York Stock Exchange ("NYSE") until November 28, 2018.

33.     Between 2013 and 2016, AmTrust issued six series of preferred securities ("AmTrust Preferred Securities"), which are at issue in this matter. Series A was issued as preferred stock, while Series B, C, D, E, and F, are Depositary Shares, each representing 1/40th of a share of its associated preferred stock. The AmTrust Preferred Securities are all non-cumulative, meaning that any unpaid dividends are not due to investors at a later date, and had no stated maturity.[11]

---

[9] Series A Prospectus, p. S-2.

[10] Data for 2016 and 2017 from AmTrust's 10-K filed March 16, 2018 and data for 2018 from AmTrust's 10-Q filed November 9, 2018.

[11] Series A Prospectus, cover page; AmTrust Prospectus Supplement dated June 25, 2014 ("Series B Prospectus"), cover page; AmTrust Prospectus Supplement dated September 9, 2014 ("Series C Prospectus"), cover page; AmTrust Prospectus Supplement dated March 12, 2015 ("Series D Prospectus"), cover page; AmTrust Prospectus Supplement dated March 8, 2016 ("Series E Prospectus"), cover page; and AmTrust Prospectus Supplement dated September 20, 2016 ("Series F Prospectus").

AmTrust, at its discretion, could redeem shares of each series at the liquidation preference price.[12]

Exhibit 3 summarizes the key characteristics of the AmTrust Preferred Securities.

34.    While issuing the preferred stock, AmTrust informed investors that these securities were equity and carried significant risks. For example, the Series A prospectus disclosed:[13]

- Dividends are not assured as the Company's ability to pay dividends depends on "dividends or other distributions from [its] subsidiaries"

- The Series A securities were subordinate to AmTrust's existing and future indebtedness and other liabilities

- Its dividends are non-cumulative

- "[T]here may be little or no secondary market"

- Its prices will depend upon, among other things, the likelihood of dividend payments, interest rates, the Company's "creditworthiness, financial condition, performance and prospects, interest rates, the market for similar securities; and economic, financial, geopolitical, regulatory or judicial events that affect us and/or the insurance or financial markets generally" and

- The rating for the preferred stock series was expected to be below investment grade.

**B.    Valuation Of AmTrust Preferred Securities**

35.    As noted earlier, AmTrust Preferred Securities are perpetual securities paying dividends that are not guaranteed and are not cumulative.  Each of the six series of AmTrust Preferred Securities is redeemable at the option of AmTrust after a specified redemption date.[14]

36.    For each series, the present value of a share or ADR equals the value of a perpetual stream of dividend payments discounted at an appropriate discount rate, which depends on the applicable

---

[12] Series A Prospectus, p. S-9; Series B Prospectus, p. S-10; Series C Prospectus, p. S-9; Series D Prospectus, p. S-9; Series E Prospectus, p. S-9; and Series F Prospectus, p. S-9.

[13] Series A Prospectus pp. S-16 – S-18; Series B Prospectus pp. S-17 – S-20; Series C Prospectus pp. S-16 – S-19; Series D Prospectus pp. S-15 – S-18; Series E Prospectus pp. S-15 – S-18; and Series F Prospectus pp. S-17 – S-20.

[14] As **Exhibit 3** shows, Series A shares became redeemable starting June 10, 2018 (i.e., during part of the Class Period). For other series, the earliest redemption date was after the Class Period. Because the AmTrust Preferred Securities were redeemable, they had an embedded call option that also impacted their value.

risk factors. As discussed earlier and disclosed in the prospectuses of each series, there are multiple risk factors (not just interest rates) that could impact the valuation of various series of AmTrust Preferred Securities.

37.    For example, the Series A prospectus warned that "[f]actors that might influence the market price of the Series A Preferred Stock include, but are not limited to … [the Company's] creditworthiness, financial condition, performance and prospects, interest rates, the market for similar securities; and economic, financial, geopolitical, regulatory or judicial events that affect us and/or the insurance or financial markets generally."[15]

38.    The Company also disclosed in the related prospectus that each series of AmTrust Preferred Securities was likely to be rated "below investment grade" and therefore subject to a higher "risk of price volatility than similar, higher-rated securities."[16]

39.    In short, as Prof. Feinstein acknowledges, the prices of AmTrust Preferred Securities are impacted by multiple risk factors.[17]

## IV.    MARKET EFFICIENCY IS MOST PERSUASIVELY DEMONSTRATED THROUGH EMPIRICAL PROOF IN THE FORM OF AN EVENT STUDY

### A.    A Cause-And-Effect Relationship Between A Company's Announcements And Its Security Prices Is The "Sine Qua Non" Of Market Efficiency

---

[15] Series A Prospectus, p.S-17.

[16] Series A Prospectus, p. S-18 noting "We have not sought to obtain a rating for the Series A Preferred Stock. However, we currently expect that the rating of the Series A Preferred Stock, if obtained, **would be below investment grade**, which could adversely impact the market price of the Series A Preferred Stock. **Below investment-grade securities are subject to a higher risk of price volatility than similar, higher-rated securities**.
Furthermore, increases in leverage or deteriorating outlooks for an issuer, or volatile markets, could lead to continued significant deterioration in market prices of below-investment grade rated securities." (emphasis added); See also Series B Prospectus p. S-20, Series C Prospectus p. S-19, Series D Prospectus p. S-18, Series E Prospectus p. S-18, and Series F Prospectus p. S-20.

[17] Feinstein Report, ¶42 noting "the type of information that may be expected to significantly move the price of a preferred stock is unexpected information about solvency, ability or willingness to pay the preferred dividend, the marketability of the security, and changes in market interest rates."

40.    In an efficient market, prices of a company's securities should promptly reflect *all* publicly available information.  In the context of a securities fraud case, it is particularly important to examine whether prices respond to the new value-relevant information disclosed by the company. As Prof. Feinstein notes, in its seminal decision in *Basic v. Levinson*, the Supreme Court, while discussing market efficiency, clarified that the relevant hypothesis for securities matters is whether material information related to a company's prospects is reflected in the prices of its securities:[18]

> "The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the **available material information regarding the company and its business** ...."

41.    The *Cammer* court also noted that efficient markets are "so active and followed that material **information disclosed by a company** is expected to be reflected in the stock price."[19]

42.    In its 2013 *Amgen* decision, the Supreme Court again noted that market efficiency analysis is about whether prices of a company's securities "reflect **all publicly available information about [that] company**."[20]

43.    Finally, Prof. Feinstein himself notes that:[21]

> As the legal cases have recognized, market efficiency is relevant to a securities case because it addresses the question of whether false information (e.g., in the form of an alleged misrepresentation or omission) *[by a company]* would likely have impacted the prices at which investors bought and sold securities, and upon which investors relied.

---

[18] Feinstein Report, ¶85, citing *Basic, Inc. v. Levinson*, 485 U.S. 224, 108 S. Ct. 978, 989 (1988). (emphasis added)

[19] *Cammer*, 711 F. Supp. 1264, 1274 n.11 (D.N.J. 1989). (emphasis added)

[20] *Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1190, 185 L. Ed. 2d 308 (2013). (emphasis added)

[21] Feinstein Report, ¶88.

44.     In short, the most relevant market efficiency question for this matter is whether there was a cause-and-effect relationship between AmTrust announcements and prices of all six series of AmTrust Preferred Securities throughout the proposed Class Period.

**B.     An Event Study Is Widely Recognized As The Best Method To Test For A Cause-And-Effect Relationship Between A Company's Announcements And Its Security Prices**

45.     An event study most effectively tests for market efficiency by directly examining whether there is a cause-and-effect relationship between value-relevant information disclosed by a company and prompt changes in the prices of its securities.   As detailed below, this point is a matter of agreement among courts, academics, and even Prof. Feinstein himself.

**1.     Academic Literature Supports the Use of Event Studies to Directly Examine Market Efficiency**

46.     For example, as pointed out by Prof. Feinstein, renowned financial economist and Nobel Laureate Eugene F. Fama notes that:

> ***The cleanest evidence on market-efficiency comes from event studies, especially event studies on daily returns.*** *When an information event can be dated precisely and the event has a large effect on prices, the way one abstracts from expected returns to measure abnormal daily returns is a second-order consideration. As a result, event studies give a clear picture of the speed of adjustment of prices to information.*[22]

47.     The Barber, Griffin, and Lev (1994) paper that Prof. Feinstein cites employs the cause-and-effect relationship test to determine whether certain stocks traded in an efficient market and only then examines whether an inference based on eight structural factors will be consistent with their classification.[23]   Specifically, the authors note that they "measure the efficiency of a firm's

---

[22] Feinstein Report, ¶165 citing to "Efficient Capital Markets II," by Eugene F. Fama, *Journal of Finance*, 1991, p. 1607. (emphasis added)

[23] See Feinstein Report ¶¶90-91 and 120 citing to Barber, Brad et al., "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," *Journal of Corporation Law*, 1994 ("Barber, Griffin, and Lev (1994)").

security price by analyzing the stock price response to the announcement of unexpected earnings."[24]

48.    Discussing the efficient market definition, Barber, Griffin, and Lev (1994) note:[25]

> *In an efficient market, all publicly released information should be quickly and fully reflected in the price of a security. Beginning with the work of Ball and Brown, it has been well-established that the announcement of earnings conveys valuable information.* **Thus, if the market for certain securities is inefficient, the information content of earnings announcements would not be immediately reflected in the price of these securities.** *We therefore propose to measure the efficiency of a firm's security price by analyzing the stock price response to the announcement of unexpected earnings.*

### 2.    Court Decisions Support the Use of Event Studies to Directly Examine Market Efficiency

49.    The importance of event study analyses demonstrating a cause-and-effect relationship has been accepted and in fact emphasized by courts as well. The *Cammer* court noted that a cause-and-effect relationship, "is the **essence** of an efficient market and the foundation for the fraud on the market theory."[26]

50.    The Court in *In re Xcelera.com Secs. Litig* similarly stated that, of the *Cammer* factors, the fifth one requiring this cause-and-effect relationship between unexpected company-specific events and price movements is "in many ways, the most important."[27] The *Xcelera Court* went on to state that "[i]n the absence of such a relationship, there is little assurance that information is being absorbed into the market and reflected in its price."[28]

---

[24] Barber, Griffin, and Lev (1994) p. 294.
[25] Barber, Griffin, and Lev (1994), p. 294; internal citation omitted, and emphasis added.
[26] *Cammer v. Bloom,* 711 F. Supp. 1264 ("*Cammer*"), at 1287. (emphasis added)
[27] *In re Xcelera.com Securities Litigation* 430 F.3d 503, 512 (1st Cir.2005).
[28] *In re Xcelera.com Securities Litigation* 430 F.3d 503, 512 (1st Cir.2005).

51.     Likewise, in *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, the court observed, "Without the demonstration of such a causal relationship, it is difficult to presume that the market will integrate the release of material information about a security into its price."[29]

52.     As the Southern District of New York's Judge Cedarbaum summarized, a cause-and-effect relationship between value-relevant information and stock price "**is the critical factor -- the sine qua non of efficiency.**"[30]

### 3.     Prof. Feinstein Supports the Use of Event Studies to Directly Examine Market Efficiency

53.     In his report, Prof. Feinstein agrees that "[e]vent study analysis is one of the most commonly used analytic methodologies employed by finance researchers to assess market efficiency."[31]   Nonetheless, elsewhere in his report, he tries to downplay the importance of a cause-and-effect test,[32]  and asserts that **all five** *Cammer* factors "generally indicate whether the market for a security is efficient."[33] He further asserts that his own research shows that the structural "*Cammer* factors are **dispositive** indicators of stock price reactivity to information and therefore informational market efficiency."[34]

54.     Previously, however, Prof. Feinstein has testified that a cause-and-effect test is "the essence of market efficiency,"[35] and that he would never perform a market-efficiency analysis without examining this factor. In fact, Prof. Feinstein has stated that he "wouldn't author a report

---

[29] *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.,* 546 F.3d 196, 207 (2d Cir. 2008)

[30] *In re Federal Home Loan Mortgage Corp. (Freddie Mac) Securities Litigation*, 281 F.R.D. 174, 182 (S.D.N.Y. 2012). (emphasis added)

[31] Feinstein Report, ¶165.

[32] Feinstein Report, ¶89 noting "economic rationales and published peer-reviewed research support each [*Cammer*] factor as **an indicator of market efficiency**." (emphasis added)

[33] Feinstein Report, ¶89.

[34] Feinstein Report, ¶92.

[35] Deposition transcript of Steve Feinstein in *In Re: Groupon, Inc. Securities Litigation* (Case No. 12 CV 2450) dated February 12, 2014, 111:18-20, 115:21-116.:19.

concluding that the stock was efficient if I didn't have some demonstration – some **empirical** demonstration of the efficiency."[36]

55.     In his report that examined the market efficiency of Freddie Mac stock, Prof. Feinstein pointed out that, according to the Court in *Halliburton II*, a cause-and-effect relationship was "at the center of market efficiency," and according to the *Cammer* court, one of "the most convincing ways" to establish market efficiency.[37]

56.     In short, an event study analysis is required to demonstrate market efficiency.

## V.     PROF. FEINSTEIN'S EMPIRICAL EVIDENCE OF MARKET EFFICIENCY OF THE AMTRUST PREFERRED SECURITIES IS INSUFFICIENT AND FUNDAMENTALLY FLAWED

### A.     Overview of Prof. Feinstein's Empirical Evidence

57.      Prof. Feinstein asserts that his "empirical event study analysis and empirical regression analysis provide conclusive evidence in favor of market efficiency."[38] Based on statistically significant price responses on his three event days, Prof. Feinstein asserts that "[s]ignificant reactions to new valuation-relevant information demonstrate market efficiency and are compelling evidence that the subject securities traded in an efficient market."[39]

---

[36] Deposition transcript of Steve Feinstein in *Ohio Public Employees Retirement System v, Federal Home Loan Mortgage Corporation a/k/a Freddie Mac., et al* (Case No, 4:08-cv-00160) dated August 10, 2017, 384:16-19. (emphasis added)

[37] Report on Market Efficiency of Professor Steven P. Feinstein, Ph.D., CFA dated June 7, 2017 in *Ohio Public Employees Retirement System v, Federal Home Loan Mortgage Corporation a/k/a Freddie Mac., et al* (Case No, 4:08-cv-00160-BYP) ("Feinstein Freddie Mac Report"),¶39, citing *Halliburton Co. v. Erica P. John Fund, Inc.,* 134S. Ct. 2398, 2410, 189 L. Ed. 339 ("*Halliburton II*") and ¶¶98-99 *Cammer,* 711 F. Supp. At 1291.

[38] Feinstein Report, ¶214.

[39] Feinstein Report, ¶164.

58.    Additionally, Prof. Feinstein examined the correlation between the AmTrust Preferred Securities price changes and the S&P Preferred Shares Index, which he uses as a proxy for market interest rates.[40]  I refer to this below as Prof. Feinstein's "Significant Explanatory Variable Test."

59.    He concludes "the S&P Preferred Shares Index is a significant explanatory variable of the AmTrust Preferred Shares stock returns (sic)" and, on that basis, asserts that there was a cause-and-effect relationship between market interest rates and the prices of the AmTrust Preferred Securities, which he cites as further evidence "that the AmTrust Preferred Shares demonstrated market efficiency throughout the Class Period.[41]

60.    As detailed below, both of these conclusions by Dr. Feinstein are flawed and unreliable.

**B.    Prof. Feinstein's Three-Date Event Study Is Insufficient To Establish That The Six Series Of AmTrust Preferred Securities Traded In An Efficient Market Throughout The Class Period**

**1.    An event study of three dates cannot prove a cause-and-effect relationship**

61.    Prof. Feinstein claims that he "conducted an event study that investigates whether the AmTrust Preferred Shares reacted significantly to specific major news events during the Class Period."[42]

62.    Prof. Feinstein examined only three dates as part of his purported event study. Based on statistically significant price reactions following these three events, Prof. Feinstein concludes that

---

[40] Feinstein Report, ¶¶204-205. Specifically, he examines the statistical significance of the coefficient of the S&P Preferred Shares Index in AmTrust Preferred Securities regression analyses that he did as part of his event study.

[41] Feinstein Report, ¶205 also noting that "Evidently, **on a continuous basis throughout the Class Period**, investors monitored market interest rates and incorporated their valuation impact on the AmTrust Preferred Shares into the securities' trading prices." (emphasis added)

[42] Feinstein Report, ¶164.

"the AmTrust Preferred Shares demonstrated informational market efficiency" during the entire one-year Proposed Class Period.[43]

63.    That conclusion is flawed and unreliable. Prof. Feinstein's examination of only three dates is not sufficient to establish the existence of the cause-and-effect relationship between value-relevant news and changes in the stock price necessary to show market efficiency throughout the alleged year-long period.[44]

64.    Prof. Feinstein's three-date event study is nothing more than a "proof by example" approach from which no broad conclusions can be drawn. As Dr. David Tabak has observed, such an approach "proves merely that there were a few days when there was news and a large price movement without proving any reliable correlation between those two factors."[45] Dr. Tabak further notes that "[a] serious, and in fact, fatal, problem with this approach is that one would expect to see such results if stock-price movements were completely random and had no average correlation with news events."[46] In other words, the fact that a person ate a ham sandwich for lunch on three sunny days in 2020 is not proof that she ate ham each time the sun appeared at lunchtime in 2020.

---

[43] Feinstein Report, ¶203.
[44] Feinstein Report, ¶¶178-180.
[45] Tabak, David, "Use and Misuse of Event Studies to Examine Market Efficiency," 30 April 2010, ("Tabak (2010)"), available at https://www.nera.com/content/dam/nera/publications/archive2/PUB_Use_Misuse_of_Event_Studies_0410_final.pdf
[46] Tabak, David I., "What Should We Expect When Testing for Price Response to News in Securities Litigation?" August 2016, ("Tabak, (2016)"), available at https://www.nera.com/publications/archive/2016/what-should-we-expect-when-testing-for-price-response-to-news-in.html
The Tabak article also noted the decision in *In re PolyMedica Corp. Sec. Lit.*, 453 F. Supp. 2d 260 (D. Mass. 2006), in which the court found that the "mere listing of five days on which news was released and which exhibited large price fluctuations proves nothing."

65.    The research by Ferrillo, Dunbar, and Tabak (2004) makes a similar point. The paper notes:[47]

> *In support of their motion for class certification, securities fraud plaintiffs ought to be required to make some detailed showing that the stock in question traded in an efficient manner.*
>
> ***Merely demonstrating a single or small number of cases where there is an apparent cause and effect relationship is not enough****, since this measures only one point in time during the class period, and only the stock's response to one or a handful of disclosures.*

66.    Prof. Feinstein, himself, has previously admitted that the mere fact that a company's stock price responds appropriately to material news on a given day does not prove that the stock traded in an efficient market.[48]

67.    The plainly limited value of Prof. Feinstein's three-date event study is, in fact, even more limited than it appears on its face, because of (i) the particular dates he chose, and (ii) nature of the class period Plaintiff has alleged.

