UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| JAN MARTÍNEK, | ) ) ) | No. 19-cv-8030-KPF |
| Plaintiff, | ) ) | (Failla, J.) |
| v. | ) ) |  |
| AMTRUST FINANCIAL SERVICES, INC., BARRY D. ZYSKIND, GEORGE KARFUNKEL, AND LEAH KARFUNKEL, | ) ) ) ) |  |
| Defendants. | ) ) ) |  |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

**WOLF POPPER LLP**
Carl L. Stine
Patricia I. Avery
Adam J. Blander
845 Third Avenue, 12th Floor
New York, New York 10022
(212) 759-4600
cstine@wolfpopper.com

*Attorneys for Lead Plaintiff Jan Martínek and Lead Counsel for the Putative Class*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................................. ii

I.      INTRODUCTION ................................................................................................................. 1

II.     ARGUMENT ........................................................................................................................ 1

        A.      The Fraud-on-the-Market Presumption Applies, Establishing Predominance ....... 1

                1.      The Empirical Evidence ("Cammer 5") Indicates Market Efficiency ........ 2

                2.      There Also Exists Sufficient Structural Evidence of Market Efficiency .... 5

        B.      Plaintiff Has Shown That Damages are Measurable on a Class-wide Basis .......... 7

        C.      Plaintiff's Claims are Typical of the Class's ........................................................... 9

        D.      Defendants' Two Proposed Class Exclusions are Inappropriate .......................... 10

III.    CONCLUSION ................................................................................................................... 10

## TABLE OF AUTHORITIES

**Cases**

*Abu Dhabi Commerical Bank v. Morgan Stanley & Co. Inc.*,
  269 F.R.D. 252 (S.D.N.Y. 2010)........................................................................................... 10

*In re Am. Int'l Group Inc. Secs. Litig.*,
  265 F.R.D. 157 (S.D.N.Y. 2010)............................................................................................. 6

*BlackRock Balanced Cap. Portfolio v. Deutsche Bank Nat'l Tr. Co.*,
  No. 14-CV-09367 (JMF)(SN), 2018 WL 5619957 (S.D.N.Y. Aug. 7, 2018).......................... 10

*In re Bulk (Extruded) Graphite Prods. Antitrust Litig.*,
  No. Civ. 02–6030(WHW), 2006 WL 891362 (D.N.J. April 4, 2006) ...................................... 9

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989). ........................................................................................... 5

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC,*
  310 F.R.D. 69 (S.D.N.Y. 2015)...................................................................................... 2, 4, 6, 8

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) .................................................................................................................. 7

*In re Computer Science Corp.*
   288 F.R.D. 112 (E.D. Va. 2012) ........................................................................................... 10

*In re Conagra Foods, Inc.*,
   302 F.R.D. 537 (C.D. Cal. 2014) ............................................................................................ 9

*Cosby v. KPMG, LLP*,
  No.: 3:16-CV-121-TAV-DCP, 2021 WL 1828114 (E.D. Tenn. May 7, 2021) ......................... 3

*In re Diamond Foods, Inc.*,
  295 F.R.D. 240 (N.D. Cal. 2013) .......................................................................................... 10

*Dougherty v. Esperion Therapeutics*,
  No. 16-10089, 2020 WL 6793326 (E.D. Mich. Nov. 19, 2020) ............................................... 3

*Fort Worth Employees Retirement Fund v. J.P. Morgan Chase & Co.*,
  301 F.R.D. 116 (S.D.N.Y. 2014)............................................................................................. 9

*In re Grupo Televisa Sec. Litig.*,
  No. 18 Civ. 1979 (LLS), 2020 WL 3050550 (S.D.N.Y. June 8, 2020) ................................. 3, 4

*Haw. Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Entm't Holdings, Inc.,*
  No. 18-cv-00299 (AJN), 2021 WL 1198799 (S.D.N.Y. Mar. 30, 2021) ................................ 10

*In re HealthSouth Corp. Sec. Litig.,*
  261 F.R.D. 616 (N.D. Ala. 2009)............................................................................................. 6

*Kottaras v. Whole Foods Market, Inc.*,
  281 F.R.D. 16 (D.D.C. 2012)................................................................................................... 8

*Lumen v. Anderson*,
   280 F.R.D. 451 (W.D. Mo. 2012) ................................................................. 6

*McGuinness v. Parnes*,
   No. 87–2728, 1988 WL 66214 (D.D.C. Jun. 17, 1988) ............................... 10

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
   328 F.R.D. 86 (S.D.N.Y. 2018) ..................................................................... 7

*Monroe Cty. Employees' Ret. Sys. v. S. Co.*,
   332 F.R.D. 370 (N.D. Ga. 2019) ................................................................... 8

*Moskowitz v. Lopp*,
   128 F.R.D. 624 (E.D. Pa. 1989) .................................................................. 10

