**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |
|---|
| JAN MARTÍNEK,<br><br>                      Plaintiff<br><br>        v.<br><br>AMTRUST FINANCIAL SERVICES, INC.,<br>BARRY D. ZYSKIND, GEORGE KARFUNKEL,<br>AND LEAH KARFUNKEL,<br><br>                      Defendants |

Case No. 1:19-cv-08030-KPF

REBUTTAL REPORT OF

PROFESSOR STEVEN P. FEINSTEIN, PH.D., CFA

JUNE 1, 2021

**TABLE OF CONTENTS**

I.      SCOPE OF PROJECT AND REPORT ...................................................................1

II.     SUMMARY OF OPINIONS ..............................................................................2

III.    CRITIQUE OF THE KHARE REPORT .................................................................4

        A.      Areas of Agreement ...............................................................................4

        B.      The *Cammer* and *Krogman* Factors Are Indeed Dispositive..................11

        C.      Dr. Khare's Manipulation of *Cammer/Krogman* Test Thresholds Produces
                Misleading Results................................................................................15

        D.      Dr. Khare's Criticism of the *Cammer*/*Krogman* Factor Analysis .........17

                1.      Listing on the NYSE and Numerous Market Makers.................17

                2.      Trading Volume .........................................................................18

                3.      Analyst Coverage and Other Avenues of Information
                        Dissemination ...........................................................................19

                        a.      Analyst Coverage............................................................19

                        b.      News Coverage ...............................................................23

                4.      Institutional Ownership.............................................................24

                5.      Market Capitalization................................................................25

                6.      Bid-Ask Spread .........................................................................26

        E.      My Event Study Analysis and Dr. Khare's Erroneous Criticisms.........28

                1.      My Market Efficiency Event Study Design Was Proper ..........28

                2.      The Three Dates I Tested Were Appropriate Test Events .........29

                3.      Dr. Khare Is Wrong to Exclude the Corrective Disclosure ......33

                4.      Dr. Khare Contends that AmTrust's Earnings Announcements
                        Should Have Been Included in the Event Study........................34

                5.      Dr. Khare's Six Additional Dates Are Not Appropriate Events for
                        an Event Study Testing the Efficiency of the AmTrust Preferred
                        Share Market.............................................................................38

                        a.      1 March 2018 .................................................................40

                        b.      25 May 2018 ..................................................................41

                        c.      4 June 2018 ...................................................................41

                        d.      7 June 2018 ...................................................................42

                        e.      21 June 2018 .................................................................43

                        f.      28 November 2018.........................................................43

                        g.      Summary of Dr. Khare's Six Additional Event Dates.........44

F.     The AmTrust Preferred Share Prices Reacted Day-to-Day in Response to Interest Rates..................................................................................................44

     1.    The Preferred Shares Index Does Reflect Market Interest Rates ..............45

     2.    Other Valuation-Relevant Information Incorporated in the Preferred Shares Index ...................................................................47

     3.    The Petrobras and Eletrobras Preferred Shares ........................................47

     4.    Econometric Evidence of Market Efficiency.............................................48

     5.    The Market Factor, Sector Factor, and Company Information..................48

G.     Dr. Khare's Criticism of The Generally Accepted Out-of-Pocket Damage Methodology Amounts to Him Tilting at Windmills ............................................50

IV.     LIMITING FACTORS AND OTHER ASSUMPTIONS.....................................................53

## I.    SCOPE OF PROJECT AND REPORT

1.    In my expert report dated 15 March 2021 ("Feinstein Report"), I reported that I conducted an analysis to assess the efficiency of the market in which the AmTrust Preferred Shares traded during the period from 22 January 2018 through 18 January 2019, inclusive (the "Class Period").[1] The analysis I conducted was the widely used and generally accepted market efficiency analysis. Specifically, I analyzed the *Cammer* and *Krogman* factors, including an empirical event study, which are generally accepted as indicative of the efficiency of the market in which a security trades.

2.    In the Feinstein Report, I showed that the AmTrust Preferred Shares satisfied all of the *Cammer* and *Krogman* factors.[2] The *Cammer* and *Krogman* factor findings, in particular, the New York Stock Exchange listings, the active trading volume, the observed swift and significant responses of the trading prices to important Company information, and the statistically significant relationship to market interest rates on a day-to-day basis, are compelling evidence that the AmTrust Preferred Shares traded in an efficient market throughout the Class Period.[3] Based on the evidence and analysis, I concluded that the AmTrust Preferred Shares traded in an efficient market over the course of the entire Class Period, including within each subinterval.

3.    I also explained in the Feinstein Report that Section 10(b) damages for all Class Members could be computed using a common methodology, the standard out-of-pocket damage model typically applied in Section 10(b) class action securities cases.[4]

4.    I am now asked by Wolf Popper LLP, Counsel for Plaintiff, to consider, evaluate, and respond to the arguments and conclusions in the Expert Report of Alok Khare dated 30 April 2021 (the "Khare Report"), which was submitted by Defendants in this matter. Dr. Khare was asked to evaluate whether: (i) "Prof. Feinstein has reliably demonstrated 'that the AmTrust Preferred Shares traded in an efficient market over the course of the Class

---

[1] Unless otherwise indicated, capitalized terms used herein have the meaning ascribed to them in the Feinstein Report.

[2] Feinstein Report, ¶¶17-28, ¶¶81-215.

[3] Feinstein Report, ¶18, ¶27, ¶¶206-215.

[4] Feinstein Report, ¶¶216-226.

Period'";[5] and (ii) "Prof. Feinstein has provided a common damages methodology that can reliably estimate damages attributable to Plaintiff's theory of liability."[6]

5. This report presents my response to the Khare Report.

6. Documents that I reviewed and relied upon in preparing this report in addition to those already cited in my previous report are listed in Exhibit-1. My credentials and compensation are presented in the Feinstein Report, as is a list of testimony that I provided during the four years preceding that report. Testimony that I provided subsequent to the submission of the Feinstein Report is presented in Exhibit-2.

7. I reserve the right to amend, refine, or modify my opinion and report, including in the event any new or additional information or analysis becomes available.

## II. SUMMARY OF OPINIONS

8. The Khare Report provides no basis for revising my conclusion that the AmTrust Preferred Shares traded in an efficient market during the Class Period. I correctly conducted the widely used and generally accepted market efficiency analysis, and I applied generally accepted and well-supported standards. The findings clearly indicate that the AmTrust Preferred Shares traded in an efficient market throughout the Class Period.

9. While Dr. Khare writes that he analyzed and evaluated my analysis and conclusions, the product he submitted shows that he interpreted his assignment to be to concoct every conceivable criticism, no matter how spurious, speculative, or specious. Dr. Khare's conclusion that the evidence and my analysis do not indicate market efficiency rests on his mistakes, his misrepresentations, and his misunderstanding of mainstream market efficiency analysis. Dr. Khare's challenge to not only my work in this matter but also to the generally accepted and widely used market efficiency assessment methodology places him outside the mainstream of academic and forensic economics. He raises no valid arguments and no legitimate challenges. Consequently, my analysis and the conclusion compelled by the evidence and my analysis stand.

---

[5] Khare Report, ¶3.

[6] Khare Report, ¶3.

10. The AmTrust Preferred Shares traded on the NYSE with additional market makers facilitating trading in the securities. Trading volume for all series was above 1% turnover per week during Interval-1, the level warranting a substantial presumption of market efficiency. During Interval-2, all series had weekly turnover above 2%, exceeding the level for a strong presumption of market efficiency. AmTrust satisfied the S-3 eligibility criteria *Cammer* factor. Analyst coverage was broad at the start of the Class Period but thinned out as it became clear the common equity would be taken private. However, even after the common stock was taken private, *FactSet* reported that one analyst continued to follow AmTrust and provided financial forecasts. Numerous institutions owned AmTrust Preferred Shares. The bid-ask spreads for the AmTrust Preferred Shares were narrower than the average bid-ask spreads prevailing at the time of the 2001 *Krogman* decision that recognized narrow bid-ask spreads as an indicator of market efficiency. The bid-ask spreads also satisfied the standard for market efficiency applied in other securities cases. The total outstanding value of the AmTrust Preferred Shares was very large throughout the Class Period – larger than even the total market capitalizations of most publicly traded companies in the United States.

11. Event study analysis and regression analysis provide conclusive evidence in favor of market efficiency. All Preferred Shares exhibited highly significant price reactions immediately after important Company news events. The event study proves that there was a cause-and-effect relationship between the release of Company information and swift significant movements in the AmTrust Preferred Share prices, which is the hallmark of an efficient market. The only reasonable inference from this cause-and-effect relationship is market efficiency, and Dr. Khare offers no explanation for what else could have caused statistically significant market reactions on important news dates other than market efficiency.

12. Additionally, each of the Preferred Share series exhibited a highly statistically significant relationship to day-to-day changes in the market-wide Preferred Shares Index, which reflects market interest rates, a predominant market factor that drives preferred share valuations. This empirical result and the event study prove that available valuation-relevant information was quickly incorporated into the trading prices of the

Preferred Shares. No impediments to information flow or trading prevented the efficient incorporation of information.

13. Dr. Khare makes no argument about price impact, and he did not conduct a price impact analysis. He did not seek to assess whether the misrepresentations alleged by the Plaintiff had any impact on the price of AmTrust Preferred Shares during the Class Period. Dr. Khare offers no opinion about price impact generally, and certainly no opinion that the misrepresentations and omissions had no impact on the price of the AmTrust Preferred Shares.

14. While Dr. Khare raises some concerns about the ultimate implementation of the damage model, he does not dispute my conclusion in the Feinstein Report that damages can be computed for all Class Members using a common damage methodology that is consistent with Plaintiff's theory of liability. He does not challenge the existence, applicability, or feasibility of the out-of-pocket damage methodology for computing damages for all Class Members. The specific implementation details Dr. Khare points to – the alternative valuation of the Preferred Shares under a "but-for" scenario of no misrepresentations and omissions, and the exclusion of the valuation effects of confounding information – are not unusual and certainly not unique to this case. Should the potential complexities Dr. Khare mentions be encountered in the implementation of the damage model, they will be addressed in a common manner for all Class members. It is noteworthy that Dr. Khare's concern that non-fraud-related confounding information impacted the Preferred Share prices and therefore must be excluded from the measure of damages, implicitly acknowledges that the Preferred Shares incorporated available information and therefore traded in an efficient market.

## III.    CRITIQUE OF THE KHARE REPORT

### A.    Areas of Agreement

15. Dr. Khare does not dispute any of my findings concerning the following *Cammer* and *Krogman* factors, which indicate the efficiency of the market for the AmTrust Preferred Shares during the Class Period:

i.   **Trading Platform** – AmTrust Preferred Shares traded on the NYSE throughout the Class Period.[7]

ii.  **Trading Volume** – The average weekly trading volumes for all AmTrust Preferred Shares during the Class Period and in Interval-1 exceeded the 1% turnover level, which was acknowledged by the *Cammer* court and numerous courts subsequently to be the threshold for a substantial presumption of market efficiency. The average weekly trading volumes for all AmTrust Preferred Shares during Interval-2 exceeded the 2% turnover level, which has been accepted by the *Cammer* court and numerous courts subsequently to be the threshold for a strong presumption of market efficiency.[8]

iii. **Analyst Coverage** – During the Class period, five analyst companies published reports on AmTrust, and two Panther Investments reports were published on *Seeking Alpha*. During Interval-2, the *FactSet* consensus survey reported that at least one analyst continued to cover AmTrust and provide financial forecasts.[9]

iv.  **News Articles -** There were at least 463 news articles published about the Company during the Class Period. At least 411 articles about the Company were published during Interval-1, and 52 were published during Interval-2.[10] Dr. Khare claims to have found an even greater number of articles published about the Company during the Class Period.[11]

v.   **Institutional Ownership** – 12 major institutions voluntarily reported that they owned AmTrust Preferred Shares during the Class Period. Institutional ownership was reported for all series, except Series A. Ownership of the Preferred Shares was reported in Interval-1 by 12

---

[7] Feinstein Report, ¶¶103-110.

[8] Feinstein Report, ¶¶111-114.

[9] Feinstein Report, ¶¶115-120.

[10] Feinstein Report, ¶¶121-123.

[11] Khare Report, Footnote 169.

institutions and in Interval-2 by 7 institutions.[12] As ownership of preferred shares by institutions is voluntary, there may have been even more widespread institutional ownership than these reported figures.

vi.  **S-3 Registration Eligibility** – The Company had outstanding non-convertible securities other than common equity of at least $750 million, which satisfies the size requirement for S-3 registration throughout the Class Period.[13] Additionally, the Company regularly filed financial reports with the SEC throughout the Class Period.[14] Despite a late 10-K filing prior to the Class Period, the Company satisfied the S-3 Registration Eligibility *Cammer* factor throughout the Class Period.[15]

vii.  **Market Capitalization** – During Interval-1, the Company's market capitalization averaged $2.71 billion,[16] making AmTrust larger than 79% of all US companies by size.[17] Throughout the Class Period, the aggregate market capitalization of just the AmTrust Preferred Shares alone averaged $665.4 million.[18] This average outstanding value of the Preferred Shares was larger than the respective market capitalizations of 58% of all publicly traded companies in the US.[19] The average aggregate market capitalization of the AmTrust Preferred Shares was $692.2 million during Interval-1, and $494.4 million in Interval-2.[20] In both intervals, the outstanding market capitalization of the Preferred Shares alone (excluding common equity) ranked within the 5th decile of market capitalizations of all US companies.[21]

---

[12] Feinstein Report, ¶¶124-129.

[13] Feinstein Report, ¶¶138-139.

[14] Feinstein Report, ¶140.

[15] Feinstein Report, ¶¶20 and 143.

[16] Feinstein Report, ¶146.

[17] See, Errata to the Feinstein Report, dated 7 April 2021, reference ¶146. Also presented in Exhibit-3 of this Report.

[18] Feinstein Report, ¶148.

[19] See, Errata to the Feinstein Report, dated 7 April 2021, reference ¶148.

[20] Feinstein Report, ¶149.

