LCEHMARC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

JAN MARTINEK,

                 Plaintiff,

          v.                                19 Civ. 8030 (KPF)

AMTRUST FINANCIAL SERVICES,
INC., ET AL.,

                                            Conference

                 Defendants.

------------------------------x

                                            New York, N.Y.
                                            December 14, 2021
                                            10:10 a.m.

Before:

                 HON. KATHERINE POLK FAILLA,

                                            District Judge

                         APPEARANCES

WOLF POPPER LLP
     Attorneys for Plaintiff
BY:  CARL LESTER STINE
     ADAM JOSEPH BLANDER
     SAMI AHMAD

QUINN EMANUEL URQUHART & SULLIVAN LLP
     Attorneys for Defendants
BY:  KEVIN SAMUEL REED
     ARI ROYTENBERG

LCEHMARC

(Case called)

THE DEPUTY CLERK:  Counsel, please state your name for the record, beginning with plaintiff.

MR. STINE:  Hi, your Honor.  Good morning.  Carl Stine from Wolf Popper.  With me today is Adam Blander, also from Wolf Popper, and Sami Ahmad from Wolf Popper.

THE COURT:  Thank you very much.  To whom should I be directing my questions this morning?

MR. STINE:  Well, Mr. Blander's going to be dealing with the spoliation issue, and I'll take care of all the other housekeeping-type stuff.

THE COURT:  OK.  Thank you very much.

MR. REED:  Good morning, your Honor.  Kevin Reed, from Quinn Emanuel, on behalf of defendants, with my colleague Ari Roytenberg.  I'll be handling the spoliation issues, and Mr. Roytenberg will be handling the discovery stuff.

THE COURT:  Thank you very much, and good morning to you as well.

Mr. Blander, I understood that the spoliation issue was still live.  There was an issue regarding the common interest privilege and how far it extended.  I thought the parties had worked that out, but let me understand whether that is still in play.

MR. BLANDER:  Your Honor, that's not in play.  We received last evening the documents at issue that we requested.

LCEHMARC

I reviewed them quickly, and I don't think we have a problem, with respect to those documents at least.

THE COURT:  All right.  Thank you.

Then let's talk about the spoliation issue.  I've received -- I have reviewed the parties' submissions, although understandably haven't really reviewed the reply that I struck.

MR. BLANDER:  I'm sorry, your Honor, I couldn't hear the last thing you said.

THE COURT:  All right.  I did not review the letter that was stricken from the record.  But let me understand, from the deposition testimony that you have, why you believe that Ms. Cooperberg -- am I saying her name correctly?  Yes, Ms. Cooperberg -- was destroying relevant documents, material documents, that were subject to a litigation hold?

MR. BLANDER:  Sure.  So I'll address each of those issues.

THE COURT:  Sir, let me say, and let me say to each of you, if it is easier for you to remain seated so that we're all hearing you, I take no offense.

MR. BLANDER:  Oh, that's fine.  I appreciate it.  I'll sit down.

THE COURT:  And then bring the microphone a little bit closer to you.  Thank you.

MR. BLANDER:  So when I deposed Ms. Cooperberg, Ms. Cooperberg testified that she used hard copy notebooks to

LCEHMARC

take notes regarding the AmTrust business.  She took sufficient notes that she had to go through a notebook approximately every two months.  Also what's not in dispute is that at the relevant time period, Ms. Cooperberg was the chief investigator -- investor relations officer at AmTrust.  So, surely, she was taking notes about matters relating to the business, but there's more --

THE COURT:  Sir, your adversary suggests she also took electronic notes.  Did you ask her the question to identify what materials were worthy of handwritten notes, what were worthy of electronic notes, and whether and to what extent handwritten notes made their way to electronic notes?

MR. BLANDER:  No, the distinction wasn't raised about what was the difference, although I would submit that the fact that we have certain electronic notes that she wrote, that she wrote a blank email, for example, in her Outlook folder, they are highly relevant, and I --

THE COURT:  And they were produced to you --

MR. BLANDER:  Correct.

THE COURT:  -- the electronics.  So I guess I'm not sure why I should deduce from the fact that there was electronic notes produced to you that her handwritten notes were also as highly relevant as you say and also needed to be produced.

MR. BLANDER:  Well, first of all, I'll just note I

LCEHMARC

think we're at a disadvantage, which is the case at any spoliation motion, because we just don't have those notes.  But we do have her testimony, and I think it is a reasonable inference given the very informal electronic notes -- again, these are just notes that she just jotted something down and either hit send or just --

THE COURT:  Slow down, sir.

MR. BLANDER:  Sure.  Your Honor, I have a copy of the electronic note.  If I may approach, you can see it just as referenced.

THE COURT:  This is the stricken document?

MR. BLANDER:  This is an attachment to the stricken document, exactly.

THE COURT:  You may hand it up.  And I don't appreciate your belief that you can intuit or you can file replies because I don't forbid it.  I also don't allow it.  So going forward, you can actually follow my individual rules of practice, sir.

MR. BLANDER:  Your Honor, I'll just say I apologize, and it won't happen again.  Obviously, we misunderstood your rules, and certainly, we didn't mean to circumvent any rules.  I just can't be any clearer than that.  We apologize.

