UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JAN MARTÍNEK, | ) | |
| | ) | No. 19-cv-8030-KPF |
| Plaintiff, | ) | (Failla, J.) |
| | ) | |
| v. | ) | |
| AMTRUST FINANCIAL SERVICES, INC., | ) | |
| BARRY D. ZYSKIND, GEORGE | ) | |
| KARFUNKEL, AND LEAH KARFUNKEL, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
LEAD PLAINTIFF'S SPOLIATION MOTION**

**WOLF POPPER LLP**
Carl L. Stine
Patricia I. Avery
Adam J. Blander
845 Third Avenue, 12th Floor
New York, New York 10022
(212) 759-4600
cstine@wolfpopper.com

*Attorneys for Lead Plaintiff Jan Martínek and Lead Counsel for the Putative Class*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................................ ii

PRELIMINARY STATEMENT ....................................................................................................... 1

BACKGROUND .............................................................................................................................. 1

ARGUMENT .................................................................................................................................... 3

    I.      LEGAL STANDARD ........................................................................................................ 3

    II.     MS. COOPERBERG'S DESTRUCTION OF HER NOTEBOOKS
           CONSTITUTES SPOLIATION ...................................................................................... 5

           A.     Ms. Cooperberg Had a Duty to Preserve Her Professional Notebooks ...... 5

           B.     AmTrust and Its Agent, Ms. Cooperberg, Acted Culpably ...................... 10

           C.     The Destroyed Evidence Was Relevant to Plaintiff's Claims .................. 12

    III.    AN ADVERSE INFERENCE IS APPROPRIATE ............................................. 15

CONCLUSION .............................................................................................................................. 16

## TABLE OF AUTHORITIES

**Cases**

*Arista Records, LLC v. Usenet.com, Inc.*,
    633 F. Supp. 2d 124 (S.D.N.Y. 2009) .................................................................................. 4, 15

*Charlestown Cap. Advisors, LLC v. Acero Junction, Inc.*,
    337 F.R.D. 47 (S.D.N.Y. 2020) .................................................................................... 11

*Golia v. Leslie Fay Co.,*
    C.A. No. 01-cv-1111(GEL), 2003 WL 21878788 (S.D.N.Y. Aug. 7, 2003) ........................... 16

*John Wiley & Sons, Inc. v. Book Dog Books, LLC*,
    No. 13-cv-816, 2016 WL 11556548 (S.D.N.Y. Apr. 12, 2016) ............................................. 10

*Kronisch v. United States*,
    150 F.3d 112 (2d Cir. 1998) ............................................................... 5, 14, 15, 16

*In re NTL, Inc. Sec. Litig.*,
    244 F.R.D. 179 (S.D.N.Y. 2007) ...................................................................................... 4

*Ottoson v. SMBC Leasing & Fin., Inc.,*
    268 F. Supp. 3d 570 (S.D.N.Y. 2017) ................................................................................ 4

*In re Pfizer Inc. Sec. Litig.*,
    288 F.R.D. 297 (S.D.N.Y. 2013) ...................................................................................... 6

*R.F.M.A.S., Inc. v. So*,
    271 F.R.D. 13 (S.D.N.Y. 2010), *opinion adopted*, 271 F.R.D. 55 (S.D.N.Y. 2010) ......... *passim*

*Reilly v. Natwest Mkts. Group Inc.*,
    181 F.3d 253 (2d Cir. 1999) ........................................................................................ 13

*Residential Funding Corp.*,
    306 F.3d at 107 (2d Cir. 2002) ...................................................................................... 15

*Sekisui Am. Corp. v. Hart,*
    945 F. Supp. 2d 494 (S.D.N.Y. 2013) ....................................................................... 5, 10, 16

*Skyline Steel, LLC v. PilePro, LLC*,
    101 F. Supp. 3d 394 (S.D.N.Y. 2015) ........................................................................... 5, 10

*Turner v. Hudson Transit Lines*,
    142 F.R.D. 68 (S.D.N.Y. 1991) .................................................................................... 5, 15

*Wager v. G4S Secure Integration, LLC*,
    No. 19-cv-3547, 2021 WL 5304321 (S.D.N.Y. Nov. 15, 2021) ................................................ 4

*Zubulake v. UBS Warburg LLC*,
  220 F.R.D. 212 (S.D.N.Y. 2003)....................................................................... 4, 5, 11

**Rules**

Federal Rule of Civil Procedure 37 ......................................................................... *passim*

**PRELIMINARY STATEMENT**

Lead Plaintiff, Jan Martínek ("Plaintiff"), by and through his undersigned counsel, respectfully submits this memorandum of law in support of his motion for a finding of spoliation against Defendant AmTrust Financial Services, Inc. ("AmTrust") for discovery misconduct arising from the destruction of the hard-copy notebooks belonging to AmTrust's most senior investor relations officer, Chaya Cooperberg.

