UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JAN MARTÍNEK,

                Plaintiff,

          -v.-

AMTRUST FINANCIAL SERVICES, INC.,
BARRY D. ZYSKIND, GEORGE KARFUNKEL,
and LEAH KARFUNKEL,

                Defendants.

19 Civ. 8030 (KPF)

**OPINION AND ORDER**

---

KATHERINE POLK FAILLA, District Judge:

      Plaintiff Jan Martínek moves to certify a class in this securities fraud
case and to appoint himself and his attorneys as class representative and lead
counsel, respectively, under Federal Rule of Civil Procedure 23.  Defendants
AmTrust Financial Services, Inc. ("AmTrust"), and AmTrust executives Barry D.
Zyskind, George Karfunkel, and Leah Karfunkel (together, the "Individual
Defendants") oppose certification on the grounds that (i) Plaintiff is not a
typical representative of the proposed class and (ii) individual issues of reliance
and damages will predominate over issues common to the proposed class.  In
the alternative, Defendants argue that Plaintiff's proposed class definition
should be limited.  For the reasons that follow, the Court grants Plaintiff's
motion for class certification and denies Defendants' request to limit the class
definition.

## BACKGROUND[1]

The Court previously recounted the facts of this case in its August 14, 2020 Opinion and Order denying Defendants' motion to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 9 and 12(b)(6). (Dkt. #34). *See Martinek* v. *AmTrust Fin. Servs., Inc.*, No. 19 Civ. 8030 (KPF), 2020 WL 4735189, at *1 (S.D.N.Y. Aug. 14, 2020). The Court presumes familiarity with that prior recitation, and provides here only a brief summary of the facts and procedural history relevant to the instant motion.

### A.   Factual Background

AmTrust is an insurance company founded and controlled by the Karfunkel-Zyskind family. (Compl. ¶¶ 13-18). Each of the Individual Defendants sits on AmTrust's Board of Directors. (*Id.* at ¶¶ 14-16). Barry

---

[1]   The facts in this Opinion are drawn primarily from Plaintiff's Complaint ("Compl." (Dkt. #5)), which is the operative pleading in this case, and from the parties' submissions in connection with Plaintiff's motion for class certification. These submissions include: (i) the declaration of Carl L. Stine in support of Plaintiff's motion and the exhibits attached thereto (Dkt. #45), including Dr. Steven P. Feinstein's Report on Market Efficiency dated March 15, 2021 (the "Feinstein Report" (Dkt. #45-1)); (ii) the declaration of Kevin S. Reed in opposition to Plaintiff's motion and the exhibits attached thereto (Dkt. #49), including (a) Plaintiff's April 15, 2021 deposition transcript ("Pl. Dep." (Dkt. #49-1)) and (b) Dr. Alok Khare's Rebuttal Expert Report dated April 30, 2021 (the "Khare Rebuttal Report" (Dkt. #49-5)); and (iii) the declaration of Carl. L. Stine in further support of Plaintiff's motion and the exhibits attached thereto (Dkt. #52), including Dr. Steven P. Feinstein's Rebuttal Report dated June 1, 2021 (the "Feinstein Rebuttal Report" (Dkt. #52-1)).

The Court is mindful that "[t]he party seeking class certification bears the burden of demonstrating compliance with Rule 23's prerequisites by a preponderance of the evidence." *Kurtz* v. *Costco Wholesale Corp.*, 818 F. App'x 57, 60 (2d Cir. 2020) (summary order) (citing *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 264 (2d Cir. 2016)). Here, because the factual background of this case is not in dispute (*see* Pl. Br. 2-4; Def. Opp. 2-5), the Court draws on the facts alleged in the Complaint to provide an overview of Plaintiff's claims.

For ease of reference, the Court refers to Plaintiff's memorandum of law in support of his motion for class certification as "Pl. Br." (Dkt. #44); Defendants' memorandum of law in opposition to Plaintiff's motion as "Def. Opp." (Dkt. #48); and Plaintiff's reply memorandum as "Pl. Reply" (Dkt. #51).

Zyskind is AmTrust's CEO and Chairman of the Board, and George Karfunkel and Leah Karfunkel serve as directors.  (*Id.*).

Plaintiff is an investor who purchased shares of AmTrust's preferred stock on the New York Stock Exchange (the "NYSE") between January 22, 2018, and January 18, 2019.  (Compl. ¶ 12; *see also id.* at ¶ 20).  AmTrust's preferred stock comprised six different series of preferred stock and depositary shares that were issued between 2013 and 2016 (collectively, the "Preferred Stocks").  (*Id.* at ¶ 26).  The six series of Preferred Stocks were denominated Series A-F.  (*Id.*).  The Preferred Stocks were non-cumulative and offered varying quarterly dividend rates, with Series A offering the lowest dividend rate and Series E offering the highest.  (*Id.*).  While Series A shares were bought and sold as whole shares, Series B-F shares were bought and sold as depositary shares.  (*Id.*).  Each depositary share represented a 1/40th interest in one share of the Preferred Stock.  (*Id.*).  Prior to their ultimate delisting, the Preferred Stocks were listed and traded on the NYSE.  (*Id.* at ¶ 32).

In 2017, the Individual Defendants, together with certain third parties (collectively, the "Acquisition Group"), began to explore the acquisition of AmTrust's outstanding common stock.  (Compl. ¶ 37).  The Acquisition Group announced a proposal to acquire the outstanding common stock in a January 9, 2018 letter sent to AmTrust's Board of Directors.  (*Id.* at ¶ 44).  The letter stated that the Acquisition Group contemplated acquiring only AmTrust's common stock, not the Preferred Stocks.  (*Id.* at ¶ 45).  The following day, on

January 10, 2018, the Individual Defendants filed an amended Schedule 13D (Amendment No. 13) and press release disclosing the proposal.  (*Id.* at ¶ 46).

As AmTrust navigated the process of bringing the proposed acquisition to a shareholder vote, AmTrust and the Individual Defendants stated on several occasions that the acquisition would not disturb the Preferred Stocks' status as publicly-traded securities.  On March 1, 2018, for instance, AmTrust issued a press release stating that the Preferred Stocks "will remain outstanding and it is expected that [the stocks] will continue to be listed on the [NYSE] following the consummation of the transaction."  (Compl. ¶ 50).  Defendants then republished that same statement in a March 16, 2018 Form 10-K (*id.* at ¶ 66(h)) and a May 4, 2018 Schedule 13E-3 (Amendment No. 1) (*id.* at ¶ 66(k)).  Similarly, in their April 9, 2018 preliminary proxy and May 4, 2018 definitive proxy, Defendants stated that "each outstanding share of preferred stock of the Company *will* remain outstanding and *will* continue to be listed on the [NYSE] following the merger."  (*Id.* at ¶¶ 67-68 (emphases added)).

Following the finalization of the acquisition on November 29, 2018 (Compl. ¶ 70), AmTrust announced in a January 18, 2019 press release that AmTrust's board had approved the voluntary delisting and deregistration of the Preferred Stocks (the "Delisting Announcement" (*id.* at ¶¶ 71-73)).  On the next trading day following the Delisting Announcement, the prices of the Preferred Stocks dropped by almost 40%, losing over $300 million in value in one day. (*Id.* at ¶ 82).  On February 7, 2019, AmTrust filed a Form 15 advising that it had terminated listing of the Preferred Stocks.  (*Id.* at ¶ 92).

**B.      Procedural Background**

Plaintiff filed the underlying Complaint, styled as a putative class action, on August 28, 2019.  (Dkt. #1).  The Complaint's first of two counts alleges that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  (Compl. ¶¶ 104-111).  The second count alleges control person liability for the Individual Defendants pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  (*Id.* at ¶¶ 112-120).

Broadly speaking, Plaintiff alleges that Defendants committed securities fraud by misrepresenting that the Preferred Stocks would continue to be listed on the NYSE following the Acquisition Group's purchase of AmTrust's outstanding common stock.  (Compl. ¶¶ 12, 105-107, 117; *see also* Dkt. #34 at 37-39 (providing a more detailed account of Plaintiff's allegations)).  More pointedly, Plaintiff alleges that Defendants' fraud led him to purchase the Preferred Stocks at artificially inflated prices, and that he suffered substantial losses when Defendants later revealed that the Preferred Stocks would be delisted.  (Compl. ¶ 12).  In total, Plaintiff alleges that he suffered approximately $176,366 in damages.  (Pl. Br. 7).[2]

---

[2]      Plaintiff has not alleged a consistent loss figure.  In his Complaint, Plaintiff estimates that he suffered losses of approximately $177,800.  (Compl. ¶ 12).  By contrast, in his briefing in support of conditional certification and on the instant motion, Plaintiff estimates his loss at $176,366.  (Dkt. #21-5; Pl. Br. 7-8).  The Court uses Plaintiff's more recent estimation of $176,366 because it is supported by a detailed record of Plaintiff's purchases and sales of the Preferred Stocks.  (*See* Dkt. #21-5).

On January 31, 2020, Defendants moved to dismiss the Complaint for failure to state a claim under Federal Rules of Civil Procedure 9(b) and 12(b)(6). (Dkt. #27-29).  By Opinion and Order dated August 14, 2020, the Court denied Defendants' motion, finding that certain but not all of Defendants' alleged misstatements were actionable.  (Dkt. #34).  Defendants then filed their Answer to the Complaint (Dkt. #35), and the parties proceeded to discovery (Dkt. #37).

On March 15, 2021, Plaintiff filed the instant motion for class certification under Federal Rule of Civil Procedure 23.  (Dkt. #43-45). Defendants filed their brief in opposition to Plaintiff's motion on April 30, 2021 (Dkt. #48-49), and Plaintiff filed his reply in further support of his motion on June 1, 2021.  (Dkt. #51-52).  Accordingly, the Court deems Plaintiff's motion to be fully briefed and ripe for the Court's decision.

## DISCUSSION

### A.  Applicable Law

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano* v. *Yamasaki*, 442 U.S. 682, 700-01 (1979)).  "To come within the exception, a party seeking to maintain a class action 'must affirmatively demonstrate his compliance' with [Federal Rule of Civil Procedure] 23." *Comcast Corp.* v. *Behrend*, 569 U.S. 27, 33 (2013) (quoting *Dukes*, 564 U.S. at 350).

