Federal Judi...

News, cases, companies, firr

Try our **Advanced Search** for more refined results

- Federal Judiciary - 2nd Cir...
  - My Account
  - Emails & Alerts
  - Newsletter Signup

News, cases, companies, firr

Search | Toggle Dropdown

- Search Law360
- Search News Only
- Search Cases Only
- Search PTAB Only
- Search TTAB Only

Advanced Search

Close

- Law360
- Law360 UK
- Law360 Pulse
- Law360 Employment Authority
- Law360 Tax Authority
- Law360 Insurance Authority

- Products
- Lexis®
- Law360 In-Depth
- Law360 Updates
- Law360 Podcasts

- Rankings
- Regional Powerhouses
- Law360's MVPs
- Glass Ceiling Report
- Law360 400
- Diversity Snapshot
- Practice Groups of the Year
- Rising Stars
- Titans of the Plaintiffs Bar

- Sections
- Adv. Search & Platform Tools
- **Browse all sections**

Cited in Martinek v AmTrust Fin Servs
19Civ8030 Decided 2/3/22

Archived on 2/7/22

This document is protected by copyright.
Further reproduction is prohibited without permission.

- Banking
- Bankruptcy
- Class Action
- Competition
- Employment
- Energy
- Expert Analysis
- Insurance
- Intellectual Property
- Product Liability
- Securities

- Beta Tools
- Track docs
- Track attorneys
- Track judges

- Site Menu
- Join the Law360 team
- Search legal jobs
- Learn more about Law360
- Read testimonials
- Contact Law360
- Sign up for our newsletters
- Site Map
- Help

Intellectual Property Securities Bankruptcy Competition Employment White Collar Legal Industry Access To Justice Law360 UK Pulse || See all sections

Cited in Matinek v AmTrust Fin Servs
19Civ8030 Decided 2/3/22
Archived on 2/7/22
This document is protected by copyright.
Further reproduction is prohibited without permission.

Lawyers, how satisfied are you with your job?
Take our survey.

Expert Analysis

# Testing Securities Market Efficiency With Cammer Factors

*By David Tabak*

By David Tabak February 5, 2019, 2:54 PM EST

Law360 (February 5, 2019, 2:54 PM EST) -- Most securities class actions seek to achieve class certification through the fraud-on-the-market theory, which posits that if a security trades in an efficient market, investors can rely on the market price to incorporate the effects of any misrepresentation. If the market for the security is deemed to be efficient, investors need not individually prove that they read the material containing the misrepresentation in order to make a claim.[1]



Arguments that a security traded in an efficient market are usually made by appeal to the five Cammer[2] factors, and additional factors from both case law and academic literature. In general, there are no clear benchmarks for how securities should or do perform in tests of the Cammer factors, and some of the benchmarks that exist in the case law are arbitrary. With the goal of providing benchmarks for stocks that are generally expected to trade in efficient markets, this article shows how members of the S&P 500 Index performed in calendar year 2018 on the Cammer tests.

David Tabak

Before looking at the results, it should be noted that since the members of the S&P 500 Index are among the stocks that we would expect to trade in an efficient market, the proper threshold is presumably not that a stock exceeds the median value (i.e., does better than half of the stocks in the S&P 500 Index), but rather that it does at least as well as some smaller number of S&P 500 companies. Analyses using the same procedures used here can also provide benchmarks for different sets of companies, and for different time periods.[3]

## Cammer Factor 1: Average Weekly Trading Volume

The Cammer court stated that "[t]urnover measured by average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption[.]"[4] The chart below shows the average weekly turnover for members of the S&P 500 Index as of Dec. 31, 2017 during calendar year 2018 at the 2.5th, 5th, 10th, 25th, 50th and 75th percentiles.[5]



Source: FactSet Research Systems Inc.

## Cammer Factor 2: Analysts

The Cammer court next stated that "it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period."[6] The chart below shows the number of

analysts providing earnings-per-share estimates for the members of the S&P 500 Index during 2018.



