UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JAN MARTÍNEK, | ) | |
| | ) | Case No. 19-cv-8030-KPF |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| AMTRUST FINANCIAL SERVICES, INC., | ) | Hon. Katherine Polk Failla |
| BARRY D. ZYSKIND, GEORGE | ) | |
| KARFUNKEL, AND LEAH KARFUNKEL, | ) | LEAVE TO FILE |
| | ) | EXCESS PAGES GRANTED |
| Defendants. | ) | (ECF No. 100) |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT, APPROVAL OF PLAN OF ALLOCATION, AND
APPROVAL OF REQUESTS FOR ATTORNEYS' FEES,
EXPENSES, AND PLAINTIFF SERVICE AWARD**

**WOLF POPPER LLP**
Carl L. Stine
Patricia I. Avery
Adam J. Blander
Radha Raghavan
845 Third Avenue, 12th Floor
New York, New York 10022
(212) 759-4600
cstine@wolfpopper.com

*Attorneys for Class Representative, Jan Martínek, and the Class*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..........................................................................................................iii

INTRODUCTION ..................................................................................................................... 1

I.    OVERVIEW OF THE ACTION.......................................................................................... 2

II.   TERMS OF THE SETTLEMENT ....................................................................................... 6

III.  IMPLEMENTATION OF THE NOTICE PLAN ................................................................ 7

IV.   FINAL APPROVAL OF THE SETTLEMENT AND APPROVAL OF COUNSEL'S
      REQUESTS ARE WARRANTED .................................................................................... 8

      A.   Lead Plaintiff and Lead Counsel Have Adequately Represented the Class .................... 9

      B.   The Settlement Was Negotiated at Arm's Length............................................................ 10

      C.   Relief Provided to the Class is Adequate and Reasonable in Light of the Risks, Costs,
           Delays, and Complexity of the Litigation ....................................................................... 11

           1.   Risks Associated with Establishing Liability and Damages at Trial ...................... 11

           2.   Complexities Involved in the Litigation.................................................................. 15

           3.   Costs and Delays of the Litigation .......................................................................... 15

      D.   The Proposed Method for Distributing Relief is Effective ............................................ 16

      E.   Lead Counsel's Requests are Reasonable ....................................................................... 17

           1.   The Legal Standard for Award of Attorneys' Fees ................................................. 18

           2.   The Application for an Award of Attorneys' Fees is Reasonable and Should be
                Approved ................................................................................................................... 19

                (i)    The Requested Attorneys' Fee is Reasonable Under the Percentage of the Fund
                       Method ...............................................................................................................19

                (ii)   The Requested Attorneys' Fee is Reasonable Under the *Lodestar "Cross-
                       Check"* Method ...............................................................................................20

                (iii)  The Requested Attorneys' Fees are Reasonable Under the *Goldberger* factors
                       22

                       (a)   The Time and Labor Expended by Counsel ............................................. 22

                       (b)   The Magnitude and Complexities of the Litigation................................. 23

                       (c)   The Risks of the Litigation ...................................................................... 23

                       (d)   The Quality of Representation.................................................................. 24

                       (e)   The Requested Fee in Relation to the Settlement .................................... 25

                       (f)   Public Policy Considerations ................................................................... 25

           3.   The Application for the Reimbursement of Expenses is Reasonable and Should
                be Approved ............................................................................................................. 26

4.   The Application for a Plaintiff Award is Reasonable and Should be Approved .... 27

F.   Equitable Treatment of Class Members Relative to One Another ................................. 29

G.   The Remaining *Grinnell* and Rule 23 Factors Are Also Met ........................................ 30

1.   The Reaction of the Class to the Settlement ............................................................. 30

2.   The Stage of the Proceedings .................................................................................... 30

3.   The Costs and Risks of Maintaining the Class Action Through Trial .................... 31

4.   The Ability of Defendants to Withstand a Greater Judgment ................................. 31

5.   Range of Reasonableness of the Settlement in Light of the Risks and Best Possible Recovery ..................................................................................................... 31

6.   The Supplemental Agreement to the Settlement is Typical and Reasonable .......... 33

V.    THE PLAN OF ALLOCATION IS FAIR AND REASONABLE AND SHOULD BE FINALLY APPROVED ............................................................................................................. 33

VI.   NOTICE TO THE CLASS SATISFIED RULE 23 AND DUE PROCESS ....................... 33

VII.  CONCLUSION .................................................................................................................... 34

# TABLE OF AUTHORITIES

**Cases**

*In re Am. Bank Note Holographics, Inc.*,
127 F. Supp. 2d 418 (S.D.N.Y. 2001) ....................................................................... 10, 12

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.*,
No. MDL 1500, 02 Civ. 5575 (SWK), 2006 WL 903236  (S.D.N.Y. Apr. 6, 2006) ........................... 15

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
472 U.S. 299 (1985) ............................................................................................. 18

*In re Bayer AG Sec. Litig.*,
No. 03 Civ 1546 (WHP), 2008 WL 5336691 (S.D.N.Y. Dec. 15, 2008) ............................................ 15

*In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*,
909 F. Supp. 2d 259 (S.D.N.Y. 2012) ....................................................................... 30

*In re Bisys Sec. Litig.*,
No. 04 Civ. 3840(JSR), 2007 WL 2049726 (S.D.N.Y. July 16, 2007) ............................................... 24

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980) ............................................................................................. 18

*In re China Media Express Holdings, Inc.*,
Civil Action No. 11-CV0804 (VM), 2015 WL 13639423 (S.D.N.Y. Sept. 18, 2015) ............ 20

*In re China Sunergy Sec. Litig.*,
No. 07 Civ. 7895(DAB), 2011 WL 1899715 (S.D.N.Y. May 13, 2011) ................................. 26

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974) .................................................................................... 9

*City of Providence v. Aéropostale, Inc.*,
11 Civ. 7132 (CM) (GWG), 2014 WL 1883494 (S.D.N.Y. May 9, 2014), *aff'd sub nom.*
*Arbuthnot v. Pierson*, 607 F. App'x 73 (2d Cir. 2015) ..................................................... *passim*

*In re Colgate-Palmolive Co. ERISA Litig.*,
36 F. Supp. 3d 344 (S.D.N.Y. 2014) ......................................................................... 18

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ............................................................................................... 31

*In re Comverse Tech., Inc. Sec. Litig.*,
No. 06–CV–1825 (NGG)(RER), 2010 WL 2653354 (E.D.N.Y. June 24, 2010) ........ 20, 23, 25

*In re Cont'l Ill. Sec. Litig.*,
962 F.2d 566 (7th Cir. 1992) ................................................................................... 24

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*,
502 F.3d 91 (2d Cir. 2007) ...................................................................................... 9

*In re Credit Default Swaps Antitrust Litig.*,
No. 13md2476 (DLC), 2016 WL 2731524 (S.D.N.Y. April 26, 2016) .................................. 17

*D'Amato v. Deutsche Bank*,
236 F.3d 78 (2d Cir. 2001) ................................................................................................. 11

*In re Deutsche Bank AG Sec. Litig.*, No. 1:09-cv-01714-GHW-RWL, 2020 WL 3162980
(S.D.N.Y. June 11, 2020) .................................................................................................. 19

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
MDL No. 12-2389, 2015 WL 6971424 (S.D.N.Y. Nov. 9, 2015) .......................................... 32

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
No. 02-CV-3400 CM PED, 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010) .................. 24, 25, 28

*In re Fuqi Int'l, Inc. Sec. Litig.*,
No. 10-cv-2515 (DAB), 2016 WL 736649 (S.D.N.Y. Feb. 19, 2016) ................................... 19

*In re Glob. Crossing Sec. & ERISA Litig.*,
225 F.R.D. 436 (S.D.N.Y. 2004) ....................................................................................... 11

*Goldberger v. Integrated Res.*,
209 F.3d 43 (2d Cir. 2000) ........................................................................................ *passim*

*Hayes v. Harmony Gold Mining Co.*,
No. 08 Civ. 03653(BSJ)(MHD), 2011 WL 6019219 (S.D.N.Y. Dec. 2, 2011) ...................... 20

*Hicks v. Stanley,*
No. 01 Civ. 10071(RJH), 2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005) .......................... 26, 29

*Liberty Media Corp., LMC v. Vivendi Universal, S.A.,*
923 F. Supp. 2d 511 (S.D.N.Y. 2013) ................................................................................ 13

*In re Lloyd's Am. Trust Fund Litig.,*
96 Civ. 1262 (RWS), 2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002) .................................. 21

*Maley v. Del Global Techs. Corp.*,
186 F. Supp. 2d 358 (S.D.N.Y. 2002) ....................................................................... 20, 21, 26

*Matlick v. AmTrust Financial Services Inc.,*
67 Misc. 3d 1202 (N.Y. Sup. Ct. 2020) ............................................................................. 14

*In re Merrill Lynch Tyco Research Sec. Litig.*,
249 F.R.D. 124 (S.D.N.Y. Apr. 16, 2008) .......................................................................... 17

*In re MetLife Demutualization Litig.*,
689 F. Supp. 2d 297 (E.D.N.Y. 2010) ............................................................................. 8, 27

*Micholle v. Ophthotech Corp.*,
No. 1:17-cv-00210 (VSB) (GWG), ECF No. 147-2 (S.D.N.Y. Sep. 16, 2022) ..................... 21

*Missouri v. Jenkins*,
491 U.S. 274 (1989) ......................................................................................................... 21

iv

*Monserrate v. Tequipment, Inc.*,
   11 CV 6090 (RML), 2012 WL 5830557 (E.D.N.Y Nov. 16, 2012) ...................................... 20

*In re NASDAQ Market-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998) ......................................................................................... 21

*New Jersey Carpenters Health Fund, et al., v. Residential Capital, LLC, et al.,*
   No. 1:08-cv-08781(KPF) (DCF) (S.D.N.Y. Jul. 31, 2015) (J. Failla) ..................................... 21

*In re Nielsen Holding Plc Sec. Litig.*,
   No. 1:18-cv-07143-JMF  (S.D.N.Y. July 21, 2022) ................................................................ 27

