UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JAN MARTÍNEK, | ) | |
| | ) | Case No. 19-cv-8030-KPF |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| AMTRUST FINANCIAL SERVICES, INC., | ) | Hon. Katherine Polk Failla |
| BARRY D. ZYSKIND, GEORGE | ) | |
| KARFUNKEL, AND LEAH KARFUNKEL, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DECLARATION OF CARL L. STINE, ESQ. IN SUPPORT OF LEAD PLAINTIFF'S
MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, APPROVAL
OF PLAN OF ALLOCATION, AND APPROVAL OF REQUESTS FOR ATTORNEYS'
FEES, EXPENSES, AND PLAINTIFF SERVICE AWARD**

**WOLF POPPER LLP**
Carl L. Stine
Patricia I. Avery
Adam J. Blander
Radha Raghavan
845 Third Avenue, 12th Floor
New York, New York 10022
(212) 759-4600
cstine@wolfpopper.com

*Attorneys for Class Representative, Jan Martínek, and the Class*

I, CARL L. STINE, declare under penalty of perjury pursuant to 28 U.S.C. §1746, hereby affirm as follows:

1.      I am a partner of the law firm of Wolf Popper LLP ("Wolf Popper"), Plaintiff's Lead Counsel in this Action.  I am a member in good standing of the New York Bar and admitted to practice in the United States District for the Southern District of New York.[1]  I submit this Declaration in support of Plaintiff's Motion for Final Approval of the Settlement, Approval of the Proposed Plan of Allocation, and Approval of Lead Counsel's Requests for Attorneys' Fees, the Reimbursement of Litigation Expenses, and for a Plaintiff Service Award.

2.      I have personal knowledge of the matters set forth herein based on my active participation in, and supervision of, the Action, and if called upon as a witness, I could and would testify competently thereto.  Also, for the avoidance of doubt, I fully agree with all the factual statements contained in the memorandum of law filed herewith, and if called upon as a witness, I could and would testify competently to those facts as well.

3.      My firm, Wolf Popper LLP, undertook this litigation, including the prosecution of this Action, on an entirely contingent basis.

4.      The services undertaken by my firm in connection with the litigation can be summarized as, among other things: (a) investigating potential claims against Defendants before filing the Complaint; (b) thereafter filing the notice as required under the PSLRA and moving for lead plaintiff and lead counsel; (c) briefing, arguing, and withstanding Defendants' motion to dismiss; (d) conducting extensive discovery, including (i) serving document requests, interrogatories, requests for admission, third-party subpoenas and FOIA and FOIL requests (ii) meeting and conferring with Defendants and third parties on the scope of production, (iii) obtaining

---

[1] Unless otherwise defined herein, all capitalized terms have the meanings ascribed to them in the Stipulation of Settlement dated June 22, 2022 ("Stipulation").  ECF No. 91-1.

1

production of over 200,400 pages of document discovery and producing substantial document discovery to Defendants on behalf of Plaintiff, (iv) meeting and conferring with Defendants regarding various discovery disputes, several of which were submitted to the Court for resolution, including a fully briefed motion for a spoliation finding, (v) taking depositions of nine fact witnesses including various high-ranking executives and directors at AmTrust, including Defendants Zyskind and George Karfunkel, (vi) retaining experts to opine on market efficiency, damages, loss causation, and certain other issues, which included serving four expert reports by Steven P. Feinstein, and analyzing Defendants' expert reports; (e) briefing and arguing a class certification motion that, among other things, raised complex issues related to market efficiency, which was granted by the Court; (f) preparing and submitting mediation papers (for two separate mediation sessions) and analyzing and responding to Defendants' mediation papers; (g) engaging in two mediation sessions and follow-up settlement communications with Defendants, with the help of an experienced mediator, which culminated in an agreement in principle to settle this Action for $13,000,000; (h) negotiating and drafting appropriate documentation of the Settlement, including the Stipulation and notice documents; (i) presenting the Settlement and Notice documents to the Court by way of a Preliminary Approval Motion, which the Court approved; and (j) implementing, overseeing, and working with the Claims Administrator in administering all aspects of the settlement administration, including communicating directly with dozens of potential Class Members.[2]

---

[2] Part of this last task included emailing the many investors who had contacted AmTrust to discuss the Preferred Stock during the relevant time period (who we identified through AmTrust's document production) to advise them of the Settlement. While the vast majority of these communications were not handled by me personally, I have been told by my colleagues that these informal discussions about the Settlement have been uniformly positive (i.e., no complaints).