68.    With regard to the former, one of the dates Prof. Feinstein chose for his three-date event study was Plaintiff's alleged corrective disclosure date, January 22, 2018, when AmTrust announced that the AmTrust Preferred Securities would be delisted.  This choice biases the event study analysis in favor of an inference of market efficiency, as a corrective disclosure is often associated with large price declines, and therefore, expected to have statistically significant price

---

[47] Ferrillo, Paul A.; Dunbar, Frederick C. Ph.D.; and Tabak, David Ph.D., "The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases," St. John's Law Review, Vol. 78, Winter 2004, No. 1, Article 4, ("Ferrillo, Dunbar, and Tabak (2004)"), Available at: https://scholarship.law.stjohns.edu/lawreview/vol78/iss1/4, p. 128. (emphasis added)

[48] Deposition transcript of Steve Feinstein in *Ohio Public Employees Retirement System v, Federal Home Loan Mortgage Corporation a/k/a Freddie Mac., et al* (Case No, 4:08-cv-00160) dated August 10, 2017, 96:11-97:4 and 183:1-6.

declines. In other words, one already knows the answer before doing the test. As Tabak (2010) notes:[49]

> *One interesting question that has arisen in various cases is the proper order of steps in an event study. In particular, some experts have stated that one must first find the news and then measure the price movements while others have argued that one can first identify the significant price movements and then assess the news.*
>
> *Fortunately,* **the relevant academic literature is clear: first one identifies news and then measures price movements associated with that news***. The reasoning for this is rooted in the basics of scientific methodology: first a hypothesis is proposed and then a test is made to see if that hypothesis can be rejected.*

69.    Not surprisingly, Ferrillo, Dunbar, and Tabak (2004) explicitly recommend against using an alleged corrective disclosure as an event date because "including those days in the analysis would bias the results."[50]

70.    This choice of a corrective disclosure is also problematic for another reason. The corrective disclosures are typically associated with large price declines, and as, the Ferrillo, Dunbar, and Tabak (2004)[51] paper discusses, a large decline could be due to investor overreaction to bad news (suggestive of an inefficient market).  It bears noting that the possibility of investor overreaction driving the large price decline upon a corrective disclosure is clearly present in this case, as market commentary suggests that investors may have been laboring under the incorrect impression that AmTrust intended to eliminate the AmTrust Preferred Securities dividends after the company was privatized.[52]

---

[49] Tabak (2010), p. 4. (emphasis added)
[50] Ferrillo, Dunbar, and Tabak (2004), fn. 155.
[51] Prof. Feinstein has relied upon Ferrillo, Dunbar, and Tabak (2004) in his earlier reports and in Villanueva and Feinstein (2020) cited in this matter.
[52] *See* https://seekingalpha.com/article/4283143-amtrust-preferreds-to-pop discussing that "At the time of the privatization, **the consensus opinion regarding the preferred dividends was**

71.    Excluding the corrective disclosure, Prof. Feinstein's event study is limited to just two events for a year-long Proposed Class Period – one at the start and the other in May 2018. That is patently insufficient to support a conclusion that the market for AmTrust Preferred Securities was efficient throughout a one-year period ending in January 2019.

72.    The necessary exclusion of the corrective disclosure date is also problematic for Prof. Feinstein's conclusion of efficiency because he determined that it was appropriate to break the class period into two "subintervals" for purposes of analyzing efficiency and to analyze each subinterval separately. [53]

73.    Prof. Feinstein's first subinterval is the portion of the class period prior to the cessation of trading in AmTrust's common stock upon the closing of the going private transaction on November 29, 2018, and the second is the portion of the class period after that day.

74.    Excluding the corrective disclosure date leaves just two dates for analysis in Prof. Feinstein's first interval and zero in his second interval. As noted above, two dates are insufficient to support an event study for the first interval, and zero obviously means there is no event study for the second interval.

---

**that they would be eliminated immediately after the transaction closed. Never mind that they had just announced the November preferred dividend** (to be paid post-closing) – that was irrelevant according to the consensus opinion. They had announced it prior to the transaction closing, so the fact that it technically occurred while AmTrust was already private was apparently a moot point." (emphasis added)

[53] Feinstein Report, footnote 1. Prof. Feinstein examined several of his structural factors separately over two distinct sub-periods of the proposed Class Period, stating "[o]n 29 November 2018, AmTrust announced it completed a merger transaction that took private the Company's common equity. Trading in the common stock ceased that day."

I agree with Prof. Feinstein that it was appropriate to break the class period into two "subintervals," given the fact that there was much less information available to AmTrust investors because no analyst published any report in interval-2.  Following Prof. Feinstein, I also conducted "the subinterval analysis to determine whether the Preferred Securities traded in an efficient market both before and after that common stock transaction date."

### 2. Prof. Feinstein's justification for using only three-dates in his event study is baseless

75.    Prof. Feinstein justifies the use of just three dates in his event study by asserting that earnings announcements – normally used in such studies[54] – are inappropriate events to examine the market efficiency of preferred stock due to what he terms an "equity buffer" that supposedly makes preferred stock less sensitive than common stock to company information, because common stock is in a first-loss position vis-à-vis preferred stock.[55]

76.    As noted above, three dates are insufficient to support an event study, whatever the purported justification.  That aside, Prof. Feinstein's claim that a purported equity buffer rendered AmTrust's earnings announcements unsuitable for use in his event study of the AmTrust Preferred Securities' market efficiency is nothing more than his *ipse dixit* assumption, unsupported by any authority or scholarship.

77.    Prof. Feinstein makes the critical flaw of ignoring the fact that, throughout the Class Period, AmTrust Preferred Securities were rated below investment grade (also called high yield or junk [56] ), and therefore, highly risky and sensitive to earnings and other corporate announcements.[57]

---

[54] See for example Barber, Griffin, and Lev (1994), Villanueva and Feinstein (2020), and Tabak (2019).

[55] Feinstein Report, ¶175.

[56] See, https://www.fidelity.com/learning-center/investment-products/fixed-income-bonds/bond-ratings noting "Bonds with a rating of BBB- (on the Standard & Poor's and Fitch scale) or Baa3 (on Moody's) or better are considered 'investment-grade.' Bonds with lower ratings are considered 'speculative' and often referred to as '**high-yield**' or '**junk**' bonds." (emphasis added)

[57] Over the proposed Class Period, the AmTrust Preferred Securities were rated by AM Best at "bb+" with a negative watch through July 3, 2018, at which point they were downgraded to "bb." AM Best's Long-Term Issue Credit Ratings ("IR"s) are "an opinion of the ability to meet the ongoing financial obligations to security holders when due. As such, an IR is an opinion regarding the relative future credit risk. Credit risk is the risk that an issue may not meet its contractual obligations as they come due." According to AM Best, AmTrust Preferred Securities'

78.     In general, a high yield preferred stock (e.g., AmTrust Preferred Securities) is riskier than an otherwise identical high yield bond because the preferred stock would have a lower seniority in the capital structure than the otherwise identical bond.[58]  As the Handbook of Fixed Income Securities by Prof. Fabozzi (cited by Prof. Feinstein) explains, prices of "a company's high yield bonds, like its stock price, can be **highly sensitive to minor changes in the earnings outlook,**" and, therefore, prices of AmTrust Preferred Securities, being riskier than otherwise identical high yield bonds, are expected to be highly sensitive to "minor changes in the earnings outlook."[59]

79.     Datta, et al. (1997) notes that "**junk grade debt (rated BB or below) may be thought of as being more like equity** than investment-grade debt (rated BBB or above)."[60] The authors go on to list other studies that have presented empirical evidence of this effect.[61]

---

Long-Term IRs of "bb" or "bb+" are "[a]ssigned to issues where, in our opinion, fair credit characteristics exist, generally due to a moderate margin of principal and interest payment protection or other issue-specific concerns that may be exacerbated by a vulnerability to economic changes or other conditions."  Ratings of "bb" through "c" are identified by AM Best as "speculative grade" as opposed to "investment grade" ratings of "bbb" and above. [Source: Bloomberg, L.P.; AM Best, "Guide to Best's Credit Ratings," December 17, 2019, pp. 21-22].

[58] Feinstein Report, ¶37 noting "[p]referred shares are a senior claim to common shares but are generally junior to notes and bonds."

[59] Fabozzi, Frank J., *The Handbook of Fixed Income Securities*, New York: McGraw Hill, 2011, (8th ed), ["Fabozzi (2011)"] p. 986 noting "**The price of a company's high yield bonds, like its stock price, can be highly sensitive to minor changes in the earnings outlook**. High-yield analysts therefore operate much as equity analysts do in participating in companies' earnings calls and tracking industry data that may shed light on future profits. They go beyond their equity counterparts in studying the details of the issuers' funding capability and covenant provisions, which become highly pertinent under conditions of financial stress." (emphasis added)

[60] Datta, Sudip; Iskandar-Datta, Mai; and Patel, Ajay; "The Pricing of Initial Public Offers of Corporate Straight Debt," The Journal of Finance, Vol LLII, No. 1, March 1997, 379-396 ("Datta, et al. (1997)"), p. 380. (emphasis added)

[61] Datta, et al. (1997), p. 380 noting that "since straight debt can be viewed as being made up of risk-free debt and equity, the riskier the straight debt offer, the larger the equity component in the security. Therefore, junk grade debt (rated BB or below) may be thought of as being more like equity than investment-grade debt (rated BBB or above)."

80.    The research by Hartzmark et. al. (2011) states that "firm-specific announcements have a much greater impact on the value of high-yield bonds": [62]

> *Defaults on non-investment-grade, high-yield or speculative-grade bonds (also called junk bonds) are much more common. About half of all bonds that are rated CCC by Standard and Poor's Corporation have defaulted within ten years. Although high-yield bonds, like investment-grade bonds, are also sensitive to changes in interest rates and credit market conditions, stock price behavior of the issuing firm, and other **firm-specific announcements have a much greater impact on the value of high-yield bonds**. Therefore, in efficient markets, there is substantially more sensitivity between the prices of the issuer's stock and its high-yield bond; that bond price will thus be more sensitive to corporate announcements.*

81.    Additionally, Prof. Feinstein's use of a purported equity buffer to justify the choice to not analyze AmTrust earnings announcements is also flawed because, in making his assumption, Prof. Feinstein does not account for the facts that (i) the dividends on the Preferred Securities were non-cumulative dividends, and (ii) AmTrust stopped paying dividends on its common stock in June 2018. In other words, the purported equity buffer, if any, was eliminated in June 2018 before two of the three earnings announcements in the proposed class period were released.[63]

82.    In short, Prof. Feinstein's assertion that "regular earnings announcements are usually not informative candidate events for testing preferred stock market efficiency"[64] does not apply to AmTrust Preferred Securities.[65]

---

[62] Hartzmark, Michael, Schipani, Cindy A., and Seyhun, H. Nejat, "Fraud on the Market: Analysis of the Efficiency of the Corporate Bond Market," 2011, *Columbia Business Law Review*, ["Hartzmark et. al (2011)"], p. 14. (emphasis added)

[63] Source: Bloomberg, L.P.

[64] Feinstein Report, ¶176.

[65] Furthermore, I note that AmTrust stopped paying a dividend on its common stock in June 2018 (Bloomberg, L.P.), so after that point there was even *less* of a cushion for the Preferred Securities, as the common shares were no longer receiving dividends and therefore there was less expectation that the preferred dividends would continue.

83.     Prof. Feinstein's assertion that an equity buffer renders earnings announcements unsuitable for testing preferred stock market efficiency is also contradicted by his analyses in other matters involving preferred shares.  In at least two other such matters, Prof. Feinstein examined the market efficiency of preferred stocks through event studies of earnings announcements.[66]

> **3.     Correcting Prof.  Feinstein's event study to include 9 additional dates that he failed to analyze confirms that Prof. Feinstein has failed to demonstrate the cause-and-effect relationship for the AmTrust Preferred Securities**

84.     In line with the above, Prof. Feinstein should have considered the three AmTrust earnings announcements that occurred during the alleged class period.

85.     In addition to ignoring earnings announcements, Prof. Feinstein also should have examined no less than six other "announcements and developments informing investors about the future treatment and status of the Preferred Shares in the planned Go-Private Transaction."[67]

86.     Prof. Feinstein asserts that "[i]n the instant case, announcements and developments informing investors about the future treatment and status of the Preferred Shares in the planned Go-Private Transaction were available and appropriate event candidates," as these events conveyed "unexpected information to investors that was economically material to the valuation of the Preferred Shares."[68] Nonetheless, Prof. Feinstein ignores six events that, according to his

---

[66]  See Corrected Report on Market Efficiency of Professor Steven P. Feinstein, Ph.D., CFA dated October 23, 2015 *IN RE: Petrobras Securities Litigation*, No. 14-cv-9662 (JSR), ¶¶208-213; Report on Market Efficiency of Professor Steven P. Feinstein, Ph.D., CFA dated June 30, 2017 *IN RE: Electrobras Securities Litigation*, No. 15-cv-5754-JGK, ¶¶244-264.

[67] Feinstein Report, ¶177.

[68] Feinstein Report, ¶¶177-178 noting "These events each affected the likelihood that the Preferred Shares would or might be delisted, which outcome would reduce or impede their future marketability. According to generally accepted valuation principles, reduced or impeded marketability has a severe negative affect on value."

criterion, contained information economically material to the valuation of the Preferred Securities.[69]

87.     Like the May 18, 2018 event that Prof. Feinstein did analyze, all of the six events give the market information about the probability of the transaction being completed, which was value-relevant to the AmTrust Preferred Securities because, as stated by Prof. Feinstein, these events "affected the likelihood that the Preferred Shares would or might be delisted, which outcome would reduce or impede their future marketability."[70]

88.     Notably, Prof. Feinstein has identified four of these six announcements in his report, which presents a "Timeline of Events" for the planned Go-Private Transaction, and yet failed to analyze them. These are:

- March 1, 2018, when AmTrust enters into the Definitive Merger Agreement;[71]
- June 7, 2018, when "[t]he Company Revises Deal Terms and Increases the Acquisition Price to $14.75 Per Share;"[72]
- June 21, 2018, then the AmTrust shareholders approve the transaction;[73] and
- November 27, 2018, when the Company obtains regulatory approval for the transaction.[74]

89.     Additionally, there are two other events that relate to the status of the go-private transaction that were not in Prof. Feinstein's timeline.[75] These are:

---

[69] Feinstein Report, ¶¶178-180.

[70] Feinstein Report, ¶178.

[71] Feinstein Report, ¶¶69-70.

[72] Feinstein Report, ¶72.

[73] Feinstein Report, ¶73.

[74] Feinstein Report, ¶74. This event occurred after the close of market, so I examine the price movements on November 28, 2018. I note that Prof. Feinstein also includes November 29, 2018, but since, as he stated, the November 27 announcement includes the fact that the transaction is expected to close on November 29, I do not view this as unexpected company news and, therefore, it is not appropriate to test.

[75] I reviewed news and analyst reports to identify the two go-private transaction related events that Prof. Feinstein failed to analyze. As Prof. Feinstein notes, "a comprehensive identification of

- May 25, 2018, when Institutional Shareholder Services issued a report urging shareholders to vote against the transaction;[76] and

- June 4, 2018, when the company delayed the shareholder meeting to vote on the merger agreement.[77]

90. In line with the above, Prof. Feinstein should have considered these six AmTrust announcements that informed "investors about the future treatment and status of the Preferred Shares in the planned Go-Private Transaction" and occurred during the alleged class period.[78]

91. To examine price impact of earnings announcements and six other announcements that Prof. Feinstein failed to analyze, I use Prof. Feinstein's market model.[79]

92. I find that none of the AmTrust Preferred Securities series had statistically significant reactions to any of the three earnings announcements in the period. [*See* **Table 2;** *t*-statistics are shown in italics and statistical significance at the 95% confidence level is noted by "*."]

---

all disclosures of information related to the alleged fraud is beyond the scope of this report and is properly addressed in an analysis of loss causation and damages." [Feinstein Report, ¶131]

[76] "ISS Urges Investors to Block AmTrust Go-Private Deal," *The Deal*, May 25, 2018. I note that the Complaint in this matter refers to this report as "greatly anticipated." See Complaint, ¶59.

[77] "BRIEF-AmTrust Says Co Has Been Advised That Karfunkel-Zyskind Family Scheduled Meeting With Carl Icahn," *Reuters News*, June 4, 2018.

[78] Feinstein Report, ¶¶178-180.

[79] Specifically, I use same regression specifications that Prof. Feinstein used. Prof. Feinstein stated that he "used dummy variables to control for potentially abnormal returns on 1) 22 January 2018 and 2) 18 May 2018." [Feinstein Report, ¶191] I added 12 additional dummy variables to account for the additional 12 dates that I test. See **Exhibit 4** for a summary of my regression results. My additional dummy variables include four of the five alleged misrepresentations that Prof. Feinstein did not analyze. These alleged misrepresentation dates are March 1, 2018, March 16, 2018, April 9, 2018, and May 4, 2018. [Complaint, ¶¶50, 52, 66(f), 66(h), 66(k), 67, and 68 and MTD Order, at 28-34. I note that, none of these four alleged misrepresentations had a statistically significant price impact on all of the six series of AmTrust Preferred Securities (Series C moved in a statistically significant manner for one date, April 9, 2018). [See **Exhibit 5**]

**Table 2: None of the Six Series of AmTrust Preferred Securities had Statistically Significant Price Responses to Any of the AmTrust Earning Announcements**

| Date | Event | Abnormal Return | | | | | |
|------|-------|----------|----------|----------|----------|----------|----------|
| | | Series A | Series B | Series C | Series D | Series E | Series F |
| 5/10/2018 | Quarterly earnings announcement | 0.71% | 0.70% | -0.53% | -0.06% | -0.73% | -0.86% |
| *t-stat* | | *0.38* | *0.35* | *-0.29* | *-0.03* | *-0.34* | *-0.49* |
| 8/10/2018 | Quarterly earnings announcement | -0.55% | 0.54% | -0.05% | 0.03% | -0.34% | -0.34% |
| *t-stat* | | *-0.29* | *0.27* | *-0.03* | *0.02* | *-0.16* | *-0.19* |
| 11/12/2018 | Quarterly earnings announcement | 0.15% | -0.67% | -1.99% | -1.13% | -2.68% | -2.01% |
| *t-stat* | | *0.08* | *-0.34* | *-1.09* | *-0.64* | *-1.26* | *-1.15* |
| **Number Statistically Signficant** | | **0** | **0** | **0** | **0** | **0** | **0** |
| **Percentage Statistically Significant** | | **0%** | **0%** | **0%** | **0%** | **0%** | **0%** |

93.    With regard to the six other relevant announcements, I find that none of the six announcements caused a statistically significant price response in all six series of the Preferred Securities. [80] Moreover, five of the six series of AmTrust Preferred Securities did not have a statistically significant price reaction on any of these six announcements. [See **Table 3** below; *t*-statistics are shown in italics and statistical significance at the 95% confidence level is noted by "*."]