*O'Neil v. Appel,*
   165 F.R.D. 479 (W.D. Mich. 1996) ............................................................... 6

*Ohio Public Employees Retirement System v. Federal Home Loan Mortgage Corp.*,
   No. 4:08CV0160, 2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) ........................................ 2, 9

*In re Petrobras Sec. Litig.,*
   312 F.R.D. 354 (S.D.N.Y. 2016) ................................................................... 3

*Pirnik v. Fiat Chrysler Autos., N.V.*,
   327 F.R.D. 38 (S.D.N.Y. 2018) ..................................................................... 8

*Pub. Emples. Ret. Sys. of Miss. v. TreeHouse Foods, Inc.,*
   No. 16-cv-10632, 2020 WL 919249 (N.D. Ill. Feb. 26, 2020) ..................................... 9

*In re Signet Jewelers Ltd. Sec. Litig.,*
   No. 16 Civ. 6728 (CM) (RWL), 2019 WL 3001084 (S.D.N.Y. July 10, 2019) ........................ 7

*Strougo v. Barclays PLC,*
   312 F.R.D. 307 (S.D.N.Y. 2016) ................................................................... 7

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
   546 F.3d 196 (2d Cir. 2008) ......................................................................... 6

*In re Teva Sec. Litig.,*
   No. 3:17-cv-558 (SRU), 2021 WL 872156 (D. Conn. Mar. 9, 2021) ................................ 3

*Waggoner v. Barclays PLC,*
   875 F.3d 79 (2d Cir. 2017) ........................................................................... 8

*Willis v. Big Lots, Inc.*,
   No. 2:12-cv-604, 2017 WL 1074048 (S.D. Ohio Mar. 17, 2017) ................................... 4

*Wilson v. LSB Indus., Inc.*,
   No. 15 Civ. 7614 (RA) (GWG), 2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018) ....................... 8

*Yi Xiang v. Inovalon Holdings, Inc.*,
   327 F.R.D. 510 (S.D.N.Y. 2018) ................................................................... 1

## INTRODUCTION[1]

It is black-letter law that securities fraud actions are well-suited for class certification. OB1, 10. This case is no exception, and the Class should be certified forthwith. Defendants' brief ("DB") raises three arguments in opposition. *First*, Defendants deny that the Preferred Stock traded in an efficient market on the NYSE. The analyses of Professor Steven Feinstein disproves Defendants, which, among other things, shows the securities moved significantly on "new news" about its continued listing on the NYSE. Plaintiff has amply met his burden of proving market efficiency at the class certification stage.[2] *Second*, Defendants claim that Plaintiff has failed to identify a viable class-wide damages model. In fact, Feinstein has opined that he will rely on a near-universally-recognized methodology to calculate per share damages. That there may be (in Defendants' view) some interconnection between losses caused by their misconduct and losses caused by other factors exists in nearly every fraud case and does not defeat predominance. Third, Defendants argue Plaintiff is atypical because he believed that the market underpriced the Preferred Stock. But this is true of every investor who buys a security. The expected differences of opinions among investors does not mean that they did not rely on market prices for transaction decisions or that the Preferred Stock's market price failed to synthesize all material information.

## I.    ARGUMENT

### A.    The Fraud-on-the-Market Presumption Applies, Establishing Predominance

The Preferred Stock repeatedly demonstrated the hallmark of efficiency by displaying

---

[1] Capitalized terms are defined in Plaintiff's opening brief ("OB"). Given page limitations, Plaintiff endeavors not to repeat facts, authority, and arguments already identified in the OB, but hereby incorporates them all herein. Plaintiff also respectfully refers to and incorporates Feinstein's Opening and Rebuttal Reports ("OR and "RR"). Plaintiff does not discuss adequacy, numerosity, commonality, superiority, and ascertainability, which Defendants concede.

[2] *See* OB13 (Second Circuit has held that entitlement to fraud-on-the-market presumption is less onerous at this stage than at trial); *Yi Xiang v. Inovalon Holdings, Inc.*, 327 F.R.D. 510, 526 (S.D.N.Y. 2018) ("class certification can be revisited at any time under Fed. R. Civ. P. 23(c)(1)") (citations omitted).

1

statistically significant stock price movement on the entry of new news into the market.  All six series of Preferred Stock sharply rose upon Defendants' January 22, 2018 announcement that they intended to maintain the stock's NYSE listing after the Buyout.  The Preferred Stock's price thereafter increased materially upon Carl Icahn's May 17, 2018 proxy war announcement against the Buyout.  Then, the price of the Preferred Stock declined by almost 40% upon Defendants' January 18, 2018 announcement of the delisting. FR ¶¶ 196-202 (detailing stock movement).  That the Preferred Stock traded in an efficient market is the only conceivable inference from these facts, but, in any event, is supported by Feinstein's exhaustive analyses.  The Khare Report ("KR")—authored by an economist whose testimony has (to Plaintiff's knowledge) never been accepted by any court—focuses on minutiae in an attempt to poke holes in Feinstein's analyses, and contains significant errors.[3]  Among other things, Feinstein shows why other events reflected in Khare's event study reflect news that would not be expected to change the Preferred Stock price. Thus, the lack of material stock movement on those other, lesser news days is consistent with efficiency.