[21] See, Errata to the Feinstein Report, dated 7 April 2021, reference ¶149.

viii. **Float** – Almost all of the Preferred Shares were in public float and were therefore available for trading during the Class Period.[22] The float of the AmTrust Preferred Shares in aggregate averaged $662.13 million over the Class Period,[23] which was larger than the market capitalizations of at least 58% of all publicly-traded companies in the US.[24]

ix. **Bid-Ask Spread** – The average bid-ask spreads for the AmTrust Preferred Shares over the course of the Class Period for Series A, B, C, D, E, and F were 1.36%, 1.03%, 1.22%, 0.79%, 1.04%, 0.67%, respectively.[25] For Interval-1, the average bid-ask spreads for Series A, B, C, D, E, and F were 1.25%, 0.96%, 1.02%, 0.75%, 0.99%, and 0.59%, respectively.[26] For Interval-2, the average bid-ask spreads for Series A, B, C, D, E, and F were 2.08%, 1.50%, 2.50%, 1.03%, 1.40%, and 1.16%, respectively.[27] The bid-ask spreads among the AmTrust Preferred Shares were therefore narrower than the average bid-ask spread of 3.70% prevailing at the time of the *Krogman* opinion.[28] Dr. Khare does not dispute that the AmTrust Preferred Share bid-ask spreads were narrower than the spreads deemed to weigh in favor of market efficiency in the very recent *Teva Securities Litigation* decision and in the *Cyberguard* and *Electronic Game Card* cases.[29]

16.    Dr. Khare adopts all elements of my regression analysis. In particular, he accepts and even adopts for his own use the following:

---

[22] Feinstein Report, ¶153.

[23] Feinstein Report, ¶151.

[24] See, Errata to the Feinstein Report, dated 7 April 2021, reference ¶151.

[25] Feinstein report, ¶156.

[26] Feinstein Report, Footnote 119.

[27] Feinstein Report, Footnote 119.

[28] Feinstein Report, ¶157, ¶158, and Footnote 119.

[29] Feinstein Report, ¶159.

i.    My choice of US Market Index;

ii.   My choice of Sector Index;

iii.  The inclusion of a market-wide preferred stock index as an explanatory variable driving the AmTrust Preferred Share prices;

iv.   My choice of the S&P Preferred Stock Index;[30]

v.    My choice of regression estimation period;[31]

vi.   My use of dummy variables to control for potentially atypical observations in the regression estimation period.[32]

17.    Dr. Khare does not contest what news transpired on 22 January 2018, nor that the Preferred Shares rose significantly in response to that news. That day, the Karfunkel-Zyskind Family filed a form with the SEC assuring investors that it was their "intention" to continue the listing of all Preferred Shares on the NYSE.[33]As shown in Table-1, all six series of AmTrust Preferred Shares increased in a statistically significant fashion in response to this announcement.

18.    Dr. Khare does not contest that the news event on 22 January 2018 was an appropriate news event for testing market efficiency. He includes this news event in his own event study.[34]

**Table-1: Regression Model Results for 22 January 2018**

| AmTrust Security | Logarithmic Return | Market Return | Preferred Shares Index | Sector Index Return | Explained Return | Residual Return | t-stat | |
|---|---|---|---|---|---|---|---|---|
| Series A | 8.00% | 0.76% | 0.29% | 0.46% | 0.74% | 7.26% | 3.88 | ** |
| Series B | 7.89% | 0.76% | 0.29% | 0.46% | 0.76% | 7.13% | 3.63 | ** |
| Series C | 7.09% | 0.76% | 0.29% | 0.46% | 0.61% | 6.47% | 3.55 | ** |
| Series D | 7.61% | 0.76% | 0.29% | 0.46% | 0.71% | 6.90% | 3.76 | ** |
| Series E | 8.55% | 0.76% | 0.29% | 0.46% | 0.87% | 7.69% | 3.67 | ** |
| Series F | 9.31% | 0.76% | 0.29% | 0.46% | 0.54% | 8.77% | 5.09 | ** |

**Note**: "**" indicates statistical significance at the 99% confidence level.

---

[30] Khare Report, ¶91.

[31] Khare Report, ¶91.

[32] Khare Report, ¶91.

[33] AmTrust Financial Services, Inc., Form SC 13D/A, filed 22 January 2018, accepted 6:11 AM, p. 5.

[34] Khare Report, Footnote 79.

19.    Dr. Khare does not contest what news transpired after the market close on 17 May 2018, nor that the Preferred Shares rose significantly in response to that news the next trading day. In this event, influential activist investor Carl Icahn released an open letter to the board of directors opposing the Go-Private Transaction. Mr. Icahn's letter stated, "I am one of your largest shareholders and own almost 9.4% of AmTrust Financial Services, Inc. ('AmTrust'). I am strongly AGAINST the proposed going-private transaction and intend to solicit proxies AGAINST the deal."[35] As shown in Table-2 below, all six series of AmTrust Preferred Shares increased in a statistically significant fashion in response to this development. Dr. Khare does not contest these facts. Nor does Dr. Khare contest that the news event on 17 May 2018 was an appropriate news event for testing market efficiency. Dr. Khare includes this news event in his own event study.[36]

**Table-2: Regression Model Results for 18 May 2018**

| AmTrust Security | Logarithmic Return | Market Return | Preferred Shares Index | Sector Index Return | Explained Return | Residual Return | $t$-stat | |
|---|---|---|---|---|---|---|---|---|
| Series A | 6.89% | -0.22% | 0.13% | -0.23% | 0.30% | 6.59% | 3.52 | ** |
| Series B | 7.73% | -0.22% | 0.13% | -0.23% | 0.40% | 7.33% | 3.74 | ** |
| Series C | 6.65% | -0.22% | 0.13% | -0.23% | 0.41% | 6.24% | 3.43 | ** |
| Series D | 7.05% | -0.22% | 0.13% | -0.23% | 0.35% | 6.70% | 3.65 | ** |
| Series E | 4.70% | -0.22% | 0.13% | -0.23% | 0.44% | 4.26% | 2.03 | * |
| Series F | 7.65% | -0.22% | 0.13% | -0.23% | 0.20% | 7.45% | 4.32 | ** |

Notes: "*" indicates significance at the 95% confidence level.
    "**" indicates significance at the 99% confidence level.

20.    Dr. Khare does not contest what news transpired after the market closed on 18 January 2019, nor that the Preferred Shares fell significantly in response to the news the next trading day. On 18 January 2019, after the close of trading, the Company announced that it would delist the AmTrust Preferred Shares from the NYSE.[37] Dr. Khare does not dispute that the delisting of the Preferred Shares is precisely what the alleged misrepresentations and omissions, and the instant lawsuit, are about. It is a generally

---

[35] AmTrust Financial Services, Inc., Form SC 13D, filed 17 May 2018, accepted 4:15 PM, Exhibit-2; and Feinstein Report, ¶180.

[36] Khare Report, ¶95.

[37] AmTrust Financial Services, Inc., Form 8-K, filed 18 January 2019; and Feinstein Report, ¶180.

9

accepted financial valuation principle, supported by abundant peer-reviewed research, that delisting is an important, negative, valuation-relevant event.

21.    As shown in Table-3 below, all six series of AmTrust Preferred Shares decreased in a statistically significant fashion in response to the information released on 18 January 2019 (Friday) after the close of trading. Dr. Khare does not contest this fact. Dr. Khare agrees that the market prices fell significantly in reaction to the delisting announcement.[38]

**Table-3: Regression Model Results for 22 January 2019**

| AmTrust Security | Logarithmic Return | Market Return | Preferred Shares Index | Sector Index Return | Explained Return | Residual Return | t-stat |
|---|---|---|---|---|---|---|---|
| Series A | -46.45% | -1.43% | -0.41% | -1.02% | -1.09% | -45.36% | -24.24 ** |
| Series B | -45.89% | -1.43% | -0.41% | -1.02% | -1.04% | -44.85% | -22.86 ** |
| Series C | -51.88% | -1.43% | -0.41% | -1.02% | -0.77% | -51.11% | -28.05 ** |
| Series D | -44.22% | -1.43% | -0.41% | -1.02% | -0.98% | -43.24% | -23.57 ** |
| Series E | -48.64% | -1.43% | -0.41% | -1.02% | -1.14% | -47.50% | -22.68 ** |
| Series F | -46.13% | -1.43% | -0.41% | -1.02% | -0.88% | -45.25% | -26.23 ** |

**Note**: "**" indicates statistical significance at the 99% confidence level.

22.    Dr. Khare does not dispute that all three news events were important information events and that they each elicited statistically significant reactions in the trading prices of the AmTrust Preferred Securities.

23.    The event study results are empirical proof of a cause-and-effect relationship between the release of Company information and changes in the AmTrust Preferred Share market prices. Reacting to these events, the AmTrust Preferred Shares demonstrated informational market efficiency.

24.    Dr. Khare does not dispute that according to the regression analysis, for each of the Preferred Share return series, the S&P Preferred Stock Index was a statistically significant explanatory variable to which the prices of the AmTrust Preferred Shares responded on a consistent day-to-day basis. While Dr. Khare incorrectly contends that the S&P Preferred Stock Index is not a representation of market interest rates, he does

---

[38] See, "Based on statistically significant price reactions following these three events, Prof. Feinstein concludes that 'the AmTrust Preferred Shares demonstrated informational market efficiency' during the entire one-year Proposed Class Period." (Khare Report, ¶62).

accept that the index represents market-wide information that is relevant to the valuation of the AmTrust Preferred Shares.[39] As such, Dr. Khare implicitly accepts that the regression analysis proves that the AmTrust Preferred Shares responded to and reflected market-wide, valuation-relevant information on a consistent day-to-day basis.

### B.    The *Cammer* and *Krogman* Factors Are Indeed Dispositive

25.    Among the most egregious errors underlying Dr. Khare's erroneous opinion is his wholesale disregard of the *Cammer* and *Krogman* factors, with the exception of the fifth *Cammer* factor, as indicators of market efficiency. Dr. Khare incorrectly states:

> "Courts sometimes also examine so-called structural factors, which can provide indirect evidence of market efficiency by demonstrating the existence of conditions that facilitate the existence of an efficient market. These structural factors are rarely, if ever, sufficient to demonstrate market efficiency on their own; they are best used to buttress a finding of market efficiency that is primarily based on direct evidence of the requisite cause-and-effect relationship."
> **Khare Report, ¶120.**

26.    Dr. Khare either misunderstands or misrepresents the vast majority of prior court opinions in class action securities cases. Contrary to Dr. Khare's representation, courts in all circuits routinely rely on the full set of *Cammer* and *Krogman* factors to determine whether a security market is efficient. Representative opinions from cases in the Second Circuit include those rendered in the *Petrobras Securities Litigation*, *Waggoner v. Barclays*, and the very recent opinion in *Pearlstein v. Blackberry*.

> "However, it has recognized that courts generally apply a set of eight factors, known as the '*Cammer* factors.' Id.; see *Cammer v. Bloom*, 711 F. Supp. 1264, 1286 (D.N.J. 1989) (setting out five factors); *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001) (considering three additional '*Cammer*' factors)."
> ***In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 369 (S.D.N.Y. 2016).**

---

[39] Khare Report, ¶109.

11

> "And as to market efficiency, the Court looks to the *Cammer* and *Krogman* factors, the prevailing tests for market efficiency, which are so named after *Cammer v. Bloom*, 711 F. Supp. 1264, 1286–87 (D.N.J. 1989) and *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001)."
> **Pearlstein v. Blackberry Ltd.**, No. 13 CIV. 7060 (CM), 2021 WL 253453, at \*15 (S.D.N.Y. Jan. 26, 2021).

> "In addition to the *Cammer* factors, courts often consider what are known as the three *Krogman* factors when analyzing whether the market for a stock is efficient. Petrobras, 862 F.3d at 276. Those factors are '(1) the capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders ('the float').' *Krogman*, 202 F.R.D. at 474."
> **Waggoner v. Barclays PLC**, 875 F.3d 79, 94-95 (2d Cir. 2017).

27. In the *Petrobras* case, the court stated that courts "generally apply" the full set of eight factors. The court in the *Blackberry* case characterized the *Cammer* and *Krogman* factors as the "prevailing tests." While Dr. Khare stated that courts only "sometimes" examine the *Cammer* and *Krogman* factors, the *Waggoner* court stated that courts "often" consider them.

28. While Dr. Khare represented that the first four *Cammer* and the three *Krogman* factors are peripheral and insufficient on their own to establish market efficiency, numerous courts in the Second Circuit and other circuits have explicitly stated otherwise, deciding that those *Cammer* and *Krogman* factors were sufficient to establish market efficiency even without the fifth *Cammer* factor.

> "Even if Lead Plaintiffs had failed to satisfy the fifth *Cammer* Factor, the Court's conclusion that the market for Vale ADRs was efficient would remain unchanged. The remaining four *Cammer* Factors and three *Krogman* Factors support a finding of market efficiency. The Second Circuit explained that if these seven factors are satisfied, the fifth *Cammer* Factor is not necessary for a finding of market efficiency."
> **In re Vale S.A. Sec. Litig.**, No. 1:15-CV-9539-GHW, 2019 WL 11032303, at \*13-14 (S.D.N.Y. Sept. 27, 2019).

> "The only factor that is subject to disagreement is *Cammer*'s fifth factor, i.e., whether there was a 'demonstration of a cause and effect relationship between [BlackBerry]'s unexpected, material disclosures and changes in stock price.' *Waggoner*, 875 F.3d at 94 (alteration omitted) (quoting

12

*Bombardier*, 546 F.3d at 200). As the Second Circuit noted in *Waggoner*, where the remaining four *Cammer* factors and the three *Krogman* factors all point toward market efficiency, a court can dispense with the fifth *Cammer* factor completely."

**Pearlstein v. Blackberry Ltd., 2021 WL 253453, at \*16.**


"The Second, Fourth, Fifth, and Eleventh Circuits have instructed that the *Cammer* factors serve only as a guide for determining market efficiency to be applied in a case-by-case basis in addition to other considerations and that, while important in certain cases, the fifth *Cammer* factor is not a mandatory prerequisite in every case for finding market efficiency. *Waggoner v. Barclays PLC*, 875 F.3d 79, 97-98 (2d Cir. 2017); *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 368 (4th Cir. 2004); *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005); *Bell v. Ascendant Solutions, Inc.,* 422 F.3d 307, 313, 316 (5th Cir. 2005); *Local 703, I.B. of T. Grocery & Food Employees Welfare Fund v. Regions Financial Corp.*, 762 F.3d 1248, 1255-56 (11th Cir. 2014). Although these circuit courts require proof and thorough analysis of market efficiency in context, they disclaim rigid adherence to a bright line test. The parties have not cited, and the Court has not found, contrary authority."