THE COURT:  So this is a message from Ms. Cooperberg to Ms. Cooperberg?

MR. BLANDER:  Correct.  This is an Outlook note, and

LCEHMARC

as you can tell by -- just to give some reference of why this is highly relevant, this is Ms. Cooperberg telling herself in the upcoming 13D, do not disclose any intent to delist.  This is, I think, three or four days before the beginning of the class period when the individual defendants said that they don't intend to delist.  So if the electronic notes that she's writing bear any resemblance to the written notes that she's writing, and I think that's a very reasonable inference to make, then we've been deprived of very relevant evidence.

THE COURT:  Yes, but what your adversary suggests is that you didn't ask sufficiently specific questions of her to understand what notes made it from handwritten to electronic and, more specifically, whether there were notes regarding the substance of this litigation that existed in handwritten form only and were destroyed.

MR. BLANDER:  Right.  So, you know, with respect to my adversaries, I really don't think that's an appropriate criticism because they're asking did I specifically ask Ms. Cooperberg:  Did you draft notes that were related to the delisting?  If she was honest, she would probably say, like she said for most questions, I don't remember.  What I did ask her, and what I think is clearly sufficient because I asked her:

Did you take notes related to the AmTrust business?

The answer:  Yes.

How many notes?

LCEHMARC

Notes that were sufficient to take up two notebooks.

Also, what's her only job during this time?  Her job has changed since the going private merger.

THE COURT:  Slow down, sir.

MR. BLANDER:  It's the mask.  I'm sorry.

THE COURT:  No, no, you're speaking too quickly.  Slow down, sir.

MR. BLANDER:  OK.  I said her job changed following the going private merger.  It's not in dispute that she had -- her job during the relevant time period was she the chief investment relations officer at AmTrust.  The primary issues related to the investment -- to investor relations at this time was corresponding with investors, corresponding with regulators, corresponding with AmTrust officers about the merger, included in the merger was the future of the preferred stock.  So it would be surprising, if not nearly impossible, I respectfully submit, that the notes that she composed would not contain relevant information.  I think that's buttressed by the fact that the informal notes she took in electronic form, which were not developed into any sort of work product, are highly relevant and are about the preferred stock.

THE COURT:  When do you believe she was on notice that she should be saving her notes?

MR. BLANDER:  She was on notice to save her notes as early as -- well, certainly throughout the period where we were

LCEHMARC

requesting any documents, but I think that notice began -- that duty began upon the filing of many investor litigations alleging inadequacies in disclosures to investors, including an SEC investigation which was probing the adequacy of the disclosures to investors. I think then that -- excuse me, that duty, I think, got stronger upon the introduction of the merger to the public and then when there were threatened -- it was threatened litigation regarding the merger. Then that duty got even stronger upon the announcement of the delisting when Ms. Cooperberg was inundated with emails from investors threatening litigation, and I think that duty got even stronger when that litigation eventually transpired. But my belief is that duty existed upon the filing of investor lawsuits which existed, and I think that began in 2017.

Also, because your Honor asked about a litigation hold, this is another document that was stricken. So I won't show it to you if you don't want, but just to provide context because your Honor asked. There was a litigation hold in place. Following Ms. Cooperberg's --

THE COURT: When, sir, was that dated?

MR. BLANDER: Sure. The litigation hold that we are aware of -- I'll just -- I'm going to answer your question. I just want to provide the background.

I asked Ms. Cooperberg at her deposition: Did you receive a litigation hold? She said she did not remember.

LCEHMARC

Following the litigation -- following her deposition, defendants produced a litigation hold document which was dated February 14, 2019.  That's seven days after the delisting occurred.  However, there are some problems with this document.  First of all, there's no -- even though it's addressed to Ms. Cooperberg and other officers, there's no indication that she received it; there's no indication that she signed an acknowledgment form that she received it.  In fact, the document itself, the meta data says that the custodian is from a different AmTrust officer.

In addition, the litigation hold references other litigation holds that were in effect earlier.  I think the title of the document is something like "Litigation Hold Update."  It refers to litigation that existed at least a year earlier, saying that this litigation hold just updates the recipients about prior litigation holds that are in effect.  We don't have those prior litigation holds, but we don't believe, just to be clear, that the existence of a litigation hold one way or the other should really make that much of a difference, because whether AmTrust failed to actually implement a litigation hold proceeding or whether Ms. Cooperberg simply didn't follow it, the prejudice to us is exactly the same.

THE COURT:  Is it your understanding, sir, that even after February of 2019 Ms. Cooperberg continued to destroy her notebooks after they were filled?

LCEHMARC

MR. BLANDER:  Yeah.  I mean, she testified to that. She -- one of the initial discussions I had with Mr. Reed when I asked for clarification about why we don't have any notebooks, his position was, well, you wouldn't have received any, in any event, because she destroys notebooks every two months, and your lawsuit was only filed, I think, roughly seven months after the delisting.  So she -- her testimony was that she destroyed notebooks following the February delisting, which is why we have none, unlike other witnesses where we do have written notes.

THE COURT:  You mentioned that her job responsibilities changed.

MR. BLANDER:  Correct.

THE COURT:  In her new position, is she in a position to generate additional relevant evidence, or is the work that she does today not relevant to your litigation?