As discussed herein, despite knowing that AmTrust was being sued and investigated in multiple fora for misleading investors and other corporate malfeasance, Ms. Cooperberg destroyed her professional notes spanning the entire relevant time period of this Action. Given that Ms. Cooperberg was an important point-person in crafting disclosures at the heart of this case, given that her own private *electronic* notes demonstrate that she took notes on topics directly addressing the merits of Plaintiff's fraud claims, and given that Ms. Cooperberg (as AmTrust's public-facing officer) was inundated with messages from investors about the future of AmTrust's preferred stock during this time period, the most reasonable, if not the only, inference is that Plaintiff has been deprived of evidence. Given this prejudice to Plaintiff, a spoliation finding in the form of an adverse inference, along with any other relief the Court finds appropriate, is required in order to prevent AmTrust from profiting from its own culpability.

**BACKGROUND**

This is a putative class action for securities fraud on behalf of purchasers of the six series of shares of AmTrust preferred stock (collectively, the "Preferred Stock"), from January 22, 2018, through January 18, 2019 (the "Class Period"). During the Class Period, Defendants falsely assured investors that they would maintain the listing of the Preferred Stock on the New York Stock Exchange ("NYSE"), notwithstanding the plans of the Individual Defendants (AmTrust's

1

controlling stockholder group) to acquire AmTrust's common stock in a private Buyout.[1]

On January 18, 2019, less than two months after the Buyout closed, Defendants announced they were delisting the Preferred Stock, which caused the stock's price to plummet by nearly 40% by the next trading day, with the shares losing over $300 million dollars in market value.  ¶ 82.

In the wake of these events, Plaintiff commenced this Action, and this Court thereafter appointed him as Lead Plaintiff and his counsel as Lead Counsel under the PSLRA.  Dkt. No. 23. In an Opinion and Order dated August 14, 2020 (Dkt. No. 34), this Court denied in substantial part Defendants' motion to dismiss, finding, among other things, that Plaintiff had pleaded sufficient facts demonstrating that Defendants' statements regarding the continued listing of the Preferred Stock were false or misleading; that Defendants failed to issue any meaningful cautionary statements so as to invoke the safe harbor provision of the PSLRA; and that Defendants acted with scienter.  The Court concluded that "[t]he fact of the matter is that, prior to the Merger, Defendants repeatedly assured investors that the preferred stock would remain listed, and then, less than two months after the transaction closed, decided to delist the preferred stock," and that the "professed reasons for delisting the stock . . . were known to the Individual Defendants before the Merger," a fact "only strengthen[ing] Plaintiff's argument [that] this was a classic bait and switch."  *Id.* at 41. Following denial of the motion to dismiss, a discovery schedule was subsequently established. Dkt. Nos. 37, 56.

On October 7 and October 19, 2021, Plaintiff's counsel deposed Ms. Cooperberg, AmTrust's "Chief Communications Officer" and most senior investor relations officer.[2]  During

---

[1] Terms not defined herein have the same meaning as defined in Plaintiff's Complaint, Dkt. No. 5. References to paragraphs of the Complaint are in the form "¶__."

[2] *See* Cooperberg Deposition Transcripts, Volumes 1 & 2, attached herein in combined form as Exhibit A to the Declaration of Adam J. Blander.  All exhibits to the declaration are referred to as "Ex. __"

the course of the depositions, it was revealed that Ms. Cooperberg had prepared written notes in hard-copy notebooks regarding her "professional matters" at AmTrust. Ex. A 17:22-17:24; *id.* ("Q: To be clear, you take notes regarding your professional matters in a notebook, right? A. Yeah, I tend to. Yes, I keep notebooks."). The notes, however, were not available, because Ms. Cooperberg revealed that she "throw[s] [the notebooks] away. I throw them away after they're done, when the notebooks come to the last page." *Id.* at 18:2 – 18:4. Ms. Cooperberg also revealed that she went through "[m]aybe one notebook every two month or so." *Id.* at 18:11-15. A two-month notebook cycle would indicate that Ms. Cooperberg destroyed approximately six notebooks pertaining to her work at AmTrust during the Class Period alone.[3] Ms. Cooperberg also testified that she was aware of multiple investor lawsuits related to AmTrust, and an SEC investigation related to the adequacy of AmTrust's disclosures to investors (which ultimately resulted in sanctions against AmTrust and its CFO and monetary penalties exceeding $10 million[4]), yet she nonetheless destroyed her notes. *Id.* at 66.

As a result of Ms. Cooperberg's destruction of evidence, Plaintiff has been deprived of *all* written materials from this key witness.