### 1.   Class Certification

A party seeking class certification under Rule 23 must clear two hurdles. *First*, under Rule 23(a), the moving party must make a threshold showing that: "[i] the class is so numerous that joinder of all members is impracticable; [ii] there are questions of law or fact common to the class; [iii] the claims or defenses of the representative parties are typical of the claims or defenses of the class; and [iv] the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).  Commonly referred to as "numerosity, commonality, typicality, and adequacy," *Kurtz* v. *Costco Wholesale Corp.*, 818 F. App'x 57, 60 (2d Cir. 2020) (summary order), these Rule 23(a) prerequisites "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims," *Dukes*, 564 U.S. at 349 (internal quotation marks omitted) (quoting *General Telephone Co. of Southwest* v. *Falcon*, 457 U.S. 147, 156 (1982)).  In addition to Rule 23(a)'s explicit textual requirements, the Second Circuit also recognizes an implicit "ascertainability" requirement, which commands that the proposed class be "defined using objective criteria that establish a membership with definite boundaries."  *In re Allergan PLC Sec. Litig.*, No. 18 Civ. 12089 (CM) (GWG), 2021 WL 4077942, at *5 (S.D.N.Y. Sept. 8, 2021) (quoting *In re Petrobras Sec.*, 862 F.3d 250, 257 (2d Cir. 2017)).

*Second*, if the Rule 23(a) prerequisites are satisfied, the party seeking certification must then show that "the action can be maintained under Rule 23(b)(1), (2), or (3)."  *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 238 (2d Cir. 2012).  Where, as here, certification is sought under Rule 23(b)(3), the

moving party must establish that (i) "questions of law or fact common to class members predominate over any questions affecting only individual members" and (ii) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

A "district court may certify a class only after determining that each Rule 23 requirement is met." *Lisnitzer* v. *Zucker*, 983 F.3d 578, 588 (2d Cir. 2020).  "To certify a class, a district court must make a definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues, ... must resolve material factual disputes relevant to each Rule 23 requirement, and must find that each requirement is established by at least a preponderance of the evidence." *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 37 (S.D.N.Y. 2020) (quoting *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013)).  "Ultimately, the district court has broad discretion in deciding how and whether to certify a class, arising from its 'inherent power to manage and control pending litigation.'" *Id.* (quoting *Myers* v. *Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010)).

### 2.    Appointment of Class Counsel

Rule 23 also provides guidance to courts concerning the appointment of class counsel, requiring them to consider "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the type of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class."  Fed.

R. Civ. P. 23(g)(1)(A).  The court may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

## B.  Analysis

In this case, Plaintiff seeks to certify a class of:

> All persons who purchased Series A preferred stock of AmTrust Financial Services, Inc. ("AmTrust"), or AmTrust's Depositary Shares Representing 1/40th of a share of either AmTrust's Series B, C, D, E or F preferred stock ... on the open market on a U.S. stock exchange from January 22, 2018, to January 18, 2019, inclusive ... excluding present and former executive officers of AmTrust and any parent, subsidiary, or affiliate of AmTrust, Barry D. Zyskind, George Karfunkel, and Leah Karfunkel and their immediate family members (collectively, the "Excluded Persons") and the legal representatives, heirs, successors, or assigns of any such Excluded Person[.]

(Dkt. #43; *see also* Pl. Br. 1).  Plaintiff also seeks to have himself appointed class representative and his counsel appointed class counsel.  (*Id.*).

This Opinion proceeds in five parts.  The Court begins by addressing whether the proposed class satisfies the threshold requirements of Rule 23(a). In the subsequent two sections, the Court turns to whether the proposed class meets the predominance and superiority requirements of Rule 23(b)(3).  The Court then considers Defendants' suggested limitations to Plaintiff's proposed class definition.  Finally, the Court addresses Plaintiff's application to appoint himself and his attorneys as lead representative and class counsel, respectively.  As the Court will explain, it concludes that (i) the proposed class satisfies both Rule 23(a) and Rule 23(b)(3); (ii) Defendants' proposed limitations

to the class definition are unwarranted; and (iii) Plaintiff and his counsel are appropriate representatives of the class. The Court therefore certifies the class and appoints Plaintiff as lead representative and his counsel as class counsel.

### 1.      The Proposed Class Satisfies Rule 23(a)

As the party seeking class certification, Plaintiff "bears the burden of satisfying Rule 23(a)'s" threshold requirements. *In re Patriot Nat'l, Inc. Sec. Litig.*, 828 F. App'x 760, 764 (2d Cir. 2020) (summary order). Plaintiff argues that the evidence stated in his expert report, authored by Dr. Steven P. Feinstein, demonstrates that each Rule 23(a) prerequisite is satisfied here. (Pl. Br. 5-10; *see generally* Feinstein Report). Defendants do not dispute Plaintiff's showing of numerosity, commonality, adequacy of representation, or ascertainability, and the Court's discussion of these requirements is accordingly brief. By contrast, and as discussed further *infra*, Defendants vigorously dispute Plaintiff's showing of typicality. (Def. Opp. 23-25).

#### a.      Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Courts in this Circuit presume numerosity at 40 putative class members." *Stewart* v. *Hudson Hall LLC*, No. 20 Civ. 885 (PGG) (SLC), 2021 WL 6285227, at *7 (S.D.N.Y. Nov. 29, 2021). That said, "[t]he movant need not provide a precise quantification of their class, since a court may make common sense assumptions to support a finding of numerosity[.]" *Lea* v. *Tal Educ. Grp.*, No. 18 Civ. 5480 (KHP), 2021 WL 5578665, at *5 (S.D.N.Y. Nov. 30, 2021) (quoting *Kalkstein* v. *Collecto, Inc.*,

304 F.R.D. 114, 119 (E.D.N.Y. 2015)).  "In a securities class action, numerosity can be demonstrated by showing that a large number of shares were outstanding and traded during the class period."  *Hawaii Structural Ironworkers Pension Tr. Fund, Inc.* v. *AMC Ent. Holdings, Inc.*, 338 F.R.D. 205, 211 (S.D.N.Y. 2021) (internal quotation mark omitted).

The proposed class in this case comprises all individuals who purchased AmTrust's Preferred Stocks on a U.S. stock exchange between January 22, 2018, and January 18, 2019.  (Pl. Br. 1).  During this roughly one-year period, there were over 36 million shares of Preferred Stock outstanding.  (Feinstein Report ¶¶ 47-58).  The average daily trading volume (*i.e.*, the average number of shares traded per day) ranged from 12,681 shares (for Series A) to 34,975 shares (for Series F) (*id.* at ¶ 111), and the weekly turnover rate ranged from 1.38% (for Series A) to 2.09% (for Series C) (*id.* at ¶ 112).[3]

Although Plaintiff does not estimate the proposed class's size, the Court is satisfied that the class is sufficiently numerous to clear the numerosity requirement's low bar.  Defendants do not challenge Plaintiff's showing of numerosity, and the Court finds that the number of outstanding shares and the frequency with which the shares were traded during the class period demonstrates that the class is sufficiently numerous to make joinder impracticable.  *See Wallace* v. *IntraLinks*, 302 F.R.D. 310, 315 (S.D.N.Y. 2014)

---

[3]    The weekly turnover rate is calculated by "averaging the daily ratio of the trading volume for a particular series of the AmTrust Preferred Shares to the number of shares outstanding for a particular series, and then multiplying by 5 (the number of trading days in a typical week)."  (Feinstein Report ¶ 112 n.93).

(finding "where defendant had millions of shares outstanding during the class period, and defendants make no contrary argument, there is numerosity").

### b.   Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  The commonality requirement "simply requires that there be issues whose resolution will affect all or a significant number of the putative class members." *Johnson* v. *Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015).  The requirement "is satisfied if there is a common issue that 'drive[s] the resolution of the litigation' such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Sykes* v. *Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 84 (2d Cir. 2015) (quoting *Dukes*, 564 U.S. at 350).

As above, Defendants do not challenge Plaintiff's showing under this prerequisite, and the Court has little difficulty in finding it met here.  In this case, as in many putative securities fraud class action cases, "[a]ll class members' entitlement to relief would turn on whether the misstatements and omissions were false, misleading and material, and whether purchasers of the preferred shares suffered losses resulting therefrom." *In re SunEdison, Inc. Sec. Litig.*, 329 F.R.D. 124, 140 (S.D.N.Y. 2019).  Because the resolution of these common issues will largely, if not entirely, determine the outcome of each class member's claim, there are questions of law or fact common to the class.

### c.   Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  Of potential significance to the instant motion, courts have made clear that "[t]he typicality requirement is 'not demanding.'"  *Villella* v. *Chem. & Mining Co. of Chile Inc.*, 333 F.R.D. 39, 55 (S.D.N.Y. 2019) (quoting *In re MF Glob. Holdings Ltd. Inv. Litig.*, 310 F.R.D. 230, 236 (S.D.N.Y. 2015)).  Typicality "does not require factual identity between the named plaintiffs and the class members, only that the disputed issues of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class."  *In re MF Glob. Holdings Ltd. Inv. Litig.*, 310 F.R.D. at 236.  "In securities cases alleging dissemination of allegedly false or misleading statements, the nature of the common injury generally satisf[ies] typicality."  *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 443 (S.D.N.Y. 2013); *see also Lapin* v. *Goldman Sachs & Co.*, 254 F.R.D. 168, 175 (S.D.N.Y. 2008) (observing that typicality and commonality "tend to merge into one another, so that similar considerations animate analysis" of the requirements).