Cammer Factor 3: Market Makers and Arbitrageurs

The Cammer court commented that the "existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level."[7]

Since Cammer, there has been criticism of the market maker portion of this factor, since many market makers react to buying and selling pressure and not to news.[8] Also, many market makers trade small amounts of volume, while the New York Stock Exchange has a single Designated Market Marker that may account for a disproportionate amount of market-making activity, making counts of the number of market makers potentially misleading, particularly for the NYSE. Therefore, we do not include counts of market makers in this article.

Some courts have used institutional holdings as a proxy for arbitrageurs.[9] The charts below show the fraction of shares outstanding held by institutions, as well as the number of institutions holding shares in each member of the S&P 500 Index, with the results being the average from the fourth quarter of calendar year 2017 through the third quarter of 2018 (as 4Q18 data are not yet available).



## Average Quarterly Institutional Holdings as a Percentage of Shares Outstanding for Members of the S&P 500 Index
### Q4 of 2017 to Q3 2018

Note: Quarter 4 of calendar year 2018 is excluded from this analysis as not all institutional holders have submitted their most recent quarterly filings as of Jan. 4, 2019.

Source: FactSet Research Systems Inc.

Cited in Martinek v. AmTrust Fin Servs
19Civ8030 Decided 2/8/22

Archived on 2/7/22

This document is protected by copyright.
Further reproduction is prohibited without permission.



Average Quarterly Number of Institutional Holders for Members of the S&P 500 Index
Q4 of 2017 to Q3 2018

Note: Quarter 4 of calendar year 2018 is excluded from this analysis as not all institutional holders have submitted their most recent quarterly filings as of Jan. 4, 2019.

Source: FactSet Research Systems Inc.

Cited in Martinek v. AmTrust Fin Servs 19Civ8030 Decided 2/3/22 Archived on 2/7/22 This document is protected by copyright. Further reproduction is prohibited without permission.

### Cammer Factor 4: S-3 Eligibility

The fourth Cammer factor is whether "the Company was entitled to file an S-3 Registration Statement in connection with public offerings[.]"[10]

All of the S&P 500 Index members met the S-3 eligibility requirement of a float of $75 million on every day of the year.

### Cammer Factor 5: Price Response to News

The final Cammer factor is whether there are "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."[11] The standards and benchmarks regarding this factor have probably been the most discussed, and the most disputed. [12]

Some courts have accepted a minimalist requirement of selected examples of corporate or financial events and associated price responses, while other courts have correctly recognized that such a selection is unscientific and "proves nothing."[13] There are also questions about which events to examine in this analysis. For the benchmark provided below, we consider each S&P 500 Index member's earnings announcements in 2018, and examine what fraction of those correspond to a statistically significant price movement, though recognizing that these figures do not actually correspond to a test of market efficiency.[14]



## Percentage of Statistically Significant Earnings Announcement Days for Members of the S&P 500 Index

### Jan. 2, 2018 to Dec. 31, 2018

Note: Company stock price returns are predicted by regressing the daily logarithmic returns of the company's stock on the daily logarithmic returns of the S&P 500 Index and the S&P 500 Industry Sector Index corresponding to the company's GICS sector code. The estimation period used in all market models is taken to be Jan. 2, 2017 to Dec. 29, 2017.

Source: FactSet Research Systems Inc.

Cited in Martinek - Am Trust Fin Servs 19Civ8030 Decided 2/3/22 Archived on 2/7/22 This document is protected by copyright. Further reproduction is prohibited without permission.

Consistent with past literature, we find that many potentially material news events are not associated with a statistically significant stock price movement, even for members of the S&P 500 Index. Also consistent with the academic literature, days with news events (here, earnings announcements) are more likely to be associated with a statistically significant stock-price movement than days without news events.