*In re Paine Webber Ltd. P'ships. Litig.*,
   171 F.R.D. 104 (S.D.N.Y. 1997) ......................................................................................... 10

*Pantelyat v. Bank of Am., N.A.*,
   16-cv-8964 (AJN), 2019 WL 402854 (S.D.N.Y. Jan. 31, 2019) ............................................ 31

*Pearlstein v. Blackberry Limited,*
   No. 13 Civ. 7060 (CM) (KHP), 2022 WL 4554858 (S.D.N.Y. Sept. 29, 2022)............... *passim*

*In re PPDAI Grp. Inc. Sec. Litig.,*
   No. 18-CV-6716 (TAM), 2022 WL 198491 (E.D.N.Y. Jan. 21, 2022)............................. 18, 19

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
   85 F. Supp. 410 (S.D.N.Y. 1997).......................................................................................... 24

*In re Qudian Inc. Sec. Litig.*,
   No. 1:17-cv-09741-JMF, 2021 WL 2328437 (S.D.N.Y. June 8, 2021) ............................. 27, 29

*Reichman v. Bonsignore, Brignati & Mazzotta,*
   *P.C.*, 818 F.2d 278 (2d Cir. 1987)........................................................................................ 26

*In re RJR Nabisco, Inc. Sec. Litig.*,
   No. 88 CV 7905, 1992 WL 210138 (S.D.N.Y. Aug. 24, 1992)................................................ 21

*Roberts v. Texaco, Inc.*,
   979 F. Supp. 185 (S.D.N.Y. 1997)......................................................................................... 21

*In re Salomon Inc Sec. Litig.*,
   No. 91 CIV. 5442 (RPP), 1994 WL 265917 (S.D.N.Y. June 16, 1994) .................................. 11

*In re Signet Jewelers Limited Sec. Litig.*,
   No. 1:16-cv-06728-CM-SDA, 2020 WL 4196468  (S.D.N.Y. July 21, 2020)......................... 29

*Strougo v. Bassini*,
   258 F. Supp. 2d 254 (S.D.N.Y. 2003)..................................................................................... 30

*In re Sumitomo Copper Litig.*,
   189 F.R.D 274 (S.D.N.Y. 1999) ........................................................................................... 10

*Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*,
   No. 01–CV–11814(MP), 2004 WL 1087261 (S.D.N.Y. May 14, 2004)................................. 24

*Thompson v. Metro Life Ins. Co.*,
  216 F.R.D. 55 (S.D.N.Y. 2003) ....................................................................................... 9

*Velez v. Novartis Pharms. Corp.*,
  No. 04 CIV 09194 CM, 2010 WL 4877852 (S.D.N.Y. Nov. 30, 2010) .................................. 19

*In re Vitamin C Antitrust Litig.*,
  No. 06-MD-1738 (BMC) (JO), 2012 WL 5289514 (E.D.N.Y. Oct. 23, 2012) ........................ 31

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
  396 F.3d 96 (2d Cir. 2005) ......................................................................................... 8, 10, 18

*In re Warner Communications Sec. Litigation*,
  618 F. Supp. 735 (S.D.N.Y. Aug. 21, 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986) ............... 25, 31

*In re WorldCom, Inc. Sec. Litig.*,
  388 F. Supp. 2d 319 (S.D.N.Y. 2005) ................................................................................. 18

## Statutes

15 U.S.C. § 78j .................................................................................................................. 2

15 U.S.C. § 78t .................................................................................................................. 2

15 U.S.C. § 78u ........................................................................................................... 28, 34

28 U.S.C. § 1715 ................................................................................................................ 6

## Rules

Fed. R. Civ. P. 23(c)(1) ...................................................................................................... 31

Fed. R. Civ. P. 23(e) ................................................................................................... *passim*

Local Civil Rule 23.1 ......................................................................................................... 26

## Other Authorities

Janeen McIntosh & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2021
  Full-Year Review* at 23, Figure 21 (NERA Jan. 25, 2022), *available at*
  www.nera.com/publications/archive/2022/recent-trends-in-securities-class-actionlitigation--
  2021-full-y.html ............................................................................................................. 33

*Securities Class Action Settlements - 2021 Review and Analysis* at 4 and 6, Figure 5 (Cornerstone
  Research 2022), *available at* https://www.cornerstone.com/wp-
  content/uploads/2022/03/Securities-Class-Action-Settlements-2021-Review-and-Analysis.pdf
  ................................................................................................................................. 33

## INTRODUCTION

Jan Martínek ("Lead Plaintiff" or "Plaintiff")[1] submits this brief in support of his motion for final approval of the Settlement resolving this class action, approval of the proposed Plan of Allocation, and approval of Lead Counsel's requests for attorneys' fees, the reimbursement of litigation expenses, and for a plaintiff service award (the "Motion").

The proposed Settlement, if finally approved, will resolve all claims against Defendants in exchange for a cash payment of $13,000,000 for the benefit of the Class. The Settlement (as set forth in the Stipulation) is a product of good-faith and arm's-length negotiations between highly experienced counsel, following extensive fact and expert discovery, and facilitated by a well-respected mediator. The Settlement, which represents an unusually significant percentage of maximum provable aggregate damages in a securities fraud class action—either 27% or 32%, depending on the damages model used—is a favorable outcome in light of the substantial risks and costs attendant to continued litigation, as described below.

In its July 21, 2022 Preliminary Approval Order (ECF No. 97), the Court (i) preliminarily approved the Settlement; (ii) approved the form, content, and manner of providing notice of the Settlement to the Class; and (iii) set a schedule for final approval of the Settlement, including deadlines for Class Members to opt out or object, and set a November 16, 2022 hearing date. The Court also found that it will likely be able to finally approve the Settlement under Rule 23(e)(2) as being fair, reasonable, and adequate to the Class, subject to further consideration. *Id.* ¶ 2. The Court authorized Lead Counsel to retain A. B. Data, Ltd. ("A.B. Data") as the Claims Administrator, and directed dissemination of the approved forms of Notice to the Class.

---

[1] Unless otherwise defined herein, all capitalized terms have the meanings ascribed to them in the Stipulation of Settlement dated June 22, 2022 ("Stipulation"), previously filed at ECF No. 91-1. Unless otherwise noted, all references to "¶ ___" are to the Stipulation; and internal citations and quotation marks are omitted.

Lead Plaintiff now moves this Court for final approval of the Settlement, the proposed Plan of Allocation of the Settlement Fund, and "Lead Counsel's Requests," defined in the Stipulation and Preliminary Approval Order as Counsel's requests for (i) an award of attorneys' fees, (ii) reimbursement of expenses, and (iii) a Lead Plaintiff service award. *See* ECF No. 97 ¶ 2. Lead Plaintiff submits that there has been no change in circumstances since he filed his motion for preliminary approval (ECF No. 95), which the Court granted. The Settlement, which will provide the Class with a substantial immediate cash benefit, remains, and is, fair, reasonable, and adequate. Moreover, the Plan of Allocation treats all Class Members equitably, and all Claimants will participate in the Settlement on a *pro rata* basis, based on a recognized loss formula consistent with Plaintiff's expert's damage analysis. The Class would have faced significant risks if the case had gone to summary judgment, trial, appeals, and any contested claims process.

Further, as described below, Lead Counsel's request for attorneys' fees in the amount of 33.33% of the $13 million Settlement Fund, or $4,332,900, is within the range of reasonableness of fees awarded in this Circuit, particularly given the excellent recovery obtained by Counsel following the completion of all fact discovery and the exchange of all opening and rebuttal expert reports, and the unique risks inherent to this Action. Similarly, the request for a reimbursement of expenses (which does not even cover all of Counsel's expenses) should be granted, as they were all reasonably incurred, and the amount requested ($460,000) is unremarkable for an action of this complexity. Finally, the request for a $15,000 service award to Mr. Martínek to compensate him for the 100-plus hours he estimates he spent pursuing this representative action is justified.

I.     <u>**OVERVIEW OF THE ACTION**</u>

On August 28, 2019, Plaintiff commenced this putative class action on behalf of purchasers of the six series of shares of AmTrust preferred stock (collectively, the "Preferred Stock") alleging violations of Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j and 78t) and SEC

Rule 10b-5. Specifically, the Complaint (ECF No. 5) alleged that throughout the Class Period of January 22, 2018, through January 18, 2019 (both dates inclusive), Defendants made materially false and misleading statements regarding whether AmTrust's Preferred Stock would remain listed on the New York Stock Exchange following the closing of a transaction whereby the common shares of AmTrust would be taken private. The Complaint further alleged that the misrepresentations inflated the price of the Preferred Stock during the Class Period, resulting in financial losses to purchasers of Preferred Stock once the truth was revealed. *Id.*

On November 18, 2019, the Court entered an Order appointing Mr. Martínek as Lead Plaintiff and Wolf Popper LLP as Lead Counsel in this Action pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"). ECF No. 23.

On January 31, 2020, Defendants served papers in support of their motion to dismiss the Complaint. ECF Nos. 27-29. On March 13, 2020, Lead Plaintiff served his memorandum of law in opposition to Defendants' motion, and, on April 3, 2020, Defendants served their reply. ECF Nos. 30-31. Under the PSLRA, discovery was stayed during the pendency of Defendants' motion.

On August 14, 2020, the Court issued an Opinion and Order denying Defendants' motion to dismiss. ECF No. 34. On September 4, 2020, Defendants filed their Answer. ECF No. 35.

In September 2020, the parties commenced extensive discovery in the Action, including serving and responding to interrogatories, document requests, requests for admission, the production of more than 200,400 pages of documents by Defendants and parties affiliated with Defendants,[2] the production of over 3,300 pages of documents from Plaintiff, and the exchange of privilege logs. *See generally* Stine Decl. ¶ 4. Counsel also held many exhaustive discussions

---

[2] The third parties produced documents pursuant to subpoenas served by Lead Plaintiff. Lead Plaintiff also obtained documents produced by the SEC in response to a Freedom of Information Act request, and documents produced by the New York State Department of Financial Services in response to a Freedom of Information Law request. ¶ F.