5.      Based on the accounting records of Lead Counsel, attorneys and staff at Wolf Popper worked approximately 3,998 hours on this litigation from inception through October 11, 2022, for a lodestar value of $2,634,531.  A breakdown of Lead Counsel's hours is reflected below:

**Wolf Popper LLP**
*Martinek v. AmTrust Financial Services, Inc. Time Report*
**Worked Through October 11, 2022**

| NAME | POSITION/TITLE | HOURS | HOURLY RATE | LODESTAR |
|---|---|---|---|---|
| Chet B. Waldman | Partner | 9.30 | $895 | $8,323.50 |
| Robert C. Finkel | Partner | 79.40 | $895 | $71,063.00 |
| Carl L. Stine | Partner | 631.40 | $895 | $565,103.00 |
| Patricia I. Avery | Partner | 261.50 | $895 | $234,042.50 |
| Matthew Insley-Pruitt | Partner | 5.40 | $825 | $4,455.00 |
| Adam J. Blander | Partner | 1,533.80 | $750 | $1,150,350.00 |
| Radha Raghavan | Associate | 387.00 | $440 | $170,280.00 |
| Sami T. Ahmad | Associate | 283.00 | $440 | $124,520.00 |
| Sandra Vidal-Pellon | Of Counsel | 165.00 | $435 | $71,775.00 |
| Emer Burke | Staff Attorney | 34.10 | $380 | $12,958.00 |
| Laura Bellini | Staff Attorney | 414.50 | $380 | $157,510.00 |
| Karina J. Castro | Staff Attorney | 10.50 | $380 | $3,990.00 |
| Sean Doucet | Staff Attorney | 18.60 | $380 | $7,068.00 |
| Steven Fleisig | Financial Analyst | 12.60 | $370 | $4,662.00 |
| Christopher Dunleavy | Law Clerk | 19.00 | $320 | $6,080.00 |
| Melissa Gianfagna | Senior Paralegal | 124.50 | $320 | $39,840.00 |
| Noah Madoff | Paralegal | 8.10 | $310 | $2,511.00 |
| **TOTAL LODESTAR** | | 3,997.70 | | $2,634,531.00 |

6.      The more than 3,998 hours my firm expended on this case were reasonably spent, especially given the high-stakes, high-risk nature of this litigation.

7.      Work was carefully allocated across my firm to maximize efficiency.  Thus, when possible, senior attorneys did not do the work that could be accomplished by more junior attorneys,

3

and attorneys did not do the work that could be completed by paralegals.  Lead Counsel assigned tasks depending on a number of considerations, with the goal of avoiding duplication of effort.

8.    The information set forth in this Declaration concerning Wolf Popper's time, including in the schedule above, was prepared from daily time records regularly prepared and maintained by Wolf Popper in the ordinary course of business.  I am the partner who oversaw Wolf Popper's activities in the litigation, and attorneys working under my direction reviewed my firm's daily time records to confirm their accuracy.  The purpose of this review was to confirm both the accuracy of the entries on the reports as well as the necessity for, and reasonableness of, the time and expenses committed to the Litigation.

9.    As a result of this review, reductions were made to both time and expenses in the exercise of billing judgment.  For example, I removed from the lodestar calculation any time expended by law school interns and summer associates for legal research (notwithstanding that they were paid and that work performed contributed to the successful prosecution of this action) and removed time spent by individuals who worked less than five hours on the matter.[3]  Also, excluded from the lodestar calculation is time specifically spent on issues relating to attorneys' fees or the plaintiff service award.  The lodestar figure also does not take into account the considerable number of hours that will be spent by Lead Counsel on further briefing and argument related to this Motion, and on administration and processing of claims and disseminating payment to Class Members, which, given the December 13, 2022 claim submission deadline, will continue well into 2023.

10.    The hourly rates shown are the current rates set by Wolf Popper for each individual. For personnel who are no longer employed by Wolf Popper, the lodestar calculation is based on

---

[3] Including these individuals would increase our lodestar by $97,851, generating a total lodestar of $2,732,382.

the hourly rates of such person in their final year of employment by Wolf Popper.  For individuals who were promoted during the pendency of the litigation (e.g., Mr. Blander, who was promoted from Associate to Partner effective January 1, 2021), the hourly rates of such person are based on their current hourly rates.