---

[80] Series D had a statistically significant reaction on one of these six announcements (November 28, 2018).

**Table 3: None of the Six Announcements that Prof. Feinstein Failed to Analyze Caused a Statistically Significant Price Response in all Six Series of the AmTrust Preferred Securities**

| Date | Event | Abnormal Return | | | | | |
|------|-------|----------|----------|----------|----------|----------|----------|
| | | Series A | Series B | Series C | Series D | Series E | Series F |
| 3/1/2018 | AmTrust Enters into the Definitive Merger Agreement | -2.31% | -2.91% | -2.35% | -1.85% | -1.66% | -0.58% |
| *t-stat* | | *-1.22* | *-1.46* | *-1.29* | *-1.05* | *-0.78* | *-0.33* |
| 5/25/2018 | ISS Report Recommending "No" Vote | 0.30% | 0.41% | 1.89% | 2.08% | 1.26% | 1.02% |
| *t-stat* | | *0.16* | *0.21* | *1.04* | *1.18* | *0.59* | *0.58* |
| 6/4/2018 | Shareholder Vote delayed | -0.03% | -0.54% | -2.09% | -0.14% | -1.61% | -0.31% |
| *t-stat* | | *-0.02* | *-0.27* | *-1.15* | *-0.08* | *-0.76* | *-0.18* |
| 6/7/2018 | AmTrust Enters into Amendment to Merger Agreement | 1.29% | 0.77% | -0.05% | 0.97% | 1.36% | 0.78% |
| *t-stat* | | *0.68* | *0.39* | *-0.03* | *0.55* | *0.64* | *0.45* |
| 6/21/2018 | AmTrust Stockholders Approve Amended Merger Transaction | -0.69% | -0.31% | -0.17% | 0.25% | 0.04% | -0.01% |
| *t-stat* | | *-0.36* | *-0.15* | *-0.09* | *0.14* | *0.02* | *-0.01* |
| 11/28/2018 | AmTrust Go-Private Transaction Receives Regulatory Approval | 0.55% | 0.21% | -1.44% | -9.48% * | -2.70% | -0.56% |
| *t-stat* | | *0.29* | *0.10* | *-0.79* | ***-5.39*** | *-1.27* | *-0.32* |
| **Number Statistically Signficant** | | **0** | **0** | **0** | **1** | **0** | **0** |
| **Percentage Statistically Significant** | | **0%** | **0%** | **0%** | **17%** | **0%** | **0%** |

94.    Considering the nine events (the six go-private transaction-related events, and three earnings announcements) that Prof. Feinstein fails to analyze and the January 2018 and May 2019 events he did analyze, and excluding the alleged corrective disclosure he erroneously included in his event study analysis, I find that the six series of AmTrust Preferred Securities responded to only 18.2% (for five of the six series) or 27.3% (for one of the six series) of these events.[81] As per Tabak (2019), the percentage of statistically significant earnings announcement days for nearly 90% of stocks included in the S&P 500 index exceeds the above proportions for the six series of AmTrust Preferred Securities.[82]

---

[81] If I include the alleged corrective disclosure in this analysis, the results increase to 25% (for five of the six series) or 33% (for one of the six series). To estimate price reactions (and their statistical significance) of the nine events, I use Prof. Feinstein's market model.

[82] Tabak, David, "Testing Securities Market Efficiency With Cammer Factors," Law 360, February 5, 2019 ("Tabak (2019)"). The article analyzes the 2018 data for stocks included in the

-29-

95.    In other words, these low proportions indicate that all six series of the AmTrust Preferred Securities did not show the requisite cause-and-effect relationship between value-relevant news and preferred stock price changes necessary to prove market efficiency. [See **Table 4** below; *t*-statistics are shown in italics and statistical significance at the 95% confidence level is noted by "*."]

S&P 500 index, and provides threshold percentile values for different *Cammer* factors. The S&P 500 is a market-cap weighted index of 500 large-cap U.S. equities. See S&P 500 USD Factsheet, available at https://www.spglobal.com/spdji/en/indices/equity/sp-500/#overview.

**Table 4: All Six Series of the AmTrust Preferred Securities
Did Not Show The Requisite Cause-and-Effect Relationship**

| Date | Event | Abnormal Return | | | | | |
|------|-------|----------|----------|----------|----------|----------|----------|
| | | Series A | Series B | Series C | Series D | Series E | Series F |
| 1/22/2018 | The Karfunkel-Zyskind Family filed a Form SC 13D/A with the SEC stating intention to keep AmTrust Preferred Shares listed on NYSE | 7.29% * | 7.15% * | 6.47% * | 6.86% * | 7.68% * | 8.79% * |
| *t-stat* | | *3.83* | *3.60* | *3.55* | *3.90* | *3.62* | *5.02* |
| 3/1/2018 | AmTrust Enters into the Definitive Merger Agreement | -2.31% | -2.91% | -2.35% | -1.85% | -1.66% | -0.58% |
| *t-stat* | | *-1.22* | *-1.46* | *-1.29* | *-1.05* | *-0.78* | *-0.33* |
| 5/10/2018 | Quarterly earnings announcement | 0.71% | 0.70% | -0.53% | -0.06% | -0.73% | -0.86% |
| *t-stat* | | *0.38* | *0.35* | *-0.29* | *-0.03* | *-0.34* | *-0.49* |
| 5/18/2018 | Carl Ichan Releases Letter Opposing the Go-Private Transaction | 6.60% * | 7.32% * | 6.22% * | 6.71% * | 4.25% * | 7.45% * |
| *t-stat* | | *3.47* | *3.68* | *3.42* | *3.81* | *2.00* | *4.26* |
| 5/25/2018 | ISS Report Recommending "No" Vote | 0.30% | 0.41% | 1.89% | 2.08% | 1.26% | 1.02% |
| *t-stat* | | *0.16* | *0.21* | *1.04* | *1.18* | *0.59* | *0.58* |
| 6/4/2018 | Shareholder Vote delayed | -0.03% | -0.54% | -2.09% | -0.14% | -1.61% | -0.31% |
| *t-stat* | | *-0.02* | *-0.27* | *-1.15* | *-0.08* | *-0.76* | *-0.18* |
| 6/7/2018 | AmTrust Enters into Amendment to Merger Agreement | 1.29% | 0.77% | -0.05% | 0.97% | 1.36% | 0.78% |
| *t-stat* | | *0.68* | *0.39* | *-0.03* | *0.55* | *0.64* | *0.45* |
| 6/21/2018 | AmTrust Stockholders Approve Amended Merger Transaction | -0.69% | -0.31% | -0.17% | 0.25% | 0.04% | -0.01% |
| *t-stat* | | *-0.36* | *-0.15* | *-0.09* | *0.14* | *0.02* | *-0.01* |
| 8/10/2018 | Quarterly earnings announcement | -0.55% | 0.54% | -0.05% | 0.03% | -0.34% | -0.34% |
| *t-stat* | | *-0.29* | *0.27* | *-0.03* | *0.02* | *-0.16* | *-0.19* |
| 11/12/2018 | Quarterly earnings announcement | 0.15% | -0.67% | -1.99% | -1.13% | -2.68% | -2.01% |
| *t-stat* | | *0.08* | *-0.34* | *-1.09* | *-0.64* | *-1.26* | *-1.15* |
| 11/28/2018 | AmTrust Go-Private Transaction Receives Regulatory Approval | 0.55% | 0.21% | -1.44% | -9.48% * | -2.70% | -0.56% |
| *t-stat* | | *0.29* | *0.10* | *-0.79* | *-5.39* | *-1.27* | *-0.32* |
| **Number Statistically Signficant** | | **2** | **2** | **2** | **3** | **2** | **2** |
| **Percentage Statistically Significant** | | **18.2%** | **18.2%** | **18.2%** | **27.3%** | **18.2%** | **18.2%** |

96.    My conclusion remains unchanged, even if I include the alleged corrective disclosure in the analysis. [83]

97.    All the event dates in **Table 4** are in interval-1. As I noted earlier, except for the alleged corrective disclosure, Prof. Feinstein has not identified any value-relevant event for AmTrust

---

[83] Including this date does not change my conclusions as this would increase the percentages that I report to only 25% for five of the series and 33.3% for the sixth series.

Preferred Securities during interval-2.[84] Yet, depending on the series, there are 6 to 12 statistically significant price changes according to Prof. Feinstein's event study regression model; much more than two days (expected significant days based on chance alone), and therefore, indicating potential inefficiency.[85] In short, the large number of significant price reactions, absent any news, also confirm that Prof. Feinstein has failed to demonstrate that the AmTrust Preferred Securities traded in an efficient market during interval-2.

### C. Prof. Feinstein's Significant Explanatory Variable Test Is Insufficient To Establish That The Six Series of AmTrust Preferred Securities Traded In An Efficient Market Throughout The Proposed Class Period

98.    Prof. Feinstein asserts that his Significant Explanatory Variable Test indicates a cause-and-effect relationship between market interest rates and the prices of the AmTrust Preferred Securities. More specifically, his analysis consists of the following steps: (i) he deems the S&P Preferred Shares Index a proxy for market interest rates, (ii) he finds a statistically significant relationship between movements of the S&P Preferred Shares Index and AmTrust Preferred Securities (which he concludes makes the S&P Preferred Shares index a "significant explanatory variable of the AmTrust Preferred Securities stock returns [*sic*]"), and (iii) on that basis, he concludes that there is a cause-and-effect relationship between changes in interest rates and the

---

[84] Feinstein Report, ¶178 noting "I reviewed news and analyst reports to ascertain which events over the course of the Class Period were appropriate candidates for a market efficiency event study"

[85] The number of days when AmTrust Preferred Securities exhibited statistically significant price changes during interval-2 are:

| Series A | Series B | Series C | Series D | Series E | Series F |
|----------|----------|----------|----------|----------|----------|
| 11 | 8 | 7 | 6 | 12 | 10 |

During interval-2, there are 34 trading days, and based on chance alone, one would expect around two statistically significant days at the 95% confidence interval.

prices of the AmTrust Preferred Securities that "proves that the AmTrust Preferred Shares demonstrated market efficiency throughout the Class Period."[86]

99.    As with Prof. Feinstein's three-date event study, there are numerous flaws in this analysis.

### 1.    Prof. Feinstein's Significant Explanatory Variable Test is not a generally accepted test of examining a cause-and-effect relationship

100.    As an initial matter, Prof. Feinstein fails to provide any citation from "published peer-reviewed empirical research" that uses his Significant Explanatory Variable Test to examine market efficiency.[87] As described above, both courts and academic literature repeatedly cite to an event study analysis as the proper method for demonstrating a cause-and-effect relationship indicative of market efficiency. The test is not an event study and merely examines the correlation between prices of a series of preferred stock and the Preferred Shares Index.[88]   Prof. Feinstein incorrectly represents the correlation he observes between movements of the S&P Preferred Shares Index and the prices of the AmTrust Preferred Securities as a cause-and-effect relationship even though the test neither identifies any specific events when interest rates increased or decreased nor does it estimate any price impact solely attributable to an identified interest rate increase or decrease.

101.    Prof. Feinstein's own analyses in other matters suggest that his Significant Explanatory Variable test is not a reliable indicator of market efficiency, as the test has failed for other preferred securities found to be trading in an efficient market. According to Prof. Feinstein, the statistically significant relationship between changes in interest rates and changes in the price of

---

[86] Feinstein Report, ¶205.

[87] Feinstein Report, ¶17.

[88] An event study would require Prof. Feinstein to identify particular days when interest rate went up or down, identify price changes solely attributable to the identified interest rate change, and then examine whether changes are statistically significant (i.e., large enough, and not due to random price movements).

a preferred stock should **always** hold for preferred stocks trading in an efficient market,[89] such that in the absence of that relationship, one should conclude that the preferred stock is not trading in an efficient market.

102.   However, Prof. Feinstein has previously presented market efficiency analyses of preferred stocks that he has opined to be trading efficiently where his regressions report that the Significant Explanatory Variable Test failed (i.e., had *statistically insignificant t*-statistics on the Preferred Shares Index).

103.   In two matters, the Petrobras Securities Litigation and the Electrobras Securities Litigation, Prof. Feinstein's regression analyses show that the Significant Explanatory Variable Test for the Preferred Shares Index[90] failed in almost all sub-periods examined.

104.   In the Petrobras matter, Prof. Feinstein used five sub-periods for his regressions, of which four had statistically insignificant t-statistics. In the Electrobras matter, Prof. Feinstein used the class period in that matter and also ran two sub-periods, all of which had statistically insignificant t-statistics. Those t-statistics are shown in **Exhibit 6**.

105.   Nonetheless, in both matters, Prof. Feinstein opined that preferred stocks were trading in an efficient market. In Petrobras Securities Litigation, Prof. Feinstein opined that "that **the Petrobras preferred ADR traded in an efficient market during the Class Period.**"[91]

---

[89] Feinstein Report, ¶36 (emphasis added) noting that, according to principles of valuation, "in an efficient market, one would expect to find a significant relationship between changes in market interest rates and the change in the prices of preferred stock."

[90] That is, the same index used for the AmTrust Preferred Securities, the S&P Preferred Stock Index.

[91] Corrected Report on Market Efficiency of Professor Steven P. Feinstein, Ph.D., CFA dated October 23, 2015 *IN RE: Petrobras Securities Litigation*, No. 14-cv-9662 (JSR), ¶¶207, 210, 213, and 216. (emphasis added)

Similarly, in the Electrobras Securities Litigation, Prof. Feinstein opined that "**the preferred ADS was efficient.**"[92]

106.   In short, Prof. Feinstein fails to show that his Significant Explanatory Variable Test is a generally accepted test of market efficiency, and his own analyses suggest that this test is not a reliable indicator of market efficiency.

> **2.    The Significant Explanatory Variable Test cannot demonstrate a cause-and-effect relationship between interest rates and the prices of AmTrust Preferred Securities as the Preferred Shares Index is not a suitable proxy for interest rates**

107.   Even if a statistically significant relationship between interest rates and the prices of the AmTrust Preferred Securities could be used to demonstrate market efficiency, Prof. Feinstein has not shown that relationship here.

108.   Prof. Feinstein uses the movements of the S&P Preferred Shares Index as a proxy for market interest rate changes and asserts that "[t]he AmTrust Preferred Shares moved significantly with the S&P Preferred Shares Index, which reflects changes in market interest rates."[93] However, Prof. Feinstein's use of the S&P Preferred Shares Index as a proxy for market interest rates is in error.

109.   The Preferred Shares Index is not affected only by market interest rates, as Prof. Feinstein implies.[94] Rather, it is an index of approximately 300 publicly-traded U.S. preferred stocks.[95] The index may be affected by both interest rate changes and events that have a common impact on the prospects for the individual companies that make up the index.

---

[92] Report on Market Efficiency of Professor Steven P. Feinstein, Ph.D., CFA dated June 30, 2017 *IN RE: Electrobras Securities Litigation*, No. 15-cv-5754-JGK, ¶243. (emphasis added)
[93] Feinstein Report, ¶205.
[94] Feinstein Report, ¶205.
[95] See Factsheet available at https://www.spglobal.com/spdji/en/indices/fixed-income/sp-us-preferred-stock-index/#overview.

110.   Prof. Feinstein's Significant Explanatory Variable Test incorrectly assumes that a relationship with the Preferred Shares Index is the same as the relationship with changes in market interest rates, and this flaw is confirmed through an examination of co-movements of interest rate changes and the Preferred Shares Index changes. As Prof. Feinstein posits, when interest rates go up, it should cause preferred stock prices to decline.[96] Therefore, if the Preferred Shares Index price is a good proxy for interest rate changes, one should typically see that when interest rates go up, the Preferred Shares Index goes down, and *vice versa*.

111.   My examination of co-movement of the Preferred Shares Index changes and changes in long-term interest rates finds that Prof. Feinstein's assumption that the Preferred Shares Index is a good proxy for interest rate changes is incorrect. I found, on 53% of days during the Proposed Class Period, the changes in the Preferred Shares Index and the changes in interest rates did not move in the expected directions.[97] [See **Table 5**]

---

[96] Feinstein Report, ¶204.

[97] Because AmTrust Preferred Securities did not have a stated maturity date, I consider market yields on 20-year U.S. Treasuries on a constant maturity basis, obtained from federalreserve.gov, for my analysis. As a sensitivity analysis, I also examined the co-movements between the six series of AmTrust Preferred Securities and interest rates, and found that on between 54% and 58% of days, they did not co-move in the expected directions. See **Exhibit 7**.

**Table 5: On 53% of Days, the Preferred Shares Index and Long-Term Interest Rates Did Not Co-Move in Expected Directions**

| | |
|---|---|
| Days Where Interest Rate Went Down and Preferred Shares Index Did Not Go Up | 53 |
| Days Where Interest Rate Went Up and Preferred Shares Index Did Not Go Down | 47 |
| Days When Interest Rate Did Not Move and Preferred Shares Index did | 33 |
| Total Days with Co-Movements not in Expected Direction | 133 |
| Total Days in Proposed Class Period with Interest Rate Data | 249 |
| **Percentage of Days with Co-Movements not in Expected Direction** | **53%** |

112.   Thus, Prof. Feinstein's conclusion that "[e]vidently, on a continuous basis throughout the Class Period, investors monitored market interest rates and incorporated their valuation impact on the AmTrust Preferred Shares into the securities' trading prices"[98] is flawed and incorrect.

### 3.   The Significant Explanatory Variable Test also fails to demonstrate the market efficiency of the six series of AmTrust Preferred Securities because, in an efficient market, prices should reflect all available information

113.   Assuming for argument's sake that Prof. Feinstein's Significant Explanatory Test was an effective means to test for a cause-and-effect relationship between interest rates and AmTrust Preferred Securities' prices (it is not), the test still does not demonstrate that the AmTrust Preferred Securities quickly and fully reflected changes in all available value relevant information, and therefore traded in an efficient market.

114.   Prof. Feinstein's regression models (including his Preferred Shares Index) estimated over the Proposed Class Period explain, on an average, only 19% to 22.5% of the price changes in

---

[98] Feinstein Report, ¶205.

AmTrust preferred stocks.[99]  Of these small proportions (19% to 22.5%), the S&P Preferred Shares Index changes explain even a smaller proportion because Prof. Feinstein's regression models have two more indices.[100] [See **Table 6**]

**Table 6: Adjusted R-Square from Prof. Feinstein's Market Models**[101]

|  | Series A | Series B | Series C | Series D | Series E | Series F |
|---|---|---|---|---|---|---|
| Adjusted R-squared | 0.208 | 0.214 | 0.196 | 0.208 | 0.190 | 0.225 |

115.   In other words, about 77 to 81% of price changes in AmTrust preferred stocks during the Proposed Class Period are attributable to either company-specific information or random price changes. This result is not surprising given below investment grade ratings of AmTrust Preferred Securities.   Company-specific announcements typically provide investors with, among other things, credit risk related information, and as the Fabozzi (2011) handbook explains:[102]

> *High-yield bonds, sometimes disparagingly referred to as "junk bonds," are corporate issues rated speculative-grade (below Baa/BBB- ). Like all corporate bonds, they combine interest rate risk with credit risk, but **unlike investment grade issues, credit risk dominates their price movements**.*

---

[99] The adjusted-R square of a model provides an estimate of the extent to which explanatory variables (i.e., changes in market index, sector index and the Preferred Shares Index for this matter) in the model, as a whole, explain changes in the dependent variable (price changes of the particular series of AmTrust preferred stock). See, for example, Tabak, David I. and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," in *Litigation Services Handbook: The Role of the Financial Expert* 3rd Edition, (2001), p. 6,  stating "When the estimation regression is run, one of the statistics generated is the adjusted R-squared. This statistic measures the strength of the fraction of the variable being explained by the combined set of independent variables (the market and industry indices) used to do the explaining." (internal citation omitted).