### 1.    The Empirical Evidence ("*Cammer 5*") Indicates Market Efficiency

*Cammer 5* considers how a security reacts to new news.  Securities that trade in efficient markets are expected to react immediately to new news relevant to the valuation of that security.  An event study tests that hypothesis.  Feinstein's response to Khare's criticisms of his event study are in Section E of his report, however Plaintiff responds to several specific points:[4]

---

[3] Feinstein is a well-respected expert on market efficiency matters. OB12, n.4; *see also* Ex. 4 to RR (listing 26 "Recent Securities Cases Where Professor Feinstein's Opinions Have Been Accepted"). By contrast, a Lexis search demonstrates that Khare has never testified in any U.S. proceeding, and the KR does not suggest otherwise. Attempting to attack Feinstein's credibility, Defendants repeatedly cite to *Ohio Public Employees Retirement System v. Federal Home Loan Mortgage Corp.*, 2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) ("*OPERS*"), but fail to note that *OPERS* is the *only* case in Feinstein's 20+ year career in which his testimony was stricken.  As discussed herein, *OPERS's* reasoning has also been criticized.  Briefs aside, there is no substitute for reading, side by side, each expert's reports.  Plaintiff submits that the reports speak for themselves, and that Feinstein's opinion is clearly more credible.

[4] While *Cammer 5* is established here, is not "critical" (DB7-8) to a finding of market efficiency.  *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC,* 310 F.R.D. 69, 82-83 (S.D.N.Y. 2015) (rejecting this contention and distinguishing Defendants' cases); *see also Dougherty v. Esperion Therapeutics*, 2020 WL 6793326, at *4 (E.D. Mich.

2

Defendants claim that Feinstein's examination of only three event days fails to show market efficiency for events other than those three days.[5] There are several problems for this contention. First, an event study requires major news events for testing purposes, and "the forensic analyst cannot manufacture test events [like Khare has done], but rather must work with the actual history the company experienced. If only three big news events occurred, then three is the number of events that should be tested." RR ¶ 83. Indeed, Judge Stanton recently credited Feinstein's analysis wherein there was only *one* significant news event relevant to the allegations in that complaint.[6] Certain news events would not be expected to alter the market's perception of the value of the Preferred Stock, and therefore the lack of stock price movement would not be relevant in assessing market efficiency.[7] Second, Defendants ignore that the very purpose of an event study

---

Nov. 19, 2020) (*OPERS*, "on which Defendants so heavily rely" in claiming that *Cammer 5* is dispositive, is contrary to Second Circuit precedent and "appears to be an outlier"); RR ¶¶ 25-33 (criticizing Khare for downplaying the other factors); OB14 (*Cammer* is an "analytical tool," not a "checklist") (citations omitted)

[5] *See* DB9 (using a misguided "ham sandwich" analogy to make this point, which Feinstein eviscerates on its own terms, and also through using an additional "solar eclipse" analogy at RR ¶¶ 90-92).

[6] *In re Grupo Televisa Sec. Litig.*, 2020 WL 3050550, at *7 (S.D.N.Y. June 8, 2020) ("[T]hree of the four events were unlikely to cause an unusual market reaction, and one cannot draw conclusions from their failure to do so. The single event which conveyed concrete, urgent attention - getting information to the Televisa investors [i.e., disclosure of the fraud] produced a statistically significant price drop which would be 'highly unusual from random volatility alone.'") (citing Feinstein). By the same token, Defendants' reliance on *OPERS* (DB12) is misguided because Feinstein has not focused on only one event date, and in any event that would not be sufficient reason to reject his analysis. *In re Teva Sec. Litig.,* 2021 WL 872156, at *39 (D. Conn. Mar. 9, 2021) ("[I]n my view, the *OPERS* Court did not explain its reasoning beyond rejecting the test for small sample size").

The minimal number of relevant news days means that Defendants' insistence on a "broad event study" (DB11) is not credible. Defendants also make the opposite argument: that the "reduction in publicly available news" following the Buyout "warrants separate examinations of market efficiency" for Interval-2. *Id.* Again, Feinstein *did* analyze Interval-2, including the statistically significant price decline following announcement of the delisting. That Feinstein was able to show swift market reaction to new news during a slow post-Buyout news cycle strongly supports market efficiency.