**Di Donato v. Insys Therapeutics, Inc., No. CV-16-00302-PHX-NVW, at \*12 (D. Ariz. Sept. 20, 202019).**


"The parties have expended much effort discussing and disputing the application of the fifth *Cammer* factor, whether it has been met, and whether it matters if it has or has not been met. In fact, it doesn't matter. '[N]o court has adopted a per se rule that any one *Cammer* factor is dispositive.' *Strougo v. Barclays PLC*, 312 F.R.D. 307, 320-21 (S.D.N.Y. 2016). Numerous Courts within the Sixth Circuit have held that market efficiency can be established without regard to the fifth *Cammer* factor. *See In re Accredo Health, Inc. Sec. Litig.*, 2006 WL 1716910, \*10 (W.D. Tenn. 2006) (even if plaintiffs failed to establish *Cammer* 5, 'this alone would not negate the efficiency of the market'); *Zwick Partners, LP v. Quorum Health Corp.*, 2019 WL 1450546, \*13 (M.D. Tenn. 2019) (market efficiency established without reference to *Cammer* 5); *Burges v. BancorpSouth, Inc.*, 2017 WL 2772122, \*9 (M.D. Tenn. 2017)(same); *Ross v. Abercrombie & Fitch Co.*, 257 F.R.D. 435, 454 (S.D. Ohio 2009)(same)."

**Dougherty v. Esperion Therapeutics, Inc., No. 16-10089, 2020 WL 2832252, at \*6 (E.D. Mich. May 31, 2020), *report and recommendation adopted*, No. 16-10089, 2020 WL 6793326 (E.D. Mich. Nov. 19, 2020).**


29.    Dr. Khare's attack on the *Cammer* and *Krogman* factors is not only a challenge to my analysis, but it is also an attack on the generally accepted and widely used methodology for assessing market efficiency. Courts rely on this methodology, the methodology I

applied in the instant case. Exhibit-4 presents a sample of securities cases where my market efficiency analysis and opinion have been accepted by courts.

30. That the courts got it right with respect to the dispositive value of the structural *Cammer* and *Krogman* factors is supported by published peer-reviewed finance research, which Dr. Khare also misunderstands or misrepresents. Villanueva and Feinstein [2020] concluded as follows:

> "Our findings that the *Cammer/Krogman* factors are generally dispositive of reactivity supports the widespread use by courts of the *Cammer/Krogman* factors as indicia of market efficiency."
> **"Stock Price Reactivity to Earnings Announcements: The Role of the *Cammer/Krogman* Factors," by Miguel Villanueva and Steven Feinstein, *Review of Quantitative Finance and Accounting*, 2020, pp. 43-44 (currently published online and forthcoming in print).**

31. As noted in the Feinstein Report, the earlier study by Barber, Griffin, and Lev [1994] also finds the volume, analyst coverage, and market maker *Cammer* factors to be probative of market efficiency.

> "Consistent with the efficiency indicators used recently by the courts, the inefficient firms have lower mean trading volume, fewer market makers, lower analyst following, and lower institutional ownership (number and percentage) than efficient firms."
> **"The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," by Brad Barber et al., *Journal of Corporation Law*, 1994, p. 302.**

32. Dr. Khare states that he interprets the Barber et al. [1994] article differently, pointing to multivariate test results that Barber et al. [1994] also presented.[40] Barber et al. [1994] found that when examined individually in univariate tests, the levels of volume, market makers, analyst coverage, and institutional ownership distinguished between efficient and inefficient stocks. But, when tested collectively in a combined regression, the explanatory power of volume and analyst coverage swamped the explanatory power of the other factors. Barber et al. [1994] stated that it is the "correlation between efficiency drivers" that accounts for the difference between the univariate and multivariate test

---

[40] Khare Report, ¶¶128-129.

results.[41] Nonetheless, Barber et al. [1994] described the *Cammer* factors as "efficiency drivers" and the result remains that when examined individually, volume, market makers, analyst coverage, and institutional holding each have probative value in distinguishing between efficient and inefficient stocks.

33. Despite his rhetoric, Dr. Khare apparently acknowledges that the Barber et al. [1994] univariate tests found the *Cammer* factors to be probative indicators of market efficiency.[42] To argue that some informative factors should be disparaged or disregarded because they are generally correlated with other factors that have overwhelming explanatory power is nonsensical. As other researchers and most courts have done, the full set of factors should be examined and considered.

### C.     Dr. Khare's Manipulation of *Cammer/Krogman* Test Thresholds Produces Misleading Results

34. Dr. Khare seeks to apply nonstandard and incorrect factor level thresholds for the *Cammer/Krogman* factor tests. For several of the *Cammer* and *Krogman* factors, Dr. Khare incorrectly argues that there are inconsistencies between the *Cammer/Krogman* test thresholds I applied in my published work and the thresholds applied in my analysis of the AmTrust Preferred Shares. Specifically, he points out that in Villanueva and Feinstein [2020],[43] I tested to see if a stock was more likely to behave efficiently if it had a *Cammer* factor value above the median factor value within the universe of publicly traded stocks. By contrast, I compared the *Cammer* factor values for the AmTrust Preferred Shares to standard thresholds that are widely used and generally accepted as sufficient to indicate market efficiency.

---

[41] "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," by Brad Barber et al., *Journal of Corporation Law*, 1994, p. 307.

[42] Khare Report, ¶129, inclusive of footnotes.

[43] "Stock Price Reactivity to Earnings Announcements: The Role of the *Cammer*/*Krogman* Factors," by Miguel Villanueva and Steven Feinstein, *Review of Quantitative Finance and Accounting*, 2020 (currently published online and forthcoming in print).

35. Dr. Khare's criticism in this regard exposes his lack of understanding of the experimental design in the Villanueva and Feinstein [2020] article, and also that he mistakenly overlooked that the article contains a separate section in which Dr. Villanueva and I investigated optimal (that is, most probative) factor test thresholds.

36. First, the initial use of medians in the Villanueva and Feinstein [2020] article was for the purpose of testing the probative nature of the *Cammer* and *Krogman* factors, not for purposes of discerning which stocks were efficient and which were not. That is, the statistical experiment was designed to test the factors, not the stocks. The test was designed to follow the seminal Barber et al. [1994] exploration to see if stocks with more volume, analysts, market makers, size, and narrower bid-ask spreads were more likely to be efficient than stocks in the bottom half of the sample. The median was never intended to represent a necessary threshold that a stock must surpass in order to be deemed efficient. It would be silly to interpret the test design that mistaken way, as such an interpretation would imply that half the universe of publicly traded stocks was necessarily inefficient.

37. The Villanueva and Feinstein [2020] tests did establish that the *Cammer* and *Krogman* factors were probative indicators of market efficiency. Once that was established, we conducted additional research to ascertain what factor thresholds were most probative of market efficiency. Dr. Khare apparently overlooked that section of the article. As it turned out, the most probative thresholds were generally less stringent than the factor thresholds commonly used (the thresholds applied in the Feinstein Report) and were far less stringent than the median factor values.

38. Dr. Khare's eschewing the standard *Cammer* and *Krogman* factor test thresholds in favor of stock market medians is starkly exposed as an egregious error when he cites to a *Law360* column authored by Dr. David Tabak for purported support.[44] Dr. Tabak specifically states that for each of the factors, the stock market median is **not** an appropriate threshold for testing market efficiency.

---

[44] Khare Report, ¶132, citing "Testing Securities Market Efficiency with *Cammer* Factors," by David Tabak, *Law360*, 5 February 2019.

"Before looking at the results, it should be noted that since the members of the S&P 500 Index are among the stocks that we would expect to trade in an efficient market, the proper threshold is presumably **not that a stock exceeds the median value** (i.e., does better than half of the stocks in the S&P 500 Index), but rather that it does at least as well as some smaller number of S&P 500 companies."

**"Testing Securities Market Efficiency with *Cammer* Factors," by David Tabak, *Law360*, 5 February 2019 (emphasis added).**

### D.    Dr. Khare's Criticism of the *Cammer*/*Krogman* Factor Analysis

39.    Despite his rejection of all of the *Cammer* and *Krogman* factors except for the fifth *Cammer* factor as probative indicators of market efficiency, Dr. Khare devotes considerable attention to explaining how in his opinion *Cammer* and *Krogman* factor evidence should be evaluated to assess market efficiency. Below I review each of the *Cammer* and *Krogman* factors and explain why Dr. Khare's criticisms are erroneous.

### 1.    Listing on the NYSE and Numerous Market Makers

40.    As explained in the Feinstein Report, the *Cammer* court articulated the importance of an NYSE listing, stating that market efficiency can be presumed for virtually all securities that trade on the NYSE.[45] An NYSE listing is widely used and generally accepted in securities litigation as an indicator of market efficiency.[46] Dr. Khare does not dispute that market efficiency can be presumed for virtually all securities traded on the NYSE, or that the *Cammer* court said so. Rather, Dr. Khare's argument is that this consideration was not codified as one of the established *Cammer* factors ("While the *Cammer* Court discussed the importance of exchange listing, the court did not identify this as a factor."[47])

41.    Dr. Khare's semantic point is as ineffectual as it is argumentative. At the time of the *Cammer* opinion, stocks listed on the NYSE were generally not also traded by Nasdaq market makers. As such, NYSE listed stocks had few identifiable market makers other

---

[45] Feinstein Report, ¶103; and *Cammer*, 711 F. Supp. 1264, at 1292 (quoting Bromberg and Lowenfels [1988], §8.6).

[46] For example, "While other courts have been reluctant to conclude that a stock was traded efficiently solely because it was traded on the NYSE or NASDAQ, most courts agree that such listing is a good indicator of efficiency." (Opinion and Order, filed 20 August 2015, *Carpenters Pension Trust Fund of St. Louis v. Barclays*, 12-vc-5329-SAS, at 78).

[47] Khare Report, ¶179.

than the NYSE specialist assigned to the stock by the NYSE, yet they were deemed to trade in an efficient market. As an indicator of market efficiency, the number of market makers was clearly intended to represent how developed was the market making infrastructure of the security market in question, and an NYSE security indisputably satisfied that factor. Today, if a security is listed on the NYSE, it enjoys a well-developed market making infrastructure that promotes efficiency and satisfies the market maker *Cammer* factor.

42. Dr. Khare takes pot shots at my exposition quantifying that at least 14 institutions served as market makers for the AmTrust Preferred Shares. His criticism is misguided as well as moot. During the Class Period, the Preferred Shares all traded on the NYSE, and this fact alone is sufficient to satisfy the market maker *Cammer* factor.

43. Dr. Khare provides no reason to revise my conclusion. That the AmTrust Preferred Shares traded on the NYSE and trading was facilitated by numerous market makers is compelling evidence of the efficiency of the market for the AmTrust Preferred Shares throughout the Class Period.

### 2. Trading Volume

44. In the Feinstein Report, I reported that for the Class Period and both subintervals, the average weekly turnover of the AmTrust Preferred Shares exceeded the level accepted by courts as being indicative of market efficiency.[48] Dr. Khare does not challenge this finding. Rather, Dr. Khare squabbles over the fact that I also reported the trading volume on a per day basis and the *Cammer* court did not provide a threshold for the average *daily* trading volume, only the average *weekly* turnover.[49]

45. Weekly average volume can easily be converted to daily, and vice versa. This conversion is neither difficult nor controversial.

46. As presented in the Feinstein Report, the average weekly turnover over the course of the Class Period for the Preferred Shares ranged between 1.38% and 2.09%. For Interval-1, the average weekly turnover ranged between 1.21% and 1.94%. For Interval-2, the average weekly turnover ranged between 2.36% and 3.11%. The *Cammer* court cited the

---

[48] Feinstein Report, ¶¶111-114.

[49] Khare Report, ¶143.

conclusion of Alan Bromberg and Lewis Lowenfels that "average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption."[50] By this standard, the trading volume of the AmTrust Preferred Shares justified a substantial presumption of market efficiency during Interval-1 and a strong presumption during Interval-2.

47.    Dr. Khare wishes to abandon the *Cammer* court standard, and he argues that the threshold for passing this factor test should be the median weekly turnover rate from either all CRSP stocks (3.3%) or from among all S&P 500 stocks (3.7%). As noted above, there is no legitimate justification for replacing the standard threshold with a population median. Dr. Khare's reconfiguration of the volume factor test is unfounded.

48.    Interestingly, the optimal volume factor test threshold identified by Villanueva and Feinstein [2020] – that is, the threshold that most reliably differentiates between reactive and unreactive stocks, is a weekly turnover rate of 1.15%. All of the AmTrust Preferred Share series surpassed this threshold during the Class Period, just as they surpassed the *Cammer* court's threshold for a substantial presumption of market efficiency in Interval-1 and the threshold for a strong presumption of market efficiency in Interval-2.

49.    Dr. Khare provides no reason to revise my conclusion – a conclusion consistent with the *Cammer* opinion, economic theory, and empirical research. The active trading volume of the AmTrust Preferred Shares is compelling evidence of the efficiency of their market over the course of the Class Period.

### 3.    Analyst Coverage and Other Avenues of Information Dissemination

#### a.    Analyst Coverage

50.    In the Feinstein Report, I explained that from Thomson Eikon I was able to obtain analyst reports covering AmTrust published by five different analyst firms during Interval-1 of the Class Period. As not all published analyst reports are available from Thomson Eikon, one can conclude that **at least** five analyst firms covered AmTrust during Interval-1, possibly more.

---

[50] *Cammer*, 711 F. Supp. 1264, at 1293.

51. In the Feinstein Report, I pointed out that in addition to the analyst reports available from Thomson Eikon, there were two analyst reports published on *Seeking Alpha*. Dr. Khare points out that the Preferred Shares specifically were covered and rated by *A.M. Best*.[51]

52. In the Feinstein Report, I explained that while I was unable to obtain from Thomson Eikon AmTrust analyst reports published during Interval-2, it is evident that at least one analyst did cover AmTrust during Interval-2.[52]

53. Dr. Khare does not dispute these findings. Rather, Dr. Khare argues that the published reports from the five analyst firms whose reports were available on Thomson Eikon were not focused specifically on the Preferred Shares. Dr. Khare mistakenly ignores the fact that the information and analysis about AmTrust that these securities analysts provided is relevant to all securities issued by AmTrust, including the Preferred Shares. While common stock and preferred stock have different sensitivities to company financial performance, they are claims on the same company and their valuations are functions of the same performance, albeit different functions. Consequently, while they may have focused primarily on the common stock, the AmTrust analyst reports fostered efficiency in the market for the Preferred Shares as well.