MR. BLANDER:  Yeah, I am sure that the time period negotiated between the parties, which I forget, has an end date, and I'm sure the end date has passed.  We haven't asked for all documents to the present.  Her current position, and then Mr. Reed will correct me, I think it's chief people's officer of AmTrust.  She basically does HR and marketing now that AmTrust is essentially a private company.  I'm not asking for documents from Ms. Cooperberg to the present.

THE COURT:  You've asked for an adverse inference

instruction, and to me that usually comes up when we're talking about a trial.  We're a little bit ahead of ourselves here.  Do you contemplate also somehow seeking an adverse inference or using some form of instruction in connection with summary judgment briefing?

MR. BLANDER:  It's a possibility, yes.  I mean, it's hard to know until we file any potential summary judgment motion or defendants file any potential summary judgment motion, but, certainly, we're entitled to that inference at the summary judgment stage.

THE COURT:  What is it that you think her notes say?

MR. BLANDER:  Well, I think at the very least -- and I can use the word "speculate" very gently because the notes have been destroyed, so all I can do is speculate -- but I think the notes likely have similar notations to what was electronically produced, which is that regardless of what the defendants', the individual defendants, intents were following the merger, it was crucial from an investor relations perspective for AmTrust to assure preferred stockholders that there was no intention to delist the preferred stock.  That's what the note I just handed up suggests, and I think there would be similar notations like that in the record.

Also, this is a note just from one period of time. It's an important period of time, which is right before the beginning of the class period, but as your Honor is aware,

LCEHMARC

there are many other disclosures thereafter about the preferred stock until the class period ended.  Again, I don't want to use the word "speculate," but it would not surprise me if there were notes about follow-up disclosures regarding the preferred stock, if not notes about correspondence or phone calls with other investors who were asking Ms. Cooperberg throughout the class period, what is going on with the preferred stock?  There would also be notes about her conversations with AmTrust officers.

I'll just say, frankly, I don't blame Ms. Cooperberg for answering many questions at the deposition with an answer such as like "I don't know," "I don't remember."  I think that's somewhat understandable when you're talking about discussions that happened three years ago.  But that's why you have to retain your notes, particularly if you're a high-ranking officer in a Fortune 500 company.  This wasn't her first rodeo.  Ms. Cooperberg had at least two investor relations jobs at public companies prior to AmTrust, and she was also a former business journalist.  Nonetheless, she destroyed her notes.

So we're really at a loss in the sense that I think this note that I showed you, it's an important note.  There are other important documents in the case, but this is an important one.  I think it suggests fraud, and we have -- you know, I think her handwritten notes would likely contain similar notes

LCEHMARC

which we've been utterly deprived of.

I guess I should be clear that my colleagues have done a diligent job. Initially, they didn't produce written notes. We then brought it to their attention. We said, Where are the written notes? We need the written notes, and they gave us written notes from certain custodians. And some of them are helpful; some of them are not. We received none from the investment relations officer at AmTrust.

THE COURT: All right. Thank you.

Mr. Reed, what is the situation? What do you understand to be Ms. Cooperberg's practice with respect to note-taking, and why -- it does seem strange that someone in her position would feel comfortable destroying notes.

MR. REED: Your Honor, I think first we have to start with the record as it stands, which is that they have established nothing more than Ms. Cooperberg sometimes took notes in a notebook, sometimes took notes electronically, and that it was her practice, as a matter of habit, to toss the written notebooks when they were full. That is the sum total of the record.

THE COURT: Yes, although, to be clear, sir, the fact that you produced an electronic note after her deposition suggests that perhaps they didn't have the -- they might have asked different questions if only they had had more materials.

Am I correct that the electronic note that was just

LCEHMARC

handed to me this morning was something that was produced after her deposition?

MR. BLANDER:  I should have clarified.  The litigation hold was produced after the deposition.

THE COURT:  Excuse me.  The litigation hold was produced after the deposition.

My point is, Mr. Reed, I think you're suggesting to me that plaintiff's counsel was deliberate in its questioning to sort of leave issues open so that they could now come to me and argue spoliation, and if only they had asked better, more precise questions, we might not be here.

MR. REED:  I think that's true, your Honor.  I don't mean to suggest nefariousness.  I think it's more tactics.  I don't know how much of this is clear from the transcript, but the original question with respect to notebooks came up in the morning, and Ms. Cooperberg testified, yes, I used notebooks. It was my practice to throw them away.  I understand in the heat of a deposition, perhaps you don't always ask the right follow-up question, but then there was a lunch break, during which Mr. Blander and, I assume, his partner, Mr. Stine, discussed this and decided they would follow up on the notebooks, and they asked questions on the notebooks.  But they were limited to:  You understand you were subject to a lit? They didn't ask:  What's did you take notes on?  Was there a distinction between electronic notes and handwritten notes?

LCEHMARC

Ms. Cooperberg had a childcare issue, and we had to terminate the deposition early that day. So we agreed we'd come back, and I think it was about a week later. I don't have the exact number of days, but it was several days during which they had additional time to ponder this question and think about what they wanted to ask. During that second session, they made no reference at all to the notebooks. So the paucity of the record here is not, to my mind, an accident. It is because they didn't -- they chose not to ask the questions that could have elucidated this further.