## ARGUMENT

### I.    LEGAL STANDARD

"Federal common law and various procedural rules governing discovery impose upon litigants a number of obligations regarding the handling and production of evidence." *R.F.M.A.S., Inc. v. So*, 271 F.R.D. 13, 21 (S.D.N.Y. 2010), *opinion adopted*, 271 F.R.D. 55 (S.D.N.Y. 2010).

---

[3] The negotiated time period governing Plaintiff's document requests was obviously longer: September 1, 2017, through August 28, 2019 (the "Relevant Time Period"), the latter date reflecting when Plaintiff filed this Action.

[4] Securities and Exchange Commission, *Insurance Company and Former CFO Charged With Faulty Loss Reserves Disclosures* (June 17, 2020), *available at* https://www.sec.gov/news/press-release/2020-135.

"Chief among these obligations is the common-law duty to preserve documents and property that could potentially serve as evidence in a lawsuit." *Id.* (citations omitted). When a party breaches its discovery obligations, it subjects itself to potential sanctions for spoliation of evidence. *Id.*

The power to sanction a party for spoliation of evidence is derived from Federal Rule of Civil Procedure 37 and the courts' "inherent supervisory power." *See, e.g., R.F.M.A.S., Inc.*, 271 F.R.D. at 22 (citing *Arista Records, LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 138 (S.D.N.Y. 2009)); *In re NTL, Inc. Sec. Litig.*, 244 F.R.D. 179, 191 (S.D.N.Y. 2007); *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003).

Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Ottoson v. SMBC Leasing & Fin., Inc.,* 268 F. Supp. 3d 570, 579 (S.D.N.Y. 2017) (citations omitted). The purpose of a spoliation finding is to: "(1) deter parties from violating discovery obligations; (2) place the risk of an erroneous judgment on the party that wrongfully created the risk; and (3) restore the prejudiced party to the same position that it would have been in absent the discovery violation by an opposing party." *R.F.M.A.S., Inc.*, 271 F.R.D. at 24.

The party seeking a spoliation finding must show: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed 'with a culpable state of mind'; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Wager v. G4S Secure Integration, LLC,* No. 19-cv-3547, 2021 WL 5304321, at *6 (S.D.N.Y. Nov. 15, 2021) (citations omitted).

Moreover, while the court has wide discretion to fashion appropriate relief in the event of a spoliation finding, ranging from the awarding of fees and costs to the preclusion of evidence, to

4

the dismissal of one's case, one common remedy is the invocation of an adverse inference at summary judgment and at trial. *See, e.g., Kronisch v. United States*, 150 F.3d 112 (2d Cir. 1998) (relying on adverse inference to deny summary judgment); *Sekisui Am. Corp. v. Hart,* 945 F. Supp. 2d 494, 509-10 (S.D.N.Y. 2013) (ordering that jury be given adverse inference instruction). As described herein, Plaintiff satisfies each of the above requirements, and, accordingly, a spoliation finding in the form of an adverse inference is justified.

## II.   MS. COOPERBERG'S DESTRUCTION OF HER NOTEBOOKS CONSTITUTES SPOLIATION

### A.  Ms. Cooperberg Had a Duty to Preserve Her Professional Notebooks

"In order to make a finding of spoliation, the court must first determine that the allegedly spoliating party had a duty to preserve the evidence at issue." *R.F.M.A.S., Inc.*, 271 F.R.D. at 23 citing *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 72 (S.D.N.Y. 1991). Plaintiff has satisfied his burden of showing that a spoliation finding is warranted.

It cannot be reasonably disputed that the notebooks used by a senior AmTrust officer to take notes of business matters and investor communications are the type of documents that are required to be preserved. "Evidence that must be preserved includes documents, electronically stored information and physical evidence . . . [that] is reasonably likely to be requested during discovery." *R.F.M.A.S., Inc.*, 271 F.R.D. at 23-24 (citing *Turner*, 142 F.R.D. at 72).

It also cannot be disputed that AmTrust and Ms. Cooperberg had an obligation to preserve the evidence throughout the Relevant Time Period. This is because the obligation arises "when the party has notice that the evidence is relevant to litigation." *R.F.M.A.S., Inc.*, 271 F.R.D. at 24 quoting *Zubulake*, 220 F.R.D. at 216; *Skyline Steel, LLC v. PilePro, LLC*, 101 F. Supp. 3d 394, 407 (S.D.N.Y. 2015) ("It is undisputed that a litigant has the duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery

of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject

of a pending discovery request."); *In re Pfizer Inc. Sec. Litig.*, 288 F.R.D. 297, 313–14 (S.D.N.Y.