In this case, Defendants argue that Plaintiff cannot meet his burden of demonstrating typicality because he is subject to unique defenses that render him atypical of the class.  (Def. Opp. 23-25).  "The Second Circuit has instructed that 'the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification ... [but] class certification is inappropriate where a putative class representative is

13

subject to unique defenses which threaten to become the focus of the litigation.'" *Bowling* v. *Johnson & Johnson*, No. 17 Civ. 3982 (AJN), 2019 WL 1760162, at *4 (S.D.N.Y. Apr. 22, 2019) (quoting *Gary Plastic Packaging Corp.* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990)). While "the defendant need not show at the certification stage that a unique defense will prevail, only that it is meritorious enough to require the plaintiff to devote considerable time to rebut the unique defense," *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 460-61 (S.D.N.Y. 2018) (internal alterations omitted), the court "should not disqualify a named plaintiff based upon any groundless, far-fetched defense that the defendant manages to articulate," *Lapin*, 254 F.R.D. at 179; *see also Med. Soc'y of the State of New York* v. *UnitedHealth Grp. Inc.*, 332 F.R.D. 138, 150 (S.D.N.Y. 2019) (same).

Drawing on Plaintiff's deposition testimony, Defendants contend that Plaintiff is "in direct conflict with the rest of the purported class" for two reasons.  (Def. Opp. 24).  *First*, Defendants argue that Plaintiff's testimony conflicts with his theory of reliance, "because while he argues in his Complaint … that the market believed Defendants' statements that the securities would remain listed and priced them accordingly, his sworn testimony … is that the market disbelieved Defendants' statements and priced the [securities] on the basis that they would be delisted."  (*Id.*).  *Second*, Defendants assert that Plaintiff's testimony that he believed the Preferred Stocks were undervalued "places him in opposition to the damage theory he

has alleged for the class, which rests on the premise [that] the price of the [stocks] was inflated by the purported misrepresentations[.]" (*Id.*).

Neither of Defendants' arguments is persuasive.  Contrary to Defendants' assertion, Plaintiff did not testify that the market disbelieved Defendants' statements.  (*See* Def. Opp. 24).  Rather, Plaintiff testified that he believed the market was undervaluing the Preferred Stocks because "there was a concern that the security could be delisted … or there was a risk." (Pl. Dep. 96:6-8). Plaintiff's belief that the market was concerned that the Preferred Stocks might be delisted cannot be fairly read as an assertion that the market actively *disbelieved* Defendants' statements.  Moreover, Defendants' argument is beside the point.  Defendants suggest that Plaintiff is an inappropriate representative of the proposed class because his testimony calls into question the extent to which the class relied on Defendants' alleged misstatements.  But Plaintiff intends to prove reliance using the "fraud-on-the-market" presumption endorsed by the Supreme Court in *Basic Inc.* v. *Levinson*, 485 U.S. 224 (1988). (*See* Pl. Br. 11-12).  That "presumption allows class-action plaintiffs to prove reliance through evidence common to the class." *Goldman Sachs Grp., Inc.* v. *Arkansas Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1958-59 (2021).  If Plaintiff can successfully invoke the presumption — and Defendants do not challenge Plaintiff's ability to try to do so[4] — Plaintiff's subjective belief about other class

---

[4]     Although Defendants do not challenge Plaintiff's particular ability to invoke *Basic*'s fraud-on-the-market presumption, they do argue that the presumption does not apply in this case.  (Def. Opp. 6-21).  The Court addresses this argument in the portion of the Opinion evaluating predominance under Rule 23(b)(3).

members' purchasing decisions are unlikely to play a significant role in the case, because class members' reliance will be "presumed" upon a showing that the particular "investor [bought] or [sold] stock at the market price[.]" *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014).

Defendants' second argument — that Plaintiff is opposed to the proposed class on the issue of damages — fares no better. As Defendants observe, Plaintiff testified that he believed that the Preferred Stocks were undervalued at the time he purchased them. (Def. Opp. 23 (citing Pl. Dep. 93:12-94:1, 95:25-96:8, 104:5-17)). Defendants claim that Plaintiff's testimony conflicts with his proposed damages model because that model presumes that the Preferred Stocks' market prices were inflated by Defendants' alleged misstatements. (*Id.* at 24). The Court struggles to see how this could be the case. It is entirely plausible that Plaintiff believed the Preferred Stocks were undervalued at the time he purchased them, but that he would have taken a less bullish view of their value had he known that Defendants intended to delist them. If credited, Plaintiff's account would align with his proposed damages model, which would allow class members to recover the artificial value created by Defendants' alleged misstatements. (*See* Feinstein Report 66-69 (explaining Plaintiff's proposed damages methodology in greater detail)). Accordingly, Defendants' arguments do not undermine Plaintiff's showing of typicality.

### d.   Adequacy of Representation

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).

"Adequacy has two components: 'First, class counsel must be qualified, experienced and generally able to conduct the litigation,' and '[s]econd, the class members must not have interests that are antagonistic to one another.'" *AMC Ent. Holdings, Inc.*, 338 F.R.D. at 212 (quoting *In re Drexel Burnham Lambert Grp., Inc.,* 960 F.2d 285, 291 (2d Cir. 1992)).

Here, both Plaintiff and his counsel are adequate representatives of the proposed class. Plaintiff's counsel, Wolf Popper LLP, is an experienced law firm that has litigated similar securities class actions in the past. (Dkt. #21-6 (Wolf Popper LLP resume)). *See Tsereteli* v. *Residential Asset Securitization Tr. 2006-A8*, 283 F.R.D. 199, 209 (S.D.N.Y. 2012) (finding that Wolf Popper LLP was "qualified and capable of prosecuting" a securities class action); *In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*, No. 02 MDL 1484 (JFK), 2007 WL 4526593, at *6 (S.D.N.Y. Dec. 20, 2007) (same). Further, Plaintiff has demonstrated a willingness to prosecute this action on behalf of the proposed class, and his alleged loss total of $176,366 provides him with a substantial incentive to continue to do so. (Pl. Br. 7-8). And finally, there is no indication that members of the putative class have interests that either are or are likely to be antagonistic to one another. Indeed, as discussed with respect to Rule 23(a)'s commonality requirement, individual class members' entitlement to relief will largely turn on factors unrelated to their identities or characteristics, making it unlikely that conflicts within the class will develop. Plaintiff and his counsel are therefore adequate representatives of the proposed class.

### e.    Ascertainability

Lastly, the implied requirement of ascertainability dictates that "a class must be 'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member,' and must be 'defined by objective criteria that are administratively feasible,' such that 'identifying its members would not require a mini-hearing on the merits of each case.'" *de Lacour* v. *Colgate-Palmolive Co.*, 338 F.R.D. 324, 334 (S.D.N.Y. 2021) (quoting *In re Petrobras Sec.*, 862 F.3d at 260).  Although neither party addresses this requirement in their briefing, the Court finds that it is satisfied here.  The proposed class comprises investors who purchased particular securities, on particular public markets, during a particular time period.  (*See* Pl. Br. 1).  "These criteria … are clearly objective," *In re Petrobras Sec.*, 862 F.3d at 269, and sufficient to demonstrate that the class is ascertainable.  Accordingly, Plaintiff has satisfied each of the Rule 23(a) prerequisites.

### 2.    The Proposed Class Satisfies Rule 23(b)(3)'s Predominance Requirement

The Court focuses its attention — as the parties did — on whether Plaintiff has satisfied Rule 23(b)(3)'s predominance requirement.  Predominance requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members[.]" Fed. R. Civ. P. 23(b)(3).  The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prod., Inc.* v. *Windsor*, 521 U.S. 591, 623 (1997).  "A court examining predominance must assess [i] 'the elements of the claims and defenses to be

litigated,' [ii] 'whether generalized evidence could be offered to prove those elements on a class-wide basis or whether individualized proof will be needed to establish each class member's entitlement to relief,' and [iii] 'whether the common issues can profitably be tried on a class[-]wide basis, or whether they will be overwhelmed by individual issues.'" *Scott* v. *Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 512 (2d Cir. 2020) (quoting *Johnson*, 780 F.3d at 138).

The parties are sharply divided on the issue of predominance. Plaintiff contends that common issues will predominate because *Basic*'s fraud-on-the-market presumption will enable him to establish Defendants' liability using evidence common to the class. (Pl. Br. 10-23). Defendants rejoin that individual issues will predominate on multiple levels. *First*, Defendants argue that individual issues of reliance will predominate because *Basic*'s fraud-on-the-market presumption cannot be invoked in this case. (Def. Opp. 6-21). *Second*, Defendants argue that individual issues of damages will predominate because Plaintiff has not shown that damages can be measured on a classwide basis consistent with his theory of liability. (*Id.* at 21-23). As it will explain, the Court is not convinced by Defendants' arguments and finds that common questions of liability will predominate over any individualized issues.

### a.   Reliance

The Court begins with Defendants' argument that individualized issues of reliance will predominate. "Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *In re Allergan PLC Sec. Litig.*, 2021 WL

19

4077942, at *8 (quoting *Erica P. John Fund, Inc.* v. *Halliburton Co.,* 563 U.S. 804, 809 (2011)).  As discussed, Plaintiff brings his claims under the Exchange Act and the regulations promulgated thereunder.  (*See* Compl. ¶¶ 104-120).  To prevail on his Section 10(b) and Rule 10b-5 claims, Plaintiff will be required to prove: "[i] a material misrepresentation or omission by the defendant; [ii] scienter; [iii] a connection between the misrepresentation or omission and the purchase or sale of a security; [iv] reliance upon the misrepresentation or omission; [v] economic loss; and [vi] loss causation.'" *GAMCO Inv'rs, Inc.* v. *Vivendi Universal, S.A.,* 838 F.3d 214, 217 (2d Cir. 2016).[5]

Here, as is often true in securities fraud cases, "[w]hether common questions of law or fact predominate … turns on the element of reliance." *Erica P. John Fund, Inc.,* 563 U.S. at 810.  Recognizing that "[i]f every plaintiff had to prove direct reliance on the defendant's misrepresentation, individual issues then would overwhelm the common ones, making certification under Rule 23(b)(3) inappropriate," the Supreme Court held in *Basic* "that securities fraud plaintiffs can in certain circumstances satisfy the reliance element of a Rule 10b-5 action by invoking a rebuttable presumption of reliance, rather than proving direct reliance on a misrepresentation." *Halliburton Co.,* 573 U.S. at 268 (internal alterations and quotation marks omitted); *accord Goldman Sachs Grp., Inc.,* 141 S. Ct. at 1958-59.  Where it applies, the *Basic* presumption provides that "an investor presumptively relies on a defendant's

---

[5]     The Court focuses on this claim because liability for a Section 20(a) violation is derivative of liability for a Section 10(b) violation.  *See generally Fries* v. *Northern Oil & Gas, Inc.,* 285 F. Supp. 3d 706, 723 (S.D.N.Y. 2018).

misrepresentation if that 'information is reflected in the market price of the stock at the time of the relevant transaction.'" *Erica P. John Fund, Inc.*, 563 U.S. at 812 (internal alterations omitted) (quoting *Basic*, 485 U.S. at 247).