This is, in fact, a test that provides evidence in favor of market efficiency, and 84 percent of the members of the S&P 500 Index have a statistically significant difference in the likelihood of having a statistically significant price movement following an earnings announcement in these data. The percentage of S&P 500 Index members passing this test rises to 99 percent when five years of data (i.e., 2014-2018) are examined.[15]

## Conclusion

The analyses presented here show a reasonable dispersion of results in how a group of large-company stocks, most of which presumably trade in efficient markets, perform on tests of the five Cammer factors. Notably, some of the tests (e.g., the volume test using the standards discussed in Cammer and the S-3 eligibility test) are passed by all or nearly all of these stocks.

That does not mean that those tests are uninformative, but may suggest that the bar on those tests is sufficiently low that stocks that are generally accepted as trading in an efficient market should tend to pass them easily. In contrast, even these stocks respond to earnings announcements in a statistically significant manner only about half of the time, implying that a requirement that a stock respond in a statistically significant manner to news events all or nearly all the time may not be consistent with the data.[16]

No single test, nor any group of tests, can prove that a security traded in an efficient market.[17] Instead, different tests provide information that can be weighed to reach a conclusion regarding market efficiency. Hopefully, the benchmarks established here, as well as similar benchmarks that can be based on the time period in any particular litigation (as well as extended to tests beyond those in Cammer), will help in understanding how relatively well or poorly a stock performs on tests of the Cammer factors.

---

*David Tabak, Ph.D. is the securities and finance practice managing director at NERA Economic Consulting.*

*Disclosure: Economists at NERA have served as expert witnesses in some of the cases cited in the endnotes, being retained by plaintiffs in St. Jude and by defendants in Countrywide and PolyMedica.*

*The opinions expressed are those of the author(s) and do not necessarily reflect the views of the firm, its clients, or Portfolio Media Inc., or any of its or their respective affiliates. This article is for general information purposes and is not intended to be and should not be taken as legal advice.*

[1] Basic Inc. v. Levinson ⬤ , 485 U.S. 224, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988).

[2] Cammer v. Bloom ⬤ , 711 F. Supp. 1264 (D.N.J. 1989).

[3] The set of companies in the analysis should affect the relevant benchmark. For example, one might argue that for a security to be deemed to "pass" a Cammer factor it should perform at least as well as 5 percent of the members of the S&P 500, 50 percent of the stocks listed on the Nasdaq Capital Market or 99 percent of a sample of OTCBB-traded stocks. (Each of these percentages is just an example.) The analysis can also be made more specific to an individual case by running the benchmark analysis over the proposed class period.

[4] Cammer at 1286, citing Bromberg & Lowenfels, 4 Securities and Commodities Fraud, § 8.6 (Aug. 1988).

[5] The 2.5th and 5th percentiles correspond to the levels that would show that a stock's turnover was statistically different from the typical stock in the S&P 500 Index at the 5 percent level using a two-sided and a one-sided test, respectively.

[6] Cammer at 1286.

[7] Cammer at 1286-87.

[8] See, for example, Unger v. Amedisys Inc. ⬤ , 401 F.3d 316, 324 (5th Cir. 2005) ("… growing concern that the mere number of market makers, without further analysis, has little to do with market efficiency"). See also Barrie v. InterVoice-Brite Inc. ⬤ , Civil Action No. 3: 01-CV-1071-K (N.D. Tex. Oct. 26, 2009) ("Although the number of market makers as an indicator of market efficiency has been strongly criticized (and is given little weight) by the courts, this factor still may be considered in conjunction with their volume of trading activity").

[9] See, for example, Local 703 v. Regions Financial Corp. ⬤ , 762 F.3d 1248, 1258 (11th Cir. 2014) on the number of institutional investors ("And the number of institutional investors holding Regions stock during the class period ranged from 329 to 425") and AP-Fonden v. St. Jude Medical Inc. ⬤ , Civil No. 12-3070 (JNE/HB) (D. Minn. Dec. 22, 2015) on the percentage of shares held by and traded by institutional investors ("Institutional investors, which held a large percentage of SJM stock, traded actively during this period").