3

through letters, emails, and telephonic and zoom meet and confer conferences about discovery issues (two of which were submitted to the Court for resolution). Between October 7, 2021, and December 1, 2021, Plaintiff deposed the following nine fact witnesses:

- James Carey, Managing Director of Stone Point Capital LLC (AmTrust's private equity partner),
- Chaya Cooperberg, Chief People and Communication Officer, and AmTrust's most senior investor relations officer during the Class Period,
- Donald DeCarlo, AmTrust director and Chairman of AmTrust's Audit Committee during the Class Period,
- Evan Greenstein, Senior Vice President and Treasurer of AmTrust during the Class Period,
- Catherine Miller, SVP Governance and Regulatory Counsel of AmTrust during the Class Period,
- Zachary Wolf, Deputy CFO and Executive Vice President of Strategic Development during the Class Period,
- Defendant George Karfunkel, director and alleged controlling shareholder of AmTrust,
- Adam Karkowsky, Chief Financial Officer of AmTrust during the Class Period, and
- Defendant Barry Zyskind, Chairman, CEO and alleged controlling shareholder of AmTrust.[3]

In early 2021, the parties agreed to engage in private mediation in an attempt to resolve the Action. In advance of the mediation, the parties exchanged mediation statements. A mediation session before Robert Meyer was held on April 1, 2021. Mr. Meyer, who is affiliated with JAMS, is an experienced trial lawyer, and has more than a dozen years of experience mediating complex business disputes, including many securities fraud class actions. While the parties engaged in good-faith negotiations, they were unable to agree to settlement terms that day. ¶ M.

On March 15, 2021, Lead Plaintiff filed his motion for class certification supported by an expert report on market efficiency from Professor Steven P. Feinstein, Ph.D., CFA. ECF Nos. 43-45. In connection with the motion, Defendants deposed Lead Plaintiff on April 15, 2021. On April 30, 2021, Defendants opposed the motion and also filed a rebuttal expert report from Dr.

---

[3] Fact discovery closed on December 3, 2021.

Alok Khare. ECF Nos. 48-49. On June 1, 2021, Lead Plaintiff filed reply papers in further support of the motion, which included a rebuttal report from Dr. Feinstein. ECF Nos. 51-52.

On December 14, 2021, the parties appeared before the Court for i) a status conference and for ii) a pre-motion conference related to two anticipated discovery motions to be brought by Lead Plaintiff, which resulted, among other things, in Lead Plaintiff filing a formal motion related to one of the discovery issues, which the parties fully briefed, and which was fully submitted as of the date of the Stipulation. ECF Nos. 74-79, 81-84.

In an Opinion and Order dated February 3, 2022 (ECF No. 80), the "Class Certification Order"), the Court granted the class certification motion, appointed Lead Plaintiff and Lead Counsel as Class Representative and Class Counsel, respectively, and certified as a class:

> All persons who purchased Series A preferred stock of AmTrust Financial Services, Inc. ("AmTrust"), or AmTrust's Depositary Shares Representing 1/40th of a share of either AmTrust's Series B, C, D, E or F preferred stock [the "Preferred Stock"] on the open market on a U.S. stock exchange from January 22, 2018, to January 18, 2019, inclusive excluding present and former executive officers of AmTrust and any parent, subsidiary, or affiliate of AmTrust, Barry D. Zyskind, George Karfunkel, and Leah Karfunkel and their immediate family members (collectively, the "Excluded Persons") and the legal representatives, heirs, successors, or assigns of any such Excluded Person.

Following the Class Certification Order, expert discovery commenced. Initial expert reports were exchanged on March 7, 2022, with Lead Plaintiff serving a report addressing damages by Professor Feinstein, and Defendants serving a report addressing damages by Dr. Khare and a report addressing certain industry issues by Paul Mottola. On April 6, 2022, rebuttal reports from Professor Feinstein and Dr. Khare were exchanged. *See* Stipulation ¶ L.

As the foregoing shows, each side obtained substantial factual and expert discovery bearing on their respective claims and defenses and, given the advanced stage of the Action, were well-positioned to evaluate the merits and costs of continued litigation. Armed with this knowledge, in

early 2022, the parties agreed to resume mediation and exchanged supplemental mediation statements addressing developments during discovery.  After weeks of arms-length negotiations, Mr. Meyer issued a double-blind mediator's proposal that the Action be settled for $13,000,000, which the parties independently accepted on April 19, 2022.  Stipulation ¶ N.  The parties executed the Stipulation on June 22, 2022, and filed it with the Court the following day.  ECF No. 91-1.[4]

## II.    TERMS OF THE SETTLEMENT

This Settlement requires Defendants to pay, or cause to be paid, $13,000,000 in cash to the Escrow Account.  ¶¶ 1(oo), 7 (i).  Once Taxes, Notice and Administrative Costs, Court-awarded Litigation Expenses, Court-awarded Attorneys' Fees, Court-approved Plaintiff Service Award, and any other Court-approved costs or fees are deducted from the Settlement Fund, the remaining balance (i.e., the Net Settlement Fund) will be distributed to Authorized Claimants pursuant to the Stipulation and Plan of Allocation.  ¶ 10.  There will be no reversion to Defendants of any portion of the Settlement Fund.  ¶ 14.  In exchange, Lead Plaintiff and each Class Member will be deemed to have fully released any and all Released Plaintiff's Claims against Defendants and the other Defendants' Releasees, and will be forever barred from prosecuting any and all Released Plaintiff's Claims against any of the Defendants' Releasees.  ¶ 4.[5]

The Stipulation also anticipates that Lead Counsel will request attorneys' fees, reimbursement of litigation expenses, and a service award for Lead Plaintiff ("Lead Counsel's

---

[4] On July 12, 2022, Defendants' Counsel advised the Court that, on July 5, 2022, they served the notice required under the Class Action Fairness Act, 28 U.S.C. § 1715 et seq., pursuant to the Stipulation. ECF No. 93.

[5] While the definition of "Released Claims" is typical of other securities class action settlements, it also includes exclusions ensuring that other pending or potential actions are not affected.  *See* ¶ 1 (jj) (excluding claims "asserted in any ERISA or derivative action"; "of any person or entity who or which submits a request for exclusion that is accepted by the Court"; "arising from the purchase or sale of AmTrust's subordinated notes"; or "asserted in the dismissed consolidated putative class action styled *In re AmTrust Financial Services, Inc. Securities Litigation*, No. 1:17-cv-01545-LAK (S.D.N.Y.), on appeal as of the date of this Stipulation," among other exclusions).

Requests"). However, such awards are not a condition or material term of the Settlement, nor are such Requests the subject of any agreement between the parties. ¶¶ 16-17.[6]

## III.    IMPLEMENTATION OF THE NOTICE PLAN

On July 14, 2022, Lead Plaintiff filed his motion for preliminary approval, which included the Stipulation and proposed notices to the Class. ECF No. 95. On July 21, 2022, the Court preliminarily approved the Settlement, approving the retention of A.B. Data as Claims Administrator and the content and form of notice. ECF No. 97. On August 15, 2022, A.B. Data mailed 4,981 copies of the Postcard Notice of preliminary settlement to potential Class Members, brokers, and nominee holders, advising them of the proposed settlement, the last date to submit claims, the last date by which requests for exclusions must be received and directing them to the settlement website for more information. Ewashko Decl. ¶ 6. As of October 10, 2022, A.B. Data has mailed 20,196 copies of the Postcard Notice. In addition, A.B. Data has re-mailed 433 Postcard Notices to persons whose original mailings were returned. *Id.* ¶ 9. On August 15, 2022, the Claims Administrator established a website, www.AmtrustPreferredStockLitigation.com ("Settlement Website"), which contained copies of the Longform Notice, the Claim Form, the Stipulation, the Summary Notice, the deadlines for Class Members to submit Objections, requests for exclusions, Proof of Claim and Release forms, Lead Plaintiff's Motion for Preliminary Approval of the Settlement, the Preliminary Approval Order, the Class Action Complaint, the Order denying Defendants' Motion to Dismiss, and the Order granting Plaintiff's motion for Class Certification. *Id.* ¶ 13. A.B. Data also established a case-specific telephone number for Class

---

[6] If valid opt-outs exceed the threshold provided in a confidential supplemental agreement executed contemporaneously with the Stipulation, Defendants have the right to terminate the Settlement. ¶ 37. As of October 11, 2022, no opt-outs have been received. *See* Declaration of Jack Ewashko Regarding Mailing of Notice, Publication of Summary Notice filed herewith ("Ewashko Decl.") ¶ 15.

Members to call and ask questions, and, although not required under the notice plan, also made approximately 370 calls to investors to inform them about the Settlement and guide them to the website for more information.[7]  On August 29, 2022, the Summary Notice was published in PR Newswire and Investor Business Daily ("IBD").  *Id.* ¶ 11.

Requests for exclusion must be received by the Claims Administrator by October 26, 2022. As of October 11, 2022, the date of finalization of the Ewashko Declaration, there have been no requests for exclusion.  *Id.* ¶ 15.  Any objection to the Settlement should also be received by October 26, 2022.  No objections have been received so far.

## IV.    FINAL APPROVAL OF THE SETTLEMENT AND APPROVAL OF COUNSEL'S REQUESTS ARE WARRANTED

"There is a strong judicial policy in favor of settlements, particularly in the class action context."  *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 330 (E.D.N.Y. 2010); *see also Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005).  Federal Rules of Civil Procedure Rule 23(e)(2) instructs that the court should consider the following factors when determining whether a settlement is "fair, reasonable, and adequate":

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

---

[7] Ewashko Decl. ¶ 12.  The contact information of these investors was provided by Lead Counsel, who compiled a list, based on the discovery record, of persons who had contacted AmTrust's investor relations department to discuss the Preferred Stock during the relevant time period.  *Id.* Lead Counsel also compiled a separate list of investors who contacted AmTrust by email or who called but left an email address as a mode of contact, and Lead Counsel sent those investors individual emails.  Stine Decl. ¶ 5, n. 2.