11.    My firm's current hourly rates, are comparable to those of other class action attorneys, and are also the same rates my firm charges to, and gets paid by, paying, non-contingency clients.  It is my understanding that Wolf Popper's hourly rates are comparable to the regular rates submitted by comparable firms for lodestar cross-checks in other securities class action fee applications.

12.    Wolf Popper is highly experienced in the area of securities litigation and class actions, and has successfully prosecuted numerous securities litigations and securities fraud class actions on behalf of investors, as described in the attached resume.

13.    Lead Counsel also incurred expenses of $467,492.33 in connection with the prosecution of this Action as reflected in the books and records of my firm, of which Lead Counsel requests reimbursement of $460,000.[4]  These books and records are prepared from expense vouchers, check records, and other source materials and are an accurate record of the expenses incurred.  The firm's unreimbursed expenses are as follows:

| EXPENSES | CHARGE |
|---|---|
| TELEPHONE | 31.67 |
| TRAVEL-TAXI FARES | 245.00 |
| MESSENGER – FEDEX | 204.67 |
| PROCESS SERVER | 275.00 |
| COURT-USDC-NY-S-FILING FEES | 400.00 |
| PR NEWSWIRE | 420.00 |

[4] The Notice advised the Class that Lead Counsel would seek no more than $460,000 in expenses based on records at the time of preparing preliminary approval motion papers.  Accordingly, Lead Counsel foregoes requesting reimbursement for expenses of $7,492.33.

| | |
|---|---|
| PHOTOCOPYING/SCANNING | 1,255.00 |
| E-DISCOVERY VENDOR | 8,705.19 |
| MEDIATION - JAMS, INC. | 9,017.00 |
| ONLINE RESEARCH - PACER/LEXIS/WEST | 17,532.30 |
| EXPERT SERVICES - CROWNINSHIELD FINANCIAL RESEARCH, INC. | 383,259.00 |
| VERITEXT - DEPOSITIONS | 46,147.50 |
| **TOTAL** | **467,492.33** |

14. Pursuant to the case schedule, the parties' expert reports related to damages were exchanged among the parties during the expert discovery stage of the litigation, but were never filed with Court. In the report of Professor Steven Feinstein (Lead Plaintiff's expert), and as discussed in the Plan of Allocation (found on pages 4-6 of the Notice), Dr. Feinstein estimated losses per share for each series of Preferred Stock as follows: Series A: $5.15; Series B: $5.32; Series C: $6.39; Series D: $5.26; Series E: $6.06; Series F: $5.16.

15. Under Dr. Feinstein's damages model, if Plaintiff were able to prove every element of his claim at trial, the Class's alleged maximum estimated aggregate damages would be either $40.9 million, using the traditional "one-day drop" model, or $47.4 million, using a more aggressive two-day drop model, with the second day offset by a bounce-back in the stock price of the Preferred Stock on the third day after the corrective disclosure at the end of the class period. Under the PSLRA, damages per share are capped at the difference between the purchase price of the stock and the average closing price of the stock for up to 90-days after the end of the Class Period. Thus, depending on their purchase price, not every Class Member would be entitled to the full amount of damages.

16.    Accordingly, the $13,000,000 Settlement represents either approximately 32% or 27% of the maximum recoverable damages for the Class, depending on the model used.  This is an outstanding result for the Class given the risk of the litigation.

17.    However, the estimated damages figures reflected above assumes, among other things, that (i) Lead Plaintiff was able to prove every aspect of his claims on liability, (ii) Lead Plaintiff's damages model was accepted by the jury in full, and Defendants' alternative models were entirely rejected by the jury, (iii) after a judgment in favor of Lead Plaintiff and the Class, *all* damaged Class Members filed claims on *all* shares purchased during the Class Period, and (iv) during the claims process, each Class member would have prevailed, in full, against any challenges by Defendants that their losses were overstated (e.g., any challenge claiming that losses should be offset by any sales of Preferred Stock made during the Class Period).  Had Defendants succeeded on any liability point or in convincing the jury or the Court to accept their damages model, then the recovery for the Class could have been significantly less or even zero.

18.    Therefore, it is almost certain that actual recoverable damages after trial and appeals would be substantially less than the maximum recoverable damages estimate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the 12th day of October, 2022.

_____
Carl L. Stine
**Wolf Popper LLP**
845 Third Avenue, 12th Floor
New York, NY 10022