[100] Feinstein Report, Exhibit-7a through 7-f.

[101] Feinstein Report, Exhibit-7a through 7-f.

[102] Fabozzi (2011), p. 986. (emphasis added).

116.    Thus, the Significant Explanatory Variable Test alone would not examine a cause-and-effect relationship for the **vast majority** of price changes of the six series of AmTrust Preferred Securities.

117.    Additionally, according to Prof. Feinstein's AmTrust Preferred Securities regression analyses, there was no statistically significant positive correlation between market-wide and sector-specific indices and prices of the six series of AmTrust Preferred Securities.[103]  In other words, Prof. Feinstein's Significant Explanatory Variable Test fails for the market and sector indices.

118.    If the Significant Explanatory Variable Test is indeed probative of a cause-and-effect relationship, as Prof. Feinstein asserts, then, according to his own criterion, AmTrust Preferred Securities, **on a day-to-day basis**, did not show a cause-and-effect relationship with information changes related to both the market as a whole as well as the specific industry in which AmTrust operates.[104]  Because, in an efficient market, security prices should reflect **all** publicly available information and not just **some** publicly available information, the test, taken at its face value, supports an inference that AmTrust Shares did not trade in an efficient market.

---

[103] The $t$-statistics associated with the market and sector indices in those regression analyses show that AmTrust Preferred Securities did not move significantly with market and sector indices in the expected direction, i.e., had a positive and statistically significant correlation. [See **Exhibit 8**]

[104] Feinstein Report, ¶¶184-185.

## VI.    PROF. FEINSTEIN'S EXAMINATION OF THE STRUCTURAL INDICATORS OF EFFICIENCY DOES NOT SUPPORT HIS CONCLUSION THAT THE SIX SERIES OF AMTRUST PREFERRED SECURITIES TRADED IN AN EFFICIENT MARKET

### A.    Overview of Prof. Feinstein's Analysis of Structural Factors

119.    As discussed above, a strong cause-and-effect relationship between value-relevant information and a stock price is direct evidence of market efficiency and the *sine qua non* for demonstrating market efficiency.

120.    Courts sometimes also examine so-called structural factors, which can provide indirect evidence of market efficiency by demonstrating the existence of conditions that facilitate the existence of an efficient market.  These structural factors are rarely, if ever, sufficient to demonstrate market efficiency on their own; they are best used to buttress a finding of market efficiency that is primarily based on direct evidence of the requisite cause-and-effect relationship.[105]

121.    As noted earlier, Prof. Feinstein has himself testified that a cause-and-effect test is "the essence of market efficiency,"[106] and that he would never perform a market-efficiency analysis without examining this factor. In fact, Prof. Feinstein has stated that he "wouldn't author a report concluding that the stock was efficient if I didn't have some demonstration – some **empirical** demonstration of the efficiency."[107]

---

[105] See, for example, *In re Federal Home Loan Mortgage Corp. (Freddie Mac) Securities Litigation*, 281 F.R.D. 174, 182 (S.D.N.Y. 2012), stating "Although the less important *Cammer* and *Krogman* factors support an inference of efficiency, these factors cannot substitute for evidence of a cause-and-effect relationship between unexpected news and market price."

[106] Deposition transcript of Steve Feinstein in In Re: Groupon, Inc. Securities Litigation (Case No. 12 CV 2450) dated February 12, 2014, 111:18-20, 115:21-116.:19.

[107] Deposition transcript of Steve Feinstein in Ohio Public Employees Retirement System v, Federal Home Loan Mortgage Corporation a/k/a Freddie Mac., et al (Case No, 4:08-cv-00160) dated August 10, 2017, 384:16-19. (emphasis added)

122. Prof. Feinstein purports to have analyzed the *Cammer* and *Krogman* structural factors. To bolster his analysis of structural indicators of market efficiency, he introduced what I refer to as "Feinstein Factors" not listed in either the *Cammer* or the *Krogman* decision.[108] Prof. Feinstein generally examined these factors over the Proposed Class Period and in two above-described sub-intervals, referred to as Interval-1 and Interval-2.[109]

123. The *Cammer* and *Krogman* factors examined by Prof. Feinstein are:

- Trading volume, number of securities analysts, market makers, S-3 registration statement eligibility, market capitalization, float, and bid-ask spread percentage

124. The structural Feinstein Factors are:

- Listing on NYSE, news coverage, and institutional ownership

125. Prof. Feinstein asserts that the "Preferred Shares satisfied all of the *Cammer* and *Krogman* factors, but some to stronger and weaker degrees."[110] As discussed below, his assertion is flawed and unreliable.

**B.**     **Prof. Feinstein Incorrectly Asserts That The Structural *Cammer* / *Krogman* Factors And "Published Peer-Reviewed Empirical Research, Indicate Market Efficiency" For The Preferred Securities**

126. Academics have questioned whether the structural *Cammer* and *Krogman* factors are reliable indicators of market efficiency.

127. Citing to the empirical research of Barber, Griffin, and Lev (1994), Prof. Feinstein asserts that their research "confirmed that trading volume, number of market makers, and analyst coverage are indicative of market efficiency."[111] He also asserts that "Barber, Griffin, and Lev [1994] found that high institutional ownership is also indicative of market efficiency."[112]

---

[108] See **Exhibit 9** for a listing of the various factors and the basis, if any, from Prof. Feinstein.
[109] Interval 1 is January 22, 2018 through November 28, 2018 and Interval 2 is November 29, 2018 through January 18, 2019. See Feinstein Report, ¶102.
[110] Feinstein Report, ¶18.
[111] Feinstein Report, ¶90.
[112] Feinstein Report, ¶91.

128.   My review of Barber, Griffin, and Lev (1994) finds that the paper examines which of eight factors contribute to the market of security being efficient and report that **only two of the eight factors** "volume of trade and number of analysts following the stock," were found as "efficiency drivers."[113]   The remaining six factors not deemed to be an efficiency driver are:  number of market makers, firm size, percentage bid-ask spread, return volatility, price, and institutional holding.

129.   Prof. Feinstein seems to have selectively relied on univariate results[114] presented in the Barber, Griffin, and Lev [1994]  paper to assert that the paper finds the number of market makers and high institutional ownership as an efficiency driver even though the paper cautions against that.[115]   Contrary to Prof. Feinstein's assertions, the paper goes on to conclude that:

- "[s]urprisingly, several presumed efficiency indicators that were used by courts, the **number of market makers**, in particular, failed in our tests to discriminate between efficiently and inefficiently priced securities,"[116]  and

- "other variables examined -firm size, percentage bid-ask spread, return volatility, price, and **institutional holdings**-either fail the significance test or yield results counter to our expectations."[117]

---

[113] Barber, Griffin, and Lev (1994), p. 310 noting "Our findings, based on two models of expected earnings-time-series and analysts's forecasts-clearly indicate two factors as efficiency drivers: volume of trade and number of analysts following the stock."

[114] That is, when individual factors were tested in isolation from others.

[115] Barber, Griffin, and Lev (1994), p. 310; I note that prior to the multivariate statistical analysis, the paper also examine simple descriptive statistics and noted that "Consistent with the efficiency indicators used recently by the Courts, the inefficient firms have lower mean trading volume, fewer market makers, lower analyst following, and lower institutional ownership (number and. percentage) than efficient firms." The paper then cautions that "While our results confirm some of the rules courts have applied, inferences from the preceding univariate analysis must be conditioned by the complex' correlation structure between the variables used in the analysis" and goes to perform multi-variate analyses that find only trading volume and analyst coverage as efficiency drivers.

[116] Barber, Griffin, and Lev (1994), p. 286.

[117] Barber, Griffin, and Lev (1994), p. 310.

130.   In any event, to the extent the *Cammer* and *Krogman* factors have some utility in examining market efficiency, it is necessary to measure their presence (or absence) in the market for a particular stock against contemporaneous benchmarks. A factor that is present to a degree below (or above for the percentage bid-ask spread factor) the relevant benchmark(s) does not support a finding of market efficiency.

131.   Prof. Feinstein recognized this in a paper he co-authored just last year, which stated that "[s]tocks whose factor values lie **above median** size, volume, analyst coverage, and number of market makers, and whose bid-ask spread is **below median**, are far more likely to exhibit reactivity to earnings announcements than stocks without those factor characteristics."[118] Yet, in this matter, Prof. Feinstein fails to examine these factors for AmTrust Preferred Securities relative to the benchmark values reported in that paper.

132.   Additionally, there are two other sources of data that overlap with the Proposed Class Period and can be used to determine benchmark median values[119] — the Feinstein Benchmark dataset,[120] and research from Dr. David Tabak.[121]

1.      **Benchmarks from three sources (Villanueva and Feinstein (2020), Tabak (2019), and the Feinstein Benchmark dataset), whenever available, confirm that Prof. Feinstein has failed to demonstrate that structural *Cammer/ Krogman* factors "indicate market efficiency" for the six series of the Preferred Securities.**

(a)      **Market Capitalization, S-3 Registration, and Float**

---

[118] Villanueva, Miguel and Steven Feinstein, "Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors," Forthcoming in *Review of Quantitative Finance and Accounting*, 2020 ("Villanueva and Feinstein (2020)"), p. 43. (emphasis added)

[119] That is, the statistic used to determine benchmarks in Villanueva and Feinstein (2020).

[120] This is data on the set of US companies that Prof. Feinstein used for some analyses in the Feinstein Report. See, for example, Feinstein Report, footnote 114.

[121] Tabak (2019).

133. In his research, Prof. Feinstein and his co-author state that they "focus on market capitalization as a single encompassing 'size' factor standing in for the Cammer/ Krogman factors of S-3 eligibility, market capitalization, and float."[122] Therefore, I first review Prof. Feinstein's analysis of market capitalization of Amtrust Preferred Securities, and find it to be flawed for at least the following reasons.

134. First, Prof. Feinstein examines the market value of the common stock in Interval-1. The analysis is irrelevant to this matter because the efficiency of common stock is not at issue in this matter.

135. Second, Prof. Feinstein analyzes the sum of all six series' outstanding values and compares them to all publicly traded companies.[123] As discussed in **Exhibit 10**, each series of AmTrust Preferred Securities traded distinctly and, therefore, it is incorrect to analyze this factor at an aggregate level, as Prof. Feinstein does.[124]

136. In Villanueva and Feinstein (2020), the authors report a median size of $720.7 million as the benchmark to distinguish reactive stocks.[125]

137. Prof. Feinstein reports an aggregate average outstanding value of $665 million for the Proposed Class Period, $692 million in Interval-1, and $494 million for Interval-2.[126] Even these aggregate values are below the benchmark median value of $720.7 million. And as just noted,

---

[122] Villanueva and Feinstein (2020), p. 4.

[123] Feinstein Report, ¶149.

[124] In fact, in the Petrobras Securities Litigation, Prof. Feinstein examined the market cap of the Petrobras preferred ADRs to examine this factor's evidence for market efficiency for that series. See Corrected Report on Market Efficiency of Professor Steven P. Feinstein, Ph.D., CFA dated October 23, 2015 IN RE: Petrobras Securities Litigation, No. 14-cv-9662 (JSR), ¶190.

[125] Villanueva and Feinstein (2020), p. 15.

[126] Feinstein Report, Table-4. I note that Prof. Feinstein also uses the term outstanding value to refer to market capitalization.

using aggregate values, instead of examining each class of AmTrust Preferred Securities individually, is in error.

138.   Further, when I examine each of the AmTrust Preferred Securities series individually, I find that the average market values (and even the maximum values) for each series to be far below $720.7 million, as shown below in **Figure 1**.

**Figure 1: Daily Market Values of AmTrust Preferred Securities Do Not Exceed Villanueva and Feinstein Benchmark Median Value**



139.   Additionally, I benchmarked the average market capitalization of each of the six series of AmTrust Preferred Securities (that Prof. Feinstein reports in his Table 4) to market capitalization data from the Feinstein Benchmark dataset.

140.    **Table 7** below shows the percentiles where each series falls in terms of market capitalization compared to the list of "all publicly-traded companies" used by Prof. Feinstein.[127]

**Table 7: The Feinstein Benchmark Dataset Shows that the AmTrust Preferred Securities Market Caps are at the 19th – 38th Percentiles of U.S. Companies**

| AmTrust Security | Percentile of U.S. Companies | | |
|---|---|---|---|
| | Class Period Average Outstanding Value | Interval-1 Average Outstanding Value | Interval-2 Average Outstanding Value |
| Series A | 26% | 25% | 23% |
| Series B | 25% | 24% | 22% |
| Series C | 22% | 21% | 19% |
| Series D | 32% | 32% | 29% |
| Series E | 30% | 30% | 27% |
| Series F | 38% | 38% | 35% |

141.    The percentiles shown represent where the AmTrust Preferred Securities fall in comparison to all U.S. companies. For example, the percentile of 26% for Series A during the Class Period indicates that Series A's average market cap was larger than only 26% of U.S. companies' average market caps over the same period. As shown on the table, all six series, during all three time periods, fell well below the 50th percentile, or median – the statistic used by Villanueva and Feinstein (2020) to determine benchmark values.

142.    Based on the fact that market capitalization for each of the six series of AmTrust Shares fails to exceed two benchmarks — one based on Prof. Feinstein's own research and the other based on the Feinstein Benchmark dataset,  Prof. Feinstein has failed to demonstrate that this factor "support[s] a conclusion of market efficiency."[128]  Additionally, as "market capitalization [is] a single encompassing 'size' factor standing in for the Cammer/ Krogman factors of S-3

---

[127] This is based on the average month-end data provided by Prof. Feinstein. Feinstein Report footnote 115 states that this includes "all public companies listed on the NYSE, AMEX, NASDAQ, and ARCA."

[128] Feinstein Report, ¶150.

eligibility, market capitalization, and float,"[129] the conclusion also applies to S-3 eligibility and float factors.

### (b)    Trading Volume and Weekly Turnover

143.    Prof. Feinstein has presented data on the average daily volume of the AmTrust Preferred Securities and asserted that it is evidence that "trading volume for all of the Preferred Shares was very active."[130] The *Cammer* court did not provide any threshold for this factor, and neither Villanueva and Feinstein (2020) nor Tabak (2019) analyze this as a *Cammer* factor.

144.    Nonetheless, for the sake of completeness, I compared the average daily volume for AmTrust Preferred Securities to the median average daily volume for the Feinstein Benchmark dataset, found them below the median value and, therefore, not supportive of Prof. Feinstein's assertion of market efficiency.

145.    I find that, during all three periods (the full Proposed Class Period and each sub-interval), a minimum of 65% of stocks in Prof. Feinstein's data set had a higher average daily trading volume than the six series of AmTrust Preferred Securities. [See **Table 8** below]

**Table 8: The Feinstein Benchmark Dataset Shows that the AmTrust Preferred Securities Average Daily Volumes are at the 16th to 35th Percentiles of U.S. Companies**

| AmTrust Security | Percentile of U.S. Companies | | |
| --- | --- | --- | --- |
| | Class Period Average Daily Volume | Interval-1 Average Daily Volume | Interval-2 Average Daily Volume |
| Series A | 17% | 16% | 22% |
| Series B | 18% | 18% | 21% |
| Series C | 17% | 17% | 20% |
| Series D | 23% | 22% | 26% |
| Series E | 21% | 19% | 27% |
| Series F | 28% | 26% | 35% |

---

[129] Villanueva and Feinstein (2020), p. 4.
[130] Feinstein Report, ¶111.

146.   Prof. Feinstein also presents an analysis of weekly turnover, i.e., "the percentage of outstanding shares that turn over each week" through trading – one of the structural factors considered by the *Cammer* court.[131]

147.   Villanueva and Feinstein (2020) presents a median weekly turnover of 3.3% as the benchmark for this factor.[132] As shown in Table-2 in the Feinstein Report, all six series of AmTrust Preferred Securities had average weekly turnovers below 3.3% for the Proposed Class Period as well as for Interval-1 and Interval-2.

148.   The average weekly turnover for all the six series of AmTrust Preferred Securities is also below the median benchmark of 3.7% from Tabak (2019).[133] Irrespective of whether I consider the Proposed Class Period as a whole or Interval-1 and Interval-2 separately, I find that all the six series of AmTrust Preferred Securities had weekly turnover fall below the 50th percentile (i.e., median) in all instances and as low as below the 17th percentile.[134] See **Table 9** below for these results.

---

[131] Feinstein Report, ¶112 and Table 2; weekly turnover for a week equals trading volume for that week as a proportion of shares outstanding.

[132] See Villanueva and Feinstein (2020), p. 15 noting median daily turnover of 0.66%.  Per Villanueva and Feinstein (2020), fn. 9, median volume figures refer to daily turnover, so the equivalent median weekly turnover  is 3.30%.

[133] Tabak (2019).

[134] That is, that at least 50% of companies have higher average turnovers than all six series of AmTrust Preferred Securities during over the whole class period and in Interval-1 and Interval-2 if examined alone. During Interval-1, Series A falls below the 17th percentile, meaning that fewer than 17% of all U.S. companies have lower rates of turnover, and 83% have higher rates of turnover.

**Table 9: The Feinstein Benchmark Dataset Shows that the AmTrust Preferred Securities Average Turnovers are at the 16th to 44th Percentiles of U.S. Companies**

| AmTrust Security | Percentile of U.S. Companies | | |
| --- | --- | --- | --- |
| | Class Period Average Weekly Turnover | Interval-1 Average Weekly Turnover | Interval-2 Average Weekly Turnover |
| Series A | 19% | 16% | 34% |
| Series B | 25% | 26% | 34% |
| Series C | 30% | 29% | 44% |
| Series D | 22% | 21% | 32% |
| Series E | 23% | 20% | 44% |
| Series F | 21% | 18% | 41% |

149. Ignoring his recent research, Prof. Feinstein uses the weekly turnover benchmark of 1% and 2% from more than seventeen-year-old research by Alan Bromberg and Lewis Lowenfels published in 2003,[135] and cited in the *Cammer* court decision.[136]

150. As an initial matter, I note that the Proposed Class Period and Interval-1 figures in Prof. Feinstein's Table-2 for the six series of AmTrust Preferred Securities are below 2% for eleven of the twelve observations.