[7] To create a lower reaction percentage, Khare's event study identifies *six* additional events that are meaningless to the Preferred Stock. Feinstein goes through these events and explains why significant price movement would not be expected on that news. RR ¶¶ 110-129; *cf. In re Petrobras Sec. Litig.,* 312 F.R.D. 354, 371 (S.D.N.Y. 2016) (crediting Feinstein's explanation that "one should not expect to see a price movement on every news day"). Even if one credited Khare's event study, its statistical reaction range of 18.2% to 27.3% would *still* demonstrate market efficiency. *Cosby v. KPMG, LLP*, 2021 WL 1828114, at *3-4 & n.5 (E.D. Tenn. May 7, 2021) (certifying class including preferred shareholders; finding that a 17.65% reaction rate was sufficient and distinguishing *Freddie Mac* (DB13) for the proposition that 28% rate is insufficient for a finding of market efficiency); *id.* at *14-15 (rejecting defendant's contentions that expert should have examined more event dates, as the "the price of preferred securities may not be affected [by traditional event days, like earnings releases] until there are signs of the company defaulting");

is to compare event days "to all of the other lesser or non-news days."  RR ¶ 84.  "[T]he event study examines *every day,* and determines whether the security price behavior on the major event dates differed significantly from the price behavior on ordinary days."[8]

Khare also tries to deny that the Preferred Stock was protected by an "equity buffer," which limits reaction to earning announcements, by claiming that Feinstein had used such events when analyzing preferred securities in other cases. But this ignores that those securities, unlike in AmTrust, offered variable (i.e., not fixed) dividends "that were functions of the profits those companies earned."  RR ¶ 100.  Moreover, Khare's contention that the equity buffer was eliminated once AmTrust ceased paying dividends on the common stock ignores that dividends ceased pursuant to the Merger Agreement, *not* due to supposed financial straits. RR ¶¶ 103-109.

Khare also criticizes the use of a corrective disclosure date as an event date, because such dates are "often associated with large price declines" (KR ¶ 68), but as Feinstein notes, this criticism essentially concedes that the security traded in an efficient market. RR ¶ 94.[9]

In addition to the empirical event study results, Feinstein also points out that a regression analysis demonstrates that the Preferred Stock responded continuously, in a highly statistical fashion, to daily changes in interest rates.  OB19-20.  Defendants claim this additional empirical

---

*Barclays,* 310 F.R.D. 78, 94 (debates about the "*degree*" of market efficiency are "largely beside the point"; "defendants' evidence that the market *may have been* inefficient" is insufficient) (emphasis in original).

[8] *Id.* (Emphasis added). Accordingly, Feinstein's event study is not a "proof by example" (DB9) which chooses dates with large stock reactions and then works backwards to infer efficiency.  Here, Feinstein identified news events, and then tested for statistically significant price movement.  RR ¶¶ 87-88; 95-97.

[9] *See Grupo*, 2020 WL 3050550, at *7 (relying solely on corrective disclosure date in finding market efficiency); *Willis v. Big Lots, Inc.*, 2017 WL 1074048, at *4 (S.D. Ohio Mar. 17, 2017) ("[t]hat the objective criterion incorporated corrective disclosure dates does not undermine the reliability of the methodology").

Defendants also claim that a large decline from a corrective disclosure could demonstrate a market "over-reaction" and thus suggest inefficiency.  DB11.  Defendants cannot deem too little reaction *and* too much reaction as both indicative of inefficiency. Whether the market reacted wisely (in Defendants' misguided view, see n.21, *infra*) upon the corrective disclosure is not relevant.  The inquiry is whether the market reacted swiftly upon the news, which is the hallmark of informational efficiency.

analysis should be disregarded because it is "not an event study." DB14. This is wrong. Either Feinstein's analysis and its underlying methodology demonstrate a causal relationship, or they don't. Feinstein should be applauded, not disparaged, for making additional empirical inquiries, particularly given Defendants' charge that his event study used too few event days.[10] Regarding the substance of Defendants' critique, their surmise that the S&P Preferred Share Index is not a reliable proxy for interest rates is belied by the data, which reflects a correlation at "far greater than [a] 99% confidence level."[11] Finally, that Feinstein has shown "at most show a *correlation* between interest rate changes and Preferred Securities prices," DB15 (emphasis in original), is "a curious criticism" as it all but concedes that the Preferred Stock incorporated all "valuation relevant information," which is "the essence of market efficiency."[12]

### 2.    There Also Exists Sufficient Structural Evidence of Market Efficiency

Feinstein has amply demonstrated that inquiry into the structural *Cammer/Krogman* factors also supports a finding of market efficiency, Defendants' potshots notwithstanding:

**\* Weekly Turnover**: Defendants do not dispute that the Preferred Stock traded above the volume benchmark used in *Cammer*, (DB16) that is dispositive in demonstrating a "substantial presumption," if not a "strong presumption" in favor of market efficiency.[13]

 **\* Analyst Coverage:** Defendants concede that, pre-Buyout (i.e., for most of the Class

---

[10] *Contra* Defendants, the Second Circuit has "repeatedly declined to adopt a particular test for market efficiency" and held that there are "no distinct requirements" for proving it. OB13 (citations omitted); *see also* RR ¶¶ 130, 141-142 (demonstrating that the interest rate study is supported by the literature). In another potshot, Defendants claim that Feinstein opined in other cases that certain preferred securities traded efficiently, even though their price did not correlate with interest rates. DB14. Defendants ignore that those securities offered variable, rather than fixed, dividends, and thus "did not behave like fixed income securities." RR ¶140.