54. In his later argument addressing what information should have moved the Preferred Share prices, Dr. Khare recognizes that preferred share prices are indeed functions of the same information that drives common stock prices, contradicting his contention that analyst reports focused on common stock are of no use to preferred share investors.[53,54]

---

[51] Khare Report, Footnote 57; and "A.M. Best Removes from Under Review, Downgrades Credit Ratings of AmTrust Financial Svcs. and Most Subs.; Assigns Stable Outlook," *A.M. Best*, 3 July 2018.

[52] Feinstein Report, ¶120; and Barber et al. [1994] found that coverage by one or two analysts strengthened the presumption of efficiency for a publicly traded stock ("The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," by Brad Barber et al., *Journal of Corporation Law*, 1994, pp. 302 and 310-311).

[53] Khare Report, ¶115.

[54] Despite acknowledging that preferred share prices are functions of the same information that drive common stock prices, such that the same analyst reports are useful to investors in both classes of securities, Dr. Khare manages to be wrong in both his analyst coverage argument and his empirical test argument. Dr. Khare fails to recognize that while the valuation functions may have the same inputs, the functional forms and sensitivities are different. For example, because of their senior status, preferred shares are *less* sensitive to small changes in earnings and cash flow than are common shares.

55.    Next, Dr. Khare argues that "[Feinstein] fail[ed] to note that the Panther Investments publications he cites from *Seeking Alpha* were not issued by an analyst firm."[55] Dr. Khare is wrong to dismiss *Seeking Alpha* and the coverage disseminated on that platform. Though the *Seeking Alpha* reports were not authored by traditional sell-side analyst firms, they are informative, publicly available, widely disseminated, and contain influential buy/sell recommendations. Many financial blogs, including *Seeking Alpha*, have become leading disseminators of financial information, supplementing traditional sell-side equity analyst reports for the investment community. Published peer-reviewed research has proven that reports disseminated on internet platforms, *Seeking Alpha* in particular, are influential and useful to investors, providing valuation-relevant information and promoting market efficiency.[56]

56.    Dr. Khare also contends that I should have used the median benchmarks for analyst coverage purportedly set forth in the Villanueva and Feinstein [2020] article and the Tabak [2019] paper. As noted above, Villanueva and Feinstein [2020] and Tabak [2019] do not advocate for a median benchmark. Tabak [2019] explicitly advocates against using the median as the benchmark for market efficiency.

57.    I stated in the Feinstein Report, and I reiterate here, that while the extent of analyst coverage in Interval-2 does not constitute support for a conclusion of market efficiency, neither does it support a conclusion that the market was inefficient during that period.[57] The analyst coverage evidence is indeterminate in that interval. While coverage was at best thin in Interval-2, there was apparently one analyst still following AmTrust and responding to the FactSet consensus analyst forecast survey in Interval-2. Barber et al. [1994] found that coverage by at least ***one*** analyst, as measured by consensus survey

---

[55] Khare Report, ¶154.

[56] See, e.g., "Wisdom of Crowds: The Value of Stock Opinions Transmitted Through Social Media," by Hailiang Chen et al., *The Review of Financial Studies*, Vol. 27, No. 5, 2014, p. 1368: "To examine the role of peer-based advice, we extract user-generated opinions from Seeking Alpha (hereafter, SA; http://seekingalpha.com). Our choice of SA as the focus of this study was motivated by its popularity. As of August 2013, SA had 500,000 to 1 million unique visitors per day (comScore - ScorecardResearch) and, as such, was one of the biggest investment-related social media websites in the U.S. The website's goal is to provide 'opinion and analysis rather than news, and [it] is primarily written by investors who describe their personal approach to stock picking and portfolio management, rather than by journalists.'"

[57] Feinstein Report, ¶120 (emphasis added).

respondents, strengthened the presumption of efficiency for a publicly traded stock.[58] In Interval-2, AmTrust did have one analyst covering, an analyst who was a consensus survey respondent.

> "Thus, a stock with at least one analyst and volume in excess of 6.49 would, on average be presumed efficient with respect to the information contained in earnings."
> **"The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," by Brad Barber et al., *Journal of Corporation Law*, 1994, p. 310.**

58. **An important clarification:** In the Feinstein Report, I stated that while the analyst coverage during Interval-1 is compelling evidence of market efficiency in Interval-1, the analyst coverage in Interval-2, by itself, does not weigh in favor of a finding of market efficiency, but neither does the thin analyst coverage in Interval-2 necessarily mean that the market was not efficient during Interval-2. I wrote, "For Interval-2, the evidence does not support a finding of market efficiency, but neither does it necessarily indicate inefficiency."[59] This sentence, was intended to relate only to the analyst coverage *Cammer* factor. In context, it should be clear that I was only referring to the analyst coverage evidence in Interval-2, not all of the *Cammer* and *Krogman* factor evidence. Despite the indeterminate nature of the analyst coverage evidence in Interval-2, I conclude in paragraphs 27 and 215 of the Feinstein Report that the preponderance of the evidence compels the conclusion that the AmTrust Preferred Shares traded in an efficient market throughout the Class Period, including throughout Interval-1 and Interval-2.

59. Dr. Khare provides no reason for me to revise my conclusion that analyst coverage during Interval-1 satisfies the analyst coverage *Cammer* factor and that at least one analyst covered AmTrust during Interval-2, which is neither evidence for nor against market efficiency for that interval.

---

[58] "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," by Brad Barber et al., *Journal of Corporation Law*, 1994, pp. 302 and 310-311 (emphasis added).

[59] Feinstein Report, ¶¶21 and 209.

### b. News Coverage

60. As explained in the Feinstein Report, "although the *Cammer* court focused on coverage by securities analysts, other courts have noted that news media, including news reports on the internet or other electronic sources, facilitate the flow of information to the marketplace, thereby promoting market efficiency."[60] Dr. Khare objects to this evidence, which courts have considered, on the grounds that news coverage is not a factor listed "in *Cammer* or *Krogman*."[61] Dr. Khare observes that Villanueva and Feinstein [2020] did not examine news coverage.[62] He also asserts "that news coverage is **_less_** probative of market efficiency compared to coverage by analysts."[63]

61. Dr. Khare is wrong to disregard that AmTrust was widely covered by the news media. News coverage precludes a potential impediment to market efficiency. A market may be inefficient if information about the company is difficult to obtain. Extensive media coverage rules out this potential impediment to market efficiency. Moreover, while the *Cammer* and *Krogman* courts may not have addressed and given weight to media coverage, other courts have.[64]

62. Dr. Khare further protests that only news articles that include the term "preferred" should be considered probative of market efficiency for the Preferred Shares.[65] This condition is ridiculous. Information about AmTrust's business, performance, and prospects may be relevant to the valuation of the Preferred Shares even if the news report does not explicitly mention the Preferred Shares. Certainly, the news coverage about the Go-Private Transaction was relevant to the valuation of the Preferred Shares, even if the news articles did not explicitly discuss the Preferred Shares.

---

[60] Feinstein Report, ¶121.

[61] Khare Report, ¶181.

[62] Khare Report, ¶182.

[63] Khare Report, ¶181 (emphasis added).

[64] See, e.g., "Plaintiffs have shown that CyberGuard was featured in a significant number of news items indicating that information regarding CyberGuard may have been widely distributed, which would support a finding of efficiency." (*Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 499 (S.D. Fla. 2003)); and "The number of securities analysts following and reporting on Banc stock during the class period favors market efficiency (as does the extent of Banc news coverage in general)." (*In re Banc of California Securities Litigation,* 326 F.R.D. 640, 649 (C.D. Cal. 2018)).

[65] Khare Report, ¶183.

63. Dr. Khare provides no basis for me to revise my conclusion that throughout the Class Period, news and information about AmTrust was readily available to market participants, supporting the conclusion that the market for the AmTrust Preferred Shares was an efficient market.

### 4. Institutional Ownership

64. As explained in the Feinstein Report, "consistent with published empirical research, some courts have considered institutional ownership of a security to be indicative of market efficiency."[66] 12 major institutions voluntarily reported that they owned AmTrust Preferred Shares during the Class Period.[67] Institutional ownership was reported for all series, except Series A.[68]

65. Dr. Khare does not dispute that institutional ownership promotes market efficiency. Instead, he notes that neither the *Cammer* nor *Krogman* courts listed institutional ownership as a factor.[69] While the *Cammer* and *Krogman* courts may not have considered institutional ownership coverage, other courts have.[70] And with good reason. As explained in the Feinstein Report, large money management institutions generally employ their own financial analysts who conduct research and analysis on the securities they buy. Consequently, institutional ownership indicates broader participation of professional securities analysts covering the subject security, and more sophisticated investors involved in trading and market price determination.

66. Criticizing my examination of institutional ownership, Dr. Khare again claims that only above-median institutional ownership supports market efficiency.[71] Dr. Khare is wrong, and the Tabak [2019] article he references states otherwise.

---

[66] Feinstein Report, ¶124.

[67] Feinstein Report, ¶129.

[68] Feinstein Report, ¶129.

[69] Khare Report, ¶174.

[70] See, e.g., "Third, the Court finds that because institutional investors held a substantial percentage of Alstom's securities and because these investors could easily buy and sell Alstom's securities on exchanges such as the NYSE and Euronext Paris, they have likely acted as arbitrageurs and facilitated the efficiency of the market." (*In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008)).

[71] Khare Report, ¶176.

24

67. Dr. Khare provides no basis for me to revise my conclusion that the AmTrust Preferred Shares were held and traded by sophisticated institutional investors, and this fact supports a conclusion of market efficiency.

### 5. Market Capitalization

68. As explained in the Feinstein Report, the different series of Preferred Shares have very similar terms and structures and differ primarily in their dividend rates and dates of issue and potential redemption. They have identical seniority rank in the Company's capital structure. Consequently, evaluation of aggregate outstanding size is appropriate for purposes of assessing the efficiency of the market in which they trade.[72]

69. Without any basis in financial principles or research, Dr. Khare argues that size should be examined only individually and not in the aggregate.[73] Dr. Khare is wrong. The SEC has weighed in on this issue and disagrees with Dr. Khare's contention. According to the SEC, to determine whether the outstanding value of preferred shares is sufficiently large to qualify a company for S-3 registration, which the *Cammer* court recognized as an indicator of market efficiency, the outstanding values of all preferred share issues should be summed. According to the SEC, to satisfy the condition for S-3 eligibility based on preferred share market capitalization, the company can have in the aggregate at least $750 million of preferred securities registered under the Securities Act, which is computed as "the principal amount of any debt and the greater of liquidation preference or par value of any non-convertible preferred stock."[74] Similarly, the *A.M. Best* ratings upon which Dr. Khare relies grouped together the credit ratings of the Preferred Shares.[75]

---

[72] Feinstein Report, ¶150.

[73] Khare Report, ¶135.

[74] Feinstein Report, ¶138; and SEC Release No. 33-9245; 34-64975; File No. S7-18-08, 27 July 2011.

[75] "The ratings assigned to debt and preferred stock depend both on the operating company's ICR level and the subordination of the security in the capital structure of the operating company. The subordination of the security in the capital structure also determines the notching between a Holding Company ICR and the ratings on its debt issue." ("Best's Credit Rating Methodology," *A.M. Best*, 13 November 2020. p. 89); See also, e.g., "Notching also applies to the structural subordination of debt issued by operating subsidiaries or holding companies that are part of an enterprise viewed as a single economic entity. For example, the debt of a holding company may be rated lower than the debt of its subsidiaries that have the enterprise's assets and cash flows. We extend the notching approach to analyzing the creditworthiness of instruments involving payment priority. For example, we would generally rate preferred stock and

70.  Not only is he wrong about aggregated versus disaggregated outstanding value, but Dr. Khare again applies an incorrect benchmark. He compares the size of each series of the AmTrust Preferred Shares to the stock market median market capitalization. As noted above, blindly using the median as a test benchmark is inappropriate and uninformative. For the size factor, using the stock market median is even more inappropriate and misleading. The stock market median to which Dr. Khare wishes to compare the Preferred Share issue size is the median of common stock market capitalizations. Common stock market capitalization measures the total value of outstanding common stock for each company. Most companies are financed more with common stock than preferred stock, so using a common stock median to judge the relative size of outstanding preferred stock issues is inherently biased.

71.  Further, Dr. Khare overlooks that Villanueva and Feinstein [2020] explored the optimal size test thresholds that most reliably differentiate between reactive and unreactive stocks and found that the optimal test threshold was far lower than the stock market median market capitalization.[76]

72.  Dr. Khare's baseless arguments and flawed analysis render his criticisms misguided and his conclusion unreliable. The outstanding value of AmTrust's Preferred Shares is undeniably large. Evaluated correctly, the size factor weighs in favor of the conclusion that the Preferred Shares traded in an efficient market over the course of the Class Period.

### 6.    Bid-Ask Spread

73.  In the Feinstein Report, I found that during the Class Period and subintervals, the average bid-ask spreads of the AmTrust Preferred Shares were narrower than the levels accepted by courts as being indicative of market efficiency.[77] For example, I noted that in a recent case within the Second Circuit, *In re Teva Securities Litigation*, the district

---

so-called hybrid capital instruments lower than senior debt to indicate that payment could be deferred." ("Principles of Credit Ratings," by Mark Puccia et al., *S&P Global*, 16 February 2011, p. 7).

[76] "Stock Price Reactivity to Earnings Announcements: The Role of the *Cammer/Krogman* Factors," by Miguel Villanueva and Steven Feinstein, Review of Quantitative Finance and Accounting, 2020 (currently published online and forthcoming in print).

[77] Feinstein Report, ¶¶155-162 and Footnote 119.

court held that the average daily bid-ask spread of 2.66% for Teva preferred shares, "weighs moderately in favor of market efficiency."[78] Two other courts have stated that bid-ask spreads of 2.44% and 2.91% were sufficiently narrow to indicate market efficiency.[79]

74.   Dr. Khare examines the CRSP data and observes what I observed and reported, which was that the AmTrust Preferred Share bid-ask spreads were wider than the contemporaneous average, but not exorbitantly so.[80] Dr. Khare then erroneously concocts a median "benchmark" from the Villanueva and Feinstein [2020] paper that is an inappropriate and uninformative threshold.[81]

75.   In the Feinstein Report, I point out that the AmTrust bid-ask spreads were narrower than the mean bid-ask spreads prevailing at the time when the *Krogman* court recognized narrow bid-ask spread to be an indicator of market efficiency. Dr. Khare criticizes this comparison on the grounds that the *Krogman* case was 17 years ago. This criticism is unavailing, especially when considering why a narrow bid-ask spread indicates market efficiency. With a wide bid-ask spread, trading is expensive. Expensive trading may dissuade investors with relevant information or reliable valuations from trading on that information, which in turn could potentially exclude that information and valuation from entering the market price. If the bid-ask spreads across the board have become narrower over the last 17 years, this trend would make the stock market as a whole more efficient. It would not raise the bar for each individual security to be deemed efficient.