In our letter responding to their pre-motion letter, I could have supplemented the record, but I didn't know that that was the case -- that didn't seem appropriate in the context of a pre-motion letter exchange. I spoke to Ms. Cooperberg about that. I could make a proffer to you about what she would say, if that would be useful to you.

THE COURT: Please do. And I'd ask you to bring the microphone a little bit closer to you, sir. Thank you.

MR. REED: Sure. Ms. Cooperberg was sort of aghast at this whole thing. She views her notebooks as sort of a personal document where she writes to-do lists, reminders to herself. I said, you know, I asked her: Can you categorically rule out that you never take any notes of conversations? She says: No, I can't categorically rule it out, but that's certainly not my practice. My notebook is just sort of my

LCEHMARC

day-by-day kind of reminder list.  I don't do any drafting in my notebook, she said.  Anything that is of significance in terms of the business, I write on my computer.

I said:  Why do you tossed the notebooks?

She said:  It's just -- I don't view it as a substantial business document.  It's just reminders to myself, and when I build them up, I throw them away.

She is somebody who is aware of lit holds.  She believes she complies with them, notwithstanding that these notebooks get tossed.

THE COURT:  Does not the lit hold -- normally, it would include notes.  It wouldn't just be your formal memos of discussions that you've had.  It would include your notes as well.  So I'm not sure why -- I don't want a grocery list, and I don't want her note to make sure she calls somebody when she gets back to her office, but to the extent that there are notes, I would think that she would know that those get saved.

MR. REED:  I think she would, too, your Honor.  I think her perception of these notebooks is that they don't include those sort of materials.  We don't have them, so she can't rule out that it never happens.

THE COURT:  Yes.

MR. REED:  But she is an experienced businessperson. She understands lit hold obligations.  I think this may be something that she doesn't feel that it's substantial enough to

LCEHMARC

warrant preservation.  She may have been wrong in that, but the bottom line is, as we sit here today, there is no evidence that she took a note relating to this case.  There is no evidence that had she taken a note, it would have been something that would be relevant or helpful.  And at the end of the day, as we sit here today --

THE COURT:  You've heard Mr. Blander opine on what these notes might have been.

MR. REED:  I heard Mr. Blander nakedly and blatantly speculate about what his notes may have been.

THE COURT:  He's saying they would be just like the electronic notes that you did produce.  And what was for her the decisive factor as to what made it into electronic notes and what made it only into the written ones?

MR. REED:  I think what she would say, based on my conversation with her, if she felt it was significant to the business, she would put it in electronic form.  But I think the best question your Honor asked is what would the adverse inference be?  What do you think these notes would say? There's certainly no evidence to suggest that there's a note that says "hide a plan to delist these securities."

THE COURT:  Other than this electronic note that says do not disclose any plans to delist.

MR. REED:  Your Honor, that's an instruction as to what the -- should say based on what she's been told about what

LCEHMARC

the intentions are.  It also says do not disclose any plan --
first of all, it doesn't say "do not disclose the plan," "do
not disclose a plan."  This is saying this is what the 13D
should say:  Do not disclose any plans to delist the preferred
stock or any material changes to the dividend policy, because
there were no such things.

THE COURT:  That's your read of this note?  That's
interesting.  Again, you all have seen more of the discovery
than I have.  That's a mighty benign reading of the note, and I
might have had a different reading of it.

Go ahead.  Keep going.

MR. REED:  Your Honor doesn't have the benefit of the
context of the full scope of discovery here.  There has been
not a single shed of testimony where any witness has even --
I'm trying to think of the most powerful word I can use here.
Certainly nobody has ever said there was a plan to delist.
Nobody's ever said there's a plan to delist prior to the time
it was announced.  There are no documents in which there's
reference to a plan, hidden or secret plan, to delist.  This
note is the only thing they have come up with.

THE COURT:  But, sir, I guess my point is it's a
strange note.  And I understand it's only one document.  There
are many documents I haven't seen.  But it's a strange note to
say don't talk about these plans to delist the preferred stock
or any material changes to the dividend policy.  It would seem

to me, if there was no such things, there would be no reason to have a note saying do not disclose them, because there's nothing to disclose.  This actually seems to call attention to it and suggests something more active, as though there are plans to delist the stock, there are material changes to the dividend policy, and she's being told not to include them.  I think it's a very curious note.

MR. REED:  Well, I would respectfully disagree, your Honor.  The context of this is they've already filed a public filing announcing the merger which says nothing about the preferred stock.  They then begin to get some questions:  What are you guys going to do with the preferred stock?  So there's a plan put in place to do a subsequent filing in which they will disclose any plans about the preferred stock, and this is simply a note saying this subsequent filing, which is going to disclose our intentions with respect to the preferred stock, should not say anything about any plan to delist them or anything about any plan to change the dividend policy, because there are no such plans.  So it should simply say we have no plans.

THE COURT:  Please understand as well that I do not have the entirety of the transcript of the witness' deposition, but I found something curious about it.  There was discussion about her indicating that if something was sufficiently important, it would become work product.  I'm not sure what

LCEHMARC

that means, and perhaps you can explain what she meant when she testified in that regard.

MR. REED:  My understanding, your Honor, of what she meant was that she said if she took a note and it was important enough to the business to memorialize, she would put it in some sort of electronic form.

THE COURT:  So she wasn't using work product as attorneys use work product?