2013) (obligation "arises when the party has notice that the evidence is relevant to litigation . . .

for example when a party should have known that the evidence may be relevant to future

litigation.").   Here, Ms. Cooperberg was on notice of pending investor litigation related to

AmTrust, throughout the Relevant Time Period.  Those actions, include, but are not limited to:

- A derivative action alleging breaches of fiduciary duty and the usurping of a corporate opportunity from AmTrust against the Individual Defendants in connection with a transaction involving Tower Group International, Ltd.  *Cambridge Ret. Sys. v. DeCarlo,*  C.A. No. 10879-CB (Del. Ch.) (commenced in April 2015).

- A consolidated action alleging securities fraud related to AmTrust's financial reporting. *In re Amtrust Financial Services Inc. Securities Litigation*, C.A. 1:17-cv-01545 (S.D.N.Y.) (commenced in March 2017).

- A consolidated derivative action alleging violations and other misconduct of the securities laws related to AmTrust's financial reporting *In re AmTrust Financial Services, Inc. Deriv. Litig.*, 1:17-CV-00553-MN (D. Del.) (commenced in May 2017).

- A consolidated class action alleging breaches of fiduciary duty arising from the Buyout *In re AmTrust Financial Services, Inc. Stockholder Litigation, C.A.* No. 2018-0396-AGB (Del. Ch.) (commenced May 2018).

- A lawsuit commenced by one of AmTrust's Preferred Stock underwriters, arising from the delisting.  *Keefe, Bruyette & Woods, Inc. v. AmTrust Fin. Serv., Inc.,* Index No. 650695/2019 (N.Y. Sup. Ct.) (commenced February 2019).

- A lawsuit commenced by preferred stockholders alleging breach of contract, among other claims, arising from the delisting.  *Matlick v. AmTrust Financial Services, Inc.,* Index No. 651349/2019 (N.Y. Sup. Ct.) (commenced March 2019).

In addition, Ms. Cooperberg was aware that, as early as June of 2013, AmTrust was

responding to the SEC's investigation into its accounting practices and the adequacy of its public

disclosures.  Ex. A at 177:3-9.

As the senior investor relations officer of a company facing a host of investor lawsuits and

at least one SEC investigation, Ms. Cooperberg's duty to preserve her hard copy notebooks would

6

have begun no later than July 2016 (long before the start of the Relevant Time Period), when she joined AmTrust as its Chief Communications Officer and became aware AmTrust was a target of these proceedings.  In the context of repeated litigation against AmTrust, there can be no justification for key Company personnel to destroy business records.  This duty to preserve material is especially acute in Ms. Cooperberg's case because she was inundated with investor concerns, questions, and complaints about the post-Buyout status of the Preferred Stock throughout the Relevant Time Period.  As Ms. Cooperberg herself stated, "So my job was to communicate with investors information from the company and to communicate information from investors back to – back to senior executives of management." Ex. A at 88:6-9.  Ms. Cooperberg also oversaw the drafting of talking points for her investor relations team that addressed expected questions regarding the post-Merger future of the Preferred Stock.  *See* Ex. A at 159:21-23.

Indeed, Ms. Cooperberg was the recipient of a barrage of communications from confused and angry investors and analysts, several of which she relayed to other AmTrust executives.  *See, e.g.*:

- January 16, 2018 text message from Chaya Cooperberg to AmTrust CFO Adam Karkowsky (Ex. B) ("Fielding a lot of calls from confused preferred holders").

- January 16, 2018 email to Cooperberg (Ex. C) ("Few more questions on preferred. 1. If common is taken private, will the preferred be delisted? 2. Any concern over preferred dividend continuity, assuming offer is closed?").

- January 16, 2018 email to Cooperberg (Ex. D) ("If taking Amtrust is such a good deal for Amtrust investors, why is the Amtrust common stock trading above the proposed acquisition price and why is the Amtrust preferred stock which I own a lot of crashing?").

- January 18, 2018 email from Cooperberg to various individuals (Ex. E) ("We want to share that over the past three days, the IR team has been overwhelmed with calls and emails from AmTrust preferred shareholders.").

- January 18, 2018 email to Cooperberg (Ex. F) ("I was hoping that one of you is available today to discuss the preferred shares — I'm getting a lot of questions from Stifel's retail distribution about their potential de-listing and dividend suspension if and

7

when AmTrust goes private, and I just don't know enough to answer the questions.").

- September 27, 2018 email to Cooperberg (Ex. G) ("A week ago I talked by phone with you about changes in Preferred shares "A" and "C" status after AFSI goes private. You assured me the preferred shares will not be delisted, and dividends will be paid, according existing documents (although series A and C are non-cumulative) But the situation is strange - the price of preferred shares continue to drop pretty fast, sometimes 3-4% per day. Today series A and C (which I owe) cost $15 -$17. Also trading volume increased noticeably. Such a drop 50% below nominal $25 value is very unusual for the listed Preferred shares for company in good financial standing. I am trading Preferred shares for many years, and NEVER saw such a situation. Your clients - retail investors - are losing millions of dollars.").