Generally, to invoke the *Basic* presumption, "a plaintiff must prove: [i] that the alleged misrepresentation was publicly known; [ii] that it was material; [iii] that the stock traded in an efficient market; and [iv] that the plaintiff traded the stock between the time the misrepresentation was made and when the truth was revealed." *Goldman Sachs Grp., Inc.*, 141 S. Ct. at 1958. At the class certification stage, however, a plaintiff need not establish the second element of materiality, "because such proof is not necessary to ensure satisfaction of Rule 23(b)(3)'s predominance requirement." *Amgen Inc.* v. *Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 467 n.4 (2013).

If a plaintiff is able to successfully invoke the *Basic* presumption, "[t]he defendant may then rebut the presumption through '[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price.'" *Goldman Sachs Grp., Inc.*, 141 S. Ct. at 1958 (quoting *Basic*, 485 U.S. at 248). "So for example, if a defendant could show that the alleged misrepresentation did not, for whatever reason, actually affect the market price, or that a plaintiff would have bought or sold the stock even had he been aware that the stock's price was tainted by fraud, then the presumption of reliance would not apply." *Halliburton Co.*, 573 U.S. at 269. The defendant "bears the burden of

persuasion to prove a lack of price impact," and "must carry that burden by a preponderance of the evidence." *Goldman Sachs Grp., Inc.*, 141 S. Ct. at 1963.

In this case, the parties dispute only *Basic*'s third element, which requires that the Preferred Stocks traded in an efficient market over the proposed class period. (*See* Def. Br. 6-21). After all, Defendants' alleged misstatements were made in public SEC filings and press releases. (Pl. Br. 12). And the class is, by definition, limited to investors who purchased the Preferred Stocks between the time of Defendants' alleged misrepresentations and the time when Defendants delisted the Preferred Stocks. (*Id.*).

"An efficient market is 'one in which the prices of the [stock] incorporate most public information rapidly.'" *Waggoner* v. *Barclays PLC*, 875 F.3d 79, 94 (2d Cir. 2017) (quoting *Teamsters Loc. 445 Freight Div. Pension Fund* v. *Bombardier Inc.*, 546 F.3d 196, 204 (2d Cir. 2008)). Although the Second Circuit has "declined to adopt a particular test for market efficiency," courts in this District "regularly consider five factors first set forth in" *Cammer* v. *Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) (the "*Cammer* factors"), and three additional factors first identified in *Krogman* v. *Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) (the "*Krogman* factors"). *Waggoner*, 875 F.3d at 94-95. The five *Cammer* factors are:

> [i] the average weekly trading volume of the [securities], [ii] the number of securities analysts following and reporting on them, [iii] the extent to which market makers traded in the [securities], [iv] the issuer's eligibility to file an SEC registration Form S-3, and [v] the demonstration of a cause and effect relationship

22

> between unexpected, material disclosures and changes
> in the [securities'] prices.

*Bombardier Inc.*, 546 F.3d at 200.  And the three *Krogman* factors are: "[i] the

market capitalization of the company; [ii] the bid-ask spread of the stock; and

[iii] the percentage of stock not held by insiders."  *In re Allergan PLC Sec. Litig.*,

2021 WL 4077942, at *9.  Collectively, the *Cammer/Krogman* factors facilitate

the Court's inquiry into the efficiency of the market for a particular security.

The eight *Cammer/Krogman* factors measure market efficiency in

different ways.  The first four *Cammer* factors and each of the three *Krogman*

factors "examine indirect indicia of market efficiency for a particular security."

*Waggoner*, 875 F.3d at 94.  By contrast, the fifth *Cammer* factor (the existence

of a cause-and-effect relationship between certain disclosures and changes in

the securities' price) "invites plaintiffs to submit direct evidence, consisting of

'empirical facts showing a cause and effect relationship between unexpected

corporate events or financial releases and an immediate response in the stock

price.'"  *In re Petrobras Sec.*, 862 F.3d at 276 (quoting *Cammer*, 711 F. Supp. at

1287).  Because the fifth *Cammer* factor differs in kind from the remaining

seven factors, the Court will address that factor at the end of its analysis.

Although the Court will consider each of the *Cammer/Krogman* factors in

turn, it pauses here to note that the factors are merely tools that guide the

Court's analysis.  Consistent with the Second Circuit's refusal to adopt a

particular test for market efficiency, *see Waggoner*, 875 F.3d at 94; *see also In

re Petrobras Sec.*, 862 F.3d at 277 (approving of a district court's adoption of "a

holistic analysis based on the totality of the evidence presented"), the Court's ultimate finding as to market efficiency does not turn on whether any one or combination of factors is satisfied, but rather on whether the evidence as a whole makes it more likely than not that the Preferred Stocks traded in an efficient market during the proposed class period.

### i.     Average Weekly Trading Volume

The first *Cammer* factor evaluates the average weekly trading volume of the securities during the proposed class period. *Cammer*, 711 F. Supp. at 1286. "A large weekly volume of trades suggests an efficient market 'because it implies significant investor interest in the company,' which implies, in turn, 'that many investors are executing trades on the basis of newly available or disseminated corporation information.'" *In re Glob. Brokerage, Inc.*, No. 17 Civ. 916 (RA) (BCM), 2021 WL 1160056, at *12 (S.D.N.Y. Mar. 18, 2021) (quoting *Cammer*, 711 F. Supp. at 1286), *report and recommendation adopted sub nom. In re Glob. Brokerage, Inc. f/k/a FXCM Inc. Sec. Litig.*, No. 17 Civ. 916 (RA) (BCM), 2021 WL 1105367 (S.D.N.Y. Mar. 23, 2021).

Here, over the proposed class period, "the average weekly trading volume for the Preferred Stock as a percentage of shares outstanding ranged from 1.38% to 2.09%, depending on the series." (Pl. Br. 14). At first blush, these averages weigh strongly in favor of finding market efficiency. *See Cammer*, 711 F. Supp. at 1286 (observing that a weekly trading volume of 2% or more "would justify a strong presumption" that the market is efficient, and that a volume of 1% "would justify a substantial presumption").

24

Defendants raise two arguments against the application of the *Cammer* presumption in this case based on trading volume. *First*, Defendants argue that the Preferred Stocks' trading rates should be examined at a more granular level of detail, and that this narrower view reveals that many of the Preferred Stocks traded at an average of less than 1% per week for significant stretches of the class period. (*See* Def. Opp. 16). The Court finds that this argument succeeds in diminishing the extent to which the first *Cammer* factor weighs in favor of market efficiency, because it suggests a diminished level of investor interest in the Preferred Stocks. *Cf. In re Glob. Brokerage, Inc.*, 2021 WL 1160056, at *13 (concluding that evidence did not establish market efficiency where the security traded at a volume of less than 1% approximately 65% of the time and a volume of 0% during 31% of all weeks over the class period).

*Second*, Defendants separately contend that Plaintiff's showing under the first *Cammer* factor is undermined by academic research authored by Dr. Feinstein and another researcher, Dr. David Tabak. (Khare Rebuttal Report ¶¶ 143-144). Using datasets compiled by Dr. Feinstein and Dr, Tabak, Defendants find that "a minimum of 65% of stocks in Prof. Feinstein's data set had a higher average daily trading volume" than the Preferred Stocks (*id.* at ¶ 145), and that a similar percentage in Dr. Tabak's dataset had a higher average weekly turnover (*id.* at ¶ 148). Defendants further suggest that Dr. Feinstein's academic work has identified more stringent benchmarks for measuring whether a particular average weekly turnover rate suggests market

25

efficiency than the 1% and 2% thresholds identified in *Cammer* and discussed in the Feinstein Report.  (*Id.* at ¶ 149).

Dr. Feinstein offers two points in response.  *First*, he challenges Defendants' suggestion that a stock must trade near or above the median turnover rate to be deemed efficient.  (Feinstein Rebuttal Report ¶ 36).  In particular, Dr. Feinstein quotes Dr. Tabak, on whose work Defendants rely to make their argument, for the proposition that "since the members of the S&P 500 Index are among the stocks that we would expect to trade in an efficient market, the proper threshold is presumably not that a stock exceeds the median value … but rather that it does at least as well as some smaller number of S&P 500 companies."  (*Id.* at ¶ 38 (quoting David Tabak, *Testing Securities Market Efficiency with Cammer Factors*, Law360 (Feb. 5, 2019), https://www.law360.com/articles/1125546/testing-securities-market-efficiency-with-cammer-factors)).  *Second* and relatedly, Dr. Feinstein rejects Defendants' suggestion that his academic work calls into doubt the thresholds identified in *Cammer*.  Dr. Feinstein states that the benchmarks analyzed in his academic work and cited by Defendants are the thresholds that were "most probative of market efficiency."  (Feinstein Rebuttal Report ¶ 37).  Far from undermining *Cammer*, Dr. Feinstein states that "the most probative thresholds were generally less stringent than the factor thresholds commonly used … and were far less stringent than the median factor values."  (*Id.*).

The Court finds that Defendants' second argument does not undermine the extent to which the first *Cammer* factor suggests market efficiency.

Defendants do not suggest that Dr. Feinstein's academic work provides the exclusive (or even the standard) benchmarks used in this area of study.  Nor do Defendants dispute that courts routinely rely on the measures identified in *Cammer* and used by Dr. Feinstein here.  Rather, Defendants appear to use Dr. Feinstein's academic work to attempt to undermine Dr. Feinstein's credibility before this Court.  Given Dr. Feinstein's explanation of his work and the routine use of the *Cammer* thresholds by courts in this Circuit, the Court is not persuaded that Dr. Feinstein's selection of benchmarks is inappropriate.  *See, e.g.*, *Villella*, 333 F.R.D. at 55 (employing the *Cammer* thresholds); *Pirnik* v. *Fiat Chrysler Automobiles, N.V.*, 327 F.R.D. 38, 44 (S.D.N.Y. 2018) (same).