[10] Cammer at 1287.

[11] Cammer at 1287.

[12] See, for example, In re Countrywide Fin. Corp. Sec. Litig. ⬤ , 273 F.R.D. at 586, 618 (C.D. Cal 2009)

finding that "the events for study should be selected using criteria that are as objective as possible. Further, those criteria should be determined before looking at the result to be studied[.]" See also Brown v. China Integrated Energy ("[W]hether information is 'of the import necessary to change the price of' stock is not objective").

[13] Courts that have recognized the flaw in examining a set of dates selected without an objective basis include In re PolyMedica Corporation Securities Litigation, 453 F. Supp. 2d 260, 270 (D. Mass. 2006) (plaintiffs' expert's "mere listing of five days on which news was released and which exhibited large price fluctuations proves nothing") and ScripsAmerica Inc. v. Ironridge Global LLC, 119 F. Supp. 3d 1213, 1256 (C.D. Cal. 2015) ("The court agrees, as an initial matter, that simply pointing to thirteen days on which Scrips' stock price allegedly reacted to press releases is flawed").

[14] Statistical significance was determined at the 5 percent level using a two-sided test. For each stock, a market model using the S&P 500 Index itself and an industry index was estimated over 2017. Previous research has shown similar results.

[15] While additional data should not be expected to affect some tests in any systematic way, additional data make this statistical test more powerful, meaning that it is more likely to identify a material difference if one truly exists.

[16] As there is no clear definitive test of what constitutes a material news event, setting a higher bar for what is material news will result in fewer events, and should result in a larger percentage of those events being associated with a statistically significant price movement. Thus, there is no reason for 50 percent or any other percentage of purportedly material events to be associated with a statistically significant price movement in an efficient market.

[17] In contrast, at least in theory, a test could disprove that a stock traded in an efficient market. This is similar to how no medical test could prove that someone is 100 percent healthy, because there could always be some form of illness (or inefficiency) that escapes the test.

*For a reprint of this article, please contact reprints@law360.com.*

Cited in Matthew v. AmTrust Fin. Serv.
19-Civ-8030 Decided 2/3/22.
Archived on 2/7/22.
This document is protected by copyright.
Further reproduction is prohibited without permission.

## 0 Comments

Sign In To Comment

More Expert Analysis

## Useful Tools & Links

- Add to Briefcase
- Save to PDF & Print
- Rights/Reprints
- Editorial Contacts

## Related Sections

- Capital Markets
- Class Action
- Securities

## Companies

- [Abbott Laboratories](#)
- [Amedisys Inc.](#)
- [China Integrated Energy Inc.](#)
- [NASDAQ Inc.](#)
- [NERA Economic Consulting](#)
- [Regions Financial Corp.](#)



[The 2021 Regional Powerhouses](#)

The law firms on Law360's list of 2021 Regional Powerhouses are handling some of the biggest deals and most high-profile courtroom battles across eight states, offering clients regional expertise and making a lasting impact on the law at the state and local level.

## Top 10 trending in Capital Markets

- 1[Chancery Rules Out 'Blank Check' Mergers For Some Cos.](#)
- 2[Hemp Real Estate Co. Settles SEC Crowdfunding Case](#)
- 3[PDVSA Says It's Not Venezuela's Alter Ego In $118M Debt Case](#)
- 4['No One Outworks' Judge Childs, A Potential High Court Pick](#)
- 5[J&J Says Talc Plaintiff Attys Fed Confidential Docs To Reuters](#)
- 6[Tether Action Sees CFTC Staking Territory In Crypto Oversight](#)
- 7[SEC Could Pull More 'Unicorns' Into Public Reporting Regime](#)
- 8[3 Firms Guide Cannabis-Focused Silver Spike For $85M IPO](#)
- 9[Wilson Sonsini-Led Biotech Firm Rallies After $124M IPO](#)
- 10[Libor Reversal Draws Fine Line Between 'Wrong' And Fraud](#)

Cited in Martinek v AmTrust Fin Servs
19Civ8030 Decided 2/3/22
Archived on 2/7/22
This document is protected by copyright.
Further reproduction is prohibited without permission.