In addition, the Second Circuit considers the following "*Grinnell* Factors," some of which overlap with Rule 23(e)(2):

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974).  For a settlement to be deemed substantively and procedurally fair, reasonable, and adequate, not every factor must be satisfied. "[R]ather, the court should consider the totality of these factors in light of the particular circumstances."  *Thompson v. Metro Life Ins. Co.*, 216 F.R.D. 55, 61 (S.D.N.Y. 2003).

As discussed below, the proposed Settlement readily satisfies Rule 23(e)(2) and the applicable Second Circuit factors.  Accordingly, the Settlement should be approved.

### A.    Lead Plaintiff and Lead Counsel Have Adequately Represented the Class

The determination of adequacy "typically entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation."  *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.,* 502 F.3d 91, 99 (2d Cir. 2007) (citations omitted).

Here, Lead Plaintiff's interests are not antagonistic to the interest of the other members of the Class.  Further, Lead Plaintiff and Lead Counsel have adequately represented the Class as required by Rule 23(e)(2)(A) by investigating potential claims, and thereafter diligently and vigorously prosecuting the Action since August 2019.  The Class Certification Order already found that "both Plaintiff and his counsel are adequate representatives of the proposed class," that Lead Counsel "is an experienced law firm that has litigated similar securities class actions in the past,"

9

and that "Plaintiff has demonstrated a willingness to prosecute this action on behalf of the proposed class, and his alleged loss total of $176,366 provides him with a substantial incentive to continue to do so." *See* ECF No. 80 at 17. The Court also found and the absence of any conflicts. *Id.*

### B.        The Settlement Was Negotiated at Arm's Length

The Settlement is fair and reasonable as it was a result of arm's-length negotiations among the Parties assisted by an experienced mediator. The experience and reputation of counsel and the arm's-length nature of the negotiations is entitled to great weight. *See, e.g.*, *Wal-Mart*, 396 F.3d at 116 ("A 'presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery'"); *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 428 (S.D.N.Y. 2001) (courts should ensure that "the settlement resulted from arm's-length negotiations").

The proposed Settlement was the result of negotiations between Lead Counsel and defense counsel, with the aid of a well-respected mediator, Robert Meyer. These negotiations included two rounds of comprehensive submissions to the mediator from both parties concerning their respective views on the strengths and weaknesses of the litigation, first in early 2021 and later in early 2022 upon the close of fact discovery, and two rounds of full-day mediation sessions with Mr. Meyer. The attorneys on both sides are experienced and were thoroughly familiar with the factual and legal issues posed in the litigation, which had been prosecuted and defended aggressively, as well as the pros and cons of their respective cases. *See In re Sumitomo Copper Litig.*, 189 F.R.D 274, 280 (S.D.N.Y. 1999) (when settlement negotiations are conducted at arm's length, "'great weight' is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation") (quoting *In re Paine Webber Ltd. P'ships. Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997)); *In re Salomon Inc Sec. Litig.*, No. 91 CIV. 5442

10

(RPP), 1994 WL 265917, at *13 (S.D.N.Y. June 16, 1994) (judgment of experienced counsel "weighs strongly in favor [of] the proposed settlement"). Finally, the Settlement was reached as the result of a double-blind mediator's proposal that the parties accepted, which further supports a finding that the Settlement was negotiated at arm's length. *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (a "mediator's involvement" during negotiations "helps to ensure that the proceedings were free of collusion and undue pressure"). The record thus demonstrates the procedural fairness of the Settlement.

### C.      Relief Provided to the Class is Adequate and Reasonable in Light of the Risks, Costs, Delays, and Complexity of the Litigation

As Rule 23(e)(2)(C)(i) and the first, fourth, and fifth *Grinnell* Factors overlap with each addressing the substantive fairness of the Settlement in light of the risks posed by continuing litigation, they are discussed together. As described below, the $13 million recovery to the Class is adequate and reasonable in light of the risks, costs, delays, and complexity of the Litigation. *See In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 459 (S.D.N.Y. 2004) (holding that "the Court need only assess the risks of litigation against the certainty of recovery under the proposed settlement" while assessing this factor).

#### 1.      Risks Associated with Establishing Liability and Damages at Trial

Here, Defendants expressly denied and continue to deny all charges of wrongdoing or liability against them arising out of any of the conduct alleged in the Litigation. Defendants have also denied and continue to deny that Lead Plaintiff or Class Members have suffered damage or were otherwise harmed by the conduct alleged in the Litigation. Though Lead Plaintiff and Lead Counsel believe they would have succeeded in establishing each of the elements of their alleged claims, Lead Plaintiff would be required to prove all elements of his fraud claims to prevail at

summary judgment or trial, while Defendants would need to only succeed on disproving one such element or succeed in establishing one affirmative defense to potentially defeat the entire action.

As an initial matter, Plaintiff would have had to show falsity and scienter, which was not assured, particularly in this action where Plaintiff's fraud claim hinged in large part upon proving the Defendants' "current intention" (January 22, 2018 statement, Complaint ¶ 66(c)) or "expect[ation]" (March 1, 2018 statement, Complaint ¶ 66(f)) about the post-Buyout future of the Preferred Stock. *See In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d at 426 ("Plaintiffs acknowledge the substantial risk involved in proving scienter, because it goes directly to a defendant's state of mind, and proof of state of mind is inherently difficult"); *id.* (court stating that scienter is a "difficult burden").  As this Court is aware from the post-discovery status conference (ECF No. 72), Lead Counsel unearthed one document where AmTrust's investor relations ("IR") officer noted in a personal January 18, 2018 Outlook note that "[i]n the offer letter in the 13D filed by the buyer group do not disclose any plans to delist the preferred stock or any material." Ex. X to ECF No. 78-1.  It would be Plaintiff's position that this document constitutes evidence of a concealed plan by Defendants, at the start of the Class Period, to delist the stock following the Buyout.  However, Defendants would likely have argued at trial, as they did in opposition to Plaintiff's spoliation motion, ECF No. 81, which was *sub judice* at the time of the Settlement, that Plaintiff was misreading the note, and that in any event, there was no evidence that the IR officer participated in any decision-making regarding the Preferred Stock's delisting status or that she even substantively discussed these matters with the "buyer group," i.e., the Individual Defendants. Moreover, Defendants would likely have argued that there existed no other document corroborating Plaintiff's theory.  Thus, there was substantial risk that Defendants would be able to convince a jury that, consistent with their statements, they intended to maintain the listing, and

only revisited those intentions at the very end of the Class Period when changed circumstances demanded it.

Moreover, Plaintiff's expert's damages calculations, which had maximum aggregate figures of either $40.9 million or $47.4 million, depending on the model used, reflected liability assumptions that, even if Plaintiff prevailed in his fraud claim, were not assured.[8]  Specifically, the per-share inflation figures reflected in Dr. Feinstein's report was based on a backcasting model that assumed that the facts revealed at the end of the Class Period—that Defendants had determined to delist the Preferred Stock—was known and misrepresented on the first day and throughout the Class Period.  Dr. Feinstein's backcasting model enabled him to use the Preferred Stock price declines at the end of the Class Period as a reasonable proxy for how the shares would have reacted if that truth had been disclosed at the beginning of the Class Period.[9]  Thus, under this "secret delisting plan" fraud theory (referred to as a "classic bait and switch" by the Court, ECF No. 34 at 41), the Preferred Stock traded at an inflated price at the beginning of the Class Period—equivalent to the measured stock drop at the end of the Period—due to Defendants' concealment of the *100% likelihood* that the stock would be delisted following the Buyout.  Consider, however, a situation in which Plaintiff prevailed at trial on a different, and potentially more conceivable, fraud theory:  not that Defendants had a "secret" plan to delist, but rather that Defendants' stated "current

---

[8] These aggregate damage figures, described more fully below, do not reflect the maximum potentially recovery against Defendants.  Rather, the figures assume a hypothetical 100% participation rate by affected shares in the claims process, and assumes that defendants would be unable to obtain an offset from any claimants' losses due to contemporaneous sales of Preferred Stock.

[9] Similar back-casting models have been accepted by courts in this Circuit.  *See, e.g., Liberty Media Corp., LMC v. Vivendi Universal, S.A.,* 923 F. Supp. 2d 511, 525 (S.D.N.Y. 2013) ("Dr. Nye calculated the damages Liberty suffered as a result of this inflation by analyzing the declines in Vivendi's stock price on the nine days during which the market responded to the materialization of the hidden liquidity risk. Vivendi has offered no legal basis for concluding that this was an unacceptable approach.").

intention" to maintain the listing was baseless (and thus false), because they had, in fact, not reached any intention one way or the other.  Under this theory, Defendants would have likely argued that, notwithstanding their fraudulent statements, the market still factored into the price of the Preferred Stock the material risk that the stock *may* be delisted post-Buyout.  Accordingly, the truth concealed by Defendants' fraud was not the certainty of delisting, but merely the greater *risk* of a delisting, which materialized at the end of the Class Period.  Thus, in the event of liability under this second theory, Defendants would likely argue (i) that Dr. Feinstein's inflation figures were greatly overstated, and (ii) that Dr. Feinstein lacked a reliable methodology to calculate damages because he would be unable to backcast the stock price decline at the end of the Class Period as a proxy for the share inflation throughout the Class Period due to fraud.

Thus, there is no guarantee that Plaintiff and the Class would prevail on damages, and even if they did, how the Court's rulings on any motion for summary judgment and complex expert testimony matters—even if solely related to liability matters—would likely affect damages, or how the case might be presented to a jury.

Moreover, even if Lead Plaintiff succeeded at summary judgment and trial, Defendants would almost certainly file an appeal, which could further extend the lawsuit for years, and risk reversal.  And, any judgment after trials and appeals would be subject to a claims process, which itself could be contested by Defendants (as described below), if the case were not settled. Therefore, there was a significant risk that there could be no recovery or an aggregate recovery to the Class significantly less than $13 million if there were no settlement. The fact that similar claims, brought by an overlapping set of investors, were dismissed by the Supreme Court of New York reveals this risk. *See Matlick v. AmTrust Financial Services Inc.,* 67 Misc. 3d 1202 (N.Y. Sup. Ct. 2020).  It is also noteworthy that on February 7, 2019, following the delisting, preferred

14

shareholders filed a breach of fiduciary duty putative class action in the Delaware Court of Chancery, but the case was voluntarily dismissed on July 24, 2019, following the defendants' filing of a motion to dismiss. *See Mark Gottlieb, et al., v. Barry D. Zyskind, et al.,* Case No. 2019-0091 (Del. Ch.). That no investor aside from Plaintiff moved to be appointed as a lead plaintiff underscores the risks in this case. These risks underscore the desirability of this Settlement.