151. Prof. Feinstein's Table-2 examines this metric on an average basis for the Proposed Class Period and for each of Interval-1 and Interval-2. As the average turnover over a period can be biased by high turnover during a few weeks, I examined the number of weeks for which the weekly turnover met the *Cammer* benchmarks. I find that, for each of the six series of AmTrust Preferred Securities, there are many weeks during the Proposed Class Period when the weekly turnover is less than the 1% threshold identified by the *Cammer* Court. The trading in Series D

---

[135] Feinstein Report, ¶82 citing to Alan Bromberg and Lewis Lowenfels, Securities Fraud and Commodities Fraud, §7.4 (Dec. 2003).

[136] Feinstein Report, ¶113, citing *Cammer*, 711 F. Supp. 1264, at 1286 stating that "[t]urnover measured by average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption."

and F seems to be especially low, as their weekly turnover was less than 1% of shares outstanding for more than 40% of the weeks in the Proposed Class Period. See **Exhibit 11**.

152. In short, considering all the evidence as a whole, I find that, contrary to his assertion, Prof. Feinstein has failed to demonstrate that "the active trading volume of the AmTrust Preferred Shares is compelling evidence of the efficiency of their market over the course of the Class Period."[137]

### (c)    Analyst Coverage

153. Prof. Feinstein finds that five analyst companies published reports on AmTrust during the Proposed Class Period. He also discusses two reports written by Panther Investments (one of which specifically analyzed AmTrust Preferred Securities) and published on *Seeking Alpha*.[138]

154. For Interval-1, Prof. Feinstein has generally discussed analysts covering AmTrust's common shares, not its preferred shares. He points to one exception, which is a report published on *Seeking Alpha*.[139] He notes that "one of the reports [written by Panther Investments] specifically analyzed the AmTrust Preferred Shares."[140] Prof. Feinstein fails to note that the Panther Investments publications he cites from *Seeking Alpha* were not issued by an analyst firm.[141]

---

[137] Feinstein Report, ¶114.
[138] Feinstein Report, ¶¶117-118.
[139] Feinstein Report, ¶118.
[140] Feinstein Report, ¶118.
[141] *Seeking Alpha* articles are written by contributors who include "individual and institutional investors, fund managers, college students, retirees, analysts and basically anyone who wants to share investment insights and ideas with our community." [See https://seekingalpha.com/page/become-a-seeking-alpha-contributor] In other words, the articles published on *Seeking Alpha* may or may not be written by trained professional securities analysts.

155.    For Interval-2, Prof. Feinstein notes that one analyst covered AmTrust as a company. However, that analyst did not publish any report during that period.[142]

156.    In other words, according to evidence that Prof. Feinstein relies upon, there was at most one report focused on AmTrust Preferred Securities during the entire Proposed Class Period, and that was not an analyst report.

157.    Prof. Feinstein also examines analysts providing earnings per share estimates ("analyst EPS estimate coverage"), and  reports that between 1 and 6 firms issued earnings per share estimates throughout the Proposed Class Period.[143]  Villanueva and Feinstein (2020) reports a median analyst EPS estimate of 5.5 as the benchmark.[144] Additionally, according to Tabak (2019), the median value for analyst EPS estimate coverage was 16.[145]  Therefore, the analyst EPS estimate coverage for the AmTrust Preferred Securities is below both these benchmarks. **Figure 2** below shows the averages for AmTrust and these benchmarks.

---

[142] Feinstein Report, ¶116 and ¶120.
[143] Feinstein Report, ¶116.
[144] Villanueva and Feinstein (2020), p. 15. According to the paper, "Analyst coverage is the yearly average number of analysts that reported their estimates to I/B/E/S preceding each earnings announcement." [Villanueva and Feinstein (2020), p. 4].
[145] Tabak (2019).

**Figure 2: Analyst Coverage was Below Benchmarks from Villanueva and Feinstein (2020) and Tabak (2019) throughout the Proposed Class Period**



158.    Thus, both the analyst report coverage for AmTrust Preferred Securities and AmTrust as a company does not meet the above two benchmarks.

159.    Not surprisingly, Prof. Feinstein himself notes that, for Interval-2, "the evidence does not support a finding of market efficiency."[146]

---

[146] Feinstein Report, ¶21. Prof. Feinstein qualifies his statement by noting that "neither does it necessarily indicate inefficiency."

160.   Further, contrary to his assertion, Prof. Feinstein also fails to demonstrate that "the [analyst] coverage during Interval-1 satisfies the analyst coverage *Cammer* factor."[147]

### (d)   Bid-Ask Spread

161.   Prof. Feinstein has also presented evidence based on the bid-ask spreads of the AmTrust Preferred Securities. A narrower bid-ask spread has been posited to suggest market efficiency because it purportedly indicates that buyers and sellers both have full access to all available information and are, therefore, valuing the stock in question similarly.[148]

162.   Villanueva and Feinstein (2020) analyzed bid-ask spread in percentage terms and found a benchmark median value of 0.11%.[149]

163.   As shown in **Table 10**, AmTrust Preferred Securities' bid-ask spreads, ranging from 0.59% to 2.5% depending on period, were all far above 0.11%, indicating that the AmTrust Preferred Securities' spreads were wider than the median. In fact, as per Villanueva and Feinstein (2020), AmTrust Preferred Securities' bid-ask spreads were in the highest quintile.[150]

---

[147] Feinstein Report, ¶120.
[148] Feinstein Report, ¶99 noting "[a] narrow bid-ask spread makes trading in the security less costly for investors and thereby tends to attract greater interest, greater coverage, and greater volume, all of which, in turn, promote market efficiency."
[149] Villanueva and Feinstein (2020), p. 15.
[150] Villanueva and Feinstein (2020), p. 15 reporting "Bid-ask spread ranges from 0.01% to 13.21% with a median of 0.11%. The lowest bid-ask spread quintile ranges from 0.01% to 0.05%, and **the highest quintile ranges from 0.41% to 13.21%**." (emphasis added)

**Table 10: AmTrust Preferred Securities Average Percentage Bid-Ask Spread were
All Far Above 0.11%**

| AmTrust Security | Class Period Average % Bid-Ask Spread | Interval-1 Average % Bid-Ask Spread | Interval-2 Average % Bid-Ask Spread |
|---|---|---|---|
| Series A | 1.36% | 1.25% | 2.08% |
| Series B | 1.03% | 0.96% | 1.50% |
| Series C | 1.22% | 1.02% | 2.50% |
| Series D | 0.79% | 0.75% | 1.03% |
| Series E | 1.04% | 0.99% | 1.40% |
| Series F | 0.67% | 0.59% | 1.16% |

164.    Again, ignoring his own research, Prof. Feinstein compares these figures for the AmTrust Preferred Securities to **average** figures for all U.S. companies.[151] As Prof. Feinstein admitted, "the AmTrust Preferred Share bid-ask spreads were generally wider than average, but not exorbitantly so."[152]

165.    Using the Feinstein Benchmark dataset, I examined the average bid-ask spreads of AmTrust Preferred Securities in **Table 11** below as a percentile of those of the set of U.S. companies over the same periods.

---

[151] Using the same set identified in footnote 115 to the Feinstein Report. In terms of percentage bid-ask spread, Prof. Feinstein noted a Class Period average for the set of U.S. companies of 0.56%, and Interval-1 average of 0.53%, and an Interval-2 average of 0.70%. These figures are from a list of "Errata/Typos in the March 15, 2021 Report on Market Efficiency of Steve P. Feinstein, Ph.D, CFA" and reflect corrected versions of figures in ¶156 and footnote 119 to the Feinstein Report. Of the Class Period average figure, Prof. Feinstein notes "[t]he bid-ask spread for the AmTrust Preferred Shares was wider than the average bid-ask spread among common stocks." [Feinstein Report, ¶156.]

[152] Feinstein Report, ¶162.

**Table 11: The Feinstein Benchmark Dataset Shows that the AmTrust Preferred Securities Average Percentage Bid-Ask Spread are at the 79th – 93rd Percentiles of U.S. Companies**

| | Percentile of U.S. Companies | | |
| AmTrust Security | Class Period Average % Bid-Ask Spread | Interval-1 Average % Bid-Ask Spread | Interval-2 Average % Bid-Ask Spread |
| --- | --- | --- | --- |
| Series A | 88% | 88% | 91% |
| Series B | 85% | 85% | 89% |
| Series C | 87% | 85% | 93% |
| Series D | 82% | 82% | 85% |
| Series E | 85% | 85% | 88% |
| Series F | 80% | 79% | 86% |

166. As shown in these tables, for all series of AmTrust Preferred Securities, for all time periods examined, the AmTrust Preferred Securities bid-ask spreads are always higher than at least 78% of all U.S. companies, with some series higher than over 90% of all U.S companies.

167. Prof. Feinstein also presents evidence on dollar-based bid-ask spreads. I analyze these dollar spreads using the Feinstein Benchmark dataset, and find results similar to those for the percentage bid-ask spreads, i.e., the spreads are wider than the benchmark median spreads. [See **Exhibit 12**]

168. Ignoring his own research in Villanueva and Feinstein (2020) and the recent Feinstein Benchmark dataset, Prof. Feinstein uses a benchmark that is more than 17 years old to support his opinion.[153] Obviously, investors who are evaluating the bid-ask spread for an investment are not viewing it relative to bid-ask spreads 17 years ago. They are viewing this investment opportunity relative to their other reasonable alternatives, and therefore contemporaneous bid-ask spreads should be considered as the relevant benchmark.

---

[153] Feinstein Report, ¶158 stating that "[i]n 2001, the year of the *Krogman* opinion, the average month-end bid-ask spread for all stocks in the CRSP database was 3.70%."

169.    Prof. Feinstein cites three instances in which courts accepted bid-ask spreads wider than those of the AmTrust Preferred Securities as indicators of market efficiency. All three of these instances are examples of courts simply viewing the bid-ask spreads relative to others that have been found in past cases to be efficient, not examining the bid-ask spreads relative to the contemporaneous data.[154]

170.    In short, considering all the evidence as a whole, I find that, contrary to his assertion, Prof. Feinstein has failed to demonstrate that "the size of the bid-ask spreads on the AmTrust Preferred Shares supports the conclusion that their market was efficient during the Class Period."[155]

### (e)    Market Makers

171.    Prof. Feinstein asserts that the trading of the AmTrust Preferred Securities "was facilitated by numerous market makers"[156] without providing any evidence indicating how "numerous" they were. I note that Prof. Feinstein has presented such evidence in previous matters. In fact, for the preferred securities in the Petrobras Securities Litigation, Prof. Feinstein cited evidence of "at

---

[154] See *In re Teva Sec. Litig.,* No. 3:17-cv-558 (SRU), 29 (D. Conn. Mar. 9, 2021), stating "Courts routinely hold that average bid-ask spreads well above that support market efficiency. See *Petrie v. Elec. Game Card, Inc.,* 308 F.R.D. 336, 356 (C.D. Cal. 2015) (citing cases);" *Cheney v. Cyberguard Corp.,* 213 F.R.D. 484, 501 (S.D. Fla. 2003), stating "In the instant case, Defendants' expert found that CyberGuard's average daily relative bid-ask spread for the Class Period was 2.44%. Bruce Report, ¶ 9. This is significantly lower than the high bid-ask price of 5.6% found to suggest market inefficiency in *Krogman*. Accordingly, this factor weighs in favor of market efficiency in the case at bar;" and
*Petrie v. Elec. Game Card, Inc.,* 308 F.R.D. 336, 356 (C.D. Cal. 2015), stating "Here, the average and median bid-ask spread of EGC stock during the Class Period was 2.91% and 2.20% respectively. No court has held that EGC's bid-ask spread is too high. However, as Defendants point out, EGC's bid-ask spread is higher than the bid-ask spread of other companies in cases where courts have found market efficiency. As shown in Mr. Mulcahey's list of such cases, the vast majority of these cases involved companies with a bid-ask spread of lower than 1%. Mulcahey Decl. I, Ex. 15. In conclusion, this factor supports Plaintiffs' case more than it does Defendants', but not strongly."
[155] Feinstein Report, ¶162.
[156] Feinstein Report, ¶110.

least 147 market makers for Petrobras preferred ADRs"[157] and in the Electrobras Securities Litigation, Prof. Feinstein cited evidence that "there were at least 80 market makers for Electrobras preferred ADS."[158] In Prof. Feinstein's own recent research, he includes numbers of market makers for the companies in his dataset, finding a median number of 41.6.[159] However, in this matter, Prof. Feinstein has failed to provide any evidence to indicate how many market makers were making the market for the six series of AmTrust Preferred Securities.

172. Furthermore, Prof. Feinstein's inference that the AmTrust Preferred Securities' "numerous" market makers is supportive of market efficiency is contrary to the findings in the research that he himself cites. Barber, Griffin, and Lev (1994) states that "[s]urprisingly, several presumed efficiency indicators that were used by courts, the **number of market makers**, in particular, failed in our tests to discriminate between efficiently and inefficiently priced securities."[160]

---

[157] Corrected Report on Market Efficiency of Professor Steven P. Feinstein, Ph.D., CFA dated October 23, 2015 *IN RE: Petrobras Securities Litigation*, No. 14-cv-9662 (JSR), ¶181.

[158] Report on Market Efficiency Professor Steven P. Feinstein, *In Re: Eletrobras Securities Litigation* No. 15-Cv-5754-JGK, June 30, 2017, ¶220.

[159] Villanueva and Feinstein (2020), p. 15.

[160] Barber, Griffin, and Lev (1994), p. 310; I note that prior to proper statistical analysis, the paper also examined simple descriptive statistics and noted that "Consistent with the efficiency indicators used recently by the Courts, the inefficient firms have lower mean trading volume, fewer market makers, lower analyst following, and lower institutional ownership (number and. percentage) than efficient firms." The paper then cautions that "While our results confirm some of the rules courts have applied, inferences from the preceding univariate analysis must be conditioned by the complex' correlation structure between the variables used in the analysis" [Barber, Griffin, and Lev (1994), p. 302] and goes to perform multi-variate analyses that find only trading volume and analyst coverage as efficiency drivers. Prof. Feinstein seems to have selectively relied on univariate results presented in the paper and ignores the subsequent multivariate analyses that control for deficiency in univariate analysis.

### 2. Prof. Feinstein incorrectly asserts that Feinstein Factors "indicate market efficiency" for the Preferred Securities

173. Benchmarks from the three sources, whenever available, also confirm that the additional Feinstein Factors also do not support Prof. Feinstein's assertion that those factors "indicate market efficiency" for the six series of the Preferred Securities.

### (a) Institutional Ownership

174. Prof. Feinstein has presented evidence that "12 major institutions" reported owning AmTrust Preferred Securities, which is not a factor mentioned in the *Cammer* or *Krogman* decisions.[161] To put Prof. Feinstein's evidence in proper context, for each of the six series, I provide the institutional holdings reported by Prof. Feinstein as a percentage of shares outstanding for that series in **Table 12** below.

---

[161] Feinstein Report, Table-3.

**Table 12: Institutional Holdings of AmTrust Preferred Securities as Percentage of Shares Outstanding[162]**

| | Quarter-End Date | | | |
|---|---|---|---|---|
| | 3/31/2018 | 6/30/2018 | 9/30/2018 | 12/31/2018 |
| **Series A** | | | | |
| **Total** | - | - | - | - |
| **Total % of Outstanding Shares** | **0.0%** | **0.0%** | **0.0%** | **0.0%** |
| **Series B** | | | | |
| Nuveen Asset Management LLC | 21,485 | 21,485 | 21,485 | 21,485 |
| PNC Investments LLC | 3,075 | - | - | - |
| Sonora Investment Management LLC | - | - | 825 | - |
| **Total** | **24,560** | **21,485** | **22,310** | **21,485** |
| **Total % of Outstanding Shares** | **0.6%** | **0.5%** | **0.5%** | **0.5%** |
| **Series C** | | | | |
| KCM Investment Advisors LLC | 57,174 | 49,841 | 42,066 | 35,467 |
| **Total** | **57,174** | **49,841** | **42,066** | **35,467** |
| **Total % of Outstanding Shares** | **1.8%** | **1.6%** | **1.3%** | **1.1%** |
| **Series D** | | | | |
| BlackRock Fund Advisors | 884,070 | 960,560 | 979,539 | 873,978 |
| KCM Investment Advisors LLC | 28,770 | 26,187 | 21,916 | 15,384 |
| PNC Investments LLC | 3,081 | - | - | - |
| Private Capital Group LLC | - | - | 400 | - |
| Stonebridge Advisors LLC | - | - | - | 26,764 |
| **Total** | **915,921** | **986,747** | **1,001,855** | **916,126** |
| **Total % of Outstanding Shares** | **12.5%** | **13.5%** | **13.7%** | **12.5%** |
| **Series E** | | | | |
| BlackRock Fund Advisors | 707,899 | 749,245 | 799,805 | 714,215 |
| Diagonal Inversiones Capital, AV SA | - | - | 951 | 960 |
| KCM Investment Advisors LLC | 41,723 | 37,640 | 34,382 | 25,296 |
| Stonebridge Advisors LLC | 399,923 | 405,418 | 413,137 | 356,602 |
| **Total** | **1,149,545** | **1,192,303** | **1,248,275** | **1,097,073** |
| **Total % of Outstanding Shares** | **20.0%** | **20.7%** | **21.7%** | **19.1%** |
| **Series F** | | | | |
| BlackRock Fund Advisors | 1,353,523 | 1,430,647 | 1,459,022 | 1,302,107 |
| Global X Management Co. LLC | 79,472 | - | - | - |
| Holbrook Holdings, Inc. | 5,500 | 5,500 | - | 9,091 |
| Miller Value Partners LLC | - | - | 357,000 | - |
| Nikko Asset Management Co., Ltd. | - | - | 484 | 484 |
| Sonora Investment Management LLC | - | - | 900 | - |
| Stonebridge Advisors LLC | 718,989 | 722,298 | 734,111 | 684,692 |
| **Total** | **2,157,484** | **2,158,445** | **2,551,517** | **1,996,374** |
| **Total % of Outstanding Shares** | **18.8%** | **18.8%** | **22.2%** | **17.4%** |

---

[162] Data obtained from Prof. Feinstein's workpapers.

175.    As the table shows, for three of the six series, there are either no institutional holdings or a very low percentage of holdings. In fact, some of the institutions in Prof. Feinstein's list of 12 held only small quantities of shares for short periods of time, such as Private Capital Group LLC, which held 400 shares of Series D as of September 30, 2008, and reported no other holdings at any point in time. In **Table 12**, I have circled in red any such holdings that were under 1,000 shares and did not appear for more than two consecutive reporting dates.

176.    Villanueva and Feinstein (2020) does not provide a benchmark figure for institutional holdings because it does not analyze this as a potential efficiency driver. However, Tabak (2019) found that, from Q4 of 2017 through Q3 of 2018, the median institutional holdings of S&P 500 companies was 86.8% of shares outstanding. Over the same period, S&P 500 companies had a median of 902 institutional investors.[163] The institutional investors in the six series of AmTrust Preferred Securities, both in terms of amounts of holdings and in terms of the number of investors, fell well below these thresholds.