[11] RR ¶¶ 135-136 (reflecting table outlining the statistical basis for this confidence).

[12] RR ¶ 138. At any rate, the criticism is methodologically unsupportable. RR ¶¶ 133-136, 143-147 (Feinstein explaining how the regression analyses demonstrate that Preferred Stock responded to company information, and did not merely correlate with interest rates).

[13] *Cammer v. Bloom*, 711 F. Supp. 1264, 1293 (D.N.J. 1989). Defendants' claim, supported by no legal authority, that Feinstein should have analyzed "each week individually," DB16, turns *Cammer,* which inquires into *average* trading volume, on its head. By definition, there will be weeks that trade below the average; *see also* RR ¶¶ 44-49 (rebutting Khare's contentions and explaining why his proposed 3.3% "benchmark" is meritless here); RR ¶¶ 34-38 (explaining how Khare conflates "benchmark" with "median").

Period), AmTrust had extensive analyst coverage but deem it significant that most analysts followed the common stock and AmTrust more generally. This is not surprising, given that the common stock was more volatile than the Preferred Stock, and more sensitive to company news like earnings releases.[14]  Defendants also pounce on the fact that most (but not all) analysts not surprisingly terminated coverage of AmTrust following the Buyout, but in doing so mischaracterize Feinstein's testimony.[15]

**\* Market Makers and Institutional Ownership:** By dint of trading on the NYSE, arguably the "most liquid, and most efficient forum[] in the world," the Preferred Stock traded through, at the very least, a "Designated Market Maker." OB16.  Defendants' claim that trading on the NYSE "does not necessarily indicate that the market for that particular security is efficient," DB18, is not true,[16] and in any event distracts from the fact that market makers for the benefit of traders of Preferred Stock *existed*, which is all this *Cammer* factor inquires into.  Regarding the related issue of institutional holdings, Defendants (through Khare) also claim that only a "small fraction" of Preferred Stock was owned by institutions, but Khare does not know this, as he relies entirely on the data supplied by Feinstein, who admitted that his sample was likely under-representative, as institutions are not required to report preferred stockholdings. OB22.  In fact, Khare's own analysis reflects that self-reporting institutions alone owned at least 21.7% and 22.2% of Series E and Series F Preferred Stock.  KR ¶ 174; *see* RR ¶¶ 64-67 (rebutting Khare's points regarding institutions).

**\* SEC Form S-3 Eligibility:** Defendants acknowledge AmTrust was eligible to file a Form S-3, thereby meeting this *Cammer* factor, but claim it should be overlooked because Plaintiff has purportedly failed other *Cammer* factors.  DB19.  This is illogical, and an

---

[14] RR ¶¶ 50-59 (rebutting Khare's contentions, and noting that coverage levels were well within the benchmark); *cf. In re HealthSouth Corp. Sec. Litig.,* 261 F.R.D. 616, 635 (N.D. Ala. 2009) (coverage of the "equities also provided information of interest to the bond market when concerned with the overall financial health of the issuing firm."). The cases cited by Defendants concerned securities with unique characteristics, rendering general analyst coverage of the issuer to be less pertinent in determining whether this *Cammer* factor was met.  *See In re Am. Int'l Group Inc. Secs. Litig.,* 265 F.R.D. 157 (S.D.N.Y. 2010) (in case vacated by Second Circuit, coupon bonds at issue were not even "discussed" by analysts covering issuer's other debt securities); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 205-06 (2d Cir. 2008) (value of certificates was "tied to the performance of the underlying mobile homes, and only incidentally to the performance of [the issuer] or its subsidiaries").

[15] Specifically, Feinstein stated that, in connection with this *Cammer* factor solely for *analyst coverage* during Interval-2, "the evidence does not support a finding of market efficiency, but neither does it necessarily indicate inefficiency." OR ¶ 120.  Defendants quote the former portion of the sentence but not the latter. DB17; *see* OB15 (citing authority that even one firm publishing reports support efficiency).  Analysts aside, Feinstein noted that there were at least 463 articles about AmTrust published during the Class Period, including 52 published *after* the Buyout. OR ¶ 122. There were even reports specifically analyzing the Preferred Stock. OR ¶ 118. The extensive, repeated coverage of AmTrust in the national financial press (including *The Wall Street Journal, Barron's*, and *Reuters*) is quite distinguishable from the "random" local coverage belittled in *O'Neil v. Appel,* 165 F.R.D. 479 (W.D. Mich. 1996) (DB18).  Feinstein thus opined that given all indicia of efficiency, not just analyst coverage, that the Preferred Stock did trade in an efficient market through the entire Class Period, including in the post-Buyout period.