76.   If the bid-ask spread was narrow enough to be deemed efficient previously, that same bid-ask spread should be deemed sufficiently narrow for efficiency now. Dr. Khare provides no basis for me to revise my opinion in the Feinstein Report that the AmTrust Preferred Share bid-ask spreads were sufficiently narrow to support a conclusion of market efficiency.[82]

---

[78] *In re Teva Sec. Litig.*, No. 3:17-cv-558 (SRU), at 36 (D. Conn. Mar. 9, 2021).

[79] See, e.g., *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 501 (S.D. Fla. 2003) and *Petrie v. Electronic Game Card, Inc.*, 308 F.R.D. 336, 356 (C.D. Cal. 2015); and Feinstein Report, ¶159.

[80] Feinstein Report, ¶162; and Khare Report, ¶164.

[81] Khare Report, ¶¶162-164.

[82] Feinstein Report, ¶159.

### E.       My Event Study Analysis and Dr. Khare's Erroneous Criticisms

### 1.       My Market Efficiency Event Study Design Was Proper

77.    As detailed in the Feinstein Report, I conducted an event study to investigate whether the AmTrust Preferred Shares demonstrated market efficiency by reacting significantly to major news events during the Class Period.[83] A market efficiency event study identifies news events that according to valuation principles should reasonably elicit a large change in the subject security's price. The event study then tests to determine whether the subject security price did change by an amount so large that one can rule out random volatility as the cause of the observed movement. A price movement that is so large that it is not likely a random fluctuation is termed "statistically significant." If the event study finds that important news events do elicit statistically significant price movements, the event study proves that the subject security demonstrated market efficiency.

78.    Lesser news events, which according to valuation principles should not cause large price movements, are inappropriate event study candidate events because the absence of a statistically significant price movement would prove nothing. One cannot tell from a nonsignificant price response whether the security failed to efficiently capture the new information, or if instead the nonsignificant movement was the appropriate efficient response to the modest or mixed news. In the Feinstein Report, I explained that "ideal candidate events for inclusion in an event study testing for market efficiency are therefore events on which company-specific information was released that is new, unexpected, and of such import as to reasonably be expected to elicit a stock price reaction over the threshold for statistical significance in an efficient market."[84]

79.    As noted above, Dr. Khare adopts my event study regression model and does not dispute the result that the returns for the AmTrust Preferred Shares following all three events I tested were statistically significant.

---

[83] Feinstein Report, ¶¶163-164.

[84] Feinstein Report, ¶170.

80.     However, as one would expect, Dr. Khare takes issue with my event study analysis. His primary criticism is about event selection. Dr. Khare argues that the three events I tested are not enough, even though the number of appropriate candidate events is dictated by the subject company's experience over the examination period rather than researcher discretion. Dr. Khare argues that several additional lesser news events should also have been tested for significant price reactions, even though a nonsignificant reaction to modest or mixed news proves nothing about market efficiency. Dr. Khare argues that earnings announcements should have been tested, even though it is well known that preferred shares are generally insensitive to the routine news reported in earnings announcements. Dr. Khare argues that the significant stock price reaction to the delisting of the Preferred Share should be disregarded, even though the delisting was indisputably important news that serves as an ideal candidate event for testing whether or not AmTrust Preferred Shares efficiently responded to information. None of Dr. Khare's criticisms have merit.

### 2.    The Three Dates I Tested Were Appropriate Test Events

81.     As described in the Feinstein Report, I reviewed news and analyst reports to ascertain which events over the course of the Class Period were appropriate for a market efficiency event study.[85] I identified three. Each of these events conveyed unexpected information to investors that was economically material to the valuation of the Preferred Shares. Each event had a major impact on the market's assessment of the likelihood that the Preferred Shares would be delisted. It is a generally accepted valuation principle, supported by abundant peer-reviewed research, that marketability is an economically material property for any security.[86] According to the finance and accounting literature, lack of marketability discounts can be quite large, even over 30%.[87] Consequently, in the

---

[85] Feinstein Report, ¶178.

[86] "Discounts for Illiquidity and Lack of Marketability," by Shannon Pratt and Alina Niculita, Chapter 17 of *Valuing a Business, The Analysis and Appraisal of Closely Held Companies*, 5th Edition, The McGraw-Hill Companies, Inc., 2008 (and sources cited within); and *Quantifying Marketability Discounts*, by Z. Christopher Mercer, Peabody Publishing, LP, Revised Edition, 1997 (and sources cited within).

[87] "The Value of Marketability as Illustrated in Initial Public Offerings of Common Stock," by John Emory, *Business Valuation Review*, Vol. 16, No. 3, 1997; and "Discounts on Restricted Stock: The Impact of Illiquidity on Stock Prices," by William Silber, *Financial Analysts Journal*, Vol. 47, 1991.

instant case, unexpected events that substantially change the market's assessment of the likelihood of delisting are major news for the AmTrust Preferred Shares. Such events are therefore appropriate for a market efficiency event study. Dr. Khare apparently does not disagree, as he retains the first two of the three events that I examined in his alternative event study.[88]

82.    While I observed other news events during the Class Period, some of which related to the likelihood of the consummation of the Go-Private Transaction, I determined that these additional events were either reasonably expected or contributed very little new information of relevance to the valuation of the Preferred Shares. As such, those other events were not appropriate for inclusion in the market efficiency event study.

83.    Dr. Khare contends that for a market efficiency event study, three events is too few. Dr. Khare's criticism is unfounded and misguided. As explained above, and also in a *Law360* column I co-authored,[89] the forensic analyst cannot manufacture test events, but rather must work with the actual history the company experienced. If only three big news events occurred, then three is the number of events to test. Dr. Khare is wrong to suggest that more events should and can be appropriately tested, or that lesser news events should be inserted to make up for what he considers to be a deficit relative to an imaginary standard.

84.    Moreover, Dr. Khare is wrong when he asserts that an event study focusing on three major events is drawing conclusions from an analysis of only three dates.[90] Although the event study focusses on three major events, it compares those three event dates to all of the other lesser or non-news days in the entire examination period. Thus, the event study examines every day and determines whether the security price behavior on the major event dates differed significantly from the price behavior on ordinary days.

---

[88] Khare Report, Footnote 79.

[89] "What a Solar Eclipse Has to Do with Market Efficiency," by Daniel Bettencourt and Steven Feinstein, *Law360*, 17 November 2017.

[90] Khare Report, ¶¶61-74.

85. In a seminal exposition on event study methodology, MacKinlay [1997] describes how an event study compares event dates to all non-news days in the control period (the regression period, which in this case was the entire Class Period).[91]

86. Contrary to Dr. Khare's incorrect assertion, my event study examined all 251 days in the Class Period, not just three.

87. Further, Dr. Khare is incorrect when he characterizes the widely used and generally accepted event study methodology as unconvincing proof by example. His mischaracterization reveals his apparent lack of understanding of this experimental design.

88. In support of his mischaracterization of event study analysis as "proof by example," Dr. Khare references an unpublished monograph by NERA economist David Tabak [2010].[92] However, Dr. Khare misinterprets the article. The "proof by example" approach that Dr. Tabak criticizes is not the correct event study approach that I followed, but rather a backward event study approach. The backward approach finds examples of significant stock price movements coinciding with news by first identifying significant security price movements and then attributing those movements to whatever news may have transpired on those days. That style of event study is incorrect, as there will always be examples of significant price movements scattered throughout a company's past returns, but locating them proves nothing about whether or not those movements were indeed efficient reactions to information. I did not conduct a backward event study. I first identified news events and then tested for statistically significant price movement.

89. Dr. Khare is also wrong when he suggests that nothing can be learned from an event study that finds in all three instances the stock reacting significantly to major news. These demonstrations of market efficiency prove that there were no impediments to information flow precluding market efficiency, no impediments to trading that could have impeded market efficiency, and that market participants did not irrationally ignore

---

[91] "Event Studies in Economics and Finance," by A. Craig MacKinlay, *Journal of Economic Literature*, Vol. 35, 1997, p. 15.

[92] Khare Report, ¶64, citing "Use and Misuse of Event Studies to Examine Market Efficiency," by David Tabak, available at https://www.nera.com/content/dam/nera/publications/archive2/PUB_Use_Misuse_of_Event_Studies_0410_final.pdf, 30 April 2010.

economically material information. The event study results prove that there was a cause-and-effect relationship between information flow and price movement, which is the essence of market efficiency.

90.     Dr. Khare absurdly suggests that the event study results only prove that the stock behaved efficiently on the three event dates tested, and one has no way to know if the stock also behaved efficiently on other days in the Class Period.[93] Dr. Khare attacks the generally accepted and widely used event study methodology, primarily because he apparently does not understand it. As noted above, while a market efficiency event study should be run only on major news event dates, the results allow for inferences about all other dates. In fact, one of the roles of the other *Cammer* and *Krogman* factors is to justify extension of the results from the sample of tested events to all other dates. If the market behaves efficiently on the test dates, and the structure of the market remained well developed and supportive of market efficiency throughout the Class Period, it is reasonable and appropriate to conclude that the market was efficient throughout the Class Period. This conclusion is what the evidence compels in the instant case for the AmTrust Preferred Shares.

91.     In the Bettencourt and Feinstein [2017] *Law360* column, I explained that while Albert Einstein could only test his theory of relativity when there was a total eclipse of the sun, it would have been unreasonable to conclude that the theory of relativity was only operative during total solar eclipses. This is the logical error Dr. Khare makes when he argues that market efficiency demonstrated on all of the appropriate event dates says nothing about market efficiency on other dates. Market efficiency demonstrated on appropriate event dates, coupled with consistently strong *Cammer* and *Krogman* factor results compels a conclusion of continuous market efficiency.

92.     Dr. Khare inadvertently offers an apt analogy, which is instructive if properly modified. Dr. Khare states that if one observes a person eating a ham sandwich on three days, one cannot conclude that they ate a ham sandwich every day.[94] I agree. However, there are proper inferences. For example, one can conclude that this person is not averse to eating

---

[93] Khare Report, ¶¶62-64.

[94] Khare Report, ¶64.

32

ham. If modified to be more congruous with testing for market efficiency, the analogy becomes even more instructive. Suppose a college cafeteria offers one entrée per day. Ham sandwiches are served only occasionally; other entrées are served on the other days. A researcher wishes to determine whether a particular student will eat a ham sandwich when served. The test must be conducted when the ham sandwiches are served. What Dr. Khare apparently misunderstands is that you cannot test if the student will eat a ham sandwich on chicken enchilada day! The appropriate experimental design is to observe the reaction to ham sandwiches on ham sandwich days, and then make inferences about amenability to ham on all other days based on the results. Similarly, you cannot test for a significant efficient security price reaction to news on days when there is no major news. But, if an event study conducted on major news days proves that the stock responds to news, this result establishes efficiency for all days. The test proves that there are no impediments to market efficiency. Thus, it is reasonable to infer from a sample of major news days that the stock also behaves efficiently on the other lesser news days when the efficiency hypothesis cannot be tested with an event study.

### 3.    Dr. Khare Is Wrong to Exclude the Corrective Disclosure

93.    Dr. Khare asserts that the significant reaction of the Preferred Shares on 22 January 2019 to the 18 January 2019 delisting announcement should be disregarded in the market efficiency evaluation. Specifically, Dr. Khare offers:

> "With regard to the former, one of the dates Prof. Feinstein chose for his three-date event study was Plaintiff's alleged corrective disclosure date, January 22, 2018, [*sic*] when AmTrust announced that the AmTrust Preferred Securities would be delisted. This choice biases the event study analysis in favor of an inference of market efficiency, as a corrective disclosure is often associated with large price declines, and therefore, expected to have statistically significant price declines. In other words, one already knows the answer before doing the test."
> **Khare Report, ¶68.**

33

94. This criticism is preposterous. Dr. Khare is essentially conceding that the securities traded in an efficient market by stipulating that they would of course move significantly in reaction to such important news. Well, if it is agreed that the big news would, should, and did elicit a big price response, then it is agreed that the securities traded in an efficient market.

95. If an event is selected for a market efficiency event study because it produced a steep price decline, rather than because an independent assessment determined the news to be important, this could constitute selection bias. But this is not at all what I did. I did not select 18-22 January 2019 for the event study because it was alleged to be a corrective disclosure or because the price decline that day was large. The event was selected because of the momentous news on that date, and thus fit the appropriate selection criteria.

96. Dr. Khare does not and cannot dispute that generally accepted valuation principles dictate that reduced marketability stemming from delisting has a severe negative effect on value. Nor can he dispute that the news that impacted the price of the AmTrust Preferred Shares on 22 January 2019 was important news.

97. As such, 22 January 2019 was not only an appropriate day for testing the efficiency of the market for the AmTrust Preferred Shares, it was an ideal event day.

### 4. Dr. Khare Contends that AmTrust's Earnings Announcements Should Have Been Included in the Event Study

98. In the Feinstein Report, I explained that based on financial valuation principles, earnings announcements are not appropriate events for testing market efficiency for the AmTrust Preferred Shares.[95] The senior status of these securities, their fixed dividends, and the equity buffer provided by the common equity effectively insulated the Preferred Shares from the news announced during AmTrust's routine earnings announcements.[96] As AmTrust's earnings announcements would not be expected to elicit significant changes

---

[95] Feinstein Report, ¶¶175-177.

[96] Feinstein Report, ¶¶35-38. "Unlike common stockholders, preferred stockholders do not share in the increased profits that come from good years for the firm, nor in the decreased profits that come from bad years, unless earnings drop far enough to prohibit the preferred dividend payment." (*Investments*, 2nd Edition, by Nancy Jacob and R. Richardson Pettit, Irwin, 1988, p. 335).

in the Preferred Share prices in an efficient market, the results from testing those dates would be uninformative. Those dates do not satisfy the event selection criteria.

99. With little to support his argument aside from speculation and inapposite comparisons to distinguishable cases, Dr. Khare disagrees. Surprisingly, Dr. Khare does not assess the news in the earnings announcements and does not contend that there was any major unexpected positive or negative information disseminated. He disregards the stated event selection criteria.