MR. REED:  It was not intended to be attorney work product.  Is that your question, your Honor?

THE COURT:  It is.

MR. REED:  OK.  I think it was meant to convey that if she viewed it as something of significance to the business, she would memorialize it electronically.

THE COURT:  I'd like you to please continue with your argument, sir, responding to -- your adversary suggests that we'll never know, and you say, well, they haven't made a record.  So there's a little bit of circularity to both side's arguments.  They're always going to say, well, we don't know what really important things were because she destroyed them, and you'll say, well, they can't make a showing that they were sufficiently important.

I do understand that a showing has to be made, and I accept, for the moment, your argument that they asked questions in a way that prevented them from figuring out the answers that

LCEHMARC

might be helpful or not helpful to this particular motion.  But it is, nonetheless, a cause of concern for me that she consistent -- that no one ever told her not to destroy her notebooks.  So it's clear that she knew that she was doing it.  These weren't accidentally destroyed.  It was par for the course.

Did no one else at the company know that she was doing this?

MR. REED:  I haven't asked that question, your Honor.

THE COURT:  All right.

MR. REED:  I haven't surveyed the company to find out whether anybody knew she was doing this.  Certainly, to my knowledge, hasn't come up in any prior proceedings.

THE COURT:  Would you speak, sir, to the issue of timing.  Apparently your argument to plaintiff's counsel was that given the timing of their complaint, it was not a surprise and it should not be a surprise and it was certainly not inappropriate for Ms. Cooperberg to destroy her notebooks because there was no reason to believe that she needed to keep them.  According to your adversaries, I should actually be thinking about 2017 and 2018 as the period when Ms. Cooperberg should have known not to destroy her notebooks.  Please speak to that.

MR. REED:  Your Honor, I think I have to pull back my argument a little bit on further reflection.  I don't think she

had an obligation to preserve them in 2017 or '18, because I don't think there's been anything before the Court that suggests she had relevant information with respect to whatever those proceedings were.  She was an investor relations person.  She wasn't a decision maker.  I think I probably overextended myself in suggesting that she didn't have an obligation to preserve any relevant notes until the complaint was filed because Mr. Blander correctly notes that when the delisting was announced in January of 2019, that we began to get complaints from investors; some of them threatened litigation.  So to the extent she had an obligation to preserve relevant notes, I would say it probably would have attached in or around the beginning of 2019.

THE COURT:  Was there an SEC investigation, and if so, when was the company first made aware of it?

MR. REED:  An SEC investigation relating to the delisting?

THE COURT:  Yes.

MR. REED:  There was none.

THE COURT:  There was none.

Was there contemporaneously an SEC investigation into something at AmTrust?

MR. REED:  There was an investigation by the SEC into various accounting issues.  My memory's failing as to whether it was ongoing as of early 2019.  I don't know that

LCEHMARC

Ms. Cooperberg would have been a significant custodian in connection with those sorts of issues.

THE COURT:  That's, in fact, my question.  OK.

Mr. Reed, is there something else you want me to know with respect to the plaintiff's motion?  I guess a question I'm going to have for your adversary in a moment is whether I should be deciding this motion on the papers before me and the information I'm receiving today or whether the parties believe that a more robust record would be appropriate.  So I'll hear from you on that and also anything else you want to tell me.

MR. REED:  Sure.  I don't think your Honor can fairly grant a spoliation finding on the record as it stands.  I think they simply haven't made any sort of case as to whether or not relevant notes existed or whether relevant notes would have been helpful.  Any inference at this point would be surely a guess as to what some hypothetical notes that may once have existed would have said.

I guess I would like to -- I would ask to see the particular adverse inference that they would purpose before I comment more specifically on why it's not warranted, but on the record as it stands, I don't think any adverse inference could be made.

Then the last point that we --

THE COURT:  No, just if you could pause right there, please, sir.

I appreciate your argument, which is, well, you have enough to deny and not enough to grant.  I guess I'm going to be asking whether there should be formal motion practice on this issue.  Do you have a position with respect to that?

MR. REED:  I think I would leave that to your Honor.  My view is, on the current papers, the motion should be denied.

THE COURT:  All right.  Please continue, sir.

MR. REED:  The last point I would make would be the last point in our letter, which is that even if you ignore that this is an application based on speculation stacked upon speculation, the last part of the analysis is there -- is the severe sanction of an adverse inference warranted?  I think that answer should clearly be no.

The Second Circuit says before you can impose a sanction for spoliation, you have to have a culpable state of mind.  Now, the case law makes clear that that's a fairly low bar and that even negligence can be a culpable state of mind, but the cases also make clear that where all you have is negligence, you don't give an adverse inference.  Here, that's all you have, at most.  There's been no suggestion that there was some effort to destroy evidence or that Ms. Cooperberg was acting in sort of a bad faith way.  At worse, she made an error in judgment in not appreciating that her notebooks filled with her sort of to-do lists and reminders should have been preserved in an excess of caution.  That's the most the record

LCEHMARC

can possibly show.  The severe sanction of an adverse inference isn't warranted under the case law.

THE COURT:  All right.  Thank you.

Mr. Blander.