- September 28, 2018 email to Cooperberg (Ex. H) ("I am interested in AmTrust preferred stocks as a potential investment and have some questions that relate to the rights and protections that preferred stockholders will have after AmTrust goes private. This email is a follow up to a message I left with an assistant in your office yesterday. Here we go. . .").

- October 15, 2018 email to Cooperberg (Ex. I) ("We understand the preferred shares will remain outstanding but will they still be exchanged through NASDAQ?").

- November 15, 2018 email to Cooperberg (Ex. J) ("There is no official information on your website about Preferred shares after the privatization.  You told me by phone that they will not be delisted, and dividend will not be discontinued.  But absence of official information about privatization details (which is, I believe, your direct responsibility) creates UNCERTAINTY and, as a result, investors are losing big. . .").

- November 28, 2018 email to Cooperberg (Ex. K) ("I own AmTrust preferred C what happens to these shares after the delisting on NASDAQ?").

- December 18, 2018 email to Cooperberg (Ex. L) ("I'm emailing as a significant preferred stockholder to get your guidance on your plans for the preferreds. They have taken quite the hit since you went private on speculation that you will not pay dividends, delist them, or not redeem them upon their call date. Preferred stock holders are supposed to be treated better than common and I feel like just the opposite has occurred. Your silence regarding this particular part of your company has been very damaging to us who have supported AmTrust over the years. Maybe that's intentional, but I can tell you the unrest may cause you more problems if you don't address them now.").

- December 19, 2018 email to Cooperberg (Ex. M) ("Hi — I have a quick question for you... I understand that Amtrust Preferred Stock will be having a delisting. Is this accurate? If yes, do you know when this is scheduled for? Additionally, can you shed any light on the recent weakness in share price?").

- January 12, 2019 email to Cooperberg (Ex. N) ("If Amtrust is taken private as proposed, how will the AFSI preferred stockholders be impacted? | I have been a loyal

8

AFSI preferred shareholder (as well as related companies MHLD and NGHC preferred shareholder) for several years. They represent an integral part of my family's fixed income portfolio.").

- January 22, 2019 email to Cooperberg (Ex. O) ("There was a press release saying these would stay listed, and then a month later management decides to delist for cost purposes. Let's call a spade a spade. I have no doubt you are sitting on the bid right now soaking up your preferreds at 40 cents on the dollar from scared retail investors that don't know if they will ever be able to trade out of the position. Moreover, I am sure that was always the plan.  I hope investors remember this when Stone Point and management try to cash out.").

- January 23, 2019 email to Cooperberg (Ex. P) ("Both the Sprues Point and the proxy statement (see below) indicated that the prefs would continue to be listed. Is this not a breach of those obligations? Have you been notified of any litigation or SEC investigations?").

- January 24, 2019 Cooperberg email (Ex. Q) ("How does [the delisting] impact the Surety T - Listing and AM BEST ? This does not sound favorable.").

- January 28, 2019 email to Cooperberg (Ex. R) ("I am very concerned about my prd 7.5% preferred my wife and myself each have 800 shares bought 3/12/2015. with the de-listing and current and future value of shares. How will be able to sell our shares? Will AMTRUST buy them?. They are callable. 3/19/2020 will they be called? My wife and I are both 83 are years old and have cancer and heart problems. The dividends are helping us with are medical cost. Please reply ASAP.").

- January 28, 2019 letter from large investor to Cooperberg demanding a meeting with AmTrust's CEO, and threatening litigation (Ex. S) ("We are writing to indicate our profound disappointment in the actions of Amtrust, to delist and deregister AmTrust's preferred shares. . .").

- January 31, 2019 email to Cooperberg (Ex. T) ("Thank you for your response… Do you know how fun it is to look at a client and say, sorry about the 70% loss in your preferred, the company mislead us, **again**....") (emphasis in original).

- February 2, 2019 email to Cooperberg (Ex. U) ("I believe the main reason for delisting PREFERRED shares is to enrich owners by stealing money from the investors. They broke the official promise to keep shares listed, they artificially dropped share price TWICE – and now they can, for example, buy back shares for almost nothing. I am also ASHAMED by their predatory move. … Everybody involved in that dirty scheme will be punished eventually.").