### ii.        Analyst Coverage

The second *Cammer* factor considers whether and the extent to which financial analysts covered the securities.  *Cammer*, 711 F. Supp. at 1286. "[T]he existence of a number of financial analysts who report on a security supports a finding of market efficiency because it permits an inference that financial statements relating to a security are closely reviewed by investment professionals, who in turn make buy/sell recommendations to client investors." *Bombardier Inc.*, 546 F.3d at 205 (internal alterations omitted) (quoting *Cammer*, 711 F. Supp. at 1286).

Plaintiff concedes that this factor provides, at best, mixed support for his position.  (Pl. Br. 15).  During the proposed class period, six analyst companies published reports discussing AmTrust in general, but only one of the six reports addressed the Preferred Stocks in particular.  (Feinstein Report ¶¶ 116-

27

118).  Analyst coverage grew even sparser "as it became clearer that [AmTrust] would be taken private," with no analyst reports published between November 29, 2018, and the Delisting Announcement.  (*Id.* at ¶ 120).  In addition to reports authored by financial analysts, AmTrust was also the subject of 463 news article over the class period.  (*Id.* at ¶ 122).  Plaintiff does not, however, identify what portion of these news articles specifically addressed the Preferred Stocks.  Because Plaintiff has not adduced evidence that financial analysts or the broader financial media covered the Preferred Stocks over the proposed class period, this factor does not weigh in favor of a finding of market efficiency.  *See In re VALE S.A. Sec. Litig.*, No. 19 Civ. 526 (RJD) (SJB), 2022 WL 122593, at *15 (E.D.N.Y. Jan. 11, 2022) (making a similar finding).

### iii.        Market Makers

The third *Cammer* factor addresses the extent to which market makers traded in the securities.  *Cammer,* 711 F. Supp. at 1286-87.  "Market makers promote the efficiency of a security's market because they react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level."  *Bombardier Inc.*, 546 F.3d at 206 (internal quotation marks omitted).  This factor unquestionably tips in Plaintiff's favor. Trading in the Preferred Stocks was facilitated by a designated market maker on the NYSE (Feinstein Report ¶¶ 104-105), "which courts presume to be an efficient market," *AMC Ent. Holdings, Inc.*, 338 F.R.D. at 217; *see also Villella*, 333 F.R.D. at 54 (the fact that securities "traded on the New York Stock Exchange … by itself is a strong indication of efficiency"); *Menaldi* v. *Och-Ziff*

*Cap. Mgmt. Grp. LLC*, 328 F.R.D. 86, 95 (S.D.N.Y. 2018) (noting that a stock's exchange on the New York Stock Exchange satisfied third *Cammer* factor); *Pirnik*, 327 F.R.D. at 44 (observing that trading "facilitated by a designated market maker on the NYSE" satisfied *Cammer*'s market maker factor).  In addition, Plaintiff also identifies several investment banks, such as JMP Securities, Morgan Stanley, and UBS, that served as underwriters for the Preferred Stocks during the proposed class period.  (Feinstein Report ¶ 108).  This evidence further supports a finding of market efficiency.  *See In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. at 447 (finding that "evidence that there were at least six large, reputable banks that served as market makers" supported finding of market efficiency).[6]

### iv.        Eligibility to File Form S-3

The fourth *Cammer* factor considers whether the security's issuer was eligible to file an SEC Form S-3, a short-form registration statement that can

---

[6]       Although not formally a consideration under *Cammer*'s market maker factor, Dr. Feinstein suggests that the existence of institutional investment in a security provides additional evidence of market efficiency.  Dr. Feinstein claims that this is so because "[i]nstitutions are sophisticated investors who typically employ equity analysts of their own to evaluate the securities they hold and trade."  (Feinstein Report ¶ 124).  Other courts have made similar observations.  *See, e.g.*, *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008) (finding that "because institutional investors held a substantial percentage of Alstom's securities and because these investors could easily buy and sell Alstom's securities on exchanges such as the NYSE and Euronext Paris, they have likely acted as arbitrageurs and facilitated the efficiency of the market").  Here, Dr. Feinstein found that at least 12 major institutions invested in certain of the Preferred Stocks over the proposed class period.  (Feinstein Report ¶ 129).  In opposition, Defendants point out that these institutional investors held only three of the six series of Preferred Stocks, and often did so for limited periods of time.  (Khare Rebuttal Report ¶ 175).  Although the Court accepts that Dr. Feinstein's count of the number of institutional investors who invested in the Preferred Stocks may be understated because it relies on self-reported data (*see* Feinstein Report ¶ 129), it finds that the limited number of investors and the limited duration of their investments render less probative Dr. Feinstein's institutional investment evidence.

be used by reporting companies in certain cases.  *Cammer*, 711 F. Supp. at 1287.  Here, AmTrust was eligible to file a Form S-3 during the proposed class period, except for a limited portion when it was ineligible due to the timing of certain other financial filings.  (Feinstein Report ¶¶ 130-143).  This factor therefore weighs in favor of market efficiency.  *See Cammer*, 711 F. Supp. at 1287 (finding that ineligibility does not weigh against market efficiency if "such ineligibility was only because of timing factors rather than because the minimum stock requirements … were not met").  Defendants do not contest that this factor is satisfied, but argue that it should be discounted because it is duplicative of *Cammer*'s other factors.  (Def. Opp. 19).  The Court simply observes that this factor is satisfied but does not on its own compel a finding of market efficiency.

## v.      Market Capitalization

Turning now to the *Krogman* factors, the Court observes that the first factor addresses the security issuer's market capitalization.  *Krogman*, 202 F.R.D. at 478.  The significance of this factor inheres in the assumption that "there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."  *Id.*

Prior to the Acquisition Group's purchase of AmTrust's common stock, AmTrust's total market capitalization varied between $2.35 and $2.92 billion and averaged $2.71 billion, putting it in the second decile of all U.S. companies.  (Pl. Br. 20).  In most cases, AmTrust's valuation would indicate that the Preferred Stocks traded in an efficient market over the proposed class

30

period.  *See Carpenters Pension Tr. Fund of St. Louis* v. *Barclays PLC*, 310 F.R.D. 69, 92 (S.D.N.Y. 2015) (finding that market capitalization of between $0.5 to $3.2 billion indicated market efficiency).

Recognizing that AmTrust's market capitalization is an imperfect proxy of market efficiency in this case because it measures the value of AmTrust's common stock as opposed to its Preferred Stocks, both parties offer more detailed measures of the Preferred Stocks' valuation.  Plaintiff isolates the value of the Preferred Stocks over two periods: (i) the period between the Individual Defendants' announcement of their intent to acquire AmTrust's common stock and the completion of the acquisition ("Interval-1") and (ii) the period between the acquisition's completion and the Delisting Announcement ("Interval-2"). (Pl. Br. 14 n.5).  During Interval-1, the average value of the Preferred Stocks was $692.2 million, and during Interval-2 the average value was $494.4 million.  (Feinstein Report ¶ 149).  Both values exceeded the common stock market capitalization of 60% of all publicly traded companies.  (*Id.*).

Defendants counter that it is "improper" to analyze the market capitalization of the Preferred Stocks in the aggregate because each series of Preferred Stock has distinct trading characteristics.  (Def. Br. 20).  When the Preferred Stocks are disaggregated, Defendants contend, their market capitalization is revealed to be "in the *bottom* quartile when compared to other publicly-traded companies."  (*Id.* (noting that the percentiles ranged from 21.7% (for Series C) to 38.3% (for Series F) of all publicly-traded companies)). But Defendants do not convincingly explain why, in a case involving all six

series of Preferred Stock, each series should be evaluated individually against the total market capitalization of other publicly-traded companies, nor do they cite any legal authority supporting their claim that the value of each series is so minimal as to invoke a presumption against market efficiency. Accordingly, the Court finds that this factor provides some evidence of market efficiency.

### vi.    Bid-Ask Spread

The second *Krogman* factor considers the bid-ask spread of the stock. *Krogman*, 202 F.R.D. at 478. "A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade." *Id.* Neither party has identified, and the Court's research has not uncovered, a specific range within which a bid-ask spread must fall to suggest market efficiency or inefficiency. *Compare In re VALE S.A. Sec. Litig.*, 2022 WL 122593, at *8 (spread of 0.09% favored market efficiency), *with In re Teva Sec. Litig.*, No. 17 Civ. 558 (SRU), 2021 WL 872156, at *17 (D. Conn. Mar. 9, 2021) (spread of 2.66% "weighs moderately in favor of market efficiency").

Here, the bid-ask spreads for Series A, B, C, D, E, and F of the Preferred Stocks were 1.36%, 1.03%, 1.22%, 0.79%, 1.04%, and 0.67%, respectively. (Feinstein Report ¶ 156). Echoing the courts' varied approaches to this factor, the parties dispute the significance of these values. Defendants emphasize Dr. Feinstein's finding that each of these spreads is greater than the average spread of common stocks traded on U.S. stock exchanges during the class period. (Def. Opp. 20 (citing Dr. Feinstein Report ¶ 156)). But Dr. Feinstein notes in the same breath that the Preferred Stocks' bid-ask spreads are

"narrower than the average bid-ask spreads prevailing at the time of the *Krogman* decision[.]"  (Feinstein Report ¶ 157; *see also id.* at ¶ 158 (observing that in 2001, when *Krogman* was decided, "the average month-end bid-ask spread" was 3.7%)).  Further, *Krogman* itself found that a spread of 5.6% suggested market efficiency.  *Krogman*, 202 F.R.D. at 478.  Accordingly, the Court finds that this factor weighs in favor of market efficiency.