Hello! I'm Law360's automated support bot.

How can I help you today?

For example, you can type:

- I forgot my password
- I took a free trial but didn't get a verification email
- How do I sign up for a newsletter?

Ask a question!
Ask a question!

© 2022, Portfolio Media, Inc. | About | Contact Us | Legal Jobs | Advertise with Law360 | Careers at Law360 |
Terms | Privacy Policy | Cookie Settings | Help | Site Map

×

Already have access? Click here to login

# Get instant access to the one-stop news source for business lawyers

Register Now!

# Sign up now for free access to this content

Enter your details below and select your area(s) of interest to stay ahead of the curve and receive Law360's daily newsletters

Email (NOTE: Free email domains not supported)

First Name

Last Name

Password (at least 8 characters required)

Confirm Password

Select at least one primary interest:

☐ Access To Justice        ☐ Aerospace & Defense        ☐ Appellate
☐ Asset Management         ☐ Banking                    ☐ Bankruptcy
☐ Benefits                 ☐ California                 ☐ Cannabis
☐ Capital Markets          ☐ Class Action               ☐ Commercial Contracts
☐ Commercial Litigation Uk ☐ Competition                ☐ Compliance

Cited in Martinek v Amtrust Fin Servs 19Civ8030 Decided 2/3/22

Archived on 2/7/22

This document is protected by copyright. Further reproduction is prohibited without permission.

| | | |
|---|---|---|
| ☐ Construction | ☐ Consumer Protection | ☐ Corporate |
| ☐ Corporate Crime & Compliance Uk | ☐ Cybersecurity & Privacy | ☐ Delaware |
| | ☐ Employment | ☐ Energy |
| ☐ Environmental | ☐ Financial Services Uk | ☐ Fintech |
| ☐ Florida | ☐ Food & Beverage | ☐ Georgia |
| ☐ Government Contracts | ☐ Health | ☐ Hospitality |
| ☐ Illinois | ☐ Immigration | ☐ Insurance |
| ☐ Insurance Uk | ☐ Intellectual Property | ☐ International Arbitration |
| ☐ International Trade | ☐ Legal Ethics | ☐ Life Sciences |
| ☐ Massachusetts | ☐ Media & Entertainment | ☐ Mergers & Acquisitions |
| ☐ Native American | ☐ New Jersey | ☐ New York |
| ☐ Pennsylvania | ☐ Personal Injury & Medical Malpractice | ☐ Private Equity |
| | | ☐ Product Liability |
| ☐ Project Finance | ☐ Public Policy | ☐ Real Estate |
| ☐ Retail & E Commerce | ☐ Securities | ☐ Sports & Betting |
| ☐ Technology | ☐ Telecommunications | ☐ Texas |
| ☐ Transportation | ☐ Trials | ☐ White Collar |

Law360 may contact you in your professional capacity with information about our other products, services and events that we believe may be of interest.

You'll be able to update your communication preferences via the unsubscribe link provided within our communications.

We take your privacy seriously. Please see our Privacy Policy.

[Register](#)

☐ ×

Sign up for our Capital Markets newsletter

You must correct or enter the following before you can sign up:

Please provide a professional email:

Select more newsletters to receive for free

Law360 takes your privacy seriously. Please see our Privacy Policy.

No Thanks   Sign up now

Thank You!

Cited in Marinek v AmTrust Fin Servs 19CV8030 Decided 2/3/22

Archived on 2/7/22

This document is protected by copyright. Further reproduction is prohibited without permission.