### 2.      Complexities Involved in the Litigation

Courts have recognized that "shareholder actions are notoriously complex and difficult to prove." *In re Bayer AG Sec. Litig.*, No. 03 Civ. 1546 (WHP), 2008 WL 5336691, at *5 (S.D.N.Y. Dec. 15, 2008); *see also In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, No. MDL 1500, 02 Civ. 5575 (SWK), 2006 WL 903236, at *9 (S.D.N.Y. Apr. 6, 2006) ("[T]he legal requirements for recovery under the securities laws present considerable challenges, particularly with respect to loss causation and the calculation of damages. These challenges are exacerbated . . . where a number of controlling decisions have recently shed new light on the standard for loss causation."). This Action was fraught with the same high level of complexity and challenges. It involved several complex issues concerning class certification (which as discussed, Defendants would likely revisit later in the Litigation), liability and damages that would require enormous effort and substantial time investment by Lead Counsel and Plaintiff's expert, introduction of voluminous documentary and deposition evidence, vigorously contested motions, and a considerable expenditure of judicial resources. The complexity of the Plaintiff's claims thus weighs in favor of settlement.

### 3.      Costs and Delays of the Litigation

For reasons described above, the Litigation, any litigated claims process, and potential appeal could have dragged on for several years without necessarily leading to any recovery for the Class, much less a greater recovery, were there no settlement.

As the benefits conferred on the Class by the Settlement outweigh the risks, delay, and considerable costs of further litigation, and the relief falls within the range of reasonableness as discussed below at Part IV.G.5, the Settlement is adequate and supports final approval.

### D.      The Proposed Method for Distributing Relief is Effective

The notice plan, Plan of Allocation, and Claims Administration process follows a standard and effective process.  It includes a Postcard Notice that was mailed to potential Class Members, a Summary Notice that was published on a national wire service, and a Settlement website from where Class members may obtain the Notice (a.k.a., the "Longform Notice") and a Claim Form, which may be submitted either by mail or online.  *See* Ewashko Decl. Ex. A.[10]  The Claim Form is to be submitted or postmarked by December 13, 2022.  *Id.*

Based on the information provided by Claimants, the Claims Administrator will determine their eligibility to participate (i.e., whether they are an Authorized Claimant) and calculate each Authorized Claimant's *pro rata* share based on the Authorized Claimant's net losses,[11] and Lead Plaintiff will be subject to the same formula for distribution of the Settlement as other Class Members.

The Plan of Allocation (set forth on page 4 of the Notice) was developed in consultation with both Plaintiff's damages expert and the Claims Administrator and is based on the expert's estimated amount of alleged artificial inflation in the per-share prices of Preferred Stock that was caused by Defendants' allegedly false or misleading statements or omissions.  In calculating the

---

[10] The Claim Form, and all forms of Notice are included as exhibits to the Ewashko Declaration.

[11] The Plan of Allocation provides that a "Recognized Loss Amount" will be calculated for each purchase or acquisition of AmTrust Preferred Stock on a U.S. open market during the Class Period that is listed on the Claim Form and for which adequate documentation is provided.  Such "Recognized Loss Amounts" will be calculated separately for each series of Preferred Stock and then aggregated across all of an Authorized Claimant's purchases or acquisitions of all series of AmTrust Preferred Stock during the Class Period to determine the total "Recognized Loss" for each Authorized Claimant.  Notice at 5.

estimated artificial inflation allegedly caused by those statements or omissions, Plaintiff's damages consultant considered the price changes in Preferred Stock in reaction to the January 18, 2019 public disclosure that corrected the alleged misrepresentations and omissions, and considered whether any of the price changes were attributable to non-fraud related information. The Plan also takes into account whether, and to what extent, Claimants sold Preferred Stock during the time period Plaintiff alleges that the price of Preferred Stock was inflated.

Thus, the Plan of Allocation, which adopts a procedure to equitably distribute the Net Settlement Fund on a *pro rata* basis, is fair and adequate. *In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 135 (S.D.N.Y. Apr. 16, 2008) (plan "that calls for the pro rata distribution of settlement proceeds on the basis of investment loss is presumptively reasonable"); *see also In re Credit Default Swaps Antitrust Litig.*, No. 13md2476 (DLC), 2016 WL 2731524, at *4 (S.D.N.Y. April 26, 2016) (approving plan that estimated price inflation caused by the defendants' conduct and then entitled each claimant to a recovery "based on its pro rata share" of the loss).

### E.    Lead Counsel's Requests are Reasonable

Rule 23(e)(2)(iii) instructs court to look to "the terms of any proposed award of attorney's fees, including timing of payment." As noted earlier, while the Settlement anticipates that Lead Counsel will make a request for attorneys' fees, expenses, and for a plaintiff service award, such awards are not a condition or material term of the Settlement, nor are they the subject of any agreement between the parties. As for the "timing of payment" portion of the Rule, the Stipulation authorizes Defendants' payment of attorneys' fees "immediately" upon issuance of the Court's fee award (¶ 17), which is a common and unobjectionable provision in settlement agreements when the agreement (as is the case here) contemplates that the Court retains jurisdiction to resolve any

disputes related to the disposition of settlement funds.  *See In re PPDAI Grp. Inc. Sec. Litig.,* No. 18-CV-6716 (TAM), 2022 WL 198491, at *14, n.14 (E.D.N.Y. Jan. 21, 2022).

The remainder of this Section explains why Lead Counsel's Requests are justified.

### 1.    The Legal Standard for Award of Attorneys' Fees

"When attorneys create a common fund from which members of a class are compensated for a common injury, they are entitled to a reasonable fee – set by the court – to be taken from the fund." *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 354 (S.D.N.Y. 2005).  This common fund doctrine incentivizes plaintiffs and counsel to litigate the case vigorously, deterring securities misconduct.  As noted by the Supreme Court, private actions "provide 'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [SEC] action.'" *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985).  Moreover, the common fund doctrine prevents unjust enrichment and ensures that class members do not benefit from a lawsuit without paying for its costs.  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).

In an analysis of the "reasonableness" of a fee application, courts may use either the "percentage of the fund" method or the "lodestar" method.  *See Wal-Mart*, 396 F.3d at 121-22.  In the Second Circuit, the trend is toward using the percentage method as it "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." *Id.* at 122.  However, when using this percentage-of-the-fund method, courts can also look to counsel's "hours as a 'cross check' on the reasonableness of the requested percentage," *Goldberger v. Integrated Res.,* 209 F.3d 43, 50 (2d Cir. 2000), "to ensure that an otherwise reasonable percentage fee would not lead to a windfall." *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 353 (S.D.N.Y. 2014).

However, whether the court uses the percentage-of-the-fund method or the lodestar approach, it should continue to consider the traditional criteria that reflect a reasonable fee in

18

common fund cases, including: (i) the time and labor expended by counsel; (ii) the magnitude and complexity of the litigation; (iii) the risks of the litigation; (iv) the quality of representation; (v) the requested fee in relation to the settlement; and (vi) public policy considerations. *See Goldberger*, 209 F.3d at 50. Consideration of the relevant *Goldberger* factors demonstrates that the requested fee is fair and reasonable.

**2.    The Application for an Award of Attorneys' Fees is Reasonable and Should be Approved**

**(i)    The Requested Attorneys' Fee is Reasonable Under the Percentage of the Fund Method**

Lead Plaintiff's fee request of 33.33% of the gross Settlement Fund is well in line with the Second Circuit's "benchmark." *See Velez v. Novartis Pharms. Corp.*, No. 04 CIV 09194 CM, 2010 WL 4877852, at *21 (S.D.N.Y. Nov. 30, 2010) (collecting cases showing that "[d]istrict courts in the Second Circuit routinely award attorneys' fees that are 30 percent or greater"). "The federal courts have established that a standard fee in complex class action cases like this one, where plaintiff[']s counsel have achieved a good recovery for the class, ranges from 20 to 50 percent of the gross settlement benefit." *Id.* As demonstrated in the cases below, the 33.33% fee request is within the range of percentage fees awarded in the Southern and Eastern Districts of New York in class action cases that settled for comparable amounts:

| Name of Case | Percentage of common fund | Settlement Amount |
|---|---|---|
| *In re PPDAI Grp. Inc. Sec. Litig.*, 18-CV-6716 (TAM), 2022 WL 198491 (E.D.N.Y. Jan. 21, 2022) | 33.33% | $9,000,000 |
| *In re Deutsche Bank AG Sec. Litig.*, No. 1:09-cv-01714-GHW-RWL, 2020 WL 3162980 (S.D.N.Y. June 11, 2020) | 33.33% | $18,500,000 |
| *City of Providence v. Aéropostale, Inc.*, 11 Civ. 7132 (CM) (GWG), 2014 WL 1883494 (S.D.N.Y. May 9, 2014), *aff'd sub nom. Arbuthnot v. Pierson*, 607 F. App'x 73 (2d Cir. 2015) | 33% | $15,000,000 |
| *In re Fuqi Int'l, Inc. Sec. Litig.*, No. 10-cv-2515 (DAB), 2016 WL 736649 (S.D.N.Y. Feb. 19, 2016) | 33% | $7,500,000 |

19

| *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358 (S.D.N.Y. 2002) | 33.33% | $11,500,000 |
| *In re China Media Express Holdings, Inc.*, Civil Action No. 11-CV0804 (VM), 2015 WL 13639423 (S.D.N.Y. Sept. 18, 2015) | 33.33% | $12,000,000 |
| *Hayes v. Harmony Gold Mining Co.*, No. 08 Civ. 03653(BSJ)(MHD), 2011 WL 6019219 (S.D.N.Y. Dec. 2, 2011) | 33.33% | $9,000,000 |