177.    The Barber, Griffin, and Lev (1994)  paper analyzed this factor and reported that "other variables examined -firm size, percentage bid-ask spread, return volatility, price, and **institutional holdings**-either fail the significance test or yield results counter to our expectations."[164]

---

[163] Tabak (2019).

[164] Barber, Griffin, and Lev (1994), p. 310 (emphasis added); I note that prior to proper statistical analysis, the paper also examined simple descriptive statistics and noted that "Consistent with the efficiency indicators used recently by the Courts, the inefficient firms have lower mean trading volume, fewer market makers, lower analyst following, and lower institutional ownership (number and. percentage) than efficient firms." The paper then cautions that "While our results confirm some of the rules courts have applied, inferences from the preceding univariate analysis must be conditioned by the complex' correlation structure between the variables used in the analysis" and goes to perform multi-variate analyses that find only trading volume and analyst coverage as efficiency drivers. Prof. Feinstein seems to have selectively relied on univariate

### (b)    NYSE Listing

178.    Prof. Feinstein asserts that the listing and trading of the AmTrust Preferred Securities on the NYSE is "compelling evidence of the efficiency of the market for the AmTrust Preferred Shares throughout the Class Period."[165]

179.    While the *Cammer* Court discussed the importance of exchange listing, the court did not identify this as a factor. Barber, Griffin, and Lev (1994) note "that efficiency is not a market or an exchange attribute, but rather a characteristic of a given security during a given period of time."[166] I also note that courts have found some securities listed on the NYSE not to have been trading in an efficient market.[167]

### (c)    News Coverage

180.    Prof. Feinstein asserts that "[a]lthough the *Cammer* court focused on coverage by securities analysts, other courts have noted that news media, including news reports on the internet or other electronic sources, facilitate the flow of information to the marketplace, thereby promoting market efficiency."[168]

181.    This is another Feinstein factor, not listed in *Cammer* or *Krogman*. I note that news coverage is less probative of market efficiency compared to coverage by analysts, who are trained to analyze company announcements for their value relevance. As discussed above, there were no

---

results presented in the paper and ignores the subsequent multivariate analyses that control for deficiency in univariate analysis.

[165] Feinstein Report, ¶110.

[166] Barber, Griffin, and Lev (1994), p. 290.

[167] See, for example, *In re Federal Home Loan Mortgage Corp. (Freddie Mac) Securities Litigation*, 281 F.R.D. 174 (S.D.N.Y. 2012) and *Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307 (5th Cir. 2005).

[168] Feinstein Report, ¶121.

analyst reports specifically covering AmTrust Preferred Securities, and very few analyst reports covering AmTrust as a company.

182.   Prof. Feinstein asserts that "at least 463 articles were published about the Company during the Class Period."  Neither in his research, nor in his report, does Prof. Feinstein provide a benchmark to assess the probative value of this factor. In fact, in his research, Prof. Feinstein does not analyze this factor at all and only considers the analyst coverage.

183.   Additionally, here he does not analyze how many of those news articles were specific to AmTrust Preferred Securities. I have replicated Prof. Feinstein's news search and found only 71 articles over the Class Period that met his search terms and also included the term "preferred."[169] Of these, 55 were published during Interval-1 and 16 were published during Interval-2.

## VII.   PROF. FEINSTEIN'S  SECTION 10(B) DAMAGE METHODOLOGY IS FLAWED AND INCOMPLETE

### A.    Overview of Prof. Feinstein's Damage Methodology

184. Prof. Feinstein proposes a vague and overly general methodology that can purportedly calculate damages for each investor in the proposed Class.  As part of his methodology, he states that:

- Using an event study and other non-specified potential empirical analyses, he would examine if price declines on alleged corrective disclosure, adjusted for non-specified potentially non-fraud related information, demonstrate "if the alleged misrepresentations and omissions had caused the security price to be artificially inflated,"[170] [Loss Causation Analysis],

- He would then construct an inflation ribbon using "event study analysis, combined with widely used and generally accepted valuation tools," and

---

[169] This replication is as described in footnote 99 to the Feinstein Report, where he describes "a Factiva search in 'All Sources' for articles published during the Class Period where "AmTrust Financial Services, Inc." was the "Company" search field parameter." I note that I found 566 articles rather than 463 with these search parameters (490 in Interval-1 and 76 in Interval-2). I then ran the search again but modified the search by adding the term "preferred" in the "Free Text Search" field.
[170] Feinstein Report, ¶223.i.

"working chronologically backwards from the final corrective disclosure to the start of the Class Period, accounting for alleged fraud-related residual price declines as they occurred,"[171] and

- He would adjust inflation-based damages by limitations imposed by PSLRA.

## B. Flaws in Prof. Feinstein's Damage Methodology

185. As discussed below, Prof. Feinstein's methodology is incomplete and flawed because he:

- Fails to identify potential economic impact associated with change in trading venue from the NYSE to over the counter ("OTC") (i.e., Plaintiff's theory of liability),

- Ignores that the allegations in this matter primarily related to alleged affirmative misrepresentations about continued listing, and does not consider price impact, if any, of alleged misrepresentations in his analysis,

- Fails to provide any details of confounding information relevant for this matter, and what particular valuation method, if any, is capable of assessing impact of the confounding information. To the extent the feasible valuation methods are not able to assess the impact of confounding information released with alleged corrective disclosure, a mechanical event study of price impact of an alleged corrective disclosure will be incapable of estimating an inflation attributable to purported fraudulent act.

186. As discussed earlier, the AmTrust Preferred Securities are risky securities that pay their investors fixed dividend rates on a non-cumulative basis and can be redeemed at any point after certain dates at AmTrust's option. Their prices are impacted by multiple factors, e.g., interest rates, investor's perception of risks associated with current and future dividend payments, holding period of marginal investor, and ease of trading.

187. Recall that for each series of AmTrust Preferred Securities, prospectuses listed several risk factors, including, AmTrust's "creditworthiness, financial condition, performance and prospects, interest rates, the market for similar securities; and economic, financial, geopolitical, regulatory or judicial events that affect us and/or the insurance or financial markets generally"[172]

---

[171] Feinstein Report, ¶223.ii.
[172] Series A Prospectus p. S-17; Series B Prospectus p. S-19; Series C Prospectus p. S-18; Series D Prospectus p. S-17; Series E Prospectus p. S-17; and Series F Prospectus p. S-19.

188.   Given their below investment grade ratings, information about credit risk (e.g., perceived risk to dividend payments) would dominate price changes in AmTrust Preferred.[173]

189.   In this matter, Plaintiff alleges damages to class members "as a direct and proximate result of the announcement of the delisting."[174] Plaintiff further alleges that class members purchased shares at inflated prices due to "public information relating to AmTrust and the continuation of the listing of the preferred shares on the NYSE."[175] Therefore, the key issue in this matter is the alleged impact of the AmTrust Preferred Securities moving from the NYSE to trade OTC.

190.   As the move from NYSE to OTC trading was a permanent one, any transitory price reaction related to other factors cannot be claimed as damages.[176] Market commentary following the change in listing supports the fact that the market may have overreacted to the announcement, and reassessed credit risk associated with the AmTrust Preferred Securities due to anxiety about the status of the continuing dividend payments on those securities.[177]

---

[173] Fabozzi (2011), p. 986.

[174] Complaint, ¶97.

[175] Complaint, ¶95.

[176] I note that the prices of the AmTrust Preferred Securities returned to their January 18, 2019 levels by May 16, 2019 (Series A), July 19, 2019 (Series B), September 10, 2019 (Series C), August 8, 2019 (Series D), August 15, 2019 (Series E), and May 16, 2019 (Series F). [Data from Capital IQ]

[177] See https://seekingalpha.com/article/4283143-amtrust-preferreds-to-pop discussing "For anyone evaluating AmTrust preferred stock between late last year and this year, there were two potential changes that could happen to the shares:

1. AmTrust could choose to delist the preferred shares.

2. AmTrust could choose to suspend the dividend on the preferred shares.

But, if you think about it, **the listed status is not central to the analysis. So long as the dividends continued along with general health of the balance sheet, whether the securities were listed or not was actually irrelevant to the investment decision**. Surely anyone would participate in an investment in a private business offering a high enough return on capital, even though by definition it would be unlisted on a major stock exchange." (emphasis added) and "At the time of the privatization, **the consensus opinion regarding the preferred dividends was that they would be eliminated immediately after the transaction closed. Never mind that they had just announced the November preferred dividend** (to be paid post-closing) – that was irrelevant according to the consensus opinion. They had announced it prior to the transaction

-63-

191.    Therefore, price change attributable to other factors—e.g., temporary or permanent change in investors' expectations about the Company's likelihood of dividend payments or market interest rates—are not related to plaintiff's theory of liability, and must be identified and excluded by any proper damages model.  Prof. Feinstein has neither identified which confounding factors also contributed to investor losses nor what methodology would he use to estimate and exclude the price impact of the confounding information.

192.    Prof. Feinstein also ignores that the allegations in this matter primarily related to alleged affirmative misrepresentations about continued listing, and he does not consider price impact, if any, of alleged misrepresentations in his analysis.  Prof. Feinstein proposes to calculate per-share damages to investors by **solely using alleged corrective disclosures**.

193.    He proposes using an "event study analysis" as well as "potentially other empirical analyses if necessary" to calculate "**if the disclosures**, correcting the alleged misrepresentations and omissions, caused the prices of the AmTrust Preferred Shares to fall."[178] In terms of potential valuation analyses that can be used in addition to event study analyses, Prof. Feinstein offers "valuation multiple models, such as those based on earnings, earnings before interest, tax, depreciation and amortization (EBITDA), revenue, book value, and cash flow; discounted cash flow (DCF) models; scenario analysis, and the literature regarding valuation effects of factors such as marketability and quality of accounting."[179] While Prof. Feinstein states that "these tools address the very complexities that could potentially be encountered in the course of computing

closing, so the fact that it technically occurred while AmTrust was already private was apparently a moot point." (emphasis added)

[178] Feinstein Report, ¶223. (emphasis added)
[179] Feinstein Report, ¶222.

inflation and damages in this case,"[180] he has not offered any information about what specific model could be used to isolate the pricing impact solely attributable to the delisting of preferred securities. Instead, Prof. Feinstein lists a litany of methods without identifying which one can be used to ascertain damages purportedly attributable to the move of the AmTrust Preferred Securities from the NYSE to trading OTC.

194.   Due to his failure to describe a specific damage calculation methodology that takes into account the specific issues related to Plaintiffs' claims about the AmTrust Preferred Securities, Prof. Feinstein's opinion that "class-wide damages in response to the specific misrepresentations and omissions ultimately established by the Plaintiff's [*sic*]can be calculated in a straightforward manner common to all Class members"[181] is flawed and incomplete.

---

[180] Feinstein Report, ¶221.
[181] Feinstein Report, ¶219.

**Exhibit 1:  CV of Alok Khare, Ph.D., CFA, CAIA**



# Alok Khare, PhD, CFA, CAIA

## Senior Managing Director – Forensic & Litigation Consulting

Alok.Khare@fticonsulting.com

---

50 California Street

Suite 1900

San Francisco, CA 94111

Tel: +1 415 283 4248

**CERTIFICATIONS**

Chartered Financial Analyst ("CFA)

Certified Alternative Investment Analyst ("CAIA")

**PROFESSIONAL AFFILIATIONS**

American Economic Association

American Finance Association

CAIA Association

CFA Institute

CFA Society, San Francisco

**EDUCATION**

B. Tech., Electrical Engineering IIT, Kanpur, India

Ph.D., Economics UC Santa Barbara

Alok Khare is a Senior Managing Director in the Forensic and Litigation Services Practice at FTI Consulting, Inc. ("FTI"), and co-leader of the Securities, Accounting, and Regulatory Enforcement Practice in FTI's Forensic & Litigation Consulting segment.  He is an economist who provides economic, financial, and statistical analyses to evaluate claims in litigations. He also specializes in the analysis of transfer pricing.

He has performed economic analyses that evaluate class certification, loss causation, negative causation, and damage claims in numerous securities matters asserting violations of Rule 10b-5 of the Securities and Exchange Act of 1934 or section 11 of the Securities Act of 1933.  He has evaluated event studies, and market efficiency analyses supporting class certification claims.  He has analyzed performance and transaction costs of trading strategies and valued equities and other securities (e.g., bonds, options, futures, warrants, restricted stock units).   He also performed economic analyses to evaluate loss causation, event studies, and damage claims in security matters filed in Australia and Canada.

The industries that Dr. Khare has experience with include Auto Parts, Auto Manufacturing, Biotech, Banking, Brokerage, and Mutual Funds, Credit Card Payment Processing, Computer Software, Consumer Goods, Computer Manufacturing, Electronic Parts, Food & Beverage, Health, Insurance, Mortgages, Mining, and Telecommunications Industries.

Dr. Khare obtained his Ph.D. from UC Santa Barbara. His dissertation committee included Prof. Rajnish Mehra (chair), known for his research on the equity premium puzzle, and Nobel Laureate Prof. Finn E. Kydland.  During his Ph.D., he taught Corporate Finance, Ph.D. level econometrics sequence, intermediate microeconomics, and macroeconomics classes as a teaching assistant. He worked as a research assistant at the UC Santa Barbara Economic Forecast Project and developed real estate and macroeconomic forecast models. During the Ph.D., he also worked at Partnervest Advisory Services, a SEC Registered Investment Advisor based in Santa Barbara. While working at Partnervest, among other things, he performed analysis of equity & fixed-income securities, as well as mutual funds. He also did statistical analyses to analyze performance of their proprietary asset allocation models.

After the Ph.D., Dr. Khare worked as a postdoctoral fellow and a lecturer in the statistics department at UC Santa Barbara. After that, he started working in economic consulting and worked at LECG, LLC, AFE Consulting, and Navigant Consulting before joining FTI in 2015.

Alok Khare, PhD, CFA, CAIA

## Selected Engagement Experience

Securities & Finance

Dr. Khare has experience performing event studies, evaluating price impact, market efficiency, loss causation, and damage claims filed in the U.S., Australia, and Canada. In total, he has performed economic analyses to evaluate class certification/ loss causation/ damage claims in more than 20 matters alleging violations of security laws in the U.S., Australia, and Canada.

Antitrust

Dr. Khare has analyzed, among other things, allegations of price fixing, monopolization and attempted monopolization, market foreclosure, and other exclusionary practices. He has analyzed relevant markets, change in market concentration, and estimated, among other things, purported overcharges due to alleged price fixing, the elasticity of demand, loss in consumer surplus, and impact on output and employment following exclusion of certain products from relevant markets. He has designed and analyzed sophisticated econometric models used to assess alleged overcharges in price fixing matters and other antitrust issues.

Class Actions, Breach of Contract and Other Damage Claims

Dr. Khare has evaluated damage claims in numerous matters, including breach of contract matters and class actions. He has evaluated and designed economic and statistical models (including conjoint analyses, hedonic, time-series, and panel data regression models) to assess common impact, causation, and damage claims in class actions.

Transfer Pricing and Valuation

Dr. Khare has analyzed income allocation among different geographies, using the methodologies accepted in IRS Regulation 482 and the OCED transfer pricing guidelines, and assessed the adequacy of transfer pricing documentation.

Investigations

Dr. Khare has provided economic, statistical, and other data analytics to counsel representing businesses in regulatory enforcement actions (e.g., SEC, DOJ). He has also assisted with internal investigations by companies and their boards.

Disparate Impact, Model Validation & Statistical Analyses

Dr. Khare has analyzed disparate impact in labor and employment, and fair lending areas.  He has developed and validated complex economic, financial, and econometric models.  The econometric models he has worked on include time series (ARCH/ GARCH/ VAR), panel data, logistic regressions, and difference-in-difference models.  He has designed statistical samples and has extrapolated sample results to the population.  He was one of the lead reviewers in the FTI team engaged by the Social Security Administration to review the Pension Insurance Modelling System used by the Pension Benefit Guarantee Corporation (PBGC). He reviewed, among other things, economic, financial, and statistical models (e.g., stock return, interest rate, bankruptcy, stochastic simulation models) used by the PBGC.

## ARTICLES

- Yes, You Can Raise Your Prices During a Pandemic, *FTI Journal*, November 2020 (co-author with George Derpanopoulos)

- What Economics Can Tell Us About COVID-19 Era Price-Fixing, *Law360*, June 10, 2020, (co-author with George Derpanopoulos)

- INSIGHT: Covid-19 and Transfer Pricing Implications for Digital Companies, *Bloomberg Tax*, September 21, 2020 (co-author with Sreevidhya Devarajan)

- INSIGHT: Covid-19—Don't Ignore Your Transfer Pricing Arrangements, *Bloomberg Tax*, April 29, 2020 (co-author with Sreevidhya Devarajan)

Alok Khare, PhD, CFA, CAIA

- Leveraging Data Analytics To Assess Corporate Diversity, *Law360*, September 14, 2020 (co-author with Maurice Crescenzi and Matt Duffy)

- Investors Hunting for Positive Returns Should Look South. And North. And East. And West, *FTI Journal*, November 2020 (co-author with Samuel Aguirre and Leonardo Florencio)

- Executive Compensation Claw Back Policy: Making Sense of Recovery Measurement, *Risk and Compliance Magazine*, Oct-Dec 2015 (co-author with Rahul Surana and Rick Ostiller)

- Dodd-Frank Pay Ratio Rule: Business Implications And The Future Of CEO Compensation, *Navigant Magazine*, October 2014 (co-author with Rahul Surana)

### Exhibit 2:  Documents Considered

**DOCUMENTS RELATED TO THIS MATTER**

- Jan Martinek v. AmTrust Financial Services, Inc., et al., Class Action Complaint dated August 29, 2019
- Martinek v. Amtrust Fin. Servs., Inc.,, No. 19 Civ. 8030 (KPF), 2020 BL 308515 (S.D.N.Y. Aug. 14, 2020), Court Opinion filed August 14, 2020
- Report on Market Efficiency of Professor Steven P. Feinstein, Ph.D., CFA dated March 15, 2021 in Jan Martinek v. AmTrust Financial Services, Inc., et al., Case No. 1:19-cv-08030-KPF and exhibits
- Errata/Typos in the March 15, 2021 Report on Market Efficiency of Steve P. Feinstein, Ph.D, CFA
- Workpapers provided by Prof. Feinstein, including the "Feinstein Benchmark dataset"

**ACADEMIC AND PROFESSIONAL LITERATURE**

- Barber, Brad et al.,"The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," *Journal of Corporation Law*, 1994
- Datta, Sudip; Iskandar-Datta, Mai; and Patel, Ajay; "The Pricing of Initial Public Offers of Corporate Straight Debt," *The Journal of Finance, Vol LLII, No. 1*, March 1997
- Fabozzi, Frank J., The Handbook of Fixed Income Securities, New York: McGraw Hill, 2011, (8th ed)
- Fama, Eugene F. (1991), "Efficient Capital Markets II," *Journal of Finance*
- Ferrillo, Paul A.; Dunbar, Frederick C. Ph.D.; and Tabak, David Ph.D., "The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof from Plaintiffs in Fraud-on-the-Market Cases," St. John's Law Review, Vol. 78, Winter 2004, No. 1, Article 4
- Hartzmark, Michael, Schipani, Cindy A., and Seyhun, H. Nejat, "Fraud on the Market: Analysis of the Efficiency of the Corporate Bond Market," *Columbia Business Law Review,* 2011
- Tabak, David I. and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," in *Litigation Services Handbook: The Role of the Financial Expert* 3rd Edition, (2001)
- Tabak, David I., "What Should We Expect When Testing for Price Response to News in Securities Litigation?" August 2016
- Tabak, David, "Testing Securities Market Efficiency With Cammer Factors," *Law 360*, February 5, 2019
- Tabak, David, "Use and Misuse of Event Studies to Examine Market Efficiency," 30 April 2010
- Villanueva, Miguel and Steven Feinstein, "Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors," Forthcoming in *Review of Quantitative Finance and Accounting*, 2020

**NEWS ARTICLES**

- "BRIEF-AmTrust Says Co Has Been Advised That Karfunkel-Zyskind Family Scheduled Meeting With Carl Icahn," *Reuters News*, June 4, 2018
- "ISS Urges Investors to Block AmTrust Go-Private Deal," *The Deal*, May 25, 2018.