[16] *See* RR ¶¶ 40-43 (noting that a NYSE-traded stock "enjoys a well-developed market making infrastructure"); *see also Lumen v. Anderson*, 280 F.R.D. 451, 459-60 (W.D. Mo. 2012) (there are cases "too numerous to cite" establishing that NYSE-traded securities "are at least entitled to a presumption of efficiency—making it incumbent upon Defendants to rebut the presumption"); *accord Barclays*, 310 F.R.D. at 83.

attempt to eviscerate a factor inconvenient to Defendants.[17]

**\* Market Capitalization:**  Market capitalization is the value of a company's outstanding common equity.  OR ¶ 146.  Feinstein noted that regardless of whether one solely analyzed AmTrust's common stock's value, or solely analyzed the Preferred Stock, the value of either stock exceeded the market cap of most publicly traded companies.  OB20-21.  Defendants claim that Feinstein should not have analyzed the "aggregate" value of the Preferred Stock, but instead should have analyzed each series of Preferred Stock in isolation.  But even if one analyzed each series individually, Defendants cite no legal authority stating their individual value would be so minimal as to invoke a presumption against market efficiency.  Second, and more fundamentally, Defendants wholly fail to demonstrate why each Preferred Stock series, which have near-identical terms and characteristics, should be analyzed in isolation.[18]

**\* Bid-Ask Spread:**  Defendants ignore the recent authority holding that the bid-ask spread of a particular preferred security, which was more than twice the bid-ask spread for the AmTrust Preferred Stock, was indicative of market efficiency.  OB21 (citing OR ¶ 159 & *Teva*)).  Similarly, Defendants continue to make an apples-to-oranges comparison, between the spread of the Preferred Stock and *common* stock, and in any event, the spread reflected in the comparison would still "marginally" help Plaintiff more than Defendants. *See* OB21-22 (citation omitted); *see also* RR ¶¶ 70-73 (Khare used inappropriate spread benchmark).

## B.    Plaintiff Has Shown That Damages are Measurable on a Class-wide Basis

Defendants' claim that Feinstein has not articulated a viable class-wide damage theory as required under *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), is meritless.  Defendants appear to suggest that Feinstein must tease out, at this stage, the stock price decline attributable to fraud from non-fraud (i.e., "confounding") factors.  DB22.  But that is clearly not the law.[19] Without explicitly stating what they are attempting, Defendants are improperly asking the Court to require Plaintiff

---

[17] OR, Sec. A (identifying the various "areas of agreement" among Feinstein and Khare, one of which was AmTrust's "S-3 Registration Eligibility").

[18] Defendants conclusorily claim that there were "distinct trading characteristics" for each series (DB20 (citing KR ¶ 135)), but this is an oversimplification, and importantly has no bearing on analyzing this *Cammer* factor. RR ¶¶ 68-72 (noting why there is no basis to disaggregate each series, and noting that "the SEC has weighed in on this issue, and disagrees with Khare's contention," as did A.M. Best, which rated all series together).

[19] *Strougo v. Barclays PLC,* 312 F.R.D. 307, 327 (S.D.N.Y. 2016) (purported failure to disaggregate losses purportedly attributable to confounding factors would not defeat predominance because the issue "would affect all class members in the same manner"); *In re Signet Jewelers Ltd. Sec. Litig.,* 2019 WL 3001084, at *20 (S.D.N.Y. July 10, 2019) (disaggregation not required); *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 328 F.R.D. 86, 99 (S.D.N.Y. 2018) (predominance met even though expert "d[id] not eliminate any alternative causes or contributing factors").

to affirmatively prove loss causation at this stage.[20]   More fundamentally, to the extent the Preferred Stock's price decrease was caused by any of the non-fraud-related factors identified by Defendants—an extremely dubious proposition[21]—Feinstein demonstrates that his model will analyze such factors in determining damages, and will do so commonly for all Class members. OR ¶¶ 219-224; RR ¶ 148-157.  Despite their attempts to obfuscate, the circumstances surrounding (i) Defendants' fraud, (ii) its revelation, and (iii) the market's reaction to both events, is straightforward, which means that the methodologies to be used in analyzing out-of-pocket damages—accepted in nearly every Section 10(b) case—will also be straightforward, or at the very least, "measurable on a class-wide basis."[22]  It is no surprise that Defendants are unable to cite to any case with remotely similar facts supporting their argument.[23]

---

[20] *Barclays*, 310 F.R.D. at 99 ("plaintiffs are not required to demonstrate either loss causation or damages for purposes of class certification"); *id.* (existence of confounding information during five-year-long class period did not suggest that "individualized damages issues will … predominate" in light of the "minimal scrutiny required under *Comcast* and Rule 23(b)(3)"); *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 47-48 (S.D.N.Y. 2018) (the existence of confounding factors constitutes loss causation issue that "goes beyond the Rule 23 inquiry") (citing authority).