100. Dr. Khare cites to two prior cases, Petrobras and Eletrobras, in which I did include earnings announcements in event studies assessing the efficiency of the markets for the preferred shares issued by those companies.[97] However, what Dr. Khare overlooks is that the Petrobras and Eletrobras preferred shares were very different from the Preferred Shares issued by AmTrust. The Petrobras and Eletrobras preferred shares paid variable dividends that were functions of the profits those companies earned.[98] The AmTrust preferred shares paid fixed dividends that would change only if the company was in distress. Quarterly earnings were far more valuation relevant to the Petrobras and Eletrobras preferred shares than they were for the AmTrust Preferred Shares.

101. Dr. Khare erroneously contends that there is no scholarship or authority to support the premise that the equity buffer insulates preferred shares from company-specific news. That the equity buffer insulates preferred shares is a fundamental principle that is explained even in introductory finance textbooks. For example:

> "Unlike common stockholders, preferred stockholders do not share in the increased profits that come from good years for the firm, nor in the decreased profits that come from bad years, unless earnings drop far enough to prohibit the preferred dividend payment."
> ***Investments*, 2nd Edition, by Nancy Jacob and R. Richardson Pettit, Irwin, 1988, p. 335.**

---

[97] See, e.g., Khare Report, ¶103.

[98] Holders of the Petrobras preferred ADRs are "entitled to minimum annual dividends equal to the greater of (i) 5% of their pro rata share of our paid- in capital or (ii) 3% of the book value of their preferred shares." (Petrobras Brasileiro S.A. Petrobras, Form 424B2, filed 28 September 2010, p. S-17). Holders of the Eletrobras ADRs are entitled to at least 25% of its adjusted net income from the preceding fiscal year. (Centrais Elétricas Brasileiras S.A. Eletrobras, Form 20-F for the Fiscal Year ended 31 December 2014, filed 11 October 2016, p. 158).

102.    Nuveen, a global investment manager, published a research note explaining the principle.

> "The larger common equity capital cushions create a protective buffer for preferred investors. On the balance sheet, preferreds sit above common equity. The more common equity capital banks hold, the greater the safeguard for preferred security investors."
> **"Preferred Securities in Institutional Portfolios," by Douglas Baker and Brenda Langenfield,** *Nuveen***, 25 September 2020, p. 8.**

103.    After denying that an equity buffer even matters, Dr. Khare argues that AmTrust's equity buffer had eroded, exposing the Preferred Share valuations to the vicissitudes of AmTrust's quarterly earnings. Not only is he wrong that the equity buffer eroded, but even if he were right, Dr. Khare finds no major surprises among the earnings announcements to warrant their inclusion in the event study.

104.    To support his conjecture that the AmTrust equity buffer had eroded, Dr. Khare points out that the AmTrust Preferred Shares were "rated below investment grade" by *A.M. Best*, and that "AmTrust stopped paying dividends on its common stock in June 2018."[99] It is worth noting that when addressing the analyst coverage *Cammer* factor, Dr. Khare argued that the Preferred Shares lacked focused coverage. Here, he inconsistently points out that the Preferred Shares were monitored and rated by *A.M. Best*.

105.    Contrary to Dr. Khare's assertion, according to *A.M. Best*,[100] the rating they assigned to AmTrust's Preferred Shares recognized an effective equity buffer still in place. On 3 July 2018, *A.M. Best* downgraded the debt securities, including the Preferred Shares, one notch. Specifically, the AmTrust Preferred Shares went from a bb+ to bb rating. According to *A.M. Best*, the "bb" rating was in the "fair" Long-Term Issue Credit Rating Category. *A.M. Best* explained that the "fair" designation was assigned to issues where "fair credit characteristics exist, generally due to a moderate margin of principal and

---

[99] Khare Report, ¶¶76-77, and ¶81, and Footnote 57.

[100] "A.M. Best Removes from Under Review, Downgrades Credit Ratings of AmTrust Financial Svcs. And most Subs.; Assigns Stable Outlook," *A.M. Best,* 3 July 2018.

interest payment protection or other issue-specific concerns that may be exacerbated by a vulnerability to economic changes or other conditions."[101]

106.    Dr. Khare's assertion that the AmTrust Preferred Shares should have been highly sensitive to earnings announcements because the equity buffer was eliminated is contradicted by the facts. First, *A.M. Best* stated that a moderate margin of protection was still in place. Second, as shown in Figure-1, the equity buffer increased over the course of the Class Period. In fact, the Company's market capitalization remained above $2.4 billion throughout Interval-1. Thus, the equity buffer remained intact throughout Interval-1. The equity buffer remained in Interval-2, but as the equity had gone private, it was unobservable.

107.    Dr. Khare seems to suggest that the common dividend was cut due to financial difficulties and solvency problems encountered. Only then would a cut in the equity dividend indicate a diminished equity buffer. But, this is not what happened. The common dividend was curtailed pursuant to the Go-Private Transaction. The Merger Agreement explained that while the merger was pending, the Company would ***not***:

> "set any record dates or payment dates for the payment of any dividends or distributions on its shares of common stock, or make, declare, set aside or pay any dividends on or make any other distribution in respect of any of its shares of common stock, subject to certain exceptions, including (i) the cash dividend declared on February 13, 2018, payable on April 16, 2018, in an amount of $0.17 per share and (ii) periodic cash dividends paid by the Company on preferred shares outstanding on the date hereof in an amount not in excess of the amounts required by the applicable certificates of designation for such preferred shares, with record and payment dates generally consistent with the timing of record and payment dates in the most recent comparable prior year's fiscal quarter prior to the date of the Merger Agreement."
> **AmTrust Financial Services, Inc., Form PREM14A, filed 9 April 2018, p. 94.**

---

[101] "Guide to Best's Issue Credit Ratings-(IR)," *A.M. Best*, http://www.ambest.com/ratings/debtguide.pdf, 2019.

Figure-1: Value of the Equity Buffer During the Class Period



108.    The Company never missed a dividend payment on the AmTrust Preferred Shares during or immediately following the Class Period.

109.    Clearly, Dr. Khare got it wrong. AmTrust's equity buffer had not eroded. The equity buffer was intact and had grown. That Defendants wished to take the valuable common equity private is a core fact in this case. With the Preferred Shares insulated by a healthy equity buffer during the Class Period, earnings announcements were not appropriate candidate events for testing the market efficiency of the AmTrust Preferred Shares.

### 5.    Dr. Khare's Six Additional Dates Are Not Appropriate Events for an Event Study Testing the Efficiency of the AmTrust Preferred Share Market

110.    Dr. Khare argues that for purposes of testing the efficiency of the market for the AmTrust Preferred Shares, I should have tested six "other 'announcements and developments informing investors about the future treatment and status of the Preferred

Shares in the planned Go-Private Transaction.'"[102] Dr. Khare contends that these six events "contained information economically material to the valuation of the Preferred Securities."[103] However, Dr. Khare does not correctly assess whether the information conveyed was new, surprising, and important enough according to valuation principles to be reasonably expected to elicit a significant preferred share price reaction in an efficient market. In fact, it was not.

111.    In the Feinstein Report, I explained that an "event study tests the joint hypothesis that (i) the security trades in an efficient market, and (ii) the appropriate valuation impact of the information disseminated on the event date is of such a large magnitude as to exceed the threshold for statistical significance."[104] Appropriate candidate events for inclusion in an event study testing for market efficiency are therefore events on which company-specific information was released that is new, unexpected, and of such import as to be reasonably expected to elicit a stock price reaction over the threshold for statistical significance in an efficient market.[105]

112.    Upon finding that his additional lesser news events did not elicit statistically significant price reactions, Dr. Khare should have analyzed whether the nonsignificance was due to the relatively low news content in the supplemental events, rather than jump to the conclusion that the efficiency of the market was questionable, especially given the preponderance of the evidence supporting market efficiency.

113.    Consistent with principles of classical hypothesis testing, a finding of statistical significance indicates market efficiency because it proves that the security reacted to information, but a finding of nonsignificance does not establish inefficiency. A modest nonsignificant stock price reaction (or no movement at all) is the appropriate and efficient stock price reaction to a modest, mixed, expected, or immaterial event.

---

[102] Khare Report, ¶85.

[103] Khare Report, ¶86.

[104] Feinstein Report, ¶171.

[105] Feinstein Report, ¶170.

114. As explained next, Dr. Khare's six additional days fail the screen for inclusion in the market efficiency event study. They simply were not days on which new, unexpected, unconfounded information was released that was so economically material that one should expect them to elicit statistically significant Preferred Share price reactions in an efficient market.

### a.    1 March 2018

115. It was announced on 1 March 2018 that the Go-Private Transaction that was previously announced on 9 January 2018 was proceeding according to plan. The definitive merger agreement was drafted.

116. Recall that after the close of trading on 9 January 2018, Stone Point Capital Partners had issued a joint press release with the Karfunkel-Zyskind Family, announcing the plan to acquire all of the outstanding shares of the Company's common stock.[106] On 10 January 2018, the Karfunkel-Zyskind Family filed a Form SC 13D/A with the SEC, detailing proposed terms of the transaction.[107] On 22 January 2018, the Karfunkel-Zyskind Family filed a Form SC 13D/A with the SEC, stating that it was their "current intention" to keep the Preferred Shares listed on the NYSE.[108]

117. The 1 March 2018 announcement stated that terms of the previously announced transaction were agreed upon. The price to be paid to common stock shareholders would be higher, the assurance to Preferred Share investors of continued listing was repeated, and the Go-Private Transaction was proceeding according to plan.[109]

---

[106] "Stone Point Capital Partners with CEO of AmTrust Financial and Karfunkel Family to Jointly Propose Acquiring All Shares of AmTrust Financial Common Stock Not Controlled by Family for $12.25 Per Share in Cash," *Business Wire*, 9 January 2018, 4:23 PM.

[107] AmTrust Financial Services, Inc., Form SC 13D/A, filed 10 January 2018, accepted 9 January 2018, 9:05 PM. A Schedule 13D, also referred to as Form SC 13D, is filed with the SEC when an investor owning or controlling more than 5% of a publicly traded security acquires or disposes more than 1% of the outstanding shares.

[108] AmTrust Financial Services, Inc., Form SC 13D/A, filed 22 January 2018, accepted 6:11 AM.

[109] See Feinstein Report, ¶¶69-70; and "Stone Point Capital, the Karfunkel Family and the CEO to Acquire AmTrust Financial Services, Inc.," *GlobeNewswire*, Company press release, 1 March 2018, 7:07 AM.

118. Because the announcement and its implications for Preferred Shareholders were in-line with prior Company announcements and market expectations, the announcement was not momentous, unexpected news that would reasonably be expected to elicit a large change in the prices of the AmTrust Preferred Shares.

### b.    25 May 2018

119. Dr. Khare contends that I should have included 25 May 2018 in my market efficiency event study.[110] According to Dr. Khare, the only news that day was that Institutional Shareholder Services (ISS) "issued a report urging shareholders to vote against the transaction."[111]

120. Dr. Khare overlooks that on the same day, another proxy advisory firm, Glass Lewis & Co., recommended that "AmTrust stockholders vote 'FOR' the Company's previously announced merger agreement at the Special Meeting of Stockholders on June 4, 2018."[112] The news that two advisory firms issued opposing opinions on the transaction is mixed news that would be expected to have a limited impact on the price of the AmTrust Preferred Shares. As such, 25 May 2018 is an inappropriate candidate event for testing Preferred Share market efficiency.

### c.    4 June 2018

121. Dr. Khare contends that I should have included 4 June 2018 in my market efficiency event study. That day, the Company announced that it had postponed the Special Meeting of Stockholders so that it could maneuver to obtain the common stockholder votes needed to approve the Go-Private Transaction.[113]

122. While the preliminary vote deficit may have been positive news for Preferred Shareholders as it reduced the likelihood of consummation of the Go-Private Transaction and its implications, the Company's ability to forestall the vote and lobby

---

[110] Khare Report, ¶89.

[111] Khare Report, ¶89.

[112] "Leading Proxy Advisory Firm Glass Lewis Recommends AmTrust Stockholders Vote 'FOR' Proposed Going-Private Transaction," *Contify Insurance News*, 25 May 2018.

[113] "AmTrust Announces Intention to Adjourn Special Meeting of Stockholders to June 21, 2018," *Globenewswire*, 4 June 2018, 9:29 AM.

for a majority vote was countervailing negative news. As such, the news that day was mixed for Preferred Shareholders and therefore would not be expected to elicit a statistically significant price movement, one way or the other.

123.   That securing a majority vote of the minority shareholders would be a challenge for the acquisition team, and would require more consideration for the common shareholders, was already well known. This was not new news as of 4 June 2018. On 17 May 2018, after the close of trading, renowned activist investor Carl Icahn disclosed ownership or control of approximately 18.4 million shares of AmTrust common stock. In his press release, Mr. Icahn explained that he had filed suit against the Company in Delaware and was imploring the board to "change the record date and special meeting date to ensure a fair vote."[114] Carl Icahn's opposition, when it was announced, was indeed big news, and I did include that event in the market efficiency event study.

124.   The follow-on announcement on 4 June 2018 that the meeting would be delayed (as Mr. Icahn requested), and that the Karfunkel-Zyskind Family would meet with Mr. Icahn, was unsurprising. From the perspective of the Preferred Shareholders, the news on 4 June 2018 was a mix of positive news, negative news, and unsurprising news. As such, this event is not an appropriate event candidate for testing Preferred Share market efficiency.

### d.      7 June 2018

125.   On 7 June 2018, prior to the start of trading, the Company announced that Evergreen would pay $14.75 per common share in connection with the Go-Private Transaction.[115] The press release reiterated that "the Special Meeting to approve the adoption of the merger agreement" would reconvene on 21 June 2018.[116]

126.   That common shareholders demanded more consideration is slightly positive news for the Preferred Shareholders, but the fact that the acquisition team was willing to pay it was countervailing negative news – both slight, given the assurances made to the

---

[114] Feinstein Report, ¶71; and AmTrust Financial Services, Inc., Form SC 13D, filed 17 May 2018, Exhibit-2.

[115] "AmTrust Enters into Amendment to Merger Agreement with Evergreen Parent," *GlobeNewswire*, Company press release, 7 June 2018, 6:30 AM.

[116] "AmTrust Enters into Amendment to Merger Agreement with Evergreen Parent," *GlobeNewswire*, Company press release, 7 June 2018, 6:30 AM.

Preferred Shareholders and prior expectations. The apparent purpose of Carl Icahn's proxy fight was to agitate for improved consideration for the common stockholders. The news this day was therefore anticipated and mixed. As such, this event is not an appropriate event candidate for testing Preferred Share market efficiency.