MR. BLANDER:  Just to respond, I guess, to your Honor's first question is we would submit that briefing could clarify issues.  Particularly, there are issues that are raised in Mr. Reed's opposition letter which, I think, really -- I very much appreciate litigating with Mr. Reed, but I thought they were misleading statements in his letter, which is why we filed our reply.  I understand we shouldn't have done that, and again, I apologize.  But I definitely think that further briefing would just make the record more clear.

Addressing the substance of some of Mr. Reed's statements just now, just to clarify that the SEC investigation, he referred to it as an investigation into accounting.  That is true.  However, the investigation was into the adequacy of the disclosures made to the public.  So this was an issue where the point person for investor relations would have been involved.  This is an SEC investigation which began in 2013.  That's when AmTrust was notified of this investigation.

Also, there were investigations by -- excuse me, there was litigation by investors beginning, I think, in 2014, but certainly before the relevant time period.  There were then

LCEHMARC

additional securities litigation regarding the adequacy of disclosures that was filed in 2017.  Then there was a whole host of actions that were filed in connection with the merger.

So with respect to the litigation hold, the only litigation hold we are aware of due to defendants' production is the litigation hold which is unsigned by Ms. Cooperberg, which is very late in the game, which is February 14, after the delisting.  Again, our position is -- I don't really think it matters because, given Ms. Cooperberg's position at the organization and her understanding that there were many parties out there, including private litigants as well as regulators that would potentially be interested in her written notes, what she did was, I think, clearly negligent, and I think it was clearly in bad faith.

With respect to Ms. Cooperberg's testimony that anything that would have been important would have turned into work product, I -- even if Ms. Cooperberg was sincere in that, and I assume she was, it's just simply not a credible statement.  We all know this, and your Honor knows this better than any of us, given trials, but we all know that there is important, relevant evidence that often does not make its way into a formalized memorandum.  Notes can make or break a case. In fact, secrets usually do not make their way into a formalized note.  That's not surprising.  So her testimony that work product would have been generated for important matters, I

LCEHMARC

don't think it's true; and, second, that still doesn't give her the right to destroy her notes.  The litigation hold we do have makes clear that hard copy materials, including notes, must be saved because there's an understanding that messages can change as document drafts are generated.

Also, the notion -- I do take issue with Mr. Reed's claim that we made a tactical move not to ask specific questions of Ms. Cooperberg.  Like I mentioned already, I did ask Ms. Cooperberg if she took notes related to the AmTrust business.  She said yes.  She testified she took a lot of notes.  And we also know that her sole primary job during this time was the head of investor relations.  So did I ask her specifically, did you take notes related to my client, Mr. Martinek's lawsuit?  No, I didn't ask that question, although I think the inference is reasonable that given the centrality of the merger and the future of the preferred stock during the relevant time for an investment relations officer at AmTrust, there's got to be notes there.

And if you'll just indulge me one second, your Honor, I'm trying to see if I missed anything else.

The idea that there's just negligence here and there's nothing else, I mean, that's just not true.  I think I've -- I don't want to sound like a broken record.  We're not bringing this motion because Ms. Cooperberg was merely negligent.  We're bringing this motion because we have been deprived of relevant

LCEHMARC

evidence.  Maybe that evidence is very good for us.  Maybe that evidence is very bad for us.  But we just don't know, and the reason we don't know is because AmTrust acted culpably.

THE COURT:  To be candid with both sides, I do think plaintiff's counsel has a tough row to hoe on this motion.  I do think there's a lot of speculation involved, but if you wish to file a formal motion, I will let you file the formal motion.

I'm going to ask you to please ensure that you obtain a transcript of this conference, given the substantive discussions we've had on it.  You'll obtain that in the ordinary course or with whatever speed you think is appropriate.  I will receive a copy automatically.

Do you want me now to set a schedule, or do you want to meet with Mr. Reed to speak about what would be a schedule that both sides can meet?  My concern is simply to the extent folks have holiday, New Year's plans, I wish that you not destroy your associate's happiness by making them work on motions during this time period.  So I can set something now, or you can get back to me by the end of the week with a proposed schedule.

MR. BLANDER:  I think the latter is the best practice.  I'll speak with Mr. Reed right away.  We appreciate it, your Honor.

THE COURT:  All right.  Thank you.

Changing topics, Mr. Blander, there is some

LCEHMARC

suggestion, and I wish the parties were a bit more committal about this, about the appetite for summary judgment practice. Is it your colleague who's going to be speaking to that issue?

MR. STINE:  Yes.

THE COURT:  Mr. Stine.

MR. STINE:  Thank you, your Honor.

There's a couple things on the joint letter that we've sent --

THE COURT:  Yes.

MR. STINE:  -- that we'd like to bring up with your Honor, and certainly you brought up summary judgment.  I assume that defendants will want to make a motion for summary judgment, and we're considering whether there is a partial summary judgment motion that we can't also make, too.

THE COURT:  Do the parties want to wait until after I decide the class certification motion?

MR. STINE:  It's interesting, and thank you for bringing that up, your Honor.  Actually, the thing that's most urgent about the class decision --

THE COURT:  Yes.

MR. STINE:  -- is we have a January 3 date for our expert reports.  And we have a damage expert, and we're assuming, for the damage expert, that the class motion is granted in full.  But to the extent that it's anything different than in full, it could very well affect that report.