- February 6, 2019 email from *Wall Street Journal* reporter to Cooperberg, which she then discusses with other AmTrust officers, including Defendant Zyskind (Ex. V) ("Chaya -- on deadline for a story about the KBW lawsuit over your delisting. Also, we have heard from AmTrust critics who claim the delisting is an attempt by AmTrust

to avoid the transparency of public quarterly filing etc., amid an ongoing SEC investigation. Can you comment on the suit or on the criticism?").

Given her role at AmTrust and her creation of work-related notes (*infra*), it is highly likely that Ms. Cooperberg took hard copy notes in the destroyed notebooks concerning, among other things, instructions from AmTrust executives, responses to her own queries, call notes, and other relevant directions, analyses, and statements pertaining to the Preferred Stock.

It is clear that AmTrust and Ms. Cooperberg did not "take affirmative steps to prevent inadvertent spoliation" but, instead destroyed such evidence.  Accordingly, the first prong of the test is satisfied.  *R.F.M.A.S., Inc.*, 271 F.R.D. at 24.

### B.  AmTrust and Its Agent, Ms. Cooperberg, Acted Culpably

Plaintiff has also demonstrated that the evidence was destroyed with a culpable state of mind, satisfying this second requirement. In the Second Circuit, "negligence is sufficient to establish culpability." *R.F.M.A.S., Inc.*, 271 F.R.D. at 23; *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, No. 13-cv-816, 2016 WL 11556548, at *3 (S.D.N.Y. Apr. 12, 2016) ("[T]he culpable state of mind factor is satisfied by a showing that the evidence was destroyed knowingly, even if without intent to breach a duty to preserve it, or negligently.") (citations omitted) *Hart,* 945 F. Supp. 2d at 503 ("The culpable state of mind factor is satisfied by a showing that the evidence was destroyed knowingly, even if without intent to breach a duty to preserve it, or negligently.") (citations omitted).  Bad faith is not required.  *See, e.g., Skyline Steel*, 101 F.Supp.3d at 410 ("In this circuit, a 'culpable state of mind' for purposes of a spoliation inference includes ordinary negligence.").  Indeed, defense counsel, at the pre-motion conference, conceded that a finding of bad faith was not required.  Dkt. No. 72 24:16-24:17 ("The Second Circuit says before you can impose a sanction for spoliation, you have to have a culpable state of mind.  Now, the case law makes clear that that's a fairly low bar and that even negligence can be a culpable state of mind. .

10

.").  Here, the record shows that Ms. Cooperberg unequivocally acted knowingly and intentionally in destroying the evidence at issue.  *See* Ex. A at 17:22-18:4 ("But I throw them away. I throw them away after they're done, when the notebooks come to the last page.").

Furthermore, from Defendants' more recent production dated October 29, 2021, we now know that an "Updated" litigation hold notice dated February 14, 2019 (Ex. W), was directed at Ms. Cooperberg, among other senior AmTrust employees, admonishing them to retain (among other things) hard copy notes and drafts, although it is unclear if Cooperberg actually received the hold notice.[5]  Whether AmTrust failed to deliver Ms. Cooperberg the notice or, alternatively, whether Ms. Cooperberg received the notice and ignored it, either scenario is troubling and prejudices Plaintiff and the class.[6]  The former scenario is troubling because it would show gross negligence or recklessness on AmTrust's part by failing to deliver the hold notice to a key corporate officer and failing to implement its own stated document retention policies,[7] and the latter is troubling because it would indicate bad faith by Ms. Cooperberg, AmTrust's senior most investor relations officer.  Either way, the culpability prong would be easily established. *R.F.M.A.S., Inc.*, 271 F.R.D. at 35 ("Spoliation by a party that has failed to implement a litigation-hold policy, even if unintentional, is not merely negligent, but grossly negligent or reckless.")  (citing *Zubulake*, 220 F.R.D. at 221); *see also Charlestown Cap. Advisors, LLC v. Acero Junction, Inc.*, 337 F.R.D. 47, 60 (S.D.N.Y. 2020) ("The requirement of intent, which is unique to Rule 37(e), distinguishes the destruction of electronically-stored information from

---

[5] It is unclear because the document's metadata demonstrates that it was found in another individual's custody, and there is no executed acknowledgment of receipt. Ex W at 7.

[6] Because the litigation hold was produced *after* Ms. Cooperberg's deposition, Plaintiff was unable to elicit testimony from her regarding the document.

[7] For the avoidance of doubt: while the updated hold notice is dated after the announcement of the delisting, it refers to prior notices related to earlier investor actions unrelated to the delisting.  Ex W at 2.  Defendants did not produce these earlier hold notices.

11

alternative forms of evidence; for all other types of evidence, a movant can obtain a severe sanction, including an adverse inference instruction, upon a showing that a party engaged in only 'negligent spoliation.'") (citations omitted).