### vii.    Percentage Held by Outsiders

The final *Krogman* factor, which also serves as the final indirect measure of market efficiency, addresses the percentage of the stock held by investors unaffiliated with the issuer.  *Krogman*, 202 F.R.D. at 478.  This factor weighs in favor of market efficiency where most, if not all, of an issuer's stock is held by outsiders.  *See, e.g., In re Allergan PLC Sec. Litig.*, 2021 WL 4077942, at *10 (concluding that factor weighed in favor of market efficiency where "overwhelming majority" of outstanding shares were held by outsiders).  Here, the percentage of the Preferred Stocks held by outsiders ranged from 99.13% to 100%.  (Feinstein Report ¶ 153).  Defendants do not address this factor in their briefing, and the Court finds that it weighs in favor of market efficiency.

### viii.    Cause-and-Effect Relationship

The Court ends its analysis of market efficiency with the fifth (and most disputed) *Cammer* factor, which examines whether there is a cause-and-effect relationship between "unexpected corporate events or financial releases and an immediate response in the stock price."  *Cammer*, 711 F. Supp. at 1287.  Some courts have remarked that this factor is "'the most important *Cammer* factor'

because without finding this causal relationship, it is 'difficult to presume that the market will integrate the release of material information about a security into its price.'" *In re Glob. Brokerage, Inc.*, 2021 WL 1160056, at *16 (quoting *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. at 448).  Other courts, however, have placed less emphasis on the factor, reasoning that the Second Circuit has declined to hold that its satisfaction is a necessary precondition for a finding of market efficiency.  *See, e.g., Menaldi*, 328 F.R.D. at 97-98 (citing *Waggoner*, 875 F.3d at 97-99); *Carpenters Pension Tr. Fund of St. Louis*, 310 F.R.D. at 84 (noting that "courts have found market efficiency in the absence of an event study or where the event study was not definitive").  The Court views this factor — like all the *Cammer/Krogman* factors — as a useful tool for determining whether the Preferred Stocks traded in an efficient market.

Generally, plaintiffs attempt to demonstrate a cause-and-effect relationship "by submitting an event study." *Waggoner*, 875 F.3d at 94.  Event studies are "regression analyses that seek to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events.'" *Id.* (quoting *Halliburton Co.*, 573 U.S. at 280).  "An event study that correlates the disclosures of unanticipated, material information about a security with corresponding fluctuations in price has been considered *prima facie* evidence of the existence of" a cause-and-effect relationship.  *Bombardier Inc.*, 546 F.3d at 207-08; *accord In re Petrobras Securities*, 862 F.3d at 278 (affirming the importance of event studies, but also noting that the Second Circuit has "never suggested … that such evidence was the *only* way to prove market efficiency").

34

In this case, Plaintiff relies on Dr. Feinstein's event study to demonstrate a cause-and-effect relationship between certain events and changes in the Preferred Stocks' market prices.  (*See* Feinstein Report 52-62).[7]  Dr. Feinstein begins by defining his criteria for selecting appropriate events for analysis, explaining that "[i]deal candidate events" are "events on which company-specific information was released that is new, unexpected, and of such import as to reasonably be expected to elicit a stock price reaction over the threshold for statistical significance in an efficient market."  (*Id.* at ¶ 170).  Dr. Feinstein identified three such events that occurred during the proposed class period: (i) the filing of a Schedule 13D on January 22, 2018, clarifying the Individual Defendants' intent to continue to list the Preferred Stocks on the NYSE; (ii) Carl Icahn's May 17, 2018 announcement that he would oppose the Individual Defendants' attempt to take AmTrust private; and (iii) the January 18, 2019 Delisting Announcement.  (*Id.* at ¶¶ 178-180).[8]

After selecting the three above-described events, Dr. Feinstein turned to estimating the effect of these events on the Preferred Stocks' market prices. (Feinstein Report ¶¶ 181-202).  In general terms, Dr. Feinstein explains that he

---

[7]     Dr. Feinstein also assessed the Preferred Stocks' market prices as functions of market interest rates.  (Feinstein Report ¶¶ 204-205).  Defendants contend that this segment of Dr. Feinstein's analysis is flawed for several reasons.  (Def. Opp. 13-15; Khare Rebuttal Report 31-38; *but see* Feinstein Rebuttal Report 44-50 (defending his methodology against Defendants' various criticisms)).  Because Defendants raise significant questions concerning the academic bases for such an interest rate analysis, and because the Court finds that Plaintiff's other evidence is sufficient to establish market efficiency, the Court declines to consider Dr. Feinstein's interest rate analysis.

[8]     Because the May 17, 2018 Icahn announcement and the January 18, 2019 Delisting Announcement occurred after the close of trading, Dr. Feinstein measured the impact of these events on the following trading days, which were May 18, 2018, and January 22, 2019, respectively.  (Feinstein Report ¶ 179).

accomplished this task by using regression analyses in a multi-step analytical process.  (*Id.* at ¶¶ 181-194).  The first step in the process is to run a regression analysis to "determine how the price of a company's security typically behaved in relation to the overall market and its industry sector[.]" (*Id.* at ¶ 181).  The resulting model is then used "to determine how much of each event day's actual return is explained by those market and sector effects." (*Id.*).  This process yields the "explained return," which is the difference between the return actually observed and the model's estimated return given the market and sector effects.  (*Id.*).  Once the explained return is calculated, the final step is to isolate the "residual return, which is the security's return after controlling for market and industry sector effects."  (*Id.* at ¶ 182).

Applying these methods, Dr. Feinstein found statistically significant residual returns for the Preferred Stocks on each of the three event dates. (Feinstein Report ¶¶ 195-202).  With respect to the Schedule 13D filed on January 22, 2018, Dr. Feinstein found that the likelihood of obtaining his reported residual returns "if only random volatility (rather than information) was impacting the stock price ranged between 0.000071% (Series F) and 0.045% (Series C)."  (*Id.* at ¶ 197).  Similarly, with respect to Icahn's May 18, 2018 announcement that he would oppose the Individual Defendants' acquisition of AmTrust's common stock, Dr. Feinstein found that the likelihood of observing his reported residual returns if only random volatility was impacting the price ranged from 0.0023% (Series F) to 4.31% (Series E).  (*Id.* at ¶ 199).  Finally, with respect to the January 22, 2019 Delisting Announcement,

Dr. Feinstein found that the likelihood was "virtually nil." (*Id.* at ¶¶ 201-202). Based on these findings, Dr. Feinstein concluded that "[a]ll three important news events elicited statistically significant reactions in the trading prices of the" Preferred Stocks and thus that his event study demonstrated a cause-and-effect relationship between the release of material public information about AmTrust and changes in the Preferred Stocks' market prices. (*Id.* at ¶ 203).

Before turning to the sources of disagreement between the parties' experts, the Court considers it worthwhile to identify several critical areas where the experts are in agreement. In particular, Defendants' expert, Dr. Khare, does not challenge (i) Dr. Feinstein's qualifications or ability to perform an event study analysis; (ii) Dr. Feinstein's use of an event study to demonstrate a cause-and-effect relationship; (iii) his criteria for selecting event dates; or (iv) his basic analytical model. (*See* Khare Rebuttal Report ¶ 45-48 (adopting similar methodology for selecting events); *id.* at ¶ 91 (using Dr. Feinstein's model to perform additional analyses)).

Dr. Khare does, however, mount several challenges to Dr. Feinstein's findings, arguing in particular that: (i) Dr. Feinstein studied too few events to provide statistically meaningful information (Khare Rebuttal Report ¶¶ 61-66); (ii) Dr. Feinstein should not have used the January 22, 2019 Delisting Announcement as one of the events in his study (*id.* at ¶¶ 67-74); (iii) Dr. Feinstein should have included additional events in the study (*id.* at ¶¶ 75-90); and (iv) when these additional events are added to Dr. Feinstein's model,

Plaintiff's evidence fails to demonstrate by a preponderance of the evidence that the Preferred Stocks traded in an efficient market (*id.* at ¶¶ 92-97).

The Court does not accept Defendants' first argument.  Defendants contend that "it is impossible to draw reliable conclusions about whether the requisite cause-and-effect relationship" existed based on an event study that examines three events.  (Def. Opp. 8).  To be sure, the fact that Dr. Feinstein uses only three events bears on the probative value of his findings.  *See In re VALE S.A. Sec. Litig.*, 2022 WL 122593, at *13 (making similar observation).  But Defendants take this commonsense notion too far, suggesting that such an event study can never demonstrate market efficiency.  (Def. Opp. 10 ("[T]he fact remains that three days simply are not enough to draw conclusions about whether market efficiency existed throughout a year.")).  Defendants fail to identify any authority holding that an event study must evaluate a minimum number of dates to be reliable (or even probative), and the Court declines to adopt such a baseline.  *Cf. In re Groupo Televisa Sec. Litig.*, No. 18 Civ. 1979 (LLS), 2020 WL 3050550, at *7 (S.D.N.Y. June 8, 2020) (finding that plaintiff established market efficiency even where only one of four studied events yielded a statistically significant relationship between the event and the security's price).  Rather than reject Dr. Feinstein's report wholesale on this basis, the Court takes note that it is premised on a small sample size.[9]

---

[9]    Although the Court takes notes of the limited number of events included in Dr. Feinstein's study, it rejects Defendants' suggestion that Dr. Feinstein's study examines "a mere *three days* within" the proposed class period.  (*See* Def. Br. 8 (emphasis in original)).  As Dr. Feinstein explains, "[a]lthough the event study focuses on three major events, it compares those three event dates to all of the other lesser or non-news days

38

Defendants' second argument, that Dr. Feinstein should not have
included the Delisting Announcement as one of the three events in his study, is
also unpersuasive.  (Def. Opp. 10-11).  In this regard, Dr. Khare contends that
the inclusion of the Delisting Announcement biased Dr. Feinstein's results
because "a corrective disclosure is often associated with large price declines,
and therefore, expected to have statistically significant price declines."  (Khare
Rebuttal Report ¶ 68).  To begin, Defendants' argument appears to concede
that the Delisting Announcement satisfies Dr. Feinstein's eligibility for
inclusion in the event study and provides some evidence of the market's ability
to incorporate material public information.[10]  Further, Defendant's argument is
less compelling where, as here, the alleged corrective disclosure is not the sole
event studied, and thus poses less risk of unduly influencing the event study's
bottom-line findings.  Finally, Defendants again fail to identify any binding
authority holding that the inclusion of such a date is impermissible.[11]  To the

---

in the entire examination period."  (Feinstein Rebuttal Report ¶ 84; *see also id.* ("the
event study examines every day and determines whether the security price behavior on
the major event dates differed significantly from the price behavior on ordinary days")).