Accordingly, the requested fee of 33.33% of the Settlement Fund is reasonable under the percentage of fund method.[12]

### (ii)    The Requested Attorneys' Fee is Reasonable Under the *Lodestar "Cross-Check"* Method

The lodestar cross-check method also demonstrates that the fee requested is reasonable. The lodestar method requires a two-part analysis: "first, to determine the lodestar, the court multiplies the number of hours each attorney spent on the case by each attorney's reasonable hourly rate; and second, the court adjusts that lodestar figure (by applying a multiplier) to reflect such factors as the risk and contingent nature of the litigation, the result obtained, and the quality of the attorney's work." *City of Providence*, 2014 WL 1883494, at *13. Courts in this Circuit have routinely awarded positive lodestar multipliers. *See e.g. In re Comverse Tech., Inc. Sec. Litig.*, No. 06–CV–1825 (NGG)(RER), 2010 WL 2653354, at *5 (E.D.N.Y. June 24, 2010) ("Where … counsel has litigated a complex case under a contingency fee arrangement, they are entitled to a fee in excess of the lodestar"). Multipliers from two to six times the lodestar are regularly awarded, *see Monserrate v. Tequipment, Inc.*, 11 CV 6090 (RML), 2012 WL 5830557, *3 (E.D.N.Y Nov. 16, 2012), and a multiplier of 2.09 is considered "at the lower end of the range

---

[12] *See also In re. Akari Therapeutics PLC Securities Litigation*, Master File No. 1:17-cv-03577 (KPF) (S.D.N.Y. Nov. 28, 2018) (J. Failla) (awarding one-third of the settlement fund of $2.7 million plus expenses).

of multipliers awarded by courts within the Second Circuit." *In re Lloyd's Am. Trust Fund Litig.,* 96 Civ. 1262 (RWS), 2002 WL 31663577, *27 (S.D.N.Y. Nov. 26, 2002).[13]

Here, Lead Counsel's lodestar is derived by multiplying the hours spent by each attorney and paralegal staff by their current hourly rates and then dividing the result by the requested fee award. The rates used herein are the same rates Lead Counsel charges to, and gets paid by, paying, non-contingency clients. Stine Decl. ¶ 11. And, the rates used herein are comparable to the regular rates submitted by comparable firms for lodestar cross-checks in other securities class action fee applications.[14] The total number of hours spent by Lead Counsel, including the hours spent by each attorney, is 3,998 (rounded off) hours.[15] Applying the above formula, Lead Counsel's total lodestar amounts to $2,634,531. The amount of fee requested in this motion is 33.33% of the $13 million Settlement, which amounts to $4,332,900. Accordingly, the requested fee represents a

---

[13] *See also Pearlstein v. Blackberry Limited,* No. 13 Civ. 7060 (CM) (KHP), 2022 WL 4554858 *10 (S.D.N.Y. Sept. 29, 2022) (awarding counsel $55 million, reflecting a positive multiplier, and citing considerable authority for proposition that multipliers as high as 4.8 are appropriate); *New Jersey Carpenters Health Fund, et al., v. Residential Capital, LLC, et al.,* No. 1:08-cv-08781(KPF) (DCF) (S.D.N.Y. Jul. 31, 2015) (J. Failla) (awarding counsel $69.5 million, reflecting a positive multiplier of 1.78); *Maley*, 186 F. Supp. 2d at 371 (multiplier of 4.65); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (multiplier of 3.97); *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 197 (S.D.N.Y. 1997) (multiplier of 5.5); *In re RJR Nabisco, Inc. Sec. Litig.*, No. 88 CV 7905, 1992 WL 210138, at *5 (S.D.N.Y. Aug. 24, 1992) (multiplier of 6).

[14] *See, e.g., Blackberry,* 2022 WL 4554858 at *10 (awarding fees with rates ranging from $500 for associates to $1,200 for senior partners); *see also Micholle v. Ophthotech Corp.*, No. 1:17-cv-00210 (VSB) (GWG), ECF No. 147-2 (S.D.N.Y. Sep. 16, 2022) (awarding fees with rates ranging from $375-$435 for staff attorneys, $375-$620 for associates and $775-$1350 for partners/senior partners). The lodestar has been calculated using current hourly customary rates of the timekeepers. *See In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 01695CM, 2007 WL 4115808, at *9 (S.D.N.Y. Nov. 7, 2007) ("The use of current rates to calculate the lodestar figure has been repeatedly endorsed by courts as a means of accounting for the delay in payment inherent in class actions and for inflation") (citing *Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989)).

[15] The 3,998 hour lodestar does not take into account the considerable number of future hours over the next several months that will be spent by Lead Counsel on administration matters, such as overseeing the processing of claims and the dissemination of payments to Class Members (and in the event of uncashed checks, to a Court-approved 501(c)(3) recipient), until the balance of the Settlement Fund reaches $0.00. Also, excluded from the lodestar calculation is (i) time specifically spent on issues relating to attorneys' fees or the plaintiff service award; (ii) time spent by law school interns, summer associates and attorneys who spent less than 5 hours. Including such time would increase the lodestar to $2,732,382, and decrease the implied multiplier to 1.59%.

1.64 multiplier of the total lodestar (4,332,900 / 2,634,531= 1.64), which is still "at the lower end of the range of multipliers." *In re Lloyd's,* 2002 WL 31663577, \*27. As already discussed, the 33.33% requested fee is within the range of fees awarded in similar cases, and per Second Circuit precedent, awarding a percentage approach reflecting a positive multiple aligns counsel's interests with the Class in obtaining the best possible recovery, and incentivizes counsel to litigate the matter efficiently. Moreover, the positive multiplier is reasonable given the high risk, complex issues, skill of the attorneys, and the contingency nature involved in bringing this litigation, as discussed herein. Therefore, the requested fee is also reasonable under the lodestar method.

### (iii) The Requested Attorneys' Fees are Reasonable Under the *Goldberger* factors

The six *Goldberger* factors (identified *supra* at pp. 18-19) support the requested fee.

### (a) The Time and Labor Expended by Counsel

Through October 11, 2022, Lead Counsel has spent 3,998 hours litigating this action, resulting in a lodestar of $2,634,531. These hours demonstrate that Lead Counsel devoted the necessary time and effort to aggressively litigate the Action by, among other things, (a) investigating potential claims against Defendants before filing the Complaint (which never needed to be amended) and thereafter filing notice as required under the PSLRA and moving for lead plaintiff; (b) successfully opposing Defendants' motion to dismiss; (c) conducting extensive discovery, including (i) serving document requests, interrogatories, requests for admission, third-party subpoenas, and FOIA and FOIL requests, (ii) meeting and conferring with Defendants and third parties on the scope of production, (iii) obtaining production of over 200,400 pages of document discovery and producing extensive document discovery to Defendants on behalf of Plaintiff, (iv) meeting and conferring with Defendants regarding various discovery disputes, several of which were submitted to the Court for resolution, (v) taking depositions of nine fact

22

witnesses including various high-ranking executives and directors at AmTrust, including Defendants Zyskind and George Karfunkel, (vi) retaining experts to opine on market efficiency, damages, loss causation, and certain other issues, which included serving four expert reports by Steven P. Feinstein and analyzing Defendants' expert reports; (d) successfully briefing a class certification motion that, among other things, raised complex issues related to market efficiency; (e) preparing and submitting mediation papers (for two separate mediation sessions) and analyzing and responding to Defendants' own mediation papers; (f) engaging in two mediation sessions and follow-up settlement communications with Defendants, with the help of an experienced mediator; (g) negotiating and drafting appropriate documentation of the Settlement, including the Stipulation and notice documents; (h) presenting the Settlement and Notice documents to the Court by way of a Preliminary Approval Motion, which the Court approved; and (i) overseeing the Class Administrator's execution of the Settlement Notice Plan.  Stine Decl. ¶4.  Despite the extensive time dedicated to this Litigation, throughout the Action, Lead Counsel staffed the matter efficiently and avoided any unnecessary duplication of effort.

### (b)   The Magnitude and Complexities of the Litigation

It is respectfully submitted that this Settlement is an exceptional outcome for the Class given the complexities involved in this Action, as described in Part IV.C.2.  In light of this, the fee requested is reasonable.  *See City of Providence*, 2014 WL 1883494, at *16 (finding that "difficult, complex, hotly disputed, and expert-intensive issues," favored requested fee).

### (c)   The Risks of the Litigation

The risks assumed by Lead Counsel in prosecuting this Action is one of the most important *Goldberger* factors that the Court considers in determining the reasonableness of the fees requested.  *Goldberger*, 209 F.3d at 54; *Comverse*, 2010 WL 2653354, at *5.  "Little about litigation is risk-free, and class actions confront even more substantial risks than other forms of

23

litigation." *Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*, No. 01–CV–11814(MP), 2004 WL 1087261, at *3 (S.D.N.Y. May 14, 2004); *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 985 F. Supp. 410, 417 (S.D.N.Y. 1997) ("Numerous courts have recognized that the attorney's contingent fee risk is an important factor in determining the fee award."). This risk encompasses not just the risk of no payment, but also the risk of underpayment. *See In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 569-70 (7th Cir. 1992).

Lead Counsel took the case entirely on contingency, expended 3,998 hours over several years without any certainty of payment and assumed a serious risk of nonpayment given the risks and complexities inherent in the litigation both in establishing liability and damages as discussed in detail throughout this brief, which made it a very real possibility that Counsel was not going to get compensated at all. In undertaking such responsibility, Counsel was obligated to ensure sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the costs that a case of this complexity requires, including substantial expert costs. By focusing considerable time and resources on this case, Lead Counsel forewent other opportunities. Therefore, this factor also weighs in favor of the requested fee.

### (d)      The Quality of Representation

The quality of the representation and the standing of Lead Counsel have been recognized as important factors in determining the reasonableness of a fee. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, No. 02-CV-3400 CM PED, 2010 WL 4537550, at *28 (S.D.N.Y. Nov. 8, 2010); *In re Bisys Sec. Litig.*, No. 04 Civ. 3840(JSR), 2007 WL 2049726, at *3 (S.D.N.Y. July 16, 2007).