**CASE LAW AND EXPERT EVIDENCE IN OTHER MATTERS**

- *Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184,185 L. Ed. 2d 308 (2013)
- *Basic, Inc. v. Levinson*, 485 U.S. 224, 108 S. Ct. 978, (1988)
- *Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307 (5th Cir. 2005)

- *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989)

- *Cheney v. Cyberguard Corp.,* 213 F.R.D. 484, 501 (S.D. Fla. 2003)

- Corrected Report on Market Efficiency of Professor Steven P. Feinstein, Ph.D., CFA dated October 23, 2015 *IN RE: Petrobras Securities Litigation*, No. 14-cv-9662 (JSR)

- Declaration and Report of Professor Steven P. Feinstein, *City Of Sterling Heights General Employees' Retirement System, et al. vs. Prudential Financial, Inc., et al.*, dated July 11, 2014

- Deposition transcript of Steve Feinstein in *In Re: Groupon, Inc. Securities Litigation* (Case No. 12 CV 2450) dated February 12, 2014.

- Deposition transcript of Steve Feinstein in *Ohio Public Employees Retirement System v, Federal Home Loan Mortgage Corporation a/k/a Freddie Mac., et al* (Case No, 4:08-cv-00160) dated August 10, 2017

- *Halliburton Co. v. Erica P. John Fund, Inc.,* 134S. Ct. 2398, 2410, 189 L. Ed. 339

- *In re Federal Home Loan Mortgage Corp. (Freddie Mac) Securities Litigation*, 281 F.R.D. 174, (S.D.N.Y. 2012)

- *In re PolyMedica Corp. Sec. Lit.*, 453 F. Supp. 2d 260 (D. Mass. 2006).

- *In re Teva Sec. Litig.,* No. 3:17-cv-558 (SRU), 29 (D. Conn. Mar. 9, 2021)

- *In re Xcelera.com Securities Litigation* 430 F.3d 503, (1st Cir.2005).

- *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001)

- *Petrie v. Elec. Game Card, Inc.,* 308 F.R.D. 336, 356 (C.D. Cal. 2015)

- Report on Market Efficiency of Professor Steven P. Feinstein, Ph.D., CFA dated June 30, 2017 *IN RE: Electrobras Securities Litigation*, No. 15-cv-5754-JGK

- Report on Market Efficiency of Professor Steven P. Feinstein, Ph.D., CFA dated June 7, 2017 *in Ohio Public Employees Retirement System v, Federal Home Loan Mortgage Corporation a/k/a Freddie Mac., et al* (Case No, 4:08-cv-00160-BYP)

- Report on Market Efficiency Professor Steven P. Feinstein, *American Realty Capital Properties, Inc.* No. 1:15-mc-00040-AKH, dated March 15, 2017

- Report on Market Efficiency Professor Steven P. Feinstein, *Delcath Systems, Inc* No. 13 CIV.3116 (LGS), dated February 4, 2015

- Report on Market Efficiency Professor Steven P. Feinstein, E*dna Selan Epstein et al. v World Acceptance Corporation et al.* Civil Action No. 6_14-cv-01606-MGL, dated September 28, 2016.

- Report on Market Efficiency Professor Steven P. Feinstein, *Groupon, Inc* No. 12 CV 2450, dated December 4, 2013

- Report on Market Efficiency Professor Steven P. Feinstein, *JP Morgan* No. 1_12-cv- 03852-GBD, dated February 13, 2015

- Report on Market Efficiency Professor Steven P. Feinstein, *KBR, Inc* No. 4_14-CV- 01287, dated February 19, 2016

- Report on Market Efficiency Professor Steven P. Feinstein, *Las Vegas Sands* No. 2_10-cv-00765-KJD-GWF, dated November 7, 2014

- Report on Market Efficiency Professor Steven P. Feinstein, *Puma Biotechnology, Inc* No. 8_15-cv-00865-AG-JLG, dated March 15, 2017

- Report on Market Efficiency Professor Steven P. Feinstein, *Questcor Pharmaceuticals* No. 8_12-cv-01623-DMG(JPRx), dated August 4, 2014

- Report on Market Efficiency Professor Steven P. Feinstein, *Silver Wheaton* No. 2_15-cv-05146-CAS, dated November 1, 2016

- Report on Market Efficiency Professor Steven P. Feinstein, *Symbol Technologies, Inc* No. 05-CV-3923-DRH, dated March 24, 2014
- Report on Market Efficiency Professor Steven P. Feinstein, *Walter Energy, Inc* No. 2_12-cv-00281-VEH, dated August 15, 2013
- Report on Market Efficiency Professor Steven P. Feinstein, *World Acceptance Corp* No. 6_14-cv-01606, dated September 28, 2016

- *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, (2d Cir. 2008)

## SEC FILINGS
- Amtrust Financial Services, Inc., *Series A Prospectus Supplement*, filed June 3, 2013
- Amtrust Financial Services, Inc., *Series B Prospectus Supplement*, filed June 25, 2014
- Amtrust Financial Services, Inc., *Series C Prospectus Supplement*, filed September 9, 2014
- Amtrust Financial Services, Inc., *Series D Prospectus Supplement*, filed March 12, 2015
- Amtrust Financial Services, Inc., *Series E Prospectus Supplement*, filed March 8, 2016
- Amtrust Financial Services, Inc., *Series F Prospectus Supplement*, filed September 20, 2016
- Amtrust Financial Services, Inc., *8-K*, filed January 18, 2019
- Amtrust Financial Services, Inc., *8-K*, filed January 17, 2019
- Amtrust Financial Services, Inc., *8-K*, filed January 03, 2019
- Amtrust Financial Services, Inc., *D*, filed December 11, 2018
- Amtrust Financial Services, Inc., *15-12B*, filed December 10, 2018
- Amtrust Financial Services, Inc., *8-K*, filed December 04, 2018
- Amtrust Financial Services, Inc., *SC 13D/A*, filed November 30, 2018
- Amtrust Financial Services, Inc., *SC 13D/A*, filed November 30, 2018
- Amtrust Financial Services, Inc., *S-8 POS*, filed November 29, 2018
- Amtrust Financial Services, Inc., *S-8 POS*, filed November 29, 2018
- Amtrust Financial Services, Inc., *SC 13E3/A*, filed November 29, 2018
- Amtrust Financial Services, Inc., *8-K*, filed November 29, 2018
- Amtrust Financial Services, Inc., *8-K*, filed November 29, 2018
- Amtrust Financial Services, Inc., *25-NSE*, filed November 29, 2018
- Amtrust Financial Services, Inc., *8-K*, filed November 27, 2018
- Amtrust Financial Services, Inc., *13F-HR*, filed November 14, 2018
- Amtrust Financial Services, Inc., *8-K*, filed November 09, 2018
- Amtrust Financial Services, Inc., *10-Q*, filed November 09, 2018
- Amtrust Financial Services, Inc., *8-K*, filed October 26, 2018
- Amtrust Financial Services, Inc., *13F-HR*, filed August 14, 2018
- Amtrust Financial Services, Inc., *10-Q*, filed August 09, 2018
- Amtrust Financial Services, Inc., *8-K*, filed August 09, 2018

- Amtrust Financial Services, Inc., *SC 13E3/A*, filed July 25, 2018
- Amtrust Financial Services, Inc., *SC 13D/A*, filed July 25, 2018
- Amtrust Financial Services, Inc., *8-K*, filed June 21, 2018
- Amtrust Financial Services, Inc., *DEFA14A*, filed June 18, 2018
- Amtrust Financial Services, Inc., *8-K*, filed June 12, 2018
- Amtrust Financial Services, Inc., *DEFA14A*, filed June 12, 2018
- Amtrust Financial Services, Inc., *SC 13E3/A*, filed June 11, 2018
- Amtrust Financial Services, Inc., *DEFA14A*, filed June 11, 2018
- Amtrust Financial Services, Inc., *8-K*, filed June 11, 2018
- Amtrust Financial Services, Inc., *DEFA14A*, filed June 11, 2018
- Amtrust Financial Services, Inc., *SC 13D/A*, filed June 07, 2018
- Amtrust Financial Services, Inc., *8-K*, filed June 07, 2018
- Amtrust Financial Services, Inc., *DEFA14A*, filed June 04, 2018
- Amtrust Financial Services, Inc., *8-K*, filed June 04, 2018
- Amtrust Financial Services, Inc., *DFAN14A*, filed June 04, 2018
- Amtrust Financial Services, Inc., *SC 13D/A*, filed June 04, 2018
- Amtrust Financial Services, Inc., *DFAN14A*, filed June 01, 2018
- Amtrust Financial Services, Inc., *SC 13D/A*, filed June 01, 2018
- Amtrust Financial Services, Inc., *DFAN14A*, filed May 30, 2018
- Amtrust Financial Services, Inc., *DEFA14A*, filed May 30, 2018
- Amtrust Financial Services, Inc., *8-K*, filed May 29, 2018
- Amtrust Financial Services, Inc., *DEFA14A*, filed May 29, 2018
- Amtrust Financial Services, Inc., *DFAN14A*, filed May 29, 2018
- Amtrust Financial Services, Inc., *DEFC14A*, filed May 29, 2018
- Amtrust Financial Services, Inc., *UPLOAD*, filed May 25, 2018
- Amtrust Financial Services, Inc., *DFAN14A*, filed May 25, 2018
- Amtrust Financial Services, Inc., *8-K*, filed May 25, 2018
- Amtrust Financial Services, Inc., *DEFA14A*, filed May 25, 2018
- Amtrust Financial Services, Inc., *PRRN14A*, filed May 25, 2018
- Amtrust Financial Services, Inc., *DEFA14A*, filed May 24, 2018
- Amtrust Financial Services, Inc., *DEFA14A*, filed May 24, 2018
- Amtrust Financial Services, Inc., *DEFA14A*, filed May 24, 2018
- Amtrust Financial Services, Inc., *UPLOAD*, filed May 23, 2018
- Amtrust Financial Services, Inc., *DEFA14A*, filed May 23, 2018
- Amtrust Financial Services, Inc., *DFAN14A*, filed May 23, 2018
- Amtrust Financial Services, Inc., *PRRN14A*, filed May 23, 2018

-73-

- Amtrust Financial Services, Inc., *UPLOAD*,  filed May 22, 2018
- Amtrust Financial Services, Inc., *DEFA14A*,  filed May 22, 2018
- Amtrust Financial Services, Inc., *DFAN14A*,  filed May 21, 2018
- Amtrust Financial Services, Inc., *DFAN14A*,  filed May 21, 2018
- Amtrust Financial Services, Inc., *DEFA14A*,  filed May 18, 2018
- Amtrust Financial Services, Inc., *DFAN14A*,  filed May 17, 2018
- Amtrust Financial Services, Inc., *PREC14A*,  filed May 17, 2018
- Amtrust Financial Services, Inc., *SC 13D*,  filed May 17, 2018
- Amtrust Financial Services, Inc., *13F-HR*,  filed May 11, 2018
- Amtrust Financial Services, Inc., *10-Q*,  filed May 10, 2018
- Amtrust Financial Services, Inc., *8-K*,  filed May 09, 2018
- Amtrust Financial Services, Inc., *SC 13E3/A*,  filed May 04, 2018
- Amtrust Financial Services, Inc., *DEFM14A*,  filed May 04, 2018
- Amtrust Financial Services, Inc., *CORRESP*,  filed April 30, 2018
- Amtrust Financial Services, Inc., *CORRESP*,  filed April 30, 2018
- Amtrust Financial Services, Inc., *SC 13D/A*,  filed April 30, 2018
- Amtrust Financial Services, Inc., *UPLOAD*,  filed April 23, 2018
- Amtrust Financial Services, Inc., *SC 13D*,  filed April 23, 2018
- Amtrust Financial Services, Inc., *10-K/A*,  filed April 23, 2018
- Amtrust Financial Services, Inc., *SC 13E3*,  filed April 09, 2018
- Amtrust Financial Services, Inc., *PREM14A*,  filed April 09, 2018
- Amtrust Financial Services, Inc., *8-K*,  filed March 21, 2018
- Amtrust Financial Services, Inc., *10-K*,  filed March 16, 2018
- Amtrust Financial Services, Inc., *UPLOAD,*  filed March 14, 2018
- Amtrust Financial Services, Inc., *CORRESP*,  filed March 06, 2018
- Amtrust Financial Services, Inc., *DEFA14A*,  filed March 02, 2018
- Amtrust Financial Services, Inc., *SC 13D/A*,  filed March 02, 2018
- Amtrust Financial Services, Inc., *DEFA14A*,  filed March 01, 2018
- Amtrust Financial Services, Inc., *8-K*,  filed March 01, 2018
- Amtrust Financial Services, Inc., *8-K*,  filed March 01, 2018
- Amtrust Financial Services, Inc., *DEFA14A*,  filed March 01, 2018
- Amtrust Financial Services, Inc., *NT 10-K*,  filed March 01, 2018
- Amtrust Financial Services, Inc., *UPLOAD*,  filed February 23, 2018
- Amtrust Financial Services, Inc., *CORRESP*,  filed February 15, 2018
- Amtrust Financial Services, Inc., *SC 13G*,  filed February 14, 2018
- Amtrust Financial Services, Inc., *13F-HR*,  filed February 14, 2018

- Amtrust Financial Services, Inc., *SC 13G*,  filed February 08, 2018
- Amtrust Financial Services, Inc., *UPLOAD*,  filed January 31, 2018
- Amtrust Financial Services, Inc., *SC 13D/A*,  filed January 22, 2018
- Amtrust Financial Services, Inc., *CORRESP*,  filed January 19, 2018
- Amtrust Financial Services, Inc., *8-K*,  filed January 19, 2018
- Amtrust Financial Services, Inc., *8-K*,  filed January 11, 2018
- Amtrust Financial Services, Inc., *SC 13D/A*,  filed January 10, 2018
- Amtrust Financial Services, Inc., *8-K*,  filed December 21, 2017
- Amtrust Financial Services, Inc., *SC 13D/A*,  filed December 07, 2017
- Amtrust Financial Services, Inc., *UPLOAD*,  filed December 05, 2017
- Amtrust Financial Services, Inc., *13F-HR*,  filed November 14, 2017
- Amtrust Financial Services, Inc., *8-K*,  filed November 13, 2017
- Amtrust Financial Services, Inc., *10-Q*,  filed November 09, 2017
- Amtrust Financial Services, Inc., *8-K*,  filed November 08, 2017
- Amtrust Financial Services, Inc., *8-K*,  filed November 06, 2017
- Amtrust Financial Services, Inc., *8-K*,  filed November 06, 2017
- Amtrust Financial Services, Inc., *8-K*,  filed October 03, 2017

## OTHER

- "Bond Ratings", accessed: https://www.fidelity.com/learning-center/investment-products/fixed-income-bonds/bond-ratings
- AM Best, "Guide to Best's Credit Ratings," December 17, 2019
- Bloomberg L.P.
- Capital IQ
- Constant maturity treasury rates, accessed: https://www.federalreserve.gov/
- Dow Jones Factiva
- Limber Capital, "AmTrust Preferred About To Pop", *Seeking Alpha*, August 08, 2019.
- S&P 500 Factsheet, accessed: https://www.spglobal.com/spdji/en/indices/equity/sp-500/#overview
- S&P U.S. Preferred Stock Index, accessed: https://www.spglobal.com/spdji/en/indices/fixed-income/sp-us-preferred-stock-index/#overview.
- *Seeking Alpha*, accessed: https://seekingalpha.com/page/become-a-seeking-alpha-contributor

**Exhibit 3:  Key Characteristics of the AmTrust Preferred Securities[182]**

| Series | Date Issued | Earliest Redemption Date | Coupon Rate | Shares / ADRs Outstanding | Equivalent in Preferred Shares | Liquidation Preference per Share | Aggregate Face Value |
|---|---|---|---|---|---|---|---|
| A | June 2013 | June 10, 2018 | 6.75% | 4,600,000 Preferred Shares | 4,600,000 | $25 | $115,000,000 |
| B | July 2014 | July 1, 2019 | 7.25% | 4,200,000 ADRs | 105,000 | $1,000 | $105,000,000 |
| C | Sept. 2014 | Sept. 16, 2019 | 7.625% | 3,200,000 ADRs | 80,000 | $1,000 | $80,000,000 |
| D | March 2015 | March 19, 2020 | 7.5% | 7,300,000 ADRs | 182,500 | $1,000 | $182,500,000 |
| E | March 2016 | March 15, 2021 | 7.75% | 5,750,000 ADRs | 143,750 | $1,000 | $143,750,000 |
| F | Sept. 2016 | Sept 27, 2021 | 6.95% | 11,500,000 ADRs | 287,500 | $1,000 | $287,500,000 |
| | | | | | | **Total** | **$913,750,000** |

---

[182] Date issued and redemption dates, respectively, from Series A Prospectus cover page and S-9; Series B Prospectus cover page and S-10; Series C Prospectus cover page and S-9; Series D Prospectus cover page and S-9; Series E Prospectus cover page and S-9; and Series F Prospectus cover page and S-9; remaining data from AmTrust 10-Q filed November 9, 2018, p. 60.