Defendants also claim that Feinstein "fails to provide any specific methodology for determining the price impact, if any, of the purported misrepresentation."  DB22.  While the charge is not true (*see, e.g.*, RR ¶¶ 152-156 (noting valuation methods to be used and rebutting all of Khare's "tilting at windmills" criticisms regarding damages methodology)) "plaintiffs are not required at [the Rule 23] stage to demonstrate that any price impact was due to…misrepresentations alone." *Pirnik*, 327 F.R.D. at 46, 48-49; *Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, at \*17 (S.D.N.Y. Aug. 13, 2018) (same; rejecting the defendants' contentions that Feinstein must identify which valuation tools he will use in determining inflation: as "plaintiffs do not even have a burden to produce a classwide damages model at this time, such specificity is not required at this stage of the proceedings, and defendants have not cited any case holding otherwise") (citations omitted); *see also Monroe Cty. Employees' Ret. Sys. v. S. Co.,* 332 F.R.D. 370, 399 (N.D. Ga. 2019) (absent comprehensive merits discovery, "it would be inappropriate for Professor Feinstein to conclusively state which [tools] he would use").

[21] For example: losses attributable to a "change in trading venue [from the NYSE]" (DB22) derive from Plaintiff's fraud theory concerning the delisting. RR ¶ 152.  Similarly, investor "expectations concerning the payment of dividends" (DB22) is also a feigned confounding factor, as AmTrust, on the same day it announced the delisting, issued a companion press release titled "AmTrust Announces Quarterly Cash Dividends on Preferred Stock."

[22] OB23 (citation omitted); *Waggoner v. Barclays PLC*, 875 F.3d 79, 105-06 (2d Cir. 2017) (*Comcast* only requires that plaintiff's damages model "track [his] theory of liability").

[23] *Kottaras v. Whole Foods Market, Inc.*, a pre-*Comcast* antitrust case, concerned a regression analysis that only looked at one side of the ledger regarding price increases resulting from a merger, thereby "fail[ing] to take into account any benefits customers may have received." 281 F.R.D. 16, 24 (D.D.C. 2012).  In *In re Conagra Foods, Inc.,* the plaintiff's expert had not demonstrated that his "hedonic regression and conjoint analysis" was capable of identifying a price premium in cooking oils resulting from allegedly misleading marketing materials touting the oils as "100% Natural." 302 F.R.D. 537, 577-578 (C.D. Cal. 2014).  Here, by contrast, Feinstein has put forth no such ambitious damages theory. *Fort Worth Employees Retirement Fund v. J.P. Morgan Chase & Co.* (DB21) was not a Section 10(b) action,

### C.    Plaintiff's Claims are Typical of the Class's

Defendants claim Plaintiff's "admissions" that he purchased Preferred Stock given his belief that the market undervalued them places him "at odds" with the classwide allegations of reliance and damages, rendering him atypical. DB23-24.   However, "courts are generally skeptical" to atypicality defenses "based on conflicts between…class members" and will consider them only if they put class interests "in significant jeopardy."[24]  Such skepticism is warranted here, as the class faces no jeopardy whatsoever. Specifically, Plaintiff purchased Preferred Stock, as Defendants acknowledge, *because he took them at their word when they said they would not delist it,* and in reliance on the market price.  DB23.  Defendants are perversely arguing that because they succeeded in defrauding Plaintiff (despite his diligence), he is atypical.  The opposite is true.

As Plaintiff relied on Defendants' assurances, it is irrelevant that one of his other motivations in purchasing the Preferred Stock was his belief that Defendants were unlikely to delist the stock because doing so would impact AmTrust's ability to raise capital in the future from the fixed income markets: the market undoubtedly *did* ascribe a considerable value to Defendants' representations that the Preferred Stock would remain listed.[25]  That Plaintiff thought he had an

---

but rather concerned the "difficult process of valuing the complex asset-backed securities that underlie [certain illiquid] Certificates." 301 F.R.D. 116, 141–42 (S.D.N.Y. 2014).  Moreover, the case predates several important binding Second Circuit decisions, such as *Waggoner,* and is likely no longer good law.  *Id.* ("The Second Circuit has not yet made a definitive assessment of *Comcast's* effects.").