### e.    21 June 2018

127. On 21 June 2018, the Company announced that the amended Go-Private Transaction had been approved by shareholders.[117] However, given the series of news events prior to 21 June 2018, including that Carl Icahn and his affiliates (who owned nearly one fifth of unaffiliated stock) would be voting to approve the transaction, this development was not at all unexpected. As such, this event is not an appropriate event candidate for testing Preferred Share market efficiency.

### f.    28 November 2018

128. On 27 November 2018, after the close of trading, the Company announced that it had obtained "all regulatory approvals required to complete" the Go-Private Transaction, and that under the terms of the agreement, "AmTrust common stockholders will receive $14.75 in cash for each share of AmTrust common stock they own."[118] Given prior events, this development was entirely expected and provided no new unexpected information to the marketplace relevant to the valuation of the Preferred Shares. Dr. Khare does not contend that there were any regulatory factors potentially preventing the Transaction, which would have made the news this day informative. In fact, reporting on 22 June 2018, after the shareholder vote, *The Wall Street Journal* had written, "The deal is expected to close during the second half of this year."[119] As expected, the deal closed. Therefore, this event is not an appropriate event candidate for testing Preferred Share market efficiency.

---

[117] "AmTrust Stockholders Approve Amended Merger Transaction," *GlobeNewswire*, Company press release, 21 June 2018, 11:10 AM.

[118] "AmTrust Go-Private Transaction Receives Regulatory Approval," *GlobeNewswire*, Company press release, 27 November 2018, 5:25 PM.

[119] "Banking & Finance: AmTrust Holders Back Plan to Go Private," by Waverly Colville, *The Wall Street Journal*, 22 June 2018.

### g.    Summary of Dr. Khare's Six Additional Event Dates

129.    Given that the news that emerged on each of Dr. Khare's six additional event dates was either mixed, expected, or otherwise of relatively minor valuation relevance, none of Dr. Khare's supplemental event dates are appropriate event dates for inclusion in the market efficiency event study. Moreover, given the nature of the news on those days, the modest price movements in the Preferred Shares were appropriate in an efficient market. Far from indicating a flaw in my methodology or a lack of market efficiency, these appropriately modest price responses indicate that the AmTrust Preferred Shares moved as they should in an efficient market. Dr. Khare's supplemental empirical tests support the conclusion of market efficiency.

### F.    The AmTrust Preferred Share Prices Reacted Day-to-Day in Response to Interest Rates

130.    Interest rates are an important driver of the valuation of preferred shares. As shown in leading college-level textbooks, a preferred share can be valued as a perpetuity – that is, its value equals the periodic dividend divided by a required rate of return.[120] The required rate of return, in turn is a function of a market interest rate plus a risk premium.[121] Consequently, the value of a preferred share behaves much as bond values do, generally rising when interest rates fall, and falling when interest rates rise, all else equal.

131.    In order to focus on Company information and control for the valuation effects of market information in my event study, the regression I ran included variables for the overall stock market and AmTrust's industry sector. To control for the effect of interest rates, I included the S&P Preferred Shares Index ("Preferred Shares Index"). I explained that the Preferred Shares Index captured the effect of interest rates. I pointed out that each series of the AmTrust Preferred Shares exhibited a highly statistically significant relationship with the Preferred Shares Index. I explained that based on this result, the

---

[120] See, e.g., *Investment Analysis and Portfolio Management*, by Frank Reilly and Keith Brown, 6th Edition, Harcourt, Inc., 2000, p. 445.

[121] See, e.g., *Investments*, by Zvi Bodie et al., 9th Edition, McGraw-Hill Irwin, 2011, p. 129.

market for the AmTrust Preferred Shares demonstrated efficiency by continuously reflecting changes in market interest rates.

132. Dr. Khare disagrees. He asserts, incorrectly, that there is no relationship between interest rates and the Preferred Shares Index.[122] He states that other valuation relevant information is reflected in the Preferred Shares Index besides interest rates, and the AmTrust Preferred Share prices may have been reacting to that other information.[123] He points out that the preferred shares in other cases did not exhibit a statistically significant relationship with a preferred share index,[124] and yet I and courts concluded that those other preferred shares nonetheless traded efficiently. And, Dr. Khare argues that the lack of a statistically significant relationship between the AmTrust Preferred Shares and the market and sector indices in my regressions must weigh against market efficiency.[125] Further, surprisingly, Dr. Khare asserts that there is no grounding in the finance literature that econometric proof of information incorporation is evidence of market efficiency.[126] All of Dr. Khare's arguments are fallacious, as I explain next.

### 1.    The Preferred Shares Index Does Reflect Market Interest Rates

133. Dr. Khare incorrectly asserts that the S&P Preferred Shares Index is not "a proxy for market interest rates."[127] He claims there is no relationship between the Preferred Shares Index and interest rates. To support his erroneous conclusion, he presents unscientific counts of days on which market interest rates and the Preferred Shares Index changed in the same direction and different directions. He conducts no valid statistical test of correlation. The proper scientific comparison to see if the Preferred Shares Index can serve as a proxy for the market interest rate is a regression analysis comparing the two variables and testing for correlation.

---

[122] Khare Report, ¶¶107-108.

[123] Khare Report, ¶109.

[124] Khare Report, ¶103.

[125] Khare Report, ¶¶117-118.

[126] Khare Report, ¶100.

[127] Khare Report, ¶108.

134.   I conducted the proper statistical test that Dr. Khare neglected to undertake. I regressed the Preferred Shares Index on the Market Index and on the market interest variable Dr. Khare selected.[128] All variables entered the regression model as logarithmic percent changes.

135.   As shown in Table-4 below, the regression results reveal a highly statistically significant relationship between the Preferred Shares Index and the market interest rate. The relationship between the Preferred Shares Index and the market interest rate has the correct negative sign dictated by financial theory, and the $t$-statistic of -4.66 means that the relationship is significant at far greater than the 99% confidence level.

136.   These empirical results prove Dr. Khare was wrong to assert there is no relationship between the Preferred Shares Index and the market interest rate. The S&P Preferred Shares Index is an appropriate proxy for market interest rates when assessing whether the prices of the AmTrust Preferred Shares incorporated market interest rate changes.

**Table-4: Relationship between Preferred Shares Index and Market Interest Rate**

**Preferred Share Index Regression Results**

Estimation Period: 22 January 2018 through 18 January 2019

| Regression Statistics | |
|---|---|
| R Squared | 0.323 |
| Adjusted R Squared | 0.317 |
| Standard Error | 0.24% |
| Observations | 251 |

| | Coefficients | Standard Error | $t$-statistic |
|---|---|---|---|
| Intercept | -0.02% | 0.02% | -1.28 |
| Market Index | 0.16 | 0.01 | 10.77 |
| 20-Year Treasury Constant Maturity Rate | -0.06 | 0.01 | -4.66 |

---

[128] Khare Report, ¶110 and Footnote 97.

46

### 2. Other Valuation-Relevant Information Incorporated in the Preferred Shares Index

137. Curiously, Dr. Khare disparages the high correlation of the AmTrust Preferred Share returns with the Preferred Shares Index as evidence of market efficiency by stating that the Preferred Shares Index incorporates additional information relevant to the valuation of the Preferred Shares other than the market interest rate.

> "The index may be affected by both interest rate changes and events that have a common impact on the prospects for the individual companies that make up the index."
> **Khare Report, ¶109.**

138. This is a curious criticism because if the AmTrust Preferred Shares are responding to other valuation relevant information, that cause-and-effect relationship would further confirm market efficiency. Apparently, Dr. Khare concedes that the AmTrust Preferred Share prices do respond to public information, which is the essence of market efficiency.

### 3. The Petrobras and Eletrobras Preferred Shares

139. Dr. Khare argues that a significant relationship with a preferred share index cannot be evidence of market efficiency, because "In two matters, the Petrobras Securities Litigation and the Electrobras [sic] Securities Litigation, Prof. Feinstein's regression analyses show that the Significant Explanatory Variable Test for the Preferred Shares Index failed in almost all sub-periods examined."[129]

140. As explained above, the preferred shares issued by the Brazilian companies Petrobras and Eletrobras were distinguishable from the AmTrust Preferred Shares. The dividends of the Petrobras and Eletrobras securities varied with the respective companies' earnings. It is understandable that those other companies' preferred shares did not behave like fixed income securities, because their dividends were not fixed.

---

[129] Khare Report, ¶103.

47

### 4.     Econometric Evidence of Market Efficiency

141.     Dr. Khare contends that I cite no "'published peer-reviewed empirical research' that uses his Significant Explanatory Variable Test to examine market efficiency."[130] Apparently, Dr. Khare is overlooking the very definition of market efficiency and the entire field of econometrics. Econometrics is the area of quantitative economics tasked with investigating and measuring the effects of information on economic and valuation variables.

> "To start with a definition, *econometrics* is the branch of economics concerned with the empirical estimation of economic relationships. The 'metric' part of the word signifies *measurement*; and econometrics is basically concerned with measuring economic relationships."
> ***Econometric Models, Techniques, & Applications,* by Michael Intriligator, Prentice-Hall, 1978, p. 2.**

142.     A significant econometric relationship between information and prices is evidence, if not outright proof, that a subject security is impounding the investigated information. A cause-and-effect relationship between information and security price is the essence of informational market efficiency.

### 5.     The Market Factor, Sector Factor, and Company Information

143.     In paragraph 118 of his Report, Dr. Khare states, "If the Significant Explanatory Variable Test is indeed probative of a cause-and-effect relationship, as Prof. Feinstein asserts, then, according to his own criterion, AmTrust Preferred Securities on a day-to-day basis, did not show a cause-and-effect relationship with information changes related to both the market as a whole as well as the specific industry in which AmTrust operates."[131] Dr. Khare observes, "Additionally, according to Prof. Feinstein's AmTrust Preferred Securities regression analyses, there was no statistically significant positive correlation between market-wide and sector-specific indices and prices of the six series of AmTrust Preferred Securities."[132]

---

[130] Khare Report, ¶100.

[131] Khare Report, ¶118.

[132] Khare Report, ¶117.

144.    Dr. Khare's criticism here is misguided and unavailing. He never explains why the Preferred Share prices should be significantly correlated with market-wide or sector information. I explained that the fixed dividend and equity buffer insulated the Preferred Shares from most Company news, and these structures similarly largely insulated the securities from market-wide and sector news.

145.    Another defect in Dr. Khare's criticism is that he neglects to consider the correlation structure among market movements, sector movements, and movements in the Preferred Shares Index. That is, Dr. Khare neglects to check whether the relationships to market and sector movements were being captured by the AmTrust Preferred Shares' significant correlation with the Preferred Shares Index. To test this hypothesis, which Dr. Khare should have done before levying his unfounded criticism, I ran regressions to see if significant relationships between the Preferred Share returns and the market and sector explanatory variables were evident in regression results when the Preferred Shares Index was excluded.

146.    As it turns out, five of the AmTrust Preferred Shares series were indeed significantly correlated with either the Market or Sector index. As shown in Table-5 below, the $t$-statistic of either the Market Index or the Sector Index was above the threshold for statistical significance at the 95% confidence level for five of the six AmTrust Shares.

**Table-5: Independently Assessing the Correlation of AmTrust Preferred Shares with Market and Sector Indices**

| Preferred Series | Market Index $t$-Statistic | Sector Index $t$-statistic |
|---|---|---|
| A | 3.11* | 2.22* |
| B | 2.18* | 1.59 |
| C | 1.24 | 1.44 |
| D | 2.37* | 1.24 |
| E | 2.39* | 1.43 |
| F | 2.67* | 2.19* |

147.    Interestingly, Dr. Khare observes from the complete regression model that "about 77 to 81% of price changes in AmTrust preferred stocks during the Proposed Class Period are attributable to either company-specific information or random price changes."[133] That is,

---

[133] Khare Report, ¶115.

49

he concedes that he cannot rule out that the vast majority of the movements in the AmTrust Preferred Share prices are reactions to Company information. Reacting to information is the essence of informational market efficiency. But, the evidence is even stronger than that. The empirical evidence compels the conclusion that the AmTrust Preferred Shares did respond to Company information and therefore traded in an efficient market.

### G.    Dr. Khare's Criticism of The Generally Accepted Out-of-Pocket Damage Methodology Amounts to Him Tilting at Windmills

148.    In the Feinstein Report, I described the methodology for calculating 10(b) damages that I would use in this case – the out-of-pocket damages methodology.[134] This method is the appropriate damage computation methodology commonly applied in virtually all Federal class action securities cases alleging misrepresentations and omissions. This damage model fits the facts, circumstances, and liability theory of the instant case. I explained that the calculation of each Class member's damages would be a mechanical arithmetic exercise, conducted the same way for all Class members, applying the results of the Class-wide analyses described in the Feinstein Report to each Class member's trading data.[135]

149.    The out-of-pocket methodology is fully consistent with Plaintiff's theory of liability in the instant matter. It measures what compensation would place investors in a position commensurate to the economic condition that they would have been in had there been no alleged fraud. In the instant case, Plaintiff alleges that misrepresentations and omissions artificially inflated the prices of AmTrust Preferred Shares, and corrective disclosures later dissipated this artificial inflation, causing investor losses. The out-of-pocket methodology measures the loss caused by the introduction and subsequent dissipation of artificial inflation, and it does so commonly for all investors.

150.    Dr. Khare does not dispute that the out-of-pocket damage methodology is appropriate in the instant case. Nor does he disagree that the inflation ribbon can be used to compute damages commonly for all class members. Rather, he asserts that I have "propose[d] a

---

[134] Feinstein Report, ¶223(i)-(iv).

[135] Feinstein Report, ¶224.

vague and overly general methodology"[136] as the methodology fails to account for potential valuation complexities that may arise during the calculation of the inflation ribbon.