LCEHMARC

So that's one piece of it.

The other thing that your Honor should keep in mind when talking about scheduling and further things is that if your Honor grants the class cert motion, we will have to then make a motion related to notice, and the notice should go out with sufficient time before the trial so that people have the ability to opt out prior to the trial. So that's -- the motion for the notice and then if it's granted, then a three- to four-month period for the notice also. So I just wanted to bring that up now so we don't forget about that, the notice.

THE COURT: Just to pause there for a moment, sir, the issue of the class certification motion is simply I'm still in a pandemic, as are you, and I have incarcerated defendants whose stuff comes first. But assuming that is resolved, and it will one day be resolved, is it your contemplation that there would be a request for supplementation of the expert discovery? Is it your contemplation that, depending on how it's resolved, the parties might want to speak about settlement before doing summary judgment practice? What's the decision tree that you've been thinking about once the motion's decided?

MR. STINE: Mr. Reed and -- we had a discussion prior to the conference about -- I think we said in the letter that we had done a mediation with Robert Meyer --

THE COURT: Yes.

MR. STINE: -- who's a good mediator. He's a smart

LCEHMARC

guy, but it wasn't successful.  But we talked about reconnecting with him.  My thinking is that if there's a class certification decision imminent, then maybe it makes sense to wait for that because I think that could very well affect settlement.  I don't think that we would wait for summary judgment decision, though, to reconnect about settlement and try to get the case settled.

THE COURT:  Let me say this a little bit differently. I can't tell you when it will be resolved, although I suspect in maybe the next two months, just given everything else that I have going on, but I make no promises.  If that's the schedule, if you're getting it by mid-February, should I hold off on scheduling summary judgment practice until after the certification motion is decided?

MR. STINE:  Well, like I said, there's time in there because if your Honor grants the class certification motion, then there's a whole schedule having to do with notice.

THE COURT:  Yes.

MR. STINE:  It's going to push everything off anyway. It's not as if we need to do this to have a quick trial date, because that can't happen until the notice goes out anyway.  So it's fine with me if your Honor wants to push that off because I don't think it affects the bottom line of when we go to trial on this anyway.

THE COURT:  Are you thinking, then, of having the

LCEHMARC

summary judgment run concurrent with the notice to prospective class members?

MR. STINE:  Yeah, no, we could certainly do that.  We could certainly do that.  There's nothing saying we can't do that.  We could definitely do that.

There are a couple other things related to the joint letter.

THE COURT:  Go ahead, sir.

MR. REED:  Your Honor, before we move on, may I just give my thoughts on that particular issue?

THE COURT:  Sure.  I was going to come back to you after he gave me all his thoughts, but go ahead.

MR. REED:  I'm just afraid I'll forget.

THE COURT:  Oh, please.

MR. REED:  From our perspectives, I think it does make since to delay summary judgment until after class cert is decided for the simple reason that we think we have reasonable and solid arguments against class certification.  If the certification motion is decided, that could dramatically change the need for summary judgment.

THE COURT:  Fair enough, but Mr. Stine is suggesting that once it's decided, and if it's decided favorably to plaintiff and there's a notice period, we could run the summary judgment practice concurrently with the notice to prospective class members.  Would you think that that would be appropriate,

LCEHMARC

or do you want to revisit the possibility of mediation or something else entirely?

MR. REED:  Your Honor, my only concern is avoiding unnecessary billings to my client, and if the summary judgment motion is not going to be necessary, I'd rather not do it. Beyond that, I'm fine with whatever Mr. Stine wants to propose.

THE COURT:  OK.  Thank you.  I'll hear from Mr. Stine, and then I'll go back to you, sir.

Go ahead.

MR. STINE:  Thank you, your Honor.

So the other thing that I'd like to bring to your Honor's attention, we basically said discovery is over in the letter, and yesterday we received a production, which hopefully is the last one, of over 500 documents and 2,300 pages from defendants.  In discussions with defendants, they assure us that these are like -- these were things where we took issue with their privilege designations, and they're producing documents and withdrawing the privilege designations after the fact.  But we got this yesterday, and we don't know whether there's anything in there that would cause us to want to reopen depositions that have already been taken or depose somebody new based on that.  They don't think that that's going to happen, and I believe them, but we have to do our due diligence.

So I wanted to bring that to your Honor's attention, and I think that we should at least have the ability to do a

LCEHMARC

review of those documents, and if necessary, because of the production being literally months after the deadline for document production and many weeks after the close of all of the depositions, that we have an opportunity to do that.  And if we do, maybe some kind of extension of the seven-hour rule.  But we took eight depositions, so I don't foresee needing more than -- listen, I don't know what we'll need or what we won't need because we haven't reviewed the documents.  They just came in yesterday late afternoon.

THE COURT:  So in your joint letter where you say that there are potentially minor deficiencies that plaintiff would expect to resolve with the defendants without the need for judicial intervention, instead what I have is a 2,300-page production the day before this conference?

MR. STINE:  The letter was written before we had any clue.

THE COURT:  Oh, no, I understand that, although it was a joint letter.

Mr. Reed, did you know you were going to be making a 2,300-page, if that is indeed what it is, production the day before the conference?

MR. REED:  Your Honor, I'm going to --

THE COURT:  You're going to stand for this one.  OK.