Further, because AmTrust and the Individual Defendants have been repeat defendants in investor actions throughout the Relevant Time Period (and have been threatened with lawsuits from countless more individuals and entities, including on matters related to the delisting), the duty to preserve the hard copy documents of the Company's senior investor relations officer—which would have been incumbent upon *any* public company, even one not mired in investor litigation—is significantly heightened.    Against this backdrop, the destruction by Ms. Cooperberg—the highest-ranking investor relations officer of a Fortune 500 company with extensive prior experience in investor relations (and also a former business journalist)—of her professional notebooks, whether or not she was provided with a litigation hold notice, raises the inference of bad faith (even though such a finding is not required, as described above, and as defense counsel conceded).

### C.  The Destroyed Evidence Was Relevant to Plaintiff's Claims

The third factor requires that a reasonable trier of fact could find that the destroyed evidence was relevant to the other party's claim or defense.  That factor is easily satisfied here because this case hinges on what information Defendants decided to communicate to investors and when they chose to communicate it, issues directly overlapping with Ms. Cooperberg's professional duties.  To that end, Ms. Cooperberg's professional notebooks themselves are relevant to both Plaintiff's fraud claim and Defendants' defenses.  As a result, the third spoliation factor is satisfied.

Defendants have stated that Plaintiff has not been prejudiced because it is speculative to

12

assume that the destroyed notebooks contained any relevant evidence. *See* Dkt. No. 66. That is unpersuasive for a few reasons. First, the record reveals that Ms. Cooperberg, aside from taking hard-copy notes, would sometimes take notes in a blank email on her Microsoft Outlook account. Ex. A at 17:5-8 ("Q. How do you take notes? A. I take notes sometimes in a notebook, pen and paper, or I'll take notes in a – sometimes notes on my – in my Outlook in a draft email."); *id.* at 81:21-24 ("Q. Ms. Cooperberg, earlier you testified that you occasionally took notes by drafting emails to yourself. Is that correct? A. Yes, sometimes I would and still do.")

And at least one of her Outlook notes is highly relevant, where Ms. Cooperberg, on January 18, 2018, told herself the following regarding an upcoming disclosure: "*In the offer letter in the 13D filed by the buyer group do not disclose any plans to delist the preferred stock or any material changes to the dividend policy.*" Ex. X (emphasis added).[8]

As reference, this note is dated four days before the beginning of the Class Period, whereupon the Individual Defendants disclosed in an amendment to a Schedule 13D that they did *not* intend to delist of the Preferred Stock. Accordingly, if Ms. Cooperberg's written notes even partially resemble her electronic notes to herself, Plaintiff has been deprived of evidence that is highly relevant to his fraud claims.

Second, and even if this were not a situation where we have evidence of other relevant notes that shed light into what Ms. Cooperberg has destroyed, Defendants' claim before the pre-motion conference that Plaintiff is merely "speculating" is not well taken given that any analysis of the contents of destroyed documents requires using some commonsense inferences. Dkt. No. 66 at 3. The purpose of Plaintiff's spoliation motion is to ensure that Defendants do not profit from their own culpability, whether through negligence or through a more intentional state of

---

[8] Ms. Cooperberg acknowledged the authenticity of the document at her deposition. Ex. A at 83:22-84:7;

mind. *See Reilly v. Natwest Mkts. Group Inc.*, 181 F.3d 253, 267 (2d Cir. 1999) (judges must "ensure that spoliators do not benefit from their wrongdoing"); *Kronisch*, 150 F.3d at 128 ("holding the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence would subvert the prophylactic and punitive purposes of the adverse inference").

As noted by Ms. Cooperberg, "I take notes sometimes in a notebook, pen and paper, or I'll take notes. . . in my Outlook in a draft email." Ex. A at 17:5-8. Thus, Ms. Cooperberg considered her notebook notes to be in the same vein as her Outlook draft notes. As it turned out, Ms. Cooperberg's Outlook draft notes were very relevant to the fraud alleged. Critically, as stated above, one such note dated immediately before the Class Period—which *was* preserved and produced to Plaintiff, states matter-of-factly that any plans to delist the preferred stock should be omitted from an upcoming disclosure to investors.

Similar relevant information was likely lost based on Ms. Cooperberg's conduct. Based on her own admission, Ms. Cooperberg likely kept *twelve notebooks'* worth of contemporaneous notes during the Relevant Time Period, which Plaintiff will never be able to access due to no fault of his own. Moreover, as described earlier, Ms. Cooperberg was, by her own admission, "overwhelmed" with investor communications regarding the future of the Preferred Stock, and these communications were discussed with other senior AmTrust officers and employees. *Supra* (identifying just a sample of the many communications Cooperberg participated in regarding investor concerns related to the Preferred Stock). Indeed, it was the tsunami of investor queries in January 2018 directed at Ms. Cooperberg's investor relations department that caused Defendants to file the January 22, 2018 Schedule 13D, in order to, among other things, quell the Preferred Stock volatility that was occurring as a result of market uncertainty. The notion that Ms.