[10]   Defendants seek to undercut the significance of the market's reaction to the Delisting
Announcement by suggesting that "a large decline in response to the corrective
disclosure could be due to investor over-reaction to bad news, which suggests an
*inefficient* market."  (Def. Br. 11 (emphasis in original)).  This argument betrays a
misunderstanding of *Basic*'s conception of market efficiency.  *Basic* is grounded "on the
fairly modest premise that 'market professionals generally consider most publicly
announced material statements about companies, thereby affecting stock market
prices.'"  *Halliburton Co.*, 573 U.S. at 272 (quoting *Basic*, 485 U.S. at 247).  On this
understanding, Defendants' suggestion that the market may have misvalued
information conveyed in the Delisting Announcement is beside the point.  What matters
for *Basic* purposes is that the market identified material public information and
incorporated it into the Preferred Stocks' market prices.  Put differently, it is the
market's ability to *price* material public information, not its ability to *accurately* price
that information, that demonstrates market efficiency in the *Basic* sense.

[11]   Defendants cite two out-of-circuit decisions as support for such a prohibition.  (Def.
Opp. 10).  *First*, Defendants focus on the statement in *Ohio Pub. Emps. Ret. Sys.* v. *Fed.*

contrary, courts in this District have found persuasive event studies that include such corrective disclosures.  *See, e.g.*, *In re Groupo Televisa Sec. Litig.*, 2020 WL 3050550, at *7 (finding cause-and-effect relationship based on event study that used alleged corrective disclosure as one of the studied events); *Menaldi*, 328 F.R.D. at 96 (noting that "the Supreme Court [has] observed, without expressing any concern, that '[t]he episodes examined by [the plaintiff's] event study included one of the alleged misrepresentations that form the basis of the [plaintiff's] suit'" (citing *Halliburton Co.*, 573 U.S. at 280)).[12]

Defendants' third and fourth arguments are of a piece, and both carry some weight.  Defendants assert that Dr. Feinstein should have included in his event study three earnings announcements that occurred during the class

---

*Home Loan Mortg. Corp.*, No. 4:08CV0160, 2018 WL 3861840, at *2 (N.D. Ohio Aug. 14, 2018) ("*OPERS*"), that "[e]conomists ... agree that using the last day of a class period is not a scientifically valid way to test for market efficiency because, among other reasons, securities plaintiffs intentionally select such dates for purposes of increasing potential damages."  The Court fails to see why plaintiffs' desire to include a date in an event study bears on that date's scientific suitability for analysis, and the *OPERS* decision does not identify any other basis for its statement.  *Second*, Defendants point to *Bell* v. *Ascendant Sols., Inc.*, 422 F.3d 307, 316 (5th Cir. 2005), for the unremarkable proposition that a "single-day price decline on the last day of the class period in response to ... a corrective disclosure ... is plainly insufficient by itself to show market efficiency throughout the class period."  Here, Plaintiff's showing of market efficiency is not based solely on a price reaction to a corrective disclosure, but rather on Plaintiff's showing under the *Cammer*/*Krogman* factors and an event study that includes additional dates.

[12]   Defendants raise a related argument that once the alleged corrective disclosure is removed from Dr. Feinstein's even study, there is insufficient evidence of market efficiency between the Acquisition Group's purchase of AmTrust's common stock and the Delisting Announcement.  (*See* Def. Br. 11-12).  The Court is unpersuaded by this argument.  As Defendants recognize, Dr. Feinstein's analysis of this time period rests not only on the impact of the Delisting Announcement on the Preferred Stocks' market prices, but also on the indirect *Cammer*/*Krogman* factors that were discussed earlier in this Opinion.  (*Id.* at 12).  Given the Court's finding that Dr. Feinstein did not err by including the Delisting Announcement in his event study and its findings under the *Cammer*/*Krogman* factors, the Court is satisfied that Plaintiff has adduced sufficient evidence of the market's efficiency during over this time period.

period and six other announcements related to the status of the privatization of AmTrust's common stock.  (Def. Opp. 12-13).  These six additional announcements include: (i) AmTrust's entrance into the definitive merger agreement on March 1, 2018; (ii) Institutional Shareholder Services' publication of a report recommending that common stock shareholders vote against the transaction on May 25, 2018; (iii) AmTrust's announcement that it would delay the shareholder vote on the transaction on June 4, 2018; (iv) AmTrust's announcement that it would raise its acquisition price on June 7, 2018; (v) the AmTrust shareholders' approval of the transaction on June 21, 2018; and (vi) the SEC's approval of the transaction on November 27, 2018.  (Khare Rebuttal Report ¶¶ 88-89).  When these nine additional events are incorporated into Dr. Feinstein's model, Defendants contend, there is insufficient evidence of a cause-and-effect relationship.  (*Id.* at ¶¶ 91-97).  More specifically, when Dr. Khare's events are included, Defendants find that the Preferred Stocks had statistically significant reactions to between (i) 18.2% and 27.3% of events (when the Delisting Announcement is not included) (*id.* at ¶ 94) or (ii) 25% to 33% of the events (when it is) (*id.* at n.82).

Dr. Feinstein offers several defenses of his decision not to include the nine additional dates identified by Dr. Khare.  *First*, Dr. Feinstein maintains that AmTrust's three earnings announcements are inappropriate subjects of an event study in this case because of the Preferred Stocks' particular characteristics.  (Feinstein Rebuttal Report ¶ 98 (citing Feinstein Report ¶¶ 35-38, 175-177)).  Pointing to the Preferred Stocks' seniority, fixed dividends, and

41

equity buffer (Feinstein Report ¶ 175), Dr. Feinstein states that "while quarterly earnings announcements are usually good candidates for testing common stock market efficiency," such announcements are poor candidates in this context because the Preferred Stocks are less sensitive to minor fluctuations in AmTrust's financial fortunes (*id.* at ¶ 176).[13]  *Second*, Dr. Feinstein argues that none of the nine events identified by Dr. Khare should be included in the event study, because none of the events corresponds to "days on which new, unexpected, unconfounded information was released that was so economically material that one should expect them to elicit statistically significant" price reactions.  (Feinstein Rebuttal Report ¶ 114; *see also id.* at ¶ 103).

Dr. Feinstein's explanations vary in their forcefulness.  The Court appreciates, for instance, Dr. Feinstein's point that Dr. Khare has not identified "unexpected, material disclosures," *Bombardier Inc.*, 546 F.3d at 200, contained within the three earnings announcements Dr. Khare has chosen.  (Feinstein Rebuttal Report ¶ 103).  Thus, even if the Court were to agree with

---

[13]     Dr. Feinstein explains his reference to an "equity buffer" as follows:

> [B]ecause dividend payments to preferred security investors can be reduced only after dividends to common security investors are reduced to zero, and because the face value principal is in jeopardy only if the value of company assets falls so much as to wipe out the common equity, the common equity creates a value buffer for the preferred shares. This value buffer tends to hold up the value of preferred stock, keeping it from falling much in the face of all but the most severe news.

(Feinstein Report ¶ 175).

The parties' experts dispute whether the Preferred Stocks were in fact insulated by an equity buffer.  (*Compare* Khare Rebuttal Report ¶¶ 76-83, *with* Feinstein Rebuttal Report ¶¶ 103-109).  Because the Court finds Dr. Feinstein's second argument sufficient to withstand Defendants' challenge, it declines to weigh in on the parties' equity buffer dispute.

Dr. Khare that earnings announcements *can* be suitable candidates for an event study, it is not convinced that these announcements *are* suitable in this particular case.  Similarly, the Court finds Dr. Feinstein's explanations for the lack of price impact observed on June 21, 2018, and November 28, 2018, to be plausible.  (*See id.* at ¶¶ 127-128).  To review, on June 21, 2018, investors learned that AmTrust's shareholders had voted to approve the transaction, and on November 28, 2018, they learned that AmTrust had obtained "all regulatory approvals required to complete" the transaction.  (*Id.*).  Dr. Feinstein explains that he would not have expected the Preferred Stocks' prices to react to the news on either date because the market had already incorporated its expectation that the deal would close into the stocks' price.  (*Id.*).  By contrast, Dr. Feinstein's defense of his exclusion of the Acquisition Group's June 7, 2018 announcement that it had raised the value of its offer to acquire AmTrust's outstanding common stock is less convincing.  (*See id.* at ¶¶ 125-126).  This announcement plausibly provided investors with new and unexpected material information that indicated that there was a higher likelihood that the contemplated acquisition would be successful.  As a result, the Court finds the persuasive force of Dr. Feinstein's report to be weakened, but not extinguished. *See Menaldi*, 328 F.R.D. at 96 (finding that price movement following 47.1% of studied events demonstrated a "significant cause-and-effect relationship").

Ultimately, while the parties' experts spend considerable time debating each of the nine additional dates identified by Dr. Khare, the Court declines to weigh in further on Dr. Feinstein's event selection and thereby risk "get[ting]

sidetracked among the reams of expert materials[.]" *Menaldi*, 328 F.R.D. at 98. As several courts in this District have noted, "[t]he dispute over the inclusion of event dates is essentially about the role of subjectivity in such analysis." *Id.* at 96 (quoting *In re: Petrobras Sec. Litig.*, 312 F.R.D. 354, 368 (S.D.N.Y. 2016), *aff'd in part, vacated in part sub nom. In re Petrobras Sec.*, 862 F.3d at 250)). Dr. Feinstein's selection of events no doubt reflects the exercise of discretion, and that discretion is a fair subject of attack.  Indeed, Defendants are not the first to challenge Dr. Feinstein on this front; at least one court in this Circuit has raised similar concerns.  *See In re VALE S.A. Sec. Litig.*, 2022 WL 122593, at *11-14.  But Dr. Feinstein has offered reasonable explanations for his decisions, and Dr. Khare has not identified a fundamental flaw in Dr. Feinstein's methodology that would require the wholesale preclusion of his study.  The Court therefore finds that Dr. Feinstein's report provides some, albeit not conclusive, direct evidence that the market for the Proposed Stocks reacted to unexpected, material information during the proposed class period.