Lead Counsel is highly skilled and experienced in litigating complex securities class actions. Throughout, they have exerted a diligent and concentrated effort to secure the best recovery for the Class. This brief has already recounted, and will not repeat the various efforts undertaken by Counsel in the Litigation that have contributed to the excellent Class recovery.

24

Suffice to say, had Counsel not been highly skilled (all three partners on the case have been named "Super Lawyers" for 2022, with Mr. Stine named on the "Top 100" list for Metro New York) the Class may not have received such an exceptional outcome, given the risks in the case.

In addition, Plaintiff's Counsel successfully faced a highly skilled defense counsel team from Quinn Emmanuel Urquhart & Sullivan LLP, a large and prestigious national law firm with significant experience litigating high-stakes securities actions like this, and this team was headed by the firm's co-managing partner and global head of complex litigation, who was named "General Commercial Litigator of the Year" by Benchmark Litigation in 2022. *See In re Warner Communications Sec. Litigation*, 618 F. Supp. 735, 749 (S.D.N.Y. Aug. 21, 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986) ("The quality of opposing counsel is also important in evaluating the quality of plaintiffs' counsels' work."); *In re Flag Telecom Holdings*, 2010 WL 4537550, at *28 (same).

### (e)    The Requested Fee in Relation to the Settlement

"When determining whether a fee request is reasonable in relation to a settlement amount, 'the court compares the fee application to fees awarded in similar securities class-action settlements of comparable value.'" *In re Comverse, 2010 WL 2653354*, at *3 (citation omitted). As discussed in detail in Part IV.E.2(i) above, the requested fee in relation to the Settlement is within the range of percentage fees that courts in the Circuit have awarded in cases with comparable size of common fund settlements.

### (f)    Public Policy Considerations

"Public policy concerns favor the award of reasonable attorneys' fees in class action securities litigation." *See In re Flag Telecom Holdings*, 2010 WL 4537550, at *29 (citation omitted). Further, Courts have recognized that in order to carry out the "important public policy [of enforcing the securities laws] [], the courts should award fees which will adequately compensate Lead Counsel for the value of their efforts, taking into account the enormous risks

25

they undertook." *Id; see also Maley v. Del Global Tech. Corp.*, 186 F. Supp. 2d 358, 373 (S.D.N.Y. 2002) ("In considering an award of attorney's fees, the public policy of vigorously enforcing the federal securities laws must be considered."); *Hicks v. Stanley,* No. 01 Civ. 10071(RJH), 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005) ("To make certain that the public is represented by talented and experienced trial counsel, the remuneration should be both fair and rewarding."). As previously noted, other private actions have attempted to, but failed to hold Defendants accountable for the January 2019 delisting. Nonetheless, due to Lead Plaintiff's and Lead Counsel's diligence and resourcefulness, a recovery (indeed, a substantial one) was secured on behalf of investors. Accordingly, public policy favors granting Counsel's request.[16]

### 3. The Application for the Reimbursement of Expenses is Reasonable and Should be Approved

It is well-established that class counsel is entitled to reimbursement of litigation expenses from a common fund. *Reichman v. Bonsignore, Brignati & Mazzotta, P.C.*, 818 F.2d 278, 283 (2d Cir. 1987); *In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 132 (S.D.N.Y. 2008). Thus, as long as they were "incidental and necessary to the representation," reasonable expenses that are customarily charged to a client may be recovered. *In re China Sunergy Sec. Litig.*, No. 07 Civ. 7895(DAB), 2011 WL 1899715, at *6 (S.D.N.Y. May 13, 2011). As reflected in the table at paragraph 5 of the Stine Declaration, Lead Counsel has incurred $467,492.33 in litigation expenses through October 11, 2022. The Notice, however, advised the Class that Lead Counsel would seek no more than $460,000 in expenses. Accordingly, Lead Counsel requests $460,000 and foregoes requesting reimbursement for expenses incurred above that sum.

---

[16] A final note on fees: Pursuant to Local Civil Rule 23.1, Lead Counsel discloses, as it did previously, the existence of a fee-sharing agreement with Martin Kofroň, an attorney at law registered with the Czech Bar, whereby Mr. Kofroň will be paid 10% of any net fees awarded to Lead Counsel. The details of the fee-sharing agreement were described in i) Plaintiff's preliminary approval brief (ECF No. 95 at 15), which on the Settlement Website, and ii) in the Notice at 8.

While the expense request is not remarkable relative to a case of this complexity, the largest category of expenses was the expert cost, without which Plaintiff's Counsel would not have been able to obtain class certification and demonstrate class-wide damages. In other words, the expert costs were a precondition to any Class recovery. These and other incurred costs and expenses (such as mediation and legal research expenses) were reasonable and necessary to successfully prosecute the Action. *See In re MetLife*, 689 F. Supp. at 364 (reimbursing "expert fees, electronic research charges, long distance telephone and facsimile charges, postage and delivery expenses, discovery costs, filing fees, photocopying, expenses associated with locating and interviewing dozens of witnesses, and out-of-town travel expenses"). And, these expenses were incurred with no guarantee of recovery for the benefit of Class members. *See also* Stine Decl. ¶ 13.[17] As of this filing, no Class Member has objected to the requested expense reimbursement.

### 4.    The Application for a Plaintiff Award is Reasonable and Should be Approved

Courts routinely approve service awards to compensate plaintiffs for their services and the risks incurred on behalf of a class, *see, e.g.*, *In re Nielsen Holding Plc Sec. Litig.*, No. 1:18-cv-07143-JMF, slip op. ¶¶ 7-8, ECF No. 156 (S.D.N.Y. July 21, 2022) (awarding $17,750 and $5,625 to plaintiffs); *In re Qudian Inc. Sec. Litig.*, No. 1:17-cv-09741-JMF, 2021 WL 2328437, at *2 (S.D.N.Y. June 8, 2021) (awarding lead plaintiff $12,500). The PSLRA also allows for "the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class." 15 U.S.C. § 78u-4(a)(4).

---

[17] These costs and expenses do not include Notice and Administration Expenses, such as the cost of providing notice, the fees of the Claims Administrator, and Tax and Tax Expenses Pursuant to the Stipulation. Pursuant to the Preliminary Approval Order, $350,000 from the Gross Settlement Fund may be paid to the Notice and Administration Account without further Order of the Court in order to pay initial Notice and Administration Expenses. *See* ECF No. 97 ¶ 20. Lead Plaintiff will ask the Court to allow any additional Notice and Administration Expenses when it files a motion for distribution of the Net Settlement Fund after the Claims process is complete.

Here, Lead Counsel respectfully seeks a $15,000 award to Lead Plaintiff for his services, and to compensate him for costs and expenses, including lost wages, incurred directly related to the representation of the Class.[18]  As discussed more fully in the Martínek Declaration,  Mr. Martínek estimates that he spent over 100 hours working with Lead Counsel on this matter including (among many other things) (i) communicating with Lead Counsel on various issues related to litigation and settlement strategy; (ii) reviewing and providing helpful comments and edits on drafts of documents (as well as astute critiques of Defendants' submissions); (iii) providing document discovery; (iv) preparing for and sitting for a six-hour deposition; and (v) reviewing and approving the proposed Settlement.  *See* Martínek Decl. ¶ 32-33.  Moreover, as a full-time investor currently managing his own portfolio in his family office, and with 17 years of professional experience as an investment banker and a private equity analyst, Lead Plaintiff made significant contributions to the case including providing valuable insights into financial matters. In fact, in their motion to dismiss, Defendants recognized that Plaintiff was "a sophisticated investor who performed a diligent pre-suit investigation." ECF No. 28.

Aside from litigation, Plaintiff also demonstrated his commitment to holding Defendants' feet to the fire by issuing an open letter to Stone Point Capital LLC, AmTrust's private equity partner, stating that the firm was compromising its reputation in agreeing to delist the Preferred Stock, submitting a letter to the SEC opposing the delisting, and writing articles and a letter to the editor in *Barron's* articulating his objections to the delisting decision.  *Id.* ¶ 11.

The substantial time devoted to this Action took Mr. Martínek away from his complicated and time-consuming day job.  *Id.* ¶ 33.  His commitment to the Class should be acknowledged

---

[18] The requested service award is a miniscule 0.1% of the Settlement Fund, a percentage Courts have routinely approved. *See e.g., Blackberry,* 2022 WL 4554858 at *11 (approving plaintiff award representing 0.3% of settlement); *In. re. Flag Telecom Holdings,* 2010 WL 4537550 at *31 (approving plaintiff award representing 0.4% of settlement).

through a modest $15,000 service award. *See In re Signet Jewelers Limited Sec. Litig.*, No. 1:16-cv-06728-CM-SDA, 2020 WL 4196468, at \*24 (S.D.N.Y. July 21, 2020) (awarding $25,410 to plaintiff); *In re Qudian Inc.*, 2021 WL 2328437, at \*2 (awarding lead plaintiff $25,000, and class representative $12,500, for "reasonable costs and expenses directly related to [their] representation of the Class."); *Hicks*, 2005 WL 2757792, at \*10 ("Courts in this Circuit routinely award such costs and expenses both to reimburse the named plaintiffs for expenses incurred through their involvement with the action and lost wages, as well as to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place.").

As with Counsel's other Requests, no Class Member has yet objected to the requested Service Award. *See* ECF No. 96-1, Ex. A, Ex. 1. Accordingly, Lead Plaintiff's request is reasonable and should be granted.

## F.    Equitable Treatment of Class Members Relative to One Another

Rule 23(e)(2)(D), the final factor, considers whether class members are treated equitably. Here, the Settlement Agreement's release language (*see* Settlement Stipulation ¶¶ 1(l),1(bb), 1(hh), 1(ii), 1(jj), 1(kk), 1(ll), 1(uu)) treats all Class Members equitably relative to one another. Subject to Court approval, all Class Members will be giving Defendants an identical release.[19] Further, the Plan of Allocation, set forth in the Notice, treats all Class Members equitably, based on the timing of their acquisitions and sales of Preferred Stock, and gives specific attention to the series of Preferred Stock purchased or sold by a Claimant, given Plaintiff's damages expert's opinion that losses per share differed across each series.[20]

---

[19] As noted earlier at n. 5, the release is narrowly tailored to this case and includes important exclusions.