**Exhibit 4: Event Study Regression Results**[183]

| Variables | Series A | Series B | Series C | Series D | Series E | Series F |
|---|---|---|---|---|---|---|
| **Market Index** | 0.0317 | -0.1892 | -0.4867 | 0.0647 | -0.0235 | -0.0848 |
| *SE* | *0.2161* | *0.2260* | *0.2069* | *0.1998* | *0.2410* | *0.1986* |
| *t-stat* | *0.15* | *-0.84* | *-2.35* | *0.32* | *-0.10* | *-0.43* |
| **Sector Index** | -0.0533 | 0.0152 | 0.2879 | -0.0983 | -0.1263 | 0.0920 |
| *SE* | *0.2081* | *0.2177* | *0.1993* | *0.1925* | *0.2322* | *0.1913* |
| *t-stat* | *-0.26* | *0.07* | *1.44* | *-0.51* | *-0.54* | *0.48* |
| **Preferred Shares Index** | 2.5479 | 3.0349 | 2.8297 | 2.5060 | 3.1383 | 2.0331 |
| *SE* | *0.4897* | *0.5123* | *0.4689* | *0.4529* | *0.5463* | *0.4501* |
| *t-stat* | ***5.20*** | ***5.92*** | ***6.03*** | ***5.53*** | ***5.74*** | ***4.52*** |
| **Constant** | -0.0003 | -0.0001 | 0.0003 | 0.0002 | 0.0003 | -0.0005 |
| *SE* | *0.0012* | *0.0013* | *0.0012* | *0.0011* | *0.0014* | *0.0011* |
| *t-stat* | *-0.22* | *-0.11* | *0.26* | *0.18* | *0.21* | *-0.43* |
|  |  |  |  |  |  |  |
| **Observations** | 251 | 251 | 251 | 251 | 251 | 251 |
| **R-squared** | 0.2395 | 0.2484 | 0.2538 | 0.3230 | 0.2278 | 0.2605 |
| **Adjusted R-squared** | 0.1840 | 0.1936 | 0.1994 | 0.2736 | 0.1714 | 0.2065 |
| **Standard Error** | 0.0190 | 0.0199 | 0.0182 | 0.0176 | 0.0212 | 0.0175 |

---

[183] Statistical significance is indicated by $t$-statistics shown in bold font. The regression model also includes dummy variables for 14 event dates, for which coefficients and $t$-statistics are shown on the following page.

| Variables | Event Types | Series A | Series B | Series C | Series D | Series E | Series F |
|---|---|---|---|---|---|---|---|
| **1/22/2018** | Alleged Misrep (Included by Prof. Feinstein) | 0.0728 | 0.0716 | 0.0647 | 0.0686 | 0.0768 | 0.0879 |
| *t-stat* | | *3.82* | *3.59* | *3.54* | *3.88* | *3.61* | *5.01* |
| **3/1/2018** | Alleged Misrep; Go-Private event | -0.0231 | -0.0291 | -0.0235 | -0.0185 | -0.0165 | -0.0058 |
| *t-stat* | | *-1.21* | *-1.46* | *-1.29* | *-1.05* | *-0.78* | *-0.33* |
| **3/16/2018** | Alleged Misrep | 0.0011 | 0.0017 | -0.0084 | -0.0090 | 0.0092 | -0.0023 |
| *t-stat* | | *0.06* | *0.08* | *-0.46* | *-0.51* | *0.43* | *-0.13* |
| **4/9/2018** | Alleged Misrep | 0.0294 | 0.0338 | 0.0474 | 0.0258 | 0.0132 | 0.0336 |
| *t-stat* | | *1.53* | *1.69* | *2.59* | *1.46* | *0.62* | *1.91* |
| **5/4/2018** | Alleged Misrep | 0.0044 | 0.0116 | -0.0044 | 0.0046 | 0.0157 | 0.0075 |
| *t-stat* | | *0.23* | *0.58* | *-0.24* | *0.26* | *0.74* | *0.43* |
| **5/10/2018** | Quarterly Earnings Announcement | 0.0071 | 0.0070 | -0.0053 | -0.0006 | -0.0073 | -0.0086 |
| *t-stat* | | *0.37* | *0.35* | *-0.29* | *-0.03* | *-0.34* | *-0.49* |
| **5/18/2018** | Go-Private Event (Included by Prof. Feinstein) | 0.0660 | 0.0733 | 0.0622 | 0.0671 | 0.0425 | 0.0745 |
| *t-stat* | | *3.46* | *3.68* | *3.41* | *3.81* | *2.00* | *4.25* |
| **5/25/2018** | Go-Private Event | 0.0030 | 0.0042 | 0.0189 | 0.0208 | 0.0126 | 0.0102 |
| *t-stat* | | *0.16* | *0.21* | *1.04* | *1.18* | *0.59* | *0.58* |
| **6/4/2018** | Go-Private Event | -0.0003 | -0.0054 | -0.0209 | -0.0014 | -0.0160 | -0.0032 |
| *t-stat* | | *-0.02* | *-0.27* | *-1.14* | *-0.08* | *-0.76* | *-0.18* |
| **6/7/2018** | Go-Private Event | 0.0129 | 0.0077 | -0.0006 | 0.0097 | 0.0137 | 0.0078 |
| *t-stat* | | *0.68* | *0.39* | *-0.03* | *0.55* | *0.64* | *0.45* |
| **6/21/2018** | Go-Private Event | -0.0069 | -0.0030 | -0.0017 | 0.0025 | 0.0005 | -0.0001 |
| *t-stat* | | *-0.36* | *-0.15* | *-0.09* | *0.14* | *0.02* | *-0.01* |
| **8/10/2018** | Quarterly Earnings Announcement | -0.0055 | 0.0055 | -0.0005 | 0.0003 | -0.0034 | -0.0034 |
| *t-stat* | | *-0.29* | *0.27* | *-0.03* | *0.02* | *-0.16* | *-0.19* |
| **11/12/2018** | Quarterly Earnings Announcement | 0.0015 | -0.0066 | -0.0199 | -0.0113 | -0.0267 | -0.0201 |
| *t-stat* | | *0.08* | *-0.33* | *-1.08* | *-0.64* | *-1.25* | *-1.14* |
| **11/28/2018** | Go-Private Event | 0.0055 | 0.0021 | -0.0144 | -0.0948 | -0.0270 | -0.0056 |
| *t-stat* | | *0.28* | *0.10* | *-0.78* | *-5.32* | *-1.26* | *-0.32* |

**Exhibit 5:  The Alleged Misrepresentation Dates that Prof. Feinstein Failed to Analyze did Not Have a Statistically Significant Price Impact on All of the Six Series of AmTrust Preferred Securities[184]**

| Date | Event | Abnormal Return | | | | | |
|---|---|---|---|---|---|---|---|
| | | Series A | Series B | Series C | Series D | Series E | Series F |
| 3/1/2018 | AmTrust Enters into the Definitive Merger Agreement | -2.31% | -2.91% | -2.35% | -1.85% | -1.66% | -0.58% |
| *t-stat* | | *-1.22* | *-1.46* | *-1.29* | *-1.05* | *-0.78* | *-0.33* |
| 3/16/2018 | 10-K Filed | 0.11% | 0.16% | -0.84% | -0.90% | 0.92% | -0.23% |
| *t-stat* | | *0.06* | *0.08* | *-0.46* | *-0.51* | *0.43* | *-0.13* |
| 4/9/2018 | Preliminary Proxy Filed | 2.94% | 3.37% | 4.74% * | 2.58% | 1.32% | 3.37% |
| *t-stat* | | *1.55* | *1.70* | ***2.61*** | *1.47* | *0.62* | *1.92* |
| 5/4/2018 | Definitive Proxy Filed | 0.45% | 1.15% | -0.44% | 0.47% | 1.57% | 0.75% |
| *t-stat* | | *0.24* | *0.58* | *-0.24* | *0.26* | *0.74* | *0.43* |

---

[184] *t*-statistics are shown in italics and statistical significance at the 95% confidence level is noted by "*."

**Exhibit 6: *t*-statistics on the Preferred Shares Index found by Prof. Feinstein in the Petrobras and Electrobras Matters were Generally Not Statistically Significant[185]**

| Matter | Period | Preferred Shares Index t-statistic | Statistically Significant at 95% Confidence Level[186] |
|---|---|---|---|
| Petrobras | 1/22/10 - 7/28/11 | 1.30 | No |
| Petrobras | 7/29/11 - 7/27/12 | -0.10 | No |
| Petrobras | 7/30/12 - 7/26/13 | 2.45 | Yes |
| Petrobras | 7/29/13 - 7/28/14 | -1.37 | No |
| Petrobras | 7/29/14 - 7/28/15 | 0.15 | No |
| Electrobras | 8/17/10 – 6/24/15 | -1.32 | No |
| Electrobras | 8/17/10 – 9/11/12 | -1.46 | No |
| Electrobras | 9/12/12 – 6/24/15 | -0.70 | No |

---

[185] Corrected Report on Market Efficiency of Professor Steven P. Feinstein, Ph.D., CFA dated October 23, 2015 *IN RE: Petrobras Securities Litigation*, No. 14-cv-9662 (JSR), Exhibit-7b and Report on Market Efficiency of Professor Steven P. Feinstein, Ph.D., CFA dated June 30, 2017 *IN RE: Electrobras Securities Litigation*, No. 15-cv-5754-JGK, Exhibit-6ba, Exhibit-6bb, and Exhibit-6bc.

[186] In general, *t*-statistics over approximately 1.96 in magnitude indicate statistical significance at the 95% confidence level. I note that if a *t*-statistics is not significant at the 95% confidence level, then it will not be significant at the 99% confidence level; Table-9 to the Feinstein Report indicates statistical significance at the 99% confidence level.

-81-

**Exhibit 7: On 54%-58% of Days, in the Proposed Class Period the AmTrust Preferred Securities and Long-Term Interest Rates Did Not Co-Move in Expected Directions**

| | Series A | Series B | Series C | Series D | Series E | Series F |
|---|---|---|---|---|---|---|
| Days Where Interest Rate Went Down and Preferred Series Did Not Go Up | 57 | 60 | 53 | 56 | 54 | 63 |
| Days Where Interest Rate Went Up and Preferred Series Did Not Go Down | 45 | 50 | 48 | 45 | 54 | 49 |
| Days When Interest Rate Did Not Move and Preferred Series did | 32 | 33 | 33 | 33 | 32 | 32 |
| Total Days with Movements not in Expected Direction | 134 | 143 | 134 | 134 | 140 | 144 |
| Total Days in Proposed Class Period with Interest Rate Data | 249 | 249 | 249 | 249 | 249 | 249 |
| **Percentage of Days with Movements not in Expected Direction** | **54%** | **57%** | **54%** | **54%** | **56%** | **58%** |

**Exhibit 8: None of the *t*-statistics on Prof. Feinstein's Market and Sector Indices are Statistically Significant[187]**

| AmTrust Security | Market Index t-stat | Sector Index t-stat |
|---|---|---|
| Series A | 0.29 | -0.29 |
| Series B | -0.64 | -0.03 |
| Series C | -2.03 | 1.10 |
| Series D | 0.33 | -0.98 |
| Series E | -0.01 | -0.65 |
| Series F | -0.17 | 0.26 |

---

[187] Statistical significance at the 95% confidence level indicated by "*." A *t*-statistic is considered significant if it has expected sign (i.e., positive for this matter), and exceeds the threshold value of approximately 1.96 associated with the 95% confidence level. I note that if a *t*-statistics is not significant at the 95% confidence level, then it will not be significant at the 99% confidence level as well; Table-9 to the Feinstein Report indicates statistical significance at the 99% confidence level.

**Exhibit 9:  *Cammer*, *Krogman*, and Feinstein Factors**

| Factor | Comments |
|---|---|
| ***Cammer / Krogman Factors*** | |
| Trading volume (daily volume and weekly turnover) | *Cammer* factor, while the decision does refer to trading volume, it only mentions a threshold for weekly turnover, not volume |
| Number of securities analysts | *Cammer* factor |
| Market makers | *Cammer* factor |
| S-3 Registration Statement eligibility | *Cammer* factor |
| Cause-and-effect relationship between unexpected corporate events and prices | *Cammer* factor |
| Market capitalization | *Krogman* factor |
| Float | *Krogman* factor |
| Bid-ask spread percentage | *Krogman* factor |

| ***Feinstein Factors*** | ***Basis provided by Prof. Feinstein*** |
|---|---|
| Listing on NYSE | A quote within the *Cammer* opinion citing "commentators Bromberg & Lowenfels" |
| News coverage | Court decisions in *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 499 (S.D. Fla. 2003) and *In re Banc of California Securities Litigation*, No. 8:17-cv-00118-AG-DFM, (C.D. Cal. 2018). |
| Institutional ownership | Court decisions in *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008); *Smilovits v. First Solar, Inc.*, No. CV12-00555-PHX-DGC, 8 October 2013; Barber, Griffin, and Lev (1994) |
| Significant day-to-day empirical responses to interest rates | None |

**Exhibit 10: All Series of AmTrust Preferred Securities Are Distinct, and Prof. Feinstein Incorrectly Combines Them To Examine Market Capitalization**

1.      Prof. Feinstein incorrectly asserts that "separate series should be viewed as a collective whole that the Company added to over time as needed," and, therefore, "evaluation of market capitalization and outstanding value on an aggregate basis is appropriate for purposes of assessing the efficiency of the market for AmTrust's Preferred Shares."[188]

2.      Combining the series can mask evidence of inefficient trading. For example, consider if the Company issued another series of preferred shares with a market value of only $10 million. By adding that to the market value of the six series at issue here, one could come to the conclusion that its size is indicative of efficient trading, when that may not be the case.

3.      There is ample evidence that the six series of AmTrust Preferred Securities exhibit different trading behavior, and therefore, should not be examined in aggregate at least for the following reasons.

4.      First, I note the direct evidence of the six series of AmTrust Preferred Securities exhibiting inconsistent price movements. Of 63% of days during the Proposed Class Period, the six series of AmTrust Preferred Securities did not move together.[189] See **Table 13** below.

---

[188] Feinstein report, ¶150.

[189] In fact, there were 45 days during the Class Period (out of 251, or 18%), when all six series of AmTrust Preferred Securities did not react consistently in terms of direction and statistical significance.  Of these 45 days, half (22) were in Interval-2, when they made up 65% of the total days. For example, on November 29, 2018 (a date that Prof. Feinstein identifies as a key event date in his timeline of the Go-Private transaction), there were significantly different movements in the six series, with Series A moving down in a statistically significant manner while Series D

**Table 13: Number of Days When the Six Series of AmTrust Preferred Securities Did Not Move Together**

| | |
|---|---|
| Days Where Preferred Series All Moved Up | 41 |
| Days Where Preferred Series All Moved Down | 53 |
| Days Where Preferred Series All Had No Change | 0 |
| Total Days with Movements Together | 94 |
| | |
| Total Days in Proposed Class Period | 251 |
| Total Days with Movements Not Together | 157 |
| **Percentage of Days When AmTrust Preferred Securities Did Not Move Together** | **63%** |

5.    Second, the six series of AmTrust Preferred Securities significantly varied in numbers of shares or ADRs issued.[190]

6.    Finally, all six series of AmTrust Preferred Securities had different levels of trading activity during the Proposed Class Period. The different level of trading activity is confirmed by the data that Prof. Feinstein has himself presented for other factors.

- As shown in Prof. Feinstein's report, the six series of AmTrust Preferred Securities had different levels of weekly turnover.[191]

- Similarly, as discussed in Prof. Feinstein's report, the six series of AmTrust Preferred Securities had different bid-ask spreads.[192]

7.    In short, all the six series of Amtrust Preferred Securities are distinct, and Prof. Feinstein incorrectly combines them for examination of market capitalization.

---

moved up in a statistically significant manner, and Series B, C, E, and F did not move in a statistically significant manner

[190] The range was 3.2 million shares ($80 million face value) for Series to C to 11.5 million ($287.5 million face value) for Series F.

[191] Feinstein Report, Table 2.

[192] Feinstein Report, ¶¶156 and 160 and footnotes 119 and 124. The bid-ask spreads ranged from $0.11 to $0.23 (and 0.67% to 1.36%) during the Class Period, $0.11 to $0.22 (0.59% to 1.25%) during Interval-1, and $0.14 to $0.36 (1.03% to 2.50%) during Interval-2. As shown, the high value was at least 100% greater than the low value during each period, showing the vast differences in bid-ask spreads among the six series.

**Exhibit 11: The AmTrust Preferred Securities Weekly Turnover was Below 1% for 17% - 44% of the Weeks in the Proposed Class Period**

| | AmTrust Preferred Securities | | | | | |
|---|---|---|---|---|---|---|
| | A | B | C | D | E | F |
| **Interval-1** [1] | | | | | | |
| Number of Weeks | 45 | 45 | 45 | 45 | 45 | 45 |
| Number of Weeks with Average Trading Volume < 1% of Shares Outstanding | 19 | 12 | 8 | 19 | 15 | 22 |
| **Number of Weeks with Average Trading Volume < 1% of Shares Outstanding as % of Total Weeks** | **42.2%** | **26.7%** | **17.8%** | **42.2%** | **33.3%** | **48.9%** |
| **Interval-2** [2] | | | | | | |
| Number of Weeks | 8 | 8 | 8 | 8 | 8 | 8 |
| Number of Weeks with Average Trading Volume < 1% of Shares Outstanding | 0 | 1 | 1 | 2 | 0 | 1 |
| **Number of Weeks with Average Trading Volume < 1% of Shares Outstanding as % of Total Weeks** | **0.0%** | **12.5%** | **12.5%** | **25.0%** | **0.0%** | **12.5%** |
| **Entire Proposed Class Period** [3] | | | | | | |
| Number of Weeks | 52 | 52 | 52 | 52 | 52 | 52 |
| Number of Weeks with Average Trading Volume < 1% of Shares Outstanding | 19 | 13 | 9 | 21 | 15 | 23 |
| **Number of Weeks with Average Trading Volume < 1% of Shares Outstanding as % of Total Weeks** | **36.5%** | **25.0%** | **17.3%** | **40.4%** | **28.8%** | **44.2%** |

**Notes and Sources:**

Data obtained from Prof. Feinstein's workpapers.

Weeks with fewer than 5 trading days have been scaled up proportionally by multiplying by (5 / number of trading days in the week).

[1] Interval-1 includes weeks ending 1/26/18 through 11/23/18 plus the partial week-ending 11/28/18.

[2] Interval-2 includes the partial week of 11/29/18-11/30/18 and weeks ending 12/7/18 through 1/18/19.

[3] The entire Proposed Class Period includes weeks ending 1/26/18 through 1/18/19. Note that the sum of weeks in Interval-1 and Interval-2 exceeds the number of weeks in the entire Proposed Class Period due to the partial weeks included Interval-1 and Interval-2.

**Exhibit 12: The Feinstein Benchmark Dataset Shows that the AmTrust Preferred Securities Average Dollar Bid-Ask Spreads are at the 84th – 96th Percentiles of U.S. Companies**

| AmTrust Security | Percentile of U.S. Companies | | |
| | Class Period Average $ Bid-Ask Spread | Interval-1 Average $ Bid-Ask Spread | Interval-2 Average $ Bid-Ask Spread |
|---|---|---|---|
| Series A | 93% | 93% | 94% |
| Series B | 91% | 91% | 92% |
| Series C | 92% | 92% | 96% |
| Series D | 88% | 88% | 88% |
| Series E | 92% | 92% | 91% |
| Series F | 85% | 84% | 89% |

-4-