Defendants also cannot resist citing to *OPERS*.  DB22-23.  However, *OPERS* was focused on market efficiency, with the court proceeding to note—without any serious analysis—that Feinstein's testimony was also lacking under *Comcast.*  Importantly, whatever defects *OPERS* identified in Feinstein's analysis are nonexistent here.  As discussed, Feinstein's proposed methodology is not "vague," and *OPERS*'s charge that he must specify, at the class certification stage, the "tools" available to him to measure out of pocket damages, 2018 WL 3861840, at *19, is simply not an accurate reading of *Comcast,* as *Waggoner* held.  Moreover, Feinstein *has* identified the tools he intends to use. *See* OR ¶ 222; RR ¶¶ 152-156.  At best, Defendants' argument is premature: in the (nearly-impossible) event that Feinstein ultimately "fails to make good on his promises," they can always move to decertify the class. *Pub. Emples. Ret. Sys. of Miss. v. TreeHouse Foods, Inc.,* 2020 WL 919249, at *9 n.8 (N.D. Ill. Feb. 26, 2020).

[24] *In re Bulk (Extruded) Graphite Prods. Antitrust Litig.,* 2006 WL 891362, at *8 (D.N.J. April 4, 2006) (citing authority); *see also* OB7 (citing authority noting that typicality is "not demanding").

[25] *See, e.g.,* OR ¶¶ 196-197 (noting that Preferred Stock price rose sharply on January 22, 2018 upon the Individual Defendants' assurance that it was their intention to keep the stock listed, post-Buyout).

9

additional piece of insight the market lacked does not render him atypical; in fact, it would make him typical of every other investor trying to beat the market. Nor would his motivation somehow call into question the presumption that the market for Preferred Stock was efficient.[26]

### D.   Defendants' Two Proposed Class Exclusions are Inappropriate

Defendants' attempt to exclude purchasers during Interval-2 (DB25) wrongly assumes that the Preferred Stock did not trade efficiently during this period. Defendants' attempt to exclude any persons who sold shares before the end of the Class Period (*id.*) is "entirely unnecessary" and "also premature," given that Defendants have not shown that such persons were unharmed.[27]

## II.   CONCLUSION

As stated herein and in the OB, Plaintiff's Motion should be granted in its entirety.

---

[26] *In re Computer Science Corp.* 288 F.R.D. 112, 123 (E.D. Va. 2012) ("Most investors purchase stock based on the belief that the market is…undervaluing the stock" and this does not mean "that the market does not reflect a collective assessment of currently available information."); *see also In re Diamond Foods, Inc.*, 295 F.R.D. 240, 250-51 (N.D. Cal. 2013) ( "tak[ing] advantage of market inefficiencies," i.e., an investor's "subjective belief that its model was smarter than other[s]" does not show "that the market is inefficient"); *Moskowitz v. Lopp,* 128 F.R.D. 624, 631 (E.D. Pa. 1989) ("divergent motivations in purchasing shares does not defeat [*Basic*] presumption absent convincing proof that price played *no* part whatsoever in [investors'] decision making") (emphasis in original).

Defendants' cases are inapposite, and show how hollow their argument is. In *McGuinness v. Parnes*, 1988 WL 66214 (D.D.C. Jun. 17, 1988), the defendants put forth convincing evidence that the plaintiff would have purchased stock even if he knew "that information about the company's future was false," *id.* at *3, a "non-reliance" defense absent here, given that Plaintiff purchased his stock in reliance on the challenged statements. In *Blackrock*, the plaintiffs suffered no out of pocket losses, and were thus compelled to craft a sui generis "benefit-of-the-bargain damages theory" that would likely derail the litigation and prejudice other class members. *See BlackRock Balanced Cap. Portfolio v. Deutsche Bank Nat'l Tr. Co.,* 2018 WL 5619957, at *9 (S.D.N.Y. Aug. 7, 2018). Here, by contrast, Plaintiff, like, all class members, suffered out of pocket losses, and, as discussed, his motivations for purchasing the stock are unremarkable for a public investor. These facts will most assuredly *not* derail a trial. (Moreover, as a practical matter Defendants have a strategic reason not to press before the trier of fact a "we-were-so-untrustworthy-that-the-market-didn't-believe us" defense.) *Abu Dhabi Commerical Bank v. Morgan Stanley & Co. Inc.*, 269 F.R.D. 252, 262 (S.D.N.Y. 2010) was a common law fraud case where the inquiry into each class member's reliance was required, and, moreover, the court did not even address the issue of typicality.

[27] *See Haw. Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Entm't Holdings, Inc.,* 2021 WL 1198799, at *9 (S.D.N.Y. Mar. 30, 2021) (rejecting request to exclude such "in-and-out" purchasers). For example, investors who sold some, but not all Preferred Stock during the Class Period, are still damaged.

DATED: June 1, 2021                              Respectfully submitted,

**WOLF POPPER LLP**

By:_____

Carl L. Stine
Patricia I. Avery
Adam J. Blander
845 Third Avenue, 12th Floor
New York, New York 10022
(212) 759-4600

*Counsel for Lead Plaintiff*
*And the Putative Class*

11