151.    Dr. Khare lists three purported concerns with respect to measuring artificial inflation.[137]

> "Fails to identify potential economic impact associated with change in trading venue from the NYSE to over the counter ('OTC') (i.e., Plaintiff's theory of liability)."
> **Khare Report, ¶185.**

> "Ignores that the allegations in this matter primarily related to alleged affirmative misrepresentations about continued listing, and does not consider price impact, if any, of alleged misrepresentations in his analysis."
> **Khare Report, ¶185.**

> "Fails to provide any details of confounding information relevant for this matter, and what particular valuation method, if any, is capable of assessing impact of the confounding information. To the extent the feasible valuation methods are not able to assess the impact of confounding information released with alleged corrective disclosure, a mechanical event study of price impact of an alleged corrective disclosure will be incapable of estimating an inflation attributable to purported fraudulent act."
> **Khare Report, ¶185.**

152.    Dr. Khare's first concern, that I have not identified the economic impact associated with the delisting is premature. Essentially, he is complaining that I have not yet conducted the damages analysis. The quantification of the losses sustained when the delisting informed investors that prior alleged misrepresentations and omissions were false and misleading can be measured, commonly for all Class members, by observing the decline that did occur, applying valuation tools to account for any concomitant confounding information, and also by potentially considering the rich literature on marketability discounts.

---

[136] Khare Report, ¶184.

[137] Khare Report, ¶185.

153. Dr. Khare's second concern stems from his misinterpretation of my articulation of the damage model. Using empirical and valuation tools, the valuation impact of the alleged misrepresentations and omissions can be measured for every day during the Class Period. Dr. Khare offers no reason to suspect the standard valuation tools cannot accomplish this task. The artificial inflation ribbon thusly computed will be common for all Class members.

154. Dr. Khare's third concern is unfounded speculation that complexities such as confounding information may arise in the computation of the inflation, and a criticism that I have not provided fine detail for how I would address those complexities. Dr. Khare does not argue that a proper inflation ribbon cannot be constructed. Rather, he argues that I did not list with particularity all the valuation tools one might apply to do so. This detail, however, while alluded to in my report when I described what an inflation ribbon is and should reflect, as well as the actual inflation ribbon itself, would be provided in a report on loss causation and damages, which I have not yet been asked to undertake.

155. Dr. Khare overlooks that confounding information is not an unusual phenomenon. It is encountered in most class action securities cases. The standard tools and principles of valuation easily handle it. Valuation under a variety of hypothetical scenarios is undertaken everyday by financial analysts for virtually all public securities. Dr. Khare has no basis to speculate that the valuation component of the damage computation would utilize too limited a set of tools and may disregard certain facts and circumstances.

156. Dr. Khare mischaracterizes my report by stating that my description of the generally applied analysis used to calculate an inflation ribbon is the entire extent of the analysis one could possibly apply. He is wrong to assume that no other valuation tools are available, when necessary, or that I suggested such. The methodology I described would utilize all appropriate valuation tools necessary to assess the artificial inflation caused by the alleged misrepresentations and omissions on each day during the Class Period. Nowhere in my report did I state that it would not.

157. Dr. Khare's criticism is misguided because the computation of the inflation ribbon could and would certainly consider, where appropriate, the various issues he mentions. Dr. Khare pointing out what a properly constructed inflation ribbon would reflect is essentially a concession that the common damages methodology exists, is feasible, and would be correct so long as the inflation ribbon reflects the various issues that he raises. While Dr. Khare essentially concedes that a common damage methodology exists, his purported criticism is that he thinks I may execute it improperly. His concern is unfounded and certainly premature.

## IV.    LIMITING FACTORS AND OTHER ASSUMPTIONS

158. This report is furnished solely for the purpose of court proceedings in the above referenced matter and may not be used or referred to for any other purpose. The analysis and opinions contained in this report are based on information available as of the date of the report. I reserve the right to amend, refine, or supplement this report in the event that I become aware of additional information, evidence, arguments, or analyses which bear on my work on this matter.

Steven P. Feinstein, Ph.D., CFA

53

**Exhibit-1**

**Documents and Other Information**
**Considered in Addition to Those Cited in the Feinstein Report**

**CASE DOCUMENTS**

- Expert Report of Steven P. Feinstein, Ph.D., CFA, dated 15 March 2021.
- Expert Report of Alok Khare, Ph.D., dated 30 April 2021.

**SEC FILINGS**

- Petrobras Brasileiro S.A. Petrobras, Form 424B2, filed 28 September 2010.
- Centrais Elétricas Brasileiras S.A. Eletrobras, Form 20-F for the Fiscal Year ended 31 December 2014, filed 11 October 2016.

**ACADEMIC AND PROFESSIONAL LITERATURE**

- Bettencourt, Daniel S. and Steven P. Feinstein, "What a Solar Eclipse Has to Do with Market Efficiency," *Law360*, 2017.
- Bodie, Zvi, Alex Kane, and Alan Marcus, *Investments*, 9th Edition, McGraw-Hill Irwin, 2011.
- Chen, Hailiang, Prabuddha De, Yu (Jeffrey) Hu, and Byoung-Hyoun Hwang, "Wisdom of Crowds: The Value of Stock Opinions Transmitted Through Social Media," *The Review of Financial Studies*, Vol. 27, No, 5, 2014.
- Emory, John D., "The Value of Marketability as Illustrated in Initial Public Offerings of Common Stock," *Business Valuation Review*, Vol. 16, No. 3, 1997.
- Intriligator, Michael D., *Econometric Models, Techniques, & Applications*, Prentice-Hall, 1978.
- MacKinlay, Craig A., "Event Studies in Economics and Finance," *Journal of Economic Literature*, Vol. 35, 1997.
- Mason, Robert D., Douglas A. Lind, and William G. Marchal, *Statistical Techniques in Business and Economics*, 10th Edition, Irwin McGraw-Hill, 1999.
- Reilly, Frank K. and Keith C. Brown, *Investment Analysis and Portfolio Management*, 6th Edition, Harcourt, Inc., 2000.
- Silber, William L., "Discounts on Restricted Stock: The Impact of Illiquidity on Stock Prices," *Financial Analysts Journal*, Vol. 47, 1991.
- Tabak, David I., "Testing Securities Market Efficiency with Cammer Factors," *Law360*, 2019.

**Exhibit-1**

**Documents and Other Information**
**Considered in Addition to Those Cited in the Feinstein Report**

**DATA AND DATABASES**

- Bloomberg
- Capital IQ
- CRSP (Center for Research in Security Prices)
- EDGAR
- Factiva
- FactSet
- TAQ (Trade and Quote)
- Thomson Eikon
- S&P
- Seeking Alpha

**LEGAL CASES**

- *Carpenters Pension Trust Fund of St. Louis v. Barclays*, 12-vc-5329-SAS, Opinion and Order, filed 20 August 2015.
- *Dougherty v. Esperion Therapeutics, Inc*., No. 16-10089, 2020 WL 2832252, (E.D. Mich. May 31, 2020), *report and recommendation adopted*, No. 16-10089, 2020 WL 6793326 (E.D. Mich. Nov. 19, 2020).

**OTHER**

- Baker, Douglas, and Brenda Langenfeld, "Preferred Securities in Institutional Portfolios," *Nuveen*, 25 September 2020.
- "Guide to Best's Issue Credit Ratings-(IR)," *A.M. Best*, http://www.ambest.com/ratings/debtguide.pdf, 2019.
- Puccia, Mark, Katrien Van Acoleyen, Peter J. Eastham, and John A. Scowcroft, "Principles of Credit Ratings," *S&P Global*, 16 February 2011.
- Wong-Fupuy, Carlos and Maura McGuigan, "Best's Credit Rating Methodology," *A.M. Best*, 13 November 2020.
- Tabak, David, "Use and Misuse of Event Studies to Examine Market Efficiency," available at https://www.nera.com/content/dam/nera/publications/archive2/PUB_Use_Misuse_of_ Event_Studies_0410_final.pdf, 30 April 2010.
- Other documents cited in my report.

55

**Exhibit-2**

**Steven P. Feinstein, Ph.D., CFA**
**Testimony Provided Since the Feinstein Report**

In Re Vale S.A. Securities Litigation
No. 19-cv-526-RJD-SJB
United States District Court
Eastern District of New York
Deposition Testimony
March 2021

In Re EQT Corporation Securities Litigation
Master File No. 2:19-cv-00754-MPK
United States District Court
Western District Of Pennsylvania
Deposition Testimony
May 2021

56

**Exhibit-3**

**Errata to the Feinstein Report**

| Page | Reference | Original Version | Corrected Version |
|---|---|---|---|
| Page 46 | ¶146 | This magnitude of market capitalization placed AmTrust in the 2nd decile of all U S companies by size | This magnitude of market capitalization placed AmTrust larger than 79% of all U S companies by size |
| Page 47 | ¶148 | AmTrust's Preferred Shares alone were valued greater than the common stock market capitalizations of 64% of all publicly traded companies in the U S | AmTrust's Preferred Shares alone were valued greater than the common stock market capitalizations of 58% of all publicly traded companies in the U S |
| Page 47 | ¶149 | During these subintervals, the outstanding value of the AmTrust Preferred Shares alone was larger than the common stock market capitalizations of 64% and 60% of all publicly traded companies, respectively | During these subintervals, the outstanding value of the AmTrust Preferred Shares alone was larger than the common stock market capitalizations of 58% and 54% of all publicly traded companies, respectively |
| Page 48 | ¶151 | Float excludes shares held by insiders and affiliated corporate entities, yet average float of the AmTrust Preferred Shares was still larger than the total market capitalizations (which includes shares held by insiders and affiliates) of at least 64% of all other publicly traded companies in the U S  This finding of large float weighs in favor of a conclusion of market efficiency | Float excludes shares held by insiders and affiliated corporate entities, yet average float of the AmTrust Preferred Shares was still larger than the total market capitalizations (which includes shares held by insiders and affiliates) of at least 58% of all other publicly traded companies in the U S  This finding of large float weighs in favor of a conclusion of market efficiency |
| Page 49 | ¶156 | By comparison, the average month-end bid-ask spread over the course of the Class Period for all stocks in the CRSP database, which comprises all common stocks traded on U S exchanges, was 0 61% | By comparison, the average month-end bid-ask spread over the course of the Class Period for all stocks in the CRSP database, which comprises all common stocks traded on U S exchanges, was 0 56% |
| Page 50 | ¶160 | The average month-end bid-ask spread over the course of the Class Period for all stocks in the CRSP database was $0 16 on a dollar basis  On a dollar basis, all series of the AmTrust Preferred Shares were relatively close to the average dollar bid-ask spread among all CRSP common stocks, with the Series D and F being narrower and the Series A, B, C and E being wider than the CRSP average | The average month-end bid-ask spread over the course of the Class Period for all stocks in the CRSP database was $0 12 on a dollar basis  On a dollar basis, all series of the AmTrust Preferred Shares were relatively close to the average dollar bid-ask spread among all CRSP common stocks, with the Series ~~D and~~ F being narrower and the Series A, B, C, D and E being wider than the CRSP average |
| Page 50 | Footnote 119 | The average bid-ask spread among all common stocks in the market during Interval 1 was 0 58%  For Interval-2, the average bid-ask spreads for Series A, B, C, D, E, and F were 2 08%, 1 50%, 2 50%, 1 03%, 1 40%, and 1 16%, respectively  The average bid-ask spread among all common stocks in the market during Interval-2 was 0 76% | The average bid-ask spread among all common stocks in the market during Interval 1 was 0 53%  For Interval-2, the average bid-ask spreads for Series A, B, C, D, E, and F were 2 08%, 1 50%, 2 50%, 1 03%, 1 40%, and 1 16%, respectively  The average bid-ask spread among all common stocks in the market during Interval-2 was 0 70% |
| Page 51 | Footnote 124 | The average market bid-ask spread during Interval-1 was $0 16  For Interval-2, the average bid-ask spreads for Series A, B, C, D, E, and F were $0 28, $0 21, $0 36, $0 14, $0 20, and $0 15, respectively; The average market bid-ask spread during Interval-2 was $0 18 | The average market bid-ask spread during Interval-1 was $0 12  For Interval-2, the average bid-ask spreads for Series A, B, C, D, E, and F were $0 28, $0 21, $0 36, $0 14, $0 20, and $0 15, respectively; The average market bid-ask spread during Interval-2 was $0 14 |

**Exhibit-4**

**Recent Securities Cases Where Professor Feinstein's Opinions Have Been Accepted**

| Company | Identifier | District |
|---|---|---|
| American Realty Capital Properties Inc. | 1:15-mc-00040 | U.S.D.C. Southern District Of New York |
| BancorpSouth, Inc. | 3:14-cv-01564 | U.S.D.C. Middle District Of Tennessee Nashville Division |
| Corrections Corp. | 3:16-cv-02267 | U.S.D.C. Middle District Of Tennessee |
| JELD-WEN | 20-cv-112 | U.S.D.C Eastern District of Virginia |
| BlackBerry | 13-cv-07060 | U.S.D.C. Southern District Of New York |
| McKesson | 18-cv-06525 | U.S.D.C. Northern District Of California |
| El Pollo Loco Holdings, Inc. | 8:15-cv-01343 | U.S.D.C. Central District Of California |
| Eletrobras | 1:15-cv-05754 | U.S.D.C. Southern District Of New York |
| First Solar | 2:12-cv-00555 | U.S.D.C District Of Arizona |
| Grupo Televisa | 18-cv-01979 | U.S.D.C. Southern District Of New York |
| Genworth Financial, Inc. | 1:14-cv-02392 | U.S.D.C. Southern District Of New York |
| JPMorgan Chase & Co. | 1:12-cv-03852 | U.S.D.C. Southern District Of New York |
| Las Vegas Sands Corp. | 2:10-cv-00765 | U.S.D.C. District Of Nevada |
| LSB Industries, Inc. | 1:15-cv-07614 | U.S.D.C. Southern District Of New York |
| Novo Nordisk | 3:17-cv-00209 | U.S.D.C. District Of New Jersey |
| Marvell Technology Group, Ltd. | 5:15-cv-05447 | U.S.D.C Northern District Of California |
| Petrobras | 1:14-cv-09662 | U.S.D.C. Southern District Of New York |
| Prudential Financial, Inc. | 2:12-cv-05275 | U.S.D.C. District Of New Jersey |
| Puma Biotechnology, Inc. | 8:15-cv-00865 | U.S.D.C. Central District Of California |
| Resource Capital Corp. | 1:15-cv-07081 | U.S.D.C. Southern District Of New York |
| RH, Inc. | 4:17-cv-00554 | U.S.D.C. Northern District Of California |
| Silver Wheaton Corp. | 2:15-cv-05146 | U.S.D.C. Central District Of California |
| Staar Surgical Company | 2:14-cv-05263 | U.S.D.C. Central District Of California |
| SunEdison | 1:16-md-02742 | U.S.D.C. Southern District Of New York |
| The Southern Company | 1:17-cv-00241 | U.S.D.C Northern District Of Georgia |
| Twitter, Inc. | 3:16-cv-05314 | U.S.D.C Northern District Of California |

58