MR. REED:  Your tone suggests that I ought to, but I'll sit.

LCEHMARC

THE COURT:  No, I just want an answer, sir.

MR. REED:  Your Honor, I knew we had a clean-up production to make.  I didn't anticipate -- it's my fault for not, I guess, tracking it closely enough that it would be 2,300 pages, but with your Honor's permission, I would like Mr. Roytenberg, our lead attorney on discovery, to address this.

MR. ROYTENBERG:  Good afternoon, your Honor.

THE COURT:  I'm sure he appreciates being your sacrificial lamb.

MR. ROYTENBERG:  Good afternoon, your Honor.

THE COURT:  Yes, sir.

MR. ROYTENBERG:  So the fact that the production is 2,300 pages is slightly misleading in the sense that half the documents are slip sheets.  So they're literally blank pages that just say "Redacted for Privilege," so there's nothing actually in them.  About half or the documents are draft filings related to issues that are not really relevant to this case, and that's in part why this was -- these documents were left over for this late period.

And we apologize for the late production, but I think that plaintiff's counsel will see, once they review the production, that there's nothing in these documents that's central to the issues in this case.  And the reason for the late production is in part because we were really trying to be

overly thorough and give them any single possible document that could say something, and these documents were set aside from other documents that were first deemed privileged.  And we looked through the documents that were set aside to make sure that anything that was relevant was produced, and that was produced before depositions happened.  So these were sort of -- these are leftover documents.  Again, if plaintiff's counsel has concerns about the documents, it can raise it with us, we can meet and confer, and we're open to a resolution.  But I'm fairly confident that there won't be anything in there because, like I said, these are documents that were specifically set aside because they weren't that important.

THE COURT:  All right.  Well, we'll find out the parties' definitions of "important."  Thank you.

Mr. Reed, do you want to speak further on any of the issues Mr. Stine has just raised to me?

MR. REED:  No.  Thank you, your Honor.

THE COURT:  Thank you.

Mr. Roytenberg, anything further I should know?

MR. ROYTENBERG:  No, your Honor.

THE COURT:  All right.  So far I understand there's going to be a letter I get by the end of this week regarding a schedule regarding the spoliation motion.  I understand and appreciate your patience as I resolve the class certification motion, and then I suppose the decision tree begins again once

that is done.  So I'll expect to hear from the parties shortly after that motion is decided so that we can talk about things, such as summary judgment or mediation or trial or things of that nature.

Is there anything else we should be addressing in this proceeding, Mr. Stine?

MR. STINE:  Just one slight thing related to the class motion, your Honor.  So, as I said, the extra reports are due on January 3.  So for our damage expert we're assuming that the class motion will be granted in full.

THE COURT:  Yes.

MR. STINE:  So to the extent that your Honor doesn't do that and it's after January 3, which it sounds like it's going to be, hopefully it will be OK to file updated -- it's either -- I guess the question is --

THE COURT:  It can be supplemented, sir.  You can apply for a supplement -- for either an extension or a reopening of expert discovery to accommodate the fact that I did what you believe to be the wrong thing.

MR. STINE:  Right.  Well, it's not only a question of that so much, but is it better to push off the date for expert reports or to just supplement them if the -- I think that the thing that would affect that most is we have a class period that we allege in our case, and your Honor, I would assume, is going to be going through the various dates, and there's a

LCEHMARC

possibility that your Honor will pick a shorter class period than what we have, which would affect damages.  So I guess I brought up the issue, and so I would imagine that if that happens, that we'll be able to supplement it.  Of course, there will be supplement on both side and another round of depositions is my only concern about that.

THE COURT:  Mr. Stine, when you first brought the issue to my attention, you spoke of it in terms of the January 3 date.  There was nothing in your initial discussion with me that suggested you wanted an extension or a deferral of that date.  If you and Mr. Reed want to postpone expert discovery until the cert motion is decided, then tell me that that is what you want to do.

MR. STINE:  OK.

THE COURT:  You you've spoken in terms of supplementation, and I've picked up on the way you've described it.  If you both feel concurrent -- or in accordance with Mr. Reed's earlier suggestion to me that he doesn't want to incur unnecessary expenses for his client, if you both believe that expert discovery should be stayed or tolled while the motion is pending, I need someone to tell me that.

MR. STINE:  OK.

THE COURT:  So perhaps your letter on Friday could tell me that as well.

MR. STINE:  OK.  Thank you, your Honor.

LCEHMARC

THE COURT:  All right.  Thank you.

Mr. Stine, is there anything else?

MR. STINE:  No, that's it.  Thank you, your Honor.

THE COURT:  Thank you very much.

Mr. Blander, anything else to discuss?

MR. BLANDER:  No, your Honor.

THE COURT:  OK.  Thank you.

Mr. Ahmad, do they let you speak?

MR. AHMAD:  No, nothing comes to mind, your Honor. Thank you.

THE COURT:  OK.  Thank you.

Mr. Reed?

MR. REED:  No.  Thank you, your Honor.

THE COURT:  All right.  And Mr. Roytenberg?

MR. ROYTENBERG:  No, your Honor.

THE COURT:  Thank you very much, and please excuse me. I have a *pro se* conference beginning now in my robing room.  So thank you very much.

Happy holidays to all of you.

(Adjourned)