14

Cooperberg's hard-copy notebooks are bereft of responsive material is not tenable.

### III.   AN ADVERSE INFERENCE IS APPROPRIATE

Having shown the Court that a spoliation finding is warranted in this case, the remaining question is what relief is appropriate.   District courts have broad discretion to determine an appropriate remedy for discovery violations based on the facts of the particular case. *See Arista Records, LLC*, 633 F.Supp.2d at 141.  As the *R.F.M.A.S.* court stated:

> "[H]ow severe a sanction is warranted will depend on the extent of the . . . degree of that party's culpability, and the extent to which the noncompliance prejudiced the other parties. A strong showing of one of these factors may warrant sanctions even where the other two factors are weak or absent. For example, particularly serious discovery violations, such as the spoliation of highly relevant evidence, may warrant harsh sanctions even if the violation was merely negligent. *See Residential Funding Corp.*, 306 F.3d at 108 ("The sanction of an adverse inference may be appropriate in some cases involving the negligent destruction of evidence because each party should bear the risk of its own negligence." (citing *Turner v. Hudson Transit Lines*, 142 F.R.D. 68, 75 (S.D.N.Y. 1991); *Kronisch*, 150 F.3d at 126)).

271 F.R.D. at 24.

The remedies available to a court include: (i) directing the noncompliant party to provide additional discovery; (ii) shifting costs, including attorneys' fees, incurred by the other parties in connection with the discovery violation; (iii) imposing fines payable to the court on the culpable party or its attorneys; (iv) an instruction informing the jury of the discovery breach; (v) precluding the noncompliant party from using certain evidence that were withheld; (vi) a negative inference against the spoliating party; or (vii) the entry of a default judgment, dismissal, or declaration of a mistrial.  *See R.F.M.A.S., Inc.*, 271 F.R.D. at 22-23 (citations omitted); Fed. R. Civ. P. 37(b)-(f) (describing sanctions available against party who does not comply with discovery).

In this case, the finding of a negative inference against Defendants will suffice. More specifically, Plaintiff seeks to have the jury instructed that they are entitled to, but not required to, infer that had Ms. Cooperberg not destroyed her notebooks, they would have been favorable to

15

plaintiff. *Golia v. Leslie Fay Co.,* C.A. No. 01-cv-1111(GEL), 2003 WL 21878788, at *11 (S.D.N.Y. Aug. 7, 2003) (the "most appropriate sanction" is "to give the jury a strongly worded instruction that they may, if they choose, infer that the destroyed documents contained evidence unfavorable to defendant"); *Hart,* 945 F. Supp. 2d 494 at 509-10 (ordering and articulating instruction to be given to the jury, which includes an instruction as to what facts have already been determined as a matter of law, and an instruction as to which factors jury should consider in determining whether to draw an adverse inference). This inference would also be applicable at the summary judgment stage. *Kronisch,* 150 F.3d at 126 (adverse inference precluded summary judgment).

An extension of discovery will serve no material purpose. Similarly, a shifting of costs or fees (while mandated under Rule 37) will not benefit Plaintiff in any meaningful way at trial and would be a grossly insufficient remedy. By the same token, because Ms. Cooperberg's notebooks no longer exist, nothing can be gained by precluding Defendants from introducing any non-existent evidence. Moreover, in fairness to Defendants, the striking of their Answer or the entry of a default judgment against them would be too severe a sanction given their counsel's compliance with most of their other discovery obligations. Accordingly, the most germane remedy available to Plaintiff is a negative inference against Defendants, to be used at summary judgment and at trial, that:

(1) The notebooks, if preserved, would have included evidence adverse to Defendants.

(2) The notebooks, if preserved, would have included instructions not to disclose Defendants' plans to delist the preferred stock.

**CONCLUSION**

Accordingly, for the reasons discussed above, the Court should 1) find that AmTrust spoliated evidence, 2) issue an adverse inference to be utilized at summary judgment and trial, and

16

3) order other and further relief as this Court deems justified.

DATED: January 14, 2022                          Respectfully submitted,

                                                 **WOLF POPPER LLP**

                                        By:  */s/ Adam. J. Blander*

                                             Carl L. Stine
                                             Patricia I. Avery
                                             Adam J. Blander
                                             845 Third Avenue, 12th Floor
                                             New York, New York 10022
                                             (212) 759-4600

                                             *Counsel for Lead Plaintiff*
                                             *And the Putative Class*

17