*     *     *

After considering the *Cammer/Krogman* factors discussed above, the Court concludes that Plaintiff has met his burden of showing that the Preferred Stocks traded in an efficient market during the proposed class period.  To be sure, Defendants have identified weaknesses in certain of Plaintiff's evidence, demonstrating that this is not an open-and-shut case.  But these shortcomings are not fatal.  In this regard, the Court is mindful that the *Basic* presumption is based "on the fairly modest premise that market professionals generally

consider most publicly announced material statements about companies, thereby affecting stock market prices." *Halliburton Co.*, 573 U.S. at 272. Plaintiff has shown in this case that the Preferred Stocks traded on the NYSE, nearly all the *Cammer/Krogman* factors weigh in favor of market efficiency, and there is at least some direct evidence that the market responded to material public information. Taken together, this evidence is sufficient to demonstrate by a preponderance of the evidence that the market for the Preferred Stocks incorporated material public statements during the proposed class period. *See Menaldi*, 328 F.R.D. at 98 (finding that although plaintiff's expert report was "flawed," other indicators of market efficiency were sufficient to entitle plaintiff to fraud-on-market presumption). Accordingly, the Court finds that individual issues of reliance will not predominate with respect to Plaintiff's claims.

### b.   Damages

The Court addresses next whether Plaintiff has shown "that damages are capable of measurement on a classwide basis." *Comcast Corp.* v. *Behrend*, 569 U.S. 27, 34 (2013). "In *Comcast*, the Supreme Court held that courts should examine the proposed damages methodology at the certification stage to ensure that it is consistent with the classwide theory of liability and capable of measurement on a classwide basis." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 123 n.8 (2d Cir. 2013). Here, Defendants argue that Plaintiff has not identified a damages methodology consistent with the proposed class's theory of liability in this case. (Def. Opp. 21-22). The Court disagrees.

In brief, Plaintiff has identified a methodology that would measure the alleged damages suffered by the proposed class.  Plaintiff's theory of the case is that the Preferred Stocks' prices were inflated by Defendant's misrepresentation and concealment of material information; that this inflation was eliminated following the Delisting Announcement; and that Plaintiff and the class were damaged as a result.  (Compl. ¶¶ 104-120).  Dr. Feinstein represents that he will be able to measure these damages by using a three-step process.  (Feinstein Report ¶ 223).  Dr. Feinstein would begin by using "valuation tools," including event study analysis, to determine the impact of Defendants' alleged misstatements and the Delisting Announcement on the Preferred Stocks' market prices.  (*Id.*).  Dr. Feinstein would then create an "inflation ribbon" that would measure how much artificial inflation was incorporated into the price of the Preferred Stocks on each day of the class period.  (*Id.*).  Finally, Dr. Feinstein would provide a damages figure for each class member by calculating the difference between the inflation on the date the Preferred Stocks were purchased and the inflation on the date those same shares were either sold (if prior to the end of the class period) or at the end of the class period.  (*Id.*).  The Court finds that this proposed methodology, which has been accepted by other courts, is sufficient at this stage.  *See, e.g.*, *In re VALE S.A. Sec. Litig.*, 2022 WL 122593, at *18-19 (accepting Dr. Feinstein's methodology); *see also Pirnik*, 327 F.R.D. at 47 (accepting similar methodology).

Defendants' arguments in opposition are unavailing.  Defendants suggest that Dr. Feinstein has not adequately described his proposed model for

measuring class damages.  (Def. Opp. 22).  "[A]lthough Feinstein has not yet
computed damages or conducted a loss causation analysis, the model he
outlines is similar in operation and detail to ones that have regularly been
approved by other courts in this circuit."  *In re VALE S.A. Sec. Litig.*, 2022 WL
122593, at *19.  Further, Defendants argue that Dr. Feinstein's model fails to
account for certain confounding information that "could complicate the
damages analysis in this case[.]"  (Def. Opp. 22).  Defendants point in
particular to "the potential economic impact associated with a change in
trading venue (from a public exchange to over-the-counter)," suggesting that
this transition could introduce confounding factors that affected the Preferred
Stocks' price.  (*Id.*).  The Court need not address this argument at this stage
because it goes to the issue of loss causation, "and the Supreme Court has
held 'that loss causation … [is a] common question[] that need not be
adjudicated before a class is certified."  *Pirnik*, 327 F.R.D. at 47-48 (quoting
*Amgen*, 568 U.S. at 475); *see also Atlantica Holdings, Inc.* v. *Sov. Wealth Fund
Samruk-Kazyna JSC,* No. 20-2805-cv, 2022 WL 151302, at *2 (2d Cir. Jan. 18,
2022) (explaining that "proof of loss causation requires that plaintiffs
disaggregate losses caused by disclosures of the truth behind the alleged
misstatements from losses that result from other factors" (internal quotation
marks omitted)).  Accordingly, Plaintiff has shown that damages inquiries will
not predominate over common issues.

### 3.   The Proposed Class Satisfies Rule 23(b)(3)'s Superiority Requirement

Separately, Rule 23(b)(3) requires "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  As is often true in securities fraud cases, there are significant structural factors that make traditional forms of litigation both inefficient and unlikely here.  "[M]ultiple lawsuits would be costly and inefficient" and "although a large number of individuals may have been injured, no one person may have been damaged to a degree which would induce him to institute litigation solely on his own behalf[.]"  *AMC Ent. Holdings, Inc.*, 338 F.R.D. at 217 (quoting *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 312 F.R.D. 332, 352 (S.D.N.Y. 2015)).  Defendants do not contest that a class action would ameliorate these issues.  Accordingly, the Court finds that a class action is the superior method of resolving this case.

### 4.   The Court Declines to Limit Plaintiff's Class Definition

Defendants move in the alternative to exclude two categories of investors from the proposed class.  (Def. Opp. 25).  *First*, Defendants move to exclude investors who purchased Preferred Stocks following the Acquisition Group's purchase of AmTrust's common stock, arguing that Plaintiff has not demonstrated market efficiency between that purchase and the Delisting Announcement.  (*Id.*).  *Second*, Defendants move to exclude investors who sold their shares of the Preferred Stocks prior to the Delisting Announcement on the grounds that such individuals have not suffered an injury.  (*Id.*).  The Court declines to adopt either of Defendants' proposed limitations.

Defendants' first argument, which rests on their earlier assertion that Plaintiff has not shown that the Preferred Stocks traded in an efficient market during all or certain portions of the proposed class period, is simply a reprise of their predominance argument.  The Court has already addressed and dispensed with the argument and does not consider it further here.

Defendants' second argument requires more discussion.  Defendants ask the Court to amend the proposed class definition to exclude investors who sold all their shares prior to the Delisting Announcement.  (Def. Opp. 25).  Citing *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40 (2d Cir. 2009) ("*In re Flag*"), Defendants claim that "the Second Circuit has approved exclusion of prospective class members who sold before disclosure of the truth entered the market[.]"  (Def. Opp. 25).  District courts in this Circuit have taken different approaches when confronted with similar requests to exclude.  *Compare Pearlstein* v. *BlackBerry Ltd.*, No. 13 Civ. 7060 (CM), 2021 WL 253453, at *24 (S.D.N.Y. Jan. 26, 2021) (finding "no reason not to exclude" similar investors from the class), *with In re VALE S.A. Sec. Litig.*, 2022 WL 122593, at *20 (observing that "courts in this Circuit have rejected the argument that investors who are ineligible for damages should be excluded from the class at certification" (citing *AMC Ent. Holdings, Inc.*, 338 F.R.D. at 217-18)).

The Court declines to limit the class definition at this stage.  In contrast with the named plaintiffs in *In re Flag*, 574 F.3d at 37-38, Plaintiff in this case did not sell his interested in the Preferred Stocks prior to the alleged corrective disclosure (*see* Compl. ¶ 12).  Defendants' argument is therefore not applicable

49

to Plaintiff himself.  Further, Plaintiff's proposed damages methodology would preclude any investors who did not suffer an injury from recovering.  *See In re Vale S.A. Sec. Litig.*, 2022 WL 122593, at *20 (making a similar observation). And more broadly, the Court agrees that "'requiring the class definition expressly exclude those who are ineligible for damages is superfluous." *AMC Ent. Holdings*, 338 F.R.D. at 218 (quoting *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 492 (S.D.N.Y. 2009)).  Accordingly, the Court rejects Defendants' proposed limitations to the class definition.

### 5. The Court Appoints Lead Plaintiff and Class Counsel

The Court concludes by addressing Plaintiff's application to serve as lead plaintiff and for his attorneys to serve as class counsel.  (*See* Pl. Br. 1).  For substantially the same reasons that were discussed with respect to Plaintiff's showing of adequacy of representation under Rule 23(b)(3), the Court finds that Plaintiff and his counsel are suitable representatives of the class.  The Court notes in particular that Plaintiff is an experienced investor, his counsel has significant experience litigating in this area, and both have worked diligently together to initiate and prosecute this action.  (*See* Pl. Br. 8-9).  Accordingly, the Court grants Plaintiff's motion in both respects.

## CONCLUSION

For the foregoing reasons, the Court GRANTS (i) Plaintiff's motion for class certification and (ii) his application to serve as class representative and for his counsel, Wolf Popper LLC, to serve as class counsel.  By contrast, the Court DENIES Defendants' request to limit the class definition.  The Clerk of Court is directed to terminate the motion at docket entry 43.

The parties are hereby ORDERED to submit a joint letter proposing the next steps in this case on or before **February 21, 2022**.

In the interim, the Court expects that parties shall proceed to expert discovery.  As reflected in the Court's December 16, 2021 endorsement, the parties' opening expert reports are due within 30 days of this Opinion and Order; rebuttal reports are due 30 days thereafter; and all expert discovery shall conclude 30 days after the exchange of rebuttal reports.  (Dkt. #71).

SO ORDERED.

Dated:      February 3, 2022
            New York, New York

_____
        KATHERINE POLK FAILLA
        United States District Judge