[20] The damages expert estimated losses per share for each series of Preferred Stock as follows: Series A: $5.15; Series B: $5.32; Series C: $6.39; Series D: $5.26; Series E: $6.06; Series F: $5.16.

### G.      The Remaining *Grinnell* and Rule 23 Factors Are Also Met

#### 1.      The Reaction of the Class to the Settlement

The reaction of the Class to the Settlement is one of the most important indicators of fairness of the settlement, especially when there is a lack of or a small number of objections to the settlement.  *See City of Providence*, 2014 WL 1883494, at *5,; *see also Strougo v. Bassini*, 258 F. Supp. 2d 254, 258 (S.D.N.Y. 2003).

The reaction of the class to the Settlement has been overwhelmingly positive.  More than 20,195 notices were mailed to Class Members or their nominees, and as of October 11, 2022,[21] no objections or exclusions have been received.  *See* Ewashko Decl. ¶ 15.

#### 2.      The Stage of the Proceedings

While assessing this factor "the question is whether the parties had adequate information about their claims such that their counsel can intelligently evaluate the merits of plaintiff's claims, the strengths of the defenses asserted by defendants, and the value of plaintiffs' causes of action for purposes of settlement.'"  *In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*, 909 F. Supp. 2d 259, 267 (S.D.N.Y. 2012).

As already discussed in detail Parts I and IV.E.2(iii)(a) above, a Settlement was reached only following the close of all fact discovery, following the exchange of all expert reports, and following extensive negotiations supervised by an experienced mediator.  The resultant accumulation of information permitted Lead Plaintiff and Lead Counsel to knowledgably evaluate the merits of their case, and the Settlement.  *See In re Warner*, 618 F. Supp. at 745, (settlement approved where the parties "have a clear view of the strengths and weaknesses of their cases").

---

[21] It is also worth noting that all the communications Lead Counsel has had with Class members and other AmTrust investors since the Settlement was publicized have been positive.

### 3. The Costs and Risks of Maintaining the Class Action Through Trial

Defendants, with the help of their own economics expert, vigorously opposed Lead Plaintiff's class certification motion, but the Court, crediting some but not all of Lead Plaintiff's arguments, ruled in his favor and certified the Class. Lead Counsel believes that maintaining class action status through trial was likely. However, under Rule 23(c)(1), a class certification order may be altered or amended at any time before a decision on the merits, meaning that Defendants could have moved to decertify the Class or shorten the Class Period up until a jury verdict. Moreover, Defendants could have contested class certification on appeal. *See e.g., Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) (reversing class certification order).

### 4. The Ability of Defendants to Withstand a Greater Judgment

Courts also consider the defendants' ability to withstand a greater judgment. *In re Vitamin C Antitrust Litig.,* No. 06-MD-1738 (BMC) (JO), 2012 WL 5289514, at *6 (E.D.N.Y. Oct. 23, 2012) ("[I]n any class action against a large corporation, the defendant entity is likely to be able to withstand a more substantial judgment,…"). While Lead Plaintiff believes that Defendants could withstand a greater judgment, "against the weight of the remaining factors, this fact alone does not undermine the reasonableness of the instant settlement." *Id.*

### 5. Range of Reasonableness of the Settlement in Light of the Risks and Best Possible Recovery

Considering the best possible recovery, the risk-free Settlement is well within the range of approval and presents an excellent, prompt, and substantial recovery for the Class, whose claims have been pending since early 2019. *See Pantelyat v. Bank of Am., N.A.*, 16-cv-8964 (AJN), 2019 WL 402854, *7 (S.D.N.Y. Jan. 31, 2019) (in determining a settlement's range of reasonableness, the court should consider "the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion."). As

31

pertinent here, the $13 million Settlement Amount represents i) approximately *32%* of the Class's alleged maximum estimated aggregate damages as calculated by Lead Plaintiff's damages expert using a traditional "one-day drop" model (approximately $40.9 million), or ii) approximately *27%* of maximum aggregated damages under the expert's more aggressive two-day drop model, with the second day offset by a bounce-back in stock price on the third day after the corrective disclosure (approximately $47.4 million).[22]  This 27-32% range which, as described below, is unusually high for a securities class action settlement, is reasonable given the uncertainties of the law and fact and concomitant risks inherent in the litigation dragging on for an indefinite number of years.  *See In re Facebook, Inc. IPO Sec. & Derivative Litig.,* MDL No. 12-2389, 2015 WL 6971424, *6 (S.D.N.Y. Nov. 9, 2015) (citation omitted) ("The fact that the settlement amount may equal but a fraction of potential recovery does not render the settlement inadequate.  Dollar amounts are judged not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case.").

Underscoring this excellent result for the Class is the recent report from National Economic Research Associates, Inc. ("NERA"), which identified the median percentage recovery in settlements of class actions during the period of December 2012 through December 2021 involving aggregate investor losses between $20 million to $49 to be *5.2%*.  *See* Janeen McIntosh & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2021 Full-Year Review* at 23, Figure 21 (NERA Jan. 25, 2022), *available at* www.nera.com/publications/archive/2022/recent-trends-

---

[22] Stine Decl. ¶ 16.  These percentages of recovery, assume arguendo that (i) Lead Plaintiff was able to prove every aspect of his claims on liability, (ii) Lead Plaintiff's damages model was accepted by the jury in full, and (iii) after a judgment in favor Lead Plaintiff and the Class, *all* damaged Class Members filed claims on *all* shares purchased during the Class Period and *all* such Claims were approved, regardless of any challenges from Defendants with respect to specific Claims (e.g., arguments that claimed losses were inflated or non-existent due to a Claimant's sale of Preferred Stock during the Class Period, or other legal defenses uncovered during the claims process).  *Id.*

in-securities-class-actionlitigation--2021-full-y.html.  NERA also noted that in 2021, the median

settlement value for all securities class actions (excluding merger objection cases, settlements of

over $1 billion, and settlements for $0 to the class) was $8 million.  *Id.* at 20, Figure 20.

Similarly, according to Cornerstone Research, in 2021, the median settlement of a

securities class action was $8.3 million and the median settlement as a percentage of estimated

damages in Rule 10b-5 class actions involving damages between $25 and $74 million was **7.2%.**

*See Securities Class Action Settlements - 2021 Review and Analysis* at 4 and 6, Figure 5

(Cornerstone       Research       2022),       *available       at*       https://www.cornerstone.com/wp-

content/uploads/2022/03/Securities-Class-Action-Settlements-2021-Review-and-Analysis.pdf.

The same figure for settlements between 2012 to 2020 was **7.3%**. *Id.*  Accordingly, this factor

greatly favors approval of the Settlement.

### 6.      The Supplemental Agreement to the Settlement is Typical and Reasonable

Pursuant to Rule 23(e)(1)(C)(iv) and Rule 23(e)(3), the Court must consider any agreement

made in connection with the [proposed Settlement]."  As noted earlier, the Parties have entered

into a Supplemental Agreement providing Defendants the option to terminate the Settlement if the

number of valid opt-outs exceed an agreed-upon threshold. *See* supra n. 6 (noting also that, in any

event, no Class Member has yet to opt out of the Settlement).  Such an agreement is standard in

securities fraud class actions settlements. *See, e.g., Blackberry*, 2022 WL 4554858, at *7.

## V.      THE PLAN OF ALLOCATION IS FAIR AND REASONABLE AND SHOULD BE FINALLY APPROVED

As described above at Part IV.D and IV.F, the Plan of Allocation is designed to treat all

Class Members equally and equitably and thus should be finally approved.

## VI.      NOTICE TO THE CLASS SATISFIED RULE 23 AND DUE PROCESS

In the Preliminary Approval Order, the Court approved the "form and content" of the Postcard Notice, the Notice, the Claim Form and the Summary Notice and found that "the method of mailing and making available" these notices "(i) is the best notice practicable under the circumstances; (ii) constitutes notice that is reasonably calculated, under the circumstances, …(iii) constitutes due, adequate, and sufficient notice …; and (iv) satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure, the United States Constitution (including the Due Process Clause), the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4, as amended, and all other applicable law and rules."  ECF No. 97, at 6.

As described above and in the Ewashko Declaration, the Settlement Notice Program was administered in compliance with the Court's Preliminary Approval Order.  The Postcard Notice was mailed to 20,196 potential Class Members and nominees starting on August 15, 2022. Ewashko Decl. ¶ 9.  And the Longform Notices and Claim Forms were mailed to any Class Members who made such a request.  Additionally, the Settlement Website, settlement email address, and settlement telephone number were set up as described above, *id.* ¶ 12, 13, and Summary Notice was published, on two separate wire services, on August 29, 2022.  *Id.* ¶ 11. Notice thus satisfied the requirements of Rule 23, due process, and the PSLRA.  *Blackberry,* 2022 WL 4554858 (in securities action, finding that similar notice plan constituted "the best notice practicable under the circumstances including individual notice to all members who can be identified through reasonable effort.").  As described earlier, Class Counsel and A.B. Data also went beyond the requirements of the notice plan and contacted hundreds of potential Class Members (identified through the discovery record) in order to notify them of the Settlement.

## VII.    CONCLUSION

For the foregoing reasons, the Court should grant the Motion, as reflected in the i) proposed Final Judgment and ii) proposed Order, attached hereto.

DATED: October 12, 2022                    Respectfully submitted,

**WOLF POPPER LLP**

By: */s/ Carl L. Stine*

Carl L. Stine
Patricia I. Avery
Adam J. Blander
Radha Raghavan
845 Third Avenue, 12th Floor
New York, New York 10022
(212) 759-4600
cstine@wolfpopper.com

*Attorneys for Class Representative*
*Jan Martínek and the Class*

35